## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

**TAMARA M. LOERTSCHER**

        Plaintiff,

                                      Case No. 14-cv-870

    v.

**J.B. VAN HOLLEN**, in his official capacity as
ATTORNEY GENERAL OF THE
STATE OF WISCONSIN, and
**ELOISE ANDERSON**, in her official capacity as
SECRETARY OF THE DEPARTMENT OF
CHILDREN AND FAMILIES

        Defendants.

---

## COMPLAINT

---

1.      This is a facial challenge to 1997 Wisconsin Act 292, codified at, *inter alia*, Wis. Stat. § 48.133 *et seq.* (hereinafter "The Act," *see* Appendix, Exhibits 1 & 2), brought under 42 U.S.C. § 1983. The Act authorizes Defendants to seize control of pregnant women alleged to have some history or present use of drugs or alcohol. Pursuant to the Act, individuals and institutions within Defendants' oversight and control have inflicted egregious harms on Plaintiff Tamara Loertscher. Ms. Loertscher's ordeal began when she went to a hospital to get medical help. In response, agents within the oversight and control of Defendants initiated adversarial court proceedings against Ms. Loertscher without affording her counsel or any procedural safeguards. They petitioned for, obtained, and sought enforcement of court orders against her, mandating unwanted and inappropriate medical treatment and incarceration. They arrested her and jailed her while she was pregnant, and they then subjected her to solitary confinement, deprivations, and abuse while she was incarcerated. And they issued an administrative

determination—while Ms. Loertscher was still pregnant—that she had abused her less than 14-week fetus. Ms. Loertscher brings this suit to vindicate her constitutional rights, dignity, and personhood. She seeks declaratory and injunctive relief that the Act is unconstitutional on numerous grounds.

## FACTS

2.     Tamara Loertscher is a 30 year-old pregnant woman and a resident of Taylor County, Wisconsin.

3.     During her teens, Ms. Loertscher had radiation treatment that left her without a functioning thyroid. As a result, Ms. Loertscher suffers from severe hypothyroidism, meaning that she is unable to produce vital hormones without medication. In the absence of medication, Ms. Loertscher suffers from severe symptoms of depression and fatigue.

4.     Ms. Loertscher also has a history of severe, clinically diagnosed depression, a condition that is compounded by the symptoms of untreated hypothyroidism.

5.     Ms. Loertscher has been unemployed since February 2014. Previously, she worked as a certified nurse's assistant.

6.     While employed, Ms. Loertscher was not eligible for employee health care insurance.  However, with a salary, Ms. Loertscher was able to pay for her thyroid medication and related blood testing out of pocket.

7.     When Ms. Loertscher became unemployed in February of 2014, she was unable to pay for her thyroid medication and related blood testing. She attempted to apply for BadgerCare, Wisconsin's version of Medicaid, but was told by officials that there was a waiting list of more than a year to process any new applications.  She was thus without any medical treatment for her hypothyroidism beginning in February 2014.

2

8.     Without treatment for her thyroid condition, Ms. Loertscher sank into a severe depression with accompanying fatigue and intrusive thoughts.

9.     Ms. Loertscher also began to experience severe head and neck pain. Simultaneously, she suffered from increasing mental confusion and disorientation.

10.     During this time period, Ms. Loertscher began to use methamphetamine. Ms. Loertscher had no history of drug dependency or addiction. But methamphetamine, a stimulant, helped her to get out of bed in the morning and manage the symptoms of her untreated hypothyroidism and head and neck pain.

11.     Ms. Loertscher smoked marijuana during this time period as well, but very intermittently—fewer than 10 times in the year prior to July of 2014.

12.     Ms. Loertscher used no other illegal drugs at this time, and consumed almost no alcohol. The sum total of her alcohol consumption was one half glass of wine in the month of July, 2014.

13.     Toward the end of July of 2014, Ms. Loertscher began to believe that she might be pregnant. She then stopped all drug use.

14.     Ms. Loertscher has not ingested methamphetamine or used marijuana or alcohol since that time.

15.     On August 1, 2014, Ms. Loertscher went to the Taylor County Department of Human Services ("TCDHS"). She explained to personnel there that she was suffering from a number of serious medical problems, but without the ability to pay for medical treatment. She specified that she had a history of hypothyroidism that was presently untreated, and that she was severely depressed, and that these conditions made her need for medical care urgent.

16.     Personnel at TCDHS advised Ms. Loertscher to present herself to the Eau Claire

Mayo Clinic ("Mayo Clinic") emergency room that day. TCDHS personnel told Ms. Loertscher that they had spoken with the Mayo Clinic and learned that there was a bed available in the behavioral health unit ("BHU").

17.     On August 1, 2014, Ms. Loertscher sought help at the Mayo Clinic emergency room. She hoped to find out for certain if she was pregnant, and if so, to get appropriate medical treatment for her medical issues.

18.     Shortly after Ms. Loertscher's arrival, the Mayo Clinic asked Ms. Loertscher to provide a urine sample and she did so.

19.     Mayo Clinic personnel used the urine sample to perform multiple tests, including a drug screen. The results returned "unconfirmed positive" for methamphetamine, amphetamine, and tetrahydrocannabinol (THC), the active ingredient in marijuana. The test results did not quantify concentrations, and the results were labeled, "FOR MEDICAL USE ONLY, ALL RESULTS UNCONFIRMED."

20.     After obtaining and testing the urine sample, an emergency room physician told Ms. Loertscher that her urine test results had shown that she was indeed pregnant, and that there was an unconfirmed positive test result for drugs methamphetamine, amphetamine, and THC. Ms. Loertscher was at that point very worried, because she did not know how far along she was and what impact her previous drug use could have had on her pregnancy. An ultrasound tech performed an ultrasound on Ms. Loertscher later that day.

21.     The next morning, Dr. Filza Hussain came and spoke with Ms. Loertscher. Dr. Hussain did not provide any details about Ms. Loertscher's ultrasound or her pregnancy. Instead, she said that Ms. Loertscher's urine had tested positive for methamphetamine and marijuana. Upon Dr. Hussain's request, Ms. Loertscher disclosed her limited history of substance use and

asked pointedly for information about her pregnancy. Dr. Hussain refused to discuss her

pregnancy results and spoke only about the need to address Ms. Loertscher's "drug problem."

22.     Sometime later, Ms. Loertscher was finally visited by an obstetrician

gynecologist, Dr. Leonard Ezenagu. Dr. Ezenagu confirmed that the ultrasound showed a healthy

pregnancy of approximately 14 weeks gestation. Ms. Loertscher was so relieved that she began

to cry.

23.     Mayo Clinic personnel also conducted a thyroid stimulating hormone (TSH) test

that day to determine the severity of Ms. Loertscher's hypothyroidism. Ms. Loertscher's TSH

value was over 100, which is commonly understood to reflect severe, untreated hypothyroidism.

Mayo Clinic personnel told Ms. Loertscher that they had "never seen" test results that high. With

TSH test scores of this type, high levels of depression and fatigue, as well as other symptoms, are

to be expected.

24.     Ms. Loertscher then waited unattended in the emergency room for a few hours,

until she was admitted to the Behavioral Health Unit, as she had requested when she came to the

hospital. Ms. Loertscher was voluntarily admitted on the evening of August 1, 2014 to the Mayo

Clinic BHU for inpatient psychiatric and medical care on a short-term basis. She hoped to

receive medical treatment for her conditions and health issues in a clinical environment.

25.     On approximately August 2, 2014 or August 3, 2014, without Ms. Loertscher's

knowledge or consent, personnel from the Mayo Clinic shared Ms. Loertscher's confidential

medical information with agents of TCDHS, which operates in conjunction with law

enforcement under the direction and oversight of the Wisconsin Department of Children and

Families.

26.     Sometime thereafter, a Taylor County commissioner appointed attorney Michael

Shiffler to serve as guardian ad litem (GAL) on behalf of Ms. Loertscher's fetus as completely separate from Ms. Loertscher.

27.     Between August 1, 2014, and August 5, 2014, social workers at the Mayo Clinic made repeated contact with Ms. Loertscher. The two who did so most often were Jared Duellman and Corinna Everson. Ms. Everson informed Ms. Loertscher that TCDHS had been alerted to Ms. Loertscher's positive drug test. Ms. Everson then demanded that Ms. Loertscher sign a waiver permitting release of her medical records to TCDHS. When Ms. Loertscher refused, Ms. Everson warned Ms. Loertscher that if she did not comply, she would be locked up in a mandatory drug treatment program for the duration of her pregnancy, and further that her child when born would be taken from her and put up for adoption. Ms. Everson repeated this ultimatum several times despite Ms. Loertscher's request to hospital personnel that she be assigned a different social worker.

28.     On August 4, 2014, Ms. Loertscher determined that she was not getting the sort of care that she had hoped for, but that instead Mayo Clinic personnel were treating her with hostility because of her positive drug screen and admitted history of limited use. At this time, Ms. Loertscher expressed to hospital personnel a desire to go home, but she was told that she was not free to go because Taylor County had issued a temporary custody order requiring her to stay in the Mayo Clinic.

29.     On August 5, 2014, Ms. Everson led Ms. Loertscher into a conference room within the Mayo Clinic. Ms. Everson then told Ms. Loertscher that there was a judge on the phone for her. Ms. Everson then placed a document in front of Ms. Loertscher. This was a not-yet-filed "Petition for Protection or Care of an Unborn Child" ("the Petition") against Ms. Loertscher. The Petition alleged that if Ms. Loertscher is not held in custody, there is a

substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered by Tamara M. Loertscher's habitual lack of self-control in the use of alcohol beverages, controlled substances or controlled substance analogs. Ms. Loertscher did not understand this document and was extremely upset during this discussion.

30.     When asked if she was present, Ms. Loertscher spoke into the telephone but stated that she refused to answer questions in the absence of an attorney.

31.     A court transcript obtained on Ms. Loertscher's behalf reveals that this telephone call on August 5, 2014, was deemed by the court to be a hearing on the as-yet-unfiled Petition against Ms. Loertscher. On the other end of the phone were Taylor County Court Commissioner Gregory Krug, TCDHS Corporation Counsel Courtney Graff, GAL Michael Shiffler on behalf of Ms. Loertscher's fetus, and TCDHS personnel Julie Clarkson, Darlene Anderson, and Liza Daleiden.  A copy of the transcript of this proceeding is attached hereto as Exhibit A.

32.     After Ms. Loertscher announced into the phone that she would not answer questions without counsel, she left the room into which she had been ushered for the call. Commissioner Krug then found that Ms. Loertscher had waived her appearance at the hearing and that the hearing would continue in her absence. He then proceeded to take testimony.

33.     TCDHS called Dr. Jennifer Bantz, an obstetrician gynecologist at the Mayo Clinic to testify. Dr. Bantz had met with Ms. Loertscher the evening before this call during her stay in the Mayo Clinic BHU, and Dr. Bantz testified via telephone that she had reviewed Ms. Loertscher's medical history. Immediately after that, Dr. Bantz stated that she did not have Ms. Loertscher's authorization to speak on her behalf, and noted that would be breaching Ms. Loertscher's confidentiality.   TCDHS Corporation Counsel Courtney Graff advised her that it would not be an issue in that type of proceeding.  Dr. Bantz then answered questions pertaining

7

to Ms. Loertscher's personal medical information and history.

34.     During the August 5, 2014, hearing, Corporation Counsel Graff asked Dr. Bantz, whether use of methamphetamine and marijuana during pregnancy can seriously endanger the health of a fetus.  Dr. Bantz responded that she is not an expert witness in this respect, but went on to state that marijuana has not been shown to cause any specific anomalies in a fetus.  Dr. Bantz acknowledged that she did not have much experience with respect to methamphetamine use during pregnancy, but reported having done some reading the previous evening regarding methamphetamine use and reported having read an article suggesting that methamphetamine use during pregnancy can result in babies smaller at the gestational stage with a suggestion of cognitive problems later on.  Dr. Bantz then testified to greater confidence in the effects of alcohol consumption during pregnancy, noting that the existence of effects of fetal alcohol syndrome are well known.

35.     Dr. Bantz further testified that her greatest concern for Ms. Loertscher's pregnancy related to Ms. Loertscher's hypothyroidism and her ability to get appropriate prenatal care.

36.     At the close of the August 5, 2014, hearing, Commissioner Krug entered an order of "Temporary Physical Custody" against Ms. Loertscher. The Order required Ms. Loertscher to remain at the Mayo Clinic until she was "cleared," at which time Commissioner Krug ordered that she be transferred to a treatment facility during the remaining term of her pregnancy.  A copy of this order is Attached hereto as Exhibit B.

37.     On August 6, 2014, Mayo Clinic social worker Mr. Duellman informed Ms. Loertscher that arrangements had been made for her "placement" the following morning at the Lutheran Social Services Fahrman Center ("Fahrman Center"), a residential addiction treatment

facility in Eau Claire, Wisconsin. Mr. Duellman told Ms. Loertscher that she had no choice in the matter, that the "placement" was pursuant to court order, and that TCDHS would arrive at the Mayo Clinic the following morning to take her. Mr. Duellman further stated that, per the directive of social worker Julie Clarkson with the TCDHS, Ms. Loertscher was court-ordered to remain at the Mayo Clinic until TCDHS took her to the Fahrman Center.

38.     On the morning of August 7, 2014, Mayo Clinic personnel informed Ms. Loertscher that she would need to submit to a blood test before she could be "discharged" to the Fahrman Center. Mayo Clinic personnel informed Ms. Loertscher that the blood sample was for a tuberculosis (TB) test, to which the Fahrman Center required her to submit before it would admit her.

39.     Ms. Loertscher refused to permit a blood draw and stated her desire to go home immediately.

40.     Mayo Clinic records reflect that, after Ms. Loertscher refused to submit to a blood test, Mr. Duellman called Liza Daleiden, Deputy Director of TCDHS, to report that Ms. Loertscher had refused to submit to a TB screen.

41.     Records further reflect that Mr. Duellman then held a phone conference between medical and social work staff from the Mayo Clinic and personnel from TCDHS. Ms. Loertscher was not informed of nor invited to participate in this call. Mayo Clinic medical staff determined on this call that the Mayo Clinic was no longer an appropriate treatment location for Ms. Loertscher. The parties to the call then discussed alternative placement options for Ms. Loertscher.

42.     After this call, Mr. Duellman and physician Dr. Shamim Anwar of the Mayo Clinic met with Ms. Loertscher. Also present were Ms. Loertscher's mother and her mother's

boyfriend. At this meeting, Ms. Loertscher repeated her desire to be permitted to leave. Mr. Duellman and Dr. Amwar then discussed treatment options for Ms. Loertscher upon her release from the Mayo Clinic. Ms. Loertscher expressed a desire to undergo outpatient treatment with nurse practitioner Laura Sova at the Medford Clinic in Ms. Loertscher's hometown. Ms. Sova had provided treatment related to depression for Ms. Loertscher on a prior occasion. Ms. Loertscher indicated that she would speak with Ms. Sova about seeing a psychiatrist. Ms. Loertscher was given a prescription for anti-depressant medication, as well as prescription medication for her hypothyroid condition, and then she was permitted to leave.

43.     On August 11, 2014, GAL Shiffler filed a Notice of Motion and Motion for Remedial Contempt against Ms. Loertscher in Taylor County Court. The Notice set a hearing date on the contempt motion for August 25, 2014, before Judge Ann N. Knox-Bauer. Attached to the Notice was an affidavit from Liza Daleiden of TCDHS alleging that Ms. Loertscher was in contempt of the Court's August 5, 2014, Temporary Physical Custody Order because she had refused a TB test and otherwise failed to comply with TCDHS directives.  A copy of this motion and supporting affidavit is attached hereto as Exhibit C.

44.     On August 13, 2014, Corporation Counsel Courtney Graff filed a Motion to Take Expectant Mother into Immediate Custody on behalf of TCDHS. The Motion stated as grounds that Ms. Loertscher had not been in contact with TCDHS and had otherwise failed to comply with the earlier Order for her placement at the Fahrman Center.  A copy of this motion and supporting affidavit is attached hereto as Exhibit D.

45.     The same day, August 13, 2014, Judge Knox-Bauer granted the TCDHS Motion and entered an Order to Take Expectant Mother into Immediate Custody. The Order stated that it was contrary to the unborn child's best interests for the expectant mother to have been released

10

from custody and returned home due to the expectant mother's habitual use of controlled substances and her violation of the order for Temporary Physical Custody.  A copy of this order is attached hereto as Exhibit E.

46.     On August 14, 2014, Taylor County police officers delivered a copy of the Notice of Motion and Motion for Remedial Contempt to Ms. Loertscher at the home of her grandparents where Ms. Loertscher was residing.  The officers announced their intention to arrest Ms. Loertscher and to take her into custody. At this time, Ms. Loertscher's grandfather spoke with the police and convinced them not to arrest Ms. Loertscher.  The police then left.

47.     Upon receipt of the Notice of Motion and Motion for Remedial Contempt, Ms. Loertscher, her boyfriend, and her family made efforts to secure legal counsel for her. They were unsuccessful, however, because they could not afford any of the retainer fees that were quoted to them.

48.     On August 25, 2014, Ms. Loertscher appeared in court for the hearing before Judge Knox-Bauer. Present were GAL Shiffler on behalf of Ms. Loertscher's fetus, attorney Courtney Graff as Corporation Counsel for TCDHS, social workers Julie Clarkson and Liza Daleiden of TCDHS, and along with Ms. Loertscher, her boyfriend, her mother, and her mother's boyfriend.

49.     Ms. Loertscher did not have counsel at the August 25, 2014, hearing. She did not understand the purpose of the hearing or what was said. Ms. Loertscher requested that a different judge hear the case, and the hearing was then cut short. Ms. Loertscher did this because she understood that proceedings had already transpired in her absence, and she believed these must have been before the same judge, Judge Knox-Bauer. Ms. Loertscher desired her case to be heard before a judge that would not be prejudiced by having heard anything in her absence, and she

requested a substitute judge for this reason. Judge Knox-Bauer rescheduled the hearing before a different judge for September 4, 2014.  A copy of the transcript of the August 25, 2014, proceeding is attached hereto as Exhibit F.

50.     During the evening of August 25, 2014, after the hearing before Judge Knox-Bauer, police officers arrived at the home of Ms. Loertscher's grandparents again seeking to arrest Ms. Loertscher. Ms. Loertscher's boyfriend asked the officers why they would arrest Ms. Loertscher when she had just come from a hearing and had another scheduled for September 4, 2014. The police told Ms. Loertscher and her boyfriend that they had an "order" from attorney Courtney Graff stating that Ms. Loertscher was to be taken into custody. Ms. Loertscher's boyfriend pleaded that this was illogical and ultimately the police officers left without arresting Ms. Loertscher.

51.     On September 4, 2014, Judge Douglas Fox held a hearing on the contempt motion. Ms. Loertscher was present but not represented by counsel. Present were GAL Shiffler on behalf of Ms. Loertscher's fetus and Courtney Graff as TCDHS Corporation Counsel, as well as Ms. Loertscher, her boyfriend, her mother, and her mother's boyfriend. At the request of Ms. Graff, Judge Fox expressly forbid all non-attorneys other than Ms. Loertscher to speak.  A copy of this proceeding is attached hereto as Exhibit G.

52.     Judge Fox then asked GAL Shiffler what his plea was.  GAL Shiffler admitted all the allegations against Ms. Loertscher on behalf of her fetus.

53.     At the hearing, Judge Fox took testimony from Julie Clarkson of TCDHS. Ms. Clarkson testified that Ms. Loertscher had failed to abide by the August 5, 2014, order by failing to take a TB test, submit to in-patient treatment at the Fahrman Center, and otherwise comply with TCDHS directives.

12

54.     Ms. Loertscher then testified in her own defense. Without the benefit of counsel, Ms. Loertscher attempted to counter the contempt charge against her, as well as the underlying proceedings alleging abuse and neglect of her fetus. Ms. Loertscher said, "I don't feel like I need treatment. Like I feel like I went to the hospital and sought treatment and then they violated my rights and all these people got this information that I feel they shouldn't have gotten. And I feel my whole stay there was made worse[.]"

55.     At the close of the September 4, 2014, hearing, Judge Fox found Ms. Loertscher in contempt of court and ordered her to serve 30 days in jail. He set as conditions for purge of the contempt Ms. Loertscher's submission to a TB blood test so that she could be placed involuntarily in the Fahrman Center for an indeterminate period; Ms. Loertscher's consent and signature for release of all medical information requested by TCDHS; and general compliance with all other TCDHS directives.  A copy of the Remedial Contempt Order and Order for Commitment signed by Judge Fox is attached hereto as Exhibit H.

56.     On September 4, 2014, after the close of the hearing, Ms. Loertscher was led to a conference room in the courthouse where she met alone with Julie Clarkson and Liza Daleiden, social workers for TCDHS. Ms. Loertscher was frustrated and asked them what they wanted from her. One of them responded, "we just want a healthy baby." Ms. Loertscher said that this is what she wanted too, and told them that they were making things so much worse. She asked if "all this would go away" if she had an abortion. Ms. Clarkson and Ms. Daleiden responded, "yes, it would."

57.     On the evening of September 4, 2014, Ms. Loertscher surrendered to the Taylor County Jail. She was held there until September 22, 2014, a total of 18 days.

58.     During the first 48 hours of her incarceration, the Taylor County Jail failed to

provide Ms. Loertscher with her thyroid medication. When the jail finally obtained the medication, jail personnel refused to allow Ms. Loertscher to take the first dose until the next day, (approximately 36 hours after being taken into custody), even though the medication should be taken as soon as possible after a missed dose.

59.    During her incarceration in the Taylor County Jail, Ms. Loertscher began to experience a lot of cramping, pain, and vaginal discharge. She became anxious about the health of her pregnancy and asked to see a physician. At first, jail officials denied her requests, but eventually, a jail guard told her that she could see the "Jail Doctor."

60.    The next morning, Ms. Loertscher was put in a room alone for several hours to wait for the doctor. Around midday, the "Jail Doctor" visited Ms. Loertscher. Ms. Loertscher recounted the reasons for her concern, and the doctor responded, "Well, if your body decides to abort, there's nothing we can do about it." The doctor then said, "we can't give you any special treatment if the jail itself doesn't confirm the pregnancy." Ms. Loertscher did not see any purpose to a pregnancy test and declined to provide a urine sample.

61.    Shortly thereafter, a jail guard named Judy Daney came to Ms. Loertscher's cell and asked, "Are you going to take the piss test yet?" When Ms. Loertscher said no, Ms. Daney grabbed Ms. Loertscher by the arm and tried to pull her out of the cell. Ms. Daney asked another unidentified guard standing nearby, "Where is the Taser?" The other guard responded, "You're not going to do that." Ms. Daney then removed Ms. Loertscher to solitary confinement.

62.    The solitary confinement cell was a room without windows containing only a toilet and a metal bed frame. The room was cold and filthy. The floor, walls, and toilet area had hair and feces on them, and there were fingernails visible beneath the mattress frame. There was no mattress on the bed. Ms. Loertscher was given only a roll of toilet paper. A guard provided a

thin mattress and blanket in the evening and another guard took these away first thing in the morning. Ms. Loertscher remained in this cell for approximately 36 hours.

63.     While in solitary confinement, Ms. Loertscher was periodically visited by jail guards, who repeatedly asked whether Ms. Loertscher was ready to submit to a urine test. Ms. Loertscher responded "no" each time.

64.     After having spent the night in solitary confinement, Ms. Loertscher was brought again to the "Jail Doctor" by a guard named Jennifer. In front of the doctor, Jennifer threatened that if Ms. Loertscher did not comply and provide a urine sample, she would be jailed for the rest of her pregnancy and would have her baby in jail. Ms. Loertscher nonetheless declined to provide a urine sample, and the doctor said "okay, nobody will bother you about it anymore." After several more hours, Ms. Loertscher was returned to her original cell by a different guard.

65.     At some point during her incarceration, the same jail guard named Jennifer lectured Ms. Loertscher regarding the alleged effects of methamphetamine use during pregnancy. Jennifer asked Ms. Loertscher "do you even care about your baby?" and said that "your refusal to take the [pregnancy] test just proves that you're guilty."

66.     During her incarceration, Ms. Loertscher requested to be transported to two scheduled prenatal care appointments. Taylor County Jail personnel refused each time. At one point, jail personnel told her that she "shouldn't have gotten [herself] in this position [if she wanted to keep her appointments]."

67.     Ms. Loertscher had no prenatal care of any kind during the length of her incarceration.

68.     Sometime during Ms. Loertscher's incarceration, counsel was finally appointed to represent Ms. Loertscher. Attorney Justin Wolff of the Office of the State Public Defender was

appointed to represent Ms. Loertscher solely in the contempt proceeding, and not for defense against the underlying Petition. A copy of the Order Appointing Counsel is attached hereto as Exhibit I.

69.     After being appointed, Mr. Wolff negotiated a Consent Decree with GAL Shiffler and the TCDHS that would provide for Ms. Loertscher's release from jail. Ms. Loertscher signed the Consent Decree with the understanding that she needed to agree to it in order to be released from jail.

70.     On September 22, 2014, Judge Fox held a hearing. Ms. Loertscher, her boyfriend, her court-appointed counsel Justin Wolff, GAL Michael Shiffler, TCDHS social worker Liza Daleiden, and TCDHS Corporation Counsel Courtney Graff were present at the hearing. Judge Fox adopted the Consent Decree and made compliance with its terms sufficient to purge his earlier finding of contempt. Ms. Loertscher was told that her release from jail was conditional upon her signing the Decree, so she did so. A copy of the transcript of this proceeding is attached hereto as Exhibit J.

71.     Ms. Loertscher was then released from the Taylor County Jail on September 22, 2014.  A copy of the Order for Purge Modification and Release from Taylor County Jail is attached hereto as Exhibit K.

72.     By its terms, the Consent Decree permitted Ms. Loertscher to go home so long as she agreed to: Alcohol and Other Drug Abuse (AODA) Assessment; compliance with any recommended treatment resulting from the AODA Assessment; submission to drug testing on at least a weekly basis at her own expense; signing any and all releases necessary for transfer of drug test results to TCDHS; and signing any other releases as requested by TCDHS. By its terms, the Consent Decree declared that a GAL would remain appointed for Ms. Loertscher's fetus for

the duration of the pregnancy.  A Copy of the Consent Decree is attached hereto as Exhibit L.

73.     By a notice dated September 29, 2014, Ms. Loertscher was informed that TCDHS issued an administrative finding that she had committed child maltreatment. This finding is separate from the court case against Ms. Loertscher that was initiated by the original Petition filed August 5, 2014, and is independent of the Consent Decree. TCDHS apparently reached an administrative determination of child maltreatment of its own distinct volition. The notice stated that the finding was appealable within 30 days.  A copy of the notice is attached hereto as Exhibit M.

74.     Ms. Loertscher appealed this TCDHS finding on October 29, 2014; on November 14, 2014, she received notice dated November 10, 2014, that TCDHS Agency Director Amber Fallos had conducted a "desk review" of her appeal and affirmed the finding that Ms. Loertscher had committed child maltreatment of her fetus. The basis for this decision was listed as the reports of treating physicians at the Mayo Clinic to the effect that Ms. Loertscher had reported some period of use of methamphetamine and marijuana. The administrative finding was based exclusively on information recorded in Ms. Loertscher's medical records. No qualified expert testimony of any kind was provided in support of the maltreatment finding. A copy of this notice is attached hereto as Exhibit N.

75.     Ms. Loertscher has provided notice to TCDHS that she intends to challenge the "child maltreatment" finding in an administrative proceeding.  This challenge is on factual and scientific grounds, and is separate and apart from this civil rights action.

76.     Ms. Loertscher willingly sought medical help for hypothyroidism, depression, and head and neck pain upon learning that she might be pregnant. Almost from the first, her intention to seek health care was turned against her for law enforcement purposes. As a result, she was

deprived of liberty and numerous, well-established constitutional rights. Ms. Loertscher has

suffered serious emotional distress as a result of the actions of Defendant's agents. Because

TCDHS is authorized by court order to supervise and control Ms. Loertscher's medical decision-

making, that loss of liberty and accompanying distress is ongoing. Ms. Loertscher brings this suit

to bar Defendants from further engagement in these unconstitutional practices against her and

against all women in Wisconsin.

## PARTIES

77.     Plaintiff Tamara M. Loertscher is a thirty year-old pregnant woman living in

Medford, Wisconsin.

78.     Defendant J.B. Van Hollen is the Attorney General of the State of Wisconsin. He

is responsible for execution and enforcement of the laws of the State, and is a state actor acting

under color of law at all relevant times for purposes of this action.

79.     Defendant Eloise Anderson is the Secretary of the Department of Children and

Families for the State of Wisconsin. She is responsible for administration and enforcement of the

state's family laws, including Chapter 48 of the Children's Code. She is responsible for

management and direction of the county departments of human services, including TCDHS, and

is a state actor acting under color of law at all relevant times for purposes of this action.

## JURISDICTION AND VENUE

80.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4) for

causes of action arising under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the

Constitution of the United States of America and 42 U.S.C. § 1983 and § 1988 and 28 U.S.C. §

2201 and § 2202.

81.     Venue is proper in the Western District of Wisconsin under 28 U.S.C. § 1391(b)

because all events giving rise to this Complaint occurred within this District, and Defendants, who are sued in their official capacities, carry out their official duties at offices located within this District.

## CAUSES OF ACTION

### Claim 1: Violation of Substantive Due Process

82.     By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's substantive due process rights to liberty and privacy as protected by the Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution.

### Claim 2: Violation of Fourth Amendment

83.     By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments to the United States Constitution.

### Claim 3: Violation of First Amendment

84.     By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's right to be free from compelled speech under the First and Fourteenth Amendments to the United States Constitution.

### Claim 4: Violation of Equal Protection

85.     By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's right to equal protection of the law under the Fourteenth Amendment to the United States Constitution.

### Claim 5: Violation of Procedural Due Process

86.     By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's right to due process under the Fifth and Fourteenth Amendment to the

United States Constitution.

## REQUEST FOR RELIEF

87.     Plaintiff Ms. Loertscher respectfully requests the following from this Court:

(a)     Assumption of jurisdiction over this suit;

(b)     Declaratory relief to the effect that 1997 Wisconsin Act 292, amending

multiple sections of, *inter alia*,  Chapter 48, Wis. Stat. § 48.01 *et seq*., is

unconstitutional on its face;

(c)     Issuance of a preliminary injunction against enforcement of 1997

Wisconsin Act 292;

(d)     Issuance of a permanent injunction against enforcement of 1997

Wisconsin Act 292;

(e)     Award to Plaintiff Ms. Loertscher's counsel of reasonable attorneys' fees

and costs as provided by 42 U.S.C. § 1988;

(f)     Grant of such further relief as this Court deems just and proper.

Dated this 15th day of December, 2014.            Respectfully submitted,

**PERKINS COIE, LLP**

By:     s/ *Freya K. Bowen*
        David J. Harth
        dharth@perkinscoie.com
        Freya K. Bowen
        fbowen@perkinscoie.com
        Joshua L. Kaul
        jkaul@perkinscoie.com
        1 East Main Street, Suite 201
        Madison, WI  53703
        Telephone: (608) 663-7460
        Facsimile: (608) 663-7499

**NATIONAL ADVOCATES FOR PREGNANT WOMEN**
Lynn M. Paltrow *Admission pending
  NY Bar No.: 1920156
lmp@advocatesforpregnantwomen.org
Sara Ainsworth *Admission pending
  WA Bar No.: 26656
sla@advocatesforpregnantwomen.org
15 W. 36th Street, Suite 901
New York, NY 10018
Telephone: (212) 555.9252
Facsimile: (212) 225-9253

**CARR CENTER FOR REPRODUCTIVE JUSTICE**
Sarah E. Burns *Admission pending
  DC Bar No.: 2212413
sarah.burns@nyu.edu
Washington Square Legal Services, Inc.
NYU School of Law
245 Sullivan Street, 5th Floor
New York, New York 10012

*Attorneys for the Plaintiff,
Tamara Loertscher*