# Exhibit A

1               STATE OF WISCONSIN

2    CIRCUIT COURT                        TAYLOR COUNTY

3    --------------------------------------------------------

4    In the Interest of:

5    UNBORN CHILD

6    and                          Case Number 14-JC-09

7    TAMARA LOERTSCHER.

8    --------------------------------------------------------

9                      Motion Hearing

10   --------------------------------------------------------

11            HONORABLE GREGORY G. KRUG,

12         COURT COMMISSIONER, PRESIDING

13            Tuesday, August 5, 2014

14      Taylor County Courthouse, Medford, Wisconsin

15   --------------------------------------------------------

16                      APPEARANCES

17            COURTNEY L. GRAFF, Taylor County

18   Corporation Counsel, appearing on behalf of Taylor

19   County Human Services.

20            MICHAEL D. SHIFFLER, Attorney at Law,

21   appearing as Guardian ad Litem on behalf of the

22   unborn child.

23

24

25            Reported by Mary B. Burzynski, RPR

```
 1                     I N D E X:

 2    In the Interest of Unborn Child and Tamara Loertscher

 3                    EXAMINATION INDEX:

 4

 5                                              Page

 6    COUNTY'S WITNESSES:

 7    Jennifer S. Bantz, M.D.:

 8    Direct Examination by Ms. Graff:           11

 9    Examination by the Court:                  20

10    Redirect Examination by Ms. Graff:         21

11    ARGUMENT BY COUNSEL:

12    By Ms. Graff:                              23

13    By Mr. Shiffler:                           25

14

15    RULING OF THE COURT:                       26

16

17                  E X H I B I T   I N D E X:

18    No.                                       Page

19    1    Dr. Bantz's Report                    22

20

21

22

23

24

25
```

1               P R O C E E D I N G S:

2               (The following transcript was

3      transcribed from the audio recording of the hearing.)

4               THE COURT:  This is Greg Krug.  I'm

5      the court commissioner.  We're in Taylor County

6      Circuit Court at this time.

7               And is Tamara Loertscher available?

8               UNIDENTIFIED SPEAKER:  She's here in

9      the room.

10              THE COURT:  And can she just say

11     something so we know she can hear us and we can hear

12     her?

13              UNIDENTIFIED SPEAKER:  Can you say

14     something to the judge?

15              THE COURT:  Tammy, can you hear me?

16              MS. LOERTSCHER:  Yes.

17              THE COURT:  Okay.

18              This is the time and date set for a

19     temporary physical custody hearing, and in court

20     today is Courtney Graff, the attorney for Taylor

21     County and the human services department; Julie

22     Clarkson, the social worker from Taylor County Human

23     Services.  We have Darlene Anderson in the gallery

24     from human services and Liza Daleiden from human

25     services also present.

1                     The guardian ad litem for the unborn

2    child is Michael Shiffler, and I'm Greg Krug.  I'm

3    the court commissioner for today's proceedings.

4                     And, Ms. Graff, can you tell me the --

5    kind of where we are at right now?

6                     MS. GRAFF:  Certainly.

7                     Your Honor, under Wisconsin Statute

8    48 -- under Wisconsin Statute 48.133, we are

9    requesting temporary physical custody of -- of the

10   unborn child whose mother is Tamara Loertscher.

11   We -- nobody in this room since our request for a TPC

12   was filed has been able to speak with Ms. Loertscher

13   so we do not know if she's contesting this TPC

14   request at this point.

15                     THE COURT:  Okay.  So have you filed a

16   petition in this case?

17                     MS. GRAFF:  I have not filed it, Your

18   Honor.  I have copies, but copies have been

19   distributed to all parties.  I have one here in the

20   courtroom.  I did fax one to Cori.

21                     Cori, did you receive it?

22                     UNIDENTIFIED SPEAKER:  I did.  It's

23   sitting in front of Tamara right now.

24                     MS. GRAFF:  Okay.  Thank you.

25                     THE COURT:  All right.  So --

1    Ms. Graff, what are you -- what's your position on

2    the temporary physical custody, or what's the

3    county's position on where Ms. Loertscher is going to

4    be placed until the child is born?

5                    MS. GRAFF:  Due to the nature of the

6    allegations, Your Honor, we would ask that pursuant

7    to the doctor's recommendations that Ms. Loertscher

8    continue at Luther Hospital until deemed medically

9    cleared to be discharged.  Her treating physician at

10   this time has suggested that would probably be this

11   coming Thursday.

12                    At that time the county's requesting

13   that she be transferred and placed at a licensed

14   treatment facility that.  That is consistent with the

15   doctor's recommendations and the nature of the

16   allegations attached to the petition.

17                    Also for the record, I have attached

18   to the petition doctor's reports and lab results

19   which support the allegations in the petition.

20                    THE COURT:  Okay.  Before we get to

21   the -- the evidence part, Ms. Loertscher, you -- you

22   can hear me, correct?

23                    MS. LOERTSCHER:  Yes.

24                    THE COURT:  Okay.  You understand that

25   this temporary physical custody hearing is -- I have

1    to make a ruling based upon the probable cause

2    portion of this request and then to determine whether

3    you should remain in temporary physical custody until

4    cleared by the doctor or until the child is born, or

5    you -- is that right?

6              MS. LOERTSCHER:  I won't answer any

7    more questions until my lawyer Rick Cveykus is in on

8    this.

9              THE COURT:  Have you retained an

10   attorney for this proceeding?

11             MS. LOERTSCHER:  Yes.  That is him.

12             THE COURT:  And is he -- is he going

13   to be present with you at the hospital, or how are we

14   supposed to get him involved with the hearing?

15             MS. LOERTSCHER:  Well, I'm not sure

16   since I can't use the phone or anything and I have

17   somebody else doing this for me.  So --

18             THE COURT:  Okay.

19             MS. LOERTSCHER:  -- I will not answer

20   any more questions until he is present.

21             THE COURT:  Okay.  The -- the county

22   is under an obligation to hold this hearing within, I

23   want to say 48 hours.  Is that correct?

24             MS. GRAFF:  That's correct, Your

25   Honor.

Page 6

1            THE COURT:  Forty-eight hours of you

2    being taken into custody.  You will have a chance,

3    always, to have any decision from today reviewed.

4    There will be a petition filed which would also give

5    you a chance for another court hearing in there in

6    which time any placement or custody can be reviewed.

7            But the county's obligated to proceed

8    with this hearing.  So I guess -- I was going to ask

9    if we had -- if you were contesting it, but it

10   appears as if you are.

11           But I'm going to ask the county to

12   proceed with the hearing unless you have some way I

13   can get a hold of your attorney at this time to get

14   him involved with the hearing.

15           UNIDENTIFIED SPEAKER:  Do you know a

16   phone number, Tammy?

17           MS. LOERTSCHER:  (Ms. Loertscher made

18   no verbal response.)

19           MS. GRAFF:  Is that no, Cori?

20           UNIDENTIFIED SPEAKER:  She just wrote

21   it down here on a piece of paper.  I don't know if

22   you're able to call him.  It's 560-1793.

23           THE COURT:  I think what we'll do,

24   Counselor, is take a little break to see if this

25   attorney is --

1                    What's his name?

2                    MS. LOERTSCHER:  Rick Cveykus.

3                    THE COURT:  Rick Cveykus?

4                    MS. LOERTSCHER:  Yep.

5                    THE COURT:  We'll adjourn the hearing

6    a little bit, and we'll call Attorney Rick Cveykus to

7    see if he's indeed representing you and if he's

8    available for the hearing.

9                    MS. LOERTSCHER:  Okay.

10                   THE COURT:  Okay.  Thank you.

11                   MS. LOERTSCHER:  Okay.

12                   (A brief recess was taken.)

13                   DEPUTY KAUFFMAN:  Cori?

14                   UNIDENTIFIED SPEAKER:  Yeah.  I

15   just -- I just followed Tammy down the hallway to her

16   room.  She got up and left and went back to her room.

17   So I'm going to leave the conference room.  She

18   doesn't want to be a part of this.  Okay?

19                   MS. GRAFF:  Is that considered waiving

20   her appearance?

21                   DEPUTY KAUFFMAN:  Just hold on, Cori.

22                   MS. GRAFF:  I'm looking at 48.213,

23   proceedings concerning children in need of protection

24   or services and unborn children in need of protection

25   or services, and -- oh, their child expectant

                                          Page 8

1   mothers.  That's the section.

2                   And it looks like -- hang on.  Parent,

3   guardian, custodian.

4                   All right.  I guess I would ask this

5   court find that she's been given the opportunity to

6   meaningfully participate.  She did confirm that she

7   could hear us before, and she's voluntarily choosing

8   not to participate.  So she is being afforded that

9   opportunity, Judge.

10                  THE COURT:  Okay.  I'm going to find

11  that Ms. Loertscher was an active participant in this

12  hearing; had indicated to the court that she didn't

13  want to talk to the court anymore until her attorney

14  was onboard.  She gave us the name of Rick Cveykus

15  who she believed was her attorney.

16                  We've taken steps to contact

17  Mr. Cveykus personally.  He indicated that he was

18  first informed that this was a type of criminal

19  proceeding, that he doesn't normally do Chapter 48,

20  that he would have his partner who handles juvenile

21  cases to take over the course at a later date and ask

22  for a rehearing if appropriate.

23                  In trying to get back to

24  Ms. Loertscher, she had voluntarily left the hearing

25  room and was no longer available.  I take that as a

1    voluntary waiver on her part to participate in these

2    proceedings.  I did advise her previously that she

3    did have the right to a rehearing if she retained

4    counsel anyway -- anywhere along the way.

5              So I'm going to ask that counsel

6    proceed with this hearing.  The -- and we will take

7    that as a continuing objection on the part of

8    Ms. Loertscher's position as to continuing in

9    physical custody.

10             So if you want to call your doctor for

11   testimony.

12             MS. GRAFF:  Yes, please.

13             I guess, we'll -- we'll -- she still

14   has the right to come back to the hearing at any

15   time.

16             Cori, are you still there?

17             UNIDENTIFIED SPEAKER:  I am, and I'll

18   stay here on speaker.  She just told me that I needed

19   to leave because she felt like I was harassing her by

20   remaining in the room with the speakerphone on.

21             THE COURT:  Certainly we -- we

22   encourage her to come back and participate and listen

23   to what's going on, but we're going to continue with

24   the hearing.  We have a time limit to hear it.

25             UNIDENTIFIED SPEAKER:  Okay.

                                              Page 10

```
 1                      THE COURT:  Okay.

 2                      UNIDENTIFIED SPEAKER:  Okay.

 3                      (Dr. Bantz was reached by telephone

 4      for testimony.)

 5                      MS. GRAFF:  Hi.  This is Attorney

 6      Courtney Graff calling from the Taylor County Circuit

 7      Court.

 8                      THE WITNESS:  Yes.

 9                      MS. GRAFF:  I apologize that we're a

10      little bit late, but would you be able to provide

11      testimony today in regard to Tamara Loertscher?

12                      THE WITNESS:  I can, yeah.

13                      THE COURT:  Okay.  This is Greg Krug,

14      I'm the court commissioner.

15                      Dr. Bantz, ask you to raise your right

16      hand and we'll take some testimony.

17                      JENNIFER S. BANTZ, M.D., after being

18      first duly sworn, testified as follows:

19                      THE WITNESS:  Yes.

20                      THE COURT:  Thank you.

21                      Ms. Graff, you can go ahead.

22                      DIRECT EXAMINATION:

23      BY MS. GRAFF:

24          Q.  Dr. Bantz, is that how you say your last

25      name?
```

1   A. Yes. That's correct. Bantz.

2   Q. And you can hear me okay?

3   A. I can, yes. I -- yes, I can hear you. I'm

4 on a cellphone, but I'm in a quiet room, but I can

5 hear you okay.

6   Q. That's okay. I can repeat. If you need me

7 to speak louder or anything, let me know.

8   A. Uh-huh.

9   Q. Can you recite your name for the court?

10   A. It's Jennifer Bantz.

11   Q. Can you spell your last name, please?

12   A. B, as in boy, a-n-t-z.

13   Q. Okay. And are you a doctor at Luther

14 Hospital at Mayo Clinic in Eau Claire?

15   A. Yes. I -- I am an M.D. I'm an OB/GYN at

16 Mayo Clinic Health Systems in Eau Claire. Yes.

17 That's correct.

18   Q. Did you examine Tamara Loertscher?

19   A. I did last evening, uh-huh.

20   Q. And did you prepare a report or notes from

21 that examination?

22   A. I did dictate a consultation note, yes.

23   Q. And -- okay. And have you reviewed her

24 medical records on file with the hospital?

25   A. There were a lot of records, and I had a

1  busy evening.  So I reviewed the majority of them.  I

2  can't say I reviewed them all.

3       Q.  Okay.

4       A.  Yes.

5       Q.  Can you summarize your consultation notes

6  regarding your -- your meeting with her yesterday?

7       A.  Yes, I can.  And before I get started, I

8  just want to verify that I don't have her

9  authorization to speak on her behalf.  So I would be

10  breaching confidentiality.  Is that -- is that

11  correct?

12       Q.  That is not an issue in this type of

13  proceeding.

14       A.  Okay.

15       Q.  But thank you for bringing that up.

16       A.  Okay.  I was asked to see Tamara last

17  evening regarding polysubstance abuse and pregnancy.

18  It's my understanding she was admitted to the

19  hospital on August 1st, and she willingly was asking

20  for help in admission is my understanding.

21            My partner, Dr. Ezenagu, was on call

22  on Friday.  He was consulted regarding this patient.

23  He had recommended an ultrasound to assess the

24  (inaudible) and viability, and that was performed.

25  And I did review that ultrasound, and that was

1   reassuring, and I did review that result with the

2   patient.

3               Now, I did speak with Tamara regarding

4   just obtaining some history, and generally she said

5   she had a history of depression is my understanding.

6   It's been ongoing for a number of years.  She had

7   been on medication before in the past but recently

8   had not and also had the history of hypothyroidism

9   and had been not taking any medications for this, and

10  it had been for a while.  And she -- she couldn't

11  give me a timeline.  She had been reporting taking

12  some over-the-counter thyroid supplements recently.

13              And in talking with Tamara, she's

14  unsure when she conceived, and she checked some

15  pregnancy tests a while ago, and she couldn't give me

16  a timeline.  And when she realized indeed she was

17  pregnant, she realized she should cut back on her

18  methamphetamine use.

19              And I asked her how she was using the

20  methamphetamine, and she said she was smoking it, and

21  she said -- she reported she was taking it daily.  I

22  don't know when she particularly cut back on it, but

23  she did continue to use knowing she was pregnant.

24              She reported to me she was using two

25  to three times a week just to, quote, help her get

Page 14

1   out of bed, end quote.  She also reported marijuana

2   use throughout the beginning -- throughout the

3   pregnancy and also reported some use of alcohol but

4   just a few times.  She could not give me a -- a

5   specific amount.  And she did not report any other

6   drug use during the pregnancy.

7        Q.  And -- and, Doctor --

8        A.  And --

9        Q.  Sorry.  Go ahead.  While we're talking about

10  the reported drug use, that was all self-reported,

11  did any of the labs that you ordered or anything in

12  the medical records support her drug use while she

13  was pregnant?

14       A.  Yes.  She -- I'm pulling up the -- the -- I

15  have the dictations here -- sorry -- in front of me.

16            There was -- let's see here.  She had

17  a urine test, urine drug screen, on August 1st that

18  was positive for THC, methamphetamine, and

19  amphetamine use.  So that did verify her story.

20       Q.  Can you elaborate for the court or -- excuse

21  me.  Scratch that.

22            Can you recite for the court -- I

23  started reading.  Hang on.

24            Can you state whether use of those

25  drugs during pregnancy can seriously endanger the

1    health of the unborn child?

2         A.   Now, granted, I'm not an expert witness in

3    this respect, but I'm, again, an OB/GYN.  I can speak

4    specific -- on THC use, marijuana, that has not been

5    shown to cause any specific anomalies that we are

6    aware of.  There are -- you know, people are -- are

7    studying this.  Potentially there could be cognitive

8    deficits from marijuana use in pregnancy.  The more

9    concerning agent is the methamphetamine use.  In a --

10   that's the more concerning medication.

11                 I did do some reading last evening

12   before I spoke with the patient because I don't see

13   that many patients on methamphetamine; however, it is

14   becoming more common.  Those patients, the mothers,

15   tend to be underweight, and those babies tend to be

16   smaller at the gestational age.  We do know that for

17   a fact.

18                 They can be smaller, the mothers don't

19   put on as much weight, and there is a suggestion of

20   cognitive problems later on for those children, such

21   as learning disabilities, and that has been suggested

22   in the literature as opposed to direct publications

23   with organ development, organ genesis.  That has been

24   found to be the case.

25                 However, these women who are on

1   methamphetamines are not, obviously, taking good care

2   of themselves, typically not receiving prenatal care,

3   and that would create another risk for complications

4   in pregnancy, such as preterm delivery which we know

5   is a complication with lack of prenatal care and that

6   can have, obviously, complications from the

7   prematurity.

8            And with regard to the alcohol use,

9   there's fetal alcohol syndrome which has been

10  well-documented, and we can't say how much alcohol

11  would potentially lead to, you know, alcohol

12  syndrome.  I'm not sure of actually the amount she

13  had -- she had actually taken during the pregnancy,

14  and I don't think she's aware either honestly.

15       Q.  Do you believe that, Doctor, if use of these

16  drugs continues that there is a substantial

17  likelihood that the unborn child's health would be

18  affected?

19       A.  I believe that if she continued with the

20  methamphetamine use that potentially she's putting an

21  increased risk for more complications in that child,

22  potentially cognitive, that sometimes cannot be

23  determined until later on in life in those children.

24            But the continued use would, I think,

25  directly affect her ability to perhaps make good

                                            Page 17

1  decisions, such as proper prenatal care and -- and

2  adequate care for herself, such as nutrition which

3  could affect the growth of the baby.

4      Q.  Okay.  In -- in your dictation -- in your

5  consultation, excuse me, I believe you recited some

6  concerns about her being released from custody.  Can

7  you recite those for the court?

8      A.  Let me see.

9      Q.  I believe it was something about if she was

10  returned home to live with her boyfriend.

11      A.  Boyfriend, I think it was number 4 of my

12  impressions and plan.  It says, "I did discuss

13  support for her when she was discharged.  She wants

14  to go back to her boyfriend which I am concerned

15  because I believe" -- there was -- there was a typo

16  there -- "he was providing her the methamphetamine,

17  but she feels that he is supportive and he is going

18  to help her through it."

19              And she had cited an example.  He

20  helped her get through -- get her off the alcohol,

21  which she reports, but in reality it appears that

22  he's been providing her the methamphetamine, but she

23  wouldn't directly relate that to me that that's where

24  she was receiving the drug, and this was a concern I

25  had dictated as such.

1          Q.  And do you believe from what Tamara had told

2     you and reported to you, do you believe that she

3     would avail herself of community services if

4     released?

5          A.  Could you repeat that?

6          Q.  Yes.

7          A.  I'm sorry.

8          Q.  If she were released, do you believe she

9     would avail herself of community services -- to

10    community services?

11         A.  That she would get help?

12         Q.  Yes.

13         A.  As an outpatient?  I'm certain that she

14    might not.  I can't speak for her support system, but

15    it sounds poor.  I think her decision-making is poor

16    and her insight's poor.  So that concerns me.  And

17    with that concern, that concerns the outcome of the

18    pregnancy and -- and the pregnancy.  So that does

19    concern me.

20              I think she has good intentions, but

21    that might be all she has, you know.  She -- she's

22    29.  She's not 17.  She's had quite a lot of years to

23    try and get things together, and she -- she concerns

24    me.  And I did bring up with her, and I didn't

25    dictate as such, but an inpatient therapy, and she

Page 19

1   seemed to think that that wasn't necessary which I

2   don't agree with that.

3        Q.  Okay.  Is it your recommendation, Doctor,

4   that she go to a treatment facility.  Is that

5   correct?

6        A.  Yes.

7        Q.  Okay.  And besides that recommendation to

8   her, do you know of any other services that were

9   offered to her?

10       A.  I do not, no.

11                  MS. GRAFF:  Okay.  I have no further

12  questions at this time.

13                  Stay on the line.  We have another

14  attorney present.

15                  THE WITNESS:  Yep.

16                  MR. SHIFFLER:  I don't have any

17  questions, Your Honor.

18                  THE COURT:  Okay.  I have one,

19  Dr. Bantz.

20                  The -- is the methamphetamine use

21  addictive to the child, the unborn child, so that

22  when the child is born that it would -- start life

23  with an addiction to methamphetamine?

24                  THE WITNESS:  I do not know for sure,

25  and I have to read further for that, and I do not

1   know for sure for that.  I can speak for other

2   medications, methadone, but I can't speak for

3   methamphetamine, but I do not know the answer to

4   that.  Huh-uh.

5                    THE COURT:  Okay.  All right.  Based

6   on my question, do you have any other questions,

7   Ms. Graff?

8                    DIRECT EXAMINATION:

9   BY MS. GRAFF:

10       Q.  I'm not quite sure.  Did we ask you how far

11   along she was in her pregnancy?

12       A.  No.  She could -- to date, she's fourteen

13   weeks and five days.

14       Q.  All right.

15       A.  She's in her second trimester.  She also has

16   hypothyroidism, significant, and she has not been

17   taking her medications.  And her TSH is off the

18   charts.  It's greater than a hundred, and it's

19   amazing she made it this far without a miscarriage,

20   and I told her as such.

21                    Another concern of mine is the

22   hypothyroidism.  It's not controlled, and that has a

23   whole 'nother level of risk.

24                    MS. GRAFF:  Thank you, Doctor.  I

25   thank you for offering that.

```
 1                        Nothing further.
 2                   THE COURT:  Okay.  I think we have
 3     nothing further, and we'll let the doctor go back
 4     about her business.
 5                   THE WITNESS:  Okay.  Thank you.
 6                   MS. GRAFF:  Thank you.  Bye.
 7                   THE WITNESS:  Bye.
 8                   (The witness was excused.)
 9                   THE COURT:  Ms. Graff, are you
10     offering her report into evidence?
11                   MS. GRAFF:  That's attached to the
12     petition.
13                   THE COURT:  Okay.
14                   MS. GRAFF:  I guess I would offer that
15     into evidence at this point.
16                   THE COURT:  Do you want to have it
17     marked?
18                   MS. GRAFF:  Sure.
19                   THE COURT:  Okay.
20                   (Exhibit Number 1 was marked for
21     identification.)
22                   THE COURT:  Any other witnesses?
23                   MS. GRAFF:  I don't have any other
24     witnesses.
25                   THE COURT:  Mr. Shiffler, any
```

1   witnesses?

2                         MR. SHIFFLER:  I have no witnesses,

3   Your Honor.

4                         THE COURT:  Okay.  Ms. Graff, do you

5   want to make some argument here?

6                         MS. GRAFF:  Sure.

7                         I'm asking that this court find that

8   we have jurisdiction over the adult expectant mother

9   and unborn child pursuant to Wisconsin Statute

10  Chapter 48.133.

11                        That statute requires that probable

12  cause be found that there is a substantial risk that

13  the physical health of the unborn child will be

14  seriously affected or endangered by the adult

15  expectant mother's habitual lack of self-control in

16  the use of alcoholic beverages, controlled

17  substances, or controlled substance analogs exhibited

18  to a severe degree, and also probable cause to

19  believe that the adult expectant mother's refusing or

20  has refused to accept any services offered to her and

21  has not made a good-faith effort to participate in

22  any alcohol or drug abuse services offered to her.

23                        We heard on testimony today that

24  Ms. Loertscher is indeed pregnant.  She did test

25  positive for, you know, polysubstance abuse.  We

1    heard three different test results, methamphetamine,

2    amphetamine, and THC.  We also heard on testimony

3    from the doctor that Tamara's self-reported that she

4    used alcohol while pregnant.

5                While our -- our doctor only could

6    elaborate on the known effects of fetal alcohol

7    syndrome and the possible effects of THC and

8    methamphetamine, I would ask that since we have the

9    lab results that this court find probable cause does

10   exist that if the mother is not held in custody and

11   essentially forced treatment that her unborn child is

12   going to suffer substantial harm.

13               I believe that this is exhibited to a

14   severe degree according to the doctor's reports

15   attached to the petition and also that she would

16   refuse services.  She has denied all along --

17   actually, I guess I did not offer testimony that we

18   have offered services and she's refused.

19               If we need to go back and do that, if

20   the court's not satisfied, the doctor did report that

21   she made the recommendation that inpatient would be

22   consistent with her diagnosis of her condition and

23   she refused that.  So I would ask that the court find

24   that that was refusal of services.

25               And right now the doctor is

1    recommending that she remain in Luther Hospital until

2    Thursday or until she is medically cleared, and at

3    that time we ask that she be transferred to a

4    treatment facility.

5            That would be the court-ordered

6    service on behalf the unborn child that we're

7    seeking.

8            THE COURT:  Attorney Shiffler, as

9    guardian ad litem.

10           MR. SHIFFLER:  Your Honor, I think --

11           THE COURT:  Why don't you step up.  I

12   think we still have them on.

13           MS. GRAFF:  Yes.

14           MR. SHIFFLER:  I believe due to the

15   doctor's testimony about the test results for -- for

16   methamphetamines and THC and amphetamines that --

17   that there is -- there's -- that there's a likelihood

18   that the mother can't control -- can't control her

19   use of these controlled substances, and it's in the

20   child's best interest that she stay, you know, in the

21   hospital until she's medically -- medically cleared

22   and then go to a treatment facility.

23           Additionally, the doctor testified

24   about her thyroid condition, how that's a risk and

25   that's -- you know, that she was amazed she hadn't

1   miscarriaged -- had a miscarriage yet.  And so I

2   think for this child to have a chance of literally

3   being born, it's important that the mom be placed

4   in -- in a -- in a treatment facility.

5                    THE COURT:  Thank you.

6                    Today is the probable cause hearing,

7   and I will find that probable cause exists in this

8   case.  Certainly the -- the testimony from Dr. Bantz

9   concerning the self-reported drug use from

10  Ms. Loertscher, I think she indicated she was taking

11  methamphetamine on a daily basis, smoking marijuana

12  on a regular basis, using alcohol.

13                   Now the one thing we didn't have is

14  a -- is -- any testimony as to exactly how much of

15  any of those drugs she was using; however, the

16  question is whether they exist to a severe degree.

17  And coupling the facts that she reported the drug use

18  and it showed up in the urine test is the fact that

19  she also suffers from a hypothyroidism and also

20  depression.  So when you couple the use of those

21  drugs with those other two symptoms, that magnifies

22  the effect on the child.

23                   I was impressed with the doctor's

24  testimony that she believed that the use of these

25  drugs would certainly render her less likely to take

1    care of herself, which does show up in the

2    hypothyroidism where the doctor was surprised, based

3    on her levels, that she had not miscarriaged

4    (verbatim) yet.

5            So I think that that certainly shows

6    that we have the -- the drug and alcohol use is to a

7    severe degree to jeopardize the safety of the child.

8    There was testimony that she has not availed herself

9    of services available for inpatient treatment.

10           So I am going to find that there --

11   probable cause exists to have her continue in secure

12   custody currently at Luther Hospital.  When she's

13   cleared from Luther Hospital, which they believe is

14   going to be around Thursday, then I would want her

15   transferred to a treatment facility during the

16   remaining term of her pregnancy.

17           And as I indicated to Ms. Loertscher

18   at the beginning of this hearing and also to Attorney

19   Cveykus, that anywhere along the line, if they

20   request a rehearing, they would be entitled to a

21   rehearing, but I'm agreeing to enter the order for

22   temporary physical custody today.

23           MS. GRAFF:  And -- and, Your Honor, I

24   would note that the proposed order there, which

25   Attorney Shiffler's had an opportunity to review as

```
 1    well, has some attached conditions on the back, and
 2    we did make one modification whereas it usually says
 3    child/juvenile, we did add unborn child to
 4    specifically fit the statutory basis that we're
 5    pleading.
 6                    THE COURT:  Okay.  I will find that
 7    the attached conditions are reasonable under the
 8    circumstances.  They provide that she be placed at a
 9    licensed treatment facility -- treatment facility
10    until the program director deems it appropriate to
11    release her; that she comply with the program
12    director's assessment and treatment recommendations;
13    that if discharged from that program, she continue to
14    comply with the treatment recommendations, including
15    complete sobriety, random urinalysis, and that she
16    cooperate with Taylor County Human Services
17    Department; she sign all releases requested by the
18    human services department that is necessary to
19    facilitate or monitor her treatment; and that she be
20    held in contempt of court if she violates any of the
21    conditions with that order.
22                    So I will -- I'm -- I've reviewed this
23    order, and I will sign the same.
24                    Anything further?
25                    MS. GRAFF:  Nothing further.
```

                                                    Page 28

```
1                    MR. SHIFFLER:  No, Your Honor.

2                    THE COURT:  Mr. Shiffler?

3                    MR. SHIFFLER:  Nothing further.

4                    THE COURT:  Okay.  Well, then this

5     hearing is adjourned.  We will be signing off then.

6                    MS. GRAFF:  Thank you.

7                    UNIDENTIFIED SPEAKER:  Okay.  Thank

8     you.

9                    MS. GRAFF:  Thank you, Cori.

10                   (The proceedings were concluded.)

11                          *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE PAGE

I, MARY B. BURZYNSKI, Registered Professional Reporter, do hereby certify:

That said proceedings were transcribed from audiotaped media to the best of my abilities; and I hereby certify the foregoing is a full, true, and correct transcript of my shorthand notes so taken and thereafter reduced to computerized transcription under my direction and supervision.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof; and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, or that requires me to provide and service not made available to all parties to the action.

IN WITNESS WHEREOF, I have here subscribed my name, this 8th day of December.

_____
Mary B. Burzynski, RPR

Page 30