# APPENDIX 3

# Fetal Protection in Wisconsin's Revised Child Abuse Law: Right Goal, Wrong Remedy

Kenneth A. De Ville, Loretta M. Kopelman

In the summer of 1998, the Wisconsin State legislature amended its child protection laws.[1] Under new child abuse provisions, Wisconsin judges can confine pregnant women who abuse alcohol or drugs for the duration of their pregnancies. South Dakota enacted similar legislation almost simultaneously. The South Dakota statute requires mandatory drug and alcohol treatment for pregnant women who abuse those substances and classifies such activity as child abuse. In addition, the South Dakota legislation gives relatives the power to commit pregnant women involuntarily for two days; a court order can place the pregnant women in custody for up to nine months.[2] These recent legislative "successes" follow scores of failed attempts by legislators in other states to establish fetal protection laws aimed at women who use and abuse drugs and alcohol during pregnancy.[3] Barbara Lyons, of the Wisconsin Right to Life Committee, boldly predicts that, by passing fetal protection laws, "Wisconsin has become a national model for this sort of legislation."[4]

Indeed, the legislative urge to protect fetuses has not abated. In the 1999 legislative session, at least a dozen fetal protection statutes were proposed, including an additional nine that would punish women criminally for their behavior during pregnancy.[5] But even if a morally and socially justifiable fetal protection law is possible, it would have to be carefully conceived, drafted, and implemented. Our examination of the new Wisconsin statute reveals flaws in conceptualization and structure that render it morally suspect, constitutionally vulnerable, and a potential danger to both women and their future children.

Wisconsin's action, and legislative initiatives like it, is not surprising. The image of newborns injured by prenatal substance abuse sometimes seems to cry out for decisive action. In addition, infants and children harmed in utero cost society valuable and scarce social, educational, and economic resources. Despite these observations, and the state's interest in promoting the health of future citizens, such fetal protection policies remain an extraordinarily complicated class of legislation. By their very nature, fetal protection laws intrude on the most protected right in Western culture—the right to be free from bodily restraint. It is true that individual liberty can sometimes be circumscribed when the risk of harm to other individuals or society is both severe and likely. That case, however, is frequently difficult to make. Even though substance abuse poses a risk of harm to the child who will be born,[6] its magnitude and probability is highly uncertain.[7] Fetal injury stemming from substance abuse varies dramatically, and frequently unpredictably, from nonexistent to minor to tragic.[8] Finally, there may be a range of less restrictive and more effective remedies to aid the fetus without infringing on the interests of the pregnant woman. For these reasons and others, it is prudent to be skeptical, perhaps even suspicious, when evaluating fetal protection legislation in general.[9] The empirical evidence does not yet exist to justify state intrusion on an individual's liberty interests in the ways that most proposed and enacted fetal protection legislation demands, such as that in Wisconsin and South Dakota.

## The Wisconsin law

The new Wisconsin fetal protection legislation revises significantly the state's child abuse law. The purpose of the Wisconsin bill, according to its framers, is "to provide a just and humane program of services to children and unborn children and the expectant mothers of those unborn children."[10] The statute defines "unborn child" as a "human

*Journal of Law, Medicine & Ethics*, 27 (1999): 332–42.
© 1999 by the American Society of Law, Medicine & Ethics.

being from the time of fertilization to the time of birth," and stresses that provisions of the law are intended to "apply throughout an expectant mother's pregnancy."[11] "[U]nborn children," this statute states, "have certain basic needs," including the need to "develop physically to their potential and the need to be free from physical harm." To protect these basic needs, when "an expectant mother of an unborn child suffers from a habitual lack of self-control" in the use of alcoholic beverages or controlled substances "to a severe degree," a court may "determine that it is in the best interests of the unborn child for the expectant mother to be ordered to receive treatment, including inpatient treatment."[12] This treatment may include, but is not limited to, medical, psychological, or psychiatric treatment, as well as alcohol or other drug abuse treatment or other services that the court finds necessary and appropriate. In construing and implementing the legislation, "the best interests of the child or unborn child shall always be a paramount consideration," and the law should be "liberally construed to effectuate" the expressed legislative purposes.[13]

Related, revised legislation specifically frees health professionals to disclose confidential information obtained within the health care relationship. Under Wisconsin statutory law, "[a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made or information obtained or disseminated for purposes of diagnosis or treatment."[14] Under new legislation, however, this standard does not apply when "the examination of the expectant mother of an abused unborn child creates a reasonable ground for an opinion ... that the physical injury inflicted on the unborn child was caused by the habitual lack of self-control of the expectant mother of the unborn child in the use of alcohol beverages, controlled substances or controlled substance analogs, exhibited to a severe degree."[15] Thus, health professionals, social workers, counselors, and a variety of other professionals "having reason to suspect that an unborn child has been abused or reasons to believe that an unborn child is at substantial risk of abuse" are directed to report that suspicion to child welfare agency or local law enforcement officials.[16]

The statute directs the relevant child welfare agency or law enforcement officials to determine whether the "unborn child" is in immediate danger and to "take any necessary action," including confinement of the pregnant woman, to protect the unborn child.[17] An "expectant mother" can be taken into custody for up to forty-eight hours without a hearing by a law enforcement officer who "believes on reasonable grounds" that there is a substantial risk to the unborn child.[18]

At a full adversarial hearing before a judge, or jury if requested, the statute requires that a guardian ad litem be appointed to represent the fetus, to serve as an advocate for "the best interest of the unborn child."[19] The judge (or jury) will consider evidence, including the social history of the pregnant woman, the gestational age of the "unborn child," and dispositional recommendations from the child welfare agency. Hearsay evidence may be admitted.[20] In determining what measures to take, the court must order the "least restrictive" disposition or treatment option that is consistent with the well-being of the unborn child.[21] A court can order mandatory commitment and treatment for a pregnant woman who "habitually" lacks self-control toward drugs and alcohol to a severe degree, when there is a "substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered unless the expectant mother receives prompt and adequate treatment."[22] If she refuses voluntary treatment, or has not made a good faith effort to participate in such programs, then a court may place a woman in custody for involuntary treatment.[23] She may be held in custody, as long as necessary to protect the unborn child, in the home of an adult relative or friend, a private or public residential substance abuse treatment facility, or in a hospital.[24] Alternatively, the court can release the woman, order counseling or some other form of outpatient supervision,[25] and "impose reasonable restrictions on her travel," "association with other persons or places of abode," or conduct "which may be necessary to ensure the safety of the unborn child and of the child when born."[26]

## Analysis

The new Wisconsin policy is not a newly drafted, free-standing law devoted specifically to the complicated issue of fetal health. Instead, it is a revision of the state's existing child abuse and protection laws. This modification followed a 1997 Wisconsin Supreme Court ruling, *Angela M.W. v. Kruzicki*, which declared that the then current child abuse laws could not be used to confine a pregnant woman who had tested positive for cocaine.[27] (With the exception of South Carolina, other state courts that have considered the matter have maintained that unmodified, existing child protection laws could not be used to take pregnant women into custody for the benefit of their fetuses.[28]) Soon after the *Kruzicki* decision, the Wisconsin State legislature amended the statute to permit such detentions under child abuse law. The state legislature's decision to approach the issue of fetal protection through the mechanism of child abuse law creates a series of interlocking problems—conceptual, symbolic, and practical—which severely undermine the wisdom, workability, and justice of the new policy.

## Words matter

> "When I use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."

> "The question is," said Alice, "whether you can make words mean different things."
> "The question is," said Humpty Dumpty, "which is to be master—that's all."[29]

Humpty Dumpty's glib assertion has special meaning in the context of legislative enactments, especially Wisconsin's fetal protection statute. Legislative enactments give words content and power. Throughout the lengthy and detailed fetal protection statute, the legislature repeatedly employs two central terms: "unborn child" and "expectant mother." A statute's language, the legislators' choice of terms, can reflect the underlying ideology that inspired the law and have a practical impact on how the policy is implemented.

### *"Pregnant woman" or "expectant mother"*

Consider the exclusive use in the Wisconsin law of the term "expectant mother" instead of, for example, "pregnant woman." The former focuses on the status of the individual as "mother" with its attendant socially assumed duties—a potentially meaningful shift in perspective. Nationally, fetal protection policies and enforcement efforts frequently converge on the actions of the pregnant woman and fail fully to appreciate and regulate, for example, male responsibilities during pregnancy.[30] Equality before the law is a fundamental political and constitutional principle in democratic societies.[31] Policy-makers and the public should be skeptical of measures that reserve punitive action for one segment of society while neglecting analogous wrongs perpetrated by another segment of society.

Future fathers, for example, also have a duty to safeguard the interests of the child to be born. Fathers and other men sometimes play a central role in encouraging or assisting in drug use by pregnant women and are arguably culpable in other damage caused to future children. Domestic violence during pregnancy endangers both mother and future child.[32] In addition, second-hand exposure to crack cocaine, marihuana, and tobacco smoke may present at least marginal potential dangers to pregnant women and their fetuses.[33] The pregnant woman's actions may frequently pose a greater immediate risk of harm, but that is not always the case. One commentator speculates that attempts at fetal protection focus on women, in part, because our culture views child-bearing and child-rearing as largely female responsibilities.[34] This cultural assumption is reinforced in the Wisconsin fetal protection statute by referring to pregnant women in language that emphasizes not their autonomy and individuality, but that highlights their social role and presumptive duties to their fetuses and society, that is, their status as expectant mothers. Embodied in law, such an approach might be expected to focus on maternal duty and devalue individual rights—as we ultimately see is the case with Wisconsin's new legislation. Even if widespread cultural expectations underlie this language and current fetal protection approaches, it is insufficient justification in a society that is based on the aspiration that all citizens should be treated equally.

One solution to this apparent inequity is to assure that fetal protection policies target individuals based on the degree of risk they create for future persons, not on their social role or gender. Fetal protection policies that affect pregnant women, however, may still require a higher burden of justification. Fetal protection policies targeting male offenders frequently affect only their freedom of action, involving in many cases activity that is already illegal (such as domestic abuse). In contrast, fetal protection policies affecting pregnant women typically require confinement and imposition on the pregnant woman's bodily autonomy and freedom.

### *"Fetus" or "unborn child"*

Given the current pro-choice–pro-life debate in the United States, there is obvious symbolic significance in the choice of the term "unborn child" over other available descriptions. In dicta, the U.S. Supreme Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey* suggested that the state may have some interest in potential life even at the previability stage.[35] Neither it, nor any other constitutional ruling, however, even has implied that the fetus *itself* possesses constitutional rights of any sort. Under *Roe v. Wade*, *Casey*, and other relevant reproductive rights jurisprudence, the interests of the state in potential life are balanced against the considerable liberty rights of the woman.[36] It is not until the fetus reaches viability that the state's interests increase to the point where it can prohibit abortion. Even then, no fetal rights are implicated. It is the state's interest in future life, not fetal rights, that is balanced against the rights of the woman.[37] Without legislative action in specifically defined areas, there can be no assertion that the fetus possesses legal rights or that the child who will be born possesses legal rights. The fetus or future person might possess some manner of interests that deserve moral consideration; but there has never been a consensus on what those interests are, and if and how they should be protected by law.

By defining a fetus from conception as a "child," the Wisconsin legislation blurs the significant difference between the previously unenforceable interests possessed by the fetus and the very real interests possessed by an ex utero child. In doing so, the legislative language changes the legal calculus from one that balances a woman's rights against state interests, to one that balances a woman's rights against a child's rights—a significant and very real transformation with concrete implications. The new Wisconsin law underscores the creation of independent fetal interests by its provisions for the appointment of an independent guardian ad

litem to advocate for the "best interests" of the "unborn child" in child abuse proceedings.

Finally, the redefinition by the legislature of "fetus" into "child" is consistent with the grand strategy of pro-life advocates. *Roe* and its jurisprudential progeny refused to declare that fetuses were "persons" deserving protection under the Fourteenth Amendment of the U.S. Constitution. Such a declaration might have profoundly undermined the legal status of abortion. Consequently, one facet of the long-term, end-game strategy of pro-life forces has included an attempt to have fetuses declared "children" or "persons" in as many legal contexts as possible, including child abuse laws, civil wrongful death actions, and criminal homicide and assault statutes. Abortion opponents hope to argue that because state law, in a variety of situations and jurisdictions, treats fetuses as persons, that Fourteenth Amendment jurisprudence should similarly recognize the reality of fetal personhood.[38]

The selection and use of terms such as "unborn child" and "expectant mother," then, have more than symbolic importance. They have practical, rhetorical, and political power as well. Rephrasing the statutes may moderate some of the force of the language, but the potential impact on pregnant women is the same if the structure of the legal remedy employed does not fully protect their interests.

## Choice of remedies

Child abuse law allows social intervention into the normally private and protected sphere of family life. Society sanctions broad parental control over children based on the assumption that parents are the persons best suited and most inclined to act in the best interests of their children. Parental authority is also based on the notion that self-determination encompasses the freedom to raise one's children as one chooses. This freedom, though not as definitive as the notion of individual bodily autonomy, is represented in the parents' Fourteenth Amendment constitutional liberty interest in bringing up children according to the dictates of their own consciences. Child abuse laws are a recognition that those parental rights are not absolute. Coercive state interference with parental prerogatives, for the good of the state and the good of the child, is justified when there is "clear and convincing evidence" that parents' actions or decisions represent likely and serious harm to the child.[39]

By defining a fetus from conception as a "child," the Wisconsin statute attempts to extend the child abuse model described above to deal with maternal substance use. Such an approach is conceptually unfounded and misguided. The state's power to take custody of an abused or neglected child implicitly balances the well-being of the child against the parental right to raise one's child as one chooses. Parental autonomy and family privacy are important, but not transcendent liberties. Thus, the focus of state child protection activities, when a minor is endangered, is understandably on the well-being of the child.[40]

In contrast, when child abuse laws are used to protect fetuses, the nature of the relevant interests and personal liberties shifts significantly. When the state takes custody of an abused child, it interferes with the parental right to raise one's child as one chooses. But when the state takes custody of an "unborn child" by confining the mother for mandatory substance abuse treatment, it abrogates the mother's right to bodily autonomy, to mobility, to freedom of association, to individual liberty. The Supreme Court, for example, describes the involuntary civil commitment of an individual as a "massive deprivation of liberty" and demands that the confinement procedures and standards strike a balance between the rights of the individual and the legitimate concerns of the state.[41]

Thus, the Wisconsin legislature's use of the child abuse model to confine pregnant women does not account for this shift in interests that occurs when the state confines an adult individual, as opposed to that which occurs when the state takes temporary custody of an adult individual's child. At most, the child protection model balances the well-being of the "child" against the parental rights (as opposed to the more robust[42] physical liberty rights) of the parent. As a result, the child abuse approach maintains the focus on the "child" rather than fully recognizing and considering the other rights at stake. If any involuntary maternal confinement policy can be justifiably enacted, it would, at minimum, have to take full account of the liberty interests of the individuals confined against their will. The child abuse model, *by its very nature*, fails to fulfill this criteria.

If the state can demonstrate legitimate concerns regarding the effect of maternal behavior on fetal well-being, it *may* have grounds to consider intervention. However, the state's concerns must be balanced against the physical liberty interests of the woman and subjected to the scrutiny that other similar state actions must face. The child abuse model cannot provide these protections.

## Limiting liberty and empirical certitude

The Wisconsin approach to maternal substance use is flawed in another critical respect. It does not guarantee the evidentiary certainty and protection that is typically required when individual rights are abrogated. Interference with the liberty of competent adults requires satisfying a heavy burden of proof in regards to the magnitude of harm threatened and the probability that it will occur. For example, the standard of evidence constitutionally required to confine an individual involuntarily, even to prevent harm to one's self or others, ranges from "clear and convincing" to "clear, unequivocal and convincing" evidence.[43] Similarly, even the abrogation of parental prerogatives under the child abuse model requires clear and convincing evidence that the child

is likely to suffer serious harm. This standard is purposefully set high to protect individual rights. Under either formulation, child protection or involuntary commitment, the state's right to intervene depends on the quality of the evidence. That is, the justification for interventions varies with the probability and magnitude of the predicted harm, in this case that the behavior of the pregnant woman will result in serious fetal injury. The current state of empirical evidence regarding substance abuse does not generally support such a demonstration, especially for one of the most targeted groups—women who use cocaine.

The dangers of the use and abuse of alcohol during pregnancy is the best documented of any substance. In the 1970s, researchers identified a specific pattern of disabilities in children born to some alcoholic women, which they identified as fetal alcohol syndrome (FAS). Currently, FAS affects 0.29 to 0.48 per 1,000 children born in the United States, or about 1,200 children born annually.[44] In addition, prenatal alcohol abuse is one of the leading causes of mental retardation and has been linked to a wide range of mental and physical disabilities.[45] Even moderate alcohol intake during pregnancy has been linked to a range of postnatal injury and deficits, both intellectual and behavioral. However, the likelihood and nature of the impact of alcohol use during pregnancy remains highly uncertain. Typically, the more a woman drinks during pregnancy, the greater the risk posed to the resulting child. But, the studies illuminating the precise nature of the link between alcohol use and fetal injury are sometimes confounded by factors such as maternal intelligence, paternal effects, medication usage, and other variables. Moreover, different levels of alcohol use affect different women and their fetuses differently, as the result of such factors as genetic predispositions, environment, dose frequency, lifestyle, prenatal care, and other comorbid factors. Some studies have failed to find an effect of lower levels of alcohol usage, further undermining the efficacy of other studies and illustrating the potential difficulty in monitoring women's alcohol consumption during pregnancy.[46] Even studies of children born to alcoholic women show that only 10 to 40 percent suffer from FAS, though a high percentage may suffer from other disabilities.[47] Finally, according to a review of the literature on prenatal exposure to alcohol, "there is often little reliable information about the degree of alcohol exposure" during the pregnancy.[48]

None of this discussion is intended to discount the dangers of alcohol use during pregnancy. Such observations, though, should underscore the uncertainty of the potential harm. Not all children born to women who drink are injured, nor are they injured in the same way or degree.[49] Thus, it may be difficult, if not impossible to establish a clearly defined threshold beyond which the risk to the resulting child will justify, as a matter of standing policy, coercive intervention or criminal prosecution.

Studies involving the prenatal use of drugs such as marijuana, amphetamines, and barbiturates are even more equivocal. They clearly suggest that they may be harmful and should be avoided, but the exact impact on the fetus of these substances remains unclear.[50] The greatest public concern and the bulk of the fetal protection efforts have been focused on pregnant women who use cocaine. Although cocaine has been linked to a range of injuries, many serious, in many studies it has been difficult to determine which birth injuries are related to the drug's use and which are related to other coexisting risk factors. In addition, many of the original studies that spurred fears of a generation of "crack babies" were flawed in a number of ways, leading one researcher to remark that "the emergence of medical knowledge on the reproductive effects of cocaine is a fascinating example of difficult methodological hurdles 'simplified' in an unacceptable, nonscientific manner to derive at [sic] premature conclusions."[51] Similarly, as substance abuse researcher Daniel Neuspiel observes, "Early studies and anecdotal reports of adverse effects of cocaine use in pregnancy have fueled a mythology of severe risk among both professionals and the general public.... Even though recent studies ... have generally reported either less or no effects of gestational cocaine, this mythology persists."[52] Even the documented effects of maternal cocaine use vary dramatically from individual to individual, with many resulting infants showing no long-term injury.[53] In fact, not only do medical researchers disagree about the impact of cocaine use during pregnancy, but also, according to one specialist, "[c]ocaine-exposed babies are not neurologically impaired to the degree initially reported, even when they are exposed through most of the pregnancy."[54] According to Linda LaGasse, Ronald Seifer, and Barry Lester's recent examination of existing evidence on the topic, "recent studies do not support the case for devastating consequences, but rather suggest there are subtle deficits amenable to intervention."[55]

Women who use or abuse alcohol and drugs during pregnancy clearly increase the risk of injury to their fetuses. The scientific evidence is sufficient to counsel women against substance use and abuse and to provide treatment services to those women who want to forgo those substances during their pregnancies. But given current levels of knowledge regarding substance abuse and fetal harm, the risk of fetal injury will rarely be sufficient to meet the clear and convincing evidence standard that is required when the state wishes to deprive an individual of his/her liberty. And, as important, the disparate effects of substance use and the influence of comorbidity factors frustrate efforts to establish a justifiable threshold of alcohol and drug use that will trigger a particular coercive state intervention.

The Wisconsin law, then, increases the probability that individual women could be confined without sufficiently strong evidence that the fetus will likely suffer serious harm. Recall that, under the statute, any person, including a health

care professional, a social worker, or a counselor, may report a woman if he/she has "reason to suspect" or "reasons to believe" that an unborn child is at substantial risk of abuse. A physician may report a pregnant woman who tests positive for drugs or alcohol, but no such test results, or series of tests results, are required to trigger child abuse and confinement proceedings.[56] On receiving a report of suspected abuse, a law enforcement or child protection agency official may confine the pregnant woman if there are "reasonable grounds" to believe that her "habitual and severe" use of substances substantially endangers the health of the unborn child. At the woman's full adversarial hearing, potentially subjective social history evidence and hearsay evidence (usually considered suspect by courts[57]) may be introduced. The judge is empowered to confine the woman for treatment if there is a "substantial risk" that the unborn child's health is seriously threatened by the "habitual and severe" substance use.

These statutory provisions represent relatively low evidentiary standards and thus insufficient procedural safeguards given the nature of the potential deprivation of liberty faced by the pregnant women who are targets of this legislation. Women may be reported on "suspicions" of substance abuse and confined by law enforcement officials who have "reasons to believe" that the abuse has been "habitual and severe." At a full hearing, hearsay evidence is admissible, but no medical testimony is specifically required. No expert witness, for example, is required to establish the probability or magnitude of harm represented by the woman's behavior. Judges must merely believe that a woman's "habitual and severe" substance use creates a substantial risk that the "unborn child" will be injured before they can order a woman confined or into treatment against her will. Given popular misconceptions regarding the probability and magnitude of the harm posed by substance use on fetal health, judges' ability to estimate accurately the risk posed to the fetus should be questioned. Health professionals are given no guidance as to what constitutes a legitimate "suspicion" sufficient to report. "Habitual and severe" substance use is never defined and means substantially different things to different potential informants. It is never clear on what grounds a judge is to determine whether the woman's actions create a substantial risk to the unborn child.

These ambiguous yet pivotal features of the Wisconsin fetal protection law do not seem to be an oversight, but are consistent with the overall tenor and underlying meaning of the law. For example, the focus of the legislation is to protect the "unborn child," defined as a "human being from the time of conception." This definition, aimed at protecting the fetus, leaves health professionals, law enforcement officials, and judges (as well as other mandatory reporters of child abuse) little latitude except to determine that their primary duty is to protect the fetus. In contrast, key terms that are central to the protection and liberty of the pregnant woman are left vague and without content, in effect increasing the discretion left to those who report, arrest, and decide the fate of pregnant women and the nature of the duty to protect the fetus.

### Statutory ambiguity

By their very nature, statutes must grant some discretion to those individuals who are responsible for implementing them. But when statutory ambiguity allows discretion in decisions that threaten individual liberty, more substantial safeguards are warranted. Nowhere is this more true than in the Wisconsin statute's provision allowing confinement of a woman if her actions represent a "substantial risk" to the unborn child. Given that the scientific evidence regarding substance use and pregnancy is unclear, and that, in any event, it is not required, judges (or juries) are left with a potentially perilous degree of discretion. Risk, especially medical risk, is a profoundly complex notion, subject to a broad range of factors. It is shaped not only by available evidence, but also by personal values and experiences, institutional roles, and professional training. Risk perception, not surprisingly, varies elastically from individual to individual and from group to group.[58] The legislation may allow decision-makers to base their judgments of "substantial" and "risk," not on the complicated and sometimes equivocal medical and scientific evidence regarding maternal substance use, but rather on their view of what constitutes appropriate behavior for an "expectant mother." As noted, a substantial disparity exists between the public image of substance-abusing mothers and the scientific evidence currently available regarding fetal injury. Consequently, decision-makers in this process may sometimes rely on their intuitions of how expectant mothers should behave, rather than on the clear, convincing, and competent scientific evidence that is otherwise required and should be present when limiting the liberty of competent adult individuals.

Although the most disconcerting aspect of the Wisconsin legislation involves its potential burdens on pregnant women's freedom of movement, other commonly recognized liberties are endangered. For example, a woman could be forced or coerced into medical treatment against her desires if a judge or jury decides that her fetus is at risk of injury. Her presumptive right to confidential medical advice or other counseling is explicitly suspended, and her physician or other medical caregiver is expected to report her to state authorities. A woman's right to make reproductive decisions for herself, without undue interference from the state, is also implicated. Consider a woman facing a hearing and potential involuntary confinement under the Wisconsin statute. A statutorily mandated guardian ad litem is appointed to protect the best interests of the unborn child. Can the women, in the course of the hearings, choose to terminate her pregnancy? What will be the role, voice, and

weight of opinion of the guardian ad litem under these circumstances? Given current abortion rights law, it seems unlikely that the woman could be prevented from pursuing an abortion if her pregnancy has not reached the statutorily defined cut-off point in the state. That issue, however, is not addressed in the statute.

But the woman who wishes to continue, rather than to terminate her pregnancy, faces perhaps a greater threat to reproductive liberty. A woman brought before a court under this statute might have to submit to any of a wide range of limitations on her freedom of movement, freedom of association, right to privacy, and right to choose or refuse medical treatment if she wishes to continue her pregnancy. If she chooses to continue her pregnancy, she remains under the authority of the court. Such a choice regarding the loss of liberty may place a considerable burden on the woman's right to reproduce. This burden might be exacerbated by parallel legislation passed in Wisconsin to protect fetuses. The law provides criminal penalties for anyone who causes harm or death to an unborn child.[59] Once again, it is unclear if the law can or will be used against a woman who is deemed to have injured a fetus; but its existence and the threat of prosecution may undermine a woman's decision to continue her pregnancy if she fears postnatal prosecution.

Finally, many observers contend that coercive fetal protection policies will fail to accomplish their stated goal—the health of future children. Commentators generally agree that the most effective substance abuse policies are those that provide pregnant women with access to education, counseling, and treatment without fear of prosecution or confinement. Most pregnant women who use controlled substances wish to avoid harm to their future children.[60] According to a 1999 literature survey in the *Journal of Substance Abuse Treatment*, there is little empirical evidence that residential, inpatient substance abuse treatment for pregnant women is more effective than other treatment approaches.[61] But growing evidence suggests that mandatory inpatient drug treatment programs for pregnant women may aggravate the problems they are trying to sovle because they encourage women to avoid prenatal medical care of any kind for fear of incarceration and/or the loss of their children.[62] Such a course of action risks leading to higher levels of neonatal morbidity rather than lower levels, as the policy presumably intends.

We and others have argued elsewhere that coercive and involuntary measures aimed at pregnant women who use and abuse drugs and alcohol are unlikely to work and unfairly single out one group—young women—while ignoring equal or similar harm from others.[63] Such measures also threaten important civil liberties and have the potential to erode trust in medical clinical professions. Equally troublesome, past fetal protection initiatives have appeared to focus on women of color as their primary concern.[64] African-American and other minority women may have been singled out disproportionately because of skewed media portrayals that cast them as the primary abusers of substances during pregnancy.[65] The Wisconsin law contains some safeguards that may mitigate its practical impact on the liberties of pregnant women. Judges are required to select the least restrictive alternative possible to protect the unborn child when choosing among the various available statutory remedies. The Wisconsin statute specifically states that inpatient detention may only be used when a woman has refused voluntary substance abuse treatment or has failed to make a good faith effort to participate in such treatment.

In implementing this statute, law enforcement and child protection officials and judges may choose to focus their attention only on the isolated, worst-case examples of maternal substance abuse. Given the level of public outrage on this issue, the poor data, the spare safeguards, the ambiguous language, and the overall latitude granted decision-makers by the policy, it is equally likely that the statute will be applied inconsistently and in ways that undermine the liberty interests of pregnant women. The very framing of a statute as one of child abuse may presage its future application.

### Are there any acceptable coercive interventions?

Given that the Wisconsin and South Dakota statutes are fraught with practical, moral, and symbolic difficulties, are *any* coercive remedies justifiable? Clearly, some individual instances of maternal substance abuse (both hypothetical and real) are so egregious that they would justify intervention on an ad hoc basis. Intervention might also become more defensible in the future, if better information becomes available showing a clear and convincing likelihood of substantial and avoidable harm posed by women who use drugs and alcohol when they are pregnant. But is it possible to craft a social policy—a broadly applied legal remedy—that provides a formal way of dealing with egregious cases while at the same time protecting the interests of pregnant women whose behavior, although unwise, does not threaten the health of future persons in a clear and certain way?

Some observers contend that if *any* coercive fetal protection policy is defensible, it must be modeled on the civil commitment model, similar to that employed in the mental health context. Such an approach, they suggest, comes closer to "achieving the proper balance between an individual's right to freedom and society's need to protect public health and safety."[66] Indeed, in the most comprehensive review and analysis of fetal protection policies to date, Lawrence Nelson and Mary Faith Marshall attack the child abuse model and conclude that the civil commitment approach, expanded and applied judiciously, is the most appropriate currently available means to intervene in the lives of pregnant women who may be injuring themselves and their future children with substance abuse.[67]

The civil commitment model *might* be the most defensible coercive approach to fetal protection and *might* be justifiable if it is appropriately conceived and applied. However, we will try to show that such an amended form of the civil commitment model, in its likely application, threatens to result in many of the same vagaries and unwarranted infringements on the rights of women that characterize other coercive fetal protection policies and should therefore not be pursued at this time. Policy-makers, law enforcement officials, and health care providers should instead focus their efforts on enhancing voluntary education, counseling, and treatment programs for pregnant women who use controlled substances.

The current civil commitment remedy for incompetent adults already exists in a number of jurisdictions, and it is justifiably applicable to a narrow range of women who abuse controlled substances during pregnancy. In many states, individuals who represent a danger to themselves, or who are unable to care for themselves, as a result of substance abuse may be involuntarily confined and treated for substance abuse under the state's civil commitment statute. In some cases, these statutes, without revision, might also legitimately apply to incompetent women who abuse substances while they are pregnant.[68] In such instances, the pregnant woman should be afforded the same procedural safeguards as nonpregnant individuals confined under the statute. The criteria for confining a pregnant woman who represents a danger to herself because of substance abuse should differ in no way from the relevant jurisdiction's standards for confining nonpregnant individuals who endanger themselves through drug or alcohol abuse. Moreover, investigation and enforcement efforts must proceed evenhandedly—the woman should be singled out for treatment and confinement, not because she is pregnant, but because she represents a risk of harm to herself.

The legitimacy of the intervention, under currently existing involuntary commitment statutes, rests on the reason the state sanctions involuntary confinement. The justification of the pregnant woman's commitment is her own lack of decision-making capacity and threats to her own well-being (or perhaps, in some cases, that of other live-born human beings who might be endangered by her actions). Fetal health may incidentally benefit from the woman's confinement and treatment under these circumstances, but it need not if she were given powerful medications early on in pregnancy. Moreover, current involuntary commitment statutes were not framed with fetal health in mind, and thus fetal protection would be improper grounds on which to deny an individual liberty. Action under such statutes, appropriately and honestly applied, does not unjustifiably infringe on the woman's autonomy, because she has been found incapable of making decisions on her own behalf and is being confined to protect her own interests, not those of another being.

Many of the same problems that arise for child abuse laws would also arise if existing involuntary commitment statutes were expanded (or adapted) to restrict competent women to protect fetal life or the health of children who will be born. First, current civil commitment statutes, like most child abuse laws, were not intended by their drafters to protect fetal life or future children. Thus, if policy-makers wish to protect future life from in utero injury using the civil commitment model, a revised involuntary commitment statute needs to be constructed.[69] As noted earlier, *Casey* declared that the state has some legitimate interest in protecting potential life, even at the previability stage of fetal development. In both personal injury and criminal law, a legal duty to avoid harming future (that is, fetal) life has been widely, albeit not universally, recognized. Likewise, it may be possible to construct a reasonable involuntary commitment statute designed to protect future children from substance abuse.

Second, like Wisconsin's revised child abuse laws, a model expanded involuntary commitment statute might authorize the confinement of a pregnant woman when her abuse of controlled substances threatens "serious, likely and permanent harm to a future person." But because this wording might be misread to include all *possible* descendants, such a statute, at minimum, should further define "future person" as an existing fetus that the woman "intends" to carry to full term. The woman's statement on whether she "intends" to carry the fetus to term should serve as a "rebuttable presumption," or even a "conclusive presumption," of the status of the fetus. This requirement is of central importance because if the woman does not intend to complete her pregnancy, then the state has no constitutionally justifiable interest in the protection of a future person.[70]

Third, such an expanded statute, if enacted, should protect the rights and interests of the pregnant woman by the consistent application of a clear and convincing evidence standard. But this would limit the expansion of such laws to all but incompetent persons. Clear and convincing evidence is generally considered that degree of proof "which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established."[71] For example, the trier of fact (probably a judge) in a case involving a pregnant woman would be required to determine whether clear and convincing evidence exists that: the woman intended to bring the fetus to term; the woman's actions threaten "serious, likely and permanent harm" to a future person; and that the confinement and treatment chosen are the least restrictive means available. Finally, the woman should be entitled to the procedural protections ordinarily guaranteed in other involuntary commitment proceedings including: notice; an adversarial hearing; representation by counsel; and the provision of beneficial treatment during confinement in the least restrictive environment practicable.

The clear and convincing evidence standard, if honestly applied by judges, should safeguard the current rights of the pregnant woman, and is consistent with the standard employed in other situations where serious deprivations of liberty are involved. This measure is flexible and adaptable to the wide range of substance abuse cases. Judges and prosecutors could fairly apply new medical and scientific information regarding the effects of substance abuse during pregnancy as it becomes available.

If applied fairly and consistently by prosecutors and judges, this approach to the commitment of pregnant women who abuse controlled substances is likely to result in the mandatory confinement of only a very few women in the most egregious instances of substance abuse. Currently, it is clear that the use of virtually any type of controlled substance use during pregnancy is unwise. But given the state of existing prenatal and perinatal knowledge, it will rarely be demonstrable prospectively—by clear and convincing evidence—that the resulting child in any individual case is likely to be severely and permanently harmed by substance abuse. A comprehensive model statute designed to allow the involuntary commitment of pregnant women who abuse substances would still require considerable elaboration even if the general outlines and necessary limits of such a statute are already clear. The civil commitment model seems superior to a child abuse model, like Wisconsin's law, because it does not redefine the fetus as an unborn child.

Nonetheless, we cannot support the enactment of fetal protection statutes at this time. Even with safeguards, redefining the fetus as a future person at risk of harm is, on balance, unwise. Too great a danger remains, given the bias and scant evidence that we have described, that social demand and prosecutorial and judicial discretion may lead to inappropriate enforcement decisions and abuses and may represent unwarranted infringements on the rights of women without generating significant benefit for those women or their children. It is possible, of course, that involuntary commitment statutes would only be used in the egregious and very rare case. But the history of fetal protection efforts in the last decade suggests otherwise. Over the past decade, prosecutors, judges, and health professionals have been willing to intervene coercively even in the absence of specific statutes or law allowing them to do so. This "rough justice" is likely to continue in the most flagrant cases of substance abuse even in the absence of any new laws authorizing such interventions. A new law codifying and expanding the state's enforcement reach over pregnant women, through either the involuntary commitment model or the child abuse model, might not stem the practice of rough justice. Instead, it could have the obverse effect, unofficially endorsing and encouraging increased state oversight into other areas of the pregnant woman's life. As a result, expanded and voluntary educational and counseling efforts remain the more justified and appropriate clinical, social, and legal response to the problem of substance abuse during pregnancy.

## Conclusion

Wisconsin's approach to fetal protection is marred by a series of conceptual, symbolic, and practical problems. The use of the child abuse model, by its very nature, fails to fulfill the state's duty to assess fairly and impartially the liberties of individuals confined against their will. Wisconsin's fetal protection law collapses an issue involving individual maternal liberty into a revamped child abuse law, complicating the already intricate medical, moral, and social problem of substance use during pregnancy. Instead of approaching the issue warily, the Wisconsin legislature has extended traditional child abuse protection not only to viable fetuses, but also to the very point of conception. It is unclear if the statute will withstand the legal and constitutional challenges that may follow or become a model for other state legislative action. In the meantime, pregnant women in Wisconsin will remain subject to the vagaries of an ill-conceived and ambiguous statute and the decision-makers who apply it. Attempts to expand involuntary commitment measures raise similar problems.

## References


1. See Wis. Stat. §§ 48.01–.347 et seq. (1998); and "Child Abuse and Neglect and Child Abuse Services," 1997 Wisconsin Laws 292 (A.B. 463) (enacted June 16, 1998).
2. See S.D. Codified Laws §§ 34-20A-63 to -70 (Michie 1998).
3. See S. Zeller, "Fetal Abuse Laws Gain Favor," *National Journal*, July 25, 1998, at 1758.
4. *Id.*
5. See Center for Reproductive Law & Policy, "Elevating the Legal Status of the Fetus: Pregnancy Prosecutions and Abortion Rights," *Reproductive Freedom News*, 8, no. 6 (1999): 1–3.
6. See B. Steinbock, *Life Before Birth* (New York: Oxford University Press, 1992) and D. Mathieu, *Preventing Prenatal Harm: Should the State Intervene?* (Washington, D.C.: Georgetown University Press, 1996) are two of the most thoughtful and cogent overviews of this topic.
7. See, for example, G.L. Bell and K. Lau, "Perinatal and Neonatal Issues of Substance Abuse," *Pediatric Clinics of North America*, 42 (1995): 261–81; and G.K. Hulse et al., "Assessing the Relationship Between Maternal Opiate Use and Neonatal Mortality," *Addiction*, 97 (1998): 1033–42.
8. See M.A. Plessinger and J.R. Woods Jr., "Cocaine in Pregnancy: Recent Data on Maternal and Fetal Risks," *Obstetrics and Gynecology Clinics of North America*, 25 (1998): 99–112; and F.D. Eyler et al., "Birth Outcome from a Prospective, Matched Study of Prenatal Crack/Cocaine Use: II. Interactive and Dose Effects on Neurobehavioral Assessment," *Pediatrics*, 101 (1998): 237–41.
9. See K.A. De Ville and L.M. Kopelman, "Moral and Social Issues Regarding Pregnant Women Who Use and Abuse Drugs," *Obstetrics and Gynecology Clinics of North America*, 25 (1998): 237–54.
10. Wis. Stat. § 48.01 (1998).

11. *Id.* §§ 48.01-.02.
12. *Id.* § 48.01(1)(a)(am).
13. *Id.* §§ 48.01-.02.
14. *Id.* § 905.04(2).
15. *Id.* § 905.04(4)(e)(3).
16. *Id.* § 48.981(1)-(3).
17. *Id.* § 48.981(3)(b).
18. See *id.* §§ 48.193, .981(3).
19. *Id.* §§ 48.213, .235.
20. See *id.* § 48.299(4)(b).
21. See *id.* § 48.355.
22. *Id.* §§ 48.133, .19(8).
23. See *id.* §§ 48.205, .345, .347.
24. See *id.* § 48.207.
25. See *id.* §§ 48.345, .347(1)-(6), .355.
26. *Id.* §§ 48.345, .347(1)-(6), .355. See also K.A. De Ville and L.M. Kopelman, "Wisconsin's 1998 Fetal Protection Law: An Immodest Proposal," *Medicine and Law, American Philosophical Association Newsletter*, 98, no. 1 (1998): 99-102.
27. *Angela M.W. v. Kruzicki*, 561 N.W.2d 729 (Wis. 1997), *rev'd Angela M.W. v. Kruzicki*, 541 N.W.2d 482 (Wisc. Ct. App. 1995).
28. See, for example, *In re Dittrick*, 263 N.W.2d 37 (Mich. Ct. App. 1977); and *In re Steven S.*, 126 Cal. App. 3d 23 (1981).
29. L. Carroll, *Alice in Wonderland and Through the Looking Glass* (New York: Peter Pauper Press, 1941): at 123, available at <http://etext.lib.virginia.edu/etcbin/toccer-new?id= CarGlas&tag= public&images=images/modeng&data=/texts/english/modeng/parsed&part=0> (visited Dec. 16, 1999).
30. See R.I. Solomon, Note, "Future Fear: Prenatal Duties Imposed by Private Parties," *American Journal of Law & Medicine*, 17 (1991): 411-34.
31. See M.A. Graber, *Rethinking Abortion: Equal Choice, the Constitution, and Reproductive Politics* (Princeton: Princeton University Press, 1996).
32. See J.C. Campbell et al., "Correlates of Battering During Pregnancy," *Research in Nursing & Health*, 5 (1992): 219-26; J.A. Gazmararian et al., "Prevalence of Violence Against Pregnant Women," *JAMA*, 275 (1996): 1915-20; M.A. Curry, N. Perrin, and E. Wall, "Effects of Abuse on Maternal Complications and Birth Weight in Adult and Adolescent Women," *Obstetrics & Gynecology*, 92, no. 4, pt. 1 (1998): 530-34; C.B. Smikle et al., "Physical and Sexual Abuse in a Middle-Class Obstetric Population," *Southern Medical Journal*, 89 (1996): 983-88; and J. McFarlane, B. Parker, and B.K. Soeken, "Abuse During Pregnancy: Associations with Maternal Health and Infant Birth Weight," *Nursing Research*, 45, no. 1 (1996): 37-42.
33. See Solomon, *supra* note 30.
34. See J.R. Schroedel and P. Pretz, "A Gender Analysis of Policy Formation: The Case of Fetal Abuse," *Journal of Health Politics, Policy & Law*, 19 (1994): 335-60.
35. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 868 (1992).
36. *Roe v. Wade*, 410 U.S. 113 (1973); and *Webster v. Reproductive Health Services*, 492 U.S. 490 (1991).
37. J.E. Nowak and R.D. Rotunda, *Constitutional Law* (St. Paul: West Publishing, 5th ed., 1995): at 813-23.
38. See J.G. Shoop, "Is a Fetus a Person? Court Decisions Prompt Debate Over Fetal Rights," *Trial*, 33, no. 6 (1997): 13-16; L.M. Paltrow, "Punishing Women for Their Behavior During Pregnancy: An Approach that Undermines the Health of Woman and Children," in C.L. Wetherington and A.B. Roman, eds., *Drug Addiction Research and the Health of Women* (Rockville: National Institutes of Health, 1998): 467-501; and Center for Reproductive Law & Policy, *supra* note 5, at 1-3.
39. See H.D. Krause, *Family Law* (St. Paul: West Publishing, 1986): at 246-47.
40. See L.M. Kopelman, "The Best-Interests Standard as Threshold, Ideal, and Standard of Reasonableness," *Journal of Medicine and Philosophy*, 22 (1997): 271-89. It is important to note, however, that although the initial thrust of child protective services is aimed at the securing the well-being of the endangered child, the goal of the state child welfare organizations is usually to reunite the child with his/her family. We are indebted to an anonymous reviewer for this insight.
41. See *Addington v. Texas*, 441 U.S. 418 (1979).
42. In moral theory and in law, physical liberty is typically treated with more deference than other liberty rights because it is the liberty most closely associated solely with one's own interests. In contrast, parents' right to direct the upbringing of their child affects not only the parents, but also the child.
43. See P.S. Appelbaum and T.G. Gutheil, *Clinical Handbook of Psychiatry and the Law* (Baltimore: Williams & Williams, 2nd ed., 1991): at 50-51.
44. See S.N. Mattson and E.P. Riley, "A Review of the Neurobehavioral Deficits in Children with Fetal Alcohol Syndrome or Prenatal Exposure to Alcohol," *Alcoholism: Clinical and Experimental Research*, 22 (1998): 279-92.
45. See F.S. Coleman and J. Kay, "Biology of Addiction," *Obstetrics and Gynecology Clinics of North America*, 25 (1998): 1-19; and Bell and Lau, *supra* note 7.
46. See Mattson and Riley, *supra* note 44, at 286.
47. See S.N. Mattson et al., "Heavy Prenatal Alcohol Exposure With or Without Physical Features of Fetal Alcohol Syndrome Leads to IQ Deficits," *Journal of Pediatrics*, 131 (1997): 718-21; and E.L. Abel and R.J. Sokol, "Incidence of Fetal Alcohol Syndrome and Economic Impact of FAS-Related Anomalies," *Drug and Alcohol Dependency*, 19 (1987): 51-70.
48. Mattson and Riley, *supra* note 44, at 285.
49. See L. Kaskutas, "Interpretations of Risk: The Use of Scientific Information in the Development of the Alcohol Warning Label Policy," *International Journal of Addictions*, 30 (1995): 1519-48 (providing a useful summary of the strong but still somewhat equivocal scientific evidence regarding gestational consumption of alcohol).
50. See Bell and Lau, *supra* note 7.
51. G. Koren, "Cocaine and the Human Fetus: The Concept of Teratophilia," *Neurotoxicology and Teratology*, 15 (1993): 301-04, at 303. See also D.R. Neuspiel, "Behavior in Cocaine-Exposed Infants and Children: Association Versus Causality," *Drug and Alcohol Dependence*, 36 (1994): 101-07. For excellent surveys of the scientific literature regarding the flawed and inconclusive nature of much of the gestational cocaine use literature, see J.E. Ellis et al., "In Utero Exposure to Cocaine: A Review," *Southern Medical Journal*, 86 (1993): 725-31; and Lindesmith Center, *Research Brief: Cocaine & Pregnancy* (visited July 22, 1999) <http://www.lindesmith.org/library/subject.html>.
52. D.R. Neuspiel, "Cocaine and the Fetus: Mythology of Severe Risk," *Neurotoxicology and Teratology*, 15 (1993): 305-06.
53. See D.R. Neuspiel et al., "Maternal Cocaine Use and Infant Behavior," *Neurotoxicology and Teratology*, 13 (1991): 229-33; Bell and Lau, *supra* note 7; Hulse et al., *supra* note 7; Plessinger and Woods, *supra* note 8; and Eyler et al., *supra* note 8.
54. J.R. Woods Jr., "Translating Basic Research on Drugs and Pregnancy into the Clinical Setting," in Wetherington and Roman, *supra* note 38, 187-95, at 190.
55. L.L. LaGasse, R. Seifer, and B.M. Lester, "Interpreting Research on Prenatal Substance Exposure in the Context of Multiple Confounding Factors," *Clinics in Perinatology*, 26 (1999): 39-54, at 39.

56. See Wis. Stat. § 146.0255(2) (1998).

57. See J. Kaplan and J.R. Waltz, *Evidence: Cases and Materials* (Mineola: Foundation Press, 6th ed., 1987): 81–96.

58. See L. Handwerker, "Medical Risk: Implicating Poor Pregnant Women," *Social Science Medicine*, 8 (1994): 665–75.

59. See Wis. Stat. §§ 940.06–.25 et seq.

60. See M. Rosenbaum and K. Irwin, "Pregnancy, Drugs, and Harm Reduction," in Wetherington and Roman, *supra* note 38, at 309–18.

61. See E.M. Howell, N. Heiser, and M. Harrington, "A Review of Recent Findings on Substance Abuse Treatment for Pregnant Women," *Journal of Substance Abuse Treatment*, 16 (1999): 195–219.

62. See A.M. Cole, "Legal Interventions During Pregnancy: Court-Ordered Treatment and Legal Penalties for Potentially Harmful Behavior by Pregnant Women," *JAMA*, 264 (1990): 2663–70.

63. See De Ville and Kopelman, *supra* note 9; and Solomon, *supra* note 30.

64. See D.E. Roberts, "Punishing Drug Addicts Who Have Babies: Women of Color, Equality, and the Right to Privacy," *Harvard Law Review*, 104 (1991): 1419–82; I.J. Chasnoff, H.J. Landress, and M.E. Barret, "The Prevalence of Illicit-Drug or Alcohol Use During Pregnancy and Discrepancies in Mandatory Reporting in Pinellas County, Florida," *N. Engl. J. Med.*, 322 (1990): 1202–06; D.R. Neuspiel, "Racism and Perinatal Addiction," *Ethnicity & Disease*, 6, nos. 1–2 (1996): 47–55; and P.H. Jos, M.F. Marshall, and M. Perlmutter, "The Charleston Policy on Cocaine Use During Pregnancy, A Cautionary Tale," *Journal of Law, Medicine & Ethics*, 23 (1995): 120–28.

65. See D. Humphries, "Crack Mothers at 6," *Violence Against Women*, 6, no. 1 (1998): 45–61.

66. J.M. Wilton, "Compelled Hospitalization and Treatment During Pregnancy: Mental Health Statutes as Models for Legislation to Protect Children from Prenatal Drug and Alcohol Exposure," *Family Law Quarterly*, 25 (1991): 149–70, at 150.

67. See L.J. Nelson and M.F. Marshall, *Ethical and Legal Analyses of Three Coercive Policies Aimed at Substance Abuse By Pregnant Women* (Princeton: Robert Wood Johnson Foundation, Substance Abuse Policy Research Program, Grant 030790, 1997): at 95–111.

68. See S.A. Garcia and I. Keilitz, "Involuntary Civil Commitment of Drug-Dependent Persons with Special Reference to Pregnant Women," *MPDLR*, 15 (1991): 418–37.

69. Wilton, *supra* note 66, at 166.

70. The intentionality requirement, of course, would allow pregnant women to avoid involuntary commitment for potentially injurious substance abuse throughout the first two trimesters of their pregnancies by merely informing the court that they did not intend to carry the fetus to term. At the same time, however, if the pregnancy has progressed past the point of a legal abortion, then the issue of whether the woman "intends" to carry the fetus to term becomes irrelevant. She would be legally precluded from deciding otherwise.

71. H.C. Black, *Black's Law Dictionary* (St. Paul: West Publishing, 5th ed., 1979): at 227.