## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WISCONSIN

_____

**TAMARA M. LOERTSCHER**

            Plaintiff,                                  Case No. 14-cv-870

v.

**BRAD SCHIMEL**, in his official capacity as
ATTORNEY GENERAL OF THE
STATE OF WISCONSIN;
**ELOISE ANDERSON**, in her official capacity as
SECRETARY OF THE DEPARTMENT OF          **JURY TRIAL DEMANDED**
CHILDREN AND FAMILIES;
**TAYLOR COUNTY**;
**AMBER FALLOS**, in her individual and official capacity as
AGENCY DIRECTOR OF TAYLOR COUNTY
DEPARTMENT OF HUMAN SERVICES;
**LIZA DALEIDEN**, in her individual and official capacity as
DEPUTY DIRECTOR OF TAYLOR COUNTY
DEPARTMENT OF HUMAN SERVICES;
**JULIE CLARKSON**, in her individual and official capacity as
SOCIAL WORKER WITH TAYLOR
COUNTY DEPARTMENT OF HUMAN SERVICES; and
**JANE OR JOHN DOE**, in her/his individual and official capacity as
signatory and state actor on
TEMPORARY PHYSICAL CUSTODY ORDER,
dated August 4, 2014,

            Defendants.

_____

### AMENDED COMPLAINT
_____

1. This is a challenge to 1997 Wisconsin Act 292, codified at, _inter alia_, Wis. Stat. § 48.133

   _et seq._ (hereinafter "The Act," _see_ Appendix, Exhibits 1 & 2), as unconstitutional on its

   face and as applied to the plaintiff, brought under 42 U.S.C. § 1983. The Act authorizes

   Defendants to seize control of pregnant women alleged to have some history or present

   use of drugs or alcohol. Two categories of defendants are being sued: "State Defendants,"

which include Defendants Brad Schimel and Eloise Anderson, and "County Defendants," which include Taylor County, Amber Fallos, Liza Daleiden, Julie Clarkson and Jane/John Doe.  Pursuant to the Act, individuals and institutions within State Defendants' ultimate oversight and control have inflicted egregious harms on Plaintiff Tamara Loertscher. Ms. Loertscher's ordeal began when she went to a hospital to get medical help. In response, County Defendants, pursuant to unconstitutional policies, procedures and practices for implementation of the Act, invaded her private medical decision-making and initiated adversarial court proceedings against Ms. Loertscher without affording her counsel or any procedural safeguards. County Defendants, acting under the authority and ultimate control of the State Defendants, and acting pursuant to unconstitutional policies, practices, and procedures for implementation of the Act, petitioned for, obtained, and sought enforcement of unconstitutional court orders against Ms. Loertscher, mandating unwanted and inappropriate medical treatment and incarceration. They caused her to be arrested her and jailed her while she was pregnant where she was subjected to solitary confinement, deprivation of medical treatment, and other abuse.And they issued an administrative determination—while Ms. Loertscher was still pregnant—that she had abused her less than 14-week fetus. Ms. Loertscher brings this suit to vindicate her constitutional rights, dignity, and personhood. She seeks declaratory and injunctive relief that the Act is unconstitutional on numerous grounds. She further seeks an award of compensatory and punitive damages for the harm she has suffered due to the unconstitutional  actions of the Taylor County Defendants.

**FACTS**

2.  Tamara Loertscher is a 31 year-old woman who was a resident of Taylor County, Wisconsin during the time the events described in this Complaint took place.

3.  During her teens, Ms. Loertscher had radiation treatment that left her without a functioning thyroid. As a result, Ms. Loertscher suffers from severe hypothyroidism, meaning that she is unable to produce vital hormones without medication. In the absence of medication, Ms. Loertscher suffers from severe symptoms of depression and fatigue.

4.  Ms. Loertscher also has a history of severe, clinically diagnosed depression, a condition that is compounded by the symptoms of untreated hypothyroidism.

5.  Ms. Loertscher has been unemployed since February 2014. Previously, she worked as a certified nurse's assistant.

6.  While employed, Ms. Loertscher was not eligible for employee health care insurance. However, with a salary, Ms. Loertscher was able to pay for her thyroid medication and related blood testing out of pocket.

7.  When Ms. Loertscher became unemployed in February of 2014, she was unable to pay for her thyroid medication and related blood testing. She attempted to apply for BadgerCare, Wisconsin's version of Medicaid, but was told by officials that there was a waiting list of more than a year to process any new applications. She was thus without any medical treatment for her hypothyroidism beginning in February 2014.

8.  Without treatment for her thyroid condition, Ms. Loertscher sank into a severe depression with accompanying fatigue and intrusive thoughts.

9.  Ms. Loertscher also began to experience severe head and neck pain. Simultaneously, she suffered from increasing mental confusion and disorientation.

10. During this time period, Ms. Loertscher began to use methamphetamine. Ms. Loertscher had no history of drug dependency or addiction. But methamphetamine, a stimulant, helped her to get out of bed in the morning and manage the symptoms of her untreated hypothyroidism and head and neck pain.

11. Ms. Loertscher smoked marijuana during this time period as well, but very intermittently—fewer than 10 times in the year prior to July of 2014.

12. Ms. Loertscher used no other illegal drugs at this time, and consumed almost no alcohol. The sum total of her alcohol consumption was one half glass of wine in the month of July, 2014.

13. Toward the end of July of 2014, Ms. Loertscher began to believe that she might be pregnant. She then stopped all drug use.

14. Ms. Loertscher has not ingested methamphetamine or used marijuana since that time. Nor did she drink any alcohol for the remainder of her pregnancy.

15. On August 1, 2014, Ms. Loertscher went to the Taylor County Department of Human Services ("TCDHS"). She explained to personnel there that she was suffering from a number of serious medical problems, but could not afford to pay for medical treatment. She specified that she had a history of hypothyroidism that was presently untreated, and that she was severely depressed, and that these conditions made her need for medical care urgent.

16. Personnel at TCDHS advised Ms. Loertscher to present herself to the Eau ClaireMayo Clinic ("Mayo Clinic") emergency room that day. TCDHS personnel told Ms. Loertscher that they had spoken with the Mayo Clinic and learned that there was a bed available in the behavioral health unit ("BHU").

17.  On August 1, 2014, Ms. Loertscher sought help at the Mayo Clinic emergency room. She hoped to find out for certain if she was pregnant, and if so, to get appropriate medical treatment for her medical issues.

18.  Shortly after Ms. Loertscher's arrival, Mayo Clinic personnel asked Ms. Loertscher to provide a urine sample and she did so.

19.  Mayo Clinic personnel used the urine sample to perform multiple tests, including a drug screen. The results returned "unconfirmed positive" for methamphetamine, amphetamine, and tetrahydrocannabinol (THC), the active ingredient in marijuana. The test results did not quantify concentrations, and the results were labeled, "FOR MEDICAL USE ONLY, ALL RESULTS UNCONFIRMED."

20.  After obtaining and testing the urine sample, an emergency room physician told Ms. Loertscher that her urine test results had shown that she was indeed pregnant, and that there was an unconfirmed positive test result for drugs methamphetamine, amphetamine, and THC. Ms. Loertscher was at that point very worried, because she did not know how far along she was and what impact her previous drug use could have had on her pregnancy. An ultrasound tech performed an ultrasound on Ms. Loertscher later that day.

21.  Also on August 1, 2014 , Dr. Filza Hussain, a psychiatrist at the Mayo Clinic, came and spoke with Ms. Loertscher. Dr. Hussain did not provide any details about Ms. Loertscher's ultrasound or her pregnancy. Instead, she said that Ms. Loertscher's urine had tested positive for methamphetamine and marijuana. Upon Dr. Hussain's request, Ms. Loertscher disclosed her limited history of substance use and asked pointedly for information about her pregnancy. Dr. Hussain refused to discuss her pregnancy results and spoke only about the need to address Ms. Loertscher's "drug problem."

22. Sometime later, Ms. Loertscher was finally visited by an obstetrician gynecologist, Dr. Leonard Ezenagu. Dr. Ezenagu confirmed that the ultrasound showed a healthy pregnancy of approximately 14 weeks gestation. Ms. Loertscher was so relieved that she began to cry.

23. Mayo Clinic personnel also conducted a thyroid stimulating hormone (TSH) test that day to determine the severity of Ms. Loertscher's hypothyroidism. Ms. Loertscher's TSH value was over 100, which is commonly understood to reflect severe, untreated hypothyroidism. Mayo Clinic personnel told Ms. Loertscher that they had "never seen" test results that high. With TSH test scores of this type, high levels of depression and fatigue, as well as other symptoms, are to be expected.

24. Ms. Loertscher then waited unattended in the emergency room for a few hours, until she was admitted to the Behavioral Health Unit, as she had requested when she came to the hospital. Ms. Loertscher was voluntarily admitted on the evening of August 1, 2014, to the Mayo Clinic BHU for inpatient psychiatric and medical care on a short-term basis. She hoped to receive medical treatment for her conditions and health issues in a clinical environment.

25. On approximately August 2, 2014 or August 3, 2014, without Ms. Loertscher's knowledge or consent, personnel from the Mayo Clinic shared Ms. Loertscher's confidential medical information with agents of TCDHS, which operates in conjunction with law enforcement under the direction and oversight of the Wisconsin Department of Children and Families.

26. Sometime thereafter, a Taylor County commissioner appointed attorney Michael Shiffler to serve as guardian ad litem (GAL) on behalf of Ms. Loertscher's fetus as completely

separate from Ms. Loertscher.

27. On August 4, 2014, an unknown person with an illegible signature signed a "Temporary Physical Custody Request" form that purports to authorize, expressly without notice to Ms. Loertscher, her detention at "Luther Hospital", which is another name for the Eau Claire Mayo Clinic.  A copy of this document has been filed in this action at ECF No. 16-1.  The signatory to that document is named as a party in this action as Jane or John Doe.

28. Between August 1, 2014, and August 5, 2014, social workers at the Mayo Clinic made repeated contact with Ms. Loertscher. The two who did so most often were Jared Duellman and Corinna Everson. Ms. Everson informed Ms. Loertscher that TCDHS had been alerted to Ms. Loertscher's positive drug test. Ms. Everson then demanded that Ms. Loertscher sign a waiver permitting release of her medical records to TCDHS. When Ms. Loertscher refused, Ms. Everson warned Ms. Loertscher that if she did not comply, she would be locked up in a mandatory drug treatment program for the duration of her pregnancy, and further that her child when born would be taken from her and put up for adoption. Ms. Everson repeated this ultimatum several times despite Ms. Loertscher's request to hospital personnel that she be assigned a different social worker.

29. On August 4, 2014, Ms. Loertscher determined that she was not getting the sort of care that she had hoped for, but that instead Mayo Clinic personnel were treating her with hostility because of her positive drug screen and admitted history of limited use. At this time, Ms. Loertscher expressed to hospital personnel a desire to go home, but she was told that she was not free to go because Taylor County had issued a temporary custody order requiring her to stay in the Mayo Clinic.

30. On August 5, 2014, Ms. Everson led Ms. Loertscher into a conference room within the

Mayo Clinic. Ms. Everson then told Ms. Loertscher that there was a judge on the phone for her. Ms. Everson then placed a document in front of Ms. Loertscher. This was a not-yet-filed "Petition for Protection or Care of an Unborn Child" ("the Petition") against Ms. Loertscher. The Petition alleged that if Ms. Loertscher is not held in custody, there is a substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered by Tamara M. Loertscher's habitual lack of self-control in the use of alcohol beverages, controlled substances or controlled substance analogs. Ms. Loertscher did not understand this document and was extremely upset during this discussion.

31. When asked if she was present, Ms. Loertscher spoke into the telephone but stated that she refused to answer questions in the absence of an attorney.

32. A court transcript obtained on Ms. Loertscher's behalf reveals that this telephone call on August 5, 2014, was deemed by the court to be a hearing on the as-yet-unfiled Petition against Ms. Loertscher. On the other end of the phone were Taylor County Court Commissioner Gregory Krug, TCDHS Corporation Counsel Courtney Graff, GAL Michael Shiffler on behalf of Ms. Loertscher's fetus, and TCDHS personnel Julie Clarkson, Darlene Anderson, and Liza Daleiden. A copy of the transcript of this proceeding has been filed in this action at ECF No.1-2.

33. After Ms. Loertscher announced into the phone that she would not answer questions without counsel, she left the room into which she had been ushered for the call. Commissioner Krug then found that Ms. Loertscher had waived her appearance at the hearing and that the hearing would continue in her absence. He then proceeded to take testimony.

34. TCDHS called Dr. Jennifer Bantz, an obstetrician gynecologist at the Mayo Clinic to testify. Dr. Bantz had met with Ms. Loertscher the evening before this call during her stay in the Mayo Clinic BHU, and Dr. Bantz testified via telephone that she had reviewed Ms. Loertscher's medical history. Immediately after that, Dr. Bantz stated that she did not have Ms. Loertscher's authorization to speak on her behalf, and noted that would be breaching Ms. Loertscher's confidentiality if she were to talk about that history. TCDHS Corporation Counsel Courtney Graff advised her that patient confidentiality would not be an issue in that type of proceeding. Dr. Bantz then answered questions pertaining to Ms. Loertscher's personal medical information and history.

35. During the August 5, 2014, hearing, Corporation Counsel Graff asked Dr. Bantz, whether use of methamphetamine and marijuana during pregnancy can seriously endanger the health of a fetus. Dr. Bantz responded that she is not an expert witness in this respect, but went on to state that marijuana has not been shown to cause any specific anomalies in a fetus. Dr. Bantz acknowledged that she did not have much experience with respect to methamphetamine use during pregnancy, but reported having done some reading the previous evening regarding methamphetamine use and reported having read an article suggesting that methamphetamine use during pregnancy can result in babies smaller at the gestational stage with a suggestion of cognitive problems later on. Dr. Bantz then testified to greater confidence in the effects of alcohol consumption during pregnancy, noting that the existence of effects of fetal alcohol syndrome are well known.

36. Dr. Bantz further testified that her greatest concern for Ms. Loertscher's pregnancy related to Ms. Loertscher's hypothyroidism and her ability to get appropriate prenatal care.

37. At the close of the August 5, 2014, hearing, Commissioner Krug entered an order of "Temporary Physical Custody" against Ms. Loertscher. The Order required Ms. Loertscher to remain at the Mayo Clinic until she was "cleared," at which time Commissioner Krug ordered that she be transferred to a treatment facility during the remaining term of her pregnancy. A copy of this order has been filed in this action at ECF No. 1-3.

38. On August 6, 2014, Mayo Clinic social worker Mr. Duellman informed Ms. Loertscher that arrangements had been made for her "placement" the following morning at the Lutheran Social Services Fahrman Center ("Fahrman Center"), a residential addiction treatment facility in Eau Claire, Wisconsin. Mr. Duellman told Ms. Loertscher that she had no choice in the matter, that the "placement" was pursuant to court order, and that TCDHS would arrive at the Mayo Clinic the following morning to take her. Mr. Duellman further stated that, per the directive of social worker Julie Clarkson with the TCDHS, Ms. Loertscher was court-ordered to remain at the Mayo Clinic until TCDHS took her to the Fahrman Center.

39. On the morning of August 7, 2014, Mayo Clinic personnel informed Ms. Loertscher that she would need to submit to a blood test before she could be "discharged" to the Fahrman Center. Mayo Clinic personnel informed Ms. Loertscher that the blood sample was for a tuberculosis (TB) test, to which the Fahrman Center required her to submit before it would admit her.

40. Ms. Loertscher refused to permit a blood draw and stated her desire to go home immediately.

41. Mayo Clinic records reflect that, after Ms. Loertscher refused to submit to a blood test,

Mr. Duellman called Liza Daleiden, Deputy Director of TCDHS, to report that Ms. Loertscher had refused to submit to a TB screen.

42. Records further reflect that Mr. Duellman then held a phone conference between medical and social work staff from the Mayo Clinic and personnel from TCDHS. Ms. Loertscher was not informed of nor invited to participate in this call. Mayo Clinic medical staff determined on this call that the Mayo Clinic was no longer an appropriate treatment location for Ms. Loertscher. The parties to the call then discussed alternative placement options for Ms. Loertscher.

43. After this call, Mr. Duellman and physician Dr. Shamim Anwar of the Mayo Clinic met with Ms. Loertscher. Also present were Ms. Loertscher's mother and her mother's boyfriend. At this meeting, Ms. Loertscher repeated her desire to be permitted to leave. Mr. Duellman and Dr. Amwar then discussed treatment options for Ms. Loertscher upon her release from the Mayo Clinic. Ms. Loertscher expressed a desire to undergo outpatient treatment with nurse practitioner Laura Sova at the Medford Clinic in Ms. Loertscher's hometown. Ms. Sova had provided treatment related to depression for Ms. Loertscher on a prior occasion. Ms. Loertscher indicated that she would speak with Ms. Sova about seeing a psychiatrist. Ms. Loertscher was given a prescription for anti-depressant medication, as well as prescription medication for her hypothyroid condition, and then she was permitted to leave.

44. On August 11, 2014, GAL Shiffler filed a Notice of Motion and Motion for Remedial Contempt against Ms. Loertscher in Taylor County Court. The Notice set a hearing date on the contempt motion for August 25, 2014, before Judge Ann N. Knox-Bauer. Attached to the Notice was an affidavit from Liza Daleiden of TCDHS alleging that Ms.

Loertscher was in contempt of the Court's August 5, 2014, Temporary Physical Custody Order because she had refused a TB test and otherwise failed to comply with TCDHS directives. A copy of this motion and supporting affidavit has been filed in this action at ECF No. 1-4.

45. On August 13, 2014, Corporation Counsel Courtney Graff filed a Motion to Take Expectant Mother into Immediate Custody on behalf of TCDHS. The Motion stated as grounds that Ms. Loertscher had not been in contact with TCDHS and had otherwise failed to comply with the earlier Order for her placement at the Fahrman Center. A copy of this motion and supporting affidavit has been filed in this action at ECF No. 1-5.

46. The same day, August 13, 2014, Judge Knox-Bauer granted the TCDHS Motion and entered an Order to Take Expectant Mother into Immediate Custody. The Order stated that it was contrary to the unborn child's best interests for the expectant mother to have been released from custody and returned home due to the expectant mother's habitual use of controlled substances and her violation of the order for Temporary Physical Custody. A copy of this order has been filed in this action at ECF No. 1-6.

47. On August 14, 2014, Taylor County police officers delivered a copy of the Notice of Motion and Motion for Remedial Contempt to Ms. Loertscher at the home of her grandparents where Ms. Loertscher was residing. The officers announced their intention to arrest Ms. Loertscher and to take her into custody. At this time, Ms. Loertscher's grandfather spoke with the police and convinced them not to arrest Ms. Loertscher. The police then left.

48. Upon receipt of the Notice of Motion and Motion for Remedial Contempt, Ms. Loertscher, her boyfriend, and her family made efforts to secure legal counsel for her.

They were unsuccessful, however, because they could not afford any of the retainer fees that were quoted to them.

49. On August 25, 2014, Ms. Loertscher appeared in court for the hearing before Judge Knox-Bauer. Present were GAL Shiffler on behalf of Ms. Loertscher's fetus, attorney Courtney Graff as Corporation Counsel for TCDHS, social workers Julie Clarkson and Liza Daleiden of TCDHS, and along with Ms. Loertscher, her boyfriend, her mother, and her mother's boyfriend.

50. Ms. Loertscher did not have counsel at the August 25, 2014, hearing. She did not understand the purpose of the hearing or what was said. Ms. Loertscher requested that a different judge hear the case, and the hearing was then cut short. Ms. Loertscher did this because she understood that proceedings had already transpired in her absence, and she believed these must have been before the same judge, Judge Knox-Bauer. Ms. Loertscher desired her case to be heard before a judge that would not be prejudiced by having heard anything in her absence, and she requested a substitute judge for this reason. Judge Knox-Bauer rescheduled the hearing before a different judge for September 4, 2014. A copy of the transcript of the August 25, 2014, proceeding  has been filed in this action at ECF No. 1-7.

51. During the evening of August 25, 2014, after the hearing before Judge Knox- Bauer, police officers arrived at the home of Ms. Loertscher's grandparents again seeking to arrest Ms. Loertscher. Ms. Loertscher's boyfriend asked the officers why they would arrest Ms. Loertscher when she had just come from a hearing and had another scheduled for September 4, 2014. The police told Ms. Loertscher and her boyfriend that they had an "order" from attorney Courtney Graff stating that Ms. Loertscher was to be taken into

custody. Ms. Loertscher's boyfriend pleaded that this was illogical and ultimately the police officers left without arresting Ms. Loertscher.

52. On September 4, 2014, Judge Douglas Fox held a hearing on the contempt motion. Ms. Loertscher was present but not represented by counsel. Present were GAL Shiffler on behalf of Ms. Loertscher's fetus and Courtney Graff as TCDHS Corporation Counsel, as well as Ms. Loertscher, her boyfriend, her mother, and her mother's boyfriend. At the request of Ms. Graff, Judge Fox expressly forbid all non-attorneys other than Ms. Loertscher to speak. A copy of the transcript of this proceeding has been filed in this action at ECF No. 1-8. Judge Fox then asked GAL Shiffler what his plea was. GAL Shiffler admitted all the allegations against Ms. Loertscher on behalf of her fetus.

53. At the hearing, Judge Fox took testimony from Julie Clarkson of TCDHS. Ms. Clarkson testified that Ms. Loertscher had failed to abide by the August 5, 2014, order by failing to take a TB test, submit to in-patient treatment at the Fahrman Center, and otherwise comply with TCDHS directives.

54. Ms. Loertscher then testified in her own defense. Without the benefit of counsel, Ms. Loertscher attempted to counter the contempt charge against her, as well as the underlying proceedings alleging abuse and neglect of her fetus. Ms. Loertscher said, "I don't feel like I need treatment. Like I feel like I went to the hospital and sought treatment and then they violated my rights and all these people got this information that I feel they shouldn't have gotten. And I feel my whole stay there was made worse[.]"

55. At the close of the September 4, 2014, hearing, Judge Fox found Ms. Loertscher in contempt of court and ordered her to serve 30 days in jail. He set as conditions for purge of the contempt Ms. Loertscher's submission to a TB blood test so that she could be

placed involuntarily in the Fahrman Center for an indeterminate period; Ms. Loertscher's consent and signature for release of all medical information requested by TCDHS; and general compliance with all other TCDHS directives. A copy of the Remedial Contempt Order and Order for Commitment has been filed in this action at ECF No. 1-9. On September 4, 2014, after the close of the hearing, Ms. Loertscher was led to a conference room in the courthouse where she met alone with Julie Clarkson and Liza Daleiden, social workers for TCDHS. Ms. Loertscher was frustrated and asked them what they wanted from her. One of them responded, "we just want a healthy baby." Ms. Loertscher said that this is what she wanted too, and told them that they were making things so much worse. She asked if "all this would go away" if she had an abortion. Ms. Clarkson and Ms. Daleiden responded, "yes, it would."

56. On the evening of September 4, 2014, Ms. Loertscher surrendered to the Taylor County Jail. She was held there until September 22, 2014, a total of 18 days.

57. During the first 48 hours of her incarceration, the Taylor County Jail failed to provide Ms. Loertscher with her thyroid medication. When the jail finally obtained the medication, jail personnel refused to allow Ms. Loertscher to take the first dose until the next day, (approximately 36 hours after being taken into custody), even though the medication should be taken as soon as possible after a missed dose.

58. During her incarceration in the Taylor County Jail, Ms. Loertscher began to experience a lot of cramping, pain, and vaginal discharge. She became anxious about the health of her pregnancy and asked to see a physician. At first, jail officials denied her requests, but eventually, a jail guard told her that she could see the "Jail Doctor."

59. The next morning, Ms. Loertscher was put in a room alone for several hours to wait for

the doctor. Around midday, the "Jail Doctor" visited Ms. Loertscher. Ms. Loertscher recounted the reasons for her concern, and the doctor responded, "Well, if your body decides to abort, there's nothing we can do about it." The doctor then said, "we can't give you any special treatment if the jail itself doesn't confirm the pregnancy." Ms. Loertscher did not see any purpose to a pregnancy test and declined to provide a urine sample.

60. Shortly thereafter, a jail guard named Judy Daney came to Ms. Loertscher's cell and asked, "Are you going to take the piss test yet?" When Ms. Loertscher said no, Ms. Daney grabbed Ms. Loertscher by the arm and tried to pull her out of the cell. Ms. Daney asked another unidentified guard standing nearby, "Where is the Taser?" The other guard responded, "You're not going to do that." Ms. Daney then removed Ms. Loertscher to solitary confinement.

61. The solitary confinement cell was a room without windows containing only a toilet and a metal bed frame. The room was cold and filthy. The floor, walls, and toilet area had hair and feces on them, and there were fingernails visible beneath the mattress frame. There was no mattress on the bed. Ms. Loertscher was given only a roll of toilet paper. A guard provided a thin mattress and blanket in the evening and another guard took these away first thing in the morning. Ms. Loertscher remained in this cell for approximately 36 hours.

62. While in solitary confinement, Ms. Loertscher was periodically visited by jail guards, who repeatedly asked whether Ms. Loertscher was ready to submit to a urine test. Ms. Loertscher responded "no" each time.

63. After having spent the night in solitary confinement, Ms. Loertscher was brought again to the "Jail Doctor" by a guard named Jennifer. In front of the doctor, Jennifer threatened

that if Ms. Loertscher did not comply and provide a urine sample, she would be jailed for the rest of her pregnancy and would have her baby in jail. Ms. Loertscher nonetheless declined to provide a urine sample, and the doctor said "okay, nobody will bother you about it anymore." After several more hours, Ms. Loertscher was returned to her original cell by a different guard.

64. At some point during her incarceration, the same jail guard named Jennifer lectured Ms. Loertscher regarding the alleged effects of methamphetamine use during pregnancy. Jennifer asked Ms. Loertscher "do you even care about your baby?" and said that "your refusal to take the [pregnancy] test just proves that you're guilty."

65. During her incarceration, Ms. Loertscher requested to be transported to two scheduled prenatal care appointments. Taylor County Jail personnel refused each time. At one point, jail personnel told her that she "shouldn't have gotten [herself] in this position [if she wanted to keep her appointments]."

66. Ms. Loertscher had no prenatal care of any kind during the length of her incarceration.

67. Sometime during Ms. Loertscher's incarceration, counsel was finally appointed to represent Ms. Loertscher. Attorney Justin Wolff of the Office of the State Public Defender was appointed to represent Ms. Loertscher solely in the contempt proceeding, and not for defense against the underlying Petition. A copy of the Order Appointing Counsel has been filed in this action at ECF No. 1-10.

68. After being appointed, Mr. Wolff negotiated a Consent Decree with GAL Shiffler and the TCDHS that would provide for Ms. Loertscher's release from jail. Ms. Loertscher signed the Consent Decree with the understanding that she needed to agree to it in order to be released from jail.

69. On September 22, 2014, Judge Fox held a hearing. Ms. Loertscher, her boyfriend, her court-appointed counsel Justin Wolff, GAL Michael Shiffler, TCDHS social worker Liza Daleiden, and TCDHS Corporation Counsel Courtney Graff were present at the hearing. Judge Fox adopted the Consent Decree and made compliance with its terms sufficient to purge his earlier finding of contempt. Ms. Loertscher was told that her release from jail was conditional upon her signing the Decree, so she did so. A copy of the transcript of this proceeding has been filed in this action at ECF No. 1-11.

70. Ms. Loertscher was then released from the Taylor County Jail on September 22, 2014. A copy of the Order for Purge Modification and Release from Taylor County Jail has been filed in this action at ECF No. 1-12.

71. By its terms, the Consent Decree permitted Ms. Loertscher to go home so long as she agreed to: Alcohol and Other Drug Abuse (AODA) Assessment; compliance with any recommended treatment resulting from the AODA Assessment; submission to drug testing on at least a weekly basis at her own expense; signing any and all releases necessary for transfer of drug test results to TCDHS; and signing any other releases as requested by TCDHS. By its terms, the Consent Decree declared that a GAL would remain appointed for Ms. Loertscher's fetus for the duration of the pregnancy. A copy of the Consent Decree has been filed in this action at ECF No. 1-13.

72. By a notice dated September 29, 2014, Ms. Loertscher was informed that TCDHS issued an administrative finding that she had committed child maltreatment. This finding is separate from the court case against Ms. Loertscher that was initiated by the original Petition filed August 5, 2014, and is independent of the Consent Decree. TCDHS apparently reached an administrative determination of child maltreatment of its own

distinct volition. The notice stated that the finding was appealable within 30 days. A copy of this notice has been filed in this action at ECF No. 1-14.

73.  Ms. Loertscher appealed this TCDHS finding on October 29, 2014; on November 14, 2014, she received notice dated November 10, 2014, that TCDHS Agency Director Amber Fallos had conducted a "desk review" of her appeal and affirmed the finding that Ms. Loertscher had committed child maltreatment of her fetus. The basis for this decision was listed as the reports of treating physicians at the Mayo Clinic to the effect that Ms. Loertscher had reported some period of use of methamphetamine and marijuana. The administrative finding was based exclusively on information recorded in Ms. Loertscher's medical records. No qualified expert testimony of any kind was provided in support of the maltreatment finding. A copy of this notice has been filed in this action at ECF No. 1-15.

74.  Ms. Loertscher provided notice to TCDHS that she intended to challenge the "child maltreatment" finding in an administrative proceeding. This challenge was brought on factual and scientific grounds, and is separate and apart from this civil rights action. In June 2015, TCDHS withdrew its "child maltreatment" finding.

75.  Ms. Loertscher gave birth to a healthy baby boy on January 23, 2015, at a hospital in Eau Claire, Wisconsin.

76.  Ms. Loertscher willingly sought medical help for hypothyroidism, depression, and head and neck pain upon learning that she might be pregnant. Almost from the first, her intention to seek health care was turned against her for law enforcement purposes. As a result, she was deprived of liberty and numerous well-established constitutional rights.

77.  Ms. Loertscher has suffered serious emotional distress and economic damages as a result

of the actions of Defendants. Because TCDHS was authorized by court order to supervise and control Ms. Loertscher's medical decision- making, she suffered an ongoing loss of liberty throughout her pregnancy and delivery, that continued until the supervision by Defendants provided for in the Consent Decree, ECF No. 1-13, terminated on March 22, 2015. The emotional distress and economic damages Ms. Loertscher suffered as a result of Defendants' unconstitutional actions continues to this day.

78. Ms. Loertscher brings this suit to bar all Defendants from further engagement in these unconstitutional practices against her and against all women in Wisconsin, and to obtain monetary damages from the County Defendants.

79. As a result of the Defendants' actions, Ms. Loertscher suffered lasting emotional and psychological distress throughout her pregnancy, during childbirth, and after childbirth. Fear of further state intervention into her pregnancy and parenting, and experiencing ongoing surveillance and unwarranted drug tests rendered Ms. Loertscher extremely anxious and fearful of additional unwarranted state intervention in her life in Wisconsin, which had been her home since she was born. As a result, she has sought to live outside the State of Wisconsin for extended periods of time to achieve some peace of mind, even though she has desired to retain her domicile with the state of her origin, where her family still resides.

80. Even outside the state of Wisconsin, every time Ms. Loertscher seeks medical care for herself and pediatric care for her child, she is deeply anxious and distressed by concern about what effect the record of Defendants' actions against her under the Act will have on any new health care provider.  She is terrified that if her son, now a healthy 9-month old, suffers any illness or injury, that when she seeks medical care for him, she will be

blamed.

81. And because of her severe hypothyroidism, Ms. Loertscher herself must be under a doctor's care for medication and periodic blood tests.  But she is now afraid to share her medical history and confidential medical information with any physician.

82. As a result of Defendants' actions, Ms. Loerstcher's trust in the medical system and health care providers has been destroyed, which causes Ms. Loertscher severe ongoing stress and anxiety.

83.  As a result of Defendants' actions, Ms. Loertscher feared further intimidation, harassment, and unwarranted interventions by local officials if she remained in her home town. Thus Ms. Loertscher was forced to incur the expense of moving out of state with her young family in order to achieve some piece of mind.

84.  Through seizure of Ms. Loertscher's medical information pursuant to an unconstitutional policy, procedure, and practice for implementation of The Act, County Defendants harmed Ms. Loertscher and profoundly invaded her rights.

85. By taking Ms. Loertscher into custody and seeking to secure her institutionalization, despite no evidence of severe drug dependency, pursuant to an unconstitutional  policy, procedure, and practice for implementation of the Act , the County Defendants harmed Ms. Loertscher and stripped her of her constitutional rights..

86. By causing the imprisonment of Ms. Loertscher pursuant to an unconstitutional policy, procedure, and practice for implementation of the Act, County Defendants harmed Ms. Loertscher, risked her health and the health of her pregnancy, and profoundly deprived her of her constitutional rights.

87. By pursuing a child maltreatment determination against Ms. Loertscher pursuant to an

unconstitutional policy, procedure and practice for implementation of The Act, County

Defendants harmed Ms. Loertscher and violated her constitutional rights.

## PARTIES

88.   Plaintiff Tamara M. Loertscher is a thirty-one year-old woman who was living in

Medford, Wisconsin, at the time the events described in this complaint took place.

89.   Defendant Brad Schimel is the Attorney General of the State of Wisconsin. He is

responsible for execution and enforcement of the laws of the State, and is a state actor

acting under color of law at all relevant times for purposes of this action.

90.   Defendant Eloise Anderson is the Secretary of the Department of Children and Families

for the State of Wisconsin. She is responsible for administration and enforcement of the

state's family laws, including Chapter 48 of the Children's Code. She is responsible for

management and direction of the county departments of human services, including

TCDHS, and is a state actor acting under color of law at all relevant times for purposes of

this action.

91.   Defendant Taylor County is responsible for development and implementation of county-

level policies, procedures and practices for the local-level administration of the laws of

the State as they apply in Taylor County, and is a state actor acting under color of law at

all relevant times for purposes of this action.

92.  Defendant Amber Fallos, Agency Director of Taylor County Department of Human

Services, is responsible for development and implementation of county level policies,

procedures, and practices within the TCDHS, and is a state actor acting under color of

law at all relevant times for purposes of this action. Defendant Amber Fallos is sued in

both her individual and official capacities.

93. Defendant Liza Daleiden, Deputy Director of Taylor County Human Services, is responsible for the day-to-day administration and implementation of the policies, procedures and practices of TCDHS, and is a state actor acting under color of law at all relevant times for purposes of this action. Defendant Liza Daleiden is sued in both her individual and official capacities.

94. Defendant Julie Clarkson, Social Worker with Taylor County Human Services, is responsible for the day-to-day administration and implementation of the policies and procedures of TCDHS, and is a state actor acting under color of law at all relevant times for the purposes of this action. Defendant Julie Clarkson is sued in both her individual and official capacities.

95. Defendant Jane or John Doe, the unidentified actor who signed Temporary Physical Custody Request, dated August 4, 2014, authorization time 3:58 pm (filed in this action at ECF No. 16-1), is state actor acting under color of law at all relevant times for the purposes of this action, as a result of unconstitutionally taking Ms. Loertscher into custody and initiating state proceedings against her under the Act. Defendant Jane or John Doe is sued in both her/his individual and official capacities.

**JURISDICTION AND VENUE**

96. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4) for causes of action arising under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the Constitution of the United States of America and 42 U.S.C. § 1983 and § 1988 and 28 U.S.C. § 2201 and § 2202.

97. Venue is proper in the Western District of Wisconsin under 28 U.S.C. § 1391(b) because all events giving rise to this Complaint occurred within this District, and the identified

Defendants, who are sued in their official capacities, carry out their official duties at offices located within this District. Defendant Jane or John Doe violated Ms. Loertscher's constitutional rights at a hospital located in this District.

## CAUSES OF ACTION

### Claim 1: Violation of Substantive Due Process

98. By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's substantive due process rights to liberty and privacy as protected by the Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution.

### Claim 2: Violation of Fourth Amendment

99. By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments to the United States Constitution.

### Claim 3: Violation of First Amendment

100. By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's right to be free from compelled speech under the First and Fourteenth Amendments to the United States Constitution.

### Claim 4: Violation of Equal Protection

101. By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's right to equal protection of the law under the Fourteenth Amendment to the United States Constitution.

*Claim 5: Violation of Procedural Due Process*

102. By enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms.
     Loertscher's right to due process under the Fifth and Fourteenth Amendment to the
     United States Constitution.

**REQUEST FOR RELIEF**

103. Plaintiff Ms. Loertscher respectfully requests the following from this Court:

   (a)  Assumption of jurisdiction over this suit;

   (b)  Declaratory relief to the effect that 1997 Wisconsin Act 292, amending
   multiple sections of, *inter alia*, Chapter 48, Wis. Stat. § 48.01 *et seq*., is
   unconstitutional on its face;

   (c)  Issuance of a permanent injunction against enforcement of 1997
   Wisconsin Act 292

   (d) An award of compensatory and punitive damages by Taylor County,
   Amber Fallos, Liza Daleiden, Julie Clarkson and Defendant Doe;

   (e)  An award to Plaintiff Ms. Loertscher's counsel of reasonable attorneys'
   fees and costs as provided by 42 U.S.C. § 1988;

   (f)  Grant of such further relief as this Court deems just and proper.

Dated this 6th day of November, 2015.        Respectfully submitted,


**PERKINS COIE, LLP**


By:     s/ *Freya K. Bowen*_____
David J. Harth
dharth@perkinscoie.com
Freya K. Bowen
fbowen@perkinscoie.com
Joshua L. Kaul
jkaul@perkinscoie.com
David R. Pekarek Krohn
dpekarekkrohn@perkinscoie.com
1 East Main Street, Suite 201
Madison, WI 53703
Telephone: (608) 663-7460
Facsimile: (608) 663-7499

**NATIONAL ADVOCATES FOR
PREGNANT WOMEN**
Lynn M. Paltrow
NY Bar No.: 1920156
lmp@advocatesforpregnantwomen.org
Sara Ainsworth
WA Bar No.: 26656
sla@advocatesforpregnantwomen.org
Farah Diaz-Tello [add info]
15 W. 36th Street, Suite 901
New York, NY 10018
Telephone: (212) 555.9252
Facsimile: (212) 225-9253
**REPRODUCTIVE JUSTICE CLINIC**
Sarah E. Burns
NY Bar No.:  2212413;
DC Bar No.: 289140
sarah.burns@nyu.edu
Washington Square Legal Services, Inc.
NYU School of Law
245 Sullivan Street, 5th Floor
New York, New York 10012
Telephone: (212) 998-6464
Facsimile: (212) 995-4031

*Attorneys for the Plaintiff,*
*Tamara Loertscher*