## Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

-------------------------------------------------------

TAMARA M. LOERTSCHER,        VIDEO DEPOSITION OF

         Plaintiff,        JENNIFER BANTZ, M.D.

  -vs-                Case #14-CV-870

BRAD D. SCHIMEL, et al.,

         Defendants.

-------------------------------------------------------

The deposition of JENNIFER BANTZ, M.D., a witness in the above-entitled matter, taken at the instance of the Plaintiff, pursuant to Section 804.05 of the Wisconsin Statutes, before and reported by Maridee J. Olson, a Registered Merit Reporter and Notary Public for the State of Wisconsin, at the Mayo Clinic Health System, Luther Campus, 1400 Bellinger Street, Eau Claire, Wisconsin on the 1st day of September, 2016, commencing at 9:08 a.m.

(ORIGINAL TRANSCRIPT FILED WITH ATTORNEY BAIR.)

## Page 2

       A P P E A R A N C E S

NANCY L. ROSENBLOOM and LAURA A. HECHT-FELELLA, of the National Advocates for Pregnant Women, 875 Sixth Avenue, Suite 1807, New York, New York 10001-3507, appearing on behalf of the Plaintiff.

DAVID J. HARTH and JESSE J. BAIR, of the Law Firm of Perkins Coie, LLP, 1 East Main Street, Suite 201, Madison, Wisconsin 53703, appearing on behalf of the Plaintiff.

KARLA Z. KECKHAVER, of the Wisconsin Department of Justice, 17 West Main Street, P.O. Box 7857, Madison, Wisconsin 53707-7857, appearing on behalf of the Defendants Brad Schimel and Eloise Anderson.

DOUGLAS S. KNOTT, of the Law Firm of Leib Knott Gaynor, LLC, 219 North Milwaukee Street, Suite 710, Milwaukee, Wisconsin 53202, appearing on behalf of the Defendants Taylor County, Amber Fallos, Liza Daleiden, Julie Clarkson and Jane or John Doe.

COURTNEY L. GRAFF, of the Schmiege & Graff Law Office, Ltd., 123 West State Street, P.O. Box 512, Medford, Wisconsin 54451, appearing on behalf of the Defendants Taylor County, Amber Fallos, Liza Daleiden, Julie Clarkson and Jane or John Doe.

GUY J. DuBEAU, of the Law Firm of Axley Brynelson, LLP, 2 East Mifflin Street, Suite 200, P.O. Box 1767, Madison, Wisconsin 53703, appearing on behalf of the Witness and Mayo

## Page 3

Clinic Health System.

ERIN C. SKOLD, Legal Department, Mayo Clinic Health System, 1221 Whipple Street, P.O. Box 4105, Eau Claire, Wisconsin 54702-4105, appearing on behalf of the Witness and Mayo Clinic Health System.

      I N D E X        PAGE

WITNESS JENNIFER BANTZ, M.D.

Examination by Ms. Rosenbloom     5 - 65

Examination by Mr. Knott     65 - 84

Examination by Ms. Keckhaver     85 - 86

Examination by Ms. Rosenbloom     86 - 88

Examination by Mr. Knott     88 - 89

Certificate of the Court Reporter     91

EXHIBITS

38 - Curriculum Vitae     8

39 - Identification, Treatment and Reporting   18
   of Possible Victims of Abuse Procedure

40 - Disclosures to Law Enforcement Agencies/  20
   Representatives Policy

41 - Mayo Clinic Health System Medical Records  28

(Original Exhibits 38 - 41 returned to Attorney Bair.)

## Page 4

September 1, 2016.  9:08 a.m.

     P R O C E E D I N G S

THE VIDEOGRAPHER:  We're on the video record. My name is Theresa VanLieshout, the certified videographer for today's deposition.  This deposition is being recorded on video at all times unless specified and announced by the videographer.  Today's date is Thursday, September 1st, 2016.  The time is 9:08 Central Standard Time.  We are located at the Mayo Clinic in Eau Claire, Wisconsin.  The witness today is Dr. Jennifer Bantz in the case entitled Tamara M. Loertscher versus Brad D. Schimel, et al., Case Number 14-CV-870, being heard before the United States District Court, Western District of Wisconsin.  We will have counsel identify themselves and then swear in the witness.

MS. ROSENBLOOM:  Good morning.  I'm Nancy Rosenbloom and I'm with Laura Hecht-Felella of National Advocates for Pregnant Women representing the Plaintiff.

MR. HARTH:  David Harth and Jesse Bair of Perkins Coie also representing the Plaintiff.

MR. KNOTT:  And I'm Doug Knott of Lieb Knott Gaynor in Milwaukee representing the Taylor County Defendants.

MR. DuBEAU:  And I'm Guy DuBeau.  With me is

Page 5

1  in-house counsel for Mayo Clinic Health System, Erin
2  Skold, and we're here on behalf of Dr. Bantz.
3       MS. KECKHAVER:  And I'm Karla Keckhaver from the
4  Wisconsin Department of Justice.  I represent the State
5  Defendants.
6       (JENNIFER BANTZ, M.D., having been first duly
7  sworn under oath, was examined and testified as
8  follows:)
9       JENNIFER BANTZ, M.D.:  I do.
10      * * * * * * * * * * * * * * * *
11      MS. ROSENBLOOM:  Can we stipulate that the
12  deposition is covered by the Federal Rules of Civil
13  Procedure?
14      MR. DuBEAU:  Yes.
15      MS. ROSENBLOOM:  Thank you.
16      EXAMINATION BY MS. ROSENBLOOM:
17  Q  Good morning.
18  A  Good morning.
19  Q  Please state your whole name for the record.
20  A  It's Jennifer Suzanne Bantz.
21  Q  Dr. Bantz, I have some preliminary questions for you and
22     just so you understand the -- the rules today.
23  A  Okay.
24  Q  Do you understand that your testimony must be truthful
25     and is subject to penalties for perjury?

Page 6

1  A  I do.
2  Q  Okay.  And if you don't hear any of my questions, will
3     you tell me that so that I can repeat it?
4  A  Yes.
5  Q  If you don't understand a question, will you say so?
6  A  Yes.
7  Q  If you realize that an earlier answer that you gave was
8     not accurate or not complete, will you correct or
9     supplement your answer?
10  A  Yes.
11  Q  And if you answer a question, I will assume that you've
12     heard it and understood it and have given me your best
13     recollection, is that clear?
14  A  Um-hm.
15  Q  If you could --
16  A  Yes.
17  Q  -- say "yes" verbally --
18  A  Yes.
19  Q  -- for the record.  Thank you.  Have you ever been
20     deposed before?
21  A  No.
22  Q  Have you ever testified in court?
23  A  No.
24  Q  Do you consider yourself to be in good health?
25  A  Yes.

Page 7

1  Q  Is there any reason today, anything that would affect
2     your ability to understand or answer questions?
3  A  No.
4  Q  Do you have any family members who are employed by the
5     State of Wisconsin?
6  A  No.
7  Q  Do you have any family members employed by Taylor
8     County?
9  A  No.
10  Q  Did you meet with anyone to prepare for this deposition
11     today?
12  A  I met with my attorney -- attorneys.
13  Q  Okay.  And did you review any documents to prepare for
14     the deposition today?
15  A  I reviewed my dictation and my deposition from the
16     hearing.
17  Q  The transcript of your --
18  A  Yes.
19  Q  -- your hearing testimony?
20  A  Transcription, um-hm.
21  Q  Okay.  Thank you.  And when did you review that?
22  A  Last week and last evening.
23  Q  Have you read any of the legal papers in this lawsuit?
24  A  I have not.
25  Q  Did you search any files or e-mails for documents in

Page 8

1     connection with this lawsuit?
2  A  Specifically, no, I did not.  Hm-um.  No.
3  Q  Okay.  Do you have an understanding of what this case is
4     about?
5  A  Generally speaking.
6  Q  What's your general understanding?
7  A  My understanding, that a law is being challenged, the
8     law regarding a personhood of a fetus and the rights of
9     the mother and the rights of the fetus.
10      MS. ROSENBLOOM:  I am gonna ask the court
11  reporter to mark this as Exhibit --
12      MS. HECHT-FELLELA:  38.
13      MS. ROSENBLOOM:  -- Plaintiff's 38.
14      (Deposition Exhibit 38 marked for
15  identification.)
16  Q  Okay.  I'm showing you what's been marked Plaintiff's
17     Exhibit 38, which is a copy of your curriculum vitae
18     that was provided to us.  If you want to look it over,
19     could you let me know if this is a correct copy of
20     your -- your current CV?
21  A  Yes.
22  Q  Was that prepared by you?
23  A  Yes.
24  Q  And is it an accurate recounting of your education,
25     training, employment and experience?

## Page 9

1   A  Yes.

2   Q  Thank you.  Now, from where did you get your medical

3      degree?

4   A  Wright State University School of Medicine.

5   Q  And what field was your residency in?

6   A  Obstetrics and gynecology.

7   Q  Do you have any professional certifications?

8   A  No.  Besides being a Fellow in OB-GYN, no.  Hm-um.

9   Q  Okay.  Is -- is there a board certification associated

10      with OB-GYN?

11   A  Yes, I'm board certified, yeah.

12   Q  Thank you.  And where are you currently employed?

13   A  Here at Mayo Clinic Health System.

14   Q  And what is your job title here?

15   A  I am a physician and, also, I'm Department Chair.

16   Q  Department Chair of what department?

17   A  Obstetrics and Gynecology, Cochair.

18   Q  And how many -- how many people report to you as Chair?

19   A  My department, there's eight OB-GYNs and --

20   Q  Do people who are not doctors also report to you?

21   A  Also, nurse practitioners.  We have five nurse

22      practitioners.

23   Q  And whom do you report to directly?

24   A  Dr. Peck is our Chief Medical Officer.

25   Q  What's Dr. Peck's first name?

## Page 10

1   A  Bob -- Robert.  Robert.  Bob.

2   Q  Thank you.  What is your -- what's the typical patient

3      caseload in the OB-GYN Department here?

4   A  I work four and a half days a week.  We see patients in

5      the clinic, typically, about 25 patients a day in the

6      clinic.  We deliver around a thousand babies here a

7      year, including OB and midwife.  We also -- surgicals, I

8      perform surgery, so approximately three to four

9      surgeries a week not including C-sections.

10   Q  Do you serve as a consulting doctor as well as providing

11      ongoing care?

12   A  Yes.  Under Mayo Clinic, we're all considered

13      consultants, but we are consultants to the midwives'

14      practice, um-hm, and to the other primary care providers

15      in the health system.

16   Q  When you say under Mayo Clinic you're all considered

17      consultants, what does that mean?  Can you describe what

18      the job entails?

19   A  I believe you have to be a physician, a practicing

20      physician for three years and boarded and -- and then

21      you become a consultant.

22   Q  And are all your patients -- do you see all your

23      patients in the hospital?

24   A  In the clinic here --

25   Q  In the clinic, sorry.

## Page 11

1   A  -- and in the hospital and, also, I do outreach in

2      Mondovi once a month.

3   Q  What type of outreach is that?

4   A  Outpatient, both OB -- obstetrics patients and

5      gynecologic patients.

6   Q  Are those patients who have been here at the clinic or

7      the hospital who you're following or are they different

8      patients?

9   A  They're patients that may not want to travel to

10      Eau Claire, and so I'll see them for whatever their

11      obstetrics or gynecological needs in the clinic there,

12      just outpatient.

13   Q  Is that a normal part of the job responsibilities here

14      at Mayo?

15   A  After you've been here so many years, you're recommended

16      to do some outreach.

17   Q  When you see patients in your current job in addition to

18      the outreach, are they all here at the Eau Claire

19      location in this clinic and hospital or do you go to

20      other buildings as well?

21   A  Just this location here in Eau Claire, um-hm, the clinic

22      and the hospital.

23   Q  And is -- is this facility also known as Luther

24      Hospital?

25   A  Correct.  Um-hm.

## Page 12

1   Q  Sometimes people use that terminology so we want to be

2      clear.

3   A  Luther Hospital and Midelfort Clinic.

4   Q  On your CV you list private practice between 2005 and

5      2008.

6   A  Um-hm.

7   Q  How many doctors were in that practice?

8   A  Five when I left.  We were up to six at one point, but

9      five when I moved, um-hm.

10   Q  And, in general, can you describe the -- the types of

11      medical care you provided at Southside OB-GYN?

12   A  General OB-GYN care.  It was a busier practice, but

13      general obstetrics and gynecology and delivered out of

14      two hospitals, so a little bit busier there.

15   Q  And you did surgery as well?

16   A  Correct.

17   Q  So I want to turn now to your duties here at the Mayo

18      Clinic.  In general, how would you describe your typical

19      day?

20   A  A typical day, I will round on my postpartum patients or

21      my post-surgical patients and then see patients in the

22      clinic all day.  Sometimes, being Department Chair, I'll

23      have a meeting at lunchtime.  On a surgical day I'll do

24      half-day surgery and see patients.

25   Q  If a patient comes into the -- can I use clinic or

Page 13

1  hospital interchangeably here or is there a significant
2  difference?  I want to get it right.
3  A  There is a difference, yeah.
4  Q  Okay.
5  A  Yes, there is.
6  Q  Would you tell me what that difference is?
7  A  The hospital are typically covered when we're on call,
8  okay, and where our patients deliver or have surgery.
9  The clinic will just be in the clinic setting and it's
10  outpatient, so it's separate.
11  Q  Okay.  So with regard to your duties in the hospital, if
12  a patient comes in for something unrelated to
13  pregnancy --
14  A  Um-hm.
15  Q  -- and you're called in for a consultation, do you
16  typically follow that patient for the entire time she is
17  at the hospital?
18  A  Typically, if you are the -- the physician who's
19  consulted.
20  Q  And what would be the circumstances where you -- you
21  would not follow that patient for the time she's here?
22  A  If -- if it's a question, sometimes a physician will
23  call and have a question regarding a medication to give
24  a pregnant patient.  Then we would answer the question
25  if it wasn't asked for us to see the patient.

Page 14

1  Q  What is your -- as a doctor, what is your duty of
2  confidentiality to patients?
3      MR. DuBEAU:  I'll object to form.  Go ahead.
4  You can answer it, as you understand it.
5      THE WITNESS:  Confidentiality, information
6  between the patient and the physician is confidential.
7  That is not shared with others.  That is protected.
8  Q  Can that information be shared with the permission of
9  the patient?
10  A  Yes.
11  Q  Are there any other circumstances in which you could
12  share a patient's confidential medical information?
13  A  For continued care such as labor and delivery, signing
14  on a patient to your partner so --
15  Q  "Partner" meaning another physician?
16  A  Another -- another physician, um-hm.
17  Q  Are there hospital policies -- hospital or clinic
18  policies and procedures that guide your interactions
19  with patients?
20      MR. DuBEAU:  Object to form.  Answer if you
21  understand.
22  Q  If you understand.
23  A  Can you repeat that question?
24  Q  Sure.  Are there hospital or clinic policies and
25  procedures that -- that guide your interactions with

Page 15

1  patients?
2      MR. DuBEAU:  Same objection.
3      THE WITNESS:  I'm sure.  I -- I -- I'm not for
4  sure if there is.  It's kind of an education that you
5  develop through the years, I believe.
6  Q  Is there -- was there any training or information you
7  were given when you began working for Mayo about the
8  policies and procedures of -- of Mayo?
9  A  There was a code of conduct -- code of conduct book that
10  was provided.
11  Q  Does the code of conduct include things about patient
12  confidentiality?
13  A  I can't recall.  We do also perform CBTs, and I do
14  believe it has information regarding confidentiality,
15  computer-based training.
16  Q  Thank you.  Are you a mandated reporter of suspected
17  child abuse or neglect?
18  A  As a physician, it's my understanding I am one, yes.
19  Q  And do you know where that mandated reporting
20  responsibility comes from?
21  A  Not specifically, I do not.
22  Q  And how do you understand a physician's obligations as a
23  mandated reporter?
24  A  My understanding is if I'm in a situation where I'm
25  concerned for the safety of a patient, I do need to

Page 16

1  report that.  Child abuse is one that's, obviously, one
2  that is in the forefront, and so when that is the
3  situation, I need to report that.
4  Q  And if you, for example, see a child who you suspect has
5  been abused or neglected, who would you report to as a
6  mandated reporter?
7  A  If I were to report, I would report to social work.  I
8  would contact social work for their assistance.
9  Q  And do you mean social work within the hospital system?
10  A  Correct.  Yes.
11  Q  With regard to mandated reporting, did you receive
12  training on that in medical school?
13  A  I can't specifically recall if it was medical school.
14  Most likely through residency and training, postgraduate
15  training we received training.
16  Q  Have you ever made a report of suspected child abuse or
17  neglect?
18  A  I have not, no.
19  Q  And if you know, if you -- if you were to make a report
20  as a physician and you reported to the social work staff
21  here at Mayo, to whom would they report?
22      MR. KNOTT:  I need to object to the form of the
23  question.  It's a hypothetical that calls for an expert
24  opinion.  It calls for an expert opinion as to -- as to
25  the law.  I think it's beyond the scope of her expertise

## Page 17

1    and, as I said, vague and overbroad.
2        MS. ROSENBLOOM: Okay. You can answer the
3    question, and we can have it read back if it's not fresh
4    in your mind.
5        THE WITNESS: Can you read that back then?
6        (Last question read back by the court reporter.)
7        THE WITNESS: I do not know.
8    Q   Do you understand your mandated reporter obligations
9    with regard to child abuse to include fetuses?
10       MR. KNOTT: Same objections. It calls for a
11   legal conclusion.
12       MS. ROSENBLOOM: You can answer.
13       THE WITNESS: Can you repeat that question
14   again?
15       MS. ROSENBLOOM: Would you repeat it?
16       (Last question read back by the court reporter.)
17       THE WITNESS: Yes.
18   Q   And what's the basis of fetuses being included as
19   children, in your understanding?
20       MR. DuBEAU: Object to form. Object to
21   competence. You can answer if you have an
22   understanding.
23       THE WITNESS: I don't think I have an
24   understanding of that question.
25   Q   Okay. Are you familiar with Wisconsin's law having to

## Page 18

1    do with what is called in the law unborn child abuse?
2    A   We have had, yes, a law on that, yes. Yes.
3    Q   And is it your understanding that that law requires
4    doctors to report suspected abuse of so-called unborn
5    children?
6    A   Yes.
7    Q   And in your understanding -- I'm not asking you as an
8    expert on the law -- would that involve an embryo or
9    fetus at any stage of development?
10   A   If the patient's pregnant, then that would be a yes.
11   Q   Are there particular procedures or policies within the
12   Mayo Hospital or Clinic that you know of regarding the
13   so-called unborn child abuse law?
14   A   I am not aware. I don't know.
15   Q   Do you know how long that law has been in effect?
16   A   No.
17   Q   If you know, has it been in effect the entire time
18   you've been a doctor?
19   A   I don't know.
20       MS. ROSENBLOOM: Okay. I'd like to mark this as
21   the next Plaintiff's Exhibit.
22       (Deposition Exhibit 39 marked for
23   identification.)
24   Q   I'm showing you a document that's been marked
25   Plaintiff's Exhibit 39 for identification. Can you

## Page 19

1    identify this document?
2    A   As you say, yes, I can read it, yes.
3    Q   Does it look -- have you seen it before?
4    A   No, I have not.
5    Q   Okay. This document is entitled Identification,
6    Treatment and Reporting of Possible -- Possible Victims
7    of Abuse - Procedure.
8        MR. DuBEAU: And -- and, Nancy, I don't mean to
9    interrupt, but Dr. Bantz has testified that she's not
10   seen this before, she's not familiar with it. She can,
11   certainly, read the title, but she's not going to answer
12   any extensive questions about it.
13       MS. ROSENBLOOM: I don't intend to ask any.
14   Q   And at the top of the document it says Policies and
15   Procedures - UCM System. Does it look to you like this
16   is a Mayo document of some kind?
17   A   Yeah. It -- it says Northwestern Wisconsin Region and
18   down here it says Mayo, so, yes.
19   Q   Okay. And have you seen documents that are in this form
20   that are issued by Mayo?
21   A   There's lots of documents, yes.
22   Q   Okay.
23   A   Lots, but, yes, it's a familiar form, um-hm.
24   Q   Okay. Thank you. That's all for that one. I'm just
25   looking to authenticate it as a Mayo document.

## Page 20

1        MS. ROSENBLOOM: Please mark this one as well.
2        (Deposition Exhibit 40 marked for
3    identification.)
4    Q   I'm showing you what's -- I'm showing you what's been
5    marked Plaintiff's Exhibit 40 for identification. Have
6    you seen this document before?
7    A   I have not, no.
8    Q   And this is a document entitled Disclosures to Law
9    Enforcement Agencies/Representatives Policy. At the top
10   it says Policies and Procedures - UCM System. Does
11   this -- based on your familiarity with other documents
12   from Mayo, does this appear to be a document issued by
13   the Mayo System?
14   A   It appears to be.
15   Q   Okay. Thank you. When you were in medical school or in
16   your residency, did you receive training on substance
17   use during pregnancy?
18   A   Generally, we had experiences and general knowledge
19   of -- that exposure, yes.
20   Q   And did you have any particular training on -- on
21   addiction --
22   A   No.
23   Q   -- during -- sorry.
24   A   I did not, no.
25   Q   Okay. Have you had any continuing medical education

Page 21

1    courses on substance use or addiction?

2    A   No.

3    Q   How would you define substance use disorder?

4        MR. DuBEAU: I'll object to foundation. If you

5  have an understanding that you're comfortable giving, go

6  ahead.

7        THE WITNESS: How would I define substance --

8    Q   Let's -- let's back up a little bit. What's your

9  understanding of the term "substance use"?

10    A   Substance use, that's kind of -- that's very broad as

11  opposed to -- I would be assuming the substance use,

12  illegal drugs or, also, it can mean illicit drug use,

13  use of opioids and abusing those, I expect.

14    Q   When -- when you -- in -- in your practice what

15  terminology do you use to refer to a patient's use of

16  alcohol?

17    A   With regards to pregnancy?

18    Q   Yes. Sorry. Thank you for that.

19    A   What I would -- I specifically say in my notes what

20  medication or -- or drugs they would be using during the

21  pregnancy to be specific.

22    Q   Okay.

23    A   I would say alcohol use during early pregnancy.

24    Q   Um-hm. And would you use the same type of terminology

25  if someone is taking prescription medication, for

Page 22

1  example?

2    A   Yes, opioid use.

3    Q   Okay. And --

4    A   And any other medications they would be taking would be

5  helpful.

6    Q   And what about the use of other controlled substances

7  not by prescription, how would -- what terminology would

8  you use to describe that for a pregnant patient?

9    A   Such as tobacco use, controlled --

10    Q   That's an example, sure.

11    A   Yeah, I would just specifically say what they take and

12  so -- in the chart.

13    Q   Okay. Do you use the terminology of "substance use

14  disorder" or -- or "addiction"? Tell me what

15  terminology you use commonly.

16        MR. DuBEAU: Object to form. You -- you can

17  answer, if you understand it.

18        THE WITNESS: I do not use that terminology

19  since that's not my area of expertise. I would state

20  specifically what their history and what they have gone

21  through. I'm very specific in the chart with regards to

22  medications or drugs they have used in the past and

23  present.

24    Q   If you have a patient whom you feel is addicted to a

25  drug or -- alcohol, do you use the terminology of

Page 23

1  "addiction"?

2    A   Typically, I use -- I use the word "abuse."

3    Q   Okay. And how would you define addiction?

4    A   I would define addiction, a substance that a person has

5  a physical need to use to -- just to continue. I don't

6  know exactly.

7    Q   Do you use the word "dependency" when talking about

8  drugs or alcohol?

9    A   I'm -- I'm sure I do sometimes, yeah.

10    Q   And when you do, what do you mean by that word,

11  "dependence" or "dependency"?

12    A   When someone is using something they -- they need to --

13  they feel addicted to and they cannot get off this

14  medication or drug.

15    Q   If a patient is -- a pregnant patient is -- is drinking

16  alcohol, is a single use of alcohol an example of

17  dependence on alcohol?

18    A   I would not consider that, no.

19    Q   At -- at what level would you consider someone to be

20  dependent on or addicted to alcohol, a patient?

21    A   That's difficult to answer. Everybody's different.

22    Q   What -- what are the differences that would come into

23  play?

24    A   An example could be binge drinking. Some may not

25  consider that an addiction, but that's a problem. It's

Page 24

1  an exposure to, if they're pregnant, both people

2  essentially.

3    Q   Does it depend on the -- does it depend on the substance

4  as well in terms of when somebody might become dependent

5  on a substance?

6        MR. DuBEAU: I'm going to object to form.

7        MS. ROSENBLOOM: Too general?

8        MR. DuBEAU: Are you still talking about

9  alcohol?

10        MS. ROSENBLOOM: No.

11        THE WITNESS: Any substance?

12    Q   Any substance that might be addictive.

13    A   Such as caffeine?

14    Q   Sure, or methamphetamine or heroin or Valium.

15    A   Can you repeat the question again?

16    Q   Right. Is there a difference depending upon the

17  substance in terms of when someone -- how much use would

18  constitute dependence?

19        MR. DuBEAU: I'll -- I'll object to form and --

20  and, I believe, the witness's competence on that

21  question as well too, based on her prior testimony, but

22  if you understand, go ahead.

23        MR. KNOTT: I object to the form of the question

24  as vague and multiple.

25        THE WITNESS: It's difficult for me to answer.

Page 25

1    I -- I don't know how quite to answer.  It's very --
2    yeah.
3    Q  Is it possible for someone to use heroin one time and
4    not become addicted, if you know?
5    A  In -- not my area of expertise, but I would --
6         MR. DuBEAU:  Well, actually, to the extent that
7    you've identified it's outside of your area of
8    expertise, I will go ahead and interpose an Alt
9    objection and direct her not to -- to speculate on -- on
10   the standards of pharmacology and addiction medicine.
11   Q  Okay.  Dr. Bantz, do you -- have you seen patients who
12   use heroin while pregnant?
13   A  I have.
14   Q  Have you seen patients who use alcohol while pregnant?
15   A  Yes.
16   Q  Have you seen patients who use tobacco while pregnant?
17   A  Yes.
18   Q  Have you seen patients who use methamphetamines while
19   pregnant?
20   A  Yes.
21   Q  Have you -- do you consider it to be dangerous to the
22   pregnancy when someone uses any amount of
23   methamphetamine?
24   A  Potentially.  Again, I'm not an expert in toxicology,
25   but just alcohol, any amount, potentially, we don't know

Page 26

1    the amount that can cause fetal alcohol syndrome so --
2    Q  Okay.  Did you have -- during medical school or
3    otherwise did you have any training on thyroid
4    conditions?
5    A  Thyroid medications?
6    Q  Thyroid conditions.
7    A  Conditions, yes.
8    Q  Any specialized training or the training --
9    A  No, not specialized, no.
10   Q  Okay.  Just going back to the number of patients you see
11   in your practice here, do you know when patients are
12   referred to this hospital or clinic by a Social Services
13   agency?
14   A  No, I wouldn't know, no.
15   Q  Okay.  If you know, have you had any patients who were
16   referred to this facility by local Departments of Human
17   Services or Social Services in the state?
18   A  I would not know, no.
19   Q  How often have you seen pregnant patients with
20   hypothyroidism?
21   A  Fairly common, daily.
22   Q  And how common is it for you to see pregnant patients
23   who suffer from depression?
24   A  Common, daily, um-hm.
25   Q  How common is it for you to see patients who are

Page 27

1    pregnant and use substances, as we were discussing
2    before?
3    A  Not as common.
4    Q  Do you see many patients who are using methamphetamine?
5    A  Not very many, no.
6    Q  Okay.  Do you see many patients who use alcohol while
7    pregnant?
8    A  I have women in the beginning of pregnancy when they
9    weren't aware they were pregnant so --
10   Q  Do you have patients who smoke cigarettes while
11   pregnant?
12   A  Yeah.
13   Q  Do you have patients who use marijuana or other kinds of
14   THC while pregnant?
15   A  Um-hm.  Yeah.
16   Q  What about opioids?
17   A  Yes.
18   Q  When you see a pregnant woman as a patient, is it
19   typical for her to self-report use of the substances as
20   I've described above?
21   A  Typically, if we have a good rapport.
22   Q  Is there any kind of demographic pattern to the people,
23   the patients you see, who use substances, particular
24   income categories or race or ethnic groups more than
25   others?

Page 28

1    A  Difficult for me to say, yeah.
2    Q  Okay.  Do you remember seeing Tamara Loertscher as a
3    patient at Mayo in August of 2014?
4    A  Um-hm.  Yeah.
5    Q  And do you recall that she came in through the Emergency
6    Department for behavior health -- behavioral health
7    reasons?
8    A  That's what I read, yes.
9    Q  Okay.  Where -- where did you read that?
10   A  In the chart.
11        MS. ROSENBLOOM:  Okay.  Let me mark -- please
12   mark that as an exhibit.
13        (Deposition Exhibit 41 marked for
14   identification.)
15   Q  I'm showing you what's been marked Plaintiff's Exhibit
16   41 for identification.  Just for clarification for the
17   folks who were with us yesterday, we marked some other
18   medical records and there is some duplication.  I'm
19   using this set because it's paginated correctly.  Okay.
20   Dr. Bantz, does this document, just flipping through it,
21   look familiar to you?
22   A  It -- it's a dictation through the Mayo System.
23   Q  When you say "a dictation through the Mayo System," what
24   do you mean by that?
25   A  It's familiar in the sense of it has the logo.  I did

Page 29

1   not specifically review the emergency room physician
2   dictation.
3   Q   Okay.  And with these -- when you say "dictation," do
4       you mean notes dictated by medical providers?
5   A   Correct.  Yup.  Yes.
6   Q   Okay.  And when you dictate your notes when you see a
7       patient, generally, how does that work?  How do they get
8       into the electronic system?
9   A   I just dial in, dictate into the phone, and then it's
10      transcribed --
11  Q   Okay.
12  A   -- and then it comes up on the computer.
13  Q   Is it your usual practice to dictate your notes close in
14      time to when you have seen a patient?
15  A   As -- as soon as I can, yes.
16  Q   Is that the usual practice of all the medical providers
17      here at Mayo?
18          MR. DuBEAU:  Well, I'm going to object.
19          THE WITNESS:  They're supposed to.
20  Q   If you know.  If you know.
21  A   It's recommended, yes.
22  Q   Thank you.  That's what I was getting at.  There are
23      some notes in here that have your name on them.  I'm
24      gonna give you an example.  So, for example, if you look
25      at the page labeled County 169 at the bottom, there's a

Page 30

1   note at the bottom entitled Consultation that includes
2   your name under the category Performed By.  Is that the
3   typical form of -- of a dictation that would have been
4   made by you?
5   A   Yes.
6   Q   And when you -- so as far as you can tell from looking
7       at this document, were the entries made by you made
8       under the usual procedures you've described before?
9   A   Correct.  Yes.
10  Q   Do you ever review the written version of notes that you
11      have dictated previously?
12  A   I try to, majority, yes.
13  Q   Okay.  And why do you review them?
14  A   To fix any areas that will be blank and fill those in.
15  Q   Okay.  And if you recall, did you undertake that process
16      with regard to your notes on Tamara Loertscher?
17  A   I believe so, yes.
18  Q   When did you do that, if you remember?
19  A   I can't recall specifically.
20  Q   Okay.  If you remember, how was Ms. Loertscher referred
21      to you?
22  A   My partner, Dr. Ezenagu, was the original consultant,
23      and he had a very busy weekend, and he signed the
24      patient out to me with regards to the need to see her
25      for follow-up on that Monday morning.

Page 31

1   Q   And how was Dr. Ezenagu assigned to the case?
2   A   He was the OB-GYN on call the night, I believe, Tamara
3       was admitted, and he was contacted by someone -- I don't
4       know who -- with regards to this patient.
5   Q   When you described Dr. Ezenagu as your partner, are you
6       on an equal level or are you his supervisor?
7   A   Equal level.
8   Q   When you -- when did you first meet Tamara Loertscher?
9   A   Evening of the 4th, the Monday.
10  Q   Of August in 2014?
11  A   August, correct.
12  Q   Feel free to look at the notes if it helps.
13  A   Yeah.
14  Q   And when you first met her, you said you met her in the
15      evening.  Was there any reason for an evening
16      appointment or is that typical?
17  A   Well, it was in the hospital on the third floor in
18      Behavioral Health.  It was a busy day with lots of
19      deliveries, so I came up as soon as I could.
20  Q   And on that date, on August 4th, you said Ms. Loertscher
21      was in the Behavioral Health Unit?
22  A   Yes.
23  Q   To your knowledge, while she was here did she ever get
24      transferred to a different unit?
25  A   Not that I'm aware of.

Page 32

1   Q   And the Behavioral Health Unit, you said, was on the
2       third floor.  Is that of -- of this building, Luther
3       Hospital?
4   A   The hospital, yes.
5   Q   Okay.  Is that a secure unit?
6   A   Yes.
7   Q   And what does that mean?
8   A   Patients can't leave, and you have to badge yourself in
9       twice to see -- to get in to see patients.
10  Q   Okay.  If you know, why was Ms. Loertscher in the
11      Behavioral Health Secure Unit?
12  A   I don't know the specifics, but, typically, when
13      someone's admitted to the hospital for behavioral health
14      reasons or severe depression or in need of help, they'll
15      go to the third floor with regard to mental illness.
16  Q   And does the third floor have a unit that is not
17      secured?
18  A   It's all secured.
19  Q   The entire third floor?
20  A   Not the entire third floor.  There's another half that
21      isn't.  I'm not sure what's on that half.
22  Q   Okay.  And I know you're OB-GYN and not Behavioral
23      Health, but since you do see patients there, do you know
24      how the determination is made which patients are in the
25      secure unit and which are not?

Page 33

1   MR. DuBEAU:  Well, I'm gonna object.  I don't
2   think she said that Behavioral Health was necessarily
3   divided into two units.  She said part of the third
4   floor was divided into two units, is that correct?
5   THE WITNESS:  Yeah.  I think there's a clinic
6   not related to Behavioral Health, but the Behavioral
7   Health Inpatient Unit is locked, all of it.
8   Q   Okay.  The entire?
9   A   Yes.
10  Q   Thank you.
11  A   That's my understanding.
12  Q   And, to your knowledge, when you first saw
13  Ms. Loertscher on the evening of August 4th, was she
14  free to leave the hospital?
15  A   I didn't ask, but I'm assuming since she's on the third
16  floor, she wasn't free to leave that day.
17  Q   Do you know if she was -- if she self-admitted
18  voluntarily?
19  A   I learned that later.  I'm not sure if I knew that at
20  the time.
21  Q   Did you review any -- any notes of other medical
22  providers before meeting with Ms. Loertscher that first
23  time?
24  A   I can't recall specifically.  I believe I -- I must -- I
25  did.  That's generally what I do when I have a consult

Page 34

1   to get a background.  I did review the records a bit
2   more intensely afterwards to -- after I saw her with
3   regards to history more so.
4   Q   And when you first saw her, what -- what were her
5   presenting symptoms?
6   A   Her concern -- her concern was the well-being of her
7   baby and wanted to go over the ultrasound results.
8   Q   Okay.  And who had ordered the ultrasound?
9   A   It was recommended by Dr. Ezenagu to order the
10  ultrasound to date the pregnancy.
11  Q   Do you know if Ms. Loertscher wanted to have that
12  ultrasound performed or not?
13  A   I can't speak if she did or not.
14  Q   Okay.  And is it typical practice when someone comes in
15  through the emergency room who identifies herself as
16  possibly pregnant or pregnant to do an ultrasound?
17  A   No.  To do a pregnancy test, yes.
18  Q   Now, I know that you've reviewed the notes.  Do you know
19  why Ms. Loertscher was given a urinalysis at the
20  emergency room?
21  A   I don't know why.
22  Q   What would be reasons for conducting a urinalysis?
23  MR. DuBEAU:  Well, I'm going to object to
24  foundation.  I don't think she's an emergency room
25  doctor or would necessarily be in the position to know

Page 35

1   what they are thinking.
2   MS. ROSENBLOOM:  Okay.
3   MR. DuBEAU:  If I'm wrong about that and you
4   have an opinion, go right ahead but --
5   THE WITNESS:  I hate to put words in their
6   mouths, but are you specifically for bacterial or -- or
7   drug screen?
8   Q   Typically, when a patient comes in through the ER, does
9   everybody get a urinalysis?
10  A   I can't speak for that.  I hope not.  I can't speak to
11  that, no.  I don't know.
12  Q   Okay.  And when you have seen patients who have had
13  urinalysis at this facility, what have been the various
14  reasons why they received that test?
15  MR. DuBEAU:  Well, again, I'll object to
16  foundation.  If you have an understanding, go ahead.
17  THE WITNESS:  We're looking for infection.  That
18  would be the only reason we would do that, um-hm, for
19  pregnancy well-being to rule out infection.  Bladder
20  infections are common in pregnancy so --
21  Q   Is it standard practice to ask the patient's consent
22  before doing a urinalysis, in your experience?
23  A   For -- I can speak to the clinic and not the emergency
24  room and, to my experience, correct.  Typically, we tell
25  the patient what we're going to do, to check for

Page 36

1   urinalysis to check for infection, and I just tell them
2   what they're gonna do and they can object, but they
3   don't.
4   Q   And when you, in your practice, not in the Emergency
5   Department, but in your own practice when you conduct a
6   urinalysis on a patient, are you looking for substance
7   use when someone's pregnant?
8   A   Not in a urinalysis.  That would be a urine tox screen.
9   It's different.
10  Q   Okay.  Can you describe the difference?
11  A   So a urinalysis is looking for a bacterial infection,
12  and a urine tox screen is a separate test, and, in my
13  understanding, we need to have consent and I do get
14  consent of patients for that.
15  Q   Did you ever have to be drug-tested for your job?
16  A   I don't know.  I can't recall if it was here or -- maybe
17  at one point.  I can't recall.
18  Q   Okay.  If that happened, were you told why the test was
19  being given?
20  MR. DuBEAU:  You know, the purpose of this line
21  of questioning is what?
22  MS. ROSENBLOOM:  I'm -- I'm trying to understand
23  the practices in this -- in this hospital as compared to
24  employment tests, for example.
25  MR. DuBEAU:  I'm not sure that the doctor's

Page 37

1    personal experiences in this regard are relevant or
2    necessarily calculated to uncover that information.
3    I -- I will leave it to Dr. Bantz as to whether or not
4    she wishes to -- answer that, and, if she doesn't,
5    then I'll respect that right.
6         MS. ROSENBLOOM:  Fair enough.
7         THE WITNESS:  I don't remember the question.
8         (Last question read back by the court reporter.)
9         THE WITNESS:  I think I've had one drug screen
10   at one point in my life for a job, and it was a part of
11   having that job so I was aware, um-hm.
12        MS. ROSENBLOOM:  Thank you.  Let's take a break.
13        THE VIDEOGRAPHER:  The time is 9:58.  We are off
14   the record.
15        (Short recess.)
16        THE VIDEOGRAPHER:  We're back on the record.
17   The time is 10:07.
18   Q   Dr. Bantz, if you recall, when you met Ms. Loertscher,
19       how many weeks pregnant was she?
20   A   Fourteen weeks.
21   Q   And do you know why she sought care at this facility,
22       what -- what her reasons were for coming in?
23        MR. DuBEAU:  Objection, foundation.
24   Q   If you know.
25   A   For help is generally what she told me with the

Page 38

1    pregnancy and with -- and with her depression.
2    Q   Did you speak with her about her thyroid condition?
3    A   I did.
4    Q   And what was your medical impression of her thyroid
5        issue?
6    A   She was severely hypothyroid and needed to be on
7        supplementation.
8    Q   If you look at the page of the exhibit that's still in
9        front of you labeled County 170, is that part of a note
10       from you?  I believe your signature's on the next page.
11   A   Yes.
12   Q   Okay.  And your notes right at the top under
13       Consultation describe Ms. Loertscher as a 29-year-old
14       gravida one para zero.  What does that mean?
15   A   It was her first pregnancy.
16   Q   Thank you.  And in -- at the top of the second paragraph
17       you've written, "Tamara has been abusing
18       methamphetamines as well as marijuana during her
19       pregnancy."  What was your basis for your conclusion
20       that she had been abusing those substances?
21   A   She had been using the illicit drugs during the
22       pregnancy and, in my opinion, that's abusing.
23   Q   How did you know she had been using illicit drugs?
24   A   She stated she had used methamphetamine and marijuana.
25   Q   Do you know how much methamphetamine she had used during

Page 39

1    pregnancy?
2    A   Not specific quantities or specific frequencies.
3    Q   Okay.  Is your opinion that any use of
4        methamphetamine during pregnancy constitutes abuse?
5    A   Yes.
6    Q   And what about marijuana?
7    A   Yes.
8    Q   You wrote that, "Ms. Loertscher has had alcohol during
9        the pregnancy as well."  Do you know how much alcohol
10       she had had?
11   A   No.
12   Q   Were you concerned about that?
13   A   Yeah.
14   Q   And -- and you also use the term "polysubstance abuse."
15       What does that mean?
16   A   Any more than one substance being abused.
17   Q   Would that include alcohol?
18   A   Yes.
19   Q   So polysubstance use doesn't -- doesn't have to do with
20       whether -- whether it's legal or not legal to -- to
21       possess that drug?
22   A   Um.
23   Q   Well, you tell me.  I don't want to put words in your
24       mouth.
25   A   Well, the methamphetamine and marijuana are -- are

Page 40

1    illegal in this state so that would constitute
2    polysubstance use.
3    Q   Could -- could tobacco be part of polysubstance use
4        during pregnancy?
5    A   It could be, but I tend not to consider that part of an
6        illicit drug.
7    Q   What advice do you typically give pregnant women about
8        drinking alcohol?
9    A   Not to drink alcohol in pregnancy.
10   Q   At all?
11   A   Correct.
12   Q   And how adherent are your patients to your advice
13       usually?
14   A   They seem to be fairly adherent.
15   Q   And what advice, if any, do you give pregnant women
16       about the use of other drugs?
17   A   Not to use them during pregnancy.
18   Q   And do your patients typically follow your advice?
19   A   Yes, as far as I know, what they tell me.
20   Q   You noted in your notes that Ms. Loertscher admitted
21       herself voluntarily to Behavioral Health.  Do you see
22       that as a -- as a good sign, that she admitted herself
23       voluntarily?
24   A   In my opinion?
25   Q   Yes.

Page 41

1  A   She's seeking help.  I think that's a good thing.
2  Q   Okay.  And your first note under the heading Physical
3      Examination, which is on the next page, says, "Patient
4      appears well and in no acute distress."  What -- what
5      does that -- what does that mean to you?  What did you
6      mean by that?
7  A   It's a general statement.  We make a -- typically, make
8      a blanket statement about a patient and how they look.
9      They're not in pain such as someone would be in labor,
10      they would perhaps look somewhat distressed, and she
11      generally appears well, which she did, not ill-
12      appearing.
13  Q   Thank you.  And you also reviewed the ultrasound on this
14      day, is that correct?
15  A   I did.  Um-hm.
16  Q   Your notes indicate you found the ultrasound to be
17      normal -- sorry.  It's the --
18  A   Yup.
19  Q   -- three lines from the bottom of that first paragraph.
20      It says, "Generally, findings are normal at this point."
21      What does it mean when the ultrasound looks normal at 14
22      weeks pregnancy?
23  A   We don't see any gross anomalies.  The baby appears to
24      be growing symmetrically.
25  Q   Okay.  Now, in the section of these notes where you talk

Page 42

1      about Ms. Loertscher's hypothyroidism, were you
2      concerned about her TSH level being over 100?
3  A   Yes.
4  Q   What was your concern?
5  A   Potential risk of miscarriage.
6  Q   Are there other concerns for a patient with a TSH level
7      that high?
8  A   Generally -- I'm not an endocrinologist, but, generally,
9      the thyroid does control lots of types of metabolisms
10      within the body, so -- and, also, we screen that for
11      depression.  Some people can have worsening symptoms
12      of depression from severe hypothyroidism.
13  Q   And just to be clear, when we say "TSH," what is TSH?
14  A   Thyroid stimulating hormone.
15  Q   You noted that Ms. Loertscher had not been taking
16      Levothyroxine for -- for quite awhile, you said, and
17      that she was taking over-the-counter thyroid pills.
18      What does Levothyroxine do?
19  A   It is a synthetic derivative of the active thyroid
20      supplement.
21  Q   Is it a -- is it a substitute for a hormone that the
22      thyroid is not producing --
23  A   Correct.
24  Q   -- sufficiently?
25  A   Yes.

Page 43

1  Q   And you also noted here that you felt it was amazing
2      that the pregnancy had survived the -- the first
3      trimester with this TSH level.  Why is that?
4  A   The highest TSH I've seen in a pregnant woman.
5  Q   And how does TSH relate to the risk of miscarriage?
6  A   Typically, severe hypothyroidism can be a risk factor
7      for miscarriage.
8  Q   What -- what is the -- what's the -- the thing that
9      happens in the body that would cause that?
10  A   I don't know the specifics --
11  Q   Okay.
12  A   -- why, but it can.
13  Q   Thank you.  Do you know what over-the-counter pills
14      Ms. Loertscher was taking for her thyroid issue?
15  A   No.  Hm-um.
16  Q   Okay.  Are you familiar with over-the-counter
17      substitutes for Levothyroxine?
18  A   Vaguely, yes.
19  Q   Do you know if -- if there are any that have a similar
20      effect to that prescription drug?
21  A   Not a similar prescription.
22  Q   Okay.  Did you discuss with Ms. Loertscher at any time
23      whether she had health insurance prescription coverage?
24  A   I did not, that I recall.
25  Q   Did you know if she had health insurance or prescription

Page 44

1      coverage?
2  A   I did not know.
3  Q   Did you discuss with Ms. Loertscher whether she could
4      afford to pay for Levothyroxine?
5  A   I can't -- I can't recall if I had that discussion.
6  Q   If you know, is it common for people who do not have
7      health insurance prescription coverage to take
8      over-the-counter substitutes for prescription drugs?
9  A   I can't really -- that would be an assumption.
10  Q   Okay.  If you can't answer, please say you can't answer.
11  A   I can't answer that.
12  Q   Did anyone at Mayo make a referral for Ms. Loertscher to
13      an endocrinologist?
14  A   I don't know.
15  Q   Did you make such a referral?
16  A   No.
17  Q   Did you or anyone, to your knowledge, refer her to
18      people in the hospital or out of the hospital who could
19      help her with getting health insurance?
20  A   I don't know.
21  Q   Do you know Cori Everson?
22  A   No.
23  Q   Do you know if you've ever met a social worker in this
24      facility named Cori Everson?
25  A   I can't recall.  I've heard the name Cori with regard to

Page 45

1   this case.
2   Q   Okay.  Have you ever met Cori, whether you know her last
3       name or not?
4   A   I don't -- I don't recall if I have, not in this
5       situation right in this case.  I just can't recall, no.
6   Q   Did you -- you -- you told me earlier that you've never
7       made a mandatory report of suspected child abuse or
8       neglect.  Did you make any reports with regard to
9       Ms. Loertscher concerning this law we talked about
10      before, the UCHIPS law, the unborn child abuse law?
11  A   Did I report her?
12  Q   Yes.
13  A   No.
14  Q   Do you know if anyone did?
15  A   At the time?
16  Q   At any time during the time Ms. Loertscher was here.
17  A   That would be an assumption.
18  Q   Don't make assumptions.  Only if you know.
19  A   I don't know.  I did not know, no.
20  Q   Okay.  In your opinion, when you examined Ms. Loertscher
21      on August 4th, did she lack self-control in the use of
22      alcoholic beverages, controlled substances -- or
23      controlled substances?
24  A   Well, the fact that she had been using during the
25      pregnancy and she knew she was pregnant, that's lacking

Page 46

1   self-control, in my mind.
2   Q   Did she tell you that she planned to stop or had stopped
3       using alcohol and controlled substances?
4   A   She had said she'd stopped the alcohol.  I can't
5       specifically recall that she stated she was going to
6       stop.  She came in for help, so I can't assume, so she
7       specifically did not tell me she was going to stop.
8   Q   Did she seem to have the interests of her pregnancy and
9       her future child in mind when she -- when you saw her?
10  A   Yes.
11  Q   Did she seem to care about her pregnancy?
12  A   Yes.
13  Q   And she wanted it to go well?
14  A   Yes.
15  Q   Did you believe that her past use of alcohol and
16      controlled substances seriously affected or endangered
17      her pregnancy?
18  A   Yes.
19  Q   And why did you think that?
20  A   With regards to the pregnancy, she's exposing the baby
21      to illicit drugs and she was not getting prenatal care,
22      and I was concerned regarding the future where that was
23      going from there.
24  Q   If Ms. Loertscher had -- had stopped using alcohol and
25      any controlled substances -- substances as of the moment

Page 47

1   you first met her and never used again during the
2       pregnancy, would she have still severely -- seriously
3       endangered her pregnancy by the past use?
4   A   Potentially.
5   Q   What's the effect of stress on pregnancy?
6   A   Patients ask me that.  Generally, what I tell my
7       patients, we don't know of any serious complications
8       with the pregnancy with regards to just stress.  There
9       have been studies looking at women and -- who are in
10      war-torn countries and their babies are smaller, weigh
11      less.
12  Q   Do you advise your pregnant patients to avoid excessive
13      stress, if possible?
14  A   Sure.  Yes.
15  Q   Do you -- whether when in private practice or in your
16      current job, were you aware of any -- you said no to
17      doctors.  Were you aware of any nurses or nurse
18      practitioners or others who had reported a woman for
19      reported so-called unborn child abuse?
20  A   None that I'm aware of.
21  Q   Did you share any of Tamara Loertscher's medical records
22      with Taylor County Department of Human Services?
23  A   In my hearing I spoke to what was on the -- it's in the
24      record.  I discussed the thyroid and the medical
25      conditions, yes.

Page 48

1   Q   Okay.  Did you share any of the paper records with
2       Taylor County Department of Human Services?
3   A   I was on the phone so I couldn't.
4   Q   Okay.  And did Tamara Loertscher sign any HIPAA release
5       authorizing you to share her medical information with
6       anyone outside the hospital?
7   A   I am not aware, but I did bring up during my -- my
8       deposition if that was breaking patient-doctor
9       confidentiality, but that was waived in that situation.
10  Q   Okay.  I'm going to ask you about that hearing in a
11      moment.  I'm showing you what's been previously marked
12      Plaintiff's Exhibit 22 for identification.  I've given
13      Mr. DuBeau a copy.  The other parties have copies from
14      yesterday and from discovery.  So now I'm going to ask
15      you a series of questions about a hearing that took
16      place on August 5th of 2014.  You testified at a hearing
17      held by the Court Commissioner in Taylor County,
18      Wisconsin on August 5th, 2014, is that correct?
19  A   Yes.
20  Q   And were you there in person at the courthouse?
21  A   On the phone, no.
22  Q   Okay.  Were you here in the Mayo Clinic or Hospital at
23      that time?
24  A   I was at my house, home in the afternoon.
25  Q   Okay.  Were you present on the phone for the entire

Page 49

1    hearing or just your testimony?
2    A  Just my testimony.
3    Q  Did you know what that hearing was about?
4    A  It was my understanding I was asked to speak at a
5    hearing.  The social worker had called me that morning,
6    and I was told to give my opinion, impression of the
7    patient, and that was my understanding.
8    Q  Okay.  Which social worker called you that morning?
9    A  I can't recall.
10   Q  Was it a Mayo social worker?
11   A  Yes.
12   Q  Did anybody from Taylor County Department of Human
13   Services call you or ask you to testify?
14   A  No.
15   Q  Okay.  Did any lawyers contact you to ask you to
16   testify?
17   A  No.
18   Q  Did you know what the purpose of the hearing was, not
19   just your testimony, but the hearing itself?
20   A  I don't think I fully understood that.  I've never been
21   deposed or had a hearing before so I don't think I fully
22   understood the -- or comprehended the -- the situation
23   at hand.
24   Q  Did you -- do you know why you were asked to testify
25   rather than Dr. Ezenagu -- Ezenagu?

Page 50

1    A  Oh, Ezenagu.  Well, I was the one that had the contact
2    with the patient.
3    Q  Okay.  Did Dr. Ezenagu also have contact with
4    Ms. Loertscher before you did?
5    A  No.
6    Q  Do you know -- do you know why you were asked to testify
7    instead of Dr. Anwar or Dr. Hussain or Dr. Smithberg,
8    who had also seen this patient?
9    A  I was asked 'cause I was the OB-GYN and she was
10   pregnant, and so they felt I would be a good -- not
11   expert but, in that respect, a good opinion to have.
12   Q  Um-hm.  Did you do anything to prepare for testifying at
13   this hearing?
14   A  For that hearing I contacted our Legal Department for
15   advice.
16   Q  Okay.  I don't want you to tell me anything they told
17   you.  Did you speak with anyone other than your Legal
18   Department?
19   A  No.
20   Q  Did you review any records before testifying?
21   A  I reviewed, I believe, the -- the labs and I reviewed my
22   dictation, um-hm.
23   Q  Before this hearing had you ever spoken with Courtney
24   Graff, who's sitting down there at the table?
25   A  No.

Page 51

1    Q  Okay.  Were you asked by anybody for help in drafting --
2    for help in creating a request for temporary physical
3    custody for Ms. Loertscher?
4    A  No.
5    Q  Do you know who else was in the courtroom with the Court
6    Commissioner that day at the hearing?
7    A  Well, it's in here, but I believe there were two
8    attorneys.
9    Q  At the time you were called on the phone to testify did
10   you know who was there in the courtroom?
11   A  They introduced themselves.
12   Q  Were you aware that there were also people present by
13   phone from the Mayo Clinic?
14   A  I was not.
15   Q  Okay.  Do you know -- did you know at the time that
16   Ms. Graff was there at the court?
17   A  What was that again?  Sorry.
18   Q  Courtney Graff --
19   A  Courtney.
20   Q  -- who is a lawyer for Taylor County.
21   A  I didn't know specifically.  I knew there were attorneys
22   there.
23   Q  Okay.  Do you know if Ms. Loertscher was present?
24   A  I didn't know she was present, no.
25   Q  Did you know that this was a hearing in front of a Court

Page 52

1    Commissioner regarding an order of temporary physical
2    custody with regard to what the law calls an unborn
3    child?
4    A  I don't think I fully understood that, no.
5    Q  Did you know -- did anybody tell you at that time, at
6    the hearing or before, that there was a petition in the
7    court called a Petition for Care or Protection of an
8    Unborn Child?
9    A  Not that I'm aware of.
10   Q  Had you ever seen that Petition before you testified?
11   A  No.
12   Q  I know you testified before that you had never testified
13   at a hearing.  Have you had any patients from Mayo who
14   were detained under a Petition for Protection or Care of
15   an Unborn Child?
16   A  Not that I'm aware of, yeah.
17   Q  Okay.  I'm talking about any of your patients.
18   A  Yeah, not that I'm aware of.
19   Q  Okay.  Did you know at the time of the hearing that the
20   County was asking that Ms. Loertscher be required to
21   remain at Mayo, not allowed to leave, until discharge
22   and then be required to go to inpatient treatment?
23   A  No.
24   Q  Did you know that the County was seeking to have that
25   happen even if Ms. Loertscher objected?

## Page 53

1  A  I did not know that.
2  Q  Do you know whether Ms. Loertscher had a lawyer
3  representing her at this hearing?
4  A  I did not know that. I didn't know she was there, so I
5  don't know.
6  Q  Okay. Did you know that she left the room at some point
7  during the hearing?
8  A  Not at that time.
9  Q  Okay. At that time on August 5th did you know that
10  there was a lawyer appointed -- a Guardian ad Litem
11  appointed for the fetus?
12  A  No, I did not know that.
13  Q  And did you know that that gentleman was present at
14  the -- in the courtroom?
15  A  I just knew there were attorneys.
16  Q  Okay. You alluded to this before, but do you recall
17  your exchange with the Court Commissioner and Ms. Graff
18  about your concern about patient confidentiality?
19  A  I did bring that up initially, yes.
20  Q  And why did you bring up that concern?
21  A  That was recommended by my attorneys here to make sure I
22  was able to speak in order to break confidentiality.
23  Q  Now, do you know who was -- sorry, go ahead.
24  A  In order to break doctor-patient confidentiality.
25  That's why I brought that up. I was instructed to do

## Page 54

1  so.
2  Q  If you look at the page of this exhibit labeled County
3  222 at the bottom, this is a transcript of that hearing.
4  After you were sworn in the Court said, "Thank you.
5  Ms. Graff, you can go ahead." And then it says,"Direct
6  Examination by Ms. Graff," and then some questions
7  began. Did you know who Ms. Graff was when she was
8  asking you questions?
9  A  I knew she was an attorney.
10  Q  Did you know who she was an attorney representing?
11  A  No.
12  Q  Okay. And if you'll look on the next page -- not the
13  next page -- if you look at Page 224 at Line 7, can you
14  read what you said there after the "A"?
15  A  Yes, I can. "And before I get started, I would want to
16  verify that I don't have her authorization to speak on
17  her behalf so I would be breaching confidentiality. Is
18  that -- is that correct?"
19  Q  And by "her," do you mean Ms. Loertscher -- did you mean
20  Ms. Loertscher?
21  A  Yes.
22  Q  And then the questioner, Ms. Graff, says, "That is not
23  an issue in this type of proceeding." And your answer
24  was, "Okay." Is that correct? Is that the exchange
25  that happened?

## Page 55

1  A  Yes.
2  Q  Okay. And were you reassured by Ms. Graff that it was
3  okay to testify about the confidential medical
4  information in this type of proceeding?
5  A  That was my understanding.
6  Q  Did anyone else talk to you about divulging patient
7  confidential information at the hearing before you
8  testified?
9  A  No, just I spoke with our attorneys here --
10  Q  Okay.
11  A  -- advice.
12  Q  Don't tell me what they said.
13  A  No.
14  Q  That's privileged. Okay. And you testified at this
15  hearing when asked that you would recommend inpatient
16  treatment for Ms. Loertscher, is that correct?
17  A  That's correct.
18  Q  When you said that at the hearing, what did you envision
19  for inpatient treatment?
20  A  What did I envision?
21  Q  Yeah.
22  A  I envisioned her going to a facility where she may be
23  for several weeks and getting extended help 'cause I did
24  not feel she had the support at home and then
25  potentially being discharged to outpatient therapy at

## Page 56

1  that point.
2  Q  Did you know when you said that that the result of this
3  court hearing could be that Ms. Loertscher could be
4  forced into treatment?
5  A  That was not my understanding.
6  Q  Did you think at the time it would be a good idea for
7  her to be forced to go to treatment?
8  MR. KNOTT: Object to the form of the question.
9  It's vague.
10  MS. ROSENBLOOM: You can answer.
11  THE WITNESS: You can repeat that again, please,
12  the question?
13  (Last question read back by the court reporter.)
14  THE WITNESS: No.
15  Q  If you'll look at Page 227 of this transcript, you were
16  being asked some questions about drug use during
17  pregnancy, and at Line 2, the first part of your answer
18  says, "Now, granted, I'm not an expert witness in this
19  respect." Did you have concerns about giving an opinion
20  at a court hearing about drug use during pregnancy?
21  MR. KNOTT: Object to the form of the question.
22  I think it misstates her testimony. You can answer.
23  Q  You can answer.
24  A  I quantity -- I stated I wasn't an expert witness, so by
25  stating that, I felt I was giving my medical opinion,

Page 57

1   but, again, I'm not an expert witness with regards to
2   drug use in pregnancy.
3       MR. KNOTT: I'm sorry. What was the end of
4   that, with regard to?
5       THE WITNESS: Being an expert in drug use in
6   pregnancy.
7   Q   On Page 227, Line 11, you said -- the beginning of that
8   sentence says, "I did do some reading last evening
9   before I spoke with the patient because I don't see that
10  many patients on methamphetamine. However, it is
11  becoming more common." What reading did you do the
12  night before this hearing?
13  A   That was the UpToDate. I pulled that up off the
14  computer to review generally with the patient and her
15  concerns with regard to her drug use in pregnancy and
16  potential outcomes.
17  Q   What do you mean by the UpToDate? Is that a
18  publication?
19  A   It's a computer publication, UpToDate. It's a summary
20  of -- it covers all medical fields and topics mostly and
21  then it's a summary of the literature and it's up --
22  it's updated frequently.
23  Q   Do you know who issues the -- issues or publishes the
24  UpToDate?
25  A   I forget the name of the publisher.

Page 58

1   Q   Is it a publisher of medical information for physicians?
2   A   It is, yes.
3   Q   On -- if you look at Page 230, at the hearing you also
4   testified that you had offered Ms. Loertscher inpatient
5   therapy or that -- sorry, that someone had offered her.
6   Let's find that. Sorry. At the very bottom, starting
7   on Line 24, the sentence that says, "And I did bring up
8   with her and I didn't dictate as such but an inpatient
9   therapy, and she seemed to think that wasn't necessary,
10  which I don't agree with that." Who offered her
11  inpatient therapy?
12  A   I just generally had brought it up in our conversation
13  with her. That was from me.
14  Q   Had you identified a bed available in an inpatient
15  facility?
16  A   No.
17  Q   You were bringing up the concept of inpatient therapy?
18  A   I was, yes.
19  Q   And you said that she seemed to think that wasn't
20  necessary. What other options could have been
21  appropriate for her, in your opinion?
22  A   Well, inpatient therapy at the time was my
23  recommendation. Another option could be outpatient
24  therapy.
25  Q   Did you feel that Ms. Loertscher needed any treatment

Page 59

1   for her hypothyroidism?
2   A   Yes, with supplementation.
3   Q   And could that have been achieved without an inpatient
4   stay somewhere?
5   A   Yes.
6   Q   Okay. When Court Commissioner Krug asked you at this
7   hearing if methamphetamine was addictive to the child
8   and whether the child would be born addicted, you said
9   you didn't know. That's the bottom of Page 231 --
10  A   Correct.
11  Q   -- is the question from the Court. Do you have an
12  understanding of what the term "born addicted" could
13  mean?
14  A   My understanding is the baby is used to a particular
15  drug, and when the baby is delivered, it's not receiving
16  that drug, it would experience withdrawal. That's my
17  understanding.
18  Q   So -- and you -- you testified earlier that your --
19  addiction medicine is not your field of specialty,
20  correct?
21  A   That's correct.
22  Q   And you expressed that -- that at this hearing as well?
23  A   Yes.
24  Q   Okay. At this hearing during your testimony your
25  concerns about Ms. Loertscher's hypothyroidism were not

Page 60

1   focused on by the Court. Did the Court -- how did you
2   feel about that?
3   A   I don't think I had an opinion on that.
4   Q   Okay. Did the Court seem to be interested in
5   Ms. Loertscher's health or primarily about her drug use?
6       MR. KNOTT: Object, calls for speculation.
7       MR. DuBEAU: Object to form. If you understand
8   the question, go ahead.
9       THE WITNESS: That's -- I -- I -- I can't -- can
10  you repeat that again?
11      (Last question read back by the court reporter.)
12      THE WITNESS: It's difficult for me to make an
13  assumption what -- what they're interested in.
14  Q   Now, Ms. Loertscher remained at the Mayo Hospital here
15  for two days after that hearing before she was
16  discharged, is that correct?
17  A   I don't know any different.
18  Q   Okay. According to the notes, which include discharge
19  notes dated August 7th, do you believe she was
20  discharged on August 7th?
21  A   If that's what it says, yes.
22  Q   I can direct you to the page. If you'll look at Page
23  167 --
24  A   Um-hm.
25  Q   -- there's a note labeled Discharge Summary. Did you

Page 61

1  see Ms. Loertscher again during those two days after the
2  hearing?
3  A  I did not, no.
4  Q  Do you know what the hearing officer -- sorry, the Court
5  Commissioner ordered after that hearing?
6  A  No.
7  Q  Looking at Dr. Anwar's discharge notes on Page 167 and
8  168 and 169, do you see the discharge recommendations
9  and plans?
10  A  Um-hm.
11  Q  Could you answer with a word?
12  A  Yes.  Yes.
13  Q  Do you agree with Dr. Anwar's conclusions?
14        MR. DuBEAU:  Well, she's gonna assert her
15  privilege on that and not answer that question about any
16  other provider.
17        MS. ROSENBLOOM:  Okay.
18  Q  Did you agree, if you -- if you had an opinion by
19  August 7th, that Ms. Loertscher was ready for discharge
20  on August 7?
21  A  Discharge from our facility?
22  Q  Yes.
23        MR. DuBEAU:  Well, again, I'm gonna impose an
24  objection.  She's already told you that she was not
25  seeing Ms. Loertscher after August 4.  I don't know how

Page 62

1  she can possibly have an opinion on that.  I'm not going
2  to have her speculate as to whether or not that patient
3  was or was not ready for discharge at that point.
4        MS. ROSENBLOOM:  Okay.  That's fine.
5  Q  Dr. Bantz, are you familiar with Wisconsin's involuntary
6  civil commitment process sometimes known as Article 51?
7  A  No.
8  Q  Have you ever participated in proceedings to have
9  someone civilly committed for mental health reasons?
10  A  No.
11  Q  Are you familiar with the Fahrman Center?
12  A  No.
13  Q  Do you know what happened to Ms. Loertscher after she
14  was discharged from the Mayo Hospital on August 7th?
15  A  No.
16  Q  Okay.  Are you familiar with the Taylor County Jail?
17  A  No.
18  Q  Are you familiar with -- have you been to any county
19  jails in Wisconsin?
20  A  No.
21  Q  Have you ever had patients go to a jail in Wisconsin or
22  prison?
23  A  The Eau Claire County Jail, um-hm.
24  Q  Based on your own experience with patients in the
25  Eau Claire County Jail, does that jail provide prenatal

Page 63

1  care?
2        MR. DuBEAU:  Object to foundation, if you have
3  any information.
4        THE WITNESS:  They come to -- the women come to
5  us, have come to us.  They have a nurse there that
6  oversees their care.
7  Q  Do you think the jail is a healthy environment for a
8  pregnant woman with hypothyroidism and depression?
9        MR. DuBEAU:  She's going to assert her Alt
10  objection on that.
11  Q  All right.  One more quick topic for you.  I'm gonna
12  show you an exhibit previously marked as Plaintiff's
13  Exhibit 1.  This is an exhibit labeled Child Protective
14  Service Report.  It's a document from Taylor County that
15  was provided to us by the State.  If you look at the
16  second page, which is labeled 2846 at the bottom, under
17  Section -- in the narrative section under 2-B -- and I
18  know these are not your notes, this is the County's
19  notes -- the last sentence of that paragraph says, "The
20  physician is stating that this behavior is putting the
21  fetus in serious danger of harm."  And this is a report
22  from Cori Everson, the social worker here at the Mayo
23  Clinic.  Do you know if that note refers to you as the
24  physician?
25  A  I don't know if it is.

Page 64

1  Q  Okay.  You didn't recall ever having a conversation with
2  Cori Everson, is that correct?
3  A  No, not that I recall, no.
4  Q  Okay.  And if you look at the next page, 2847, in the
5  section at the bottom labeled letter N, the sentence --
6  there's a sentence that reads, "Tammy is reported to be
7  chemically dependent and unable to control the
8  dependency's effects because of the use of
9  methamphetamines."  Do you know, were you the person who
10  reported Ms. Loertscher to be chemically dependent and
11  unable to control the dependency's effects?
12  A  No.  No.
13  Q  Did anyone from Taylor County Department of Human
14  Services ever contact you after you testified at that
15  hearing?
16  A  No.
17  Q  Did anybody who works for or with Taylor County ever ask
18  you to serve as an expert in this Federal Court lawsuit?
19  A  No.
20        MS. ROSENBLOOM:  Okay.  I have no more questions
21  right now.
22        MR. DuBEAU:  Can we get sort of a sense of how
23  long others think that they may be so that we can give
24  Dr. Anwar appropriate notice?
25        MR. KNOTT:  I think I would be maybe 10 to 15

Page 65

1  minutes.
2      MS. KECKHAVER:  Yeah, depending on what Doug has
3  to say, maybe another ten minutes.
4      MR. DuBEAU:  And so are we thinking quarter
5  after or there will be another break for going off and
6  changing the -- the disc or tape?  When -- when should
7  we tell Dr. Anwar to be here?
8      MS. KECKHAVER:  I think we should tell him 11:30
9  to be safe.
10     MR. DuBEAU:  Okay.
11     THE VIDEOGRAPHER:  We have 15 minutes left in
12 tape.
13     MR. DuBEAU:  All right.  Thank you.
14     MR. KNOTT:  Are we gonna proceed then?  Are we
15 ready?
16     THE WITNESS:  Yes.
17     EXAMINATION BY MR. KNOTT:
18 Q  Dr. Bantz, my name is Doug Knott, and I did briefly
19    introduce myself.  I should also say that I represent
20    four individuals who are social workers with Taylor
21    County, and they're accused in the lawsuit of having
22    applied unconstitutional practices or policies towards
23    her, and that's where my questioning is coming from.
24 A  Okay.
25 Q  With respect to your training, Doctor, you said you have

Page 66

1  a fellowship in OB-GYN?
2  A  I'm a Fellow so --
3  Q  Okay.
4  A  -- that means I've passed all my boards, and I've
5     practiced and kept up with my yearly CMEs that I'm a
6     practicing Fellow OB-GYN --
7  Q  Okay.
8  A  -- just basic OB-GYN.
9  Q  So you met certain qualifications in order to be given
10    that title?
11 A  Um-hm.
12 Q  By the National -- "yes"?
13 A  Yes.
14 Q  By the National Organization of Obstetric and
15    Gynecological Physicians?
16 A  American Board of OB-GYN, correct.
17 Q  Okay.  And that's in addition to board certification
18    from that same organization?
19 A  (Nods head affirmatively.)
20 Q  "Yes"?
21 A  Yes.
22 Q  And as an OB-GYN, you are an expert in the field of
23    labor and delivery, right?
24 A  Correct.
25 Q  The gynecological aspect is women's health and

Page 67

1  surgeries, correct?
2  A  Correct.
3  Q  And do you perform surgeries?
4  A  Yes.
5  Q  And you also provide care and have expertise in prenatal
6     health for women, right?
7  A  Yes.
8  Q  Okay.  You became involved in Tammy Loertscher's case on
9     a -- on a referral from Dr. Hussain, correct?
10 A  Yes.
11 Q  Dr. Hussain had requested that your partner see Tammy
12    and you stepped in because he or she was unavailable?
13 A  Correct.  He was very busy call on a Sunday, and he
14    didn't get around to seeing her, so that got carried on
15    to me, the Monday on-call physician.
16 Q  Is it fair to say that it was part of Tammy's treatment
17    plan on her admission that she would have an OB-GYN
18    consult?
19 A  I believe that was the understanding.
20 Q  And that would be why Dr. Hussain was requesting an
21    OB-GYN physician see her, correct?
22 A  Correct.  Also, the patient had questions and wanted
23    somebody personally to go over the ultrasound results
24    and offer her reassurance.
25 Q  Did you before seeing Tammy on August 4, 2014 review

Page 68

1  Dr. Hussain's notes?
2  A  Before seeing her, not that I recall.
3  Q  Would it be your practice to review the -- the notes of
4     other physicians before you see a patient for an initial
5     consult?
6  A  I try to review as much as possible.
7  Q  And if you didn't review that initial psychiatric
8     assessment by Dr. Hussain, would you have done so, do
9     you think, before you testified on August 5?
10 A  I did review it after I saw the patient.
11 Q  And you can look at Exhibit 22 in front of you -- no --
12    Exhibit 41, the records --
13 A  Um-hm.
14 Q  -- at Page 164, and just to skip to the -- the specific
15    thing I wanted to ask you about, on Page 165 Dr. Hussain
16    records that in the initial assessment of Tammy on
17    August 1 Tammy told Dr. Hussain that she continued
18    engaging in methamphetamine use, which was initially on
19    a daily basis, but then she found out she was pregnant
20    and since then she has decreased it to perhaps once or
21    two times a week.  Did you -- would you have read that
22    before you testified?
23 A  I don't recall if I had read that specifically.  Tammy
24    did speak to the fact that she had reduced her
25    methamphetamine use.

Page 69

1    Q   And Dr. Hussain recorded once or two times a week.  You
2        recorded, I think, three times a week?
3    A   Two to three times, I believe, yeah.
4    Q   Okay.  That was something that Tammy told you in your
5        assessment of her on August 4?
6    A   That was my understanding, yes.
7    Q   And you understood that to be use right up until the day
8        of her admission, didn't you?
9    A   That was my understanding.
10   Q   And you understood that she was continuing to use
11       marijuana right up to the date of her admission, true?
12   A   That was my understanding.
13   Q   And at the conclusion of Dr. Hussain's initial
14       assessment she gives diagnoses, and would you have
15       looked at those diagnoses before you testified on
16       August 5?
17   A   I don't recall looking at these specific diagnoses.
18   Q   Okay.  Do you think that you were aware that she had
19       been diagnosed with a major depressive disorder?
20   A   I knew she had depression.  She had stated it.
21   Q   That was something she told you?
22   A   Yes.  Um-hm.
23   Q   And do you think you knew that she had been diagnosed
24       with severe psychosis by Dr. Hussain on August 1?
25   A   I did not know that.

Page 70

1    Q   Do you know, did you have any knowledge that she had
2        been diagnosed with some degree of psychosis at that
3        admission?
4    A   I did not, no.  Hm-um.
5    Q   And that Dr. Hussain diagnosed her on August 1 with
6        methamphetamine dependence, marijuana dependence and
7        alcohol abuse.  Do you think you knew those from
8        reviewing Dr. Hussain's record before you testified?
9    A   I did know that, yes.
10   Q   And --
11           MR. DuBEAU:  And can I ask for a clarification
12       'cause she said she didn't read these diagnoses.  You
13       mean independently or --
14           MR. KNOTT:  Well, yes.  I can ask it that way.
15   Q   So you came to those same conclusions independently,
16       didn't you, Doctor?
17   A   I try to read ahead before I speak with a patient 'cause
18       she specifically had concerns regarding the pregnancy,
19       so I knew of the -- of the drug use.  I did not review
20       this specific -- his -- his axis, his diagnoses, but I
21       knew of the -- the drug use, yes.
22   Q   And did you know from reading the -- reading ahead that
23       she had described using methamphetamine to the point
24       that you would consider it dependence?
25   A   Yes.

Page 71

1    Q   And the same with respect to marijuana?
2    A   I'm -- I -- I can't make an opinion on that.  I don't --
3        I don't know.
4    Q   Okay.  And with respect to your note, Doctor, from
5        August -- your August 4 consultation --
6    A   Um-hm.
7    Q   -- it looks like you dictated it in the early morning of
8        August 5?
9           MS. ROSENBLOOM:  What page are you on, Doug?
10          MR. KNOTT:  I'm on County 169, Exhibit 41.
11          THE WITNESS:  Yes.
12   Q   After having seen Tammy in the evening of August 4 --
13   A   Um-hm.
14   Q   -- true?
15   A   Correct.
16   Q   And I -- I think Tammy records it in her diary as
17       having -- you were there between 7 and 8 P.M.  Would
18       that be consistent with your recollection?
19   A   Yes.
20   Q   And starting at Page 169, there's a section of the
21       electronic record that says History of Present Illness.
22       Is that a standard section of medical record that you
23       fill in on any initial consult?
24   A   I don't use a template, but that's how I start my
25       general background information.

Page 72

1    Q   So you dictate History of Present Illness, and then --
2        and then you fill in the narrative that follows?
3    A   Correct.
4    Q   And am I correct in understanding that in the
5        terminology that you and other physicians use, History
6        of Present Illness means information that was provided
7        by the patient to you in an interview?
8           MS. ROSENBLOOM:  Objection to form.
9           THE WITNESS:  When I dictate the History and
10       Physical -- or the History of Present Illness, it
11       sometimes can be a combination of what the patient tells
12       me, what I glean from the chart.
13   Q   Okay.  Then -- then let me ask you about some specific
14       statements.  Page 170, second full paragraph starts,
15       "Tamara has been abusing methamphetamines as well as
16       marijuana during pregnancy.  She has also had alcohol
17       during the pregnancy as well."  Is that a statement that
18       Tammy made to you on August 4, 2014 between 7 and 8
19       P.M.?
20   A   Specifically, did she say that statement?  We --
21   Q   Is that -- are you recording a fact based on a statement
22       she made to you at that time, Doctor?
23          MS. ROSENBLOOM:  Objection to form and
24       characterization as fact.
25   Q   Are you recording something --

Page 73

1    A    You want me to answer?
2    Q    -- that Tammy told you?
3    A    We talked about the drugs she had used in pregnancy and
4    those three med -- those three drugs, yes.
5    Q    And --
6        THE VIDEOGRAPHER: Five minutes left in tape.
7    Q    Okay. And you say a few lines below, "Patient admits to
8    daily methamphetamine use for a number of months, and it
9    appears that she is getting this medication from her
10   boyfriend. However, she will not admit this." Is that
11   a statement that you recorded based on information that
12   Tammy supplied to you in that interview?
13   A    Yes.
14   Q    And what information did you receive that made you
15   believe that she was getting the medication, the
16   methamphetamine, from her boyfriend --
17       MS. ROSENBLOOM: Objection, relevance.
18   Q    -- do you remember?
19   A    Should I answer?
20       MR. DuBEAU: Yeah, you can answer.
21       THE WITNESS: Because of her social situation,
22   she was very isolated living just with her boyfriend,
23   not with her main support, and it was my assumption
24   that's where she was getting the drugs.
25   Q    And that -- that conclusion that you reached was a

Page 74

1    concern for you with respect to Tammy and the fetus's
2    health because of her social network, true?
3    A    Yes. She had limited social support.
4    Q    And so did that raise a concern for you that if she were
5    to go home, she would not be able to control her use of
6    methamphetamine?
7    A    That was my -- a concern of mine, yes.
8    Q    And was it a concern, Doctor, specifically one of the
9    reasons was because of your suspicion that she was
10   receiving the medication from her boyfriend?
11   A    Yes.
12       MR. KNOTT: I think we better take a break on
13   the -- the disc.
14       THE VIDEOGRAPHER: The time is 11:03. We are
15   off the record.
16       (Short recess.)
17       THE VIDEOGRAPHER: We're back on the record.
18   The time is 11:05.
19   Q    Okay. Dr. Bantz, continuing in the second full
20   paragraph on County 170 under History of Present
21   Illness, you record, "She cut back to approximately
22   three days a week using methamphetamine." That was
23   information that was provided to you on August 4?
24   A    That is my understanding.
25   Q    And this phrase "methamphetamine would help her get out

Page 75

1    of bed," do you remember her using that phrase in her
2    discussion with you?
3    A    Yes.
4    Q    And you understood that to be a current practice, that
5    she would use methamphetamine to help her get out of bed
6    and help with her depression?
7    A    That was my understanding.
8    Q    "And she stated she was taking marijuana on and off
9    throughout." Am I correct in understanding that to mean
10   she was taking marijuana on and off throughout her
11   pregnancy?
12   A    That was my understanding.
13   Q    And that's something -- that's based on something she
14   told you on August 4?
15   A    Yes.
16   Q    And that she used alcohol in the very beginning and then
17   you say, "But she knew she was pregnant when she was
18   taking methamphetamines." I guess I'll ask you to
19   explain that if you -- if you're able at this time.
20   A    As I -- my best recollection, she -- we discussed the
21   alcohol, and she stated when she found out she was
22   pregnant, she stopped taking the alcohol 'cause she knew
23   that was bad for the pregnancy, but she continued with
24   the methamphetamine use.
25   Q    Did the facts that she related to you in terms of her

Page 76

1    use of those drugs raise a concern for you, Doctor, that
2    her use of those drugs was habitual?
3        MS. ROSENBLOOM: Objection to form and
4    characterization of things as facts.
5        MR. DuBEAU: You can answer, if you understand.
6        THE WITNESS: Habitual, yes.
7    Q    And you said, "She feels guilty for taking the illicit
8    meds during the pregnancy." That was something that --
9    that Tammy conveyed to you on August 4?
10   A    Yes.
11   Q    And are you indicating there, Doctor, that there is a
12   concern for her ability to control her use of the drugs
13   if she is unable to stop using them even though she
14   feels guilty?
15       MS. ROSENBLOOM: Objection to form.
16   Q    Did I --
17   A    I'm confused.
18   Q    -- properly characterize one of your concerns for her?
19   Let me start over again. Doctor, after this
20   conversation was it one of your concerns for Tammy that
21   she was -- would be unable to control her use of illicit
22   meds during the pregnancy?
23   A    That was a concern, yes.
24   Q    And was one of the factors going into that concern the
25   fact that she felt guilty about it but still continued

Page  77

1   to use the meds?
2   A   I'm not sure if that was the largest factor but,
3   potentially, a smaller factor.
4   Q   Okay.  Turning to Page 171, Doctor, you indicated at the
5   end of your physical exam that the urine tox screen was
6   positive for THC, methamphetamine and amphetamine.  That
7   was based on lab data that was available to you that
8   day?
9   A   Correct.  It was in the computer, um-hm.
10  Q   Did you feel any need to have the lab confirm that
11  information somehow, to confirm the validity of their
12  tests?
13  A   With respect that she admitted to taking the medications
14  and the positive urine tox, that -- that was
15  confirmatory enough for me in that respect, um-hm.
16  Q   And then with respect to the UpToDate data, I'm just
17  going to -- to go through some of the negative side
18  effects that you identified in your conversation with
19  Tammy.  You spoke with Tammy on August 4, and you told
20  her there's a good likelihood for cognitive side effects
21  from her drug use?
22  A   That's -- yes.
23  Q   And that was based on your research and your training as
24  an OB-GYN?
25  A   That was based on reviewing the most recent data at the

Page  78

1   time on UpToDate.
2   Q   And you believed that at that time.  Do you continue to
3   believe that her conduct on that date had created a good
4   likelihood for cognitive side effects if she continued?
5   A   Potentially, yes.
6   Q   I'm sorry.  If she continued?
7   A   If she continued --
8   Q   Yeah.
9   A   -- taking methamphetamine in her pregnancy?
10  Q   Yes.
11  A   Yes.
12  Q   You indicate, "There's a good possibility there will be
13  possible depression passing on to this child, but
14  cognitive delay would not be surprising, especially with
15  methamphetamine use."  Those concerns for side effects
16  were something you discussed with Tammy on August 4?
17        MS. ROSENBLOOM:  Objection to form.
18        THE WITNESS:  I specifically discussed her
19  depression and it runs in her family, that that
20  potential mental illness can be passed on to the child,
21  just giving her general information, and that's what I
22  was referring to with the depression.  I did discuss
23  learning disabilities and cognitive delays, as stated in
24  UpToDate, which can be a side effect from
25  methamphetamine use in pregnancy.

Page  79

1   Q   You discussed that with her because you were concerned
2   that her drug use could cause cognitive delay, true?
3   A   In the baby.
4   Q   Yeah.
5   A   Yes.
6   Q   And that's something you continue to believe today?
7   A   Yes.
8   Q   You indicate that you discussed with her that her drug
9   use would put the baby at risk for small gestational age
10  or being small for their gestational age, I guess?
11  A   Um-hm.
12  Q   "Yes"?
13  A   Yes.  With regards to if she continued with
14  methamphetamines, those women tend not to eat very good
15  diets and -- and not have prenatal care as well and,
16  also, the babies can be smaller, small for gestational
17  age.
18  Q   You expressed to her a concern about hypoxia from the
19  placenta?
20  A   Um-hm.
21  Q   And, Doctor, what is the cause of the hypoxia from the
22  placenta, and what is the result?
23  A   And that was from the data from UpToDate with regard to
24  hypoxia is cutting off blood supply intermittently to
25  the placenta.  These are theoretical etiologies when it

Page  80

1   comes to cognitive delays, where that all comes from, so
2   that was information I was relaying from UpToDate.
3   Q   Okay.  So that the use of the drugs that Tammy was using
4   up to that point created a risk that the fetus would be
5   deprived of oxygen intermittently?
6         MS. ROSENBLOOM:  Objection, form.
7         MR. DuBEAU:  Yeah.  I'm going to object to form,
8   and I think the way you phrased that, she will assert
9   her Alt objection on it as well too.  You may want to
10  rephrase.
11  Q   I guess I'm -- I would just like you to explain the
12  concern as stated in UpToDate for hypoxia of the
13  placenta -- or hypoxia from the placenta in babies,
14  fetuses exposed to these medications.
15  A   UpToDate did review -- did state the cognitive delays
16  can be -- could be seen from methamphetamine use in
17  pregnancy.  With regard to the hypoxia from the
18  placenta, that could have been my medical opinion on the
19  source of the cognitive delays, if that makes sense, as
20  opposed to the specific words.  I can't recall if those
21  specific words were in UpToDate as opposed to my opinion
22  on the hypoxia to the placenta -- from the placenta.
23  Q   And you indicate -- I think this may be a repeat of an
24  earlier comment -- that drug -- you discussed with Tammy
25  that her drug use could cause cognitive delays such as

Page 81

1    learning disabilities?
2    A   Correct.
3    Q   And that was based on information you saw in the
4        literature, correct?
5    A   Correct.
6    Q   And UpToDate is a resource that's available to and used
7        by most physicians in the country, isn't it?
8    A   It is, yes.
9    Q   And it's -- it's scholarly, peer-reviewed information
10       that's compiled in a database for physicians to access
11       quickly, true?
12   A   True.
13   Q   And you had a concern with respect to Tammy's ability to
14       maintain her thyroid level, true, or her THS -- TSH?
15   A   Yes, to take her -- to take her supplement to help with
16       her thyroid, hypothyroidism.
17   Q   And was that concern derived, in part, from her
18       potential to continue using illicit drugs?
19       MS. ROSENBLOOM:  Objection to form.
20       THE WITNESS:  My concern is if she continued
21       using drugs such as methamphetamine, she may be less apt
22       to obtain prenatal care and take a supplement for her
23       thyroid disease.
24   Q   And does the medical literature that you consulted or
25       that was in your -- your knowledge before that, Doctor,

Page 82

1        lead you to a conclusion that very high TSH levels can
2        cause miscarriage?
3    A   Yes.
4    Q   Now, with respect to the hearing, you said you didn't
5        know what the -- the hearing was about in several
6        respects.  You testified to that today --
7    A   I did, yes.
8    Q   -- Doctor?  You didn't totally understand the situation,
9        correct?
10   A   That's correct.  I didn't totally understand the
11       situation since I've never given a hearing before.
12   Q   Sure.  But you gave medical opinions that were valid at
13       that time based on the information you had and medical
14       knowledge that was available to you, true?
15   A   True.  Yes.
16   Q   And your -- your -- your statements and testimony was
17       truthful?
18   A   Yes.
19   Q   And given the information you know about Tammy from your
20       assessment on August 4 and do you continue to stand by
21       the opinions that you gave in that hearing on August 5?
22   A   I recommended inpatient therapy, yes.
23   Q   Excuse me?
24   A   I recommended inpatient therapy.
25   Q   And any other opinions that you gave with respect to the

Page 83

1        propensity for those drugs to cause injury, do you
2        continue to stand by those opinions today?
3    A   I do, yes.
4    Q   And with respect to the exact situation that was gonna
5        happen during that hearing, is it possible, Doctor, that
6        the -- the Mayo social worker that was working with you
7        on that hearing told you and explained a little bit, but
8        you just don't remember today what she explained?
9        MR. DuBEAU:  Object to form, calls for
10       speculation.  If you can answer that, go ahead.
11       THE WITNESS:  I just can't recall.  It was a
12       busy night --
13       MR. KNOTT:  Sure.
14       THE WITNESS:  -- on labor and delivery.  I can't
15       recall.
16   Q   And I think you testified today that -- that both
17       inpatient and outpatient treatment would be reasonable,
18       did I understand that correctly?
19   A   I believe it was another option.
20   Q   Okay.
21   A   Yeah.
22   Q   But your recommendation on August 5 was that she go to
23       inpatient treatment?
24   A   That's correct.
25   Q   And you felt at that time that inpatient treatment would

Page 84

1        be of benefit to the health of Tammy and the child, the
2        fetus?
3    A   Yes, for her pregnancy, yes.
4    Q   I think you testified that you weren't certain of the
5        specific quantities or frequency of her drug use.
6        Breaking that down, you didn't know exactly what
7        quantities of drugs she used, but she did tell you how
8        frequently, true?
9    A   Generally speaking, yes.
10   Q   Do you know a Dr. Sengodan, S-E-N-G-O-D-A-N?
11   A   I believe.
12   Q   And is that an endocrinologist who would provide care
13       for a thyroid condition?
14   A   Many primary care providers can provide care for
15       hypothyroidism.
16       MR. KNOTT:  Okay.  Okay.  Those are the
17       questions I have for you, Doctor.  Thank you very much
18       for your time.
19       MS. KECKHAVER:  I have just a few, maybe half a
20       dozen or so, but I don't have a mic so should I swap
21       places with somebody?
22       THE VIDEOGRAPHER:  You can just pass it.
23       MS. KECKHAVER:  Do you want to switch?
24       MR. KNOTT:  Yeah.
25       MS. KECKHAVER:  I feel like I'm really far away

Page 85

1    from you.
2            MR. KNOTT:  I'll -- I'll switch.
3            MS. KECKHAVER:  No.  That's okay.
4            EXAMINATION BY MS. KECKHAVER:
5    Q   So, Doctor, I'm Karla Keckhaver.  I'm the attorney for
6        the State of Wisconsin, and I just have a couple
7        questions for you just to follow up on.  As an OB-GYN,
8        you have training and experiences with complications
9        during pregnancy?
10   A   Yes.
11   Q   How about fetal development?
12   A   Generally speaking, yes.
13   Q   How about prenatal health?
14   A   Yes.
15   Q   What about the effects of drugs or alcohol on a fetus?
16   A   I don't do specific research and I'm not a specialist in
17       addiction medicine, but from a general understanding,
18       yes.
19   Q   When you saw Tammy Loertscher for the consultation, you
20       had reviewed the results of the urine tox screen?
21   A   Yes.
22   Q   Did Tammy Loertscher do a confirmatory urine tox screen,
23       do you know?
24   A   Not that I could see on the computer.
25   Q   Do you know why she didn't?

Page 86

1    A   I can't speak to that because I didn't order the test,
2        so I can't speak to that, hm-um.
3    Q   Was the urine tox screen the only evidence you used to
4        determine that Tammy Loertscher was using
5        methamphetamines and marijuana?
6    A   She also admitted it as well.
7    Q   And is it your understanding that Tammy Loertscher knew
8        that she was pregnant when she was using
9        methamphetamines?
10   A   That was my understanding.
11   Q   And is it your understanding that she knew she was
12       pregnant when she was using marijuana?
13   A   Yes.
14           MS. KECKHAVER:  That's all I have.  Thank you.
15           MS. ROSENBLOOM:  I have just a couple more
16       questions.
17           EXAMINATION BY MS. ROSENBLOOM:
18   Q   Dr. Bantz, were you surprised to learn that Taylor
19       County relied on your testimony and your medical notes
20       as their primary basis for seeking to have
21       Ms. Loertscher forced into treatment and sent to jail
22       for noncompliance?
23           MR. KNOTT:  Object to the form of the question,
24       assumes facts not in evidence, argumentative.
25   Q   Were you surprised to learn that?

Page 87

1            MR. DuBEAU:  You can answer.
2            THE WITNESS:  Yes.  Yes.
3    Q   Taylor County had never spoken to you in person, right?
4            MR. KNOTT:  Object to the form of the question.
5            THE WITNESS:  Not in person, no.
6    Q   And when you recommended inpatient treatment for
7        Ms. Loertscher, were you recommending compulsory or
8        forced inpatient treatment?
9    A   No one asked any mandatory or voluntary admission.
10   Q   If you know, do you think inpatient treatment is
11       effective if the patient is forced into it against his
12       or her will?
13           MR. KNOTT:  I object.
14           MR. DuBEAU:  She's going to assert her Alt
15       objection on that.
16   Q   I'm not talking about your recommendation now, but
17       what's your feeling as a physician about someone
18       recommending inpatient treatment without having
19       personally evaluated a patient?
20           MR. KNOTT:  Object to the form of the question.
21           MR. DuBEAU:  Well, and, again, that's -- if I
22       understood the question, I -- at least as I understand
23       it, I'm going to object on Alt grounds.
24           MS. ROSENBLOOM:  I'm asking as a matter of best
25       practice for physicians.

Page 88

1            MR. DuBEAU:  Oh, then that's clearly an Alt
2        objection.
3            MS. ROSENBLOOM:  Okay.  Okay.  I have nothing
4        further.
5            EXAMINATION BY MR. KNOTT:
6    Q   Doctor, you were asked about whether you'd be surprised
7        if your testimony was used.  Your testimony was truthful
8        when it was given, right?
9    A   It was, yes.
10   Q   And it was stated to a reasonable degree of certainty
11       within your profession, true?
12   A   True.
13   Q   And if the order that resulted from that hearing was
14       that she would stay at Mayo Behavioral Health until she
15       was cleared for discharge and then she would go to the
16       Fahrman Center for an assessment and recommendation, if
17       that were the order that resulted, would that be
18       consistent with what you thought would be a good plan
19       for Tammy at that time?
20           MS. ROSENBLOOM:  Objection, assumes facts not in
21       evidence and objection to form.
22           MR. DuBEAU:  Join in the form objection.
23           THE WITNESS:  What's -- what's the Fahrman --
24       the -- the particular location?
25           MR. KNOTT:  The Fahrman Center.  It's a alcohol

Page 89

1   and drug abuse treatment center.
2        MS. ROSENBLOOM:  Please don't testify,
3   Mr. Knott.
4        THE WITNESS:  I -- I don't know if I can give a
5   good answer to that.
6   Q   If you assume that the Fahrman Center is a treatment
7   facility --
8   A   Um-hm.
9   Q   -- can you give an answer to that?
10  A   If it's an inpatient treatment center, that can --
11  Q   I'm sorry.
12       MR. DuBEAU:  Hold on.
13       THE WITNESS:  Yup.
14       MR. DuBEAU:  I need -- I need to hear the range
15  of questions back because I --
16  Q   You know what, I'll -- I'll just ask a different
17  question, and -- and just to clarify, Doctor, your
18  recommendation at that time was that she have inpatient
19  treatment, right?
20  A   Um-hm.  Correct.  Yes.
21  Q   And you still think that's the best thing that -- for
22  her at that time?
23  A   Yes.
24       MR. KNOTT:  All right.  Those are all the
25  questions I have.

Page 91

1   STATE OF WISCONSIN )
                        ) SS.
2   EAU CLAIRE COUNTY )
3
4        I, MARIDEE J. OLSON, Registered Merit Reporter and
5   Notary Public, State of Wisconsin, certify that the foregoing
6   is a true record of the video deposition of JENNIFER BANTZ,
7   M.D., who was duly sworn by me; having been taken on the 1st
8   day of September, 2016, at Eau Claire, Wisconsin, in my
9   presence and reduced to writing in accordance with my
10  stenographic notes made at said time and place.
11       I further certify that I am not a relative or employee
12  or attorney or counsel of any of the parties, or a relative
13  or employee of such attorney or counsel, or financially
14  interested in said action.
15       In witness whereof, I have hereunto set my hand and
16  affixed my seal of office at Eau Claire, Wisconsin, this 8th
17  day of September, 2016.
18
19
20
21  _____
    Registered Merit Reporter
    Notary Public, State of Wisconsin
22
    My commission expires November 11, 2017.
23
24
25

Page 90

1        THE VIDEOGRAPHER:  This concludes the
2   deposition.  The time is 11:27.  We are off the record.
3        (Conclusion of record at 11:27 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25