IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TAMARA M. LOERTSCHER,

      Plaintiff,

v.                    Case No. 14-cv-870

BRAD D. SCHIMEL, et al.,

      Defendants.

## STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

BRAD D. SCHIMEL
Wisconsin Attorney General

KARLA Z. KECKHAVER
Assistant Attorney General
State Bar #1028242

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

JENNIFER L. VANDERMEUSE
Assistant Attorney General
State Bar #1070979

Attorneys for Defendants
Brad D. Schimel and Eloise Anderson

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

NATURE OF THE CASE ........................................................................3

    I.     1997 Wis. Act 292..........................................................................3

         A.     Jurisdiction and purpose. ....................................................4

         B.     Reporting and investigation. .................................................6

         C.     Taking and holding an expectant mother in custody...........6

         D.     Procedures. ..........................................................................7

         E.     The Child Protective Services Access and Initial Assessment Standards........................................................9

    II.    Tamara Loertscher. ....................................................................10

ARGUMENT .........................................................................................14

    I.     Facial challenges to statutes are "especially to be discouraged." And this Court is required to address Loertscher's as-applied challenge to the Act before addressing her facial challenge.....................................................14

    II.    The Act does not violate an expectant mother's substantive due process rights. ......................................................................17

         A.     A pregnant woman has no constitutional right to use drugs or alcohol to the detriment of her unborn child. .......18

         B.     The state has a compelling interest in protecting unborn children from substantial risk of physical injury. ...................................................................................20

             1.    Case law legally establishes the state's right to intervene on behalf of unborn children......................20

Page

2. The potential detrimental effects of drugs and alcohol on unborn children further establish the compelling need for state intervention. ...................21

a. Prenatal alcohol exposure. ...............................21

b. Prenatal methamphetamine exposure............25

c. Prenatal marijuana exposure..........................27

d. Prenatal cocaine exposure. ..............................28

e. Prenatal opiate exposure.................................28

3. The high rate of maternal substance use during pregnancy and the cost to the state also establish a compelling need for early intervention. ..............................................................31

C. The Act strikes the appropriate balance between the rights of the expectant mother and the state's interest in preventing unborn child abuse. .......................................33

1. The Act requires reasonable suspicion at the screening stage, and the children's court may only invoke its jurisdiction based on reliable and credible information. ...........................................33

2. By its plain language, the Act applies only in extreme situations. ...................................................38

3. Protective custody orders are used in moderation, when necessary to keep the unborn child safe...................................................................39

III. The Act does not violate an expectant mother's procedural due process rights. ........................................................................42

A. Due process calls for such procedural protections as the particular situation demands. ........................................42

Page

B.  The Act provides sufficient process........................................43

1.  An adversarial hearing is not constitutionally required before an expectant mother can be temporarily detained under the Act.........................43

2.  The Act provides for all of the procedural protections that Loertscher seeks. ...........................45

C.  The Act is not void for vagueness.........................................49

IV.  The Act does not violate an expectant mother's equal protection rights...............................................................53

A.  Loertscher cannot show that the Act fails to treat similarly situated people in a similar manner. ..................54

B.  Rational basis scrutiny applies to this case, and Loertscher's equal protection claim fails because the Act is rationally related to a legitimate state interest........57

1.  Levels of scrutiny. ....................................................57

2.  The Act is rationally related to a legitimate state interest. ............................................................60

V.  Loertscher has abandoned her First Amendment claim. .............61

VI.  The Act does not violate an expectant mother's Fourth Amendment rights. ........................................................62

A.  Loertscher's framing of the Fourth Amendment issue. ......62

B.  The "search and seizure" of Loertscher's medical records is properly analyzed under the "right to privacy" case law...............................................62

C.  The Act does not violate any right to privacy Loertscher may have in her medical records.....................67

Page

VII.  The Court lacks subject matter jurisdiction over Loertscher's as-applied challenges to the Act under the *Rooker-Feldman* doctrine. .................................................71

    A.  The Rooker-Feldman doctrine. ...........................................72

    B.  Application of the Rooker-Feldman doctrine to Loertscher's as-applied claims. ...........................................73

VIII.  Loertscher's challenge to the Act based on the administrative finding of unborn child maltreatment is moot because the policy on this issue was recently changed........75

CONCLUSION ................................................................77

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TAMARA M. LOERTSCHER,

      Plaintiff,

v.                            Case No. 14-cv-870

BRAD D. SCHIMEL, et al.,

      Defendants.

---

## STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

## INTRODUCTION

Prenatal substance abuse is major public health problem. (State Defendants' Proposed Findings of Fact (SDPFOF) ¶ 17.) The number of newborns who have been exposed to alcohol or drugs in utero has reached an "epidemic crisis in Wisconsin and across the [United States]." (*Id.* ¶ 9.) The Wisconsin Department of Health Services estimates that nearly 1600 women tested positive for alcohol, opioids, heroin, or marijuana at the time of delivery in 2014. This is nearly a threefold increase from about 600 cases in 2009. (*Id.* ¶ 11.) These numbers are troubling. But prenatal substance use can be devastating to even one child.

The Federal Child Abuse Prevention and Treatment Act requires states to have policies and procedures in place to notify child protective services agencies of newborns suffering from prenatal drug exposure or Fetal Alcohol Spectrum Disorder and to establish a plan of safe care for these newborns. 42 U.S.C. § 5106a(b)(2)(B). Pursuant to that mandate, Wisconsin enacted such a law. *See* Wis. Stat. § 146.0255. But Wisconsin takes the law one step further—Wisconsin seeks to protect children before the harm is done.

1997 Wis. Act 292 (the "Act") revised Wisconsin's child abuse laws to include protection of an unborn child from an expectant mother's abuse of alcohol and controlled substances. The Act does not impose punishment. Rather, it encourages the expectant mother to seek treatment voluntarily, and if she will not do so, it allows the court to order involuntary treatment for protection of the unborn child. Wis. Stat. § 48.01(1)(am), (bm). Drug treatment during pregnancy has been shown to improve participation in prenatal care and reduce the fetal complications associated with illicit drug use. (SDPFOF ¶ 96.) Thus, the Act appropriately maintains the balance between the rights of the expectant mother and the state's interest in preventing unborn child abuse.

Plaintiff Tamara Loertscher contends that the Act is unconstitutional on its face—in every application—and as applied to her. (Dkt. 66:1–2, ¶ 1.) She claims that the Act violates her rights to substantive and procedural due

process, her right to equal protection, and her rights under the First and Fourth Amendments. (Dkt. 66:24–25, ¶¶ 98–102; SDPFOF ¶¶ 175–79.) Loertscher cannot show that the Act violates these rights. Therefore, the Court should grant summary judgment in favor of the State Defendants on all counts.

## NATURE OF THE CASE

### I.    1997 Wis. Act 292.

The Wisconsin Legislature enacted the Act in response to the Wisconsin Supreme Court's decision in *State ex rel. Angela M.W. v. Kruzicki*, 209 Wis. 2d 112, 561 N.W.2d 729 (1997). The court in that case held that the term "child" in the Wisconsin Children's Code, Wis. Stat. ch. 48, did not include an unborn child such that Child in Need of Protection or Services (CHIPS) jurisdiction could be exercised to protect an unborn child from prenatal drug use. *Id.* at 137. The court noted that "the confinement of a pregnant woman for the benefit of her fetus is a decision bristling with important social policy issues" and that "the legislature is in a better position than the courts to gather, weigh, and reconcile" those issues. *Id.* at 134. Recognizing the gap in the law, the Legislature promptly enacted the Act.

The Act amended multiple sections of Wis. Stat. ch. 48 and added several new sections. In particular, the Act allows the children's court to take

jurisdiction over expectant mothers and unborn children in need of protection or services:

> **Jurisdiction over unborn children in need of protection or services and the expectant mothers of those unborn children.** The court has exclusive original jurisdiction over an unborn child alleged to be in need of protection or services which can be ordered by the court whose expectant mother habitually lacks self-control in the use of alcohol beverages, controlled substances or controlled substance analogs, exhibited to a severe degree, to the extent that there is a substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered unless the expectant mother receives prompt and adequate treatment for that habitual lack of self-control. The court also has exclusive original jurisdiction over the expectant mother of an unborn child described in this section.

Wis. Stat. § 48.133. The Act's numerous provisions are discussed below.

## A.   Jurisdiction and purpose.

The Act extends the coverage of the Children's Code to unborn children, who are defined as "a human being from the time of fertilization to the time of birth." Wis. Stat. § 48.02(19). The children's court has exclusive original jurisdiction over both the expectant mother and her unborn child when she substantially endangers the physical health of her unborn child through the severe habitual use of alcohol or other drugs. Wis. Stat. § 48.133.

In addition to protecting children, a primary goal of the Children's Code is to "preserve the unity of the family . . . by strengthening family life through assisting . . . expectant mothers of unborn children . . . in fulfilling their responsibilities." Wis. Stat. § 48.01(1)(a). When an expectant mother exhibits

severe, habitual use of alcohol or drugs during pregnancy, the law's first approach is to "encourage[ ] [her] to seek treatment . . . voluntarily when voluntary treatment would be practicable and effective." Wis. Stat. § 48.01(1)(bm). If voluntary treatment is not an option, then the court can "order[ ] . . . treatment, including inpatient treatment." Wis. Stat. § 48.01(1)(am). At all times, the law is committed "[t]o provid[ing] a just and humane program of services to . . . unborn children in need of protection or services, and the expectant mothers of those unborn children." Wis. Stat. § 48.01(1)(h).

The focus of the Act is treatment, not punishment. Patients affected by addiction are typically unable to reduce substance use on their own, even during pregnancy. (SDPFOF ¶¶ 92–93.) Treating drug addiction during pregnancy is important because it minimizes fetal exposure to drugs and creates the environment to address other factors that place mother and infant at risk for adverse outcomes. (*Id.* ¶ 95.) Substance abuse treatment during pregnancy promotes maternal abstinence, improves social functioning in the mother, and improves neonatal outcomes. (*Id.* ¶ 97.) Treatment is beneficial for women with substance use disorders, even when that treatment is provided at the recommendation of child protective services. (*Id.* ¶ 98.)

## B.     Reporting and investigation.

The Act provides for voluntary reporting of suspected unborn child abuse. The Act permits, but does not require, an individual who believes an expectant mother has or may harm her unborn child through habitual alcohol or other drug use to file a report with local law enforcement or county child protection workers. Wis. Stat. § 48.981(2); (SDPFOF ¶ 100.)

A county intake worker receives referral information and conducts intake inquiries. He or she determines whether to request that a petition be filed or whether to enter into an informal disposition. Wis. Stat. § 48.067. The intake worker must also offer the expectant mother counseling and determine whether she should be held in custody. Wis. Stat. §§ 48.24(1m), 48.067, 48.069(1)(b).

## C.     Taking and holding an expectant mother in custody.

An expectant mother may be taken into custody when a law enforcement officer or intake worker has reasonable grounds to believe that the expectant mother may seriously harm her unborn child through habitual alcohol or other drug use. Wis. Stat. §§ 48.08(3), 48.193. The person taking the expectant mother into custody must make every effort to release her to an adult relative or friend or under her own supervision. Wis. Stat. § 48.203(1). But if the statutory standard is met, and the expectant mother has refused to accept the Alcohol or Other Drug Abuse (AODA) services offered to her, the

6

intake worker may decide to hold the expectant mother in custody. Wis. Stat. §§ 48.203(6), 48.205(1m).

Taking an expectant mother into custody is not an arrest; the expectant mother is not held in jail. Wis. Stat. §§ 48.193(3), 48.207(1m). She may be held in several places, including the home of an adult relative or friend, a licensed community-based residential facility, a hospital, a physician's office, or a treatment facility. Wis. Stat. § 48.207(1m). An expectant mother who is held in custody and not released must have a hearing within 48 hours after the custody decision to determine whether there is probable cause to continue to hold her in custody. Wis. Stat. § 48.213.

### D.  Procedures.

If the intake worker determines as a result of the intake inquiry that the unborn child should be referred to the court, the intake worker asks the district attorney or corporation counsel to file an Unborn Child in Need of Protection or Services (UCHIPS) petition. Wis. Stat. § 48.24(3). The district attorney or corporation counsel can file the petition, close the case, or refer the case back to intake within 20 days after the intake worker's request was filed. Wis. Stat. § 48.25(2).

Within 30 days after a petition is filed, the children's court must hold a plea hearing to determine whether any party wishes to contest the allegation that an unborn child is in need of protection or services. Wis. Stat. § 48.30. If

7

the petition is contested, within 30 days after the plea hearing, the juvenile court must hold a fact-finding hearing to determine if the allegations in the petition are proved by clear and convincing evidence. Wis. Stat. §§ 48.30(7), 48.31. Then, within 30 days after the fact-finding hearing, the juvenile court must hold a dispositional hearing to determine the disposition of a case in which an unborn child is adjudged to be in need of protection or services. Wis. Stat. § 48.335.

If the juvenile court finds that the unborn child needs protection or services, it has several options. It may order counseling, supervision by a social services agency, out-of-home placement, or participation in outpatient or inpatient alcohol or drug treatment. Wis. Stat. § 48.347. If it appears the child may be born during the effective period of the dispositional order, the court may order services or care for the child if there is a need. Wis. Stat. § 48.347(7).

The court may not place an expectant mother outside her home unless she refuses to participate in AODA services offered to her. Wis. Stat. § 48.347. Further, the court's placement and treatment decision must be appropriate for the expectant mother's needs and provided in the least restrictive environment consistent with those needs. Wis. Stat. § 48.355.

### E.   The Child Protective Services Access and Initial Assessment Standards.

The Child Protective Services Access and Initial Assessment Standards (the "IA Standards") provide child protective services agencies and caseworkers with more specific direction in screening, assessing, and investigating reports of child abuse and neglect than what is offered by the Wisconsin statutes. The IA Standards are intended to enhance statewide consistency in processing reports of child abuse and neglect. Wis. Stat. § 48.981(3)(c)1.; (SDPFOF ¶ 99.)

One area in which the IA Standards provide additional guidance is the administrative finding of maltreatment made at the conclusion of the initial assessment. Wis. Stat. § 48.981(3)(c)4. The 2007 IA Standards provided direction regarding maltreatment and maltreater administrative determinations in unborn child abuse cases. (SDPFOF ¶ 121.) Specifically, the 2007 IA Standards allowed for a determination of "substantiated" or "unsubstantiated" for unborn child abuse. (*Id.*) In the newest version of the IA Standards dated November 20, 2015, administrative determinations substantiating maltreatment are no longer made in unborn child abuse cases and identification of a maltreater in an unborn child abuse case is no longer allowed. (*Id.* ¶ 122.) The November 20, 2015, IA Standards instead allow for an administrative determination of "Services Needed," "Services Not Needed," or "Unable to Locate Source." (*Id.* ¶ 123.)

## II.    Tamara Loertscher.

On August 4, 2014, Taylor County Department of Health Services (TCDHS) received a report that Loertscher was admitted to the Eau Claire Mayo Clinic on August 1, 2014, with mental health concerns. (*Id.* ¶ 124.) The Mayo Clinic social worker making the report stated that Loertscher was three months pregnant, that she had tested positive for methamphetamines, amphetamines, and tetrahydrocannabinol (THC or marijuana), and had confirmed her drug use while pregnant. (*Id.* ¶ 125.) The social worker also indicated that a Mayo Clinic physician found that Loertscher's behavior was putting her fetus at serious risk of harm. (*Id.* ¶ 126.)

TCDHS decided to screen in Loertscher's case for further investigation and assessment. (*Id.* ¶ 127.) TCDHS investigated and recommended voluntary inpatient treatment at the Fahrman Center, where Loertscher's drug use and treatment needs would be further assessed. (*Id.* ¶¶ 129–34.) Loertscher refused to undergo an assessment at the Fahrman Center, so TCDHS caseworkers pursued Temporary Physical Custody (TPC) at the Mayo Clinic. (*Id.* ¶¶ 136–40.)

A TPC hearing was held in Taylor County Circuit Court on August 5, 2014. (*Id.* ¶ 141.) Loertscher refused to participate in the TPC hearing unless her attorney was present. The court contacted her attorney but he declined to participate. Loertscher refused to participate in the hearing and left the room.

10

The court found that Loertscher had voluntarily waived her appearance at the hearing and indicated that she would have an opportunity for a rehearing if she later retained counsel. (*Id.* ¶ 142.)

At the August 5, 2014, TPC hearing, Dr. Jennifer Bantz, Loertscher' OB/GYN at the Mayo Clinic, testified about Loertscher's pregnancy, the frequency of her reported drug use, and the effect that her drug use could have on her unborn child. (*Id.* ¶¶ 143, 145.) Dr. Bantz also testified that she did not think Loertscher would voluntarily avail herself of services if she were released from custody. She recommended inpatient AODA treatment. (*Id.* ¶ 144.) At the end of the TPC hearing, the court found that there was probable cause to hold Loertscher in custody at the Mayo Clinic and then at a treatment center where she would receive an AODA assessment and treatment. (*Id.* ¶¶ 147–49.)

After the TPC hearing, TCDHS confirmed that the Fahrman Center had an opening and would be willing to take Loertscher as a patient. (*Id.* ¶ 150.) But Loertscher did not abide by the court's TPC order. She left the Mayo Clinic and did not report for her AODA assessment at the Fahrman Center. (*Id.* ¶¶ 151–52.)

On September 4, 2014, the children's court held a plea hearing on Loertscher's UCHIPS petition and on the guardian ad litem's motion for contempt against Loertscher. (*Id.* ¶ 153.) The court advised Loertscher that if

she disputed the UCHIPS petition, she had a right to be represented by a lawyer, to a trial by jury, to cross examine witnesses, to subpoena witnesses, and to have Taylor County prove the allegations in the petition to a reasonable certainty by evidence which is clear, satisfactory, and convincing. (*Id.* ¶ 154.) Loertscher disputed the allegations in the UCHIPS petition, and the court set the matter for a trial. (*Id.* ¶ 155.)

At the September 4, 2014, hearing, the court found Loertscher in contempt of court and ordered her to serve 30 days in jail. The court stayed the order until immediately following the hearing, so that Loertscher could purge herself of the contempt by consulting with TCDHS and agreeing to be admitted to the Fahrman Center. (*Id.* ¶ 156.) The court specifically noted that Loertscher needed to undergo an AODA assessment at the Fahrman Center, but if the assessment showed that she did not need treatment or her treatment could be accomplished on an outpatient basis, she could be discharged. (*Id.* ¶ 157.)

Loertscher met with TCDHS following the September 4, 2014, hearing. She initially agreed to go to the Fahrman Center. Later that night, she changed her mind and decided to serve the 30 days in jail under the contempt order. (*Id.* ¶ 158.) Accordingly, she was held in the Taylor County jail from September 4–22, 2014. (*Id.* ¶¶ 159–61.)

While Loertscher was being held in jail, a public defender was appointed to represent her. (*Id.* ¶ 162.) On September 22, 2014, the parties in Loertscher's UCHIPS case entered into a consent decree providing for Loertscher's release from jail so long as she complied with certain conditions, including an AODA assessment and drug testing. (*Id.* ¶¶ 163–64.) Loertscher cooperated and complied with the terms of the consent decree. (*Id.* ¶ 165.)

While the consent decree was in effect, TCDHS issued an administrative finding that Loertscher had committed child maltreatment. (*Id.* ¶ 166.) Loertscher appealed the administrative finding. (Dkt. 66:18–19, ¶¶ 72–74.) While her appeal was pending, TCDHS withdrew the maltreatment finding because the IA Standards no longer required an administrative maltreatment finding for unborn child abuse. (*Id.* ¶ 167.) There are no consequences for a maltreatment determination until after the appeal process is completed. (*Id.* ¶ 168.) Because her maltreatment determination was withdrawn before her appeal was completed, Loertscher suffered no consequences as a result of the maltreatment finding. (*Id.* ¶ 169.)

On January 23, 2015, Loertscher delivered a healthy baby boy. (Dkt. 66:19, ¶ 75; SDPFOF ¶ 170.)

## ARGUMENT

**I.    Facial challenges to statutes are "especially to be discouraged." And this Court is required to address Loertscher's as-applied challenge to the Act before addressing her facial challenge.**

Loertscher raises as-applied and facial challenges to the Act. (Dkt. 66:1–2, ¶ 1.) Facial challenges are disfavored. Because the Court must try to nullify no more of the Legislature's work than is necessary, it must address Loertscher's as-applied challenges before addressing her facial challenges. Loertscher cannot succeed on either front.

A constitutional challenge to a law can take one of two forms: "facial" or "as-applied." *MDK, Inc. v. Vill. of Grafton*, 277 F. Supp. 2d 943, 947 (E.D. Wis. 2003) ("*MDK I*"). A facial challenge alleges that the law cannot constitutionally be applied to anyone, no matter what the facts of the particular case may be. *Id.; see also Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (1992) (noting that law's specific application to plaintiff was irrelevant to facial challenge). An as-applied challenge, on the other hand, alleges that the law is unconstitutional only insofar as it is applied to the specific facts of the case under review. *MDK I*, 277 F. Supp. 2d at 947.

Courts must try not to invalidate more of a law than is necessary because "[a] ruling of unconstitutionality frustrates the intent of the elected

14

representatives of the people." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion)). A statute may be invalid as applied to one set of facts and yet valid as applied to another. *Id*. As such, a statute may be declared invalid to the extent it reaches too far, but otherwise left intact. *Id*.

Because courts must limit their solutions to the problem at hand, the Supreme Court has admonished district courts to adjudicate the merits of as-applied challenges before reaching facial ones. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008) ("[f]acial challenges are disfavored for several reasons"); *Ayotte*, 546 U.S. at 329. Therefore, if Loertscher succeeds on her as-applied challenge, the Court need not consider her facial challenge. *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 683 (7th Cir. 1998).

Loertscher's substantive and procedural due process claims can be construed as facial and as-applied challenges. (SDPFOF ¶¶ 175, 179.) Her equal protection and Fourth Amendment claims cannot. Those claims apply to Loertscher in the same way they apply to all expectant mothers. (*Id*. ¶¶ 176, 178.) Thus, those claims are facial only. If this Court reaches the facial challenge, Loertscher cannot prevail. It is extremely difficult to succeed on such a challenge because the plaintiff must show that the law in question

is unconstitutional in all applications. Loertscher cannot meet this demanding standard.

Facial challenges to statutes are "especially to be discouraged." *Sabri v. United States*, 541 U.S. 600, 609 (2004). "Facial invalidation 'is, manifestly, strong medicine'" so it must be employed "sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (citation omitted). The standard applied to facial challenges is derived from the Supreme Court's decision in *United States v. Salerno*, in which the Court stated, "a facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." 481 U.S. 739, 745 (1987). As a result, a facial challenge will not succeed based on an analysis of the worst-case scenario. *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 514 (1990).

Loertscher is focused on the worst-case scenario. Her allegations fail to address the many procedural safeguards in the Act that avoid that scenario. Nor does she contemplate all the circumstances under which the Act would be valid. Accordingly, Loertscher cannot establish that the Act is unconstitutional on its face.

## II.    The Act does not violate an expectant mother's substantive due process rights.

Substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citation omitted). "'Substantive due process' analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" *Reno v. Flores*, 507 U.S. 292, 302 (1993) (alteration in original) (citations omitted). Loertscher cannot establish that the Act infringes upon a fundamental right subject to heightened review.

In her supplemental response to State Defendants' interrogatories, Loertscher asserts that "[e]nforcement of the Act violates the privacy, medical decision-making, bodily integrity, and fundamental liberty of pregnant women . . . ." (SDPFOF ¶ 175.) In making this assertion, Loertscher incorrectly frames the rights at issue here. The proper starting point is the Act's primary function and purpose: to prevent expectant mothers from harming their unborn children though alcohol or drug exposure. When framed correctly, it becomes clear that the Act does not implicate any fundamental rights subject to heightened review. Indeed, a pregnant woman has no constitutional right to use drugs, drink alcohol, or abuse her unborn child. Requiring pregnant women who use drugs or alcohol to participate in

17

treatment does not violate the Constitution. Instead, the court must balance the rights of the expectant mother against the state's interest in protecting unborn children from abuse. The Act strikes the appropriate balance and does not violate the Constitution on its face or as-applied to Loertscher.

### A.   A pregnant woman has no constitutional right to use drugs or alcohol to the detriment of her unborn child.

A pregnant woman has no constitutional right to use drugs, drink alcohol, or abuse her unborn child. The state has a *parens patriae* interest in preserving and promoting the welfare of the child. Thus, concern for the parent's rights frequently must give way to concern for the child's interest.

The Act proscribes activities that are not constitutionally protected. There is no constitutional right to use illegal drugs. *See La. Affiliate of the Nat'l Org. for the Reform of Marijuana Laws v. Guste*, 380 F. Supp. 404, 406–07 (E.D. La. 1974) (no constitutional right to possess and use marijuana in one's own home); *State v. Gray*, 584 N.E.2d 710, 714 (Ohio 1992) (J. Wright, dissenting) (no fundamental right to abuse cocaine). And there is no constitutional right to consume alcoholic beverages. *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1277 (W.D. Wash. 2012) (no constitutional right to drink alcohol); *Patch Enters., Inc. v. McCall*, 447 F. Supp. 1075, 1079 (M.D. Fla. 1978) (no fundamental constitutional right to sell or consume alcoholic beverages).

Furthermore, there is no constitutional right to be free from child abuse investigations. *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 20 (1st Cir. 2001); *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997); *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993). Parents have a constitutionally protected liberty interest in the care, custody, and management of their children. *Troxel*, 530 U.S. at 63; *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1018 (7th Cir. 2000). But this interest is not absolute. *Id.* at 1019. A parent's interest in familial integrity is limited by the compelling governmental interest in the protection of children——particularly where the children need to be protected from their own parents. *Id.*

A court reviewing a parent's claim that a state child abuse statute impinges on her fundamental rights as a parent must "balance . . . the fundamental right to the family unit and the state's interest in protecting children from abuse." *Id*. It makes sense that this standard applies to unborn child abuse as well: "Making a child endure an unsafe environment in the womb is ludicrous when this same child is afforded protection from illegal drugs and an unsafe environment the moment it takes its first breath outside the womb." *In re Unborn Child*, 683 N.Y.S.2d 366, 370 (N.Y. 1998).

A pregnant woman has no constitutional right to use drugs or alcohol to the detriment of her unborn child. She also has no right to avoid child abuse

investigations. A pregnant woman cannot be isolated in her pregnancy. *Roe v. Wade*, 410 U.S. 113, 159 (1973). She carries the unborn child and at some point her right to privacy must be measured against that of potential human life. *Id*. Here, the state interest in protecting the unborn child is paramount.

**B.    The state has a compelling interest in protecting unborn children from substantial risk of physical injury.**

**1.    Case law legally establishes the state's right to intervene on behalf of unborn children.**

Protection of a pregnant woman's health as well as that of the unborn child has been recognized as an important state interest since *Roe*, 410 U.S. at 162–63, which acknowledged that the state has an important and legitimate interest in the life of unborn children:

> We repeat, however, that the State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman, . . . and that it has still another important and legitimate interest in protecting the potentiality of human life.  These interests are separate and distinct. Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes "compelling."

Moreover, the Supreme Court has recognized that "there is a substantial state interest in potential life throughout pregnancy." *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 876 (1992).

The issue of fetal viability is not relevant to whether the state has a compelling interest in protecting human life in this context. Fetal viability is only relevant to the issue of whether, and under what circumstances, the

state can legally restrict an expectant mother's right to choose an abortion. *See id.* at 879. There is no question that the state has a compelling interest in protecting children from abuse inflicted by their parents. *Brokaw*, 235 F.3d at 1019. Here, in the context of maternal substance use, the state has a compelling interest in protecting the wellbeing of an unborn child, whether or not it has reached the stage of viability.

> **2.   The potential detrimental effects of drugs and alcohol on unborn children further establish the compelling need for state intervention.**

Case law legally establishes the state's right to intervene on behalf of unborn children. In addition, State Defendants have submitted overwhelming evidence of the potential detrimental effects of drugs and alcohol on unborn children. This evidence factually establishes the compelling need for state intervention.

> **a.   Prenatal alcohol exposure.**

Alcohol exposure can pose a significant risk to a fetus. (SDPFOF ¶ 25.) The American Academy of Pediatrics reports that the use of alcohol during pregnancy is one of the leading preventable causes of intellectual disabilities, birth defects, and other developmental disorders in newborns. (*Id.* ¶¶ 22–23.) There is no known safe amount of alcohol consumption during pregnancy. Therefore, the American Academy of Pediatrics recommends that women who

are pregnant or planning to become pregnant should abstain from alcohol consumption. (*Id.* ¶ 26.)

Ethanol is a teratogen may cause physical birth defects and developmental brain disorders that result in a wide range of cognitive, developmental, and behavioral problems. (*Id.* ¶ 28.) Children affected by Fetal Alcohol Spectrum Disorder (FASD), and the adults they become, face enormous academic and social challenges and are at risk of encounters with the criminal justice system due to their difficulty comprehending social norms and regulating their behavior. Since these effects result from injury to the brain during its development, they are life-long. In many cases, in order for affected individuals to function well at home, in school, and in communities, the investment of tremendous family, community, education, and medical resources is required. (*Id.* ¶ 29.)

The potential effects of alcohol exposure during brain development can vary widely and create life-long problems with learning and behavior regulation. The effects of prenatal alcohol exposure manifest in different ways at different stages of development during childhood, adolescence, and adulthood. (*Id.* ¶ 30.)

In infants, irritability, inability to establish normal sleep and eating patterns, and altered patterns of alertness are common. Delays in development and extremes of temperament may become evident in early

childhood. (*Id.* ¶ 31.) Preschool children may have difficulty understanding rules and instructions and this can lead to behaviors that are misinterpreted as being intentionally defiant or challenging. (*Id.* ¶ 32.) In school, learning deficits may become apparent. The injury caused by prenatal alcohol exposure can slow the processing speed of the brain, causing problems with language comprehension, learning, and social interaction. Many affected children lack the ability to meet the expectations of parents and teachers, which can generate frustration and anxiety in the children; these in turn may lead to further acting out. (*Id.* ¶ 33.) Many affected individuals are not able to adequately inhibit impulses, which leads to additional behavioral problems, including hyperactivity, aggressiveness, and socially unacceptable actions. (*Id.* ¶ 34.)

As children get older, these issues persist, and the stakes get higher. Affected individuals commonly have deficits of executive function, which in part involves the ability to organize thoughts, prioritize activities, and follow complex instructions. The inability to understand and conform to social norms can predispose affected individuals to behave in socially unacceptable ways. (*Id.* ¶ 35.) It is common, for example, for affected individuals to lack the ability to perceive malicious intent on the part of others, which can make them vulnerable to manipulation that leads to criminal behavior. Children

exposed to alcohol in utero are also at higher risk of developing dependence on alcohol and other drugs later in life. (*Id.* ¶ 36.)

Alcohol exposure during early pregnancy can also affect the development of other organs. Heart defects, cleft palate, and a range of other major and minor birth defects are more common among exposed children than in unexposed children. (*Id.* ¶ 37.) As reported at the 2016 Biennial Research Conference on Adolescents and Adults with FASD, as affected individuals reach young adulthood, many face chronic pain related to joint degeneration, recurrent infections, heart disease, increased risks for certain types of cancer and a range of other medical issues. (*Id.* ¶ 38.) Prenatal alcohol exposure can also affect growth of the fetus during pregnancy, and this effect may persist throughout childhood, resulting in short stature. The effects on brain development can also result in restricted growth of the brain, which can be manifest as microcephaly (small head size). (*Id.* ¶ 39.)

All together these effects create significant costs to individuals, families, schools, communities, and the criminal justice system. (*Id.* ¶ 40.) The state has an interest in minimizing the risks associated with alcohol use during pregnancy, by providing treatment to women who habitually use alcohol to a severe degree, helping women avoid pregnancy until such treatment is successful, and supporting children and adults whose lives are affected by prenatal alcohol exposure.

A safe level of alcohol use during pregnancy has not been definitively established. Recent studies have suggested that one episode of binge drinking may alter genetic programming enough to adversely affect brain development in some cases. In addition, brain development continues throughout the entire pregnancy, and the brain is vulnerable to the toxic effects of alcohol at all stages of development. Therefore, efforts to cease drinking are important at every stage of pregnancy. (*Id.* ¶ 41.)

The risk of a baby being born with FASD increases with the amount of alcohol a pregnant woman drinks, as does the likely severity of the condition. (*Id.* ¶¶ 44–45.) Both human and animal research studies have established that the likelihood and severity of effects increase with increasing amounts of exposure, increased duration of exposure during pregnancy, and high risk patterns of maternal alcohol consumption such as binge drinking. (*Id.* ¶ 43.) Therefore, while effective prevention and intervention efforts targeted to women who habitually use alcohol to a severe degree are likely to have the greatest impact, education regarding avoidance of alcohol use at any level during pregnancy remains an important public health issue and societal concern. (*Id.* ¶ 46.)

### b.    Prenatal methamphetamine exposure.

Methamphetamine has toxic effects on fetal neurotransmitters such as dopamine. (*Id.* ¶ 50.) Current research has demonstrated associations

between methamphetamine and preterm birth, low gestational weight, smaller head circumference, and intrauterine growth restrictions. (*Id.* ¶ 48.) For example, State Defendants' expert Dr. Barbara Knox recalled one case where a mother delivered twins very prematurely due, in part, to methamphetamine use. Premature delivery can result in neonatal death, as well as multiple complications including brain bleeds and cognitive deficits. (*Id.* ¶ 51.)

Methamphetamine use also carries risks for the expectant mother, which, in turn, creates risks for the fetus. Pregnant women admitted to the hospital with a diagnosis of methamphetamine use are more likely to experience hypertension, cardiovascular disorders, and placenta previa compared to pregnant cocaine users. (*Id.* ¶ 48.) Methamphetamine use also carries a risk for stroke in the expectant mother, which may severely impact the fetus and the delivery of oxygen and nutrients. (*Id.* ¶ 52.)

The effects of prenatal methamphetamine use can be long-lasting. Prenatal methamphetamine exposure is related to changes in infant neurobehavior, fine motor deficits, and deficits in fetal growth. (*Id.* ¶ 53.) Children as young as age three who were exposed to methamphetamine prenatally have a statistically significant increase in mood difficulties and acting out behaviors. (*Id.* ¶ 54.) Prenatal methamphetamine exposure has also been associated with delayed gross motor development in the first three

years of life. (*Id.* ¶ 55.) Prenatal methamphetamine exposure can alter behavior significantly and carries additional risk for Attention Deficit Disorder. (*Id.* ¶ 56.)

### c.   Prenatal marijuana exposure.

Marijuana, with its main psychoactive compound, tetrahydrocannibinol (THC), readily crosses the placenta. Brain transmitter concentrations are frequently altered, and brain synthesis of protein, nucleic acid, and lipids may be substantially lowered. (*Id.* ¶ 57.) Marijuana has about five times as much carbon monoxide as cigarettes and may decrease fetal oxygen levels. It can remain in the expectant mother for as long as 30 days and may result in prolonged fetal exposure. (*Id.* ¶ 58.) Infants exposed to THC in utero had a decrease in birth weight compared to infants whose mothers did not use THC during pregnancy. Infants exposed to THC in utero were also more likely to need placement in the Neonatal Intensive Care Unit (NICU) compared with infants whose mothers avoided cannabis use during pregnancy. (*Id.* ¶ 63.)

Prenatal marijuana exposure may have long-term emotional and behavioral consequences. Exposure to marijuana in utero has been associated with stunted growth outcomes, memory problems, and learning difficulties. (*Id.* ¶ 59.) Among 16- to 21-year-olds, prenatal exposure to marijuana at least doubled the risk of both cigarette and marijuana use. (*Id.* ¶ 60.)

Even more troubling is newer synthetic marijuana containing compounds such as K2/Spice, which may have up to ten times the THC concentration as conventional marijuana and may bind as much as 1000 times more powerfully to brain receptors. (*Id.* ¶ 61.) State Defendants' expert Dr. Michael Porte recently presented a case at the Meriter Unity Point/University of Wisconsin Morbidity and Mortality Rounds where a pregnant mother had unexplained seizures with a history of K2/Spice abuse. Her fetus had no spontaneous movement due to brain injury. (*Id.* ¶ 62.)

### d.   Prenatal cocaine exposure.

Cocaine easily passes from mother to fetus. (*Id.* ¶ 65.) Cocaine is toxic and may promote serious alteration in essential brain neurotransmitters, such as dopamine and serotonin. Prenatal cocaine exposure can reduce blood flow from the placenta to the fetus and reduce oxygen delivery. This can result in low birth weight and microcephaly, which carries a risk of severe developmental delay. (*Id.* ¶¶ 66, 68.) Cocaine has also been associated with placental abruption, preterm rupture of the membranes, and withdrawal symptoms. (*Id.* ¶ 67.) Children who were exposed to cocaine in utero can exhibit long-term problems with behavior in school and beyond. (*Id.* ¶ 70.)

### e.   Prenatal opiate exposure.

Opiate drugs include heroin, morphine, codeine, buprenorphine, oxycontin, dilaudid, and methadone, among others. (*Id.* ¶ 71.) Heroin and its

many derivatives readily pass from the placenta to the fetus and causes fetal accumulation. (*Id.* ¶ 72.) Prenatal opiate exposure can cause preterm labor. Abrupt withdrawal of opiates can also stimulate preterm labor and delivery, which can cause many neonatal complications, including death, brain bleeding, and developmental delay. (*Id.* ¶ 73.)

Dr. Knox recalls a situation where she was contacted by a county after law enforcement had taken a woman into custody overnight. The woman was 22 weeks pregnant and a heroin user. Dr. Knox advised the county to immediately transport the woman to the closest local hospital to confirm the self-reported pregnancy and immediately get the woman on methadone maintenance to prevent her from going into labor. Unfortunately, the woman had already gone into premature labor and delivered at only 22 weeks. (*Id.* ¶ 74.)

A child exposed to opiates prenatally may experience severe withdrawal symptoms known as Neonatal Abstinence Syndrome (NAS). (*Id.* ¶ 76.) Babies with NAS exhibit severe irritability, tremors and jitteriness, voracious appetite, diarrhea with painful skin breakdown that may become infected, hypertonia (rigid muscles), poor sleeping, and poor behavioral state transition. (*Id.* ¶¶ 77–78.) It is virtually impossible to care for babies with NAS without providing a narcotic substitute, typically morphine or methadone. (*Id.* ¶ 79.) Babies requiring such treatment are cared for in the

29

hospital, frequently in the NICU, with an average length of stay of about three weeks. (*Id.* ¶ 80.) NAS babies often exhibit a high pitched cry and require frequent holding, swaddling, and a calming environment (low noise and low light). (*Id.* ¶ 81.)

If these babies are not treated, they may fail to thrive. Their parents may become frustrated, increasing the risk for child abuse or neglect. Long- term studies show increased behavioral problems among such children, including cognitive impairment and increased risk for re-hospitalization. (*Id.* ¶ 82.) Mothers on heroin may have poor nutritional intake during pregnancy. Lower birth weights and head circumferences have been reported in their babies. (*Id.* ¶ 84.)

Forty-six babies were admitted for observation and treatment of NAS at the Meriter Unity Point NICU in 2014. This figure does not include babies who received a NAS diagnosis in the newborn nursery but did not require NICU admission. (*Id.* ¶ 88.) The Meriter Unity Point NICU recently discharged a baby whose mother used cocaine and heroin during pregnancy. The baby had severe hypertonia, irritability, and tremors. The infant required postnatal morphine and Phenobarbital to control these NAS symptoms. The baby's symptoms improved but were still present at the time of discharge. The child was sent home on Phenobarbital. (*Id.* ¶ 89.)

Loertscher questions the long-term effects of fetal opiate exposure. But even if long-term effects are unclear, the immediate and short-term effects are drastic. "When a child is born drug addicted and suffering from withdrawal symptoms, the child has been harmed and that harm necessarily continues after the birth of the child, endangering her health and development." *In re Guardianship of K.H.O.*, 736 A.2d 1246, 1253 (N.J. 1999). Courts have recognized that "an infant born addicted to drugs and suffering the resultant withdrawal symptoms has suffered harm that endangers her health and development within the meaning of [child abuse laws]." *Id*.

To conclude, prenatal exposure to controlled substances, including alcohol, methamphetamine, marijuana, cocaine and opiates, has a substantial risk of causing harm to the fetus, newborn, and developing child. The state's interest in intervening under these circumstances is compelling.

### 3. The high rate of maternal substance use during pregnancy and the cost to the state also establish a compelling need for early intervention.

Maternal substance use during pregnancy can be devastating to even one child. But it is not an isolated problem. According to national statistics, 5.4% of pregnant women use illicit drugs during their pregnancies. And 9.4% use alcohol with 2.3% binge drinking. (SDPFOF ¶ 10.) In Wisconsin, maternal substance use during pregnancy increased threefold from 2009 to 2014. (*Id.* ¶ 11.)

The impact of maternal substance use on children is dramatic, and affected children incur significant healthcare costs. Recent population-based studies conducted among school children in several communities in the United States and Europe have identified signs of FASD in 2.4 to 4.8% of school children. (*Id.* ¶ 13.) A 2015 study estimated the costs of drinking while pregnant to the United States economy during 2010 to be $5.24 billion, including lost productivity and costs to the healthcare and education systems. (*Id.* ¶ 14.)

The increasing prevalence of NAS is particularly alarming. From 2000 to 2012, NAS incidence increased nationally from 1.2 to 5.8 per 1000 hospital births. (*Id.* ¶ 12.) The Wisconsin Department of Health Services estimates an even higher rate of NAS in Wisconsin: eight per 1000 births. (*Id.*)

Newborns with NAS typically require longer hospital stays and significantly increased costs, and the state usually pays those costs. The rate of NICU admissions for NAS increased from seven cases per 1000 admissions in 2004 to 27 cases per 1000 admissions in 2013. (*Id.* ¶ 86.) A recent study found that in 2009 treatment costs for NAS-affected newborns are, on average, more than five times the cost of treating other newborns at birth. Newborns with NAS stayed in the hospital for 16 days on average and incurred average hospital charges of about $53,000. In contrast, the average hospital stay was three days and the average cost was $9500 for all other

32

hospital births. More than three-quarters of the NAS cases identified in the study were paid for by Medicaid, the federal-state program that provides health insurance coverage for certain low-income individuals. (*Id.* ¶¶ 15, 87.)

### C. The Act strikes the appropriate balance between the rights of the expectant mother and the state's interest in preventing unborn child abuse.

Strict scrutiny does not apply in this context. Instead, the court must balance the rights of the expectant mother against the state's interest in preventing unborn child abuse. The Act strikes the appropriate balance because (1) it requires reasonable suspicion at the screening stage, and the children's court may only invoke its jurisdiction based on reliable and credible information; (2) by its plain language it applies only in extreme situations; and (3) protective custody orders are used in moderation, when necessary to keep the unborn child safe.

#### 1. The Act requires reasonable suspicion at the screening stage, and the children's court may only invoke its jurisdiction based on reliable and credible information.

A report of unborn child abuse may be made by a person who has "reason to suspect" such abuse or risk of abuse. Wis. Stat. § 48.981(2)(d). Local law enforcement or county access workers must immediately investigate. Wis. Stat. § 48.981(3); (SDPFOF ¶ 101.) Pursuant to the IA Standards, the standard used to screen in a report is whether there is

reasonable suspicion that: the woman is pregnant; her behaviors demonstrate a habitual lack of self-control in the use of alcohol or controlled substances to a severe degree; and the abuse could cause physical harm to the unborn child or risk of serious harm to the child when born. (SDPFOF ¶ 102); *see also* Wis. Stat. § 48.193. This standard is consistent with the standard for conventional child abuse investigations, where caseworkers must have evidence to support a reasonable suspicion of past or imminent abuse before they can take a child into protective custody. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011). Reasonable suspicion requires more than a hunch but less than probable cause. *Id*.

After the report is screened in, the case is assigned to a county initial assessment worker for investigation and assessment. *See* Wis. Stat. § 48.981(3); (SDPFOF ¶ 103.) The county worker contacts the reporter, the expectant mother, and medical professionals to gather information. (SDPFOF ¶ 104.) Upon initial contact, treatment is immediately offered to the expectant mother. If she voluntarily agrees to treatment, county workers simply follow up to make sure she is cooperating with her assessed treatment needs. (*Id*. ¶ 106.) A UCHIPS petition would not need to be filed in this type of case as long as the expectant mother is voluntarily pursuing treatment. But if she does not follow through with voluntary treatment, county workers

may refer the case to the county district attorney's office for initiation of a UCHIPS petition. (*Id.* ¶ 107.)

If the county decides to pursue a UCHIPS action, the petition must set forth "[r]eliable and credible information which forms the basis of the allegations necessary to invoke the jurisdiction of the court . . . ." Wis. Stat. § 48.255(1m)(e). The test for the sufficiency of the evidence for a such a petition is the same as for the sufficiency of a criminal complaint—probable cause. *See In Interest of Courtney E.*, 184 Wis. 2d 592, 601, 516 N.W.2d 422 (1994). Probable cause is also the standard for holding an expectant mother in temporary physical custody. Wis. Stat. §§ 48.205(1m), 48.213(1).

Here, Loertscher's case was screened in using a reasonable person standard. (SDPFOF ¶ 127.) The access worker received information from the Mayo Clinic social worker that Loertscher was three months pregnant, that she had tested positive for methamphetamines, amphetamines, and THC, and that she had confirmed her drug use while pregnant. (*Id.* ¶ 125.) The reporter also indicated that a Mayo Clinic physician found that Loertscher's behavior was putting her fetus at serious risk of harm. (*Id.* ¶ 126.) Based on applicable IA Standards, it was appropriate to rely on medical professionals for this information. (*Id.* ¶ 128.) This information was certainly enough for the access worker to reasonably suspect that Loertscher could harm her unborn child due to her admitted drug use.

The case was then assigned to Taylor County social worker Julie Clarkson, who immediately began to investigate. (*Id.* ¶ 129.) She contacted the reporter to gather more information and met with her supervisor, Liza Daleiden, and an AODA counselor to discuss the case. (*Id.* ¶ 130.) They considered several options but decided that based on her recent drug use, Loertscher would be best served by voluntary inpatient treatment at the Fahrman Center, where her drug use and treatment needs would be further assessed. (*Id.* ¶ 131.) As part of her investigation, Clarkson tried to contact Loertscher multiple times. She also requested Loertscher's medical records from the Mayo Clinic. (*Id.* ¶ 132.)

When Loertscher finally responded to Clarkson, Clarkson notified her that TCDHS had received a referral from Mayo Clinic and screened in the case. They discussed the ongoing investigation and the facts Clarkson had gathered. (*Id.* ¶ 135.) Clarkson asked Loertscher to enter a treatment facility voluntarily, but Loertscher refused. (*Id.* ¶¶ 136, 138.) Clarkson then advised Loertscher that if she did not agree to voluntary AODA treatment, TCDHS would ask corporation counsel to take her into temporary physical custody to keep her unborn child safe. (*Id.* ¶ 137.)

TCDHS decided to pursue a TPC at the Mayo Clinic. (*Id.* ¶¶ 139–40.) At the TPC hearing, Dr. Bantz, Loertscher' OB/GYN at the Mayo Clinic, testified that Loertscher was approximately 14 weeks pregnant and that she

36

had self-reported using methamphetamine three times a week during her pregnancy. She further testified that Loertscher reported using marijuana throughout her pregnancy. A urine drug test done at the hospital confirmed Loertscher's use of marijuana, methamphetamine, and amphetamine. (*Id.* ¶¶ 141–43.) Dr. Bantz testified that she did not think Loertscher would voluntarily avail herself of services if she was released from custody. She recommended inpatient AODA treatment. (*Id.* ¶ 144.) Finally, Dr. Bantz testified about the potentially harmful effects of methamphetamine, marijuana, and alcohol on the unborn child and that there was a substantial likelihood that the unborn child's health would be affected if there was continued substance use. (*Id.* ¶ 145.)

At the end of the hearing, the court found that there was probable cause to hold Loertscher in custody first at the Mayo Clinic and then at a treatment center where she would receive AODA assessment and treatment. (*Id.* ¶ 147.) The finding of probable cause was based on reliable and credible information, including the testimony of Loertscher's treating OB/GYN. (*Id.* ¶¶ 141–47.) This evidentiary standard, along with the reasonable suspicion standard at the screening stage, maintains the appropriate balance between the rights of the expectant mother and the state's interest in protecting unborn children from harm.

### 2.    By its plain language, the Act applies only in extreme situations.

The Act permits the children's court to exercise its original jurisdiction over an unborn child alleged to be in need of protection or services only when the expectant mother "habitually" lacks self-control in the use of drugs or alcohol exhibited to a "severe degree," to the extent that there is a "substantial risk" that the physical health of the unborn child, and the child when born, will be "seriously affected or endangered" unless the expectant mother receives prompt and adequate treatment. Wis. Stat. § 48.133. The expectant mother may be held in protective custody only if there is probable cause to believe that she meets this standard *and* that she is refusing treatment. Wis. Stat. §§ 48.205(1m), 48.213(1).

Based on this language, it is clear that the Act does not apply to those instances when maternal conduct presents little to no risk to the unborn child, such as when an expectant mother consumes nominal amounts of alcohol before she knows she is pregnant. Rather, the statute is reserved for extreme situations in which the child faces substantial risks.

Loertscher's drug use was severe, and her unborn child faced substantial risks. Loertscher admitted to using methamphetamines and marijuana during her pregnancy. (SDPFOF ¶¶ 133, 143.) And she did not use these drugs just once or twice; she admitted to using methamphetamines "two to three times a week just to . . . help her get out of bed . . . [and] [s]he also

38

reported marijuana use . . . throughout the pregnancy." (*Id.* ¶¶ 133, 143.) Further, Loertscher's treating doctors at the Mayo Clinic diagnosed her with methamphetamine and marijuana dependence. (*Id.* ¶ 134.) At Loertscher's TPC hearing, Dr. Bantz testified to the potentially harmful effects of methamphetamine and marijuana use during pregnancy. (*Id.* ¶ 145.) Her testimony is consistent with the evidence provided by Drs. Porte and Knox. (*Id.* ¶ 146.) Given this evidence, Loertscher's drug use during pregnancy plainly meets the standard set forth in the Act.

### 3. Protective custody orders are used in moderation, when necessary to keep the unborn child safe.

The state does not always use protective custody to accomplish its compelling interest. One of the goals of the Children's Code is "to preserve the unity of the family, whenever appropriate, by strengthening family life through assisting parents and expectant mothers of unborn children, whenever appropriate, in fulfilling their responsibilities as parents or expectant mothers." Wis. Stat. § 48.01(1)(a). This language expresses the importance of using protective custody orders in moderation. There are numerous options, short of formal children's court intervention and a protective custody order, which can be used first, including counseling incidental to the intake process and voluntary drug or alcohol treatment. *See*, *e.g.*, Wis. Stat. §§ 48.067, 48.069, 48.203, 48.24, 48.245. The court may

not place an expectant mother outside her home unless she meets the statutory standard *and* refuses to accept the alcohol or other drug abuse services offered to her. Wis. Stat. §§ 48.193(1), 48.347.

Further, the court's placement and treatment decision must be appropriate for the expectant mother's needs and provided in the least restrictive environment consistent with those needs. Wis. Stat. § 48.355. For example, in determining what types of services are appropriate, Milwaukee County uses a referral system called Community Access to Recovery and Support Services (CARS). CARS does an intake assessment to determine the level of services needed. (SDPFOF ¶ 108.) Residential programs are provided by Meta House and United Community Care. Women are able to enter these programs while pregnant and then continue to reside there after the baby is born. These programs provide a safe and sober living environment for mothers new to recovery and their vulnerable infants who have been exposed to drugs or alcohol in utero. (*Id.* ¶ 109.) Both treatment facilities provide outpatient services after the mothers have graduated from the residential treatment program. (*Id.* ¶ 110.) CARS also provides case management services to the mother and her newborn. (*Id.* ¶ 111.) In Milwaukee, these services are provided to any expectant mother screened in for unborn child abuse. (*Id.*)

In Taylor County, Loertscher was consistently offered a less restrictive assessment and treatment option. But, at every turn, she refused. TCDHS offered Loertscher voluntary AODA assessment and treatment. She refused. (*Id.* ¶¶ 136, 138.) It was only after she refused this assessment and treatment that caseworkers pursued a TPC. (*Id.* ¶ 139.) At the close of the TPC hearing, the court ordered Loertscher to remain at the Mayo Clinic until she was "medically cleared," at which point the court ordered that she be transferred to a licensed treatment facility for assessment and treatment. (*Id.* ¶¶ 148–49.) Loertscher again refused. She left the Mayo Clinic and did not receive the AODA assessment at the treatment center. (*Id.* ¶¶ 151–52.)

Loertscher was ultimately held in contempt for her failure to comply with the court's order. (*Id.* ¶¶ 153–59.) Remedial contempt of this sort is imposed only to ensure compliance with court orders. *See* Wis. Stat. § 785.01(3). Once a civil contemnor complies with the underlying order, she is purged of the contempt and is free. *Turner v. Rogers*, 564 U.S. 431, 442 (2011). Thus, incarceration as a result of civil contempt does not rise to the level of a substantive due process violation. *See id.* at 449 (parents may be incarcerated for civil contempt if they fail to pay child support).

In all, the Act accommodates the range of situations which may be confronted by county caseworkers in protecting the health and wellbeing of unborn children. Accordingly, the Act easily meets the balancing test and

41

does not violate substantive due process on its face or as-applied to Loertscher.

## III.  The Act does not violate an expectant mother's procedural due process rights.

Loertscher challenges the procedures underlying her alleged deprivation of liberty. She claims that "[e]nforcement of the Act violates the right to due process by depriving pregnant women of procedural safeguards including, but not limited to, right to counsel; knowledge of allegations; an opportunity to present or refute evidence; and by allowing physical detention on a standard of proof lower than 'clear and convincing evidence.'" (SDPFOF ¶ 179.) Contrary to these contentions, an adversarial hearing and attendant procedural protections are not constitutionally required before an expectant mother can be temporarily detained under the Act. Moreover, the Act provides for all the procedural protections Loertscher seeks, and is not void for vagueness. The Act does not violate procedural due process on its face or as-applied to Loertscher.

### A.  Due process calls for such procedural protections as the particular situation demands.

Due process generally requires notice and an opportunity for a hearing appropriate to the nature of the case. *Toney-El v. Franzen*, 777 F.2d 1224, 1228 (7th Cir. 1985). Due process "calls for such procedural protections as the

particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted). Ascertaining what process is due requires an evaluation of the private interest at issue, the government's interests, and the risk of an erroneous deprivation of the private interest through the procedures used. *Doe v. Heck*, 327 F.3d 492, 527 (7th Cir. 2003) (citing *Mathews*, 424 U.S. at 335 (1976)).

In this case, the balancing test is essentially subsumed into the analysis of Loertscher's underlying constitutional claims, all of which require a balancing of individual interests against those of the government. *See id*. The private interests Loertscher asserts are on equal footing with the right to familial integrity at issue in a child abuse case. As such, the Act contains procedures that result in fundamentally fair process.

**B.    The Act provides sufficient process.**

**1.    An adversarial hearing is not constitutionally required before an expectant mother can be temporarily detained under the Act.**

"[G]overnment officials may remove a child from his home without a pre-deprivation hearing and court order if the official has probable cause to believe that the child is in imminent danger of abuse." *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 486 (7th Cir. 2011). The Seventh Circuit has said that "[w]hen a child's safety is threatened, that is justification

43

enough for action first and hearing afterward." *Id.* (citing *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983). The same is true when a person is held in custody following arrest. A law enforcement officer's "on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest." *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975). Then, a judicial determination of probable cause is required for any extended restraint on the liberty of an adult accused of a crime. *Id.* at 114. The judicial determination of probable cause must be made be promptly, within 48 hours of the arrest. *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 55 (1991). Because of its limited function and its nonadversary character, the probable cause determination does not require the "full panoply of adversary safeguards—counsel, confrontation, cross-examination, and compulsory process for witnesses." *Gerstein*, 420 U.S. at 119.

These same procedures, and more, are afforded to expectant mothers under the Act. Just as an arresting officer may hold a person for a brief period based on probable cause, so too an intake worker may hold an expectant mother in custody if there is probable cause to believe that the statutory standard is met. Wis. Stat. §§ 48.203(6), 48.205(1m). An expectant mother who is held in custody and not released must have a hearing before a judge or circuit court commissioner within 48 hours after the detention decision to

determine whether there is probable cause to continue custody. Wis. Stat. § 48.213. This procedure is consistent with the procedure for holding a child in custody, *see* Wis. Stat. § 48.21, and with the procedure for holding a person suspected of a crime in custody, *see Gerstein*, 420 U.S. at 114.

Loertscher was afforded a judicial determination of probable cause before she was ordered to remain at the Mayo Clinic and later go to a treatment center for AODA assessment and treatment. (SDPFOF ¶¶ 141–49.) Her court ordered placement was temporary. She would be placed at the treatment center only for as long as she needed treatment. (*Id.* ¶¶ 147–49, 157.) If her AODA assessment showed that she did not need treatment or that her treatment could be accomplished on an outpatient basis, she would be discharged. (*Id.* ¶¶ 149, 157.) Given the limited consequences of the TPC hearing, Loertscher was not entitled to full due process rights at that stage of the UCHIPS proceeding.

### 2. The Act provides for all of the procedural protections that Loertscher seeks.

The court's order of temporary physical custody was—by definition—a temporary remedy prior to adjudication and entry of an appropriate dispositional order. Loertscher never proceeded in the UCHIPS process, however, because the court held her in contempt for failing to comply with its order. (*Id.* ¶ 160.) In Wisconsin, a court has inherent power to hold in

contempt those who disobey its lawful orders. *See In Interest of D.L.D.*, 110 Wis. 2d 168, 178, 327 N.W.2d 682 (1983). This civil contempt power was not created by the Act and is, therefore, not properly challenged in this lawsuit. Loertscher's as-applied procedural due process claim fails.

Expectant mothers who proceed in the UCHIPS process are afforded constitutionally sufficient procedural protections. The Act requires the intake worker to notify the expectant mother of the allegations against her:

> If an adult expectant mother is held in custody, the intake worker shall notify the adult expectant mother and the unborn child's guardian ad litem of the reasons for holding the adult expectant mother in custody, the time and place of the detention hearing required under s. 48.213, the nature and possible consequences of that hearing, and the right to present and cross-examine witnesses at the hearing.

Wis. Stat. § 48.203(7); *see also* Wis. Stat. § 48.243 (duty of intake worker to inform expectant mother of allegations against her and rights provided); Wis. Stat. § 48.213(2) (copy of petition given to expectant mother before custody hearing begins). The expectant mother may waive the custody hearing, but if she appears, she is entitled to present and cross-examine witnesses. Wis. Stat. §§ 48.203(7), 48.213(2)(c), (d). If the expectant mother is not represented by counsel at the hearing and remains in custody, she may request through subsequently appointed counsel that the custody order be reheard. Wis. Stat. § 48.213(2)(e). The expectant mother is provided more process than a criminal suspect held in custody receives.

As discussed above, an expectant mother may be temporarily held in custody based on a finding of probable cause. But she is then entitled to a fact-finding hearing at which the court determines whether the allegations in the petition are proven by clear and convincing evidence. Wis. Stat. § 48.31. The expectant mother may present and cross-examine witnesses at the hearing. Wis. Stat. § 48.243. She may not be placed outside of her home unless she is represented by counsel. Wis. Stat. § 48.23(2m). If the court determines that the unborn child is in need of continuing protection or services, it may order counseling, supervision by a social services agency, out-of-home placement, or participation in outpatient or inpatient alcohol or drug treatment. Wis. Stat. § 48.347. The court may not place an expectant mother outside her home unless she refuses to accept the alcohol or other drug abuse services offered to her. Wis. Stat. § 48.347. The court also may not order inpatient treatment unless the treatment is appropriate for the expectant mother's needs and provided in the least restrictive environment consistent with those needs. Wis. Stat. § 48.355. Thus, other than on an emergency, temporary basis, the court may not order protection and services for the unborn child unless the allegations in the petition are proven by clear and convincing evidence. Wis. Stat. §§ 48.31, 48.347.

As for the right to counsel, the presumption is that an indigent litigant has no right to appointed counsel in a civil case in the absence of at least a

potential deprivation of physical liberty. *Lassiter v. Dep't of Soc. Servs. Durham Cty., N.C.*, 452 U.S. 18, 31 (1981) (due process does not require court appointed counsel for every indigent unrepresented parent in proceedings to terminate parental rights). But due process does not always require the provision of counsel in civil proceedings where incarceration is threatened. For example, in *Gagnon v. Scarpelli*, 411 U.S. 778, 783–91 (1973), the Supreme Court held that although probation revocation results in a loss of personal freedom, an indigent probationer's right to appointed counsel must be determined on a case-by-case basis. More recently, in *Turner*, 564 U.S. at 441–49, the Supreme Court held that an indigent defendant did not have a presumptive right to state-appointed counsel in a civil contempt proceeding that could lead to his incarceration. The Court noted the importance of the alternative procedural safeguards provided by the state. *Id*. at 447–48.

Under the Act, an expectant mother is entitled to counsel during critical phases in the process—namely when she may be placed outside her home. For example, if the petition is not contested, an expectant mother cannot be placed outside of her home unless she is represented by counsel at the hearing at which the placement is ordered. Wis. Stat. § 48.23(2m). If the petition is contested, she may not be placed outside of her home unless she is represented by counsel at the fact-finding and subsequent hearings. *Id*. The court may also appoint counsel to the expectant mother upon request or upon

its own motion. Wis. Stat. § 48.23(3). This qualified right to counsel, coupled with the numerous substitute procedural safeguards provided to the expectant mother—including notice and an opportunity to present and cross-examine witnesses at a hearing—provides constitutionally sufficient process.[1]

The statutory scheme created by the Act strikes an appropriate balance between the expectant mother's liberty interests and the state's *parens patriae* interest in preserving and promoting the welfare of the unborn child. There is little risk of an erroneous deprivation of the expectant mother's interests through the extensive procedures used. As such, the Act provides expectant mothers with sufficient process.

## C.    The Act is not void for vagueness.

Loertscher contends that "the Act is unconstitutionally vague . . . because it is framed in terms so vague that persons of common intelligence must necessarily guess at its meaning and its vagueness is of the kind that must be expected to authorize and even encourage arbitrary and discriminatory enforcement." (SDPFOF ¶ 179.)

---

[1] No determination of indigency is required for a person who is entitled to be represented by counsel under Wis. Stat. § 48.23. Wis. Stat. § 977.07(1). But, nevertheless, there is no indication in the cases cited that the court is required to appoint counsel regardless of the individual's ability to pay.

The void for vagueness doctrine is an aspect of procedural due process. *See United States v. Prof'l Air Traffic Controllers Org.*, 678 F.2d 1, 3 (1st Cir. 1982). The "doctrine rests on the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012). On the one hand, a statute may be unconstitutionally vague if it fails to define prohibited conduct with sufficient clarity to allow "ordinary people [to] understand what conduct is prohibited." *Id.* (citation omitted). On the other hand, to survive a vagueness challenge, a statute must "establish standards to permit enforcement in a nonarbitrary, nondiscriminatory manner." *Id.* (citation omitted). Nevertheless, the due process clause "does not demand 'perfect clarity and precise guidance.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). The Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

The Act is not void for vagueness. The standard for county intervention is multi-factored. Several distinct, interlocking criteria must each be met before the county may intervene or the children's court can exercise

50

jurisdiction over an unborn child alleged to be in need of protection or services. Specifically,

> [the] expectant mother *habitually lacks self-control* in the use of [drugs or alcohol] . . . exhibited to a *severe degree*, *to the extent* that there is a *substantial risk* that the physical health of the unborn child, and of the child when born, will be *seriously affected or endangered* unless the expectant mother receives prompt and adequate treatment.

Wis. Stat. § 48.133; *see also* Wis. Stat. §§ 48.19(1)(c), (1)(d)8., 48.193(1)(c), (1)(d)2., 48.205(1)(d), (1)(m), 48.21(1)(b)4., 48.213(1)(b), 48.345(14)(a), 48.347(6)(a).

The italicized terms are not defined in the statute. However, the Legislature need not define each word in a statute to protect it from a vagueness challenge.

> Our laws are written in a common language having meaning and significance apart from and independent of the legislature's use of it. In the absence of a statutory definition, this common and approved usage of nontechnical words and phrases contained in statutes is presumed to be the usage intended by the legislature. This meaning . . . may be established by using the dictionary definition.

*State v. Ehlenfeldt*, 94 Wis. 2d 347, 356, 288 N.W.2d 786 (1980) (citing Wis. Stat. § 990.01(1)). The meaning of all the operative terms can be found in The American Heritage Dictionary, Black's Law Dictionary, or case law.

*Habitually* means "[d]one by habit."[2] A "habit" is a "recurrent, often unconscious pattern of behavior that is acquired through frequent

---

[2] *Habitual*, The American Heritage Dictionary (5th ed. 2011).

repetition."[3] *Lacks self-control* requires "proof" that the expectant mother has "serious difficulty in controlling [her] behavior" regarding her use of drugs or alcohol.[4] This habitual lack of self-control in the use of drugs or alcohol must be exhibited to a *severe degree*, *i.e.*, a degree that is "[v]ery dangerous or harmful; grave or grievous."[5] Even if these factors are present, the court only has jurisdiction *to the extent* the expectant mother's behavior creates *a substantial risk* that the unborn child's physical health will be *seriously affected or endangered*. In this context, "serious" means "dangerous; potentially resulting in death or other severe consequences."[6] The child's health is *affected* by the mother's behavior if the behavior "produce[s] an effect on" the child's health or "influence[s] [it] in some way."[7] It is *endangered* if it is "expose[d] to harm or danger; imperil[ed]."[8]

---

[3] *Habit*, The American Heritage Dictionary.

[4] *Kansas v. Crane*, 534 U.S. 407, 413 (2002) (interpreting "lack of control" language in Kansas Sexually Violent Predator Act, Kan. Stat. Ann. § 59-29a01, *et seq.* (1994)).

[5] *Severe*, The American Heritage Dictionary.

[6] *Serious*, Black's Law Dictionary (10th ed. 2014).

[7] *Affect*, Black's Law Dictionary.

[8] *Endanger*, The American Heritage Dictionary.

A "substantial risk" is a measure of "dangerousness." *State v. Post*, 197 Wis. 2d 279, 312, 541 N.W.2d 115 (1995). A risk is "substantial" if it is "[t]rue or real; not imaginary."[9]

Whether an expectant mother exhibits the requisite lack of self-control justifying intervention by the county is determined by the interplay or nexus between all of the statutory factors. *Cf. In re Commitment of Laxton*, 2002 WI 82, ¶¶ 20–23, 254 Wis. 2d 185, 647 N.W.2d 784 (interpreting statutory standard for involuntary civil commitment of sexually violent persons). The statute provides expectant mothers with sufficient clarity to understand the prohibited behavior, and those enforcing the statute with sufficient clarity to apply it in a nonarbitrary and nondiscriminatory manner. *See Hegwood*, 676 F.3d at 603. The statutory standard is not void for vagueness.

## IV.    The Act does not violate an expectant mother's equal protection rights.

In her supplemental response to the State Defendants' interrogatories, Loertscher asserts that "[e]nforcement of the Act violates the Fourteenth Amendment because it strips women of fundamental rights and liberties on the basis of their biological status without appropriately serving a compelling, important, or rational government interest." (SDPFOF ¶ 178.) Loertscher

---

[9] *Substantial*, The American Heritage Dictionary.

contends that the enforcement of the Act against her violated her equal protection rights in the same way enforcement of the Act violated the rights of all expectant mothers. (*Id*.) Thus, the State Defendants interpret her equal protection claim against them as facial only.

Loertscher fails to state a proper equal protection claim, namely, that the law does not treat similarly situated people in a similar manner. Because Loertscher cannot make this threshold showing, she has no equal protection claim at all. But even assuming she has a viable equal protection claim, rational basis scrutiny applies, and the Act easily passes constitutional muster under that test.

## A. Loertscher cannot show that the Act fails to treat similarly situated people in a similar manner.

The essence of an equal protection claim is that the challenged law fails to treat similarly situated people in a similar manner. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Dissimilar treatment of dissimilarly situated persons does not violate equal protection." *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994). Thus, if a plaintiff does not establish that similarly situated persons receive dissimilar treatment under the law, the plaintiff has no equal protection claim at all. *Reed v. Reed*, 404 U.S. 71, 75–76 (1971).

Numerous federal circuit courts have held that a plaintiff must make a threshold showing that a person targeted by the law is similarly situated to those who allegedly receive favorable treatment. *See, e.g.*, *Women Prisoners of D.C. Dep't of Corr. v. D.C.*, 93 F.3d 910, 924 (D.C. Cir. 1996); *Klinger*, 31 F.3d at 731; *Samaad v. City of Dallas*, 940 F.2d 925, 940–41 (5th Cir. 1991); *see also Smith v. City of Chicago*, 457 F.3d 643, 650–51 (7th Cir. 2006). It is the plaintiff's burden to provide factual support for such a finding. *Kicklighter v. Evans Cty. Sch. Dist.*, 968 F. Supp. 712, 720 (S.D. Ga. 1997), *aff'd sub nom. Kicklighter v. Evans Cty. Sch.*, 140 F.3d 1043 (11th Cir. 1998). Without this showing, the plaintiff does not have a viable equal protection claim. *Id.*; *Klinger*, 31 F.3d at 731.

When making the "similarly situated" inquiry, a court must first precisely define the plaintiff's claim. *Klinger*, 31 F.3d at 731. Here, Loertscher asserts that "[e]nforcement of the Act violates the Fourteenth Amendment because it strips women of fundamental rights and liberties on the basis of their biological status without appropriately serving a compelling, important, or rational government interest." (SDPFOF ¶ 178.) Her claim, therefore, appears to be that the Act impermissibly targets pregnant women, or perhaps women more generally, depriving these individuals of their fundamental rights. Tellingly, Loertscher does not precisely define the class she believes

the Act is targeting, nor does she assert that the Act fails to treat similarly situated people in a similar manner. Indeed, she cannot make this showing.

The Act protects an unborn child from an expectant mother's abuse of controlled substances. *See* Wis. Stat. § 48.133. Necessarily, then, the Act pertains not to women in general, but to expectant mothers who habitually lack self control in the use of alcohol beverages, controlled substances, or controlled substance analogs. *Id.* Only an expectant mother could expose her unborn child to these substances. Men cannot be similarly situated to this group, because biologically, it is not possible for men to expose unborn children to alcohol, controlled substances, or their analogs. Similarly, the law does not apply to non-pregnant women.

In other contexts, courts have recognized that women and men are not similarly situated when a law implicates pregnancy. For example, in *Jane L. et al. v. Bangerter*, the plaintiff claimed that the Utah Abortion Act, which prohibited women from engaging in elective abortions, violated the equal protection clause in Utah's state constitution. 794 F. Supp. 1528, 1533–34 (D. Utah 1992). The plaintiff argued that the law "imposes burdens upon only women's reproductive choices and bodily integrity." *Id.* at 1533. The *Bangerter* court held that the Utah Abortion Act did not violate equal protection because "[m]en and women are not 'similarly situated' with respect to ability to carry a child. Manifestly, the Utah Act does not violate the Utah

56

Equal Protection Clause by prohibiting elective abortions for the only sex capable of having abortions." *Id*. at 1534.

Here, it is just as clear that no similarly situated "non-pregnant" population is favorably treated under the Act. Only individuals with a confirmed pregnancy could be subject to the Act.[10] Because no other group or person is similarly situated to pregnant persons for the purposes of the Act, Loertscher has no equal protection claim.

### B. Rational basis scrutiny applies to this case, and Loertscher's equal protection claim fails because the Act is rationally related to a legitimate state interest.

#### 1. Levels of scrutiny.

The Equal Protection Clause provides that no state shall "deny any person within its jurisdiction equal protection of the law." U.S. Const. Amend. XIV. The essence of this guarantee is that states must treat similarly situated people in a similar manner. *City of Cleburne, Tex.*, 473 U.S. at 439.

The Supreme Court has enunciated an analytical framework for determining the validity of state legislation challenged on equal protection grounds. *Id*. at 439–40. "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is

rationally related to a legitimate state interest." *Id*. at 440. This formulation applies "whether the plaintiff challenges a statute on its face, as applied, or . . . challenges some other act or decision of government." *Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006).

This general rule gives way, however, when a statute classifies by race or national origin, or when the statute interferes with the exercise of fundamental rights. *Cleburne,* 473 U.S. at 440; *see also Clark v. Jeter*, 486 U.S. 456, 461 (1988). Strict scrutiny generally applies under these circumstances. *Clark*, 486 U.S. at 461. To survive strict scrutiny review, the state must show that its classification is narrowly tailored to achieve a compelling state interest. *Cleburne*, 473 U.S. at 440.

Legislative classifications based on gender call for a heightened standard of review, often called intermediate scrutiny. *Id*.; *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 577 (7th Cir. 2014) ("[g]ender is a quasi-suspect class that triggers intermediate scrutiny in the equal protection context"). A gender classification fails unless it is substantially related to a sufficiently important governmental interest or objective. *Clark*, 486 U.S. at 461.

---

[10] Indeed, the IA Standards require confirmation of pregnancy to screen in an unborn child abuse case. (SDPFOF ¶ 105.)

Legal classifications based on pregnancy do not constitute gender classifications unless they "are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other." *Geduldig v. Aiello*, 417 U.S. 484, 496–97 & n.20 (1974). In *Geduldig*, the plaintiff brought an equal protection challenge to a state disability insurance system that excluded pregnancy from coverage. *Id.* at 486. The Supreme Court held that the pregnancy exclusion was not a gender-based classification, and thus rational basis scrutiny applied. *Id.* at 494–97. The Court explained:

> While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification . . . . Normal pregnancy is an objectively identifiable physical condition with unique characteristics. *Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.*

*Id.* at 496 n.20 (emphasis added); *accord Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 274 (1993).[11]

---

[11] The Court applied similar reasoning to a pregnancy exclusion case brought under Title VII. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 135 (1976) (holding that the exclusion of pregnancy from coverage under a state disability plan was not sex-based discrimination). *Gilbert* was abrogated by the Pregnancy Discrimination Act of 1978, which amended Title VII to include pregnancy classifications within the statutory definition of sex discrimination. *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 676–78 (1983). Because *Geduldig* was constitutionally based, it was not affected by the statutory change.

### 2. The Act is rationally related to a legitimate state interest.

The State Defendants are entitled to summary judgment on the equal protection claim. The Act does not implicate any fundamental right subject to strict scrutiny review. As explained in Argument Sec. II, *supra*, the Act proscribes and regulates activities that are not constitutionally protected. *See supra* at 18–20. In addition, because the Act does not target a suspect or quasi-suspect class, neither strict nor intermediate scrutiny applies. Rational basis scrutiny therefore applies. Because the Act is rationally related to a legitimate state interest, Loertscher's equal protection claim fails.

To the extent Loertscher claims that the Act classifies on the basis of gender, she is wrong. By its plain language, the Act focuses on expectant mothers, not on women generally. Wis. Stat. § 48.133. This makes sense, given that the Act aims to protect an unborn child from exposure to controlled substances while in the womb. Expectant mothers are the only population capable of exposing their unborn child to these substances. Non-pregnant women are no more subject to the Act than men are. The Act is not a pretext designed to discriminate against women, but a remedy designed to protect unborn children. There is simply no element of gender discrimination lurking in this statute.

Under rational basis scrutiny, a law must be upheld if it is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440.

60

A party alleging an equal protection challenge involving this standard bears "the heavy burden" of demonstrating that the differences in treatment are so unrelated to legitimate objectives that the only conclusion a court can reach is that the Legislature's actions were irrational. *Faheem-El v. Klincar*, 841 F.2d 712, 727 (7th Cir. 1988). Loertscher cannot meet this heavy burden.

As explained in Argument Sec. II, *supra*, both legally and factually, the state has a compelling interest in protecting unborn children from abuse. *See supra* at 20–33. The Act meets the substantive due process balancing test applicable in child abuse cases, which is more stringent than equal protection rational basis review. *See supra* at 33–42. Therefore, the Act easily passes muster under rational basis scrutiny. Moreover, for these same reasons, the Act is constitutional even if intermediate scrutiny applies. The State Defendants are entitled to summary judgment on Loertscher's equal protection claim.

## V. Loertscher has abandoned her First Amendment claim.

In response to the State Defendants' discovery request concerning Loertscher's First Amendment claim, Loertscher asserted that "[v]iolation of the First Amendment is part and parcel of Ms. Loertscher's substantive due process claim . . . ." (SDPFOF ¶ 177.) Loertscher has abandoned her First Amendment claim, and, therefore, the State Defendants will not separately address that claim herein.

61

## VI.   The Act does not violate an expectant mother's Fourth Amendment rights.

### A.   Loertscher's framing of the Fourth Amendment issue.

Loertscher asserts in her amended complaint that "[b]y enforcement of the Act, including Wis. Stat. § 48.133 *et seq.*, Defendants violated Ms. Loertscher's right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments to the United States Constitution." (Dkt. 66:24, ¶ 99.) In Loetscher's response to the State Defendants' interrogatory asking her to articulate her Fourth Amendment claim against them, she alleged that "[e]nforcement of the Act violates the prohibition against unreasonable search and seizure whereby health care providers and state actors, including law enforcement personnel, may search for and seize a pregnant woman's private information for use in enforcement of the Act against her." (SDPFOF ¶ 176.) Thus, Loertscher has confined her Fourth Amendment claim against the State Defendants to the search and seizure of her personal information (principally medical records).

### B.   The "search and seizure" of Loertscher's medical records is properly analyzed under the "right to privacy" case law.

Case law from the United States Supreme Court and the lower federal courts has analyzed claims against the disclosure of private medical records

within the "right to privacy" rubric. *See Whalen v. Roe*, 429 U.S. 589 (1977); *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631 (7th Cir. 2013). The individual's "constitutionally protected 'zone of privacy'" is drawn from several sources, including the Fourth Amendment.[12] *Whalen*, 429 U.S. at 598 (citation omitted). It is that constitutional privacy analysis that is applicable here. Although *Whalen* recognized that "private medical records warrant *some* privacy protection," it was "'very vague' on the possibility of a constitutional right to the privacy of one's medical records." *Big Ridge*, 715 F.3d at 648 (emphasis added). The Seventh Circuit expressed doubt that such a constitutionally protected privacy right even exists. *See id.*

In *Whalen*, the Court considered a constitutional challenge to a New York statute requiring physicians to file every prescription for certain controlled substances with the Department of Health. A group of affected patients argued that the statute "invade[d] a constitutionally protected 'zone of privacy.'" *Whalen*, 429 U.S. at 598 (citation omitted). The patients' constitutional concern was that "the information will become publicly known and that it will adversely affect their reputations." *Id.* at 600. "Even without *public* disclosure," patients were concerned that "private information must be

---

[12] *See Griswold v. Connecticut*, 381 U.S. 479, 484–85 (1965).

disclosed to the authorized employees of the New York Department of Health." *Id.* at 602 (emphasis added).

The Court found no constitutional infirmity. With respect to the plaintiffs' fear of *public* disclosure, the Court explained that such disclosures could occur only if state officials failed to follow the statutory strictures. The statute "expressly prohibited" public disclosure of patient identities; indeed, such breaches carried criminal penalties. *Id.* at 594–95. "There is no support in the record, or in the experience of the two States that New York has emulated, for an assumption that the security provisions of the statute will be administered improperly." *Id.* at 601; *see also id.* at 605 (holding that in a variety of contexts, government's "right to collect and use [personal] data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures"). On the other hand, mandatory disclosures to the health department are not "meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care." *Id.* at 602. "Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy." *Id.*

The Seventh Circuit applied the *Whalen* analysis to a Fourth Amendment privacy challenge to a provision of the Mine Safety

Act. *See Big Ridge*, 715 F.3d at 648. The Mine Safety Act directed mine operators, who were already required to report all mine-related injuries and illnesses to the Federal Mine Safety and Health Administration (MSHA), to permit MSHA inspection of employee medical and personnel records. *Id.* at 633. The purpose of this requirement was to "enable MSHA to verify that the mines have not been under-reporting miners' injuries and illnesses." *Id.* at 633–34. The miners claimed that the Mine Safety Act violated their Fourth Amendment privacy rights. *Id.* at 648.

The court recognized "the gravity of [the miners'] concern," and, citing *Whalen*, acknowledged that "private medical records warrant *some* privacy protection under the Fourth Amendment." *Id.* (emphasis added). However, the court was skeptical that the Fourth Amendment necessarily protected medical records from disclosure. *Id.* (citing *Anderson v. Romero*, 72 F.3d 518 (7th Cir. 1995)). Moreover, the miners' medical and personnel records were in the possession of third parties (the mine operators), which necessarily limited the miners' privacy rights. *Id.* at 649.

> "[The Supreme] Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."

*Id.* (quoting *United States v. Miller*, 425 U.S. 435, 443 (1976)); *see also id.* (citing *Young v. Murphy*, 90 F.3d 1225, 1236 (7th Cir. 1996)).

65

Regardless, even if an individual's interest in medical records held by a third party is entitled to some degree of constitutional protection, "[t]his right is not absolute." *Id.* "Whether the government can require banks, medical providers, or employers to turn over private medical records of customers, patients, or employees that are in their possession is a difficult question of balancing." *Id.* The court adopted a test set forth in *United States v. Westinghouse Electric Corp.*, 638 F.2d 570 (3d Cir. 1980), which "provided excellent guidance."

> [The *Westinghouse* factors include] the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Big Ridge*, 715 F.3d at 650 (quoting *Westinghouse Elec. Corp.*, 638 F.2d at 578).

The MSHA's examination of the miners' medical records passed the *Westinghouse* test. Allowing access was necessary to verify that mine-owners were not underreporting miners' injuries and illnesses; this public interest outweighed the miners' privacy interest in their records; the records were not in the miners' custody; access was required by express statutory mandates; and the statute put robust "precautions in place to protect the information from unauthorized disclosure to unintended parties." *Id.* at 633–34, 650–52.

66

**C.    The Act does not violate any right to privacy Loertscher may have in her medical records.**

The Act is a carefully structured, detailed statute that allows for partial disclosure of a pregnant woman's private medical information to a limited number of people under narrowly circumscribed conditions. It comports with the constitutional analysis of *Whalen* and *Big Ridge*. It does not violate any privacy or Fourth Amendment right Loetscher may have in her medical records.

The statute provides that "[a]ny person . . . who has reason to suspect that an unborn child has been abused or who has reason to believe that an unborn child is at substantial risk of abuse *may* report" that suspicion to the "county department" (here, TCDHS). Wis. Stat. § 48.981(2)(d), (3)(a)1. Regarding suspected abuse of unborn children, the statute imposes no *mandatory* reporting duties. Thus, whereas the statute mandates reporting of suspected abuse or neglect of children already born by members of more than thirty professions (*e.g.*, physician and school teacher), there are no mandatory reporters of suspected abuse of unborn children. *See* Wis. Stat. § 48.981(2)(a)–(c).

In making a report of suspected abuse, the reporter shall "inform" the department "of the facts and circumstances contributing to a suspicion of child abuse or neglect or of unborn child abuse." Wis. Stat. § 48.981(3)(a)1. If the report is made by a medical professional or entity, those facts and

67

circumstances may include medical records. Pursuant to statute, reports of unborn child abuse may be disclosed to certain specified recipients. Wis. Stat. § 48.981(7)(a). Those specified recipients are all either medical or social service professionals who will provide services to the mother and/or the unborn child; certain family members; and courts, law enforcement, and prosecutors in the event of an investigation or prosecution. Wis. Stat. § 48.981(7)(a).

Except as provided in Wis. Stat. § 48.981(7)(a), reports of suspected abuse "and records maintained by an agency and other persons, officials and institutions shall be confidential." "A person to whom a report or record is disclosed under this section may not further disclose it, except to the persons and for the purposes specified in this section." Wis. Stat. § 48.981(7)(e). A person who violates the confidentiality section is subject to a $1000 fine and up to six months in prison. Wis. Stat. § 48.981(7)(f).

Meanwhile, under Wis. Stat. § 146.82(1), medical records are presumptively confidential. Despite the presumption of confidentiality, medical records "shall be released . . . without informed consent" in many statutorily enumerated circumstances. Wis. Stat. § 146.82(2)(a). Pertinent here, medical records shall be released:

> To an agency, as defined in s. 48.981(1)(ag), a sheriff or police department, or a district attorney for purposes of investigation of threatened or suspected child abuse or neglect or suspected unborn child abuse or for purposes of prosecution of alleged child abuse or

68

neglect, if the person conducting the investigation or prosecution
identifies the subject of the record by name. The health care provider
may release information by initiating contact with an agency, sheriff
or police department, or district attorney without receiving a request
for release of the information. A person to whom a report or record is
disclosed under this subdivision may not further disclose the report or
record, except to the persons, for the purposes, and under the
conditions specified in s. 48.981(7).

Wis. Stat. § 146.82(2)(a)11. By cross-referencing Wis. Stat. § 48.981(7), the

health care privacy statute specifically incorporates both the disclosure and

the confidentiality sections of the child abuse and neglect reporting statute.

The Act is analogous to the New York statute challenged in *Whalen*. As

in that case, Loertscher's private medical information is not subject to public

disclosure unless a person to whom disclosure is authorized fails to obey the

statute's rule of confidentiality. *See Whalen*, 429 U.S. at 594–95; *see also City

of Los Angeles, Cal. v. Patel*, 135 S. Ct. 2443, 2451 (2015). Like the New York

statute, Wis. Stat. § 49.981(7) expressly prohibits any further disclosure not

authorized by the statute and, like the New York statute, imposes criminal

penalties for any unauthorized disclosure. Wis. Stat. § 48.981(7)(e)–(f).

With respect to the disclosures to governmental entities, § 49.981 is

again analogous to the *Whalen* statute. There, the statute required physicians

to report all prescriptions of certain controlled substances to the Department

of Health. Here, the statutes permit medical professionals to report suspected

unborn child abuse, and require them to release medical records upon request

and without the mother's informed consent for purposes of investigation or

69

prosecution. Wis. Stat. §§ 49.981(3)(a)1., 146.82(2)(a)11. "Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy." *Whalen*, 429 U.S. at 602.

The Act also passes the *Westinghouse* test adopted by the Seventh Circuit in *Big Ridge*. The Wisconsin statutes permit nonconsensual disclosure of a pregnant woman's medical records, but only where necessary to protect her unborn child from prenatal drug exposure. The applicable statutes limit the entities to whom such disclosure may be made and expressly prohibit and punish with criminal penalties unauthorized redisclosure by those entities. *See* Wis. Stat. §§ 48.981(7)(e), (f), 146.82(2)(a)11. The need for access is very high; the Legislature has determined that the harm caused to an unborn child by a mother's habitual use of alcohol or controlled substances to a severe degree is a serious health problem. The limited disclosure of the mother's health records is part of the Legislature's solution to that problem. Thus, the nonconsensual disclosure of a pregnant woman's health records is pursuant to "an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Westinghouse Elec. Corp.*, 638 F.2d at 578, *quoted in Big Ridge*, 715 F.3d at 650.

Under *Big Ridge*, Loertscher's Fourth Amendment claim fails for a second reason. The issue here is whether "information revealed [by

Loertscher] to a third party [*i.e.*, the Mayo Clinic] and conveyed by [the Mayo Clinic] to Government authorities" is protected from that disclosure by the Fourth Amendment. *Big Ridge*, 715 F.3d at 649 (citation omitted). As the Seventh Circuit explained in *Big Ridge*, the Fourth Amendment does not prohibit the transfer of Loertscher's medical information from a third party hospital to a government agency. *Id.*

For all these reasons, Loertscher's Fourth Amendment privacy claim has no merit. This Court should grant summary judgment to the State Defendants on this claim.

## VII.  The Court lacks subject matter jurisdiction over Loertscher's as-applied challenges to the Act under the *Rooker-Feldman* doctrine.

In her amended complaint, Loertscher asserts that the Act is "unconstitutional on its face and as applied to the plaintiff." (Dkt. 66:1, ¶ 1.) The *Rooker-Feldman* doctrine is not a bar to Loertscher's facial challenge to the Act. *See Skinner v. Switzer*, 562 U.S. 521, 532–33 (2011) (concluding that subject matter jurisdiction existed because the plaintiff was not challenging the adverse decisions, but the constitutionality of the statute that was authoritatively construed). However, it is a bar to Loertscher's as-applied challenges. *Doe v. Fla. Bar*, 630 F.3d 1336, 1341–42 (11th Cir. 2011) (*Rooker–Feldman* bars as-applied constitutional challenges, but not facial

challenges); *Kastner v. Tex. Bd. of Law Exam'rs,* 408 Fed. App'x 777, 779 (5th Cir. 2010) (same); *Scheer v. Kelly*, 817 F.3d 1183, 1186–89 (9th Cir. 2016) (same).

### A.    The Rooker-Feldman doctrine.

The *Rooker-Feldman* doctrine is rooted in two U.S. Supreme Court decisions: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983). *See Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000). The doctrine precludes federal district courts from exercising jurisdiction over a complaint seeking federal review of a state court decision. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). This is because "no matter how erroneous or unconstitutional the state court judgment may be, the Supreme Court of the United States is the only federal court that could have jurisdiction to review a state court judgment." *Remer*, 205 F.3d at 996. A federal district court lacks jurisdiction "over challenges to state court decisions in particular cases *arising out of judicial proceedings*." *Feldman*, 460 U.S. at 486 (emphasis added).

*Rooker–Feldman* applies not only to claims already considered and decided by the state court, but also to claims not actually adjudicated but arising from the same causal nexus as adjudicated state court claims. *See Feldman*, 460 U.S. at 483. The Supreme Court has explained that if the

72

new federal claims are "*inextricably intertwined*" with the state court's ruling, the district court has no subject matter jurisdiction over the issue, even if the plaintiff failed to raise the federal claim in the state court. *Id.* In determining whether a new claim is inextricably intertwined with a state court's ruling, federal courts are, in essence, seeking to discern "whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment." *Centres, Inc. v. Town of Brookfield, Wis.*, 148 F.3d 699, 702 (7th Cir. 1998). The crucial point is whether the federal court is being asked to conduct what is essentially an appellate review of a binding state court decision. *Id.* at 703. Such review is barred by *Rooker–Feldman. Id.*

### B.   Application of the Rooker-Feldman doctrine to Loertscher's as-applied claims.

The scope of Loertscher's as-applied challenges against the State Defendants is not clearly discernible from her amended complaint and discovery responses (SDPFOF ¶¶ 175–79.) Regardless, Loertscher's allegations, at their core, challenge state court decisions. Specifically, Loertscher's amended complaint describes the August 5, 2014, temporary physical custody (TPC) hearing, the TPC court order, the August 25, 2014, contempt hearing, the contempt order, the September 22, 2014, hearing, the

consent decree, and the court order releasing her from jail. (Dkt. 66:8–10, ¶¶ 32–37, 49–56, 69.) Loertscher alleges that these court actions "taking [her] into custody," "secur[ing] her institutionalization," and "causing [her] imprisonment" violated her constitutional rights. (Dkt. 66:21, ¶¶ 85–86.)

This Court cannot address the allegedly unconstitutional handling of Loertscher's temporary custody, institutionalization, or imprisonment without revisiting the state court proceedings ordering those placements. Such a pseudo-appellate review is unequivocally barred by the *Rooker-Feldman* doctrine. *Cornell v. Burke*, 559 Fed. App'x 577, 579 (7th Cir. 2014) ("Because a contempt order qualifies as a state-court judgment, *Rooker–Feldman* divests the district court of jurisdiction to review it."); *Rosenbach v. Maffey*, No. 13-C-02158, 2013 WL 1707691, *5 (N.D. Ill. Apr. 19, 2013) (*Rooker-Feldman* bars challenge to probable cause determination to place child in foster care at birth given exposure to drugs in utero); *Borum v. Bonk*, No. 99-C-2069, 2000 WL 263958, *4 (N.D. Ill. Feb. 29, 2000) (mother's 42 U.S.C. § 1983 claims barred by *Rooker-Feldman* where state court ordered child placed into state custody).

Here, Loertscher had the full benefit of hearings in the Taylor County Circuit Court before she was ordered into temporary physical custody (Dkt. 1-2, 1-3), ordered to inpatient institutional care (Dkt. 1-2, 1-3), and placed in jail for being in contempt of court (Dkt. 1-8, 1-9.) As this Court has

already acknowledged, "Loertscher had the opportunity to challenge the constitutionality of Act 292 in state court" during these proceedings. (Dkt. 61:11.) Therefore, she is essentially seeking this Court's review of the state court's determination and judgment, which is squarely barred by the *Rooker-Feldman* doctrine. *See Barbara v. Sawyer Cty., Wis.*, No. 13-CV-83-WMC, 2013 WL 588504, *4 (W.D. Wis. Feb. 8, 2013) ("[B]ecause the harms alleged flow directly from a state court order awarding child custody . . . review of these allegations is constrained by the *Rooker-Feldman* doctrine.").

Loertscher may not avoid *Rooker-Feldman*'s bar by casting her as-applied challenges as a civil rights action; she must instead appeal the state court decision through the state court system and then, if desired, to the U.S. Supreme Court. *See Kelley v. Med-1 Sols., LLC*, 548 F.3d 600, 607 (7th Cir. 2008). As such, this Court should decline to re-litigate matters decided by the Taylor County Circuit Court and dismiss Loertscher's as-applied challenges pursuant to the *Rooker-Feldman* doctrine.

## VIII. Loertscher's challenge to the Act based on the administrative finding of unborn child maltreatment is moot because the policy on this issue was recently changed.

In her amended complaint, Loertscher alleges facts relating to TCDHS's administrative finding of unborn child maltreatment. (Dkt. 66:18–19, 21–22, ¶¶ 72–74, 87.) TCDHS withdrew this administrative

finding. (Dkt. 66:19, ¶ 74.) And the Department of Children and Families (DCF) has changed its policy on this issue to no longer include a maltreatment determination for unborn child abuse. (SDPFOF ¶¶ 121–23.) As such, any claim for injunctive relief based on the administrative finding of unborn child maltreatment is moot.

A claim may become moot based on a voluntary change of practice or policy. "A case might become moot if subsequent events made it absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968); *Ciarpaglini v. Norwood*, 817 F.3d 541, 545 (7th Cir. 2016). Repeal of a policy moots a claim challenging the policy unless the policy change does not actually correct the asserted problem. *Smith v. Exec. Dir. of Ind. War Mem'l Comm'n*, 742 F.3d 282, 287 (7th Cir. 2014).

DCF recently changed its IA Standards. (SDPFOF ¶¶ 121–23.) The 2007 IA Standards included an unborn child maltreatment determination, which was an administrative finding that unborn child abuse had occurred. (*Id.* ¶ 121.) The 2015 IA Standards no longer include a maltreatment determination for unborn child abuse. (*Id.* ¶¶ 121–23.) This change in policy corrects any asserted problem with such a determination. There is no reasonable expectation that the allegedly wrongful behavior would be repeated. Accordingly, any claim for injunctive relief against the State

Defendants based on the administrative finding of unborn child maltreatment is moot.

## CONCLUSION

This Court should grant State Defendants' summary judgment motion and dismiss this case.

Dated this 10th day of November, 2016.

BRAD D. SCHIMEL
Wisconsin Attorney General


/s/ Karla Z. Keckhaver
KARLA Z. KECKHAVER
Assistant Attorney General
State Bar #1028242

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

JENNIFER L. VANDERMEUSE
Assistant Attorney General
State Bar #1070979

Attorneys for Defendants
Brad D. Schimel and Eloise Anderson

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6365 (KZK)
(608) 266-3094 (JJS)
(608) 266-7741 (JLV)
(608) 267-2223 (Fax)
keckhaverkz@doj.state.wi.us
schmelzerjj@doj.state.wi.us
vandermeusejl@doj.state.wi.us