# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

TAMARA M. LOERTSCHER,

*Plaintiff,*

Case No. 14-cv-870

v.

ELOISE ANDERSON , BRAD SCHIMEL,
TAYLOR COUNTY,

*Defendants.*

## MOTION FOR LEAVE TO PARTICIPATE AS *AMICI CURIAE*; CORPORATE DISCLOSURE STATEMENT; AND BRIEF OF *AMICI CURIAE* AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN SOCIETY OF ADDICTION MEDICINE, AND AMERICAN PUBLIC HEALTH ASSOCIATION

*JOLENE M. FORMAN (admitted *pro hac vice* to
the Western District of Wisconsin on 10/20/2016)
JOY F. HAVILAND
DRUG POLICY ALLIANCE
1330 Broadway, Suite 1426
Oakland, California 94612
(510) 679-2300
jforman@drugpolicy.org
*Counsel for Amici Curiae*

*Counsel of Record

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

TAMARA M. LOERTSCHER,

<em>Plaintiff</em>,

v.                                          Case No. 14-cv-870

ELOISE ANDERSON, BRAD SCHIMEL,
TAYLOR COUNTY,

<em>Defendants</em>.

## MOTION FOR LEAVE TO PARTICIPATE AS *AMICI CURIAE* AND CORPORATE DISCLOSURE STATEMENT

The American College of Obstetricians and Gynecologists (ACOG), American Society of Addiction Medicine (ASAM), and American Public Health Association (APHA) by and through their undersigned counsel Drug Policy Alliance (DPA), respectfully move for leave to file the accompanying brief of *amici curiae* in support of Plaintiff's requested relief in this matter.

These *amici* are three national medical and public health organizations with recognized expertise and longstanding concern in the areas of maternal, fetal and neonatal health, and in understanding the effects of drugs and other substances on families and society.

The American College of Obstetricians and Gynecologists and its companion organization, the American Congress of Obstetricians and Gynecologists, are the leading professional associations of physicians who specialize in the healthcare of women. The American Society of Addiction Medicine is a national medical specialty society of professionals who specialize in the treatment of addiction. As the nation's leading public health organization,

1

the American Public Health Association is at the forefront of efforts to advance prevention, reduce health disparities and promote wellness including in the areas of maternal and fetal health, and access to quality health care and other health care delivery services.

A court's decision to accept an *amicus curiae* brief is considered "a matter of judicial grace" within the Seventh Circuit. *NOW, Inc. v. Scheidler*, 223 F.3d 615, 616 (7th Cir. 2000); *see also Voices for Choices v. Illinois Bell Tel. Co.*, 339 F.3d 542, 544 (7th Cir. 2003). The criterion for deciding whether to permit the filing of an amicus brief is "whether the brief will assist the judges by presenting ideas, arguments, theories, insights, facts, or data that are not to be found in the parties' briefs." *Voices for Choices v. Illinois Bell Tel. Co.*, 339 F.3d 542, 545 (7th Cir. 2003).

*Amici* ACOG, ASAM and APHA have expertise that can assist the Court beyond what the parties are able to do. The legal issues presented by this case cannot properly be decided in isolation from the scientific, medical, and public health contexts in which they are rooted. The legal questions presented in this case involve complex scientific, medical, and public health issues in which the *amici* have longstanding expertise.

*Amici* are recognized experts in fetal, neonatal, and maternal health, and in the effects of drugs and other substances on public health and families. *Amici* have both a public health and an ethical duty to bring evidence-based scientific, medical and public health information to the Court in its consideration of this case. *Amici* recognize a strong societal interest in protecting the health of women, children and families. In the view of *amici*, however, such interests are undermined, not advanced, by laws that permit the detention of a woman during the course of her pregnancy, arrest, state control over her private medical decisions, and the possible suspension or loss of parental rights after her child is born.

2

The accompanying brief will assist the Court in its disposition of this case by providing a scientific, medical, and public health background – including evidence-based, peer-reviewed research –that weighs overwhelmingly against the state control exercised against Ms. Loertscher under 1997 Wisconsin Act 292, codified under Wis. Stat. § 48.01 *et seq.* (West 1998). This brief further argues that Act 292 fails to advance the State of Wisconsin's asserted interest in protecting the welfare of the fetus.

For the foregoing reasons, ACOG, ASAM, and APHA respectfully request that this Court grant leave to allow them to appear as *amici curiae*.

DATED: November 10, 2016

Respectfully submitted,

   /s/ Jolene M. Forman

JOLENE M. FORMAN
JOY F. HAVILAND
DRUG POLICY ALLIANCE
1330 Broadway, Suite 1426
Oakland, California 94612
(510) 679-2300
*Counsel for Amici Curiae*

3

## CORPORATE DISCLOSURE STATEMENT

In accordance with Fed. R. App. P. 26.1, the Drug Policy Alliance, undersigned counsel for *amici curiae* American College of Obstetricians and Gynecologists, American Society of Addiction Medicine, and American Public Health Association, hereby certifies that:

1.     None of the *amici* is a subsidiary or affiliate of a publicly owned corporation; and

2.     None of the *amici* is a publicly held corporation and none has a financial interest in this case.

DATED: November 10, 2016

Respectfully submitted,

  /s/ Jolene M. Forman

JOLENE M. FORMAN
JOY F. HAVILAND
DRUG POLICY ALLIANCE
1330 Broadway, Suite 1426
Oakland, California 94612
(510) 679-2300
*Counsel for Amici Curiae*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

TAMARA M. LOERTSCHER,

               *Plaintiff*,

v.                                                                  Case No. 14-cv-870

ELOISE ANDERSON, BRAD SCHIMEL,
TAYLOR COUNTY,

               *Defendants*.

---

**BRIEF OF *AMICI CURIAE* AMERICAN COLLEGE OF OBSTETRICIANS
AND GYNECOLOGISTS, AMERICAN SOCIETY OF ADDICTION MEDICINE,
AND AMERICAN PUBLIC HEALTH ASSOCIATION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................................... ii

INTERESTS OF *AMICI CURIAE* ............................................................................................... 1

BACKGROUND ............................................................................................................................. 2

SUMMARY OF ARGUMENT ....................................................................................................... 5

ARGUMENT ................................................................................................................................... 6

  I.   ACT 292 IS CONTRARY TO SCIENTIFIC RESEARCH AND FAILS TO ADVANCE THE
      STATE'S ASSERTED INTEREST ............................................................................................ 7

    A.  Act 292 Prioritizes Fetal Health Above Maternal Health, Which Is Antithetical to the State's
       Purported Interest. ............................................................................................................... 8

    B.  Act 292 Misunderstands the Effects of Fetal Drug Exposure ............................................ 11

    C.  Act 292 Misunderstands the Relationship Between Drug Dependency and Medical Care ....... 15

  II.  THE DETENTION OF PREGNANT WOMEN FAILS TO DETER DRUG USE AND
      UNDERMINES ANY PURPORTED STATE INTEREST. ..................................................... 18

CONCLUSION ............................................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Collins v. Harker Heights*, 503 U.S. 115 (1992) ....................................................6

*Daniels v. Williams*, 474 U.S. 327 (1986) ............................................................6

*Jaffee v. Redmond*, 518 U.S. 1 (1997). .................................................................17

*Loving v. Virginia*, 388 U.S. 1 (1967) ...................................................................6

*McKnight v. State*, 661 S.E.2d 354, 358 n.2 (S.C. 2008).......................................14

*Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992)................6

*Reno v. Flores*, 507 U.S. 292 (1993). ....................................................................6

*Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535 (1942)..............................6

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ................................................6, 7

**Statutes**

42 U.S.C. § 1983 (West 1996)..................................................................................3

U.S.C. § 812 (West 1970)........................................................................................12

Wis. Stat. § 48.01 *et seq*. (West 1998)..............................................................2, 7, 8

**Other Authorities**

A. El-Mohandes et al., *Prenatal Care Reduces the Impact of Illicit Drug Use on Perinatal Outcomes*, 23 J. Perinatol 354 (2003). ...........................................11, 17

A. H. Schempf & D. M. Strobino, *Drug Use and Limited Prenatal Care: An Examination of Responsible Barriers*, 200 Am. J. Obstet. & Gynecol. 412.e1 (2009). ...........................................19

A. H. Schempf, *Illicit Drug Use and Neonatal Outcomes: A Critical Review*, 62 Obstetrics & Gynecology 749 (2007) ...........................................11, 13

A. Racine et al., *The Association Between Prenatal Care and Birth Weight Among Women Exposed to Cocaine in New York City*, 270 JAMA 1581 (1993) ...........................................16

A. Srinivasan & G. Blomquist, *Infant Mortality and Neonatal Rates: The Importance of Demographic Factors in Economic Analysis* (2002)...........................................16

Am. Coll. Obstetricians & Gynecologists, *Alcohol Abuse and Other Substance Use Disorders: Ethical Issues in Obstetric Gynecologic Practice*, ACOG COMMITTEE OPINION, No. 633, Jun. 2015 10, 17, 19

Am. Coll. Obstetricians & Gynecologists, *Marijuana Use During Pregnancy and Lactation*, ACOG COMMITTEE OPINION, No. 637, Jul. 2015 ................................................................................ 14

Am. Coll. Obstetricians & Gynecologists, *Methamphetamine Abuse in Women of Reproductive Age*, ACOG COMMITTEE OPINION, No. 479, Mar. 2011 ............................................................ 13

Am. Coll. Obstetricians & Gynecologists, *Nutrition During Pregnancy*, ACOG FAQ, No. 001, Apr. 2015 ................................................................................................................................... 9

Am. Coll. Obstetricians & Gynecologists, *Opioid Abuse, Dependence, and Addiction in Pregnancy*, ACOG COMMITTEE OPINION, No. 524, May 2012 ..................................................... 13

Am. Coll. Obstetricians & Gynecologists, *Oral Health Care During Pregnancy and Through the Lifespan*, ACOG COMMITTEE OPINION, No. 569, Aug. 2013 ............................................... 9

Am. Coll. Obstetricians & Gynecologists, *Refusal of Medically Recommended Treatment During Pregnancy*, ACOG COMMITTEE OPINION, No. 664, Jun. 2016....................................... 9, 16

Am. Coll. Obstetricians & Gynecologists, *Substance Abuse Reporting and Pregnancy: The Role of the Obstetrician–Gynecologist*, ACOG COMMITTEE OPINION, No. 473, Jan. 2011 (reaffirmed 2014). 7, 10

Am. Med. Ass'n, *Legal Intervention During Pregnancy*, 264 JAMA 2663 (1990)........................passim

Am. Psychiatric Ass'n, *Care of Pregnant and Newly Delivered Women Addicts: Position Statement*, APA Document Reference No. 200101 (2001). ................................................................... 18

AM. PSYCHIATRIC ASS'N., THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 1994) ................................................................................................................. 20

Am. Pub. Health. Ass'n, *Illicit Drug Use by Pregnant Women*, APHA Policy Statement, 1990 ....... 9, 10

Anja Huizink & Eduard Mulder, *Maternal Smoking, Drinking or Cannabis Use During Pregnancy and Neurobehavioral and Cognitive Functioning in Human Offspring*, 30 NEUROSCIENCE & BIOBEHAVIORAL REVS. 1 (2005)............................................................................................. 14

Brahm, Nancy C. et al., *Commonly Prescribed Medications and Potential False-positive Urine Drug Screens*, 67 Am. J. Health Syst. Pharm. 1344 (2010)......................................................... 12

Center on Addiction and Substance Abuse (CASA), SUBSTANCE ABUSE & THE AMERICAN WOMAN 64 (1996)................................................................................................................... 18

CESAR Weekly Fax from the Center for Substance Abuse Treatment, Vol. 14 Issue 33 (Aug 2005)... 13

Chris Derauf et al., *Neuroimaging of Children Following Prenatal Drug Exposure*, 20 SEMIN. CELL DEV. BIOL. (2009). ................................................................................................................ 15

Clara Crowder, *Settlement Filed in Tutwiler Prison Suit*, BIRMINGHAM NEWS, Jun. 29, 2004 .............. 20

Ctr. For The Evaluation Of Risks To Human Reproduction, Report of the NTP-DERHR Expert Panel on the Reproductive & Developmental Toxicity of Amphetamine and Methamphetamine 163 (2005). ................................................................................................................................. 11, 13

D. Moir et al., *A Comparison of Mainstream and Sidestream Marijuana and Tobacco Cigarette Smoke Produced Under Two Machine Smoking Conditions*, 21 CHEM RES TOXICOL 494 (2008) ................ 14

David C. Lewiset al., Meth Science Not Stigma: Open Letter to the Media, July 25, 2005 .................. 13

David M. Fergusson et al., *Maternal Use of Cannabis and Pregnancy Outcome*, 109 BJOG: INT'L J. OBSTETRICS & GYNECOLOGY 21 (2002) ............................................................................. 13

Deborah A. Frank et al., Growth, *Development, and Behavior in Early Childhood Following Prenatal Cocaine Exposure: A Systematic Review*, 285 JAMA 1613 (2001). ........................................... 11, 13

*Drugs Inside Prison Walls,* WASH. TIMES, Jan. 27, 2010 .................................................................... 21

G. D. Helmbrecht & S. Thiagarajah, *Management of Addiction Disorders in Pregnancy*, 2 J. ADDICTION MED. 1 (2008) ......................................................................................................... 11, 13

George Annas, *Protecting Liberty of Pregnant Patients*, 316 N. ENGL. J. MED. 1213 (1987). .............. 17

H. Hurt et al., *School Performance of Children with Gestational Cocaine Exposure*, 27 NEUROTOXICOLOGY & TERATOLOGY 203 (2005). ............................................................................ 13

H. Minkoff & M. F. Marshal, *Fetal Risks, Relative Risks, and Relatives' Risks*, 16 AM J. BIOETH 3 (2016). ................................................................................................................................ 9

Harold Pollack et al., *If Drug Treatment Works So Well, Why Are So Many Drug Users Incarcerated?, in* CONTROLLING CRIME: STRATEGIES AND TRADE-OFFS (Phil Cook et al. ed., 2011). ...................... 16

Jacquelyn Starer, *Game of Thrones: Protecting Pregnant Patients*, ASAM MAGAZINE, Dec. 12, 2014 .. 9

Jennifer E. Bruin, Hertzel C. Gerstein, & Alison C. Holloway, *Long-Term Consequences of Fetal and Neonatal Nicotine Exposure: A Critical Review*, 116 TOXICOL. SCI. 264 (2010) ............................. 12

*Julia Epstein,* The Pregnant Imagination, Fetal Rights, and Women's Bodies: A Historical Inquiry*, 139 YALE J.L. & HUMAN. 39, 159-61 (2013). ............................................................................. 8

Kukla, Rebecca & Wayne, Katherine, *Pregnancy, Birth, and Medicine*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta, ed.) ................................................................................. 9

iv

KYLE KAMPMAN ET AL., NATIONAL PRACTICE GUIDE FOR THE USE OF MEDICATIONS IN THE TREATMENT OF ADDICTION INVOLVING OPIOID USE, ASAM (2015) .................................................................. 10

Laxmaiah Manchikanti et al., *Protocol for Accuracy of Point of Care (POC) or In-Office Urine Drug Testing (Immunoassay) in Chronic Pain Patients: A Prospective Analysis of Immunoassay and Liquid Chromatography Tandem Mass Spectrometry*, 13 Pain Physician E1 (2010) ........................ 12

*Legal Interventions During Pregnancy, Court-Ordered Medical Treatments and Legal Penalties for Potentially Harmful Behavior by Pregnant Women*, 264 JAMA 2663 (1990). ................................. 17

Levy, Sharon et al., *Drug Testing of Adolescents in Ambulatory Medicine: Physician Practices and Knowledge*, 160 Archives Pediatric Adolescent Med. 146  (2006) .................................................... 12

Lisa H. Harris, *Rethinking Maternal-Fetal Conflict: Gender and Equality in Perinatal Ethics*, 96 OBSTETRICS & GYNECOLOGY 786 (2000). .............................................................................. 9

Lisa H. Lu et al., *Effects of Prenatal Methamphetamine Exposure on Verbal Memory Revealed with fMRI*, 30 J. DEV. BEHAV. PEDIATR. (2009) .................................................................................... 15

Lynne M. Smith et al., *Prenatal Methamphetamine Use and Neonatal Neurobehavioral Outcome*, 30 NEUROTOXICOLOGY AND TERATOLOGY (2008). ................................................................ 15

M. M. van Gelder et al., *Characteristics of Pregnant Illicit Drug Users And Associations Between Cannabis Use and Perinatal Outcome in A Population-Based Study*, *National Birth Defects Prevention Study,* 109 DRUG ALCOHOL DEPEND. 243 (2010) ................................................... 14

Manchikanti, Laxmaiah et al., *Protocol for Accuracy of Point of Care (POC) or In-Office Urine Drug Testing (Immunoassay) in Chronic Pain Patients: A Prospective Analysis of Immunoassay and Liquid Chromatography Tandem Mass Spectrometry*, 13 Pain Physician E1 (2010) ........................ 12

Marilyn L. Poland et al., *Punishing Pregnant Drug Users: Enhancing the Flight from Care*, 31 DRUG ALCOHOL DEPENDENCE 199 (1993) ............................................................................ 10, 16, 19

Martha A. Jessup, *Extrinsic Barriers to Substance Abuse Treatment Among Pregnant Drug Dependent Women*, 33 J. DRUG ISSUES 285 (2003) .......................................................................... 16

Megan Bastick & Laurel Townhead, *Women in Prison: A Commentary on the UN Standard Minimum Rules for the Treatment of Prisoners* (June 2008) ............................................................. 20

*Michele Goodwin,* Fetal Protection Laws: Moral Panic and the New Constitutional Battlefront*, 102 CAL. L. REV. 782 (2014)* .............................................................................................. 8

Mishka Terplan et al., *Methamphetamine Use Among Pregnant Women*, 113 OBSTETRICS & GYNECOLOGY 1290 (2009) ............................................................................................... 10

N.C. Goler et al., *Substance Abuse Treatment Linked with Prenatal Visits Improves Perinatal Outcomes: A New Standard*, 28 J. PERINATOLOGY 597 (2008) ........................................... 11

Nancy C. Brahm et al., *Commonly Prescribed Medications and Potential False-positive Urine Drug Screens*, 67 Am. J. Health Syst. Pharm. 1344 (2010)................................................................12

Nat'l Acad. of Sciences, *Drug Testing* in *Under the Influence?: Drugs and the American Work Force* (1994)................................................................................................................................12

Nat'l Acad. of Sciences, *Strengthening Forensic Science in the United States: A Path Forward* (2009) ................................................................................................................................................12

Nat'l Council on Crimes and Delinquency, The Spiral Risk: Health Care Provision To Incarcerated Women (2006) ................................................................................................................................20

Nat'l Perinatal Ass'n, *Substance Abuse Among Pregnant Women*, NPA POSITION PAPER, Sep. 2009 (Rev. 2012) ......................................................................................................................9, 19

Off. Inspector General, U.S. Dept. of Justice, Deterring Staff Sexual Abuse of Federal Inmates, Apr. 2005 ................................................................................................................................20

P. Moran et al., *Substance Misuse During Pregnancy: Its Effects and Treatment*, 20 FETAL AND MATERNAL MEDICINE REVIEW 1 (2009) ................................................................................10

Peter Fried & Andra M. Smith, *A Literature Review of the Consequences of Prenatal Marihuana Exposure: An Emerging Theme of a Deficiency in Aspects of Executive Function*, 23 NEUROTOXICOLOGY & TERATOLOGY 1 (2001) ................................................................13

R. Wickström, *Effects of Nicotine During Pregnancy: Human and Experimental Evidence*, 5 CURRENT NEUROPHARMACOLOGY 213 (2007)................................................................12

Rosemary H. Kelly et al., *The Detection & Treatment of Psychiatric Disorders and Substance Use Among Pregnant Women Cared For in Obstetrics*, 158 AM. J. PSYCH. 213 (2001). .........................17

S. C. Roberts & A. Nuru-Jeter, *Women's Perspectives on Screening for Alcohol and Drug Use in Prenatal Care*, 20 WOMENS HEALTH ISSUES 193 (2010). ................................................17

S. Henrietta et al., *Impact of Prenatal Cocaine Exposure on Child Behavior Problems Through School Age*, 119 PEDIATRICS e348 (2007)................................................................13

S. KANDALL, SUBSTANCE & SHADOW: WOMEN & ADDICTION IN THE UNITED STATES 278-79 (1996)..18

SAMHSA, U.S. Dep't Health Human Servs., *Curriculum for Addiction Professionals (CAP): Level 1* 11

Sharon Levy et al., *Drug Testing of Adolescents in Ambulatory Medicine: Physician Practices and Knowledge*, 160 Archives Pediatric Adolescent Med. 146 (2006)................................................12

Shelli B. Rossman et al., *The Multi-Site Adult Drug Court Evaluation: Study Overview and Design*, Urban Institute, Dec. 2011................................................................................................16

*Social Consequences of Substance Abuse Among Pregnant and Parenting Women*, 20 PEDIATRIC ANNALS 548 (1991). ................................................................................................................ 18

SOUTHERN REG'L PROJECT ON INFANT MORTALITY, A STEP TOWARD RECOVERY: IMPROVING ACCESS TO SUBSTANCE ABUSE TREATMENT FOR PREGNANT AND PARENTING WOMEN (1993) ........... 10, 16, 18

Substance Abuse & Mental Health Servs. Admin., *Methadone Treatment for Pregnant Woman*, Pub. No. SMA 06-4124 (2006). ............................................................................................................. 13

T.J. Matthews et al., *Infant Mortality Statistics from the 2003 Period Linked Birth/Infant Death Data Set*, 54 NAT'L. VITAL STATS. RPTS. 1 (2006) ................................................................................ 11

T.J. Matthews et al., *Infant Mortality Statistics from the 2010 Period Linked Birth/Infant Death Data Set*, 62 NAT'L. VITAL STATS. RPTS. 1 (2013) ............................................................................... 9, 11

United Nations, *Working Group on Arbitrary Detention: Preliminary Findings from its visit to the United States of America (11-24 October 2016)*, Office of the High Commissioner on Human Rights, Oct. 24, 2016 .................................................................................................................................... 20

W. Chavkin, *Drug Addiction and Pregnancy: Policy Crossroads*, 80 AM. J. PUBLIC HEALTH 483 (1990). ............................................................................................................................................ 19

## INTERESTS OF *AMICI CURIAE*

The legal issues presented by this appeal cannot properly be decided in isolation from the scientific, medical and public health contexts in which they are rooted. *Amici* include three national medical and public health organizations. These *amici* have recognized expertise and longstanding concern in the areas of maternal, fetal and neonatal health and in understanding the effects of drugs and other substances on families and society.

*Amicus curiae*, the American College of Obstetricians and Gynecologists ("ACOG" or the "College") is a non-profit educational and professional organization founded in 1951.  The College's objectives are to foster improvements in all aspects of healthcare of women; to establish and maintain the highest possible standards for education; to publish evidence-based practice guidelines; to promote high ethical standards; and to encourage contributions to medical and scientific literature. The College's companion organization, the American Congress of Obstetricians and Gynecologists (the "Congress"), is a professional organization dedicated to the advancement of women's health and the professional interests of its members. Sharing more than 57,000 members, including 873 in Wisconsin, the College and the Congress are the leading professional associations of physicians who specialize in the healthcare of women.

*Amicus curiae*, the American Society of Addiction Medicine (ASAM) is a national medical specialty society representing more than 4,300 physicians and allied health professionals who specialize in the treatment of addiction. ASAM's mission is to increase access to and improve the quality of addiction treatment; educate physicians (including medical and osteopathic students), other health care providers and the public; support research and prevention; promote the appropriate role of the physician in the care of patients with addiction; and establish addiction medicine as a specialty recognized by professional organizations,

governments, physicians, purchasers and consumers of health care services, and the general public.

*Amicus curiae*, the American Public Health Association (APHA) champions the health of all people and all communities and strengthens the profession of public health, shares the latest research and information, promotes best practices and advocates for public health issues and policies grounded in research. APHA is the only organization that combines a 140-plus year perspective, a broad-based member community and the ability to influence federal policy to improve the public's health. It has been the longstanding position of APHA that no punitive measures should be taken against pregnant women who are users of illicit drugs as this approach does not advance individual or public health.

Each of the *amici curiae* is committed to reducing potential drug-related harms at every reasonable opportunity. Thus, *amici* do not endorse the non-medical use of drugs – including alcohol or tobacco – during pregnancy. Nonetheless, it is entirely consistent with *amici's* public health and ethical mandates to bring to this Court's attention that the government interventions permitted under Act 292 are harmful to maternal and fetal health and cannot be reconciled with evidence-based, peer-reviewed, medical and scientific research.

## BACKGROUND

Plaintiff, Tamara Loertscher, brought a challenge to 1997 Wisconsin Act 292, which permits state and local authorities to initiate legal proceedings against a pregnant woman alleged to "habitually lack self-control" in the use of alcohol or controlled substances and treat a fetus of any gestational age as a child in need of protective services. Wis. Stat. § 48.01 *et seq*. (West 1998). Act 292 permits the Government to detain pregnant women, to control their private medical decisions. *Id*. Ms. Loertscher brings a facial constitutional challenge under 42 U.S.C. §

1983 (West 1996). She challenges Act 292 because it is void for vagueness and because it violates her substantive due process, procedural due process, equal protection, First Amendment, and Fourth Amendment rights. (Pl.'s Br. in Supp. of Mot. for Prelim. Inj. at 2-3; Am. Compl. at 66).

Plaintiff, Tamara Loertscher, is without a functioning thyroid as a result of radiation treatment she received as a teenager and cannot produce thyroid hormones without medication. (Pl's Br. at 8-9). Starting in February 2014, Ms. Loertscher was unemployed and was no longer able to pay for healthcare or her necessary hypothyroidism drugs. (Pl's Br. At 9). Without treatment for her thyroid condition, she began to experience severe depression and fatigue, and head and neck pain. (Pl's Br. at 9). During this time she began using methamphetamine two or three times per week to help her get out of bed in the morning. (Pl's Br. at 9). Over the course of a year she also used marijuana infrequently – less than 10 times – and she drank a half of a glass of wine once on her birthday. (Pl's Br. 9-10). Ms. Loertscher had no history of drug dependency and never used methamphetamine or any other illegal drug – except marijuana very occasionally – prior to February 2014. (Pl's Br. at 9). Toward the end of July 2014, Ms. Loertscher began to believe she might be pregnant and stopped all drug and alcohol use. (Pl's Br. at 10). She did not ingest any methamphetamine or marijuana and she did not drink any alcohol for the remainder of her pregnancy. (Pl's Br. at 10).

Ms. Loertscher went to the Eau Claire Mayo Clinic Hospital (Mayo Clinic) emergency room and sought medical care for her severe thyroid condition and depression, to confirm her pregnancy, and subsequently to receive prenatal care. (Pl's Br. at 10). Mayo Clinic personnel performed a drug screen of Ms. Loertscher's urine without her consent. (Pl's Br. at 11). The test results returned "unconfirmed positive" for methamphetamine and tetrahydrocannabinol, the

3

active ingredient in marijuana. (Pl's Br. at 11). Ms. Loertscher voluntarily explained to a Mayo Clinic psychiatrist that she had been using marijuana and methamphetamine occasionally to self-medicate for her depression and extreme lethargy. (Pl's Br. at 12). Without her knowledge, Mayo Clinic personnel disclosed Ms. Loertscher's private medical information to the Taylor County Department of Human Services and the county instituted juvenile court "unborn child abuse" proceedings against her. (Pl's Br. at 13).

During the legal proceedings, a Mayo Clinic obstetrician stated that "her greatest concern for Ms. Loertscher's pregnancy related to her hypothyroidism and her ability to get appropriate prenatal care." (Pl's Br. at 15). Yet, instead of receiving this care, the juvenile court entered a temporary physical custody order against Ms. Loertscher pursuant to Act 292. (Pl's Br. at 15). Ms. Loertscher was not appointed counsel; however, a guardian ad litem was appointed to represent her fetus for the duration of her pregnancy. (Pl's Br. at 13-14, 18-19). Ms. Loertscher was detained, mandated into unwanted and unnecessary drug treatment, and ultimately incarcerated for 19 days. (Pl's Br. at 14-15, 19). While in jail her thyroid medications were withheld for a period of time, she was denied transfer to two previously scheduled prenatal appointments, and was not provided with any drug treatment or education. (Pl's Br. at 19-20). She was eventually appointed counsel and released from jail after agreeing to the terms of a consent decree, authorizing state control over her private medical decisions. (Pl's Br. at 20-22).

On January 23, 2015, Ms. Loertscher gave birth to a healthy baby boy. (Am. Compl. at 19). However, she suffered an ongoing loss of liberty throughout her pregnancy and delivery that continued until March 22, 2015. (Am. Compl. at 20).

## SUMMARY OF ARGUMENT

Act 292 is unconstitutional on its face. The state control exercised over Tamara Loertscher violates the express intent of Act 292, is unsupported by scientific research, is contrary to the consensus judgment of medical practitioners and their professional organizations, and undermines individual and public health. Ms. Loertscher requests declaratory relief to the effect that Act 292 is unconstitutional on its face. This Court should grant Ms. Loertscher the relief requested in this matter.

*Amici* recognize a strong societal interest in protecting the health of women, children and families. In the view of *amici*, however, such interests are undermined, not advanced, by the application of Act 292 to pregnant women who seek to continue their pregnancies to term and have in the past or currently use some amount of alcohol or a controlled substance.

This brief of *amici curiae* argues that the state control exercised over Ms. Loertscher lacks any legal, medical or scientific foundation. Act 292 fails to advance the State of Wisconsin's asserted interest in protecting the welfare of the fetus. In addition, punishing women for continuing their pregnancies to term, having used alcohol or a controlled substance, has the perverse effect of encouraging women to terminate pregnancies or to shun or delay prenatal care in order to avoid significant loss of liberties, including incarceration, coerced treatment, and suspension or loss of parental rights.

Finally, the state control exercised over Ms. Loertscher is based on outdated and unfounded assumptions about the effects of prenatal exposure to controlled substances. Such assumptions are not supported by evidence-based research and reflect a basic misunderstanding of the nature of problematic drug use and the general deterrence theory of punishment. The medical and public health communities have long recognized that even when substance use becomes problematic and constitutes a disorder it is nevertheless a medical condition. For

5

pregnant women, substance use disorders can respond successfully to prenatal care in conjunction with voluntary treatment, and are best addressed as a matter of public health, not state control and punishment.

## ARGUMENT

The Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) (citing *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)(quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The fundamental liberties it protects includes, but are not limited to, the specific freedoms protected by the Bill of Rights, the right to be free from physical restraint, to parent, to decide whether to carry a pregnancy to term, to personal autonomy, and to refuse medical treatment. *See id.* at 719-20, 724-25; *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541 (1942); *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847 (1992). The Fifth and Fourteenth Amendments of the Constitution prohibit the government from infringing on a fundamental liberty "unless the infringement is narrowly tailored to serve a compelling state interest." *See Glucksberg*, 521 U.S. at 721; *see also Reno v. Flores*, 507 U.S. 292, 302 (1993).

While carrying out the provisions of Act 292, the Government violated several of Ms. Loertscher's fundamental liberties, including the right to be free from bodily restraint, to exercise her personal autonomy, to refuse medical treatment, to parent, and to choose whether to carry a pregnancy to term. *See Glucksberg*, 521 U.S. at 719-20, 724-25; *Loving*, 388 U.S. at 12; *Skinner,* 316 U.S. at 541 *Casey*, 505 U.S. at 847. The Act authorizes the government to subject pregnant women to involuntary placement in medical treatment facilities, incarceration, unwanted medical screenings and treatment, suspension or removal of their parental rights, and restrictions on their

travel. Because Act 292 expressly authorizes the government to infringe on several fundamental liberties, the law is subject to strict scrutiny review. *See Glucksberg*, 521 U.S. at 721; *Flores*, 507 U.S. at 302.

This Court must thus find Act 292 unconstitutional unless the Government can prove that it is narrowly tailored to serve a compelling interest. The Government has not and cannot meet this high burden. The plain language of Act 292 states, "the paramount goal of this chapter is to protect … unborn children." Wis. Stat. § 48.01(1)(a). The State's articulated interest in fetal health fails to justify the State's ignorance of widespread medical evidence to the contrary and the significant deprivation of fundamental constitutional rights of women.[1] The Government consistently undermined and ignored the health and wellbeing of Ms. Loertscher and her fetus. Even if this Court finds Act 292 does serve a compelling governmental interest, which *amici* do not concede, it is not narrowly tailored to serve, and is contrary to, the State's expressed interest in protecting fetal health. In fact, Act 292 harms fetal health by detaining pregnant women, removing them from their homes, incarcerating them, denying them prenatal care, medical care, and access to treatment, and corroding the doctor-patient relationship. Thus, Act 292 cannot survive strict scrutiny.

## I.    ACT 292 IS CONTRARY TO SCIENTIFIC RESEARCH AND FAILS TO ADVANCE THE STATE'S ASSERTED INTEREST.

The overall asserted purpose of Act 292 is to protect children and fetuses by permitting the State to detain and control the lives of pregnant women who use drugs. Wis. Stat. § 48.01(1)(a). The state control permitted under Act 292 is based on the scientifically and

---

[1] *See, e.g.*, Am. Coll. Obstetricians & Gynecologists, *Substance Abuse Reporting and Pregnancy: The Role of the Obstetrician–Gynecologist*, ACOG COMMITTEE OPINION, No. 473, Jan. 2011 at 1 (reaffirmed 2014) ("Drug enforcement policies that deter women from seeking prenatal care are contrary to the welfare of the mother and fetus.").

medically unsupported claim that prenatal exposure to drug use alone is harmful to the fetus and child. Wis. Stat. § 48.01 *et seq*. Yet punishing women for using drugs while pregnant, by means of forced treatment and detention, is contrary to current medical and public health evidence-based standards for protecting maternal and fetal health and is, in fact, harmful to maternal and fetal health. Thus, the Act is not narrowly tailored to advance the Government's interest in protecting the fetus.

**A.    Act 292 Prioritizes Fetal Health Above Maternal Health, Which Is Antithetical to the State's Purported Interest.**

Act 292's asserted goal of protecting the fetus, even at the expense of a pregnant woman's health, is not a compelling government interest. The Act erroneously prioritizes fetal health above maternal health and, in doing so, permits significant state intervention into the lives of pregnant women that is damaging to their health which, and ultimately to fetal and child health. No medical or public health organization supports the types of government interventions authorized under Act 292. Instead, all health-focused organizations that have studied the issue have found that such interventions are detrimental to fetal and maternal health. Government interventions, such as incarceration, civil commitment, and control over private medical decisions, dissuade pregnant women from accessing prenatal care. Yet, medical research has empirically shown that prenatal care effectively advances fetal and maternal health.

Fetal protection laws, such as Act 292, encourage clinicians to prioritize the supposed interests of fetuses above those of pregnant women, often in ways that violate women's fundamental rights.[2] Such policies that subordinate the interests of pregnant women in the name of the fetus misunderstand the relationship between fetal and maternal health. Indeed, the fields

---

[2] *See, e.g.*, Michele Goodwin, *Fetal Protection Laws: Moral Panic and the New Constitutional Battlefront*, 102 CAL. L. REV. 782, 802 (2014); Julia Epstein, *The Pregnant Imagination, Fetal Rights, and Women's Bodies: A Historical Inquiry*, 139 YALE J.L. & HUMAN. 39, 159-61 (2013).

of medicine and public health have declared that fetal health cannot be separated from maternal

health.[3] *Amicus* ACOG articulated this position in a committee opinion earlier this year:

> Intervention on behalf of the fetus must be undertaken through the pregnant
> woman's body. Thus, questions of how to care for the fetus cannot be viewed as a
> simple ratio of maternal and fetal risks but should account for the need to respect
> fundamental values, such as the pregnant woman's autonomy and control over her
> body.[4]

Sound medical practices dictate that clinicians focus on the shared needs of the pregnant woman

and fetus.[5] Rejecting a framework that treats pregnancy as a fetal-maternal conflict helps

clinicians improve health outcomes for pregnant women and their fetuses by focusing on their

mutual interests, such as access to prenatal care, folic acid, healthy food, shelter, dental care, and

drug treatment.[6]

---

[3] *See, e.g.*, Am. Coll. Obstetricians & Gynecologists, *Refusal of Medically Recommended Treatment During Pregnancy*, ACOG COMMITTEE OPINION, No. 664, Jun. 2016; Jacquelyn Starer, *Game of Thrones: Protecting Pregnant Patients*, ASAM MAGAZINE, Dec. 12, 2014, *available at* http://www.asam.org/magazine/read/article/2014/12/12/game-of-thrones-protecting-pregnant-patients; Am. Pub. Health. Ass'n, *Illicit Drug Use by Pregnant Women*, APHA Policy Statement, 1990, *available at* https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/03/10/56/illicit-drug-use-by-pregnant-women.

[4] Am. Coll. Obstetricians & Gynecologists, *Refusal of Medically Recommended Treatment During Pregnancy*, ACOG COMMITTEE OPINION, No. 664, Jun. 2016, citing H. Minkoff & M. F. Marshal, *Fetal Risks, Relative Risks, and Relatives' Risks*, 16 AM J. BIOETH 3 (2016); *see also* Kukla, Rebecca & Wayne, Katherine, *Pregnancy, Birth, and Medicine*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta, ed.) ("Medical care for pregnant women generally impacts fetuses, whether by design or as a side effect. Likewise, direct attempts to provide medical assistance to fetuses inevitably impact the women in whose bodies they reside.").

[5] *See, e.g.*, Lisa H. Harris, *Rethinking Maternal‑Fetal Conflict: Gender and Equality in Perinatal Ethics*, 96 OBSTETRICS & GYNECOLOGY 786 (2000) (clinically sound medical practices focus on the mutual interests of pregnant women and their fetuses); Jacquelyn Starer, *Game of Thrones: Protecting Pregnant Patients*, ASAM MAGAZINE, Dec. 12, 2014 ("If society really cares about these babies, it would realize that what a child needs most is a healthy mother.").

[6] *See* Lisa H. Harris, *Rethinking Maternal‑Fetal Conflict: Gender and Equality in Perinatal Ethics*, 96 OBSTETRICS & GYNECOLOGY 786 (2000); T.J. Matthews et al., *Infant Mortality Statistics from the 2010 Period Linked Birth/Infant Death Data Set*, 62 NAT'L. VITAL STATS. RPTS. 1, 2 (2013) (noting that poverty has a detrimental effect on fetal health); Am. Coll. Obstetricians & Gynecologists, *Oral Health Care During Pregnancy and Through the Lifespan*, ACOG COMMITTEE OPINION, No. 569, Aug. 2013 (noting the importance of dental hygiene for a healthy pregnancy); Am. Coll. Obstetricians & Gynecologists, *Nutrition During Pregnancy*, ACOG FAQ, No. 001, Apr. 2015 (noting the importance of healthy meals and folic acid in pregnancy); Nat'l Perinatal Ass'n, *Substance Abuse Among Pregnant Women*, NPA POSITION PAPER, Sep. 2009 (Rev. 2012) at 2 ("The most successful treatment models will include access to quality prenatal and primary medical care, child development services, crisis intervention, drug counseling, family planning, family support services, life skills training, mental health services, parent training, pharmacological services, relapse strategies, self-help groups, stress management, and vocational training.").

Access to prenatal care dramatically benefits maternal and fetal health. Yet, fear of state intervention often deters pregnant women who use drugs from pursuing prenatal care.[7] For women like Ms. Loertscher, who voluntarily seek health care and help with her pregnancy, the provisions of Act 292 actually interfere with their access to prenatal care. In Ms. Loertscher's case, she was unable to access the medications necessary to treat her serious thyroid condition and she was denied transfer to two prenatal appointments because she was incarcerated pursuant to Act 292. As the American Medical Association stated, "Pregnant women will be likely to avoid seeking prenatal or open medical care for fear that their physician's knowledge of substance abuse or other potentially harmful behavior could result in a jail sentence rather than proper medical treatment."[8]

Comprehensive, early, and high-quality prenatal care is one of the most effective weapons against infant mortality, even for women experiencing a drug dependency problem.[9] The mortality rate for infants with mothers who begin prenatal care after the first trimester, or not at all, is forty-five percent higher than the rate for infants with mothers who begin receiving

---

[7] *See* KYLE KAMPMAN ET AL., NATIONAL PRACTICE GUIDE FOR THE USE OF MEDICATIONS IN THE TREATMENT OF ADDICTION INVOLVING OPIOID USE, ASAM 42 (2015) ("Laws that penalize women for use and for obtaining treatment serve to prevent women from obtaining pre-natal care and worsen outcomes."); Marilyn L. Poland et al., *Punishing Pregnant Drug Users: Enhancing the Flight from Care*, 31 DRUG ALCOHOL DEPENDENCE 199 (1993); Mishka Terplan et al., *Methamphetamine Use Among Pregnant Women*, 113 OBSTETRICS & GYNECOLOGY 1290 (2009) ("Although the desire for behavioral change may be strong in pregnancy, substance-using women may be afraid to seek prenatal care out of fear of prosecution or child protection intervention. This is unfortunate, because prenatal care has shown improvement in birth outcomes, even given continued substance use."); Am. Coll. Obstetricians & Gynecologists, *Alcohol Abuse and Other Substance Use Disorders: Ethical Issues in Obstetric Gynecologic Practice*, ACOG COMMITTEE OPINION, No. 633, Jun. 2015.

[8] Am. Med. Ass'n, *Legal Intervention During Pregnancy*, 264 JAMA 2663, 2667 (1990); *see also* Am. Pub. Health. Ass'n, *Illicit Drug Use by Pregnant Women*, APHA Policy Statement, 1990 ("women who might want medical care for themselves and their babies may not feel free to seek treatment because of fear of . . . prosecution related to illicit drug use"); Am. Coll. Obstetricians & Gynecologists, *Substance Abuse Reporting and Pregnancy: The Role of the Obstetrician–Gynecologist*, ACOG COMMITTEE OPINION, No. 473, Jan. 2011 at 1 (reaffirmed 2014) ("Drug enforcement policies that deter women from seeking prenatal care are contrary to the welfare of the mother and fetus.").

[9] *See, e.g.*, SOUTHERN REG'L PROJECT ON INFANT MORTALITY, A STEP TOWARD RECOVERY: IMPROVING ACCESS TO SUBSTANCE ABUSE TREATMENT FOR PREGNANT AND PARENTING WOMEN 6 (1993); P. Moran et al., *Substance Misuse During Pregnancy: Its Effects and Treatment*, 20 FETAL AND MATERNAL MEDICINE REVIEW 1 (2009).

care during the first trimester.[10] Additional studies indicate that prenatal care greatly reduces the negative effects of substance dependency during pregnancy, including decreased risks of low birth weight and prematurity.[11] Furthermore, research suggests that women who obtain prenatal care – whether or not they have also obtained treatment for their substance use– reduce their use of controlled substances.[12]

###    B.    Act 292 Misunderstands the Effects of Fetal Drug Exposure.

Act 292 is premised on the false assumption that prenatal exposure to illicit drugs is more dangerous than removing pregnant women from their homes, families, and employment, and denying them access to their own doctors through civil commitment or incarceration. Evidence-based research, however, does not support this historically popular, but medically unsubstantiated, assumption.[13]

In this case, the State intervened in Ms. Loertscher's life because she tested positive for trace amounts of methamphetamine and tetrahydrocannabinol, the active ingredient in marijuana. (Pl's Br. at 11). Positive drug tests, at best, only demonstrate that a person took or was exposed

---

[10] *See* T.J. Matthews et al., *Infant Mortality Statistics from the 2003 Period Linked Birth/Infant Death Data Set*, 54 NAT'L. VITAL STATS. RPTS. 1, 6 (2006); T.J. Matthews et al., *Infant Mortality Statistics from the 2010 Period Linked Birth/Infant Death Data Set*, 62 NAT'L. VITAL STATS. RPTS. 1, 2 (2013) (infant mortality rates based on access to prenatal care were not reported with the 2010 data; however, the report did note that pregnant women with multiple risk factors – such as teenage, low-income, or unmarried women – are less likely to receive prenatal care).
[11] A. El-Mohandes et al., *Prenatal Care Reduces the Impact of Illicit Drug Use on Perinatal Outcomes*, 23 J. PERINATOL 354 (2003).
[12] *See* SAMHSA, U.S. Dep't Health Human Servs., *Curriculum for Addiction Professionals (CAP): Level 1, available at*
http://www.fasdcenter.samhsa.gov/educationTraining/courses/CapCurriculum/glossary.cfm ("Prenatal care is necessary for healthy pregnancies, particularly for women with alcohol or drug issues"); N.C. Goler et al., *Substance Abuse Treatment Linked with Prenatal Visits Improves Perinatal Outcomes: A New Standard*, 28 J. PERINATOLOGY 597 (2008) ("Women who admit to use might be more motivated to stay clean in pregnancy. However, they will only get better if they receive appropriate support that they can access without . . . stigmatization or fears of criminal investigation.").
[13] *See, e.g.*, Deborah A. Frank et al., *Growth, Development, and Behavior in Early Childhood Following Prenatal Cocaine Exposure: A Systematic Review*, 285 JAMA 1613 (2001); Ctr. For The Evaluation Of Risks To Human Reproduction, Report of the NTP-DERHR Expert Panel on the Reproductive & Developmental Toxicity of Amphetamine and Methamphetamine 163 (2005); G. D. Helmbrecht & S. Thiagarajah, *Management of Addiction Disorders in Pregnancy*, 2 J. ADDICTION MED. 1 (2008); A. H. Schempf, *Illicit Drug Use and Neonatal Outcomes: A Critical Review*, 62 OBSTETRICS & GYNECOLOGY 749 (2007).

to a substance.[14] They do not establish that a particular harm occurred to the fetus or the mother. Nor does the fact that a drug is a controlled substance establish this causal connection, either as a matter of law or science.  Certain drugs are criminally proscribed because of their potential for abuse and risk of dependence, not as a result of any proven unique risk to pregnant women, fetuses, or children. *See* 21 U.S.C. § 812(b) (West 1970)  (explaining that placement on the schedule of controlled substances requires certain findings, none of which include the risk to pregnant women, fetuses, or children). In contrast, medical and scientific evidence links nicotine use to fetal harm, yet nicotine is not classified as an illicit substance and Act 292 does not permit the supervision, control, or punishment of pregnant women for its use.[15]

---

[14] Drug testing, like many other forensic disciplines, is highly technical and imperfect. *See generally* Nat'l Acad. of Sciences, *Strengthening Forensic Science in the United States: A Path Forward* (2009) (finding serious deficiencies in the nation's forensic science system, great disparities among forensic science operations, lack of protocols and standards embraced by forensic practitioners, and lack of mandatory certification programs within forensic disciplines including toxicology and drug analysis). There are a host of problems with drug testing techniques and analyses, including the substantial risk of false positive test results, false negative test results, specimen contamination, and chain of custody, storage and re-testing issues. Laxmaiah Manchikanti et al., *Protocol for Accuracy of Point of Care (POC) or In-Office Urine Drug Testing (Immunoassay) in Chronic Pain Patients: A Prospective Analysis of Immunoassay and Liquid Chromatography Tandem Mass Spectrometry*, 13 Pain Physician E1 (2010) ("[U]rine drug testing is associated with multiple methodological flaws."); Sharon Levy et al., *Drug Testing of Adolescents in Ambulatory Medicine: Physician Practices and Knowledge*, 160 Archives Pediatric Adolescent Med. 146 (2006); Nat'l Acad. of Sciences, *Strengthening Forensic Science in the United States: A Path Forward* 116-117 (2009) (discussing intrinsic risk of error with respect to the laboratory analysis of drugs, including, *inter alia*, equipment error, operator error, environmental conditions, sample mix-ups and contamination, and transcription error); Nat'l Acad. of Sciences, *Drug Testing* in *Under the Influence?: Drugs and the American Work Force* 8 (1994) ("Urine collections systems are a critical component of the drug-testing process, but they are the most vulnerable to interference or tampering."). As the toxicological literature makes clear, "a number of routinely prescribed medications have been associated with triggering false-positive results." Nancy C. Brahm et al., *Commonly Prescribed Medications and Potential False-positive Urine Drug Screens*, 67 Am. J. Health Syst. Pharm. 1344 (2010).

[15] *See, e.g.*, Jennifer E. Bruin, Hertzel C. Gerstein, & Alison C. Holloway, *Long-Term Consequences of Fetal and Neonatal Nicotine Exposure: A Critical Review*, 116 TOXICOL. SCI. 264 (2010); R. Wickström, *Effects of Nicotine During Pregnancy: Human and Experimental Evidence*, 5 CURRENT NEUROPHARMACOLOGY 213 (2007).

In spite of pervasive myths proliferated by popular media, science has failed to prove that in utero exposure to controlled substances – such as cocaine,[16] methamphetamine,[17] heroin,[18] or marijuana[19] – causes unique harms to the fetus and child distinguishable from those caused by other factors. For example, researchers have found:

---

[16] One comprehensive study concluded: "[T]here is no convincing evidence that prenatal cocaine exposure is associated with any developmental toxicity difference in severity, scope, or kind from the sequelae of many other risk factors." Deborah A. Frank et al., *Growth, Development, and Behavior in Early Childhood Following Prenatal Cocaine Exposure: A Systematic Review*, 285 JAMA 1613, 1621 (2001). Subsequent studies confirmed these findings. *See, e.g.*, S. Henrietta et al., *Impact of Prenatal Cocaine Exposure on Child Behavior Problems Through School Age*, 119 PEDIATRICS e348 (2007); D.S. Messinger et al., *The Maternal Lifestyle Study: Cognitive, Motor, and Behavioral Outcomes of Cocaine-Exposed and Opiate-Exposed Infants Through Three Years of Age*, 113 PEDIATRICS 1677 (2004) (confirming that "infant prenatal exposure to cocaine and to opiates was not associated with mental, motor, or behavioral deficits"); H. Hurt et al., *School Performance of Children with Gestational Cocaine Exposure*, 27 NEUROTOXICOLOGY & TERATOLOGY 203 (2005) (finding that the school performance through the fourth grade of children who had been exposed to cocaine in utero did not differ from the unexposed control group.).

[17] A national expert panel that concluded: "the data regarding illicit methamphetamine are insufficient to draw conclusions concerning developmental toxicity in humans." Ctr. For The Evaluation Of Risks To Human Reproduction, Report of the NTP-DERHR Expert Panel on the Reproductive & Developmental Toxicity of Amphetamine and Methamphetamine 163, 174 (2005). *See also* CESAR Weekly Fax from the Center for Substance Abuse Treatment, Vol. 14 Issue 33 (Aug 2005), citing David C. Lewis et al., Meth Science Not Stigma: Open Letter to the Media, July 25, 2005 (More than 90 leading medical doctors, scientists, psychological researchers, and treatment specialists requesting that "policies addressing prenatal exposure to methamphetamines and media coverage of this issue be based on science, not presumption or prejudice" and warning that terms such as "meth babies" lack medical and scientific validity and should not be used.); Am. Coll. Obstetricians & Gynecologists, *Methamphetamine Abuse in Women of Reproductive Age*, ACOG COMMITTEE OPINION, No. 479, Mar. 2011 at 2 ("women who use methamphetamine frequently use tobacco, alcohol, and other drugs, which may confound the birth outcomes.").

[18] Decades of research makes clear that exposure to opioids, such as heroin, is not associated with birth defects. G. D. Helmbrecht & S. Thiagarajah, *Management of Addiction Disorders in Pregnancy*, 2 J. ADDICTION MED. 1, 9 (2008). Some newborns who are exposed to heroin and other opioids in utero experience a transitory and treatable set of symptoms at birth known as neonatal abstinence syndrome that can be, safely and effectively treated in the nursery setting. Substance Abuse & Mental Health Servs. Admin., *Methadone Treatment for Pregnant Woman*, Pub. No. SMA 06-4124 (2006); Am. Coll. Obstetricians & Gynecologists, *Opioid Abuse, Dependence, and Addiction in Pregnancy*, ACOG COMMITTEE OPINION, No. 524, May 2012 at 3 (finding that opioid use during pregnancy and related lifestyle harms are mitigated by opioid-assisted therapy offered in collaboration with pediatric care).

[19] Marijuana use by pregnant women has not been shown to cause specific harm to the fetus or child. Science has failed to establish that in utero exposure to marijuana causes unique harms distinguishable from those caused by other uncontrollable factors. *See, e.g.*, A. H. Schempf, *Illicit Drug Use and Neonatal Outcomes: A Critical Review*, 62 OBSTETRICS & GYNECOLOGY 749, 750 (2007) (finding "[s]tudies that have examined the impact of prenatal marijuana use on birth outcomes have generally reported small and inconsistent effects... In addition to null or negative effects, several studies have reported unexpected, positive effects of marijuana on gestational age-adjusted birth weight."); Peter Fried & Andra M. Smith, *A Literature Review of the Consequences of Prenatal Marihuana Exposure: An Emerging Theme of a Deficiency in Aspects of Executive Function*, 23 NEUROTOXICOLOGY & TERATOLOGY 1, 8 (2001) (In a 2001 review of the scientific literature about the effect of prenatal exposure to marijuana, the authors concluded that, to the extent some studies have found effects, "[t]he consequences of prenatal exposure to marihuana are subtle."); David M. Fergusson et al., *Maternal Use of Cannabis and Pregnancy Outcome*, 109 BJOG: INT'L J. OBSTETRICS & GYNECOLOGY 21, 21-22 (2002); Anja Huizink & Eduard Mulder, *Maternal Smoking, Drinking or Cannabis Use During Pregnancy and Neurobehavioral and Cognitive Functioning in Human*

13

> Adverse socioeconomic conditions, such as poverty and malnutrition, may contribute to outcomes otherwise attributed to marijuana . . . one population-based study reported that pregnant marijuana users were more often underweight and had lower levels of education, had a lower household income, and were less likely to use folic acid supplementation than nonusers.[20]

Thus, drug use by pregnant women is often indistinguishable from other factors – such as poverty, lack of access to medical care, malnutrition, or chronic stress – that may cause fetal and maternal harm.

Courts that have evaluated this scientific research have also rejected the assumption that prenatal drug exposure causes specific harms to the fetus. For example, the Supreme Court of South Carolina unanimously overturned the conviction of a woman who allegedly caused a stillbirth as a result of her cocaine use, noting specifically that the research the prosecutor relied on was "outdated" and that trial counsel failed to call experts who would have testified about "recent studies showing that cocaine is no more harmful to a fetus than nicotine use, poor nutrition, lack of prenatal care, or other conditions commonly associated with the urban poor." *McKnight v. State*, 661 S.E.2d 354, 358 n.2 (S.C. 2008).

This is not to say that prenatal drug exposure is benign. While current studies are unable to causally link to specific harms caused by drug exposure during pregnancy, neither do they conclude that such exposure is completely harmless.[21] *Amici* agree that more research is

---

*Offspring*, 30 NEUROSCIENCE & BIOBEHAVIORAL REVS. 1, 35-36 (2005). *See also* Am. Coll. Obstetricians & Gynecologists, *Marijuana Use During Pregnancy and Lactation*, ACOG COMMITTEE OPINION, No. 637, Jul. 2015, citing D. Moir et al., *A Comparison of Mainstream and Sidestream Marijuana and Tobacco Cigarette Smoke Produced Under Two Machine Smoking Conditions*, 21 CHEM RES TOXICOL 494 (2008) (noting that the effects of marijuana on fetal health are uncertain "in part because those who use it often use other drugs as well . . . and in part because of other potential confounding exposures.").

[20] M. M. van Gelder et al., *Characteristics of Pregnant Illicit Drug Users And Associations Between Cannabis Use and Perinatal Outcome in A Population-Based Study*, *National Birth Defects Prevention Study,* 109 DRUG ALCOHOL DEPEND. 243 (2010).

[21] *See, e.g.*, Am. Coll. Obstetricians & Gynecologists, *Marijuana Use During Pregnancy and Lactation*, ACOG COMMITTEE OPINION, No. 637, Jul. 2015. The largest (and only longitudinal) research study of women who used methamphetamine while pregnant and their infants – the Infant Development, Environment and Lifestyle (IDEAL) – reported "only subtle neurobehavioral findings in exposed newborns." Lynne M. Smith et al., *Prenatal Methamphetamine Use and Neonatal Neurobehavioral Outcome*, 30 NEUROTOXICOLOGY AND TERATOLOGY 20

warranted. Existing research on drug use during pregnancy, however, both as a matter of science and law, does not support the Government's intervention into Ms. Loertscher's life or other women in a similar situation. Moreover, Act 292 deters women from accessing prenatal care all together and from being honest with their health care providers in order to avoid punishment, which undermines fetal and maternal health. As with other medical conditions – such as for diabetes or asthma – that require management of a pregnant woman's use of prescribed medications for underlying medical conditions, the potential for fetal harm is actually greater when a pregnant woman's drug use is not treated by her health care provider in conjunction with prenatal care.

### C.   Act 292 Misunderstands the Relationship Between Drug Dependency and Medical Care.

While Act 292 does not distinguish between drug use – including the use of drugs during or prior to pregnancy – and diagnosed drug dependency, the Act fails to advance drug treatment and medical care, even for drug dependent pregnant women. The medical profession has long recognized that drug dependence is an illness that cannot often be overcome without treatment.[22] As described in the DSM-IV, one of the hallmarks of drug dependency is the inability to reduce or control substance use despite adverse consequences.[23] Because of the compulsive nature of drug dependency, criminal sanctions are unlikely to achieve the goal of deterring drug use among pregnant women. Instead, such sanctions are likely to drive drug dependent women

---

(2008). *See also* Lisa H. Lu et al., *Effects of Prenatal Methamphetamine Exposure on Verbal Memory Revealed with fMRI*, 30 J. DEV. BEHAV. PEDIATR. 185 (2009); Chris Derauf et al., *Neuroimaging of Children Following Prenatal Drug Exposure*, 20 SEMIN. CELL DEV. BIOL. 441 (2009).

[22] *See, e.g.*, "Psychoactive Substance Dependence" is listed as a mental illness with specific diagnostic criteria in the AM. PSYCHIATRIC ASS'N., THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 1994), used by mental health professionals to diagnose mental illness.

[23] Am. Med. Ass'n, *Legal Intervention During Pregnancy*, 264 JAMA 2667 (1990).

further into the shadows and away from critical health care opportunities for drug treatment, and for prenatal care and medical care more generally.

Incarceration and forced treatment further dissuades pregnant women from accessing drug treatment and prenatal care. Mandated or coerced treatment has been demonstrated to be more harmful than helpful. Evidence shows that mandated treatment is costly[24] and is no more effective than voluntary treatment.[25]

Indeed, empirical research finds that pregnant women who are threatened with criminal sanctions or mandated treatment are likely to be deterred from seeking care that is critical to the health of both the woman and fetus.[26] Studies have found that drug using pregnant women "fear and worry about loss of infant custody, arrest…and incarceration for use of drugs."[27]

Every leading medical and public health organization to address this issue has unequivocally condemned punitive legal interventions as dangerous to both maternal and fetal health.[28] As one leading public health expert observed:

---

[24] *See* Shelli B. Rossman et al., *The Multi-Site Adult Drug Court Evaluation: Study Overview and Design*, Urban Institute, Dec. 2011.

[25] *See* Harold Pollack et al., *If Drug Treatment Works So Well, Why Are So Many Drug Users Incarcerated?, in* CONTROLLING CRIME: STRATEGIES AND TRADE-OFFS (Phil Cook et al. ed., 2011).

[26] *See, e.g.*, SOUTHERN REG'L PROJECT ON INFANT MORTALITY, A STEP TOWARD RECOVERY: IMPROVING ACCESS TO SUBSTANCE ABUSE TREATMENT FOR PREGNANT AND PARENTING WOMEN 6 (1993). *See also* A. Srinivasan & G. Blomquist, *Infant Mortality and Neonatal Rates: The Importance of Demographic Factors in Economic Analysis* (2002), *available at*,
http://gatton.uky.edu/GradStudents/srinivasan/InfantHealth.pdf (examining infant mortality in Kentucky); A. Racine et al., *The Association Between Prenatal Care and Birth Weight Among Women Exposed to Cocaine in New York City*, 270 JAMA 1581, 1585-86 (1993) (finding that pregnant women who use cocaine but who have at least four prenatal care visits significantly reduce their chances of delivering low birth weight babies).

[27] *See* Martha A. Jessup, *Extrinsic Barriers to Substance Abuse Treatment Among Pregnant Drug Dependent Women*, 33 J. DRUG ISSUES 285 (2003); Marilyn L. Poland et al., *Punishing Pregnant Drug Users: Enhancing the Flight from Care*, 31 DRUG ALCOHOL DEPENDENCE 199 (1993).

[28] *See, e.g.*, Am. Med. Ass'n, *Legal Intervention During Pregnancy*, 264 JAMA 2663, 2670 (1990)(reporting AMA resolution that "civil liability for harmful behavior by the pregnant woman toward her fetus are inappropriate."); Am. Psychiatric Ass'n, *Care of Pregnant and Newly Delivered Women Addicts: Position Statement*, APA Document Reference No. 200101 (2001); Am. Coll. Obstetricians & Gynecologists, *Refusal of Medically Recommended Treatment During Pregnancy*, ACOG COMMITTEE OPINION, No. 664, Jun. 2016 (ACOG "opposes the use of coerced medical interventions for pregnant women, including the use of the courts to mandate medical interventions for unwilling patients. Principles of medical ethics support obstetrician–gynecologists' refusal to participate in court-ordered interventions that violate their professional norms or their consciences.").

> [M]arriage of the state and medicine is likely to harm more fetuses than it helps, since many women will quite reasonably avoid physicians altogether during pregnancy if failure to follow medical advice can result in … involuntary confinement … By protecting … the integrity of a voluntary doctor-patient relationship we not only promote autonomy; we also promote the well-being of the vast majority of fetuses.[29]

Even for those women who are not completely deterred from seeking care, fear of civil commitment, coerced treatment, or incarceration is likely to discourage them from being truthful about drug use, thereby corroding the formation of trust that is fundamental to any health care provider-patient relationship. As the U.S. Supreme Court recognized, a "confidential relationship" is a necessary precondition for "successful [professional] treatment." *Jaffee v. Redmond*, 518 U.S. 1, 12 (1997).

Open communication between drug-using pregnant women and their doctors is especially critical.[30] Women are particularly likely to disengage from medical care when medical providers and social workers are directed to report a pregnant woman's drug use to a child welfare agency or mandate attendance in a drug treatment program, as required by Act 292.[31] In one study, pregnant drug users did not trust health care providers to protect them from the social and legal consequences of identification and avoided or emotionally disengaged from prenatal care, which is essential to fetal and maternal health.[32]

---

[29] George Annas, *Protecting Liberty of Pregnant Patients*, 316 N. ENGL. J. MED. 1213, 1214 (1987).

[30] *See* Rosemary H. Kelly et al., *The Detection & Treatment of Psychiatric Disorders and Substance Use Among Pregnant Women Cared For in Obstetrics*, 158 AM. J. PSYCH. 213 (2001).

[31] *See, e.g.*, Am. Coll. Obstetricians & Gynecologists, *Alcohol Abuse and Other Substance Use Disorders: Ethical Issues in Obstetric Gynecologic Practice*, ACOG COMMITTEE OPINION, No. 633, Jun. 2015 at 3("A significant ethical dilemma is created by state laws that require physicians to report the nonmedical use of controlled substances . . . by a pregnant woman  . . . Such laws may unwittingly result in pregnant women concealing substance use from their obstetricians or even forgoing prenatal care entirely"."); *Legal Interventions During Pregnancy, Court-Ordered Medical Treatments and Legal Penalties for Potentially Harmful Behavior by Pregnant Women*, 264 JAMA 2663 (1990).

[32] S. C. Roberts & A. Nuru-Jeter, *Women's Perspectives on Screening for Alcohol and Drug Use in Prenatal Care*, 20 WOMENS HEALTH ISSUES 193 (2010); *see also* A. El-Mohandes et al., *Prenatal Care Reduces the Impact of Illicit Drug Use on Perinatal Outcomes*, 23 J. PERINATOL 354 (2003).

Even absent the threat of punishment, pregnant women infrequently report drug use to their doctors. Feelings of shame, fear and low self-esteem are significant barriers to establishing the trust prerequisite to patients' full disclosure of this medically-vital information.[33] Additionally, the exceptionally high rates of depression among drug-dependent women mean that their prospects of successfully completing treatment depend on their forming a strong "therapeutic alliance" with care providers.[34]

Even though Ms. Loertscher has never been diagnosed as drug dependent and voluntarily stopped using all drugs and alcohol once her pregnancy was confirmed, the Government responded harshly to her voluntary admissions of prior drug use. She was detained, mandated to participate in unnecessary drug treatment, and ultimately incarcerated. Such harsh treatment alienated and isolated Ms. Loertscher, and her fetus, from medical providers. Thus, Act 292 actually harms, rather than advances, fetal health.

## II. THE DETENTION OF PREGNANT WOMEN FAILS TO DETER DRUG USE AND UNDERMINES ANY PURPORTED STATE INTEREST.

Punitive laws have not deterred pregnant women from using drugs. Instead, medical and public health organizations have found that under such laws, like Act 292, pregnant women are more likely to continue using drugs and less likely to seek treatment or prenatal care.[35] For example the American Psychiatric Association asserted that punitive policies toward pregnant women "are likely to deter pregnant addicts from seeking . . . addiction treatment."[36] The

---

[33] *See* S. KANDALL, SUBSTANCE & SHADOW: WOMEN & ADDICTION IN THE UNITED STATES 278-79 (1996).

[34] *See* Center on Addiction and Substance Abuse (CASA), SUBSTANCE ABUSE & THE AMERICAN WOMAN 64 (1996); *Social Consequences of Substance Abuse Among Pregnant and Parenting Women*, 20 PEDIATRIC ANNALS 548 (1991).

[35] *See, e.g.*, SOUTHERN REG'L PROJECT ON INFANT MORTALITY, A STEP TOWARD RECOVERY: IMPROVING ACCESS TO SUBSTANCE ABUSE TREATMENT FOR PREGNANT AND PARENTING WOMEN (1993); Am. Med. Ass'n, *Legal Intervention During Pregnancy*, 264 JAMA 2663, 2670 (1990);  Am. Psychiatric Ass'n, *Care of Pregnant and Newly Delivered Women Addicts: Position Statement*, APA Document Reference No. 200101 (2001).

[36] Am. Psychiatric Ass'n, *Care of Pregnant and Newly Delivered Women Addicts: Position Statement*, APA Document Reference No. 200101 (2001).

National Perinatal Association similarly declared, "Incarceration or the threat of incarceration is not effective in reducing drug or alcohol abuse in pregnant women."[37]

Contrary to scientific, medical, and public health research, Act 292 authorizes the state to civilly commit and incarcerate, for failure to comply with coerced treatment, pregnant women who use drugs. Scientific evidence indicates that such punitive interventions fail to deter drug use and dependency, even among pregnant women, and place women and fetuses at risk through incarceration and disruption to family, community, employment, and medical care. Because Act 292 fails to reduce pregnant women's drug use and dependency, and in turn places pregnant women and their fetuses at greater risk, it is ineffective at achieving the Government's asserted interest in protecting fetal health.

Moreover, civil detentions, incarceration, and the threat of incarceration actually creates additional health risks for pregnant women and their fetuses, is counterproductive to the goals of promoting maternal and fetal health, and has proven to be ineffective in reducing the incidence of alcohol or drug use by pregnant women.[38] Seeking prenatal care should not expose a woman to harsh penalties, such as incarceration, involuntary commitment, loss or suspension of her parental rights, or loss of housing and employment.[39] These approaches treat drug use as a moral failing. In contrast, drug dependence is a chronic, relapsing biological and behavioral disorder

---

[37] Nat'l Perinatal Ass'n, *Substance Abuse Among Pregnant Women*, NPA POSITION PAPER, Sep. 2009 (Rev. 2012) at 2.

[38] *See, e.g.*, Marilyn L. Poland et al., *Punishing Pregnant Drug Users: Enhancing the Flight from Care*, 31 DRUG ALCOHOL DEPENDENCE 199 (1993); W. Chavkin, *Drug Addiction and Pregnancy: Policy Crossroads*, 80 Am. J. Public Health 483 (1990); A. H. Schempf & D. M. Strobino, *Drug Use and Limited Prenatal Care: An Examination of Responsible Barriers*, 200 AM. J. OBSTET. & GYNECOL. 412.e1 (2009).

[39] *See, e.g.*, Am. Coll. Obstetricians & Gynecologists, *Alcohol Abuse and Other Substance Use Disorders: Ethical Issues in Obstetric Gynecologic Practice*, ACOG COMMITTEE OPINION, No. 633, Jun. 2015.

with genetic components.[40] It is subject to medical and behavioral management in the same fashion as hypertension and diabetes.

Last month, the United Nations Working Group on Arbitrary Detention released the following findings on the civil confinement of pregnant women who use drugs in the United States:

> The civil proceedings to commit pregnant women are often confidential, lack meaningful standards, provide few procedural protections, and may take place without legal representation of the mother. This form of deprivation of liberty . . . should be replaced with alternative measures that protect women without jeopardizing their liberty. Affirmative steps should be taken by authorities . . . to maximize the availability of healthcare – including prenatal care, treatment for addiction, and outpatient services . . . [C]onfinement or involuntary treatment should be used only as a last resort when a person poses an immediate threat to themselves or other persons, only for the shortest period of time, and with appropriate due process guarantees.[41]

When civilly detained or incarcerated, pregnant women generally receive inadequate prenatal care[42] and are exposed to other health risks such as infectious disease,[43] poor sanitary conditions, poor nutrition,[44] sexual abuse,[45] high stress levels[46] and poor mental health care.[47] Furthermore,

---

[40] *See, e.g.*, "Psychoactive Substance Dependence" is listed as a mental illness with specific diagnostic criteria in the AM. PSYCHIATRIC ASS'N., THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 1994), used by mental health professionals to diagnose mental illness.

[41] United Nations, *Working Group on Arbitrary Detention: Preliminary Findings from its visit to the United States of America (11-24 October 2016)*, Office of the High Commissioner on Human Rights, Oct. 24, 2016, *available at* http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=20746&LangID=E.

[42] *See* Nat'l Council on Crimes and Delinquency, The Spiral Risk: Health Care Provision to Incarcerated Women 12 (2006), *available at* http://www.nccdcrc.org/nccd/pubs/2006_spiral_of_risk.pdf.

[43] *See* Am. Med. Ass'n, *Legal Interventions During Pregnancy*, 264 JAMA 2663, 267 (1990).

[44] *See* Nat'l Council on Crimes and Delinquency, The Spiral Risk: Health Care Provision To Incarcerated Women 16 (2006), *available at* http://www.nccdcrc.org/nccd/pubs/2006spiralofrisk.pdf.

[45] *See* Off. Inspector General, U.S. Dept. of Justice, Deterring Staff Sexual Abuse of Federal Inmates, Apr. 2005, http://www.usdog.gov/oig/special/0504/final.pdf (Kathleen Sawyer, a former Bureau of Prisons Director, stated that inmate sexual abuse was the "biggest problem" she faced as Director.)

[46] *See* Megan Bastick & Laurel Townhead, *Women in Prison: A Commentary on the UN Standard Minimum Rules for the Treatment of Prisoners* 42 (June 2008) ("The high level of stress that accompanies incarceration itself has the potential to adversely affect pregnancy.").

[47] *See, e.g.*, Clara Crowder, *Settlement Filed in Tutwiler Prison Suit*, BIRMINGHAM NEWS, Jun. 29, 2004, *available at* http://www.schr.org/node/99.

incarceration does not guarantee that pregnant women abstain from the use of controlled substances since illegal drugs are available in jails and prisons.[48]

The consequences of such commitment are particularly acute here. Ms. Loertscher experienced several such problems when she was incarcerated for failing to comply with treatment mandated by the Government. (Pl. Br. at 14-15). While she was held in jail, the Government withheld her hypothyroid medications for a period of time, denied her transfer to two previously scheduled prenatal appointments, and failed to provide her with any drug treatment or education, all of which was harmful to her and her fetus. (Pl. Br. at 19-20).

Upholding Act 292 would send a perilous message to pregnant women who use drugs or have used drugs in the past: in order to avoid state intervention it is best to not seek prenatal care, not disclose their drug use to any health care professionals, not give birth in hospitals, or to seek an abortion. This result would undermine, not advance, the Government's asserted interest of protecting fetal health.

**CONCLUSION**

For the foregoing reasons, *amici curiae* respectfully request this Court to grant Ms. Loertscher's requested relief.

---

[48] *See Drugs Inside Prison Walls,* WASH. TIMES, Jan. 27, 2010, *available at* http://www.washingtontimes.com/news/2010/jan/27/drugs-inside-prison-walls/ ("In many large state prison systems, a mix of inmate ingenuity, complicit visitors and corrupt staff has kept the level of inmate drug abuse constant over the past decade despite concerted efforts to reduce it.").

DATED: November 10, 2016

Respectfully submitted,

  /s/ Jolene M. Forman

JOLENE M. FORMAN
JOY F. HAVILAND
DRUG POLICY ALLIANCE
1330 Broadway, Suite 1426
Oakland, California 94612
(510) 679-2300
*Counsel for Amici Curiae*

22

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2016, a copy of the foregoing was electronically

filed through the ECF system and will be sent electronically to all persons identified in the

Notice of Electronic Filing.


        /s/ Jolene M. Forman

JOLENE M. FORMAN
JOY HAVILAND

DRUG POLICY ALLIANCE
1330 Broadway, Suite 1426
Oakland, California 94612
(510) 679-2300
Email: jforman@drugpolicy.org;
jhaviland@drugpolicy.org

23