# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

TAMARA M. LOERTSCHER,

        Plaintiff,

    v.

BRAD D. SCHIMEL, et al.,

        Defendants.

No. 14-cv-870

PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

STATUTORY BACKGROUND AND STATEMENT OF FACTS ........................... 3

   I.     THE ANGELA M.W. DECISION, THE LEGISLATURE'S RESPONSE, AND THE GOVERNMENT'S OPPOSITION ...................................... 3

   II.    OPERATION OF THE ACT .................................................................. 7

   III.   SCOPE OF THE ACT'S APPLICATION ............................................ 10

   IV.   MS. LOERTSCHER'S OWN EXPERIENCE UNDER THE ACT ............ 11

        A.    Background and Initial Medical Care .................................... 11

        B.    Legal Proceedings against Ms. Loertscher ............................. 13

        C.    Further Legal Proceedings Against Ms. Loertscher under the Act .......... 15

        D.    Ms. Loertscher's Incarceration Under the Act ....................... 17

        E.    The Consent Decree and Continuing State Enforcement of the Act ....... 17

PROCEDURAL HISTORY ................................................................................. 18

ARGUMENT ..................................................................................................... 19

   I.     THE ACT IS VOID FOR VAGUENESS UNDER THE DUE PROCESS CLAUSE ........................................................................................... 22

        A.    The Act Is Unconstitutionally Vague Because It Fails to Provide Women Who Are Capable of Pregnancy with Notice of Prohibited Conduct ........................................................... 22

        B.    The Act Encourages Discriminatory and Arbitrary Enforcement .......... 26

   II.    THE ACT VIOLATES THE FUNDAMENTAL SUBSTANTIVE DUE PROCESS RIGHTS OF ALL WISCONSIN WOMEN CAPABLE OF PREGNANCY ...................................................................................... 29

        A.    The Act Violates the Fundamental Substantive Due Process Rights to Physical Liberty, Freedom From Coerced Medical Treatment, Freedom From Coerced Childbearing Or Abortion, Freedom to Raise One's Family, and Privacy In Medical Information ...................... 29

             1.    The Act deprives women who are or may become pregnant of their right to physical liberty .................................. 30

             2.    The Act forces people who are or may become pregnant to undergo unconsented and inappropriate treatment ..................... 32

             3.    The Act infringes on the fundamental right to decide whether to carry a pregnancy to term or have an abortion .......... 35

             4.    The Act infringes on the fundamental right to care and control of one's children free from unjust state interference ....... 37

        B.    The Act Cannot Survive the Strict Scrutiny Applied to Laws That Violate Fundamental Rights ................................................ 39

        C.    The Act Cannot Survive Strict Scrutiny Review Because It Does Not Serve a Compelling State Interest .................................... 39

## TABLE OF CONTENTS
### (continued)

Page

D.     The Act Cannot Survive Strict Scrutiny Review Because It Is Not Narrowly Tailored ................................................................................. 45

III.     THE ACT IS UNCONSTITUTIONAL UNDER THE EQUAL PROTECTION CLAUSE ............................................................................ 46

A.     The Act Violates Equal Protection by Discriminating on the Basis of Gender ................................................................................. 47

B.     There Is No Rational Basis For Denying Pregnant Women The Same Procedural Protections Afforded Individuals Facing Civil Commitment Under Wisconsin's Mental Health Act ............................ 50

IV.     THE ACT IS UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT ............................................................................................ 53

CONCLUSION ............................................................................................................ 57

## TABLE OF AUTHORITIES

Page(s)

CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................... 19

*Arnold v. Bd. of Educ. of Escambia County Ala.*,
    880 F.2d 305 (11th Cir. 1989) ........................................................................... 35

*Brokaw v. Mercer County*,
    235 F.3d 1000 (7th Cir. 2000) ........................................................................... 54

*Camara v. Mun. Court of San Francisco*,
    387 U.S. 523 (1967) ........................................................................................... 54

*Carey v. Population Servs., Int'l*,
    431 U.S. 678 (1977) ........................................................................................... 35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................................... 19

*Center for Individual Freedom v. Madigan*,
    697 F.3d 464 (7th Cir. 2012) ............................................................................. 22

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ......................................................................... 20, 22, 27, 28

*City of Cleburne v. Cleburne Living Center*,
    473 U.S. 432 (1985) ................................................................................ 47, 50, 53

*Cleveland Bd. Of Educ. v. LaFleur*,
    414 U.S. 632 (1974) ........................................................................................... 35

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971) ........................................................................................... 25

*Colautti v. Franklin*,
    439 U.S. 379 (1979) ........................................................................................... 25

*Connally v. General Const. Co.*,
    269 U.S. 385 (1926) ..................................................................................... 22, 23

*Contreras v. City of Chicago*,
    119 F.3d 1286 (7th Cir. 1997) ........................................................................... 54

*Craig v. Boren*,
    429 U.S. 190 (1976) ........................................................................................... 47

## TABLE OF AUTHORITIES

**Page(s)**

*Cruzan v. Director, Missouri Dept. of Health,*
497 U.S. 261 (1990)...........................................................................29, 32

*Darryl H. v. Coler,*
801 F.2d 893 (7th Cir. 1986) ..................................................................54

*Daubert v. Merrell Dow Pharm., Inc.,*
43 F.3d 1311 (9th Cir.1995) ...................................................................52

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993)...............................................................................52

*Denius v. Dunlap,*
209 F.3d 944 (7th Cir. 2000) ..................................................................54

*Doe v. City of Albuquerque,*
667 F.3d 1111 (10th Cir. 2012) ..............................................................20

*Doe v. Heck,*
327 F.3d 492 (7th Cir. 2003) ..................................................................54

*Eisenstadt v. Baird,*
405 U.S. 438 (1972)...............................................................................35

*Entm't Software Ass'n v. Blagojevich,*
469 F.3d 641 (7th Cir. 2006) ..................................................................46

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) .............................................................20, 21

*Ferguson v. City of Charleston,*
532 U.S. 67 (2001)........................................................................ passim

*Foucha v. Louisiana,*
504 U.S. 71 (1992)............................................................................29, 53

*Geduldig v. Aiello,*
417 U.S. 484 (1974)..........................................................................47, 48

*Gen. Elec. Co. v. Gilbert,*
429 U.S. 125 (1976)...............................................................................47

*Gonzales v. Carhart,*
550 U.S. 124 (2007)...............................................................................40

*Grayned v. City of Rockford,*
408 U.S. 104 (1972)..........................................................................22, 27

## TABLE OF AUTHORITIES

**Page(s)**

*Green v. Berge,*
354 F.3d 675 (7th Cir. 2004) ...............................................................................55

*Hanover Ins. Co. v. N. Bldg. Co.,*
751 F.3d 788 (7th Cir. 2014) ...............................................................................19

*Hayden v. Greensburg Cmty. School Corp.,*
743 F.3d 569 (7th Cir. 2014) ...............................................................................47

*Hernandez v. Foster,*
657 F.3d 463 (7th Cir. 2011) ...............................................................................38

*Hill v. Colorado,*
530 U.S. 703 (2000) .............................................................................................20

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) .................................................................................................20

*Jackson Women's Health Org. v. Currier,*
940 F.Supp.2d 416 (S.D. Miss. 2013) ................................................................37

*Jaffe v. Redmond,*
518 U.S. 1 (1997) .................................................................................................46

*Janklow v. Planned Parenthood, Sioux Falls Clinic,*
517 U.S. 1174 (1996) (Stevens, J., concurring) .................................................21

*Karlin v. Foust,*
188 F.3d 446 (7th Cir. 1999) ..................................................................20, 26, 27

*Katz v. United States,*
389 U.S. 347 (1967) .............................................................................................54

*Kolender v. Lawson,*
461 U.S. 352 (1983) ..................................................................................22, 27, 28

*Mathews v. Eldridge,*
424 U.S. 319 (1976) .............................................................................................53

*May v. Anderson,*
345 U.S. 528 (1953) .............................................................................................38

*McCormack v. Hiedeman,*
694 F.3d 1004 (9th Cir. 2012) .............................................................................37

*Meyer v. Nebraska,*
262 U.S. 390 (1923) ......................................................................................29, 38

## TABLE OF AUTHORITIES

**Page(s)**

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ................................................................................49

*Moore v. East Cleveland*,
  431 U.S. 494 (1977) ...........................................................................29, 39

*New Jersey v. T.L.O.*,
  469 U.S. 325 (1985) ................................................................................54

*New York v. United States*,
  505 U.S. 144 (1992) ................................................................................35

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
  462 U.S. 669 (1983) ................................................................................48

*Palko v. Connecticut*,
  302 U.S. 319 (1937) ................................................................................30

*Papachristou v. City of Jacksonville*,
  405 U.S. 156 (1972) ................................................................................27

*Parham v. J.R.*,
  442 U.S. 584 (1979) ................................................................................33

*Paul v. Davis*,
  424 U.S. 693 (1976) ................................................................................35

*Payne v. Pauley*,
  337 F.3d 767 (7th Cir. 2003) ....................................................................19

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ........................................................................ passim

*Record Head Corp. v. Sachen*,
  682 F.2d 672 (7th Cir. 1982) ........................................................20, 22, 27

*Rochin v. California*,
  342 U.S. 165 (1992) ................................................................................29

*Roe v. Wade*.
  410 U.S. 113 (1973) ...........................................................................33, 35

*Romer v. Evans*,
  517 U.S. 620 ...........................................................................................53

*Russ v. Watts*,
  414 F.3d 783 (7th Cir. 2005) ....................................................................39

## TABLE OF AUTHORITIES

**Page(s)**

*Santosky v. Kramer,*
    455 U.S. 745 (1982)........................................................................38

*Shapiro v. Thompson,*
    394 U.S. 618 (1969)........................................................................47

*Skinner v. Oklahoma,*
    316 U.S. 535 (1923)...................................................................29, 35

*Smith v. Goguen,*
    415 U.S. 566 (1974)...................................................................27, 29

*Snyder v. Massachusetts,*
    291 U.S. 97 (1934)........................................................................29

*State ex rel. Angela M.W. v. Kruzicki,*
    561 N.W.2d 729 (Wis. 1997).............................................................4

*State ex rel. Smith v. City of Oak Creek,*
    139 Wis. 2d 788 (1987)...................................................................25

*Sweatt v. Painter,*
    339 U.S. 629 (1950)........................................................................53

*Troxel v. Granville,*
    530 U.S. 57 (2000)........................................................................38

*Union Pac. Ry. Co. v. Botsford,*
    141 U.S. 250 (1891)........................................................................30

*United States v. 12 200-Foot Reels,*
    413 U.S. 123 (1973)........................................................................35

*United States v. Husband,*
    226 F.3d 626 (7th Cir. 2000) ............................................................32

*United States v. Mendenhall,*
    446 U.S. 544 (1980)........................................................................54

*United States v. Reese,*
    92 U.S. 214 (1876)........................................................................27

*United States v. Salerno,*
    481 U.S. 739 (1987)........................................................................20

*United States v. Smith,*
    359 F. Supp. 2d 771 (E.D. Wis. 2005)................................................41

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Virginia,*
  518 U.S. 515 (1996).................................................................................47

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982).................................................................................22

*Wash. State Grange v. Wash. State Republican Party,*
  552 U.S. 442 (2008)............................................................................20, 22

*Washington v. Glucksberg,*
  521 U.S. 702 (1997)......................................................................30, 32, 39

*Whole Woman's Health v. Hellerstedt,*
  136 S. Ct. 2292 (2016).........................................................................37, 39

## STATUTES

42 U.S.C. § 1983..........................................................................................2

Wis. Stat. § 48.133 *et seq.*................................................................ passim

Wis. Stat. § 51............................................................................................25

Wis. Stat. § 51.01..................................................................................25, 50

Wis. Stat. § 51.20..................................................................................50, 51

Wis. Stat. § 118.16.....................................................................................25

Wis. Stat. § 125.04.....................................................................................25

Wis. Stat. § 146.0255............................................................................33, 56

Wis. Stat. § 351.02.....................................................................................26

Wis. Stat. § 785.01............................................................................10, 32, 57

Wis. Stat. § 785.02.....................................................................................10

Wis. Stat. § 785.04..............................................................................10, 15

Wis. Stat. § 905.04.....................................................................................55

Wis. Stat. § 907.02.....................................................................................52

Wis. Stat. § 961.01..............................................................................26, 48

Wis. Stat. § 961.41..............................................................................26, 48

## TABLE OF AUTHORITIES

**Page(s)**

OTHER AUTHORITIES

AMA Board of Trustees Report, *Legal Interventions During Pregnancy*, 264......................44, 45

American College of Obstetricians and Gynecologists Committee on Ethics, Committee Opinion 321, Maternal Decision Making, Ethics, and the Law (Nov. 2005) ...................................................................................................................46

American Psychiatric Association, Position Statement, Care of Pregnant and Newly Delivered Women Addicts, APA Document Reference No. 200101 (March 2001) ......................................................................................................46

American Public Health Association, Policy Statement No. 9020 ...............................................46

David Steinkraus, "Judge Frees Addict Mom," *J. Times* (Racine, Wis.), May 24, 2005...............................................................................................................................11

David Steinkraus, "Pregnant and Addicted – Hooked on OxyContin, Woman Remains Confined as She Seeks Help for Herself, Her Unborn Baby," *J. Times* (Racine, Wis.), May 12, 2005 ..............................................................11, 31

David Steinkraus, "Pregnant, Addicted Woman Asks for Help, Gets Locked Up," *J. Times* (Racine, Wis.), May 11, 2005............................................................11

Kenneth A. De Ville & Loretta M. Kopelman, "Fetal Protection in Wisconsin's Revised Child Abuse Law: Right Goal, Wrong Remedy," 27 *J.L. Med. & Ethics* 332, 337 (1999)....................................................................................53

Molly McNulty, *Pregnancy Police: The Health Policy and Legal Implications of Punishing Pregnant Women for Harm to Their Fetuses*, 16 N.Y.U. Rev. L. & Soc. Change 277 (1988)............................................................................................23

Nat'l Institute on Drug Abuse, Research Report, Cocaine: Abuse and Addiction 6 (May 2009) available at http://www.drugabuse.gov/PDF/RRCocaine.pdf .....................41, 42

The American College of Obstetricians and Gynecologists, *Substance Abuse Reporting and Pregnancy: The Role of the Obstetrician-Gynecologist*, Committee on Health Care for Underserved Women, Jan. 2011, at 1....................................44

*Reality*, 30 J. Addictive Diseases, 1 (2010), available at http://dx.doi.org/ 10.1080/10550887.2011.532048 ................................................................................28

Report of American Medical Association Board of Trustees, Legal Interventions During Pregnancy, 264 JAMA 2663 (1990)...........................................................46

Susan C. Boyd, *Mothers and Illicit Drugs: Transcending the Myths* (1999)................................28

## TABLE OF AUTHORITIES

**Page(s)**

**R**ULES

Fed. R. Civ. P. 56..........................................................................................................19

## INTRODUCTION

Under 1997 Wisconsin Act 292 ("the Act"), a woman alleged to have consumed alcohol or drugs during pregnancy may be subjected, without the benefit of counsel, to secret juvenile court proceedings originally designed to protect abused children that could result in everything from forced medical treatment and detention to permanent loss of parental rights. Judicial officers, state and local officials, hospital staff, social workers, or law enforcement personnel may initiate legal proceedings against a pregnant woman alleged to "habitually lack self-control" "to a severe degree" in the use of alcohol or controlled substances. Once such allegations have been made, the juvenile court may order the woman into custody and then keep her detained if that court is "satisfied" that the woman may pose "substantial risk" to the fertilized egg, embryo, or fetus inside of her. The juvenile court then holds a series of confidential proceedings to determine whether the woman should be maintained in custody, ordered into a mandatory treatment facility, placed under the control of a friend or relative, or have other restrictions placed upon her freedom of movement or activity. At each of these hearings, the fertilized egg, embryo or fetus must be represented by a guardian ad litem, but in the critical early hearings, the pregnant woman herself is not provided counsel.

The legal standards employed in these proceedings are vague and undefined, but the consequences for the woman subjected to them are concrete, severe and long-lasting. She may be detained, forced to undergo medically unnecessary and/or inappropriate drug or alcohol treatment, denied appropriate prenatal and other medical care, and, in addition to loss of physical liberty, may be subjected to findings of fact and legal orders that could result in termination of parental rights and permanently impact her employment opportunities. Because the juvenile court system, to which these unusual proceedings are assigned, was designed to protect the privacy of potentially abused children, all of this occurs in secret, through confidential proceedings that preclude public scrutiny.

Thousands of Wisconsin women have been subjected to the Act since its passage. Hundreds of women have been subjected to "substantiated" unborn child abuse claims and more

than one hundred and fifty women have had their child placed in out-of-home care after birth as part of an investigation under the Act. Because proceedings under the Act are confidential, little is known about these cases. Because Plaintiff Tamara Loertscher made her case public as part of this lawsuit, however, we know the details of her case. Her experience illustrates why the constitutional deprivations created by the Act are not hypothetical but very real indeed.

Ms. Loertscher was subjected to state control under this Act in August 2014. Ms. Loertscher voluntarily sought medical assistance from a hospital when she realized she might be pregnant, and in the course that treatment, she confided that she had used controlled substances and a small amount of alcohol prior to learning she was pregnant. In response, state actors accessed Ms. Loertscher's private medical information without her consent, appointed a guardian ad litem to represent her then 14-week fetus, and initiated proceedings under the Act. Ms. Loertscher, who was without counsel, was soon ordered detained, coerced into unwanted medical treatment, arrested, and ultimately jailed. She lacked necessary medical and prenatal care while incarcerated, and she was released only after agreeing to a consent decree authorizing continued state control over her medical decisions. A guardian ad litem was appointed to represent Ms. Loertscher's fetus for the duration of her pregnancy, and Ms. Loertscher was obligated to comply with the terms of the consent decree upon pain of renewed incarceration and possible suspension or loss of parental rights after birth. (All subsequent drug tests were negative, and she gave birth to a healthy boy.) Ms. Loertscher brings this facial constitutional challenge under 42 U.S.C. § 1983, seeking a statewide injunction against enforcement of the Act.

On its face, the Act is plainly unconstitutional. The Act is void for vagueness because it fails to provide adequate notice of prohibited conduct and encourages arbitrary and discriminatory enforcement. The undefined and amorphous standards set forth in the Act permit the imposition of severe sanctions based upon the unchecked discretion of myriad local authorities. The consequences of these vague standards are especially damaging because the sanctions available (and imposed) violate some of the most basic fundamental Constitutional rights recognized by the United States Supreme Court, including the right to be free from bodily

restraint, the right to freedom from coerced medical treatment, the right to procreate, and the right to control and custody of one's children. None of these intrusions are narrowly tailored to serve a compelling state interest, the level of scrutiny demanded by the fundamental nature of the rights at stake. By its terms, the Act applies to women from the moment they are carrying a fertilized egg, and harsh punishments may be imposed upon women without regard for the actual impact on maternal or fetal health. In fact, many of the proceedings and their consequences reduce the likelihood that a pregnant woman will receive appropriate prenatal care, undermining, rather than promoting, the objective the Act purports to address.

In addition, the Act violates the Equal Protection Clause by infringing the fundamental rights of pregnant women without any compelling state interest, by imposing substantial burdens on women alone despite the absence of any substantial justification, and by subjecting pregnant women to byzantine proceedings without the due process protections required by the Constitution and well below the level of protection mandated by involuntary civil commitment proceedings involving individuals with mental health and drug problems. In violation of the Fourth Amendment, the Act also permits unconstitutional access to medical records without a warrant by officials involved in the Act's enforcement.

Ms. Loertscher is entitled to summary judgment on each of these constitutional claims. Without injunctive relief from this Court, Ms. Loertscher and women throughout Wisconsin will continue to face the reality and the risk of repeated and continuous constitutional violations. Ms. Loertscher therefore requests that this Court declare the Act unconstitutional and enjoin further enforcement of the Act throughout the State of Wisconsin.

## STATUTORY BACKGROUND AND STATEMENT OF FACTS

## I.  THE ANGELA M.W. DECISION, THE LEGISLATURE'S RESPONSE, AND THE GOVERNMENT'S OPPOSITION

Originally passed as 1997 Wisconsin Act 292, and codified at *inter alia,* Wis. Stat. § 48.01 *et seq.*, the Act explicitly gives juvenile courts exclusive original jurisdiction over fertilized eggs, embryos, and fetuses—from the moment of fertilization—under the State's child

abuse and neglect code, whenever lack of "self-control" regarding drug or alcohol use is alleged against a pregnant woman. At the same time it extends jurisdiction of the children's code over pregnant women. *See* Wis. Stat. § 48.133 (providing for juvenile court jurisdiction over "adult expectant mother" of an "unborn child"); Wis. Stat. § 48.02(19) ("'Unborn child' means a human being from the time of fertilization to the time of birth.").[1]

The Act was passed in direct response to the Wisconsin Supreme Court's decision in *State ex rel. Angela M.W. v. Kruzicki*, 561 N.W.2d 729 (Wis. 1997), which held that the Wisconsin children's code did not authorize a juvenile court to exercise jurisdiction over an adult pregnant woman pursuant to a proceeding regarding a "child alleged to be in need of protection or services," also known as a "CHIPS" proceeding. Proposed Findings of Fact ("PFOF") (7). The Legislature then passed the Act to authorize the very jurisdiction the state supreme court had found unauthorized under existing statutes. (PFOF 9).

Prior to enactment, the Wisconsin Legislative Council warned the legislature that the constitutionality of the Act would be "highly doubtful" if extended to all stages of pregnancy. (PFOF 10). The Legislative Council found it "difficult to perceive" how the state's interest in "unborn life" could extend back in the gestational process to the point of conception. (PFOF 11). Ultimately, the Legislative Council concluded that applying the Act as it was written "appears to impose an undue burden on the woman," in contravention of *Planned Parenthood v. Casey*, 505 U.S. 833 (1992). (PFOF 12).

---

[1] Plaintiff uses the medically accurate phrase "fertilized egg, embryo, or fetus" to describe the reach of this Act, rather than the term "unborn child." *See* ECF No. 156 ¶ 46 ("Expert Report of Mishka Terplan, M.D., MPH, dated Jan. 28, 2016") ("Terplan Report"). In reality, pregnancy does not occur when an ovum is fertilized, but rather at the point when a fertilized egg (a blastocyst, or pre-embryo) successfully implants in a woman's uterus; once a woman is actually pregnant, the developing zygote begins to go through a procession of stages with enormous biological differences. *Id.* ¶¶ 44-45. The Act's use of the term "unborn child" to describe this process reflects the attempt of proponents of the Act to define human life and personhood as existing from the moment of fertilization. Such an endeavor is contrary to the express directive of *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992) ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."). Moreover, it pits the interest of the pregnant woman against that of the fertilized egg, embryo, or fetus she carries, despite the biological fact that these interests are intimately intertwined, no matter one's beliefs concerning the beginning of human life. *See* Terplan Report ¶¶ 44, 47-49, 53.

In addition, the Act faced opposition from state and local health agencies. Notably, the Wisconsin Division of Children and Family Services ("DCFS")[2] opposed the Act, (PFOF 13), as did the bureau of the Division of Public Health tasked with handling substance abuse issues. (PFOF 14). The City of Milwaukee Health Department voiced strong opposition. (PFOF 15, 26, 28-29, 31-34). And medical providers disagreed with the law, too. (PFOF 16). DCFS, in an effort to avoid confrontation with the state legislature, chose not to register a formal position on the Act. (PFOF 17-18). Nevertheless, DCFS sent representatives to meet with legislators in an effort to dissuade the legislature from enacting a law that DCFS felt "would force pregnant women to be taken into custody" and "create a category of abuse called unborn child abuse." (PFOF 19).

DCFS recognized the critical importance of prenatal care to fetal development and expressed concern that the Act would undermine this important objective by "scaring women away from treatment." (PFOF 20). DCFS opposed legislative efforts to require mandated reporting of suspected unborn child abuse, too, worrying that this provision would also discourage women from seeking medical care. (PFOF 21). More generally, DCFS opposed the Act because it frustrated DCFS's ability to serve families and their children. (PFOF 22). DCFS serves children and families by assessing safety and parenting skills, but the Act asked DCFS to assess a woman's parenting skills even before she has a child—an impossible task. (PFOF 22) ("[I]f a woman has not had a baby yet, it's really impossible to assess her parenting skills.").

The Milwaukee County Health Department likewise raised specific concerns about the Act, several of which DCFS shared. (PFOF 26-35). Among their concerns, the Health Department believed that Act had the potential "to cause mothers to conceal substance use from their health care providers," thus "interfering with voluntary identification and treatment processes," a concern shared by DCFS. (PFOF 29-30). The Health Department also believed that the Act could introduce "new and significant risks" to the health of the mother and fetus by encouraging mothers to delay or even avoid prenatal care. (PFOF 31). The Health Department

---

[2] DCFS is a predecessor organization of the current Wisconsin Department of Children and Families ("DCF"). (PFOF 12).

raised further concerns regarding the Act's arbitrary exclusion of certain substances, like tobacco, that are also harmful to fetuses, (PFOF 32), and the lack of clear definitions for key terms in the Act, such as "habitual use" and "substantial risk." (PFOF 33) ("These terms are insufficiently defined within the [A]ct, and writing clear definitions may well be impossible."). In addition, the Health Department opposed the Act because it implemented a criminal justice approach to maternal and child health, a position both the Health Department and DCFS believed to be destructive, in light of available drug treatment alternatives that do not threaten pregnant women with incarceration or loss of parental rights. (PFOF 34-35). Overall, in the view of both DCFS and the Health Department, the Act presented a "serious potential" for "negatively affecting the health of mothers and children" in Wisconsin by reducing the length and quality of prenatal care in this state. (PFOF 26-27).

DCFS had several conversations with legislators in an attempt to dissuade them from moving forward with the Act, but those efforts failed. (PFOF 19, 23-25). Despite DCFS's opposition, the legislature "absolutely insisted there had to be a category of child abuse called unborn child abuse[,] [t]hey would not change that." (PFOF 24). According to DCF, the legislature "want[ed] expectant mothers to receive treatment[,] [a]nd if they didn't do it voluntarily, they wanted it enforced somehow." (PFOF 25).

A sponsor of the bill, former Representative Bonnie Ladwig, remained determined to pass the Act. (PFOF 37, 40-42, 44). Rep. Ladwig did not believe that concerns regarding stigmatization should prevent the Act's passage. (PFOF 41) ("[C]ertain behaviors should be stigmatized—certainly none more so than child abuse."). Nor did she feel that the law's exclusion of tobacco raised significant concerns. (PFOF 40). Although Rep. Ladwig acknowledged a lack of medical research supporting her legislation, (PFOF 38-39), she nevertheless pressed forward with the Act. According to Rep. Ladwig, the Act provided pregnant women "with the care and treatment they need and that they are too ill to seek for themselves." (PFOF 42).

## II.     OPERATION OF THE ACT

The Act grants juvenile courts jurisdiction over "an unborn child" and the "adult expectant mother" when that pregnant women

> habitually lacks self-control in the use of alcohol beverages,
> controlled substances or controlled substance analogs, exhibited to
> a severe degree, to the extent that there is a substantial risk that the
> physical health of the unborn child, and of the child when born,
> will be seriously affected or endangered unless the expectant
> mother receives prompt and adequate treatment for that habitual
> lack of self-control.

Wis. Stat. § 48.133. (PFOF 45).

When a court takes jurisdiction over a pregnant woman pursuant to the Act, the court must appoint a guardian ad litem ("GAL") to represent the interests of the fertilized egg, embryo, or fetus. Wis. Stat. §§ 48.235(1)(f) & 48.02(19). The Act does not require the GAL or any other state actor to act on behalf of or in the interests of the pregnant woman. In fact, the GAL for the fertilized egg, embryo, or fetus may file a petition against the pregnant woman alleging abuse and neglect of the fertilized egg, embryo, or fetus she is carrying. Wis. Stat. § 48.25(1). A district attorney, corporation counsel for a county or state department of human services, or any other "appropriate" government official representing the "interests of the public" may also file such a petition as specified under Section 48.09. Wis. Stat. § 48.25(1).

Any juvenile court that has exercised this jurisdiction over a pregnant woman and her fertilized egg, embryo, or fetus under Section 48.133 may also issue a warrant to take that pregnant woman into custody based upon a "showing satisfactory" to the judge that the woman meets the criteria granting the court jurisdiction under Section 48.133. Wis. Stat. § 48.193(1)(a)-(c). In addition, law enforcement personnel may themselves take a pregnant woman into custody if, in their independent judgment, "reasonable grounds" exist to believe that the conditions for jurisdiction under § 48.133 are satisfied. Wis. Stat. § 48.193(1)(d)(2). The Act even grants human services intake workers "the power of police officers or deputy sheriffs" to take a pregnant woman into custody if they believe the conditions for jurisdiction under Section 48.133

have been satisfied. Wis. Stat. § 48.08(3). After a pregnant woman is taken into custody, an intake worker with the state or county department of human services may unilaterally decide to "release the adult expectant mother to an adult relative or friend of the adult expectant mother," or may decide to keep the pregnant woman detained. Wis. Stat § 48.203(1)&(2).

If a pregnant woman is detained under Section 48.203, a court must hold a hearing to determine if probable cause exists for her continued detention as set out in Section 48.205(1m). Wis. Stat. § 48.213(1)(a). Pregnant women are not entitled to appointment of counsel for this hearing. Wis. Stat. § 48.213(2)(e). A juvenile court judge presiding over a probable cause hearing may order a pregnant woman into an inpatient facility as described in Section 48.207(1m). Wis. Stat. § 48.213(3)(b). The court may also order the pregnant woman to be placed outside her home at the home of a friend or relative selected by the court. Wis. Stat. § 48.213(3)(b); Wis. Stat. § 48.207(1m)(a). Alternatively, the court may opt to release the pregnant woman but impose unspecified restrictions on her "travel, association with other persons or places of abode." Wis. Stat. § 48.213(3)(a). It may also require her to return to custody, subject her to the supervision of a state agency, and place other unspecified restrictions on her "conduct." *Id*.

Within 30 days of the filing of a CHIPS petition under the Act, a court must hold a hearing for a pregnant woman to enter a plea responding to the petition alleging child abuse or neglect regarding her fertilized egg, embryo, or fetus. Wis. Stat. § 48.30(1). At the plea hearing, the pregnant woman must be advised of the rights afforded her under 48.243, which includes the right to court-appointed counsel in certain circumstances. *See* Wis. Stat. § 48.23(2m). However, the pregnant woman is not entitled to representation by court-appointed counsel at the plea hearing, even if she qualifies for the appointment in connection with a subsequent fact-finding hearing. *See* Wis. Stat. §§ 48.23(2m)(b) & (4). At the plea hearing, she must decide how to plead in response to the allegations against her, whether to invoke or waive her right to a jury trial, and whether to request substitution of the judge. Wis. Stat. § 48.30(2).

Finally, the court must hold a fact-finding hearing to determine if the allegations in the CHIPS petition under the Act have been established by "clear and convincing" evidence. Wis. Stat. § 48.31(1). If a woman is threatened with placement outside her home under the Act, then she is entitled to court-appointed counsel for the first time in the course of the proceedings against her, provided she meets the statutory criteria for indigency. *See* Wis. Stat. §§ 48.23(2m)(b) &(4). If she is threatened with state supervision or involuntary court-ordered counseling or medical treatment, *see* Wis. Stat. §§ 48.347(1), (2), (4) & (5), then she is not entitled to court-appointed counsel. If the pregnant woman invoked her right to a jury trial during the prior plea hearing, then a jury is tasked with fact-finding concerning the allegations in the petition, although the ultimate decision regarding whether the fertilized egg, embryo, or fetus, is in need of protection or services is reserved for the juvenile court. Wis. Stat. § 48.31(2) & (4).

Ultimately, over a pregnant woman's objection and regardless of any denial of the allegations against her set out in the petition, and without any requirement that it consider scientifically or medically reliable evidence, the juvenile court may order a pregnant woman to undergo counseling, supervision, or a selected form of drug or alcohol treatment— including involuntarily at an inpatient facility—for the duration of the woman's pregnancy. *See* Wis. Stat. § 48.347. Further, Section 48.347(7) authorizes a court, during a woman's pregnancy, to order services or treatment for the child when born including removal from the home and substitution of legal custody. *See* Wis. Stat. § 48.345. Moreover, the Act provides for permanent involuntary termination of parental rights based solely on the fact that the mother was previously placed outside her home during her pregnancy. Wis. Stat. § 48.415(2)(a). At any time, a GAL appointed to represent a fertilized egg, embryo, or fetus, may, among other actions, petition for revision or extension of a dispositional order, and may also petition for termination of parental rights of a pregnant woman over her child once born. Wis. Stat. § 48.235(4m)(a). Nothing in the Act suggests or requires that the GAL consider the actual health impact of forced treatment or detention. A woman subject to the Act may also be subject to a determination, separate and apart

from a CHIPS proceeding, that she has abused her unborn child. *See* Wis. Stat.
§§ 48.981(3)(c)(1)(a) & (5m).

Wisconsin courts are empowered to order remedial and punitive sanctions for contempt
of court in cases where a pregnant woman is deemed to have intentionally disobeyed any order
issued by the court under the jurisdiction conferred by Section 48.133. *See* Wis. Stat. §§ 785.01
& 785.02.  Penalties for contempt include up to 1 year of jail time. *See* Wis. Stat. § 785.04.

## III.   SCOPE OF THE ACT'S APPLICATION

Thousands of Wisconsin women have been subjected to the Act. (PFOF 53). In fact,
since 2006, child protective services agencies have "screened-in" over 3,400 cases containing at
least one allegation of unborn child abuse. (PFOF 53).  Moreover, between 2005 and 2014, 467
women have faced additional deprivation of liberty that flowed from having the unborn child
abuse claims "substantiated" against them. (PFOF 59). In addition, in at least 152 instances
between 2005 and 2014, child protective services agencies have placed children in out-of-home
care after the child's birth as part of an unborn child abuse investigation. (PFOF 60).

But because proceedings under the Act are confidential, little information is available
regarding the details of individual cases. (PFOF 56). This lack of information is compounded by
DCF's record-keeping policies. DCF does not have specific details readily available concerning
unborn child abuse cases, such as, for example, in how many of those cases was a guardian ad
litem assigned to represent the fetus or in how many of those cases was a lawyer appointed to
represent the pregnant woman. (PFOF 57). Similarly, DCF does not actively track the number of
cases in which pregnant women are placed in out-of-home care. (PFOF 58).

Yet we do know the details of Tamara Loertscher's case, as well as the cases of at least
two other Wisconsin women whose detention came to public attention.[3]  These details illustrate

---

[3] Although the present motion primarily uses the experiences of Ms. Loertscher to illustrate the constitutional
deprivations caused by the Act, the cases of Alicia Beltran and Rachel Lowe have also been publicized.  According
to news reports, when Rachel Lowe was pregnant and voluntarily sought help at Waukesha Memorial Hospital for
dependency on oxycontin, she was reported to Racine County Officials who petitioned for her detention pursuant to
Act 292. She was taken into custody and ordered into a psychiatric ward at St. Luke's Memorial Hospital in Racine
where she received no prenatal care and was put on more medications than she had been taking when she originally

the nature of the constitutional deprivations effected by the Act and demonstrate that the constitutional injuries inflicted on Wisconsin women are not hypothetical but all too real.

## IV.   MS. LOERTSCHER'S OWN EXPERIENCE UNDER THE ACT

### A.   Background and Initial Medical Care

In August 2014, Plaintiff Tamara Loertscher was a 29 year-old pregnant resident of Taylor County, Wisconsin. (PFOF 61). Due to radiation treatment Ms. Loertscher had as a teenager, she suffers from severe hypothyroidism, and cannot produce vital thyroid hormones without medication. (PFOF 62-63). She also understood that hypothyroidism would make it difficult or impossible for her to become pregnant. (PFOF 64). Without her thyroid medication, Ms. Loertscher experiences severe symptoms of depression and fatigue. (PFOF 67-68). Ms. Loertscher also has a history of clinically diagnosed depression, a condition that is compounded by the symptoms of untreated hypothyroidism. (PFOF 66-68).

Ms. Loertscher previously worked as a certified nurse's aide but became unemployed in February 2014. (PFOF 69-70). When Ms. Loertscher became unemployed, she was no longer able to pay for her thyroid medication, and her attempt to apply for BadgerCare, Wisconsin's version of Medicaid, was unsuccessful due to the long waiting list. (PFOF 71-72). Accordingly, she went without any medical treatment for her hypothyroidism beginning in February 2014, and she sank into a deep depression. (PFOF 73). During this time period, Ms. Loertscher began to use methamphetamine about two or three times per week to help her get out of bed in the

---

sought help. *See* David Steinkraus, "Pregnant, Addicted Woman Asks for Help, Gets Locked Up," *J. Times* (Racine, Wis.), May 11, 2005; David Steinkraus, "Pregnant and Addicted – Hooked on OxyContin, Woman Remains Confined as She Seeks Help for Herself, Her Unborn Baby," *J. Times* (Racine, Wis.), May 12, 2005; David Steinkraus, "Judge Frees Addict Mom," *J. Times* (Racine, Wis.), May 24, 2005. In July 2013, Alicia Beltran, a pregnant woman in her first trimester, appeared before a Washington County family court commissioner "for a temporary physical custody hearing" pursuant to Act 292. Transcript, July 18, 2013, filed as ECF No. 48 (unsealed ECF No. 59) in *Beltran v. Loenish*, 13-cv-1101, at 1-2, 6 (E.D. Wis.). While a guardian ad litem appeared to represent "the unborn child" and lawyers representing the State and the county Human Services Department advocated for Ms. Beltran's detention, Ms. Beltran appeared "in person, in custody, and without counsel." Transcript at 2. In the course of the brief hearing, the Commissioner ordered Ms. Beltran to be detained for 90 days in a "residential treatment program located in Appleton, Wisconsin" as well as abide by numerous other conditions. Transcript at 8-9, 11.

morning. (PFOF 74). Ms. Loertscher had no history of drug dependency or addiction and had rarely consumed alcohol over the previous year. (PFOF 75-79).

In late July 2014, Ms. Loertscher believed she may be pregnant based on home pregnancy test results and went to the Taylor County Human Services Department ("TCHSD") for help. (PFOF 80, 84-85). She sought Medicaid coverage to access appropriate care in case she was pregnant as well as treatment for her depression and other symptoms of her untreated thyroid condition. (PFOF 86). TCHSD personnel advised Ms. Loertscher to present herself to the Eau Claire Mayo Clinic Hospital ("Mayo Clinic") emergency room that day, and she did so. (PFOF 87).

At the emergency room, Ms. Loertscher explained to medical personnel that she needed medical and psychiatric care and that she wanted to confirm her pregnancy. (PFOF 88). At the request of Mayo Clinic personnel, Ms. Loertscher provided a urine sample that day. (PFOF 89). No one at the hospital informed Ms. Loertscher that her urine would be tested for drugs or provided to state agencies, but Mayo Clinic personnel used Ms. Loertscher's urine sample to perform a drug screen. (PFOF 90, 93). The results confirmed her pregnancy and also returned an "unconfirmed positive" for methamphetamine, amphetamine, and THC, the active ingredient in marijuana. (PFOF 93). A doctor informed Ms. Loertscher that "trace amounts" of methamphetamine and marijuana had been found in her urine; the doctor advised Ms. Loertscher that drug use is bad for a baby and Ms. Loertscher expressed her willingness to stop all drug use. (PFOF 94-95). Ms. Loertscher added that she wanted more than anything for her baby to be okay. (PFOF 96).

Later that evening, Ms. Loertscher was admitted to the Mayo Clinic Behavioral Health Unit. (PFOF 98). A psychiatrist visited her to discuss her thyroid condition and the pregnancy, and she also asked Ms. Loertscher about her past drug use. (PFOF 100, 104). Ms. Loertscher candidly explained that she had been self-medicating her depression with occasional marijuana and methamphetamine but had only done this before she knew she might actually be pregnant. (PFOF 105-07). Ms. Loertscher also met with an obstetrician, who showed Ms. Loertscher the

ultrasound images of her fetus and asked Ms. Loertscher about her alcohol use. (PFOF 121-123). Ms. Loertscher explained that while she was pregnant, but did not know it yet, she drank a small amount of alcohol. (PFOF 110-11).

### B.  Legal Proceedings against Ms. Loertscher

On August 4, 2014, while Ms. Loertscher was in the hospital, Corinna ("Corey") Everson, a social worker at the Eau Claire Mayo Clinic, contacted TCHSD to report that Ms. Loertscher was a pregnant woman who had tested positive for drug use. (PFOF 112). A team of TCHSD employees "screened in" the referral, and that same day, an Alcohol and Other Drug Abuse ("AODA") counselor employed by Taylor County—based solely on the written report— determined that Ms. Loertscher would be best served by entering an inpatient treatment facility, to be followed by outpatient services. (PFOF 114-18). At the time of this meeting, no one from Taylor County had spoken to any doctors at the Mayo Clinic who had examined Ms. Loertscher. (PFOF 117).

Later that same day, Julie Clarkson of Taylor County HSD informed Ms. Loertscher that if she did not agree to voluntarily receive AODA treatment, TCHSD would request to take Ms. Loertscher into temporary physical custody. (PFOF 121). Soon after, Taylor County intake worker Kala Thompson completed a "temporary physical custody request" for the juvenile court directed at Tamara Loertscher, stating she was "taken into custody" on August 4 because of "serious risk to unborn child."  (PFOF 123). Ms. Thompson is not a doctor or psychologist, nor did she consult any medical or scientific studies when making the determination. (PFOF 124-25).

Ms. Loertscher then met with a hospital social worker, who asked questions focused on her past drug use, and Ms. Loertscher began to feel that she was not receiving the care she needed for her health concerns because the hospital staff were focused on her past drug use. (PFOF 126-129). She informed hospital staff that she wished to leave, but the nursing manager told her that there was a "hold" on her. (PFOF 130-31). Around that time, a Taylor County judicial officer appointed a guardian ad litem (GAL) on behalf of Ms. Loertscher's fetus but did not appoint counsel for Ms. Loertscher, whose liberty had already been taken away. (PFOF 132).

-13-

On August 5, 2014, a Mayo Clinic social worker led Ms. Loertscher into a conference room and told Ms. Loertscher that there was a judge on the phone. (PFOF 133). Ms. Loertscher realized from what she heard over the telephone that some kind of formal proceeding was taking place, but she had no idea what was actually going on. (PFOF 134). The social worker also placed some kind of legal papers on the table in front of Ms. Loertscher, but Ms. Loertscher did not understand what they were. (PFOF 135). Ms. Loertscher stated that she did not wish to speak without legal representation, and did not want to take part in any proceeding until she had a lawyer. (PFOF 136). She then returned to her hospital room. (PFOF 137).

In fact, the legal documents placed in front of Ms. Loertscher were a Temporary Physical Custody Request and an as-yet-unfiled "Petition for Protection or Care of an Unborn Child" against Ms. Loertscher. (PFOF 138-39). The Temporary Physical Custody Request stated that Ms. Loertscher had been taken into custody at the hospital on the basis of a serious health risk to [an] unborn child. (PFOF 139). After Ms. Loertscher had stated that she would not participate without counsel and returned to her hospital room, the court found that Ms. Loertscher had waived her appearance at the hearing and allowed the hearing to continue in her absence. (PFOF 143). The court heard testimony by telephone from Dr. Jennifer Bantz, a Mayo Clinic obstetrician, who testified that her greatest concern for Ms. Loertscher's pregnancy related to her hypothyroidism and her ability to get appropriate prenatal care. (PFOF 144, 150, 158-59). Dr. Bantz recommended inpatient drug treatment for Ms. Loertscher at the hearing, but she later acknowledged that at the time of the hearing she did not think it would be a good idea for Ms. Loertscher to be forced into treatment. (PFOF 160, 161). At the time of her telephonic testimony, Dr. Bantz did not know the nature of the hearing or the relief being sought. (PFOF 146-47, 161). The juvenile court entered the order of "Temporary Physical Custody" at the close of the hearing (PFOF 165).

On August 6, 2014, a Mayo Clinic social worker informed Ms. Loertscher that a judge had ordered her to stay in the hospital, and then to go directly to the Fahrman Center, a residential addiction treatment facility in Eau Claire, Wisconsin. (PFOF 167). The next day,

Mayo Clinic personnel informed Ms. Loertscher that she would need to submit to a blood test for tuberculosis before she could be admitted to that facility. (PFOF 168). Ms. Loertscher informed hospital personnel that she wanted to stay on her thyroid medication, start prenatal vitamins, choose her own health care providers, and leave the hospital immediately. (PFOF 170). Mayo Clinic staff authorized Ms. Loertscher's discharge because her treating doctor determined she had a plan, family support, and posed no danger to herself or others, and she was released from the hospital that day. (PFOF 171-73). No one advised Ms. Loertscher that by leaving the hospital she would be doing anything wrong.  (*See* PFOF 171-173). She believed the whole episode was over. (*See* PFOF 171-173).

> ### C.     Further Legal Proceedings Against Ms. Loertscher under the Act

On August 11, 2014, the GAL appointed on behalf of Ms. Loertscher's 15-week-old fetus filed a Notice of Motion and Motion for Remedial Contempt against Ms. Loertscher in Taylor County Circuit Court. (PFOF 174). The GAL requested that if Ms. Loertscher did not comply with the terms of the Temporary Physical Custody Order she should be subject to remedial sanctions under Wisconsin Statute Section 785.04, which could include a jail term of up to 6 months. (PFOF 175). Attached to the Notice was an affidavit from a TCHSD social worker alleging that Ms. Loertscher was in contempt of the juvenile court's August 5, 2014, Temporary Physical Custody Order because she had refused a TB test and otherwise failed to comply with TCHSD directives. (PFOF 176). The Notice set a hearing date on the contempt motion of August 25, 2014. (PFOF 177). On August 13, 2014, Taylor County Corporation Counsel filed a "Motion to Take Expectant Mother into Immediate Custody" on behalf of TCHSD. (PFOF 178). The Motion stated as grounds that Ms. Loertscher had not been in contact with TCHSD and had otherwise failed to comply with the earlier Order for her placement at the Fahrman Center. (PFOF 179). The same day, the court granted the TCHSD Motion and entered an Order to Take Expectant Mother into Immediate Custody. (PFOF 180). The Order stated that it was "contrary to the unborn child's best interests for the expectant mother to have been released from custody

and returned home due to the expectant mother's habitual use of controlled substances and her violation of the TPC [Temporary Physical Custody] Order." (PFOF 181).

The afternoon after she received the Notice, a police officer came to Ms. Loertscher's grandparents' house, where she had been staying. (PFOF 183). The police officer returned three times, and told Ms. Loertscher's family that he had come to arrest her pending a court date, scheduled for a week later. (PFOF 184). Ms. Loertscher's grandfather assured the police officer that Ms. Loertscher would appear at the scheduled hearing. (PFOF 185). Ms. Loertscher was horrified and humiliated. (PFOF 186).

On August 25, 2014, Ms. Loertscher appeared in Taylor County Circuit Court for the hearing. (PFOF 187). Present were the GAL on behalf of Ms. Loertscher's fetus, Corporation Counsel for TCHSD, and two TCHSD social workers. (PFOF 188). Ms. Loertscher was not represented by counsel. (PFOF 189). Ms. Loertscher requested that a different judge hear the case, and the hearing was then cut short. (PFOF 190). The court rescheduled the hearing for September 4, 2014, before a different judge. (PFOF 191). During the evening of August 25, 2014, another police officer came to Ms. Loertscher's grandparents' home, stating he had a warrant for her arrest. (PFOF 192). Ultimately, the police officer agreed to leave without arresting Ms. Loertscher. (PFOF 193).

On September 4, 2014, Ms. Loertscher appeared, without counsel, in Taylor County Circuit Court for the hearing on the contempt motion. (PFOF 195). The court asked the GAL what his plea was "on behalf of the child." (PFOF 196). The GAL admitted all the allegations against Ms. Loertscher on behalf of her fetus. (PFOF 196). The court then heard testimony from a TCHSD social worker, who testified that Ms. Loertscher had not complied with the August 5, 2014, Order because she did not take a TB test, did not go to inpatient treatment at the Fahrman Center, and otherwise failed to comply with TCHSD directives. (PFOF 197).

Ms. Loertscher had very little understanding of what was happening at the hearing, but tried to answer the claim that she needed drug treatment. (PFOF 198-200). She testified: "I don't feel like I need treatment. Like I feel like I went to the hospital and sought treatment and then

-16-

they violated my rights and all these people got this information that I feel they shouldn't have gotten. And I feel my whole stay there was made worse[.]" (PFOF 201). At the end of the hearing, the court found Ms. Loertscher in contempt and ordered her to either cooperate with TCHSD and go to the Fahrman Center, or to serve 30 days in jail. (PFOF 202).

Immediately following the September 4, 2014 hearing, Ms. Loertscher was led to a conference room in the courthouse where she met with TCHSD social workers. (PFOF 204). Ms. Loertscher asked them what they wanted from her; one of them responded, "we just want a healthy baby." (PFOF 204). Ms. Loertscher said that this is what she wanted, too. (PFOF 204). Ms. Loertscher then asked if "this would all go away if I had an abortion?" (PFOF 204). She recalls the social workers responding, "Yes, it would." (PFOF 205).

### D.     Ms. Loertscher's Incarceration Under the Act

On the evening of September 4, 2014, Ms. Loertscher surrendered herself to the Taylor County Jail, (PFOF 206), where she was held for a total of 18 days, (*see* PFOF 207). During her stay in jail, Ms. Loertscher received no prenatal care and was forced to miss two previously scheduled prenatal care appointments. (PFOF 208, 211).

Ms. Loertscher began to experience a lot of pain and cramping while she was in jail. (PFOF 212). She became frightened that she might have a miscarriage and asked repeatedly to see an obstetrician, and finally was told that she could see the jail doctor, who was not an obstetrician and who stated "if you're going to miscarry while you're here, there's nothing that I can do about it." (PFOF 214-15). This response made Ms. Loertscher upset and frightened for her pregnancy. (PFOF 216). She was also kept in solitary confinement for more than 24 hours after refusing to take another pregnancy test. (PFOF 218-19).

### E.     The Consent Decree and Continuing State Enforcement of the Act

While she was in jail, Ms. Loertscher found a list of public defenders in Taylor County. (PFOF 220). She called the telephone number, and a public defender was appointed to represent her in the contempt proceeding. (PFOF 221). Upon the advice of her new attorney, she signed a consent decree so that she could be released from jail. (PFOF 222). The Consent Decree

permitted Ms. Loertscher to go home so long as she agreed to complete an Alcohol and Other Drug Abuse (AODA) Assessment; comply with any recommended treatment resulting from that assessment; submit to drug testing on at least a weekly basis at her own expense; sign any and all releases necessary for transfer of drug test results to TCHSD; and sign any other releases as requested by TCHSD. (PFOF 223). The Consent Decree also provided that the GAL would remain appointed for Ms. Loertscher's fetus for the duration of her pregnancy. (PFOF 223). Ms. Loertscher agreed to these terms because she wanted to leave jail and was not using drugs or alcohol anyway. (PFOF 225).  Ms. Loertscher was released from the Taylor County Jail on September 22, 2014, and she continued to comply with all the terms of the Consent Decree, including numerous drug tests, which all returned negative results. (PFOF 226-28).

By notice dated September 29, 2014, Ms. Loertscher was informed that TCHSD issued an administrative determination that she had committed "child maltreatment." (PFOF 229). The notice stated that the finding was appealable within 30 days, and Ms. Loertscher appealed it. (PFOF 231). By letter dated November 10, 2014, Ms. Loertscher received notice that the TCHSD Agency Director had conducted a "desk review" of her appeal and affirmed the finding that Ms. Loertscher had committed child maltreatment of her fetus. (PFOF 223-25).

On January 23, 2015, Ms. Loertscher gave birth to a healthy baby boy. (PFOF 227).

## PROCEDURAL HISTORY

Plaintiff filed this action on December 15, 2014, asserting a facial challenge to the Act. (PFOF 242-43). The State Defendants moved to dismiss the Complaint on abstention and mootness grounds, and this Court denied the motion. (PFOF 244-45). The Court first concluded that this case does not require abstention because when, as here, a proceeding is no longer "ongoing," the concern motivating abstention—namely, respecting the independence and autonomy of state courts—is eliminated. (PFOF 246). Second, the Court concluded that the case is not moot because it is one "capable of repetition yet evading review." (PFOF 247).

Plaintiff thereafter amended her complaint to add an as-applied challenge, as well as claims for money damages against Taylor County and three individuals. (PFOF 248). The State

Defendants again moved to dismiss on mootness grounds because Ms. Loertscher had moved out of state, and the County Defendants moved to dismiss on the basis of immunity (either qualified or absolute) and because Plaintiff supposedly failed to identify a county policy, practice, or procedure responsible for alleged constitutional violations. (PFOF 249-50). By Opinion and Order dated June 6, 2016, the Court denied the State Defendants' motion to dismiss and denied the County Defendants' motion in part. (PFOF 251).[4]

## ARGUMENT

Ms. Loertscher is entitled to summary judgment that the Act is facially unconstitutional and that a statewide injunction should issue against any further enforcement of the Act. Federal Rule of Civil Procedure 56 states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The "mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment; the non-movant must instead present at least one "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disagreement over a material fact is not genuine if, as here, "the factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788 (7th Cir. 2014).

In general, a facial constitutional challenge to a statute is appropriate when there are "no set of circumstances [] under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), and the law is "unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). As the Seventh Circuit has explained, in the context of a facial challenge, "the claimed constitutional violation inheres in the

---

[4] The Court granted the County Defendants' motion with respect to the individual defendants because, in the Court's view, they were entitled to at least qualified immunity. (PFOF 253). While the Court recognized that "[Ms.] Loertscher's constitutional rights may have been violated," it concluded that, when viewed at the appropriate level of specificity, Ms. Loertscher's rights were not so clearly established that the individual defendants would have known they were violating her rights by enforcing the Act. (PFOF 253).

terms of the statute, not its application." *Ezell v. Chicago*, 651 F.3d 684, 698 (7th Cir. 2011). Therefore, the remedy for the constitutional violation "is necessarily directed at the statute itself and *must* be injunctive and declaratory; a successful facial attack means the statute is wholly invalid and cannot be applied *to anyone*." *Ezell*, 651 F.3d. at 698 (emphasis in original).

When a statute is challenged as unconstitutionally vague, as here, courts emphasize the nature of the rights at stake in weighing that challenge. A statute is impermissibly vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, or if it authorizes or even encourages arbitrary and discriminatory enforcement. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Vagueness is tested by more exacting standards when constitutionally protected rights are threatened. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010); *Record Head Corp. v. Sachen*, 682 F.2d 672, 674 (7th Cir. 1982). In vagueness challenges alleging infringement of constitutionally protected rights, courts may strike down a statute as vague and facially invalid even if that statute is not impermissibly vague in all of its potential applications. *Karlin v. Foust*, 188 F.3d 446, 465, n.7 (7th Cir. 1999). In addition, a facial challenge is especially appropriate when vagueness "permeates" a statute. *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999).

Furthermore, when, as here, a facial challenge alleges violation of fundamental constitutional rights, courts weigh the nature and extent of the violation and apply the relevant constitutional standards without considering hypothetically valid applications implied by some versions of the "no set of circumstances" test. As the Tenth Circuit explained, "the Supreme Court has repeatedly entertained facial challenges without engaging in this hypothetical exercise." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012). *See also Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (Stevens, J., concurring) (noting that the "no set of circumstances" test "does not accurately characterize the standard for deciding facial challenges" in many cases).

In this case, the plain text of the statute leaves no question that the Act is unconstitutional on its face. The statute is void for vagueness under the Due Process clause because it does not

provide constitutionally adequate notice to citizens of what conduct it prohibits, and because it authorizes arbitrary and discriminatory enforcement. The Act also expressly authorizes multiple infringements of fundamental substantive due process rights, including the right to liberty and to be free from bodily restraint, the right to bodily integrity and to refuse unwanted medical treatment, the right to procreate, the right to family unity, the right to decide whether to carry a pregnancy to term, and the right to be free from unreasonable searches and seizures. Thus the Act is subject to strict scrutiny, a standard of constitutional adjudication it cannot survive because it neither serves a compelling state interest nor is it narrowly tailored to serve the interests it purports to advance.  Furthermore, the statute on its face violates the Equal Protection Clause because it discriminates on the basis of gender and cannot survive intermediate scrutiny, and because it irrationally denies pregnant women the procedural protections afforded others facing involuntary detention through civil commitment as a result of mental health or drug dependency issues. In addition, the statute also violates the Fourth Amendment because it permits law enforcement officials access to a pregnant woman's private medical records without her permission or a valid warrant and allows for unconstitutional seizure of the pregnant woman. Finally, on a policy level, the Act erodes the trust and confidentiality patients need in a doctor-patient relationship, and in so doing, impedes the ability of a pregnant woman to communicate with her healthcare provider.

The Seventh Circuit has explained that in the context of a facial challenge, "[o]nce standing is established, the plaintiff's personal situation becomes irrelevant." *Ezell*, 651 F.3d at 697. Nonetheless, the facts in Ms. Loertscher's case also support the facial challenge here. The Seventh Circuit has cautioned that, in connection with adjudicating a facial challenge, a court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Center for Individual Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012) (citing *Wash. State Grange*, 552 U.S. at 450). The facts of Ms. Loertscher's case illustrate that the constitutional violations expressly authorized by the plain terms of the Act

are neither hypothetical nor imaginary, but in fact have been inflicted on a Wisconsin citizen under the terms of the Act. This Court should enjoin enforcement of the Act.

## I.     THE ACT IS VOID FOR VAGUENESS UNDER THE DUE PROCESS CLAUSE

The Act is void for vagueness because, on its face, it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits," and because it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). As discussed in detail below, the Act threatens the exercise of constitutionally protected rights and thus deprives certain individuals of liberty without clear notice while empowering officials to perpetrate those deprivations without meaningful standards.  *Id.* at 52, 56; *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Because the Act is not only vague but also threatens the exercise of constitutional rights, it is subject to a particularly stringent form of judicial review. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights"); *Record Head Corp. v. Sachen*, 682 F.2d 672, 674 (7th Cir. 1982) ("[V]agueness is tested by more exacting standards when constitutionally protected rights are threatened[.]"). Under these standards, the Act is unconstitutionally void for vagueness

### A.     The Act Is Unconstitutionally Vague Because It Fails to Provide Women Who Are Capable of Pregnancy with Notice of Prohibited Conduct

The Constitution requires that a law make clear precisely what conduct it prohibits. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."); *Connally v. General Const. Co.*, 269 U.S. 385, 393 (1926) ("The dividing line between what is lawful and unlawful cannot be left to conjecture," and a citizen cannot be deprived of her liberty based upon "statutes whose mandates are so uncertain that they will reasonably admit of different constructions."). The Act fails to meet this standard because it renders all Wisconsin residents

who are capable of pregnancy vulnerable to substantial, inconsistent, and unpredictable deprivations of fundamental liberty.

First, the Act does not provide notice of which individuals may be subject to its terms. The Act by its terms applies from the instant of fertilization and thus renders a woman subject to its enforcement before she could possibly know she is pregnant. Wis. Stat. §§ 48.01(1); 48.02(19). [5] The Act therefore threatens not only women who are pregnant, but all women who live in Wisconsin and who *may* be pregnant, regardless of whether they are aware of the actual or potential pregnancy. Because individuals have no way of knowing whether they may be subject to the Act's prohibitions, the Act fails to provide adequate notice under the Constitution. *Connally*, 269 U.S. at 390. As an illustration of this issue, the proceedings against Ms. Loertscher all flowed from alleged conduct that occurred before she knew she was pregnant. (PFOF 73-84). Indeed, the alleged conduct occurred before Ms. Loertscher even believed she was likely to become pregnant. (PFOF 64-65, 80-81, 84).

Second, the Act does not provide adequate notice of what behavior is prohibited. The Act authorizes courts and other state actors to take a pregnant woman into state custody and subject her to involuntary medical treatment and state supervision if she "*habitually lacks self-control* in the use of alcohol beverages, controlled substances or controlled substance analogs, exhibited to a *severe degree*, to the extent that there is a *substantial risk* that the physical health of the unborn child, and of the child when born, will be *seriously affected or endangered*." Wis. Stat. § 48.133  treatment; § 48.347(6) (emphasis added). [6] The Act fails to define any of these

---

[5] The moment of fertilization occurs when a viable egg fuses with viable sperm. Following fertilization, the blastocyst (the fertilized egg) may implant into the lining of the uterus (the endometrium), which typically occurs over the course of several days. Pregnancy is established only at the conclusion of the implantation of a fertilized egg. *See* Molly McNulty, *Pregnancy Police: The Health Policy and Legal Implications of Punishing Pregnant Women for Harm to Their Fetuses*, 16 N.Y.U. Rev. L. & Soc. Change 277, 314 (1988) ("If the state imposed liability before knowledge of pregnancy, women of childbearing age would have to conduct their lives as though they were perpetually pregnant.").

[6] The Act explicitly extends to minors who may be pregnant. *See* §§ 48.19(1)(cm) (authorizing judges to order minor into custody); 48.19(8) (authorizing law enforcement officials to order minor into custody); 48.205(1)(d) (authorizing intake workers to hold minor in custody); 48.21(1)(b)(4) (authorizing extension of minor's detainment in custody); 48.345(14)(a) (authorizing judge to order minor to undergo inpatient alcohol or drug treatment).

italicized terms, remaining silent on the meaning of the only words that define the threshold for prohibited conduct: "habitual"; lack of "self-control"; "severe degree"; "substantial risk"'; and "seriously affected or endangered."[7]  *Id.*  Nor do these terms reflect prevailing scientific and medical definitions or any consensus regarding substance use disorders, addiction, or the documented impacts—and lack thereof—of those conditions on an actual or potential pregnancy.[8]  Indeed, medical experts designated by Plaintiff and the State Defendants agree that the terms "habitually lacks self-control,"[9] "to a severe degree,"[10] and "substantial risk that the child when born would be seriously affected"[11] have no medical meaning.  As a result, it is impossible for a Wisconsin resident to read the Act and determine what measure of alcohol or controlled substance use (including the use of drugs prescribed to them by a doctor) by a person who is or may become pregnant rises to the level described in the Act.  In this way, the Act is

---

[7] None of these terms is included in the Act's Definitions section, § 48.02, or is elsewhere defined.  These vague terms are also incorporated into many other sections of the Act. This language is incorporated by reference in the following sections: §§ 48.067 (powers and duties of intake workers), 48.213 (hearing for adult expectant mother in custody)**,** 48.255 (petition; form and content), 48.273 (services of summons or notice), 48.275 (parents' contribution to cost of court and legal services), 48.299 (procedures at hearings), 48.30 (plea hearing), 48.305 (hearing upon the involuntary removal of a child or expectant mother), 48.31 (fact-finding hearing), 48.32 (consent decree), 48.335 (dispositional hearings), 48.357 (change in placement), 48.363 (revision of dispositional orders), 48.365 (extension of orders), 48.45 (orders applicable to adults), 48.981 (abused or neglected children and abused unborn children).

[8] *See* ECF No. 14-3 (Linda Hisgen, Director, Bureau of Programs and Policies, State of Wis. Dep't of Health and Fam. Serv's, 1997 Wisconsin Act 292, at 1-2 (Memorandum, July 23, 1998)) (noting that determining under the Act whether a woman's drug use poses serious physical harm "would have to be done on speculation, since fetal impact research is not conclusive").

[9] *See* ECF No. 154 ¶ 14 ("Rebuttal Report of Hendree E. Jones, Ph.D") ("Jones Report") ("[L]anguage[] regarding substance use or misuse that describes the user as lacking self-control or describes use in terms of habit . . . lacks precision and incorrectly places the illness . . . in a moralistic, discriminating and stigmatizing light."); ECF No. 142 at 107: 10 (Deposition of Hendree E. Jones, Ph.D") ("Jones Dep.") ("I don't understand the term 'habitual use.'"); *Id.* at 109: 1-11; ECF No. 137 at 53: 9-11 ("Deposition of Kathy Hartke, M.D.") ("Hartke Dep.") ("These are words [habitual lack of self-control in the use of controlled substances to a severe degree] that are in the law currently; and they are very difficult to interpret."); ECF No. 165 at 103: 1-2 ("Deposition of Barbara Knox, M.D." ("Knox Dep.") ("I'm not quite sure what you mean by 'habitually lacks self-control.'"); *Id.* at 105-09; ECF No. 164 at 107: 12-14 ("Deposition of Michael Porte, M.D.") ("Porte Dep.") ("I'm not going to claim to tell you that I know the technical definition [of habitual use].").

[10] ECF No. 137 at 53: 9-11 ("Hartke Dep.") ("These are words [habitual lack of self-control in the use of controlled substances to a severe degree] that are in the law currently; and they are very difficult to interpret."); ECF No. 163 at 50:25; 51:2-5 ("Deposition of David Stephan Wargowksi, M.D.") ("Wargowski Dep.") ("My understanding is that's [habitually use alcohol to a severe degree] a legal term, and I don't know what the definition of that is."); ECF No. 163 at 88: 25-25;  89: 2-13 ("Wargowski Dep.").

[11] *See, e.g.,* ECF No. 164 at 108: 25; 109: 2-3 ("Porte Dep.") (providing that "substantial risk" is "not a diagnosis"; he does not know of an agreed upon definition of "substantial risk").

vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).

In addition to leaving critical terms unique to the statute undefined, the Act fails to use word and phrases that have specific definitions elsewhere in Wisconsin law and when used in academic literature.  For example, except when referencing civil commitment proceedings under Wisconsin's Mental Health Act, which are not at issue here, the Act does *not* include medically-recognized terms such as: "drug-dependent," "alcoholic," and "alcoholism," even though those terms are included and defined by established diagnostic criteria in the Mental Health Act.[12] The Act's apparent departure from reliance on these medically-accepted definitions makes its plain terms even more difficult to interpret.  *See generally Colautti v. Franklin*, 439 U.S. 379, 392-93 (1979) (noting that law's departure from accepted medical terminology provided physicians with an ambiguous standard undefined by either the medical field or the law itself and thus rendered the law impermissibly vague).

Some of the terms the Act has in common with other Wisconsin laws remain undefined, creating additional confusion and uncertainty. For instance, the Act does not define what constitutes "habitual" use, even though many Wisconsin laws define "habitually" in terms of taking a particular, identifiable action a specific number of times. *See, e.g.*, Wis. Stat. § 118.16 (an "habitual truant" is "a pupil who is absent from school… for part or all of 5 or more days…"); Wis. Stat. § 125.04 & *State ex rel. Smith v. City of Oak Creek*, 139 Wis. 2d 788, 798-99 (1987) (person has "habitually been a law offender," for purposes of liquor licensing statute, when that individual has been documented to have previously violated the law); Wis. Stat. § 351.02 (an "habitual traffic offender" is an individual who has accumulated a certain number

---

[12] *See* Wis. Stat. §§ 51.01(1), (1m), & (8) (defining "alcoholic", "alcoholism," and "drug-dependent"); § 48.135(1) (authorizing court to proceed under Wis. Stat. § 51 when "it appears that the adult expectant mother is drug dependent or suffers from alcoholism"); 48.203(4) (authorizing the person taking "expectant mother" into physical custody to proceed under Wis. Stat. § 51 when they believe she is mentally ill, drug dependent, or developmentally disabled and that she "exhibits conduct which constitutes a substantial probability of physical harm to herself or others").

of specified violations within a five-year period).  The Act does not define "habitual" even though it forms a key threshold for prohibited conduct.

Similarly, the Act applies to "controlled substances," but that term as defined in the Wisconsin Uniform Controlled Substances Act applies to drugs ranging from marijuana to Tylenol with codeine and common prescription medications used to treat anxiety or insomnia, such as alprazolam ("Xanax") or zolpidem ("Ambien"). *See* Wis. Stat. §§ 961.01(4); 961.14(4)(t); 961.18(5)(a); 961.20(2)(a) & 961.20(2)(p). The Act also applies to alcoholic beverages. Wis. Stat. § 48.133 (alcohol).  Because the Act appears to cover *all* alcoholic beverages and controlled substances, many of which may be obtained legally, even a Wisconsin woman who did not use controlled substances that are illegal to possess would not guarantee that she could be safe from the Act's reach.[13] Nor would an individual know the number of times she could use a controlled substance or consume an alcoholic beverage before she might be subject to the Act if she later became pregnant. Indeed, in Ms. Loertscher's case, the desk review of the "child maltreatment" determination cited her occasional use of alcohol prior to conception as one of the bases for a finding of "habitual" misuse. (PFOF 234). An individual simply has no way to determine how to interpret or apply the Act to her own behavior.

### B.   The Act Encourages Discriminatory and Arbitrary Enforcement

The Act is unconstitutionally vague for the independent reason that it fails to define a clear standard of conduct, making it ripe for discriminatory and arbitrary enforcement.  *Karlin v. Foust*, 188 F.3d 446, 465 (7th Cir. 1999).  When a law is so vague that it evades uniform interpretation, it allows for unconstitutional *ad hoc* enforcement and cannot survive vagueness review. *See Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *Record Head Corp.*, 682 F.2d at 678; *Smith v. Goguen*, 415 U.S. 566, 575 (1974).  The Act fails to define offending conduct and empowers a large group of people with enforcement authority, giving those people

---

[13] Wis. Stat. § 961.41(1) criminalizes illegal "manufacture, distribution, or delivery" of controlled substances. Wis. Stat. § 961.41(1m) criminalizes illegal "possession with intention to manufacture, distribute or deliver" controlled substances. Nowhere does Wisconsin's UCSA penalize mere use of any controlled substance.

"unfettered freedom to act on nothing but their own preferences and beliefs." *Karlin*, 188 F.3d at 465.

A law must establish minimal guidelines governing enforcement. *Kolender*, 461 U.S. at 358.  Legislatures cannot, consistent with constitutional strictures, pass laws that are so vague in defining offending conduct that enforcers act on their own and courts are saddled with the job of deciding *ex post facto* which accused offenders were "rightfully detained" and which ones were the victims of aggressive, arbitrary, or discriminatory enforcement.  *Morales*, 527 U.S. at 60 (quoting *United States v. Reese,* 92 U.S. 214, 221 (1876)). The reason for this requirement is clear: a law that casts an unconstitutionally wide net is an easy tool for the "roundup of so-called undesirables." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 171 (1972). Selective enforcement of this sort is unconstitutional and conflicts with the basic promise that rule of law means equal and just enforcement.

The Act will result in exactly this sort of unconstitutional enforcement.  The Act suffers from the dual deficit that it fails to define offending conduct clearly, and it bestows enforcement power on a very large group of people.  The Act gives *anyone who furnishes services to the court* the power of a law enforcement officer or sheriff to take a pregnant person (or a person carrying a fertilized egg or embryo prior to pregnancy) who is suspected of violating the Act into physical custody.  Section 48.08(3). As a result, physician's assistants, doctors, social workers, family court commissioners, law enforcement officers, and judges, all are empowered to enforce the Act, which fails on its face to establish a uniform set of enforcement criteria.

The risk of arbitrary and discriminatory enforcement is exacerbated by the fact that the Act addresses highly charged, politicized issues about which many people hold strong, but medically and scientifically unsubstantiated, opinions, including pregnancy, alcohol consumption, and controlled substance use.  People are dramatically misinformed about the effects of in-utero drug and alcohol exposure, and moral outrage often substitutes for scientific

justification in discussions of drug and alcohol use by pregnant women.[14] Thus it is highly likely that the absence of any limiting language in the Act will give rise to widely divergent views as to what degree of use is "habitual" or "severe," whether there is any risk to a fertilized egg, embryo, or fetus from that use, and what degree of risk is "substantial." Moreover, what constitutes "self-control," and its absence, is almost entirely in the eye of the enforcer.[15]

Even child protective services workers within Taylor County do not use the same definition of "habitually lacks self-control." (PFOF 47). Julie Clarkson, for example, provided a definition but admitted that she did not know where that definition came from. (PFOF 47). Liza Daleiden, on the other hand, offered a different definition for the term. (PFOF 47). Similarly, those workers do not use the same definition for "severe degree" either. (PFOF 49).

For these reasons, the Act is ripe for unconstitutional enforcement abuses at every stage of proceedings, which may include an initial report, taking into custody, determination of jurisdiction, commitment to involuntary residential treatment, jailing for remedial contempt, adjudication as an abuser, and even the removal of a newborn from its mother.[16] The Act is unconstitutionally vague.  *See Goguen*, 415 U.S. at 575 ("Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities…").

---

[14] *See, e.g.*, Mishka Terplan & Tricia Wright, *The Effects of Cocaine and Amphetamine Use During Pregnancy on the Newborn: Myth versus Reality*, 30 J. Addictive Diseases, 1, 1-5 (2010), available at http://dx.doi.org/ 10.1080/10550887.2011.532048; Susan C. Boyd, *Mothers and Illicit Drugs: Transcending the Myths* (1999).

[15] *See Kolender*, 461 U.S. at 361 (striking down a law that required "suspicious" persons to satisfy an undefined identification requirement or else face criminal sanctions): *Morales*, 527 U.S. at 56 ("[T]he term 'loiter' may have a common and accepted meaning…but the definition of that term in this ordinance—'to remain in any one place with no apparent purpose'—does not."). *See* McNulty, *supra* note 5 at 311 ("A 'fetal neglect' law could easily result in similar discriminatory enforcement—most likely against the poor. Low-income women are in closer contact with the government through welfare agencies, public hospitals, and probation officers. As a result, they are much more likely to reported for 'fetal abuse' than are middle-class women who see private doctors and whose behavior is not supervised by the government.")

[16] Initial jurisdiction over pregnant women is covered under § 48.133 to their arrest (§ 48.193), detention (§ 48.205), involuntary treatment (§ 48.207; § 48.347(6)), adjudication as abusers (§ 48.981(3)(c)(5m)), and eventual loss of custody of their newborns (§ 48.347(7); § 48.415(2)(a)(1)).

## II.   THE ACT VIOLATES THE FUNDAMENTAL SUBSTANTIVE DUE PROCESS RIGHTS OF ALL WISCONSIN WOMEN CAPABLE OF PREGNANCY

The Act is facially unconstitutional because it deprives individuals who are or may become pregnant of their fundamental substantive due process rights to physical liberty and privacy.  The Act is not narrowly tailored to serve a compelling state interest and therefore cannot survive the strict judicial review that this court must apply to laws that violate fundamental rights.  For these reasons, it must be struck down.[17]

### A.   The Act Violates the Fundamental Substantive Due Process Rights to Physical Liberty, Freedom From Coerced Medical Treatment, Freedom From Coerced Childbearing Or Abortion, Freedom to Raise One's Family, and Privacy In Medical Information

The Due Process Clause of the Constitution protects substantive rights and liberties that [are] "deeply rooted in this Nation's history and tradition." *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977). These protected substantive due process rights include the rights to live free from unwarranted physical restraint, *Foucha v. Louisiana,* 504 U.S. 71 (1992); the right to bodily integrity, *Rochin v. California*, 342 U.S. 165 (1992), freedom from coerced medical treatment, *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261 (1990); the right to procreate, *Skinner v. Oklahoma,* 316 U.S. 535 (1923); the right to control and custody of one's children, *Meyer v. Nebraska,* 262 U.S. 390 (1923), and the right to continue a pregnancy to term or to have an abortion, *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833 (1992).  These rights are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934), and so "implicit in the concept of ordered liberty," that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut*, 302 U.S. 319, 325-326 (1937).

To the extent that the government is ever allowed to infringe on these rights, it must do so in a way that is narrowly tailored to serve a compelling state interest. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).  As set forth below, the Act cannot satisfy these criteria because it

---

[17] The constitutional rights at issue in this lawsuit are those of the individual who is or who may become pregnant. Any law directed to a fertilized egg, embryo, or fetus necessarily implicates the woman who is or who may be pregnant.

deprives individuals who are or may be pregnant of their right to be free from physical detention, forced medical treatment, forced pregnancy or abortion, and forced disruptions to family relationships, all without a compelling state interest. The Act must be enjoined.

### 1. The Act deprives women who are or may become pregnant of their right to physical liberty

The right to be free from physical restraint is the cornerstone of our constitutional democracy and a basic human right. No right is "more sacred, or is more carefully guarded… than the right of every individual to the possession and control of his own person, free from all restraint or interference of others[.]" *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891). Capacity for pregnancy does not change this fact, and nothing in the law justifies treating individuals who may become pregnant as a constitutional subclass whose liberty rights can be disregarded. *See Planned Parenthood of Se. Pa v. Casey*, 505 U.S. 833 (1992).

The Act strips Wisconsin residents who may become pregnant of their constitutional right to physical liberty. The Act authorizes courts to detain a woman based only on a "satisfactory" showing that she "habitually" "lacks self-control" "to a severe degree" in the use of drugs or alcohol and grants the court exclusive jurisdiction. Wis. Stat. §§ 48.193(1)(c); 48.133. The Act permits law enforcement officers to detain a woman based only on a "reasonable belief" that she satisfies those criteria. Wis. Stat. 48.193(1)(d)(2). The Act vests all persons providing intake services for the court with the "power of police officers or deputy sheriffs" to take a woman into custody based on the suspicion that that her use of alcohol or controlled substances exhibits a "habitual lack of self-control" to a severe degree. Wis. Stat. §§48.08(3); 48.193(d)(2).

A woman may remain detained in a strange place[18]—separated from her family, her source of income, prenatal care, and other essential rights and dignities—for several days without even a hearing. Wis. Stat. §§ 48.213(1)(a) (authorizing detention without a hearing for

---

[18] The Act permits an individual to be forcibly placed in someone else's home, a residential facility, a hospital, or a public treatment facility. Wis. Stat. §§ 48.207(1m); 48.347(3)(b); 48.347(6). For example, newspapers reported the detention of Rachel Lowe under the Act at a psychiatric ward at St. Luke's Memorial Hospital in Racine. *See* David Steinkraus, "Pregnant and Addicted – Hooked on OxyContin, Woman Remains Confined as She Seeks Help for Herself, Her Unborn Baby," *J. Times* (Racine, Wis.), May 12, 2005.

48 hours, excluding Saturdays, Sundays and legal holidays). When a hearing is held, she is not guaranteed counsel, nor is she necessarily informed in advance of the purpose of the hearing or the allegations against her. Wis. Stat. §§ 48.335 (describing hearing); 48.213(2)(e) (noting possibility of no representation).

This detention and deprivation of liberty may continue for a substantial period of time, without any clear procedure for release. Wis. Stat. § 48.203(6)(c) (stating only that an intake worker "may release" the pregnant woman "as may be appropriate" under enumerated circumstances). If a court concludes that a woman shows "habitual lack of self-control" in her use of alcohol or controlled substances to a "severe" degree, she may remain in custody even after the hearing. Wis. Stat. §§ 48.213(1)(b); 48.205(1m) (pregnant woman may be held in custody without release based on intake worker's belief that she satisfies criteria of 48.08(3)); 48.065(2)(bm) (noting potential for continued detention post-hearing); 48.067(1)-(4) (noting that a pregnant woman can be held and not released). A woman who refuses treatment may continue to be restrained. § 48.205(1m), (2)). Ultimately, a juvenile court may force her to undergo involuntary relocation to a residential facility or to an inpatient treatment center, potentially for the entirety of her pregnancy. § 48.347(3)(b), (6).

Restrictions on physical liberty may continue even after release. The Act provides enormous discretion for a court to "impose reasonable restrictions" on a woman's "travel, association with other persons or places of abode." § 48.213(3)(a)). If a woman is found to have violated any order of the court she is subject to sanctions for contempt,[19] including incarceration for up to one year. Wis. Stat.§ 785.01-785.05.

The Act therefore permits severe infringement of the constitutional right to freedom from physical restraint. Nor is this infringement hypothetical: in Ms. Loertscher's case, the juvenile court ordered that she be detained at the Eau Claire Mayo Clinic (where she had voluntarily sought medical treatment), from which she was to be transported to an inpatient facility against

_____

[19] Act 292 Sections 239 and 292 amended the Code to enable a finding of contempt of court for violations of orders issued under the Act.

her will (PFOF 166).  When she refused to accept confinement in that inpatient drug treatment facility, she was found in contempt of court and ordered to jail for 30 days, only securing her release after 18 days by agreeing to an intrusive consent decree that imposed continuing restrictions on her liberty. (PFOF 202, 222-24).

### 2. The Act forces people who are or may become pregnant to undergo unconsented and inappropriate treatment

The Act also violates the liberty rights of women who are or may become pregnant by forcing them to submit to medical treatment either directly or under threat of losing their physical liberty.  In so doing, it corrodes the doctor-patient relationship, tramples on fundamental privacy rights, and undermines maternal and fetal well-being through the actions of individuals without any obligation to base treatment recommendations on scientific evidence.

The right to refuse medical treatment is fundamental and a well-settled "constitutionally protected liberty interest." *Cruzan*, 497 U.S. at 278.  The decision when and whether to undergo medical treatment is highly personal, and an individual may refuse even lifesaving treatment. *Glucksberg*, 521 U.S. at 720 ("We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment."); *United States v. Husband*, 226 F.3d 626, 632 (7th Cir. 2000) (noting that "any medical procedure implicates an individual's liberty interests in personal privacy and bodily integrity" because "there is 'a general liberty interest in refusing medical treatment'") (quoting *Cruzan*, 497 U.S. at 278).  Moreover, both children and adults have "a substantial liberty interest in not being confined unnecessarily for medical treatment." *Parham v. J.R.*, 442 U.S. 584, 600 (1979). Pregnancy does not diminish the right to make private medical decisions, as the Supreme Court has recognized. *E.g.*, *Roe v. Wade*. 410 U.S. 113, 163 (1973).

The Act creates a number of mechanisms that may force a woman to undergo unwanted (and potentially ill-advised) medical interventions.[20]  For example, even before any hearing to

---

[20] A woman who does not consent to the treatment, or who does not avail herself of it, may even be further punished by having to pay out-of-pocket for the unsought and unconsented to treatment.  Wis. Stat. § 48.362 (3m).

review the legitimacy of her detention, a detained adult woman can be "delivered" without her consent to a hospital or doctor's office for the purpose of diagnosis or treatment based on the "belief" that she is "suffering from a serious physical condition." Wis. Stat. § 48.203(3). A woman also may be tested for substances by hospital employees, social workers, or intake workers who merely suspect that she may be using alcohol or controlled substances. Wis. Stat. § 146.0255(2). A woman may then be forced to undergo treatment as a result of the tests. *Id.* (providing for referral to an agency authorized to pursue child abuse investigations under § 48.981 and forcible medical interventions pursuant to § 48.238)).

The Act also provides numerous opportunities for a wide range of individuals to override the wishes of a pregnant woman regarding her medical treatment. The juvenile court, a law enforcement officer, or an intake worker can force a woman into physical custody at a hospital or treatment center based only on the belief that she satisfies the language of section 48.133. Wis. Stat.§ 48.205(1m). *See also* Wis. Stat. §§ 48.346(6); 48.207(1m) (b), (c), (e); 48.345(14)(a) (providing for delivery of child expectant mother into inpatient treatment). A woman can be forced into that treatment even if she refuses. Wis. Stat. §§ 48.205(1m); 48.347(4), (5), (6). The standard for overriding a woman's lack of consent is low: an intake worker or any authorized actor, § 48.205(1m)(2)), need only have "probable cause to believe" that the woman uses alcohol or controlled substances within the meaning of 48.133. Wis. Stat. § 48.205(1m). The statute does not charge the intake worker with considering the basis for a woman's decision not to submit to the ordered medical treatment. *Id*. A woman also may be forced into treatment after seeing a doctor for routine prenatal care or tests for the purpose of monitoring the health of her actual or suspected pregnancy. Wis. Stat. § 46.238 (detailing procedures for reporting a woman's blood tests results to the state).

In a particularly shocking twist, the Act empowers the egg, embryo or fetus—acting through a guardian ad litem (GAL)—to take legal action against the pregnant woman in order to challenge her medical decisions and force her into treatment. § 48.235(3)(b)(2). The GAL is a complete stranger to the woman and her health care conditions and priorities but has extremely

broad discretion to take *any action* consistent with Chapter 48.  § 48.235(4m)(8).  The GAL is required by statute to consider *only* the best interests of the fertilized egg, embryo, or fetus. Wis. Stat. §§ 48.01(1) ("[T]he best interests of the… unborn child shall always be of paramount consideration"); § 48.235(3)(a) (GAL shall be an advocate for "best interests of …unborn child for whom the appointment is made").  Nowhere does the Act require the GAL or other state actors to consider the interests of the pregnant woman—in other words, the GAL acts in the "best interests" of an embryo but not the best interests of the woman carrying that embryo. The GAL may petition a court to change or extend orders, including orders involving forced medical treatment.  § 48.235(4m)(4)&(5).

Again, the experience of Ms. Loertscher demonstrates that these threats to the constitutional right to make autonomous medical decisions are not hypothetical.  The GAL appointed to represent Ms. Loertscher's fetus successfully sought to substitute his decisions concerning Ms. Loertscher's medical treatment for her own. When Ms. Loertscher appeared at the Temporary Physical Custody hearing by telephone from the hospital, the state-appointed GAL appeared at the hearing on behalf of her fetus only. (PFOF 142).  Shortly thereafter, the GAL initiated the contempt proceedings against Ms. Loertscher over treatment issues, resulting in her incarceration in Taylor County Jail. (PFOF 174, 195-96, 219-20, 202-03, 206-07).

These many paths to forced, mandatory or coercive medical interventions violate a woman's constitutional privacy right to decide for herself when and whether to seek medical interventions during her pregnancy.  *See Casey*, 505 U.S. at 851 ("Our law affords constitutional protection to personal decisions relating to . . . procreation, . . ." because decisions that "fundamentally affect[] a person" are "central to the liberty protected by the Fourteenth Amendment. . . . [and] [b]eliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.").

**3.      The Act infringes on the fundamental right to decide whether to carry a pregnancy to term or have an abortion**

The Act may also force women to make the unconstitutional choice between ending a pregnancy and being deprived of physical freedom and other fundamental liberties.  *See New York v. United States*, 505 U.S. 144, 176 (1992) ("A choice between two unconstitutional[] [alternatives] is no choice at all.").  The right to procreate is fundamental, *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), and the decision whether to become or remain pregnant belongs to the pregnant person.  *Casey*, 505 U.S. at 859 (citing with approval circuit court opinions finding state-compelled abortion unconstitutional under *Roe*); *Roe*, 410 U.S. at 153 (holding right of privacy "broad enough to encompass a woman's decision whether *or not* to terminate her pregnancy.") (emphasis added); *see also Arnold v. Bd. of Educ. of Escambia County Ala.*, 880 F.2d 305, 311 (11th Cir. 1989), *overruled on other grounds*, 610 F.3d 701 (permitting lawsuit against public school officials accused of coercing a young woman into having an abortion and holding that, "[t]here simply can be no question that the individual must be free to decide to carry a child to term."). Individuals have the fundamental substantive due process right to make these deeply private and spiritual decisions without state pressure. *See Paul v. Davis*, 424 U.S. 693, 713 (1976); *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *Carey v. Population Servs., Int'l*, 431 U.S. 678, 685 (1977); *United States v. 12 200-Foot Reels*, 413 U.S. 123, 127 n.4 (1973); *Casey*, 505 U.S. at 859. A state may not impose an undue burden on the decision to carry a pregnancy to term.  *E.g.*, *Cleveland Bd. Of Educ. v. LaFleur*, 414 U.S. 632, 639 (1974) (invalidating a school district requirement that pregnant schoolteachers take unpaid maternity leave because it placed a "heavy burden" on the "right to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child").

The Act, too, places a "heavy burden" on this right by forcing a woman subject to its terms to endure an array of potential sanctions in order to carry her pregnancy to term.  For example, a pregnant woman may be subject to physical detention, Wis. Stat. § 48.193(a)(1-3), (d)(2); isolation from family, friends, and chosen medical providers, Wis. Stat. § 48.205(1m),

(2); § 48.213(3)(a); the pain and shame of court proceedings to determine whether she has committed abuse and/or neglect, Wis. Stat. § 48.213; and the imposition of involuntary, unnecessary, and potentially ill-advised medical treatments, Wis. Stat. § 48.347(6). For many women ending a pregnancy would be the only way to guarantee freedom from these penalties.[21] The Act therefore forces some women to choose between staying pregnant and having their constitutional rights infringed.

At the same time, the Act also burdens the right to choose to end a pregnancy by denying women physical liberty and the ability to access healthcare that reflects *their* choices. *Casey*, 505 U.S. at 874 ("[W]here state regulation imposes an undue burden on a woman's ability to [obtain an abortion,] the power of the State reach[es] into the heart of the liberty protected by the Due Process Clause."). A restriction is "undue" if its "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before viability." *Id*. at 878. The substantial obstacle must be present within "a large fraction of the cases in which [it] is relevant." *Id*. at 895.

The Act creates a number of substantial obstacles in the path of a woman being subjected to the Act who is or might be seeking an abortion. A woman physically detained under the Act may be totally unable to access abortion care throughout her pregnancy. *See, e.g,* Wis. Stat. §§ 48.193(1)(d)(2), 48.207(1m), 48.347(3). A woman may be prevented from accessing abortion care because the GAL, appointed under the Act solely to address the supposed best interests of fertilized eggs, embryos and fetuses, presumably would oppose efforts to end a pregnancy. *See* Wis. Stat. § 48.235(1)(f); Wis. Stat. § 48.235(3)(b)(2) (GAL must make "clear and specific

---

[21] Again, Ms. Loertscher's case illustrates that this dilemma is not merely hypothetical. Immediately following the September 4, 2014 hearing, Ms. Loertscher was led to a conference room in the courthouse where she met with TCHSD social workers. (PFOF 204). Ms. Loertscher asked them what they wanted from her; one of them responded, "we just want a healthy baby." (PFOF 204). Ms. Loertscher said that this is what she wanted, too. (PFOF 204). Ms. Loertscher then asked if "this would all go away if I had an abortion?" She recalls the social workers responding, "Yes, it would." (PFOF 205). The transcript of Alicia Beltran provides another illustration of the dilemma: During the proceedings, in which she was afforded no legal counsel despite her repeated requests for one, she also asked repeatedly about her to right to obtain an abortion. Transcript, July 18, 2013, filed as ECF No. 48 (unsealed ECF No. 59) in *Beltran v. Loenish*, 13-cv-1101, at 5  (E.D. Wis.) ("What if I choose to get an abortion? This will be dropped, right?"). In response to Ms. Beltran's question "If I go through with the abortion, would I have to do all this?" the Court Commissioner informed her that she would "need to ask the advice of your attorney." *Id*. at 12.

recommendations" to the court concerning "best interests of the …unborn child at every stage of the proceeding").  The Act makes access to abortion subject to state approval through modification of a court order if a pregnant woman has been ordered to inpatient drug treatment, *see* Wis. Stat. § 48.357(1) & (2m) (juvenile court must approve change in placement of adult expectant mother).  The Act also provides enormous enforcement discretion to courts, allowing them to mandate "rules for the adult expectant mother's conduct" with the aim of protecting "the physical well-being of the unborn child" whenever a pregnant woman is placed under the "supervision" of a state agency or "an adult relative or friend of the adult expectant mother." *See* Wis. Stat. § 48.347(2).  All of these rules create a basis for the denial of access to abortion.

By granting these state actors "dominion" over a pregnant woman's decision concerning abortion, the Act violates substantive due process rights.  *E.g.*, *Casey,* 505 U.S. at 898 (finding that a state cannot give even the presumed father (a husband) the power to deny a woman access to abortion).  State laws that have "the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving" even legitimate state interests.  *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (invalidating Texas law requiring abortion providers to have admitting privileges and to meet standards for surgical centers); *McCormack v. Hiedeman*, 694 F.3d 1004, 1014-15 (9th Cir. 2012) (holding that imposing criminal penalties on pregnant women for inducing her own abortion creates an undue burden); *Jackson Women's Health Org. v. Currier*, 940 F.Supp.2d 416, 422-23 (S.D. Miss. 2013) (granting preliminary injunction against regulation of abortion providers which forced all women to leave the state to obtain abortion services).  The right to choose an abortion is yet another substantive due process right violated by the Act.

### 4.    The Act infringes on the fundamental right to care and control of one's children free from unjust state interference

The Act also provides for removal of a child once born from its mother's custody based solely on what happened while the woman was pregnant and thus violates a woman's fundamental liberty interest in caring for and controlling her children.  *Santosky v. Kramer*, 455

U.S. 745, 753-54 (1982); *May v. Anderson*, 345 U.S. 528, 533 (1953); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) ("The fundamental right to familial relations is an aspect of substantive due process.").  Neither the substance nor strength of this right depends on a person's conformity with a state's legislative definition of "model parenthood."  To the contrary, the Supreme Court has long recognized and protected the sanctity of the family unit and the essential fundamental right to make parenting decisions free from interference by the state.  *Meyer*, 262 U.S. at 399; *May*, 345 U.S. at 533. *See also Troxel v. Granville*, 530 U.S. 57, 57 (2000).  Against this backdrop, the decision to terminate a woman's connection to her child is "so severe and so irreversible" that a law perpetrating this punishment is subject to strict scrutiny.  *Santosky*, 455 U.S. at 759.

The Act contravenes these precedents by allowing the swift and sweeping deprivation of a woman's right to care for and control of her child.   For example, if a woman is suspected to meet the criteria of section 48.133, she risks—against all decency and medical logic—losing custody of her future child *while she is still pregnant*. Wis. Stat. §§ 48. 347(7) & 48.345.  A woman whose punishment under the Act results in placement outside her home during her pregnancy risks permanent involuntary termination of her parental rights after her child is born based solely on the fact of that placement. Wis. Stat. 48.415(2)(a).  The Act also independently authorizes a GAL appointed under the Act to punish a woman for refusing forced treatment by petitioning for termination of a woman's parental rights once the child is born. *See* Wis. Stat. §§ 48.235(4m)(3), (6). As discussed in Section I, *supra*. the Act's vague terms authorize these severe consequences on the basis of highly questionable "findings" with multiple opportunities for arbitrary and discriminatory enforcement.  These "findings" also might be used to conclude that a woman has committed child maltreatment, *see* § 48.981(3)(a) & (3)(c)(5m), a determination that will follow her indefinitely, because of the statutory ambiguity in reference to the term "child." Each of these intrusions on family units and forced ruptures in family relationships represent a significant intrusion on well-established substantive due process rights.

**B.** **The Act Cannot Survive the Strict Scrutiny Applied to Laws That Violate Fundamental Rights**

The due process clause "forbids the government to infringe fundamental liberty interests, *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Russ v. Watts*, 414 F.3d 783, 789 (7th Cir. 2005) (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)) (emphasis in original). Because the Act violates a number of fundamental rights, this court must "examine carefully" whether it actually advances a compelling interest, and if so, whether the law is narrowly tailored. *Moore v. East Cleveland*, 431 U.S. 494, 499 (1977). Because the Act neither furthers a compelling governmental interest, nor is narrowly tailored to achieve even the interests it claims to advance, the Act is unconstitutional, and its enforcement should be enjoined by this Court.

**C.** **The Act Cannot Survive Strict Scrutiny Review Because It Does Not Serve a Compelling State Interest**

Wisconsin cannot demonstrate a compelling interest that justifies the Act's unconstitutional infringement of women's fundamental rights. The Act purports to serve the state's interest in protecting the health and development of "unborn children," defined to include fertilized eggs, embryos, and fetuses. Wis. Stat. §§ 48.01(a); 48.01(am); 48.01(bm).[22] But the necessarily corresponding concern for maternal health is conspicuously absent from the Act. The lack of concern for maternal health not only conflicts with clear Supreme Court precedent but also undermines the very interest in fetal health the Act purports to further.

The Supreme Court has held that even in the context of abortion states do not have a compelling interest in a pregnancy before viability. *Casey*, 505 U.S. at 846 ("Before viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a

_____

[22] It bears noting at the outset that the Act does no such thing; its plain terms make clear the real legislative interest it reflects – to punish people who are or may become pregnant for substance use. The Supreme Court has struck down other laws for this sort of sham interest in protecting maternal or fetal interests during pregnancy. *See Whole Woman's Health*, 136 S. Ct. at 2311 ("We have found nothing in Texas' record evidence that shows that, compared to prior law (which required a 'working arrangement' with a doctor with admitting privileges), the new law advanced Texas' legitimate interest in protecting women's health."); *Casey*, 505 U.S. 833, 898 (1992) ("The husband's interest in the life of the child his wife is carrying does not permit the State to empower him with this troubling degree of authority over his wife."). However, even taking the Act's statutory purpose at face value, it fails to serve a compelling interest and therefore must be struck down.

substantial obstacle to the woman's effective right to elect the procedure"). Yet the Act targets women so early in the procreative process that they may not yet even know whether they are, in fact, pregnant. Wis. Stat. § 48.02(19).  Furthermore, even when states have an interest in potential life after viability, any such restrictions must remain subordinate to the woman's own right to life and health. *Casey*, 505 U.S. at 870-71. *See also Gonzales v. Carhart*, 550 U.S. 124, 161 (2007) (recognizing that a prohibition on certain abortion procedures would be unconstitutional "if it subjected women to significant health risks"). Given that the health of the fetus is intimately connected to the health of the pregnant woman, the absence of any concern with the pregnant woman involved further undermines any assertion of a compelling interest.

These concerns are particularly important here, where the legislature passed the Act even after the Wisconsin Legislative Council warned that its constitutionality would be "highly doubtful" if extended to all stages of pregnancy.  (PFOF 10).[23] The Legislative Council opined that the Act as written would violate the ruling in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992). (PFOF 12). But despite the law's constitutional infirmities, legislators pushed the Act forward. (PFOF 37-44).

The legislature also passed the Act in the face of opposition from the Wisconsin Department of Children and Families ("DCFS"), the state agency tasked with oversight of child welfare services, which would have to implement the Act. (PFOF 13, 19-23) (describing attempts by DCFS to dissuade the legislature from moving forward with a law that would "would force pregnant women to be taken into custody" and "create a category of abuse called unborn child abuse"). DCFS warned legislators that the Act could "scar[e] women away from treatment," thereby reducing the likelihood of women receiving adequate prenatal care and thus undermining the purported interest the law sought to advance. (PFOF 20, 27). But, still, the legislature "absolutely insisted there had to be a category of child abuse called unborn child abuse[,] [t]hey would not change that." (PFOF 24). The legislature "want[ed] expectant mothers

---

[23] A co-sponsor of the Act, former Senator Joanna Huelsman, voiced a similar concern that the Act may be unconstitutional. (PFOF 43).

to receive treatment. And if they didn't do it voluntarily, they wanted it enforced somehow." (PFOF 25).

Furthermore, the state has not demonstrated that the Act furthers an interest in fetal health at any stage of development, even if such an interest could be compelling (which it cannot, particularly when the Act wholly neglects the health of the pregnant woman). When the Wisconsin legislature enacted Act 292, it effectively presumed on myth, not fact, that cocaine use was so uniquely and immediately harmful to fetuses that it erected an elaborate law enforcement scheme to deny pregnant women liberty and interfere with a pregnant woman's medical care. Today, leading federal government agencies confirm that "the phenomena of 'crack babies' . . . is essentially a myth." *United States v. Smith*, 359 F. Supp. 2d 771, 780 n.6 (E.D. Wis. 2005).[24] As the National Institute for Drug Abuse has reported, "Many recall that 'crack babies,' or babies born to mothers who used crack cocaine while pregnant, were at one time written off by many as a lost generation. . . . It was later found that this was a gross exaggeration." Nat'l Institute on Drug Abuse, Research Report, Cocaine: Abuse and Addiction 6 (May 2009) available at http://www.drugabuse.gov/PDF/RRCocaine.pdf. As the U.S. Sentencing Commission concluded, "[t]he negative effects of prenatal cocaine exposure are significantly less severe than previously believed" and those negative effects "do not differ from the effects of prenatal exposure to other drugs, both legal and illegal." U.S. Sentencing Comm'n, Report to Congress: Cocaine and Sentencing Commission Policy 21 (2002).

Moreover, medical experts designated by Plaintiff and the State Defendants agree that the risks of harm to a fetus and/or to the child when born from a pregnant woman's consumption of alcohol,[25] as well as other controlled substances, including marijuana, opioids and

---

[24] Plaintiff's designated experts on addiction agree that babies cannot be "born addicted" to alcohol or other drugs. ECF No. 155 ¶ 20 ("Rebuttal Report of Stephen Kandall, M.D.") ("Kandall Report"); ECF No. 139 at 117: 22-23 ("Deposition of Stephen Kandall, MD") ("Kandall Dep.") ("[W]e're careful to say they're not addicted, because they're not addicted. They're passively dependent, it's transient and treatable."). The State defendants' experts do not dispute this opinion. ECF No. 164 at 69 ("Deposition of Michael Porte, M.D.") ("Porte Dep.") ("[M]ore appropriately they're in withdrawal.").

[25] ECF No. 154 ¶¶ 16-17 ("Jones Report"); ECF No. 156 ¶ 40 ("Terplan Report") ("[T]he data is reassuring that normal alcohol consumption early in pregnancy, stopped upon discovery of pregnancy, will have no ill effect on the

methamphetamine, are varied and range from no risk to greater risk.[26] The experts further agree that the presence of smoking cigarettes, environmental factors, genetics, poor nutrition, and other conditions experienced by pregnant women contribute to the inability to determine whether any one factor causes a given risk of harm to a fetus and/or child when born.[27] And, what is more, the experts agree that while there may be correlation between the use of alcohol or other drugs by a pregnant woman and risk of harm to the child when born, correlation is not causation and the science does not support a linear relationship between use and harm.[28]

_____

developing fetus or the child once born."); ECF No. 137 at 64 ("Hartke Dep.");  ECF No. 139 at 133: 21-22 ("Kandall Dep.") ("[M]any of the effects are either nonexistent or very subtle or very minor."); ECF No 141 at 132-34 ("Deposition of Mishka Terplan, M.D., MPH") ("Terplan Dep."); ECF No. 143 at 54: 22-25 ("Deposition of Aleksandra Zgierska, M.D. Pd.D." ("Zgierska Dep.") ("It's well known that alcohol harms the fetus . . . but we don't know what specific level for a specific woman would become harmful."); ECF No. 163 at 52, 67, 76-78 ("Wargowski Dep."); ECF No. 165 at 194: 20-25; 195:2 ("Knox Dep.") (agreeing that "a consensus is still lacking about the effects of low levels of [prenatal alcohol exposure]").

[26] ECF No. 139 at 67: 9-11 ("Kandall Dep.") ("A]s a general statement these are not drugs you want to take when you're pregnant, but that's about as far as I can go."); id. at 82 ("Cocaine-exposed infants show a very wide spectrum of effects, ranging from a lack of obvious symptoms to neurobehavioral dysfunction . . . ."); ECF No. 155 ¶ 18 ("Kandall Report"); ECF No. 139 at 95:14-22 ("Kandall Dep.") (explaining that when the mother is in a supportive program "those fetuses can do beautifully. They grow normally and there's no problem"); ECF No. 156 ¶ 39 ("Terplan Report") ("[T]here is no conclusive evidence that marijuana use is likely to cause substantial or even minor harm to a developing fetus."); ECF No. 154 ¶ 20 ("Jones Report") (cited study "did not find effects on children with less than heavy prenatal methamphetamine exposure"); ECF No. 156 ¶ 37 ("Terplan Decl.") ("These data do not support statements and suggestions in the medical record that any use is harmful;" "[w]hen those who stopped use during the first or second trimester were contrasted with non-users, birth outcomes were similar"); ECF No. 165 at 216-17 ("Knox Dep.") (agreeing that data suggested a benefit to maternal and newborn health if methamphetamine use is stopped); id. at 246-47 (agreeing that studies are not conclusive between marijuana use and "certain developmental outcomes" and that there are "probably" studies that fail to show an association between marijuana use and "certain outcomes").

[27] ECF No. 155 ¶¶ 9, 13-16, 18 ("Kandall Report"); ECF No. 156 ¶ 36 ("Terplan Report") ("[I]t is hard to tease out whether 'small for gestational age' results from methamphetamine alone, methamphetamine with tobacco, or is a result of the tobacco use alone."); ECF No. 139 at 68 ("Kandall Dep.") ("[A] lot of these [harms] are really lifestyle issues . . . . it may be much more the fact that a mother is not eating well, not getting prenatal care, out on the street using drugs rather than the drug itself, which is what underlies this whole discussion of it's so difficult to ascribe an effect to a particular drug."); ECF No 141 at 94-95 ("Terplan Dep."); id. at 163 ("A lot of the cocaine literature is confounded by maternal smoking. And not a lot of the literature is actually adjusted or well[-]adjusted for that confounder."); ECF No. 142 at 45, 47 ("Jones Dep.") (effects of alcohol depend on many factors); id. at 49 (prenatal marijuana exposure "is a risk factor in a myriad of other risk factors"); id. at 88; ECF No. 163 at 68 ("Wargowski Dep.") (citing poverty, poor nutrition, and genetic backgrounds as among other factors that contribute to fetal alcohol syndrome); id. at 80-82; ECF No. 165 at 207-09, 229-31 ("Knox Dep.") (agreeing that factors other than substance use can cause preterm labor and premature birth); ECF No. 164 at 63 ("Porte Dep.").

[28] ECF No. 154 ¶ 19 ("Jones Report") ("[B]ased on collective literature, no definitive simple linear cause and effect links can be made with regard to prenatal exposure to marijuana and birth outcomes."); ECF No. 139 at 51: 11-13 ("Kandall Dep.") ("It's not a linear relationship. There are too many biological variabilities."); id. at 69; ECF No 141 at 138-39 ("Terplan Dep.") ("I think it's important to distinguish between . . . association and causality, and I don't think any of these studies really are positive like causal correlation between methamphetamine and . . .

Scientific studies do not support the claim that methamphetamine exposure will likely result in cognitive delay in infants or children after they are born. ECF No. 156 ¶¶ 35 & 37-38 ("Terplan Report"); ECF No. 154 ¶ 20 ("Jones Report"). The one consistent finding of studies on methamphetamine and pregnancy is that infants exposed to methamphetamine in utero are born at a lower than average weight for their gestational age. This is also an effect of tobacco smoking, and since women who use methamphetamine in pregnancy also commonly smoke cigarettes, it is not known whether this affect is a result of tobacco use alone. ECF No. 156 ¶¶ 36 ("Terplan Report").

Further, it is hard to depict as "compelling" a state interest in protecting the health of a fetus when the Act explicitly does *not* apply to other, potentially more harmful substances, such as tobacco. Tobacco use is demonstrably associated with stillbirth, low birth weight, miscarriage, and pre-term delivery. ECF No. 156 ¶ 39 ("Terplan Report"); ECF No. 155 ¶ 13 ("Kandall Report); ECF No. 165 at 182: 18-25; 183: 2-4 ("Knox Dep."). Compared to marijuana, the risks of harm from cigarettes have been shown to be more significant and are well established. ECF No. 156 ¶ 39 ("Terplan Report").

By intimidating, threatening, detaining, and incarcerating pregnant people, the Act strikes at maternal well-being with such force that it cannot possibly advance a state interest in fetal well-being.  The control and punishment allowed by the Act contravene the medical and public health consensus regarding appropriate prenatal care.  *See* ECF No. 156 ¶¶ 48, 52-53 ("Terplan

---

placenta previa, for example.") ECF No. 142 at 46 ("Jones Dep.") ("[W]e can't just say a linear and cause and effect prenatal alcohol always 100 percent certainty equals a bad birth outcome."); *id.* at 87 ("[Y]ou're making a simple linear cause and effect relationship [between use of drugs or alcohol and harm to the fetus] when it's not that simple."); ECF No. 165 at 209-10, 219-21 ("Knox Dep.") (agreeing that studies show that methamphetamine exposure is "associated with" certain delays and deficits and not the "cause" of); *id.* at 236: 19-23 (agreeing that studies on prenatal exposure to marijuana do not show causation of "stunted outcomes"); ECF No. 164 at 63: 18-22 ("Porte Dep.") (noting that many factors influence the risk that children will use marijuana as adolescents or young adults but that there is a 'statistical correlation" between use in pregnancy and later use by "their offspring").

In addition, Plaintiff's designated medical experts on substance use during pregnancy agree that there is "ambiguity and confusion" in the studies of fetal deficits associated with substance use among pregnant women, and the State Defendants' experts do not dispute this opinion. ECF No. 139 at 81 ("Kandall Dep."); ECF No. 163 at 77-78 ("Wargowski Dep.") (noting there is no consensus or definition of significant prenatal alcohol use and whether FASD will result).

Report") ("[P]unitive responses are in conflict with the behavioral theory underlying the non-pharmacological treatment for addition . . . ."). Indeed, DCFS and the City of Milwaukee Health Department opposed passage of the Act for this very reason. (PFOF 34-35) (expressing concern that "a criminal justice approach to maternal and child health issues is not the first and best alternative" describing that approach as "destructive," and explaining that "[r]eadily available alcohol and drug treatment for expectant mothers would be preferable to threatening mothers with incarceration and loss of parental rights.").

Even with respect to the issue of alcohol and controlled substance use, depriving a pregnant person of physical liberty is not just unconstitutionally intrusive, but also a self-defeating means of deterring alcohol and controlled substance use.  *See, e.g.*, The American College of Obstetricians and Gynecologists, *Substance Abuse Reporting and Pregnancy: The Role of the Obstetrician-Gynecologist*, Committee on Health Care for Underserved Women, Jan. 2011, at 1 (finding that "[i]ncarceration and the threat of incarceration have proved to be ineffective in reducing the incidence of alcohol or drug abuse"); ECF No. 156 ¶ 48 ("Terplan Report") ("From a public health perspective, such legislation can be considered harmful as ultimately it leads to fewer women receiving beneficial services (both prenatal care and substance use disorder)"). The American Medical Association has stated that "punishing a person who abuses drugs or alcohol is generally not an effective way of promoting curing their dependency or preventing future abuse." AMA Board of Trustees Report, *Legal Interventions During Pregnancy*, 264 J. Am. Med. Assoc. 264, 2667 (1990). For these reasons, "a wide spectrum of respected medical and public health organizations," including...the American Society of Addiction Medicine, the American Public Health Association, the American College of Physicians, the American College of Obstetricians and Gynecologists, the American Academy of Pediatrics, the March of Dimes, and the National Council on Alcoholism and Drug Dependence, have opposed the arrests of pregnant women who use drugs. *Id.*  The Act, however, takes none of this into account.  The Act serves no compelling interest and cannot survive judicial review.

**D.    The Act Cannot Survive Strict Scrutiny Review Because It Is Not Narrowly Tailored**

The Act casts an enormously wide net and plainly fails the constitutional requirement that it be narrowly tailored to achieving a compelling interest. By its own terms, the Act subjects *any person* whose body is carrying a fertilized egg and who uses some undefined amount of alcohol or controlled substance to state custody and involuntary treatment.  This means that a woman whose egg was fertilized hours before her detention, and who would test negative on a pregnancy test, would properly fall within the ambit of the Act.

The Act's vague language (see discussion of vagueness, Section I, *supra*) also creates the presumption—which has no basis in fact—that any amount of alcohol use and use of any controlled substance during pregnancy necessarily harms the fetus.  The Act also lacks identifiable enforcement standards or criteria for assessing whether a woman falls within its ambit.  The result is that the Act's theoretical reach is virtually boundless.  *Any* woman who is merely suspected by anyone empowered to report suspected substance use to a government official of alcohol or substance use is at risk of losing her most fundamental rights.  This is the opposite of narrow tailoring.

The Act is also so broad that is counterproductive for the women and the families the Act purports to protect.  For instance, the Act intrudes on and perverts the doctor-patient relationship. It authorizes health care providers to report pregnant patients to child welfare authorities, who then collaborate with law enforcement. Wis. Stat. § 48.981(2)(d). This means that even a woman who knows she is pregnant, and seeks help from her provider, could be deprived of her basic freedoms because she sought help when pregnant and relied on doctor-patient confidentiality. The Supreme Court has recognized that "the mere *possibility* of disclosure [of patients' confidences] may impede development of the relationship necessary for successful treatment." *Jaffe v. Redmond*, 518 U.S. 1, 10 (1997) (emphasis added).  In punishing women and impeding communications with their doctors, the Act therefore frustrates the public health policy position

of every professional organization of major health care providers.[29] Further, the Act contains no requirement that any treatment ordered has been proven effective nor that it will not increase risks. The Act requires no scientific studies of the impact of the law itself. The Act thus undermines its claimed purpose by devaluing maternal health.

In sum, the overwhelming consensus among medical experts and social scientists is that punitive laws like the Act are detrimental to fetal health because they discourage women from seeking prenatal care, and research indicates that risks associated with the use of controlled substances and alcohol during pregnancy are not unique, quantifiable, necessarily substantial, or certain. A statute seeking to address some kind of problem is only "narrowly tailored," for the purposes of strict scrutiny review, "if it targets and eliminates no more than the exact source of the evil it seeks to remedy." *Entm't Software Ass'n v. Blagojevich,* 469 F.3d 641 (7th Cir. 2006). Because the Act does not advance the interests of maternal, fetal, or child health, but in fact penalizes women who seek prenatal care, all in the name of addressing a problem that has been overstated—the harms wrought by drug and alcohol use by pregnant women—the Act is not narrowly tailored to serve any state interest. The Act certainly is not narrowly tailored to serve the legislature's expressed interest in advancing fetal health, as potential incarceration and imposition of unnecessary and inappropriate treatment work directly contrary to that supposed interest.

## III.   THE ACT IS UNCONSTITUTIONAL UNDER THE EQUAL PROTECTION CLAUSE

The Act targets pregnant women for unequal treatment in violation of the Equal Protection Clause. When state laws directed at a class of people infringe the fundamental rights

---

[29] *Ferguson v. City of Charleston*, 532 U.S. 67, 85 n.23 (2001) (noting the "near consensus in the medical community that programs of the sort at issue, by discouraging women who use drugs from seeking prenatal care, harm, rather than advance, the cause of prenatal health"); *see also, e.g.*, American College of Obstetricians and Gynecologists Committee on Ethics, Committee Opinion 321, Maternal Decision Making, Ethics, and the Law (Nov. 2005); American Psychiatric Association, Position Statement, Care of Pregnant and Newly Delivered Women Addicts, APA Document Reference No. 200101 (March 2001); Report of American Medical Association Board of Trustees, Legal Interventions During Pregnancy, 264 JAMA 2663, 267 (1990); American Public Health Association, Policy Statement No. 9020, Illicit Drug Use by Pregnant Women, 8 Am. J. Pub. Health 240 (1990).

of the targeted group, these laws violate the Equal Protection Clause unless they can satisfy strict scrutiny. *Shapiro v. Thompson,* 394 U.S. 618, 638 (1969), *overruled in part on other grounds*, 415 U.S. 651. As set forth above in section II, the Act deprives women in Wisconsin who are or who may become pregnant of their fundamental rights in the service of no compelling interest. For that reason alone, the Act violates the Equal Protection Clause and is facially unconstitutional.

In addition, the Act specifically targets Wisconsin citizens on the basis of gender, and is therefore also subject to heightened, or "intermediate" scrutiny under the Equal Protection clause. *See United States v. Virginia*, 518 U.S. 515, 555 (1996) ("all gender-based classifications today warrant heightened scrutiny") (citation omitted); *Hayden v. Greensburg Cmty. School Corp.*, 743 F.3d 569, 577 (7th Cir. 2014) ("Gender is a quasi-suspect class that triggers intermediate scrutiny in the equal protection context."). The Act fails this level of scrutiny, because it is not substantially related to an important governmental interest. *See Craig v. Boren*, 429 U.S. 190, 197-98 (1976). Finally, the Act does not afford pregnant women targeted under the Act the same procedural protections guaranteed by Wisconsin's Mental Health Act to individuals facing involuntary civil commitment. This arbitrary denial is not rationally related to any legitimate governmental interest, and thus the Act cannot withstand rational basis review. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).

### A.     The Act Violates Equal Protection by Discriminating on the Basis of Gender

The Act's provisions apply only to "expectant mothers." *See, e.g.,* Wis. Stat. § 48.205(1m) (authorizing holding an "adult expectant mother" in custody). While the term is undefined, it applies only to people who could be "expectant mothers," namely, women.[30]

---

[30] The Supreme Court at one time held that unequal treatment based on pregnancy did not constitute gender discrimination, *Geduldig v. Aiello*, 417 U.S. 484 (1974). *Geduldig* held that pregnant women unable to work due to pregnancy were not entitled to affirmative recovery under a state disability insurance scheme.  The court remarked that not "every legislative classification concerning pregnancy is a sex based classification," *id*. at 497 n.20, but the scheme also involved employment-related "disability" funding with limited state resources at time when women's participation in the workplace was substantially different than today. Furthermore, shortly after the Supreme Court extended this reasoning to a claim against a private employer under Title VII of the Civil Rights Act, *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), Congress enacted the Pregnancy Discrimination Act ("PDA"), which expressly

Indeed, it applies to Wisconsin women even *before* they are pregnant, as the Act defines an "unborn child" as existing from the moment of fertilization (as noted above, pregnancy is a post-fertilization event that may or may not happen). ECF No. 156 ¶¶ 44-46 ("Terplan Report"); Wis. Stat. § 48.02(19).

The Act's targeting of "expectant mothers" translates directly into obligations and potential penalties on Wisconsin women who have the capacity to become pregnant, risks that Wisconsin men with procreative capacity will never face. In addition to the numerous deprivations of civil rights permitted by the Act, this law requires all Wisconsin women to be vigilant, and correct, concerning whether they might be pregnant or carrying a fertilized egg. If they are not vigilant, Wisconsin women might consume alcohol or controlled substances while pregnant or carrying a fertilized egg, and thereby find themselves subject to the Act with its attendant losses of liberty and other deprivations of constitutional rights. Ms. Loertscher's case again illustrates that this risk is far from hypothetical: her use of drugs and alcohol before she knew she was pregnant was cited as the basis for the multiple violations the state visited upon her under the Act. (PFOF 234). In short, the Act imposes unique obligations and potential penalties only on women with the capacity to become pregnant.

Wisconsin men, who lack the capacity to become pregnant, face no similar deprivation of their rights. Alcohol use by adults is legal in Wisconsin, and controlled substances other than those enumerated in Schedule I are legally available in the state. *See* Wis. Stat. § 961.01 *et seq*. Moreover, while the State criminalizes illegal possession of controlled substances with the intent to sell them, mere use of these substances alone is not itself criminalized. *See* Wis. Stat. § 961.41. Thus the Act exposes all Wisconsin women capable of becoming pregnant to a significant risk of deprivation of their fundamental rights and permits punishment and control of pregnant women for engaging in legal behavior that is permissible by men.

---

overruled *Gilbert* and affirmed Congress' understanding that, under Title VII, discrimination based on pregnancy is sex discrimination. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983). Although *Geduldig* concerned the Equal Protection Clause rather than Title VII, its questionable holding has been only rarely cited in recent decades. More importantly, the Act here does not involve state employment benefits but rather burdens placed on women's fundamental constitutional rights.

The Act also fails the second component of intermediate scrutiny because the Act does not serve an "important governmental objective." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). A party "seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification." *Id.* This burden may be met only by demonstrating both that the governmental objective is "important" and that that the discriminatory means employed are "substantially related to the achievement of those objectives." *Id.* Defendants cannot meet this burden, as the Act singles out pregnant women for significant constitutional intrusions without any legitimate justification at all.

As discussed above in Section II.C., the Act does not advance any purported state interest in maternal, fetal, or child health, because threats of arrest, detention, and loss of parental rights are likely to deter women from approaching medical personnel with candor about private matters during pregnancy, or even seeking health care at all. Similarly, the Act targets women who have allegedly used substances during their pregnancy, even though the substances targeted by the Act are not more or even as dangerous to fetal health as other prenatal exposures, including lack of health care—the very thing the Act makes more likely by undermining women's trust in their health care providers. *See supra* Section II.C at 41-44. Indeed, Ms. Loertscher's experience once again demonstrates what the Act is designed to do: she voluntarily sought medical help for the purpose of protecting both her health and the health of her pregnancy. (PFOF 85-86). Rather than support her in this endeavor, Defendants' response was to collect medical information and use it to invoke the Act, supplanting her ability to obtain the health care she knew she needed. (PFOF 112, 116, 123, 223). Defendants transformed voluntary treatment into detention; they ordered Ms. Loertscher detained in the hospital where she had sought treatment, ordered her moved to a behavioral drug treatment facility against her wishes, and ultimately sent her to jail. (PFOF 166, 194-96, 202). The Act deprives a woman who is or may become pregnant of core constitutional liberties while undermining her health. In short, the Act is not "substantially related" to furthering any type of governmental interest in the health of a pregnancy or the health of a child

resulting from that pregnancy. There is no "exceedingly persuasive" justification for this gender-based discrimination, and the Act should be held unconstitutional under the Equal Protection Clause.

**B.      There Is No Rational Basis For Denying Pregnant Women The Same Procedural Protections Afforded Individuals Facing Civil Commitment Under Wisconsin's Mental Health Act**

The Act also violates Equal Protection because it restrains pregnant women's liberty without affording them the same procedural protections as individuals who are involuntarily committed under Wisconsin's Mental Health Act. *See* Wis. Stat. § 51.01 *et seq*. Wisconsin Statute Section 51.20 sets out procedures for civil commitment on the basis of drug or alcohol use, mental illness, or other factors, when an individual is demonstrated by clear and convincing evidence to be a danger to herself or others. The Mental Health Act provides important procedural protections to individuals threatened with civil commitment that are not available to pregnant women similarly threatened with involuntary confinement and medical treatment under the Act, including the right to immediate appointment of counsel without regard to indigency, and the protections afforded by the requirement that qualified state-appointed experts examine the individual and provide reliable scientific testimony at the hearing to determine whether the statutory requirements have been met.

Denying pregnant women the same procedural protections guaranteed all other Wisconsin citizens facing involuntary confinement and forced medical treatment is not rationally related to any legitimate state interest, and thus violates the constitutional right to equal protection under even the lenient rational basis test. *See City of Cleburne*, 473 U.S. at 439 ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike.").

The Wisconsin Mental Health Act provides for the appointment of counsel *immediately* upon the filing of a petition for commitment, without regard to proof of indigency. Wis. Stat. § 51.20(3) ("At the time of the filing of the petition the court *shall* assure that the subject

individual is represented by adversary counsel by referring the individual to the state public defender, who *shall* appoint counsel for the individual without a determination of indigency[.]") (emphasis added). Wisconsin's Mental Health Act also provides for the automatic appointment of two experts (psychiatrists and/or psychologists) to personally examine the individual subject to involuntary commitment, and requires that the appointed experts "shall have specialized knowledge determined by the court to be appropriate to the needs of the subject individual." Wis. Stat. § 51.20(9)(a)(1). Additionally, an individual facing involuntary commitment has a right to retain an additional expert, or to petition the court for the appointment of an additional expert if the individual is indigent. *See* Wis. Stat. § 51.20(9)(3).

By contrast, under the Act, a pregnant woman is not guaranteed counsel until a fact-finding hearing much later in the process, and then only if she faces involuntary placement outside her home and certain other conditions are met. If the state seeks to restrain a pregnant woman's liberty and medical-decision making without attempting to place her outside the home, she is not entitled to the appointment of counsel at all. *See* Wis. Stat. § 48.23(2m). Additionally, appointment of counsel under the Act is limited to individuals who can prove indigency as statutorily defined. Wis. Stat. § 48.23(4). By the time a pregnant woman is appointed counsel under the Act, if she even qualifies for the appointment, she may have been held in custody for up to 30 days, *see* Wis. Stat. § 48.305, and will have faced an initial "plea hearing" at which she must make crucial decisions about defending herself, including invoking or waiving her right to a jury trial and entering a plea on her own behalf—all without the benefit of legal representation, *see* Wis. Stat. § 48.30(1) & (2). Denying a pregnant woman facing involuntary commitment, confinement, and forced medical treatment the representation guaranteed to other individuals facing involuntary civil commitment cannot be rationally related to any legitimate state interest in protecting her health or the health of her pregnancy.[31]

---

[31] As a concrete example, Ms. Loertscher faced her own proceeding without legal representation, despite having repeatedly expressed her desire for counsel (*see* PFOF 194); the GAL appointed to represent her fetus entered a plea on behalf of the fetus admitting all the allegations against Ms. Loertscher. (PFOF 196).

Similarly, the Act makes no provision for the appointment of experts and does not require expert testimony at the fact-finding hearing determining whether a woman should be subject to the Act. *See* Wis. Stat. § 48.31. At the same time, however, the Act requires proof not only of "habitual" controlled substance or alcohol use by a pregnant woman deemed to lack "self-control," but also evidence of some (undefined) degree of harm or risk of harm to a fetus or child resulting from that use. *See* Wis. Stat. § 48.133. The absence of experts is particularly striking because establishing whether exposure to a particular drug during pregnancy is causally related to harm to a fetus or child requires reliable, scientifically grounded expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), concerned this exact issue: the plaintiffs in that case alleged that Merrell Dow's antinausea drug, Bendectin, had caused birth defects when taken during pregnancy. *Id*. at 582. The Supreme Court held that proof of causation must be established by "reliable" expert testimony based on scientific knowledge. *Id*. at 590. Ultimately, on remand the Ninth Circuit determined that the proffered testimony was insufficiently reliable under the new evidentiary standard to allow establishment of a triable issue of fact as to whether Bendectin had caused the birth defects. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311 (9th Cir.1995).[32]

Establishing by clear and convincing evidence that a pregnant woman's use of controlled substances or alcohol poses a "substantial risk" of harm to her fertilized egg, embryo, or fetus, or to her future child, necessitates the use of reliable, scientifically grounded expert testimony every bit as much as establishing that the standards have been met for involuntary commitment under the Mental Health Act. Yet before an individual may be involuntarily committed, he or she must have been examined by at least two, and potentially three, qualified experts who will assist the court in determining whether the standards for involuntary commitment have been met; the Act provides no such safeguard of evidentiary reliability for a pregnant woman who, once subjected to the Act, faces loss of her liberty, and even the loss of her future child.

---

[32] Wisconsin has adopted the *Daubert* standard for determining the scientific reliability of expert testimony. *See* Wis. Stat. § 907.02.

By denying pregnant women the procedural protections afforded to similarly situated people facing commitment under the Mental Health Act, the Act arbitrarily discriminates among similarly situated groups and cannot survive rational basis review under the Equal Protection Clause. *Romer v. Evans*, 517 U.S. 620, 633-34 ("A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. The guaranty of equal protection of the laws is a pledge of the protection of equal laws."); *Sweatt v. Painter*, 339 U.S. 629, 635 (1950) ("Equal protection of the laws is not achieved through indiscriminate imposition of inequalities."). The rational basis test requires that a "classification bear a rational relationship to an independent and legitimate legislative end" and that "classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633. Accordingly, a state "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446.

The Act's failure to provide pregnant women with the procedural protections guaranteed to people facing commitment under the Mental Health Act cannot satisfy this test because it is not even remotely related to furthering maternal or fetal health. The Act therefore violates the Equal protection clause and should be invalidated.[33]

## IV.    THE ACT IS UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT

Act 292 violates the Fourth Amendment's prohibition on unreasonable searches and seizures for all pregnant women in Wisconsin. State officials violate the Fourth Amendment

---

[33] Indeed, in light of the importance of the constitutional rights infringed by the Act, the procedural protections afforded women subject to its terms are woefully inadequate. The Act permits pretrial custody and detention on the basis of: (1) probable cause rather than "clear and convincing evidence." *See Foucha*, 504 U.S. at 81; Wis. Stat. §§ 48.205, 48.207, 48.203 (noting that the state may arrest and detain pregnant women upon belief of "probable cause"); (2) non-neutral fact-finders. Wis. Stat. § 48.19(1)(d)(8); (3) hearings in the absence of counsel; (4) personal opinions rather than hard evidence; (5) medical matters unsupported by scientific evidence; *see* Kenneth A. De Ville & Loretta M. Kopelman, "Fetal Protection in Wisconsin's Revised Child Abuse Law: Right Goal, Wrong Remedy," 27 *J.L. Med. & Ethics* 332, 337 (1999); and (6) court proceedings that do not adhere to the rules of evidence; Wis. Stat. § 48.299(4)(b) ("Neither common law nor statutory rules of evidence are binding"). The Act thus creates a litany of opportunities for erroneous deprivations of grave personal liberties. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). While no amount of procedure can cure the substantive due process violations inherent in the statute, the absence of adequate procedures separately violates the Due Process Clause. *Id.*

when they obtain a pregnant woman's medical test results without a warrant or her consent, pursuant to a policy intended to coerce her into substance abuse treatment under threat of arrest, prosecution, jail, or other punitive state action. *Ferguson v. City of Charleston*, 532 U.S. 67 (2001). These officials further violate the Fourth Amendment when they take a pregnant woman into custody and hold her against her will.

The Fourth Amendment, incorporated against the States by the Fourteenth Amendment, *Contreras v. City of Chicago*, 119 F.3d 1286 (7th Cir. 1997), provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Amendment assures the "privacy, dignity, and security" of individuals against arbitrary and invasive acts by Government officers or those acting on their behalf. *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528 (1967). The Fourth Amendment protects against warrantless intrusions in both civil and criminal contexts. *New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985); *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003). Thus, the Fourth Amendment applies to child welfare workers, and extends beyond criminal arrests to civil seizures, including an individual's detainment by social workers. *Id.* (citing *Brokaw v. Mercer County,* 235 F.3d 1000, 1010 n. 4 (7th Cir. 2000); *Darryl H. v. Coler*, 801 F.2d 893, 900 (7th Cir. 1986); *Brokaw*, 235 F.3d at 1010 (*citing United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). It is well established that "searches [and seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions," *Katz v. United States*, 389 U.S. 347, 357 (1967), none of which apply here.

A state's interest in the health of fetuses does not justify a departure from the rule that a nonconsensual search is unconstitutional if not authorized by a valid warrant. *Ferguson*, 532 U.S. at 70. All patients, including pregnant women, enjoy a reasonable expectation of privacy when seeking medical advice and undergoing medical tests at a hospital or the office of a health care provider. *Id.* at 78; *see also Denius v. Dunlap*, 209 F.3d 944, 956 (7th Cir. 2000)

(recognizing a "substantial" privacy right in the confidentiality of medical information). It is reasonable for patients to expect that the results of their medical tests will not be shared with nonmedical personnel without their consent. *Id.* When state actors obtain a patient's test results without her consent in order to coerce her into unwanted treatment, those actors invade the patient's privacy, in violation of the Fourth Amendment. *See Ferguson,* 532 U.S. at 78, 84; *see also Green v. Berge*, 354 F.3d 675 (7th Cir. 2004).

Wisconsin Act 292 permits the use of a pregnant woman's confidential medical information, without her knowledge or consent, if there is an indication she used drugs or alcohol during her pregnancy. The Act permits health care providers to report "unborn child abuse," Wis. Stat. § 48.981(2)(d), if a woman, while pregnant, used a substance presumed to be harmful to the fetus. If the provider has "reasonable ground" to believe "habitual lack of self-control" on the part of the pregnant woman, her records can be released to officials without regard to physician-patient or other privileges. Wis. Stat. § 905.04(4)(e)(3). Furthermore, healthcare providers are mandated reporters of "child abuse" under the Children's Code, § 48.98(2), and the Act appears to extend reporting obligations to situations involving pregnant women: individuals involved in Ms. Loertscher's case believed they were mandated reporters of "unborn child abuse." (PFOF 112).[34] Furthermore, the Act provides immunity for providers acting as reporters, thereby encouraging more reporting and sharing of private medical records. Wis. Stat. § 48.981(4).

The Act allows "[a]ny hospital employee who provides healthcare, social worker or intake worker…[to] refer an infant or an expectant mother of an unborn child…to a physician for testing of the infant's bodily fluids of the infant or expectant mother for controlled substances or controlled substance analogs," Wis. Stat. § 146.0255(2). It further allows the physician to test the pregnant woman for "controlled substances or controlled substance analogs." *Id.* While the Act appears to contemplate consent to testing for purposes of providing health care, the statute does not require consent for sharing the result with officials charged with enforcing the Act. Section

---

[34] The State's own interpretations of the Act are contradictory on whether reporting of "unborn child abuse" is mandated. (PFOF 113).

(a), which discusses sharing test results, instructs the physician that the test results of an infant *must*, and that the test results of an expectant mother *may*, be disclosed to an agency…if the test results are positive." Wis. Stat. § 146.0255(3)(a)-(b).

In short, the Act invades and destroys doctor-patient confidentiality, a central societal value. Patients receiving care in the United States expect that the information they share, and the records about their health that are produced, are created solely for the purpose of their health treatment and will be kept confidential. As the Court discussed in *Ferguson*, "[t]he reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent." *Ferguson*, 532 U.S. at 78. By effectively bringing law enforcement into the examination room, the Act profoundly violates the trust between a woman and her doctor and forfeits the citizen's constitutional guarantee against unreasonable search and seizure.

Upon receiving a report, Child Protective Service (CPS) caseworkers are instructed to investigate. (PFOF 120).  The process is further detailed in a memorandum issued by the State, which directs caseworkers to gather the following information to determine whether to substantiate the claim:

> The unborn child's fetal development as reported by a physician
> (including the effects of the expectant mother's substance abuse).
> The expectant mother's current use of controlled substances and
> the impact it is having on her, the unborn child and, when
> applicable, other children in her care. Any substance abuse history
> and treatment, criminal history, and, when applicable, any history
> of other children born with the effects of alcohol or other drugs
> used during pregnancy.

> (PFOF 120).

Caseworkers can only collect this highly sensitive, personal information by obtaining a pregnant woman's medical records from her health care provider—records which were only consensually collected by the health care worker in furtherance of medical care, not law enforcement objectives.

Once the confidential medical information is in the hands of the State, state actors use that information to force women into enrolling in drug treatment programs under threat of incarceration. The State can seek a court order taking a pregnant woman into physical custody on the basis of her confidential medical records. *See* Wis. Stat. § 48.193(1)(a)-(c) (juvenile court may issue warrant based on "satisfactory showing" that woman meets statutory criteria of § 48.133); § 48.193(1)(d)(2) (law enforcement may take pregnant woman into custody if they believe "reasonable grounds" exist to believe § 48.133 criteria are satisfied); § 48.203 (1) & (2) (intake worker may unilaterally "release adult expectant mother to an adult relative or friend of the adult expectant mother" or may decide to keep the pregnant woman detained); § 48.207(1m) (listing places where adult expectant mother may be held in custody); § 48.347(3) (authorizing ultimate out-of-home "placement" of adult expectant mother). A pregnant woman who is deemed to have intentionally violated any order issued by the juvenile court is subject to remedial and punitive sanctions for contempt, which may include incarceration for up to one year. Wis. Stat. §§ 785.01-785.05.

The Act constructs a framework whereby medical providers disclose a pregnant woman's confidential medical information to law enforcement and other state agencies if there is an indication of substance or alcohol use.  Law enforcement and other state agencies in turn use that information to coerce her into substance use treatment that may include detention and forced abstinence without medication or prenatal care. This framework violates the Fourth Amendment's guarantees against arbitrary and invasive acts by government officers and cannot be reconciled with the U.S. Supreme Court's holding in *Ferguson.* 532 U.S. at 71-72 (describing a similar disclosure scheme).  The Act therefore violates the Fourth Amendment's prohibition on unreasonable searches and seizures for all Wisconsin women.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion for Summary Judgment.

Dated this 10th day of November, 2016.            Respectfully submitted,

                                                    **PERKINS COIE, LLP**

                                        By:    _/s/ Jeff J. Bowen_____
                                               Jeff J. Bowen
                                               JBowen@perkinscoie.com
                                               David J. Harth
                                               dharth@perkinscoie.com
                                               Freya K. Bowen
                                               fbowen@perkinscoie.com
                                               Joshua L. Kaul
                                               jkaul@perkinscoie.com
                                               David R. Pekarek Krohn
                                               dpekarekkrohn@perkinscoie.com
                                               Jesse J. Bair
                                               JBair@perkinscoie.com
                                               1 East Main Street, Suite 201
                                               Madison, WI  53703
                                               Telephone: (608) 663-7460
                                               Facsimile: (608) 663-7499

                                               **NATIONAL ADVOCATES FOR
                                               PREGNANT WOMEN**
                                               Nancy Rosenbloom
                                               nlr@advocatesforpregnantwomen.org
                                               875 Sixth Avenue, Suite 1807
                                               New York, NY 10001
                                               Telephone: (212) 255-9252
                                               Facsimile: (212) 225-9253

                                               **REPRODUCTIVE JUSTICE CLINIC**
                                               Sarah E. Burns
                                               sarah.burns@nyu.edu
                                               Sarah Samuels Wheeler (_admission pending_)
                                               Alyson Zureick
                                               Washington Square Legal Services, Inc.
                                               NYU School of Law
                                               245 Sullivan Street, 5th Floor
                                               New York, New York 10012
                                               Telephone: (212) 998-6464
                                               Facsimile: (212) 995-4031

                                               _Attorneys for the Plaintiff,_
                                                  _Tamara Loertscher_