# Exhibit 2



# WISCONSIN LEGISLATIVE COUNCIL STAFF MEMORANDUM

One East Main Street, Suite 401; P.O. Box 2536; Madison, WI 53701-2536
Telephone (608) 266-1304
Fax (608) 266-3830

DATE: October 28, 1997

TO: REPRESENTATIVES SCOTT JENSEN AND BONNIE LADWIG

FROM: David J. Stute, Director

SUBJECT: Constitutionality of Extending 1997 Assembly Bill 463 to Unborn Children From the Point of Conception

This memorandum, prepared at your request, discusses the constitutional implications under *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705 (1973), and *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S. Ct. 2791 (1992), of a proposed amendment to 1997 Assembly Bill 463 that, as explained below, would extend the Bill's applicability to all stages of pregnancy. This memorandum concludes that the constitutionality of such an amendment is *highly doubtful*.

## A. *1997 ASSEMBLY BILL 463*

1997 Assembly Bill 463, relating to unborn children who are at substantial risk of serious physical injury due to the habitual lack of self-control of their expectant mothers in the use of alcohol beverages, controlled substances or controlled substances analogs, exhibited to a severe degree, was introduced by Representative Ladwig and others; cosponsored by Senator Huelsman and others, on July 31, 1997. Assembly Substitute Amendment 1 to 1997 Assembly Bill 463 was introduced by Representatives Ladwig and Huebsch on October 17, 1997. The Bill, hereafter referred to as "the Substitute Amendment," will receive a public hearing before the Assembly Committee on Children and Families on October 30, 1997.

The Substitute Amendment modifies and applies the provisions of the Children's Code (Ch. 48, Stats.) to unborn children in need of protection or services and their expectant mothers. Briefly, the Substitute Amendment expands current law to provide that expectant mothers may be taken into custody and subjected to various dispositions under the Children's Code if a showing satisfactory to a judge is made that, due to the expectant mother's habitual act of self-control in the use of alcohol beverages, controlled substances or controlled substances analogs, exhibited to a severe degree, there is a substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered unless the expectant mother is taken into custody. Further, a number of the possible dispositions involve


EXHIBIT
87
10/23/16

placing the expectant mother in various types of continuing physical custody, presumably in some cases up to the point of delivery of the child.

The Bill and the Substitute Amendment respond to the Wisconsin Supreme Court's conclusion in *Angela M. W. v. Kruzicki*, No. 95-2480-W (1997 Wis. LEXIS 39, at *30), that "the legislature is in a better position than the courts to gather, weigh and reconcile the competing policy proposals addressed" when taking up issues related to the physical confinement of a pregnant woman for the benefit of her unborn child.

The Substitute Amendment defines "unborn child" as an unborn human who is at that stage of fetal development when there is reasonable likelihood of sustained survival outside of the womb, with or without artificial support. It has been proposed to amend the Substitute Amendment by replacing this definition of unborn child with a definition that "unborn child" means a human being from the time of fertilization to the time of birth. You have asked about the constitutional implications of such an amendment, which would extend the sweep of the Substitute Amendment to pregnant women at every stage of their pregnancy.

## B. DISCUSSION

The fundamental issue in *Roe v. Wade* and its progeny is the extent to which the state, in respect to its recognized important and legitimate interest in protecting the potentiality of human life, may interfere with the constitutional right of the mother to be free from intrusion. This right, discussed in terms of personal privacy, is derived from the due process-liberty interest guaranteed by the Fourteenth Amendment to the U.S. Constitution. In *Roe*, the U.S. Supreme Court balanced these two competing rights by deciding that the state's interest reaches a "compelling state interest" at some point. As the U.S. Supreme Court said in *Roe* ". . . it is reasonable and appropriate for a state to decide that at some point in time another interest, that the health of the mother or that of potential human life, becomes significantly involved. The woman's privacy is no longer sole and any right of privacy she possesses must be measured accordingly." [*Roe* at U.S. 159.] In *Roe*, with respect to the state's interest in the health of the mother, the Court found the compelling point to arise at approximately the end of the first trimester. Before that stage of pregnancy, the state is without power to intervene. With respect to the state's interest in potential human life, the Court found the "compelling" point to be at viability, because the fetus then presumably had the capability of meaningful life outside of the mother's womb.

In *Casey*, the Court modified *Roe* by concluding that not all state regulation must be deemed unwarranted. The Court adopted an "undue burden" standard as the appropriate means of reconciling the state's interest in potential life with the woman's constitutionally protected liberty interest. In *Casey*, the Court found that, in the abortion context, the state may enact rules and regulations designed to encourage pregnant women to know that there are "philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term," so long as they do not constitute an "undue burden." However, the Court explicitly did *not* disturb the central holding of *Roe*, that the state may not prohibit a woman from making a decision to terminate her pregnancy before viability.

Extending the reasoning of these two cases to the Substitute Amendment, as it is proposed to be amended, requires a balancing of the state's interest in unborn human life against the mother's absolute right, prior to viability, to make all *decisions* concerning that pregnancy. In the abortion context, the issue is whether the state may interfere, before viability, in the mother's decision to continue or not continue her pregnancy. In the situation addressed by the proposed amendment to the Substitute Amendment, the issue is whether, prior to viability, the state's interest in unborn human life is such as to effectively regulate specific conduct, under threat of loss of physical liberty by application of provisions of the Children's Code.

It appears *unlikely* that a court would hold that the state's interest in unborn human life is sufficient to justify the burden placed on the mother to conform her previability behavior and actions to that implicitly required by the Substitute Amendment, under pain of deprivation of personal liberty. If the liberty and privacy interests acknowledged and protected in *Roe v. Wade* and subsequent cases are to have any meaning, there must be a point at which the mother's interests, vis-à-vis the state's, are relatively absolute; that is, the mother's conduct, up to and including the termination of the pregnancy, is *none* of the state's business.

Within the abortion context, that point exists up until viability is attained. As the pregnancy continues, and the unborn child reaches the point of fetal development at which there is a reasonable likelihood of sustained survival outside of the womb (the test of the Substitute Amendment), the state's interest in an unborn life may become sufficient to constitutionally justify the imposition of the potential loss of physical liberty resulting from application of the requirements of the Children's Code to the actions and conduct of the expectant mother. However, it is difficult to perceive how, as proposed by the amendment, that interest of the state can extend back in the gestational process to the point of conception. The application of the provisions of the Substitute Amendment, and their implied regulation of the actions and conduct of an expectant mother, prior to viability, appears to impose an undue burden on the woman in contravention of *Casey*.

Please feel free to contact me at the Legislative Council Staff offices for further comment on this question.

DJS:lah:wu;lah