**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

_____

**TAMARA M. LOERTSCHER,**

      **Plaintiff,**

                                   **Case No. 14-CV-870**

**v.**

**BRAD SCHIMEL,** *et al.*,

      **Defendants.**

_____

**DEFENDANT TAYLOR COUNTY'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
_____

        Defendant Taylor County ("the County"), by its attorneys, submits as following in support of its Motion for Summary Judgment dismissing all claims against it.

## <u>INTRODUCTION</u>

        Two decades ago the Wisconsin Legislature made a policy determination that it would enact 1997 Act 292 for the stated purpose of promoting the health of unborn children and expectant mothers. The Act expanded existing Child Protective Service statutes to include unborn children. The Legislature tasked the Wisconsin Department of Children and Families ("DCF") with supervising 71 county social service agencies and "assur[ing] that there are statewide policies and procedures" for implementing its laws. (PFOF 4). Plaintiff Tamara Loertscher has sued Taylor County for carrying out its mandated role in implementing Act 292. The County respectfully asserts that it did not subject Ms. Loertscher to a constitutional deprivation and no County policy, procedure or custom was the cause of the constitutional harm she alleges.

        The Court determined in its Order on the County's motion to dismiss that Ms. Loertscher would be allowed to proceed against the County defendants only to the extent that she can prove a County

policy or procedure violated her rights. (Order and Opinion, Dkt. 118, pp. 17-18, June 16, 2016).[1] That claim fails for several reasons. First, Ms. Loertscher has failed to identify an unconstitutional County custom, policy or procedure as necessary to give rise to liability under ***Monell v. New York City Dep't of Social Servs.***, 436 U.S. 658, 694 (1978). As discussed below, Wisconsin's Child Protective Service laws and DCF statewide standards give little room for county agencies to develop their own policies, and the County employees acted in compliance with mandatory statutory directives and DCF standards in every respect.

Furthermore, Ms. Loertscher alleges that Act 292 is unconstitutional on its face. (Amend. Compl., Dkt. 66, ¶ 1, 103, Nov. 6, 2016). The allegation implies that "no set of circumstances exist under which the [A]ct would be valid, i.e., that the law is unconstitutional in all of its applications." ***Wash. State. Grange v. Wash. State Republican Party,*** 552 U.S. 442, 449 (2008). A county or municipal policy cannot cause a constitutional deprivation as a matter of law where, as Ms. Loertscher alleges, the law being enforced permits no constitutional application by those tasked with its implementation. ***N.N. v. Madison Metro. Sch. Dist.***, 670 F. Supp. 2d 927 (W.D. Wis. 2009).

Finally, no County policy was "the moving force" for the constitutional harm Ms. Loertscher alleges. Despite her inflammatory accusation that County social workers "threw her in jail," Ms. Loertscher was in fact given the opportunity to receive assistance without the involvement of the courts. She elected not to cooperate, forcing the County social workers to carry out their mandated duties under Act 292 when presented with credible evidence of potential unborn child abuse and to refer the matter to law enforcement and the courts. A court hearing was held and a circuit court judge determined that probable cause existed for the court to exert its authority to take physical custody of Ms. Loertscher under the statutes. She was ordered to undergo an assessment and follow the

---

[1] Ms. Loertscher's individual capacity claims against Amber Fallos, Liza Daleiden, and Julie Clarkson, all current or former Taylor County employees, were dismissed. (Order and Opinion, Dkt. 118, June 6, 2016). Ms. Loertscher has since stipulated to dismissal of any official capacity claims against those individuals. (Stipulation for Dismissal, Dkt. 145, Nov. 7, 2016).

recommendations of the treatment professionals. Ms. Loertscher elected to ignore the state court's order, resulting in a finding of contempt that subjected her to additional orders. Ms. Loertscher ultimately elected incarceration over an assessment. Her incarceration was not the result of County policy. To the extent she alleges incarceration as a constitutional harm her claim is not actionable under *Monell* or reviewable by this Court.

## SUMMARY JUDGMENT STANDARD

Summary judgment is governed by Fed. R. Civ. P. 56 and is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Although "[a]ll factual inferences are to be taken against the moving party and in favor of the opposing party," only reasonable inferences, and not all conceivable inferences, will be drawn. *Adikes v. S.H. Kress & Co.*, 398 U.S. 144 (1980). Once a motion for summary judgment has been made and properly supported, the non-movant has the burden of setting forth specific facts showing the existence of a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts"; she must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the non-movant must present definite, competent evidence in rebuttal. *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996 (7th Cir.2002).

## WISCONSIN'S CHILDREN'S CODE AND
## CHILD PROTECTIVE SERVICE STANDARDS

DCF is the state agency charged with overall responsibility for implementing Wisconsin's child safety laws. (PFOF 1). It does so through its Child Protective Services ("CPS") program, which the DCF describes as "a specialized field of the Child Welfare System." (PFOF 2-3). Per the DCF,

"[t]he purpose of the CPS system is to identify and alter family conditions that make children unsafe or place them at risk for abuse or neglect." (PFOF 3). CPS is "an integrated system of intervention" that is "state-supervised and county-administered." (PFOF 4-5).

The stated mission of DCF in regard to the CPS program is to "supervise the county programs and assure that there are statewide policies and procedures that support the goals of child protective services: child safety and permanence." (PFOF 6). The DCF's goal is uniformity in application of the laws throughout the state. (PFOF 6). It is, in fact, required by state law to develop uniform standards for "conducting child abuse and neglect investigations or unborn child abuse investigations." Wis. Stat. § 48.981(3)(c)(1). The law provides that county social workers' investigations of abuse "shall be conducted in accordance" with the DCF-authored standards. (*Id*.)

The DCF document that counties are required by law to follow in conducting unborn child abuse investigations is called the "Child Protective Services Access and Initial Assessment Standards" (hereafter "CPS Standards")(PFOF 13-14). The CPS Standards are intended to "enhance statewide consistency in practice" by "provid[ing] CPS agencies[2] and caseworkers with more specific direction in screening and assessing reports of child maltreatment than is offered by Wisconsin statutes alone." (PFOF 15). The DCF ensures county social workers' compliance with its interpretation of CPS Standards by providing the exclusive training on the document through a partnership between DCF and the University of Wisconsin-Madison. (PFOF 12).

Counties are required as a condition of their child welfare funding to contract with the DCF. (PFOF 7). DCF requires in that contract that the counties adhere to the CPS Standards and DCF's interpretation of those standards. (PFOF 16). DCF retains the authority to police the contract and county compliance with its mandates through its powers to: (1) review and approve any county plans; (2) review and approve county budgets; (3) review and approve any subcontracts; (4) conducting case

---

[2] A Wisconsin county's Department of Human Services is defined as a "CPS agency." Wis. Stat. § 48.981(1)(ag).

reviews and on-site reviews of local agencies; and (5) dictating corrective action plans to non-complying counties. (PFOF 18-22). DCF ultimately has the power to withhold funding if a county is not satisfying its CPS program requirements. (PFOF 24).

County employees are not free to interpret and implement state law or the CPS Standards on their own, nor is the county allowed to make those interpretations for its staff. Rather, the DCF staff provides policy interpretations that must be followed. A DCF manager with responsibility for overseeing county compliance testified as follows when asked about county requests for of DCF policy and standards interpretations:

> Q: And then do counties have to follow that opinion given to them by the regional office?
>
> A: We are the state staff, yeah. So if they ask the State what they're supposed to do and they're told, then, yes, the expectation would be that the local agency would follow that.

(PFOF 17).

A county's duties in investigating potential abuse are not discretionary. Wisconsin's Children's Code, Wis. Stat. Ch. 48, is replete with mandates, including with respect to allegations of unborn child abuse. *See* Wis. Stat. § 48.01, *et seq.* The statute defining a CPS agency's responsibilities when faced with potential abuse provides that the county agency must act "[i]mmediately after receiving a report." Wis. Stat. § 48.981(3)(c)(1)(a). The agency "shall evaluate the report" to determine within 24 hours if the criteria for abuse as defined in the CPS Standards are present. *Id.* If those criteria are present, the county "shall…initiate a diligent investigation" to determine if the child is in need of protection. *Id.*

The criteria and protocols for county actions are set forth in the CPS Standards, a 72-page document that addresses each step of the intake and investigation process in detail. (PFOF 13-15). Like the statutes in the Children's Code that mandate its existence, the document directs CPS caseworkers in language that is mandatory in nature. The CPS Standards provide, for instance, that a report of unborn child abuse cannot be "screened out" unless there is a complete absence of credible information

suggesting abuse. (PFOF 35). The agency must conduct its initial investigation in accordance with specific directions, determine if the evidence suggests that maltreatment occurred under specified criteria, and determine if a referral for court action is necessary, also per specific statutes and criteria in the CPS Standards. Wis. Stat. §§ 48.981(3)(c)(4); 48.067(3)-(4); (PFOF 100, 108). All of these steps are mandatory if the criteria for proceeding are met. The county thereafter has a continuing responsibility to provide round-the-clock intake services to expectant mothers, collaborate with law enforcement, make recommendations to the court, and perform all court-ordered functions. Wis. Stat. §§ 48.067(1), (8) & (9).

## TAYLOR COUNTY'S INVOLVEMENT WITH TAMARA LOERTSCHER

Tamara Loertscher presented at the Mayo Clinic's Luther Hospital in Eau Claire on Friday, August 1, 2014. (PFOF 28). Her pregnancy was confirmed. (PFOF 28). She provided a urine sample in the Emergency Room that returned positive results for methamphetamine, amphetamine, and THC. (PFOF 28). Ms. Loertscher admitted to several healthcare providers over that weekend that she had been "self-medicating" with street drugs, including use of methamphetamine and marijuana on a regular basis after finding out that she was pregnant. (PFOF 28-30). She told Dr. Jennifer Bantz, an obstetrician/gynecologist, that she had "cut back" on methamphetamine use to "3 days a week" when she found out she was pregnant. (PFOF 50). Mayo social workers and healthcare providers determined that a call to Taylor County's Department of Human Services was required due to potential abuse of the unborn child. (PFOF 27).

On Monday, August 4, 2014, Mayo Clinic social worker Cori Everson telephoned the County to report the circumstance. (PFOF 27). She reported that Ms. Loertscher "was 3 months pregnant," "tested positive for methamphetamines, amphetamines, and THC," and used methamphetamine, alcohol and THC during her pregnancy. (PFOF 28). She reported that Ms. Loertscher "used THC every day, until she found out that she was pregnant, the use [sic] now is 1-2 times per week." (PFOF 29).

She also reported to the County that Ms. Loertscher's "physician is stating that this behavior is putting the fetus in serious danger of harm." (PFOF 30).

Having been presented with the information, the County's intake worker, Amanda Scholes (a licensed social worker), was required by law to make a "screening decision" and "response time decision" in accordance with Wis. Stat. § 48.981(3)(c) and CPS Standards. The criteria for those decisions are described in the CPS Standards. They provide that "the agency must immediately analyze the information to screen for present danger threats [as defined in the document] or other emergency conditions." (PFOF 35). The intake assessor is prohibited from screening out the case if she finds "credible information to support a suspicion" that the elements of abuse could be present. (PFOF 35). Ms. Scholes documented the report, assessed it as credible, and determined that the case was to be screened in according to CPS Standards. (PFOF 36).

Now presented with a screened in case of potential abuse, the matter was assigned to another County social worker, Julie Clarkson, to perform an investigation. Specifically, Ms. Clarkson was required by statute and CPS Standards to "gather information that assists in making the judgment as to whether there is a reasonable suspicion" of the following: (1) that Ms. Loertscher was pregnant, (2) that she was habitually using drugs to a severe degree and (3) that there was information to support a risk of harm to her unborn child due to her substance use. (PFOF 101; Wis. Stats. § 48.931(3)(c)(4)). Ms. Clarkson was also required, in collaboration with her supervisor, Liza Daleiden, to determine whether the child was "in need of protection or services, including the need for any court intervention." (PFOF 100).

Ms. Clarkson attempted to reach Ms. Loertscher by telephone in the hospital's Behavioral Health Unit on August 4 but did not receive a response from Ms. Loertscher after multiple attempts. (PFOF 102). She collaborated with the Mayo Clinic staff through Ms. Everson, with whom she communicated at least five times in 24 hours. (PFOF 102). Ms. Everson confirmed that "the doctors were very concerned that Tamara had knowingly used methamphetamines while pregnant and that she

may not have the support systems to discontinue her use of this highly addictive drug." (PFOF 103).

Ms. Clarkson also consulted a County Alcohol or Other Drug Abuse (AODA) specialist, who suggested that in-patient treatment might be necessary due to Ms. Loertscher's methamphetamine use. (PFOF 104). At Ms. Clarkon's request Ms. Everson faxed 34 pages of medical records substantiating the Mayo professionals' concerns. (PFOF 105).

Later in the day on August 4, Ms. Loertscher returned Ms. Clarkson's phone call. She confirmed that she was pregnant, but denied that she needed help for any drug issues. (PFOF 106). Asked about the positive drug test, Ms. Loertscher informed Ms. Clarkson that she had stopped using "meth" one week prior. (PFOF 106.) Ms. Clarkson advised Ms. Loertscher that her urine screen would not have been positive if that were the case, to which Ms. Loertscher did not respond. (PFOF 106.) Ms. Loertscher denied using marijuana within the last 30 days, which would also be inconsistent with the positive drug screen results. (PFOF 107.) Ms. Clarkson requested that Ms. Loertscher "consider voluntary treatment for drugs and alcohol to make sure that she and the baby continue to be safe." (PFOF 108). Ms. Loertscher responded that she did not want treatment and that her physician had informed her she did not need to work with Taylor County. (PFOF 108). Ms. Clarkson again requested that Ms. Loertscher accept voluntary child welfare services, explaining that a Temporary Physical Custody hold could be sought if she did not cooperate. (PFOF 108.) Ms. Loertscher indicated she would be getting an attorney and refused to speak further. (PFOF 108)

Ms. Clarkson then consulted Taylor County law enforcement and the circuit court's juvenile intake worker, who determined that the statutory criteria for a Temporary Physical Custody hold were met. (PFOF 37-46); *see* Wis. Stat. § 48.205(1m)(providing that adult expectant mother may be held if an intake worker determines there is probable cause). A court hearing was held on August 5 in conformance with all statutory requirements. Dr. Bantz, Ms. Loertscher's obstetrician/gynecologist, testified to her opinions concerning Ms. Loertscher, including her conclusion that Ms. Loertscher's unborn child was placed at risk of harm by her drug use. (PFOF 50-64). Ms. Loertscher initially

appeared at the hearing by telephone, but withdrew sometime during the hearing and refused to participate thereafter. (PFOF 54-58). Circuit Court Commissioner Gregory Krug attempted to contact the person Ms. Loertscher identified as her counsel, but that person refused to participate. (PFOF 58). The court concluded it would go forward in order to meet statutory deadlines for doing so, advising Ms. Loertscher and her counsel that they could seek reconsideration of his decision when the issue of Ms. Loertscher representation was resolved. (PFOF 58-60).

Judge Krug found probable cause to believe Loertscher's habitual drug use may lead to health problems for her unborn child and ordered her to stay at the Mayo Clinic until medically cleared, at which point she would be transferred to an inpatient treatment facility for assessment. (PFOF 65-67). Arrangements were made the next day, August 6, for Ms. Loertscher to be admitted to Lutheran Social Services Fahrman Center, a residential treatment facility in Eau Claire, following her discharge from Luther Hospital. (PFOF 69). Ms. Loertscher refused, however, to take a mandatory tuberculosis test, which was a prerequisite to her admission at Fahrman Center. (PFOF 70).

Ms. Loertscher was discharged from Luther Hospital on August, 7, 2014 but did not report to the Fahrman Center for treatment per the court's order. (PFOF 71). On August 11, the guardian *ad litem* for the unborn child, Attorney Adam Shiffler, filed a "Notice of Motion and Motion for Remedial Contempt" against Loertscher for her failure to abide by the court's August 5 placement order. (PFOF 72). Two days later, the Taylor County Corporation Counsel filed a "Motion to Take Expectant Mother into Immediate Custody" on the same grounds. (PFOF 73). Taylor County Circuit Court Judge Ann N. Knox-Bauer granted that motion and signed an "Order to Take Expectant Mother into Immediate Custody Pursuant to Wis. Stat. 48.193(1)(c); 48.193(d)(3)." (PFOF 74-75).

Despite an order that she be taken into custody, Ms. Loertscher was not arrested. (PFOF 75-76). On August 17 Ms. Clarkson sent Ms. Loertscher a letter requesting to schedule a meeting to discuss Ms. Loertscher's input as "to what [Loertscher] feels would be most workable for you to receive treatment." (PFOF 77). Ms. Clarkson noted that Ms. Loertscher's "input is important" because

the County wanted her "to be successful in being safe and healthy and bringing a safe and healthy child into this world." (PFOF 77). Ms. Loertscher did not respond. (PFOF 77).

A remedial contempt hearing on August 25 was adjourned when Ms. Loertscher, appearing on her own behalf, requested substitution of the presiding judge. (PFOF 78). Ms. Clarkson again tried to speak with Ms. Loertscher after the August 25, 2014 hearing but she refused. (PFOF 79). The rescheduled hearing was held on September 4 before Circuit Court Judge Douglas Fox. (PFOF 80). Ms. Clarkson testified as to the events, including her requests for cooperation. (PFOF 81). Ms. Loertscher testified in her own defense. (PFOF 81).

Judge Fox found Ms. Loertscher in contempt of court for refusing to abide by the court's order and sentenced her to 30 days in jail. (PFOF 82). He also ordered that she submit to a blood test in anticipation of her placement at the Fahrman Center. (PFOF 82). Ms. Clarkson met with Ms. Loertscher after the hearing at which point she agreed to go to treatment. (PFOF 83). Ms. Loertscher also took a urine screen test at that time, which tested positive for THC and Benzoids. (PFOF 84).

Ms. Clarkson made arrangements for Ms. Loertscher's admission to the Fahrman Center that evening. (PFOF 83). Despite indicating she would accept treatment, Ms. Loertscher presented instead to the Taylor County Jail the evening of September 4, where she resided until her release on September 22, 2014. (PFOF 85).

## ARGUMENT

The analysis of potential *Monell* liability "must begin with the proposition that 'Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477-80, 106 S. Ct. 1292, 1297-98 (1986), *quoting Monell v. New York City Dept. of Social Services*, 436 U.S. at 691. To form the basis for municipal liability under § 1983, the tortious conduct "must

be pursuant to a municipality's 'official policy'" *Pembaur,* 475 U.S. at 480. The "official policy" requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is "actually responsible." *Id.* Recovery from a municipality is "limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 480-81.

Here, Ms. Loertscher clearly disagrees with the policy decision of the Wisconsin Legislature. She challenges the validity of the legislation. Her allegations against the County, however, are self-serving hyperbole and often demonstrably false. Ms. Loertscher cannot substantiate her contention that a County policy caused her alleged constitutional injury.

## I. TAYLOR COUNTY CANNOT BE LIABLE UNDER 42 U.S.C. § 1983 FOR CONDUCT COMPELLED BY STATE LAW.

To go forward to trial on her *Monell* claim Ms. Loertscher must identify a County act that was the moving force behind her constitutional injury. She must demonstrate, specifically, that her deprivation was caused by (1) an official County policy, (2) a widespread County practice or custom, or (3) a decision by an official with final policymaking authority that constitutes an official act of the County. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). She cannot meet that requirement.

Ms. Loertscher's amended pleading alleges vaguely that County employees acted "pursuant to unconstitutional policies, procedures and practices," but fails to identify any specific policy. (Amend. Compl., Dkt. 66, ¶ 1, Nov. 6, 2015). Asked in discovery to identify the unconstitutional County policies on which she bases her lawsuit, Ms. Loertscher came no closer to meeting her burden. Her counsel directed the defense to a series of *DCF-authored* documents produced by the State Defendants. [3] None

---

[3] Ms. Loertscher identified in discovery the following documents as the County's unconstitutional policies: (1) a DCF document titled "Drug-Affected Infants" (state 11432); (2) a DCF document titled "Ongoing Standards—What Has Been Learned Thus Far"; (3) a document titled "Meeting Minutes—Ongoing Standards Questions," which is not a "policy" or a County document; (4) a document titled "Marathon County Drug Endangered Children Protocol", which

of those documents were the official policy of the County, nor were they a motivating factor in her alleged constitutional deprivation.

The truth of the matter is that Ms. Loertscher is attempting to secure an award of damages and attorneys' fees against the County for what is a facial challenge to the constitutionality of Act 292. It is not the *application* of the Act by the County or a local gloss on its implementation about which she complains. Rather, Ms. Loertscher's real dispute is with the Legislature's decision to make such a law. Regardless of the outcome of that challenge, she has no claim against the County for enforcing the Act.

**A.**     ***N.N. v. Madison Metro. School District.***

Fortunately, this Court has previously considered a similar case and issued a thoughtful and thorough assessment of the extent to which a municipality may be held liable under ***Monell*** for its implementation of a state statute. ***N.N. v. Madison Metro. Sch. Dist.***, 670 F. Supp.2d 927 (2009). Although Judge Crabb in ***Madison Metro*** was assessing a state law that, unlike Act 292, gave the municipality some discretion in its implementation (*id.* at 938), the case is nevertheless instructive both for its discussion of the law in general and its specific holding. Ms. Loertscher cannot support a claim under either ***Madison Metro*** or the authorities discussed in that decision.

**1.**     **Background Facts.**

***Madison Metro*** involved a student's suit against her school district for damages under § 1983 after it denied her request to be transferred to a different district. ***Id***. at 930-31. The school district denied her transfer request pursuant a provision in Wisconsin's "open enrollment" statute that required denial if transfer would "increase racial imbalance in the school district." The statute did not define

---

is not a County policy; (5) a DCF document titled "Questions for Access/Initial Assessment Standards Training on 05/08/08"; and (6) a DCF document titled "Access/ & Initial Assessment Roundtable Q & A" (PFOF 135-136). In addition, she references Taylor County's "Interagency Agreement," a document required by CPS Standards that memorializes the understanding between the Department of Human Services and the County Sheriff's Department concerning cooperation in abuse cases. She also references a document Taylor County, again pursuant to law, was required to draft and provide to individuals who were deemed to have mistreated a child, to notify them of their appeal rights. As discussed below, Ms. Loertscher has not plead anything remotely related to these documents and it is difficult for the County to predict any argument for its unconstitutionality and impact on Ms. Loertscher's case.

"racial imbalance," nor did it provide thresholds for determining imbalance in a specific school district. 670 F. Supp. 2d at 930. Instead the statute directed districts to adopt a resolution "specifying . . . the limitation on transfers into or out of the school board [sic]." *Id.* (*quoting* Wis. Stat. § 118.51(4)(a)(5).

The defendant school district, as required, drafted guidelines that "delegated to the Superintendent the authority to define the terminology 'increase in the racial imbalance in the Madison Metropolitan School District'" and "minority student." *Id.* The defendant denied the plaintiff's transfer request, finding that her transfer would increase racial imbalance based on the definitions authored by the superintendent. *Id.* at 930-31.

The student alleged that Wis. Stat. § 118.51(7) was facially unconstitutional and sought damages against the school district pursuant to 42 U.S.C. § 1983. During the lawsuit, the Attorney General's office issued an opinion that the statute was unconstitutional based on a recent Supreme Court decision invalidating similar state laws. *Id.* The school district discontinued its practice but the plaintiff still pursued her claim for damages. *Id.* The school district moved for summary judgment arguing, among other things, that the statute "left it with no constitutional alternative." *Id.* at 932. The district argued that ***Monell*** liability cannot hinge on acts it was required to undertake by state law.

## 2.      Discussion of Relevant Authorities.

Judge Crabb's decision surveyed the cases in which municipalities claimed they were acting pursuant to a compulsory state law and therefore could not be liable, discussing each in detail. *Id.* at 932-34. She identified two district court decisions in which it was held that state laws did not immunize municipalities. *Id.* at 934 (*discussing **Davis v. City of Camden***, 657 F. Supp. 396 (D.N.J. 1987) and ***Conroy v. City of Philadelphia***, 421 F. Supp. 2d 879 (E.D. Pa. 2006)). She noted conversely that at least seven federal circuits, including the Seventh Circuit, had directly or by implication held that municipalities cannot be liable under 42 U.S.C. § 1983 for taking action that was mandated by state law. *Id.* at 934-35 (*discussing **Vives v. City of New York***, 524 F.3d 346, 352 (2d Cir. 2008) (holding that municipality cannot be liable for conduct performed pursuant to state law that it was required to

enforce); ***Cooper v. Dillon***, 403 F.3d 1208 (11th Cir. 2005) (finding that city may only be liable for conduct taken in enforcing unconstitutional statute if it had discretion not to enforce the law); ***Whitesel v. Sengenberger***, 222 F.3d 861, 872 (10th Cir. 2000) (holding that municipality cannot be liable for "merely implementing" a policy created at the state level); ***Bockes v. Fields***, 999 F.2d 788, 791 (4th Circ. 1993) (holding that county could not liable firing employee pursuant to state laws and procedures); ***Garner v. Memphis Police Dep't.***, 8 F.3d 358, 363-64 (6th Cir. 1993) (holding municipality could be liable for conduct it was authorized but not required to perform by state law); ***Familias Unidas v. Briscoe***, 619 F.2d 391, 404 (5th Cir. 1980) (holding municipal entity cannot be liable for enforcing state law where the municipal policy "may more fairly be characterized as the effectuation of the policy of the State . . . embodied in that statute, for which the citizens of a particular county should not bear singular responsibility").

### 3.    Discussion of Seventh Circuit Authorities.

Judge Crabb's discussion of the Seventh Circuit authority on the topic is obviously significant. She discussed ***Surplus Store and Exchange, Inc. v. City of Delphi***, 928 F.2d 788 (7th Cir. 1991), in which the Court of Appeals concluded that a municipal entity could not be liable under ***Monell*** for its acts in furtherance of a state law. 928 F.2d at 790-92. In that case a Delphi City police officer suspected items of jewelry at a pawn shop had been stolen. He seized the items, leaving a receipt with the shop owner and returning them to their rightful owner. ***Id.*** at 789. The pawn shop sued the City, alleging that its officer violated the pawn shop's constitutional rights by seizing the items without due process. ***Id***. The pawn shop specifically alleged that the officer's conduct was under color of state law because he acted pursuant to Indiana statutes authorizing such seizures. ***Id***.

The Indiana district court dismissed the § 1983 claim on grounds the pawn shop had adequate state law remedies. ***Id.*** at 789-90. The Seventh Circuit affirmed, but on other grounds. ***Id.*** The court held that the pawn shop had failed to identify a specific municipal policy or custom. The claim that the

City had a policy of instructing its police officers to enforce the statutes was insufficient for **Monell** liability. **Id**. at 790-91. The court held:

> It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the "policy" of enforcing state law. If the language and standards from *Monell* are not to become a dead letter, such a "policy" simply cannot be sufficient to ground liability against a municipality.

**Id**. at 791-92.

Judge Crabb interpreted the **Surplus Store** decision as resting on a causation concept. Specifically, the municipal policy of enforcing state laws, without more, cannot be the "moving force" behind a constitutional violation; it is state law that is the cause in that circumstance. 670 F.3d. at 935-936; *See also* **Whitesel**, 222 F.3d at 872; **Familias Unidas**, 619 F.2d at 404.

Judge Crabb also discussed **Bethesda Lutheran Homes and Servs, Inc. v. Leean**, 154 F.3d 716 (7th Cir. 1998), a second decision in which the Court of Appeals determined that enforcement of state law cannot serve as a basis for liability. The plaintiffs in **Bethesda Lutheran** sued county officials and the county where a residential facility for the mentally disabled was located. Plaintiffs challenged a Wisconsin statute that permitted admission into residential facilities only with the recommendation of the social services agency of the individual's county of residence. **Id**. at 718 (*citing* Wis. Stat. § 55.06(3)(c)). The statute essentially required the county to refuse admission to nonresidents of Wisconsin.

Plaintiffs alleged the county officials' implementation of the statute violated their constitutional right to travel. The Seventh Circuit found the statute unconstitutional but still had to resolve the issue of whether the county could be liable for damages for its enforcement of those laws. The court noted its prior decisions in **Surplus Store** and **Quinones v. City of Evanston**, 58 F.3d 275 (7th Cir. 1995) and affirmed the principle that municipalities cannot be subject to **Monell** liability for enforcement of unconstitutional state laws, stating:

> The plaintiff who wants a judgment against the municipality under [§ 1983] must be able to trace the action of the employees who actually injured him to a policy or other action of the municipality itself. ***When the municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury***.

*Id*. at 718 (emphasis added). In addition to its own precedents, the court noted the policy concern where "federal constitutional law, enforced through section 1983, puts local government at war with state government." *Id*.

### 4.      Holding in *Madison Metro*.

Judge Crabb distilled the law as turning on the question of ultimate responsibility for the constitutional harm.

> Whether it is framed as an issue of "causation," "policy" or "choice," the question under ***Bethesda Lutheran*** is whether the municipality enforcing a state law has enough discretion in implementation to make the municipality "responsible" for any constitutional violation that occurred.

670 F.3d at 936; *see also **Pembaur v. City of Cincinnati***, 475 U.S. 469, 478 (recognizing that ***Monell*** is a case about responsibility; municipalities are only be held responsible for conduct they condoned).

Applying that principle, Judge Crabb concluded that, although the school district was "applying its own interpretation of the law in its own guidelines," it was not responsible for the constitutional harm. The Court noted that "the policy choice was made by the state: to prohibit transfers that increase racial imbalance." Although the school district supplied the definition of the term "increase racial balance" about which plaintiff complained, "it did so in the context of trying to implement a state mandate and a state policy." *Id*. at 937, 941. The takeaway from ***Madison Metro*** is that if state law or policy compels a municipality to act, the municipality cannot be liable even if it exercised some discretion in enforcing mandatory state directives. *Id*. at 941.

### 5. Seventh Circuit authority since *Madison Metro.*

The Seventh Circuit recently revisited this issue in ***Snyder v. King***, 745 F.3d 242, 243-44 (7th Cir. 2014), where it addressed § 1983 official capacity claims against county voting officials who removed the plaintiff's name from voter registration rolls pursuant to a state law mandating removal of persons convicted crimes. The plaintiff argued that the officials' enforcement of the law was akin to a county policy because the statute only authorized removal and that it was county officials who exercised discretion in their enforcement of the law, including defining what constituted a crime warranting removal. ***Id.*** at 247-48.

The court reaffirmed its holdings to the effect that when a municipality acts pursuant to mandatory state statutes, "the state law is the proximate cause of the plaintiff's injury," not the local government's compliance with it. ***Id.*** at 247 (*citing* ***Surplus Store***, 928 F.2d at 791-92 and ***Whitesel v. Sengenberger***, 222 F.3d 861, 872 (10th Cir. 2000) (county cannot be liable for "merely implementing" a policy created at the state level). The court in ***Snyder*** rejected plaintiff's argument that defendants should be responsible because they "made an independent choice from among various alternatives authorized by state law." The court noted that, even if lacking in detail, the statute in question did not merely authorize removal from the voter rolls; the statutory language was compulsory. Its conclusion, the court noted, was in line with other federal circuits that distinguish between conduct that is authorized by statute (which could give rise to municipal liability) and conduct that is mandated by statute (which is not actionable). ***Id.*** at 248.

The court's summary in ***Snyder*** applies equally in Ms. Loertscher's case. As discussed below, if Ms. Loertscher did suffer constitutional harm, "[I]t is the statutory directive, not the follow-through, which cause[d] [the] harm." ***Id.*** at 249.

### B. *The County's conduct was required by the Wisconsin's Children's Code.*

There is really no dispute that the County social workers' conduct was compliant with state law. The County has disclosed as an expert Charmain Klyve, a county social services administrator

who has trained CPS employees for 16 years. She will testify that the Taylor County social workers performed their duties "by the book" in compliance with CPS Standards. (Klyve Report, Dkt. 128, filed August 19, 2016). Plaintiff has not identified an expert to suggest that their conduct somehow deviated from those standards. An examination of the County employees' conduct in light of the CPS Standards reveals the exceptionally narrow discretion the County is given in the area of child protective services.

As a CPS agency under contract with the DCF, the County was required to assess the report of suspected abuse received from Mayo/Luther Hospital "immediately" and, if credible evidence of abuse was present, determine whether protective custody was required to protect Ms. Loertscher's unborn child. Wis. Stat. §§ 48.981(3)(c)(1)(a); 48.981; 48.981(3)(c)(4); 48.067(3)-(4). Couched in mandatory language, *e.g.*, "shall", it is apparent that state law, not a County decision or policy, was the moving force behind Ms. Loertscher's claimed harms. *See **Swatek v. County of Dane***, 192 Wis.2d 47, 58-59, 531 N.W.2d 45 (1995) (recognizing that "[t]he general rule is that the word 'shall' is presumed to be mandatory when it appears in a statute").[4] State law defines the "duties of county departments," mandating that:

> Within 24 hours after receiving a report under par. <u>(a)</u> of suspected unborn child abuse, the agency, in accordance with that authority, ***shall initiate a diligent investigation to determine if the unborn child is in need of protection or services***. An investigation under this subd. 1. a. ***shall be conducted in accordance with standards established by the department for conducting child abuse and neglect investigations or unborn child abuse investigations***.

Wis. Stat. § 48.981(3)(c)(1)(emphasis added). The County had no discretion as to whether or how it would respond. The statute not only mandates that the County must respond, it mandates the time

---

[4] To the extent the Taylor County agent's conduct were not done pursuant to Wisconsin law or CPS Standards they cannot be attributed to the county and, therefore the county cannot be liable for the same. ***McClanahan v. City of Tumwater***, 2012 WL 411383, * 21 (W.D. Wash. Sept. 19, 2012) (holding that a "city cannot be liable for the actions of its employees unless the employees acted pursuant to a 'policy, practice, or custom.' As a matter of law, a 'rogue employee' does not give rise to a ***Monell*** claim").

frame and *how* it must respond—"in accordance with standards established by the department", *i.e.*, the published CPS Standards.

The CPS Standards dictate the following "Criteria for Screening Out a Report of Unborn Child Abuse":

> **VI.C.2. Criteria for Screening Out a Report of Unborn Child Abuse**
>
> - There is insufficient information to make it possible to identify and locate the expectant mother.
> - There is no credible information to support a suspicion that the individual is pregnant.
> - There is no credible information that the expectant mother is currently severely abusing alcohol, controlled substances, or controlled substance analogs.
> - There is no credible information that the abuse of the named substance(s) could cause serious physical harm to the unborn child or risk of serious physical harm to the child when born.

(PFOF 35). The DCF will not permit counties to screen out (*i.e.*, dismiss) reports of abuse at their discretion; they are required by CPS Standard, as incorporated by law in Wis. Stat. § 48.981(3)(c)(1) and their contracts, to pursue investigations if there is *any* credible evidence to support the possibility of abuse. The Mayo/Luther Hospital social worker's report that Ms. Loertscher was 3 months pregnant, tested positive for methamphetamines, amphetamines, and THC, and continued use during her pregnancy meant the County would have violated the law if they did not act promptly to screen in her case. (PFOF 26-30).

The additional report that Ms. Loertscher's physicians were concerned about the health of the fetus and Ms. Loertscher's refusal to accept voluntary services meant that referral to the juvenile court intake worker and law enforcement was mandatory. (PFOF 30, 38). Wis. Stat. § 48.205(1m). State law dictates the obligations of that court employee, including her responsibility for "[d]etermining whether the child or expectant mother of an unborn child shall be held under § 48.205." Wis. Stats. § 48.067 ("Powers and duties of intake workers"). There simply is no discretion in these matters, including the determination by the juvenile court intake worker whether the mother must be held.

Moving past the initial 24-48 hour period after the report, Ms. Clarkson was required by law and CPS Standards to perform a "diligent investigation" such that a determination could be made within 60 days whether abuse had occurred. Again, the language is mandatory.

> The county department ...**shall** determine, within 60 days after receipt of a report that the county department, department, or licensed child welfare agency investigates under subd. 1., whether abuse or neglect has occurred or is likely to occur. The determination **shall** be based on a preponderance of the evidence produced by the investigation.

Wis. Stat. § 48.931(3)(c)(4)(emphasis added). CPS Standards provide very specific guidance on how to perform the investigation, including the role of the caseworker's supervisor. (PFOF 100-103). She was required to gather sufficient information to do the following:

---

**XIV.G. Conclusion of the Initial Assessment**

The CPS caseworker must make the following decisions and share the information with the parent/caregiver:

- Whether the child is in need of protection or services, including the need for any court intervention.
- Whether there are any identified threats to child safety and the plan to control those threats.
- How identified threats to child safety are related to the parent/caregivers ability to provide protection (diminished protective capacities).
- The responsibility of the agency to provide CPS Ongoing Services when a child is unsafe (*See CPS Safety Intervention Standards*).
- The maltreatment determination.
- The maltreater determination, when applicable.
- The process to appeal a substantiated maltreater determination.
- If the case is going to be closed with CPS, how to access community resources, if needed.

---

(PFOF 100).

Notably, both the "maltreatment determination" and "maltreater determination" about which Ms. Loertscher complains are mandatory tasks that the caseworker must complete to comply with CPS Standards. (*Id*.) The standards required Ms. Clarkson and her supervisor, Ms. Daleiden, to make a finding of maltreatment if they believed by a "preponderance of the evidence" that unborn child abuse was present. Wis. Stat. § 48.931(3)(c)(4) (PFOF 109-111). Again, the CPS standards defined the sole criteria for making this determination:

XX.B.  **Criteria for Substantiating Unborn Child Abuse**

All of the following criteria must be met in order to substantiate that unborn child abuse has occurred:

- An unborn child is at risk of serious harm.
- The risk of harm is caused by the habitual lack of self-control of the expectant mother in the use of alcohol beverages, controlled substances, or controlled substance analogs.
- The habitual lack of self-control in the use of the substances is exhibited to a severe degree.

(PFOF 111). Ms. Clarkson and Ms. Daleiden had no discretion. If the criteria were met they were required to find maltreatment.[5]

The County's "Case Finding Determinations" summarizes the evidence supporting its determination that maltreatment occurred by the preponderance of the evidence. (PFOF 113-117). That decision was based on records from Ms. Loertscher's medical providers indicating she admitted using methamphetamine 2-3 times per week, as well as THC and alcohol, after determining she was pregnant. (*Id.*). A psychiatrist diagnosed her with "methamphetamine dependence, marijuana dependence and alcohol abuse." (*Id.*). In addition, the County's summary notes that Dr. Bantz, the obstetrician/gynecologist, "gave testimony that using Methamphetamine could result in the baby being born smaller, with a low birth weight, potentially cognitive problems in the future, problems with organ development, and pre-term delivery" and that alcohol use "can cause Fetal Alcohol Syndrome." (*Id.*). Ms. Loertscher refused to cooperate and refused AODA assessment, meaning all of the evidence available to the County weighed in favor of finding maltreatment.

In ***Madison Metro*** Judge Crabb determined that ***Monell*** liability could not be found where the state statute gave the school district discretion to define its own racial balance thresholds. This case involved substantially more discretion than counties in Wisconsin are allowed in enforcing

---

[5] Appendix 2 to the CPS Standards even defines the term "preponderance of the evidence": "credible" and "persuasive" evidence is needed leading to a conclusion "*that the maltreatment is more probable to have occurred than not.*" (PFOF 110) (emphasis in original).

Wisconsin's Child Protective Service laws. Ms. Loertscher cannot plausibly suggest County policy was "a moving force" behind her circumstance. Her claim fails as a matter of law.

        **C.**      ***The Taylor County documents identified by plaintiff as "policies" were neither actual County policies or "the moving force" behind her alleged constitutional injury.***

Plaintiff's counsel identified in discovery two Taylor County documents that are described as "policies" attributable to the County: a "Taylor County Human Services Department Appeal Process for Substantiating Maltreatment Findings" (Appeals Policy) and "Interagency Agreement" between the County and local law enforcement. (PFOF 135).

Both documents were required by state law for use in CPS investigations. Specifically, Wis. Stat. § 48.931(3)(c)(5m), which discussed a maltreater's right to appeal that designation, provided that the county departments "shall provide [the maltreater] with an opportunity for a review of that initial determination ***in accordance with rules promulgated by the department***." (Emphasis added). Similarly, the "Interagency Agreement" is formally known as a "Memorandum of Understanding" required by state law and CPS Standards. The standards require county officials to collaborate with law enforcement during the initial access stage for the protection of the public and children.

---

**XXV.D.  Development of MOU**

County agencies and BMCW shall develop written memoranda of understanding (MOU) between the local agency and each law enforcement agency located within the county, including tribal law enforcement agencies.

If a law enforcement agency will not meet with the county agency or the BMCW to develop an MOU, the county agency shall develop "a written policy specifying the kinds of reports it will routinely report to local law enforcement authorities" [s. 48.981(3)(a)3., Stats.], send or give the policy to the law enforcement agency and document its efforts to meet with the law enforcement agency.

---

(PFOF 39).

It is at least questionable that documents required by state law could be "official" policies of the counties. *See **Madison Metro.,*** 670 F.Supp.2d at 938 (noting municipalities do not "have to choose

between following their own interpretation of the Constitution and putting themselves at 'war with state government.') Regardless, neither document suggests an unconstitutional County-endorsed policy or was a moving force between any constitutional harm suffered by Ms. Loertscher.

## II. PLAINTIFF HAS NOT ALLEGED A CONSTITUTIONAL VIOLATION BY THE COUNTY.

Ms. Loertscher's **Monell** claim requires her to prove that the County's conduct with which she takes issue violated her constitutional rights. **Matthews v. City of East St. Louis**, 675 F.3d 703, 709 (7th Cir. 2012) (holding that if there is "no constitutional violation, [there is] therefore no municipal liability"). While it is unclear from the Amended Complaint exactly what County conduct Ms. Loertscher claims violated her rights *other than* its enforcement of the statute, she does reference several instances of County conduct that she appears to argue is wrongful. The conduct is not, however, of constitutional significance. She alleges:

- Ms. Daleiden and Ms. Clarkson attended, but did not participate in her initial August 5, 2014 hearing on the Temporary Physical Custody Request. (Amend. Compl., Dkt. 66 at ¶ 32, Nov. 6, 2015).

- Ms. Daleiden received a phone call from Mayo Clinic disclosing Ms. Loertscher's refusal to take a blood test as a prerequisite to her court-ordered admission to the Fahrman Center treatment facility. (*Id.* at ¶ 41).
- Ms. Clarkson informed a Mayo Clinic social worker about the court order directing Ms. Loertscher to remain at the Mayo Clinic until her transport to the Fahrman Center treatment facility. (*Id.* at ¶ 38).

- Ms. Daleiden signed an affidavit as a witness in relation to Ms. Loertscher's August 25, 2014 contempt hearing. (*Id.* at ¶ 44; Motion for Contempt, Dkt. No. 1-4, Dec. 15, 2014).

- Ms. Daleiden and Ms. Clarkson were present at, but did not participate in Ms. Loertscher's August 25, 2014 contempt hearing. (Amend. Compl., Dkt. 66 at ¶ 49, Nov. 6, 2015).

- Ms. Clarkson testified as a witness at Ms. Loertscher's September 4, 2014 contempt hearing. (*Id.* at ¶ 52).

- Ms. Daleiden attended, but did not participate in Ms. Loertscher's September 22, 2014 contempt hearing. (*Id.* at ¶ 69).

- Ms. Daleiden and Ms. Clarkson told Ms. Loertscher that they "just want a healthy baby." (*Id*. at ¶ 55).

- Ms. Daleiden and Ms. Clarkson allegedly responded to Ms. Loertscher's inquiry as to whether her CPS proceedings would go away if she terminated her pregnancy. (*Id*. at ¶ 55).

(PFOF 134)

She does not allege in her pleadings that this conduct is related to her ***Monell*** claim, nor does she attribute these mundane tasks to any county policy, practice or custom. Regardless, the Court in its decision on the County's motion to dismiss (Order, Dkt. 118, June 6, 2016), recognized that Ms. Clarkson's and Ms. Daleiden's conduct in those instances "can hardly be said to have violated Loertscher's constitutional rights." ***Loertscher v. Anderson***, 2016 U.S. Dist. LEXIS 73548 *21 (W.D. Wis. June 6, 2016). Since this conduct did not violate Loertscher's rights, it cannot give rise to a claim under ***Monell***. ***Matthews***, 675 F.3d at 709; ***Thompson***, 33 F.3d at 859 (7th Cir. 1994).

Ms. Loertscher appears to identify alleged harms caused by the County's "unconstitutional policy, procedure, or practice for implementation of the Act" at paragraphs 84 through 87 of the Amended Complaint. There she alleges the following resulted from County policies: "seizure of [her] medical information"; "taking [her] into custody and seeking to secure her institutionalization, despite no evidence of severe drug dependency"; "causing [her] imprisonment"; and pursuing a child maltreatment determination against her. (PFOF 135).

The allegations miss the mark in attempting to define ***Monell*** liability. First, as discussed above, if the County activity results from "implementation of the Act," as she alleges, then County policy is not the moving force behind the harm—state law is. Pursuing a maltreatment determination, for instance, was mandated by statute, Wis. Stat. § 48.931(3)(c)(4), and not County policy. The decision and its implementation cannot give rise to municipal liability as a matter of law. ***Bethesda***, 154 F.3d 716; ***Surplus Store***, 928 F.2d 788.

More fundamentally, if these harms resulted from County activity they were the result of individual choices and judgments of individuals rather than County *policy*. There must be a "direct causal link" between these alleged violations and a county policy, practice or custom. ***City of Canton, Ohio v. Harris***, 489 U.S. 378, 386 (1989); ***Kujawski v. Board of Comm'rs of Bartholomew County, Ind.***, 183 F.3d 734, 737 (7th Cir. 1999). Ms. Loertscher is confusing individual judgment decisions of County employees (for which they are immune) with County policy.

If, as she alleges, the County should not have referred her case for a Temporary Protective Custody order without "evidence of a severe drug dependency", that might be an individual's misjudgment of the weight of the evidence, but it is not the product of a County policy. In fact, much of Ms. Loertscher's disagreement with the County's employees is in their interpretation of her statements, her physician's conclusions, and the significance of the evidence before them. All of those disagreements go to individual judgment in the particular case, not a County policy. None of the individuals against whom she makes allegations are County policymakers with final discretion to direct County policies. ***Pembaur v. City of Cincinnati,*** 475 U.S. 469, 486 (1986)(noting that "[a] sheriff, for instance, is not the final policymaker with respect to the probable cause requirement for a valid arrest. He has no alternative but to act in accordance with the established standard; and his deliberate or mistaken departure from the controlling law of arrest would not represent municipal policy.")

The decision to obtain Ms. Loertscher's medical information was required by statutes mandating a "diligent investigation" (Wis. Stat. § 48.931(3)(c)(1)) and CPS Standards. It is not even a violation of state privacy statutes, much less unconstitutional. Wis. Stat. § 905.04(4)(e)(3)(stating "there is no privilege for information contained in a report of child abuse or neglect", including unborn child abuse).

### A. Ms. Loertscher's claim that the County imprisoned her is factually erroneous and not reviewable by this Court.

The core of Ms. Loertscher's lawsuit against the County is her exaggerated claim that the County "threw her in jail." The Court is without jurisdiction to preside over a § 1983 case in which the injury claimed results from a state court order under the ***Rooker-Feldman*** doctrine. ***Zurich Americans Inc. Co. v. Superior Court for the State of California***, 326 F.3d 816, 821 (7th Cir. 2003). To the extent that Ms. Loertscher is claiming the invalidity of a state court order causing her incarceration as a source of unconstitutional harm, her claim is barred. ***Exxon Mobil Corp. v. Saudi Indus. Corp.***, 544 U.S. 280, 291-92 (2005) (holding lower federal courts are without jurisdiction to review claims for relief for "an injury cause by [a] state-court judgment); *see also **Garry v. Geils***, 92 F.3d 1362 (7th Cir. 1996) (dismissing § 1983 claim that defendant caused property to be condemned because suit was akin to challenging the state court's decision condemning the property).

In addition to not being a compensable harm in this Court, the allegation is just factually inaccurate. The County had no choice but to investigate the report of unborn child abuse and to refer the case to the juvenile court intake worker and law enforcement for their determination of whether protective custody was warranted. Wis. Stat. § 48.205(1m). The court intake worker had responsibility for "[d]etermining whether the child or expectant mother of an unborn child shall be held under § 48.205." Wis. Stats. § 48.067 ("Powers and duties of intake workers"). The intake worker—a court employee—issued a custody hold until the court hearing on August 5, 2014, at which Judge Krug found probable cause to order Ms. Loertscher to obtain treatment consistent with the court's obligations and discretion under state statutes. (PFOF 40-43, 65). After that hearing Ms. Loertscher was subject to the jurisdiction of the state court; the County did not direct the events thereafter.

It was Ms. Loertscher's conduct in contempt of the state court's orders—not a County policy— that resulted in her ultimate incarceration. (PFOF 65). The guardian *ad litem* for the unborn child and Corporation Counsel, both of whose conduct is subject to immunity, sought to enforce the state court's facially-valid Placement Order. (PFOF 72-73). Even if the County staff had participated, the enforcement of a facially-valid order "does not constitute an unconstitutional act or policy under

*Monell.*" *Dodson Aviation, Inc. v. Padron*, 2011WL 1097774 (D. Kan. March 22, 2011) (*citing*

*Shelton v. Wallace*, 1996 WL 428363, *3 (6th Cir. 1996) (holding that "[t]he policy of enforcing state

court orders, even if we assume that those orders may from time to time be erroneous, cannot be an

unconstitutional policy"). Ms. Loertscher's claim of having been "institutionalized" or "thrown in jail",

while dramatic, was not the result of an unconstitutional County policy.

### III. LOERTSCHER'S FACIAL CHALLENGE TO THE VALIDITY OF ACT 292 DEFEATS HER *MONELL* CLAIM AS A MATTER OF LAW.

Ms. Loertscher has made a facial challenge to the validity of Act 292, asserting in doing so that

there is "no circumstance in which its enforcement would be valid." *Wash. State Grange v. Wash.

State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739,

374 (1987)). Such a challenge, if successful, defeats her claim against the County as a matter of law.

Judge Crabb observed in *Madison Metro* that the ability of the defendant school district to

apply the challenged statute in a lawful manner was an important factor in the court's analysis and the

driving force behind her dismissal of the plaintiff's *Monell* claim. 670 F. Supp. 2d at 937. If the school

district "had 'various alternatives' in front of it, some constitutional, some not, but made the 'deliberate

choice to follow a course of action' that violated the Constitution," Judge Crabb wrote, "that would

weigh heavily in favor of finding that defendant adopted an unconstitutional policy that caused

plaintiff's injury." *Id*. at 937. If, on the other hand, the school district had no alternative but to

implement an unconstitutional law, then it cannot be said that the municipality's conduct was

"responsible for the injury." *Id.* at 939. Judge Crabb concluded that the school district did not have

discretion under the statute at issue to implement a constitutionally-acceptable transfer plan and

therefore the district's own conduct did not cause the constitutional deprivation. *Id.*

Ms. Loertscher has not alleged in this lawsuit that the County had an opportunity to enforce

Act 292 in a manner she would accept as constitutional. To the contrary, the entire thrust of this lawsuit

is that the law is unconstitutional on its face and in every application. (Am. Compl., Dkt. 66, ¶ 1, 103).

If her assertions are correct, then the County did not make a "conscious choice" to enforce the law in an unconstitutional manner. There was no choice the County social workers could make other than to ignore their legal responsibilities. Their attempt to conform to Wisconsin law—even if the law is unconstitutional—was not a County policy and cannot be the basis for *Monell* liability. *Id.* at 935 (*citing* Dina Mishra, Comment, *Municipal Interpretation of State Law and "Conscious Choice"*, 27 Yale L. & Pol'y Rev. 249, 250 (Fall 2008).

### IV.    THE COUNTY CANNOT BE LIABLE IF ACT 292 IS FOUND CONSTITUTIONAL.

The State Defendants filed a dispositive motion seeking a decision from the Court that 1997 Wisconsin Act 292 is constitutional. (Dkt. 166). The County requests dismissal of Ms. Loertscher's claims against it if the Court were to grant that motion. The County, as a matter of law, cannot be liable under 42 U.S.C. § 1983 for its enforcement of a facially-valid state law, nor can it be liable under *Monell* without some underlying unlawful conduct on behalf of its agents. *Allen v. Wright*, 468 U.S. 737, 752 (1984); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983). A successful motion by the State Defendants precludes the County's liability.

### V.    THE COUNTY IS ENTITLED TO ELEVENTH AMENDMENT IMMUNITY.

The Eleventh Amendment provides immunity to states, their agencies, and their officials when sued under 42 U.S.C. § 1983. *Garcia v. City of Chicago*, 24 F.3d 966, 969 (7th Cir. 1994). This immunity extends to municipalities and their employees when they are acting as an agent or arm of the state or enforcing a state policy. *Id.; Scott v. O'Grady*, 975 F.2d 366, 369 (7th Cir. 1992); *Trenton v. New Jersey*, 262 U.S. 182, 185-87 (1923) (holding that a municipality acts as an agent of the state in exercising the powers delegated to it by the state); *Vives v. City of New York*, 524 F.3d 346, 351 (2d Cir. 2008) (*citing Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990)). The Seventh Circuit has extended this immunity to state child protective services departments and their workers. *Ryan v. Ill. Dep't of Children & Family Services*, 185 F.3d 751, 758 (1999) (holding that Illinois' department of

children and family services is a state agency entitled to Sovereign Immunity); *see also **Rodriguez v. Stevenson**, 243 F. Supp. 2d 58, 61 (D. Del. 2002).

The Fifth Circuit Court of Appeals held in ***Stem v. Ahearn***, 908 F.2d 1 (1990), that two Harris County Children's Protective Services workers were agents of the Texas Department of Human Services when they investigated a child abuse allegation reported to the county and were therefore entitled to Eleventh Amendment Immunity. 908 F.3d 1, *3-4. The Court reached this conclusion because the county agency was ultimately administered and supervised by the state DHS, the employees were hired and trained by the state, and were subject to DHS regulation and required to perform investigations pursuant to state law. ***Id.*** at *5.

Wisconsin state law ultimately determines whether an individual is considered an arm of the state for purposes of immunity. ***Mount Healthy City Sch. Bd. of Educ. v. Doyle***, 429 U.S. 274, 280 (1977)). The following facts support finding Wisconsin county CPS caseworkers to be agents of the state:

- Taylor County was under contract with DCF to perform CPS functions; this contractual relationship was a prerequisite to the County maintaining state funding. (PFOF 7-8).

- Taylor County and its workers were considered "CPS Agency" and "CPS caseworkers," respectively, when carrying out its contractual CPS function. (PFOF 8).

- DCF has exclusive supervisory authority over Wisconsin county Departments of Human Services performing CPS functions. (PFOF 18).

- Wisconsin county social workers are required to follow CPS Standards and the provisions of Wisconsin's Children's Code when investigating abuse allegations for DCF. Wis. Stat. § 48.01, *et seq.*; (PFOF 16-17).

- The state exclusively trains county workers to perform their CPS functions. (PFOF 12).

- Wisconsin counties are required to comply with CPS Standards; their conduct is reviewed by DCF and in the event of non-compliance DCF can withhold county funding for CPS programs. (PFOF 19, 23-24).

- DCF maintains authority to impose corrective action measures and review county budget and program decisions. (PFOF 21-22).

In short, the structure of the Wisconsin CPS model involves state supervision of county workers. Where, as here, the allegations arise out of county implementation of state statutes, sovereign immunity is warranted *Garcia*, 24 F.3d at 969.

## CONCLUSION

For the reasons provided herein, Defendant Taylor County respectfully requests an Order dismissing all claims against it with prejudice.

Dated this 10th day of November, 2016.

**LEIB KNOTT GAYNOR LLC**

By: *s/ Douglas S. Knott*
     Douglas S. Knott, SBN 1001600
     Ryan M. Wiesner, SBN 1090647
     Attorneys for Defendant Taylor County
     219 N. Milwaukee Street, Suite 710
     Milwaukee, WI 53202
     Telephone (414) 276-2102
     Fax (414) 276-2140
     Email   dknott@lkglaw.net
               rwiesner@lkglaw.net