# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

TAMARA M. LOERTSCHER,

     Plaintiff,

  v.                       Case No. 14-cv-870

BRAD D. SCHIMEL, et al.,

     Defendants.

---

## STATE DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

BRAD D. SCHIMEL
Wisconsin Attorney General


KARLA Z. KECKHAVER
Assistant Attorney General
State Bar #1028242

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

JENNIFER L. VANDERMEUSE
Assistant Attorney General
State Bar #1070979

Attorneys for Defendants
Brad D. Schimel and Eloise Anderson

# TABLE OF CONTENTS

Page

ARGUMENT ...................................................................................2

I.   The Act is not void for vagueness......................................................2

II.  The Act does not violate an expectant mother's substantive due process rights..........................................8

   A.   No fundamental right subject to strict scrutiny review is infringed upon by the Act. ....................................8

      1.   Right to freedom from bodily restraint. .......................9

      2.   Right to freedom from involuntary medical treatment...................................................13

      3.   Right to continue or terminate a pregnancy. ............15

      4.   Right to familial integrity.........................................19

   B.   The state's interest in protecting unborn children from a substantial risk of physical injury is paramount. ............................................................21

      1.   The potential harmful effect of drugs and alcohol on unborn children is a compelling state interest. ..........................................................21

      2.   Court-mandated treatment under the Act does not undermine the compelling state interest......................................................25

III. The Act does not violate an expectant mother's equal protection rights.........................................................29

IV.  The Act does not violate an expectant mother's Fourth Amendment rights. ....................................................36

CONCLUSION...............................................................................40

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TAMARA M. LOERTSCHER,

     Plaintiff,

  v.               Case No. 14-cv-870

BRAD D. SCHIMEL, et al.,

     Defendants.

## STATE DEFENDANTS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1997 Wis. Act 292 (the "Act") is presumed constitutional. *See Bowen v. Kendrick*, 487 U.S. 589, 617 (1988). Loertscher claims that she "is entitled to summary judgment that the Act is facially unconstitutional and that a statewide injunction should issue against any further enforcement of the Act." (Dkt. 177:30.) Loertscher bears the burden of establishing that the Act is unconstitutional in all applications and in every circumstance. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). This she cannot do.

Loertscher concedes that her personal situation is "irrelevant," except to the extent that it serves as an illustration of the Act's application. (Dkt. 177:32–33.) She uses her situation to imply that all allegations of unborn child abuse proceed to court involvement and compelled treatment,

and that all of the various forms those proceedings take are unconstitutional. But the statistics Loertscher cites concerning unborn child abuse proceedings do not support this claim.[1] (Dkt. 177:21.) Loertscher fails to contemplate all the circumstances under which the Act would necessarily be valid—for example, in many situations the Act simply gives child protection workers the ability to receive reports of unborn child abuse, investigate them, and engage expectant mothers in voluntary services. (State Defendants' Proposed Findings of Fact (SDPFOF) ¶¶ 101–20.) Nor does she consider the evidentiary standards and procedural protections that guard against unconstitutional applications of the Act. Loertscher must show that the Act cannot be constitutionally applied to anyone. She fails to meet that high bar.

## ARGUMENT

### I.    The Act is not void for vagueness.

Loertscher argues that the Act is void for vagueness. (Dkt. 177:33–39.) The State Defendants have already explained in their summary judgment brief that the statute is not void for vagueness. (Dkt. 167:54–58.)

---

[1] Loertscher cites statistics showing the number of unborn child abuse "allegations" screened-in for investigation. (Dkt. 177:21.) These statistics say nothing about whether multiple allegations were made about the same woman, nor do they indicate what action—if any—was taken in each case. In many situations, the Act may simply serve as a vehicle for engaging an expectant mother in voluntary services. (SDPFOF ¶¶ 101–20.)

Loertscher begins her argument with the assertion that the Act is "subject to a particularly stringent form of judicial review" under the vagueness doctrine because it "threatens the exercise of constitutional rights." (Dkt. 177:33.) Loertscher is wrong. The Act is a civil statute, not a criminal statute. The Supreme Court is more tolerant of statutes with "civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S 489, 499 (1982). And, the statute does not threaten the exercise of constitutional rights. In the substantive due process section of her brief, Loertscher claims that the Act infringes her rights to physical liberty, to refuse medical treatment, to continue or terminate a pregnancy, and to family integrity. (Dkt. 177:41–49, 58.) As the State Defendants will show in their response to that argument, these rights are either not subject to strict scrutiny review or not directly affected by the Act. *See infra* at 8–20.

A statute is void for vagueness if it fails to define prohibited conduct with sufficient clarity to inform ordinary people what is prohibited, and to enable those enforcing the statute to do so "in a nonarbitrary, nondiscriminatory manner." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 602 (7th Cir. 2012) (citation omitted).

As shown in the State Defendants' summary judgment brief, the statutory terms Loertscher characterizes as undefined are all easily

understood nontechnical words and phrases. "In the absence of a statutory definition, this common and approved usage of nontechnical words and phrases contained in statutes is presumed to be the usage intended by the legislature. This meaning . . . may be established by using the dictionary definition." *State v. Ehlenfeldt*, 94 Wis. 2d 347, 356, 288 N.W.2d 786 (1980) (citation omitted). Here, the dictionary defines the statutory terms "habitually," "lacks self-control," "severe degree," "substantial risk," "affected," and "endangered." (Dkt. 167:56–58.) A statute is not void for vagueness if the court can, using "the ordinary process of statutory construction, . . . give a practical or sensible meaning to the statute." *Gross v. Woodman's Food Mkt., Inc.*, 2002 WI App 295, ¶ 57, 259 Wis. 2d 181, 655 N.W.2d 718; *accord Karlin v. Foust*, 188 F.3d 446, 474 (7th Cir. 1999). In this case, if the court interprets the statute in accordance with the ordinary meanings of the individual statutory terms, it will find that it is not void for vagueness.

Loertscher contends that the experts do not know what the statutory terms mean, so therefore the statute is void for vagueness. (Dkt. 177:35, n.8–11.) The state's experts know. Asked what "habitually used alcohol to a severe degree" means, Dr. David Wargowski, said this "verbiage . . . made it clear that there was heavy alcohol exposure during the pregnancy." (SDPFOF ¶ 208.) When asked to define habitual use, Dr. Michael Porte, said that it

"depends on the drug." (*Id.* ¶ 209.) Thus, for example, habitual use of marijuana would be daily use, while habitual use of methamphetamine would be two or three times a week. (*Id.*)

Dr. Porte said that "substantial risk" is not a "diagnosis," but insisted that it had meaning. (*Id.* ¶ 210.) "I don't think I need a technical word-for-word 50 percent risk, 25 percent risk. Substantial risk for me is well above that group that does not use these drugs prenatally. [And] each drug is different." (*Id.*) As a neonatologist, Porte "treat[ed] a lot of babies who, if their mothers weren't doing narcotics, I wouldn't see them." (*Id.* ¶ 211.) Dr. Barbara Knox said that the substantial risk determination depends on "the substance or substances that are reported being used; how often is the person reported to be using; when was the last use for the person; what are the levels, if any, that have been detected. . . . [what are] the volumes, the quantities, etc." (*Id.* ¶ 212.)

Meanwhile, Loertscher's own expert, Dr. Kathy Hartke, stated that a doctor should be able to determine whether an expectant mother "habitually lacks . . . self-control in the use of controlled substances" and that she had been able to make such an assessment herself on at least two occasions. (*Id.* ¶¶ 213–14.)

Loertscher also complains that the Taylor County social workers enforcing the Act against her do not understand the statutory

terms. (Dkt. 177:39.) She contrasts the deposition testimony of Julie Clarkson and her supervisor Liza Daleiden. (Dkt. 177:39.) Clarkson defined "habitual lack of self-control" as "the person isn't able to control their use of the substance." (SDPFOF ¶ 215.) Daleiden agreed with this definition, but elaborated further: "habitual means that it happens often, it is habit, it is occurring often. The person is unable to control so there is a lack of self-control so on their own they are unable to stop this behavior and to a severe degree." (*Id.* ¶ 216.) Clarkson didn't have a definition of "severe degree," but explained that, with respect to Loertscher, "the primary thing was that she was using methamphetamine . . . [, which] is reportedly very serious and severe." (*Id.* ¶ 217.) She later added, severity could be measured by "[t]he type of drugs that were being used, the frequency of use, the refusal to receive services for that." (*Id.*) Daleiden's understanding was consistent with Clarkson's. She said use to a "severe degree" would be use that "could endanger the . . . unborn child." (*Id.* ¶ 218.) As an example, she said that a monthly "bowl of marijuana" would be habitual, but not "to a severe degree." (*Id.*) These definitions are consistent with each other and consistent with the dictionary definition of the terms.

The Child Protective Services Access and Initial Assessment Standards ("IA Standards") developed by the Department of Children and Families (DCF) provide specific guidance to county social workers for how to apply the

statutory standard. In pertinent part, caseworkers must gather and document certain information when receiving reports of unborn child abuse:

- verification of pregnancy . . . ;

- a description of the substances and quantity of substances she is alleged to be using;

- a description of the behaviors that lead the reporter to believe that the expectant mother is demonstrating a habitual lack of control or that her substance abuse is exhibited to a severe degree;

- the history of her substance abuse, treatment received and previous children who were born with the effects of alcohol or other drugs used during pregnancy; [and]

- a description of the prenatal care the expectant mother is receiving, if any, and the name of the doctor and medical clinic where she receives services.

(*Id.* ¶ 105.) These instructions provide appropriate guidance to county workers enforcing the Act.

Loertscher observes that the Act is not limited to expectant mothers who are drug-dependent or alcoholic. (Dkt. 177:36.) Loertscher is correct. The Act is based on and directed towards an expectant mother's behavior, not her physical dependency on drugs or alcohol. Similarly, she notes that the Act applies to all controlled substances, including "common prescription medications," and legal substances such as alcohol. (Dkt. 177:37.) Again, Loertscher is correct. The standard for applying the Act to an expectant mother's use of prescription drugs and legal substances is the same as it is for her use of illegal drugs like methamphetamines. Is she using it with a

habitual lack of self-control to a severe degree to the extent that there is a substantial risk that the physical health of her unborn child will be seriously affected or endangered unless she receives prompt and adequate treatment?

The Act is not void for vagueness. It informs expectant mothers what behavior is prohibited, and enables those enforcing the statute to do so in a nonarbitrary and nondiscriminatory manner.

## II.     The Act does not violate an expectant mother's substantive due process rights.

As discussed in the State Defendants' summary judgment brief, the rights at issue in this case, when correctly framed, do not implicate the constitution. (Dkt. 167:22–25.) An expectant mother has no right to use drugs, drink alcohol, or abuse her unborn child. (Dkt. 167:22–25.) Even if the rights identified by Loertscher were at issue here, strict scrutiny does not apply to a child abuse statute under these circumstances. Instead, the court must balance the rights of the expectant mother with the state's interest in protecting unborn children from abuse. The Act meets that test.

### A.     No fundamental right subject to strict scrutiny review is infringed upon by the Act.

Loertscher provides broad generalizations of rights that she claims are implicated by the Act. (Dkt. 177:40–49.) But she fails to identify any particular right with specificity, and she does not discuss in detail the cases she cites in support of these rights. (Dkt. 177:40–49.) Indeed, the cases she

cites to support her broad claims are distinguishable. Loertscher cannot demonstrate that the Act violates a fundamental right subject to strict scrutiny review.

### 1. Right to freedom from bodily restraint.

Loertscher argues that she has a right to be free from physical restraint. (Dkt. 177:41–43.) She argues that any interference with this right is subject to strict scrutiny. (Dkt. 177:40–43, 50–57.) This is not so.

As a preliminary matter, there is no provision for incarcerating an expectant mother under the Act. *See* Wis. Stat. § 48.207(1m). Taking an expectant mother into custody is not an arrest; the expectant mother is not held in jail. Wis. Stat. §§ 48.193(3), 48.207(1m). Loertscher was incarcerated in jail only because she was held in contempt by the state court. The civil contempt power was not created by the Act and is, therefore, not properly challenged in this lawsuit. Moreover, Loertscher's incarceration as a result of civil contempt does not rise to the level of a substantive due process violation. *Turner v. Rogers*, 564 U.S. 431, 449 (2011) (parents may be incarcerated for civil contempt if they fail to pay child support).

Even if incarceration were at issue, the Supreme Court has repeatedly held that the government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest. *Salerno*, 481 U.S. 739, 748 (1987). For example, there is no absolute constitutional

barrier to detention of potentially dangerous resident aliens pending deportation proceedings. *Carlson v. Landon*, 342 U.S. 524, 537–42 (1952). If the police suspect an individual of a crime, they may arrest and hold him until a neutral magistrate determines whether probable cause exists. *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). And an arrestee may be incarcerated until trial if he presents a risk of flight. *Bell v. Wolfish*, 441 U.S. 520, 534 (1979).

Loertscher cites *Foucha v. Louisiana*, 504 U.S. 71 (1992), in support of her claim that she has a fundamental right to freedom from bodily restraint. She argues that any infringement of that right is subject to strict scrutiny review. (Dkt. 177:40–57.) In *Foucha*, the Supreme Court concluded that the indefinite detention of insanity acquittees who are not mentally ill but who do not prove they would not be dangerous to others violates due process. *Id*. at 83. The Supreme Court did not settle on a standard of review in *Foucha*. *Id*. at 79, 81. It is unclear what standard the Court ultimately applied but, at least initially, it stated a deferential standard: "Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id*. at 79.

The Supreme Court has not expressly identified the proper level of scrutiny to apply when reviewing constitutional challenges to civil

commitment statutes. *United States v. Timms*, 664 F.3d 436, 445 (4th Cir. 2012). Contrary to Loertscher's contention, the Supreme Court has never applied strict scrutiny to the laws involving involuntary commitment. Such laws are subjected only to deferential review. In *Jackson v. Indiana*, 406 U.S. 715, 738 (1972), the Supreme Court held that Indiana's provisions for the indefinite institutionalization of incompetent defendants violated substantive due process because they did not bear any *reasonable relation* to the purpose for which the defendant was committed. Similarly, in *O'Connor v. Donaldson*, 422 U.S. 563, 575–76 (1975), the Supreme Court held that the confinement of a non-dangerous mentally ill person was unconstitutional *not* because the state failed to show a compelling interest and narrow tailoring, but because the state had *no legitimate interest whatsoever* to justify such confinement. In *Jones v. United States*, 463 U.S. 354 (1983), the Supreme Court held that there was no substantive due process bar to holding an insanity acquittee beyond the period for which he could have been incarcerated if convicted. The Court concluded that it had no basis for invalidating the commitment law as a matter of substantive due process because the law was *reasonably related* to Congress' purposes. *Id*. at 368.

Indeed, the Supreme Court has consistently upheld involuntary commitment statutes provided the confinement takes place pursuant to

proper procedures and evidentiary standards. *Kansas v. Hendricks*, 521 U.S. 346, 357 (1997) (citing *Foucha*, 504 U.S. at 80; *Addington v. Texas*, 441 U.S. 418, 426–27 (1979)). For example, the state may confine a mentally ill person indefinitely to a mental hospital provided there is clear and convincing evidence that the person is mentally ill and dangerous. *Jones*, 463 U.S. at 362.

The Act provides proper procedures and evidentiary standards for its limited interference with an expectant mother's liberty. If an expectant mother is detained under that Act, the person taking her into custody must "make every effort to release" her. Wis. Stat. § 48.203(1), (6). The expectant mother cannot continue to be held in custody unless, within 48 hours, the court determines that there is probable cause that she meets the statutory standard and that she is refusing treatment. Wis. Stat. §§ 48.205(1m), 48.213(1). Ultimately, the court can order inpatient treatment at a residential facility or inpatient treatment center. Wis. Stat. § 48.347(3)(b), (6). The court can only make such an order based on clear and convincing evidence presented at a fact-finding hearing. Wis. Stat. § 48.31. Even then, the court cannot place an expectant mother outside her home unless she refuses to participate in Alcohol and Other Drug Abuse (AODA) services offered to her. Wis. Stat. § 48.347. And the court's placement and treatment decision must be appropriate for the expectant mother's needs and provided in the least

restrictive environment consistent with those needs. Wis. Stat. § 48.355. Given these evidentiary standards and procedural protections, the Act does not violate the right to freedom from bodily restraint.

### 2. Right to freedom from involuntary medical treatment.

Loertscher contends that the Act "forces people who are or may become pregnant to undergo unconsented and inappropriate treatment." (Dkt. 177:43.) She argues that this right to refuse medical treatment is fundamental, and any intrusion on that right is subject to strict scrutiny. (Dkt. 177:43–45, 50–57.)

Loertscher cannot support her argument that the right to refuse involuntary medical treatment is subject to strict scrutiny review. She cites *Cruzan by Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990), and *Washington v. Glucksberg*, 521 U.S. 702 (1997). (Dkt. 177:43.) In both cases, the Supreme Court recognized a person's general right to refuse unwanted medical treatment. But the Court also recognized that the question of whether that right was violated must be determined by balancing the individual's liberty interest against relevant state interests. *Cruzan*, 497 U.S. at 278–79; *Glucksberg*, 521 U.S. at 728. In *Cruzan*, the Court engaged in a balancing test without specifying whether it was employing a rational basis

test or the compelling interest standard. 497 U.S. at 278–79. In *Glucksberg*, the Court applied a rational basis test. 521 U.S. at 728.

In certain circumstances, the state's interest in preserving the wellbeing of an unborn child outweighs the expectant mother's constitutional right to refuse medical treatment. For example, in *Pemberton v. Tallahassee Memorial Regional Medical Center., Inc.*, 66 F. Supp. 2d 1247, 1251–54 (N.D. Fla. 1999), the court held that an order requiring a pregnant woman to undergo a caesarean section did not violate the woman's substantive due process rights because the state's interest in preserving the life of the unborn child outweighed the pregnant mother's constitutional right to refuse medical treatment. Similarly, in *Jefferson v. Griffin Spalding County Hospital Authority*, 274 S.E.2d 457, 458 (1981), the Supreme Court of Georgia authorized a hospital to perform a caesarean section and any necessary blood transfusions on a pregnant woman who refused medical treatment. *But see In re A.C.*, 573 A.2d 1235, 1237 (D.C. Ct. App. 1990) (error for trial court to have weighed the rights of the mother against the interests of the state because doing so violated the mother's right of bodily integrity). In these cases, the medical treatment at issue involved surgery, which is much more invasive than AODA treatment. When non-invasive treatment is involved, the balance surely tips in favor of protecting the unborn child.

Further, the Act provides for involuntary treatment only as a last resort. Drug testing of expectant mothers is discretionary and requires informed consent. Wis. Stat. § 146.0255(2). Reporting of the results of such a test—or of any suspected unborn child abuse—is also discretionary. Wis. Stat. §§ 48.981(2)(d), 146.0255(2). Then, the same procedures and evidentiary standards discussed above are applicable when the court orders involuntary treatment. *See supra* at 12–13. Wis. Stat. §§ 48.205(1m), 48.213(1), 48.31, 48.347. While a Guardian ad Litem (GAL) is appointed for the unborn child, the GAL can only make recommendations to the court. Wis. Stat. § 48.235. The court makes the custody and treatment determinations based upon the evidence provided. Wis. Stat. §§ 48.205(1m), 48.213(1), 48.31, 48.347. At every procedural step, the Act's first approach is to encourage the expectant mother to seek treatment voluntarily. Wis. Stat. § 48.01(1)(bm). If voluntary treatment is not an option, then the court can order treatment. Wis. Stat. § 48.01(1)(am). The Act does not unconstitutionally interfere with the right to freedom from involuntary medical treatment.

### 3. Right to continue or terminate a pregnancy.

Loertscher claims that the Act infringes on a woman's right to decide whether to carry a pregnancy to term. (Dkt. 177:46–47.) The Act does no such thing. Regardless, the test is rational basis if Loertscher frames the right at issue in this way.

Loertscher relies on cases that are not relevant here. She cites *Skinner v. State of Oklahoma ex rel. Williamson*, where the Supreme Court held that an Oklahoma statute permitting the sterilization of habitual criminals violated the equal protection clause. 316 U.S. 535, 541 (1942). She also cites several abortion cases. (Dkt. 177:46.) But the Act does not force an expectant mother to have an abortion nor does it extinguish her ability to procreate. Those cases are inapposite.

Loertscher also cites *Cleveland Board of Education v. LaFleur*, 414 U.S. 632 (1974). In *LaFleur,* two teachers challenged their school systems' maternity leave policies on the grounds that the policies penalized a pregnant teacher for deciding to bear a child. *Id*. at 640. The Supreme Court applied deferential review. The Court found no rational relationship between the purpose of the maternity leave policy and the means crafted to achieve that end. *Id*. at 642–43. Thus, even if the right at issue is properly framed as the right to bear a child without undue government interference—which it is not, rational basis is the appropriate standard of review.

Loertscher argues that the Act forces "a woman subject to its terms to endure an array of potential sanctions in order to carry her pregnancy to term." (Dkt. 177:46.) The "sanctions" Loertscher lists include court proceedings, temporary physical detention, and involuntary treatment. (Dkt. 177:46–47.) First, these actions are not inevitable under the

Act—indeed, there is a strong preference for voluntary treatment without the need for court intervention. Wis. Stat. § 48.01(1)(bm). Second, even the more burdensome actions allowed under the Act are not punishment. *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("[T]he mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment."). The focus of the Act is treatment of the expectant mother for the protection of the unborn child. Wis. Stat. § 48.01(1)(am), (bm). Thus, the Act in no way discourages an expectant mother from carrying her pregnancy to term. Rather, as discussed in the State Defendants' brief in support of summary judgment, the Act imposes reasonable restrictions in furtherance of the state's compelling interest in protecting unborn children from harm. (Dkt. 167:25–47.)

For similar reasons, Loertscher cannot demonstrate that the Act burdens the right to terminate a pregnancy. (Dkt. 177:47–48.) A state abortion regulation is constitutional unless it places an undue burden on the exercise of a woman's right to abortion, which is defined as "plac[ing] substantial obstacles in the path of a woman seeking an abortion before the fetus attains viability." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992). Here, the Act is not an abortion regulation, and it does not make getting an abortion more difficult. The Act places no greater impediment on a

woman's right to an abortion than on her right to receive some other medical treatment, such as an appendectomy.

Even if it did interfere with that right, any effect is incidental. "Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure." *Id*. at 874. "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Id*.

The Act is "not designed to strike at the right itself." *Id*. Rather it is designed to provide treatment to expectant mothers who are using drugs or alcohol to the determent of their unborn children. The law is silent as to abortion. And it provides for numerous hearings and other procedural safeguards whereby an expectant mother could raise her intention to terminate her pregnancy. *See*, *e.g.*, Wis. Stat. § 48.203(6)(b) (intake worker shall make every effort to release the adult expectant mother); § 48.213 (hearing for adult expectant mother in custody held within 48 hours after hold decision made); § 48.30 (plea hearing held within 30 days after petition filed); § 48.31 (fact-finding hearing); § 48.357(2m) (expectant mother may request a change in placement). Any effect that the Act has on abortion is purely incidental and does not implicate the Constitution.

#### 4. Right to familial integrity.

Loertscher contends that the Act "provides for removal of a child once born from its mother's custody based solely on what happened while the woman was pregnant and thus violates a woman's fundamental liberty interest in caring for and controlling her children." (Dkt. 177:48.) She argues that strict scrutiny applies when such a right is implicated. (Dkt. 177:48–57.) Loertscher misapprehends the relevant provisions of the Act. And even if the Act interfered with the right to familial integrity, strict scrutiny is not the applicable test.

Contrary to Loertscher's contention, there is no provision for termination of parental rights based on an expectant mother's placement outside the home during pregnancy. (Dkt. 177:49.) A court can terminate parental rights following a Unborn Child in Need of Protection or Services (UCHIPS) determination only if (1) the *child* has been outside the home for six months or longer, *not including time spent outside the home as an unborn child*, (2) the parent has failed to meet the conditions established for the safe return of the child to the home, and (3) there is substantial likelihood that the parent will not meet those conditions within nine months. Wis. Stat. § 48.415(2)(a).

Further, a court may not remove a child from the home based solely on the mother's prenatal substance use. Wis. Stat. §§ 48.345, 48.347(7), 48.415(2). Jurisdiction over a newborn must be based on the conditions that exist at the time of birth. Wis. Stat. §§ 48.345, 48.347(7); (SDPFOF ¶ 188.) And there is no doubt that once a child is born, the prevention of child abuse "constitutes a government objective of surpassing importance." *New York v. Ferber*, 458 U.S. 747, 757 (1982).

Even if the Act implicated the right to familial integrity, the standard of review is not strict scrutiny. Rather, the applicable test involves balancing the expectant mother's rights with the state's interest in preventing unborn child abuse. *See Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1018 (7th Cir. 2000). As discussed in the State Defendants' brief in support of summary judgment, the Act strikes the appropriate balance because (1) it requires reasonable suspicion as the screening stage, and the children's court may only invoke its jurisdiction based on reliable and credible information; (2) by its plain language it applies only in extreme situations; and (3) protective custody orders are used in moderation, when necessary to keep the unborn child safe. (Dkt. 167:38–47.) The Act does not violate an expectant mother's substantive due process rights.

## B. The state's interest in protecting unborn children from a substantial risk of physical injury is paramount.

Loertscher and amici argue that the Act does not advance a compelling state interest. They present two policy arguments in support of this point. They argue that (1) the risk of prenatal drug and alcohol exposure to fetal health has been greatly overstated (Dkt. 175:24–28; 177:50–54); and (2) the Act—and laws like the Act—discourage expectant mothers from seeking prenatal care and AODA treatment and are, therefore, detrimental to maternal and fetal health.[2] (Dkt. 175:21–24, 28–34; 177:54–57.) Their arguments as to the first point mischaracterize the evidence presented by the experts in this case, and their arguments as to the second point are irrelevant under the applicable standard of review.

### 1. The potential harmful effect of drugs and alcohol on unborn children is a compelling state interest.

Loertscher argues that "medical experts designated by [Loertscher] and the State Defendants agree that the risks of harm to a fetus and/or to the child when born from a pregnant woman's consumption of alcohol, as well as other controlled substances, including marijuana, opioids and methamphetamine, are varied and range from no risk to greater

---

[2] The State Defendants have moved for reconsideration of the court's order granting amici leave to file their brief because amici improperly rely on evidence that is hearsay and has not been vetted by the discovery process. (Dkt. 186.)

risk." (Dkt. 177:52–53 (footnote omitted).) This summary of the expert testimony is inaccurate and ignores evidence to the contrary. The medical experts agree that prenatal drug and alcohol exposure poses a substantial risk of harm to unborn children.

It is undisputed that substance abuse in pregnancy is associated with a myriad of poor health outcomes. (SDPFOF ¶ 18.) Loertscher's expert, Dr. Stephan Kandall, opined that alcohol exposure is the most damaging substance exposure. (*Id.* ¶ 24.) Dr. Kandall agreed that alcohol use during pregnancy can pose a significant risk to a fetus. (*Id.* ¶ 25.) It is generally accepted that both abusive and heavy drinking are associated with Fetal Alcohol Syndrome (FAS) and fetal alcohol effects such as growth restrictions, birth defects, and neurodevelopmental problems. (*Id.* ¶ 27.) Low to moderate alcohol consumption during pregnancy also has potential to cause harm. (*Id.* ¶¶ 26, 45.) Individuals metabolize alcohol differently so the exact amount of alcohol that must be consumed to cause fetal damage is not known. (*Id.* ¶¶ 43–45.) But it is undisputed that heavy drinking—in other words consumption that is habitual and severe—is extremely risky and may cause serious harm to an unborn child. (*Id.* ¶¶ 22–27, 43–44.)

Like alcohol, prenatal opioid use can have devastating effects on an unborn child. It is undisputed that prenatal opioid use can cause a serious condition known as Neonatal Abstinence Syndrome (NAS). (*Id.* ¶¶ 75–79.) Babies with NAS may exhibit irritability, high-pitched crying, tremors, diarrhea, and poor sleep. (*Id.* ¶¶ 77–78.) These babies are frequently cared for in the Neonatal Intensive Care Unit and often require a narcotic substitute for treatment. (*Id.* ¶¶ 79–80.) Amici characterize NAS as "transitory and treatable." (Dkt. 175:26 n.18.) But the symptoms of NAS—even if short-lived when treated—are particularly severe. (*Id.* ¶¶ 77–78.) Furthermore, NAS is not always recognized immediately and may go untreated, which can result in serious longer-term problems, including death to the neonate. (*Id.* ¶¶ 82–83.)

Other drugs—like methamphetamines and marijuana—also have potential to cause serious harm. It is undisputed that these drugs, at the very least, may cause preterm birth or low birth weight, which can have serious health consequences. (*Id.* ¶¶ 48, 49, 51, 63, 64.) There is a dispute among the experts as to whether additional negative health outcomes are present. (*Id.* ¶¶ 48–64.) But it is undisputed that "these are not drugs you [ ] want [to] take when you're pregnant." (*Id.* ¶ 182.)

Loertscher and amici attempt to temper this evidence by arguing that there is no linear, direct cause-and-effect relationship between prenatal alcohol and drug use and negative birth outcomes. (Dkt. 175:24–28; 177:53.)

This argument is absurd, at least as to alcohol and opioids. The risk of harm is so great for those substances, that there is—or very nearly is—a causal connection. Even if there is merely a correlation between substance use and harm, the state nevertheless has a compelling interest in protecting unborn children. Loertscher's and amici's argument to the contrary is persuasive only when strict scrutiny is the test, which is not the case here. The State is not required to tease out the "exact source of the 'evil' it seeks to remedy" so that it eliminates no more than that harm. *Entm't Software Ass'n v. Balgojevich*, 469 F.3d 641, 646 (7th Cir. 2006) (citation omitted); (Dkt. 177:57.) Indeed, that would always be impossible when "risk" is involved. The same is true for Loertscher's and amici's argument that the Act fails to regulate the use of other substances that may be harmful during pregnancy, such as tobacco. (Dkt. 175:25; 177:54.) The state is not required to regulate consistently and perfectly when strict scrutiny is not the applicable standard.

Finally, Loertscher argues that the state does not have a compelling interest in pregnancy before viability. (Dkt. 177:50.) But viability is only relevant in the abortion context, as Loertscher acknowledges. *See Casey*, 505 U.S. at 879; (Dkt. 177:50.) Here, in the context of maternal substance use, the state has a compelling interest in protecting the wellbeing of an unborn child whether it has reached the stage of viability or not. *See Brokaw*, 235 F.3d at 1019 (government has a compelling interest in protecting children

from abuse). Unlike in the abortion context, the unborn children at issue under the Act are wanted by their mothers and will eventually develop into children. Alcohol and drug use at any stage of pregnancy can be detrimental to an unborn child and child when born. (*See*, *e.g.*, SDPFOF ¶¶ 37, 41, 50, 57, 65–66.) The state has a compelling interest in protecting children from that harm. Further, even in the abortion context, the Supreme Court has recognized that "there is a substantial state interest in potential life throughout pregnancy." *Casey*, 505 U.S. at 876.

### 2. Court-mandated treatment under the Act does not undermine the compelling state interest.

Loertscher and amici argue that "punitive laws like the Act" are detrimental to fetal health because they discourage women from seeking prenatal care and substance abuse treatment. (Dkt. 175:21–24, 28–34; 177:50–57.) There are two problems with this argument. First, as discussed above, the Act does not impose punishment; rather, it is treatment-focused at all stages of the process. *See supra* at 12–17. Second, Loertscher and amici offer no alternative approach—other than suggesting that the State should do nothing. Even if doing nothing were a workable solution—and Loertscher has not shown that it is in all circumstances—the state is not required to consider "less restrictive alternatives." That is only required when the test is strict

scrutiny, which is not the test here. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) (Under strict scrutiny, "if a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."); *Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003) (Under a balancing test, the government action need only be "reasonably related in scope to the circumstances which [allegedly] justified the interference in the first place.") Treatment—even court-imposed treatment—does not undermine the state's compelling interest in protecting unborn children from harm. Rather, it is a reasonable response to the problem of prenatal substance exposure.

Drug treatment in pregnancy has been shown to improve participation in prenatal care and reduce the fetal complications associated with illicit drug use. (SDPFOF ¶¶ 95–97.) According to Loertscher's medical expert, Dr. Mishka Terplan, "research has clearly demonstrated the harmful effects of alcohol and illicit drug use in pregnancy and has shown substance abuse treatment to be efficacious in reducing use and improving outcomes in this high risk population." (*Id.* ¶ 91.) But expectant mothers often leave treatment prematurely, relapse in drug treatment, or choose not to enter treatment. (*Id.* ¶¶ 94, 180–81, 183.) Expectant mothers may not be able or willing to enter treatment outside the criminal justice system. (*Id.* ¶ 181.)

Treatment is beneficial for women with substance use disorders, even if that treatment is provided at the recommendation of child protective services. (*Id.* ¶ 98.) In fact, individuals who are referred into treatment from the criminal justice system are less likely to leave against professional advice compared to those who were referred in some other way. (*Id.* ¶ 185.) According to data provided by the Wisconsin Department of Health Services, individuals who participated in county-authorized substance abuse treatment due to a referral from the criminal justice system were more likely to complete treatment with significant improvement than individuals who voluntarily participated in substance abuse treatment. (*Id.* ¶ 186.) And according to Loertscher's experts, there is an association between substance abuse treatment compliance and positive birth outcomes. (*Id.* ¶¶ 95, 96, 97, 184.)

The benefit of substance abuse treatment for pregnant drug users is illustrated by the Milwaukee County unborn child abuse process. In Milwaukee County, caseworkers offer treatment upon initial contact with an expectant mother who is using alcohol or drugs. (*Id.* ¶ 106.) If she voluntarily agrees to treatment, caseworkers simply follow up to make sure she is cooperating with treatment. (*Id.*) If she will not engage in voluntary treatment, caseworkers may seek court involvement. (*Id.* ¶ 107.) In either case, caseworkers use a referral system to assess treatment needs. (*Id.* ¶ 108.)

If needed, the expectant mother can receive residential care at Meta House or United Community Care. (*Id.* ¶ 109.) Both facilities offer treatment programs, care after childbirth, and outpatient services. (*Id.* ¶¶ 109–10.)

Without the Act, counties would not be able to receive reports of unborn child abuse. This would reduce caseworker contact with expectant mothers using alcohol and drugs, which, in turn, would reduce the opportunity to engage these mothers in services. (*Id.* ¶ 115.) If the Act is struck down, some drug-exposed infants may go without the proper screenings and treatment at birth because medical providers might not be alerted to prenatal drug or alcohol exposure though the unborn child abuse process. (*Id.* ¶¶ 112, 113.) This could result in early discharges if no withdrawal symptoms are present at birth. If withdrawal symptoms develop after discharge, these babies could go home to unsafe situations. (*Id.* ¶ 114.) And mothers who engage in treatment while pregnant are much less likely to need child protective services after the birth of their child, which saves the state a lot of money in out-of-home care expenses. (*Id.* ¶ 118.)

Treatment provided under the Act can be beneficial to both the baby and the mother. In Milwaukee County, there have been many success stories for expectant mothers who engage in treatment under the Act. (*Id.* ¶ 119.) For example, an unborn child abuse case was opened for an expectant mother who was using $60 worth of heroin a day. She agreed to residential treatment

where she stayed for 90 days, and then she went to intensive outpatient treatment. She has had her baby and is continuing to do well. (*Id.* ¶ 120.) Without the unborn child abuse process, Milwaukee County would not have had an avenue to engage this woman and make her aware of these resources. (*Id.*)

As discussed herein and in the State Defendants' summary judgment brief, the Act furthers state interests in the health, safety, and welfare of unborn children and their expectant mothers. The Act also furthers the state interest in reducing healthcare costs and the expenditure of state resources. (Dkt. 167:25–38.) Court-mandated treatment under the Act does not undercut those state interests. Indeed, it furthers them. And, as discussed in the State Defendants' summary judgment brief, the Act strikes the appropriate balance between the rights of the expectant mother and the state's interest in preventing unborn child abuse. (Dkt. 167:38–47.)

## III. The Act does not violate an expectant mother's equal protection rights.

Loertscher argues that the Act violates the equal protection rights of pregnant women in three different ways. First, she argues that the Act infringes on pregnant women's fundamental rights without advancing any compelling interest. Second, she asserts that it classifies on the basis of gender without meeting the intermediate scrutiny standard. Third,

Loertscher contends that the Act does not provide pregnant women with the same procedural protections available under the Mental Health Act, Wis. Stat. § 51.01, *et seq*. All three arguments fail.

Loertscher argues that, without satisfying the strict scrutiny standard of constitutional review, the Act impinges on pregnant women's fundamental rights to physical liberty, to refuse medical treatment, to continue or terminate a pregnancy, and to family integrity. (Dkt. 177:41–49, 58.) As the State Defendants have shown, the identified rights are either not fundamental, not subject to strict scrutiny review, or not directly affected by the Act. *See supra* at 8–20.

Next, Loertscher argues that the Act discriminates against women on the basis of gender because it does not apply to men, "who lack the capacity to become pregnant." (Dkt. 177:59.) In a tortured argument, she insists that *all women* physically capable of pregnancy are subject to the Act because an unborn child is defined as "a human being from the time of fertilization." Wis. Stat. § 48.02(19); (Dkt. 177:59.) Loertscher admits that the Act applies only to "expectant mothers," *i.e.*, women who are pregnant, not merely carrying a fertilized egg. (Dkt. 177:59.) As a practical matter, the Act can only apply to women who are actually pregnant, because there is no test to determine whether a woman is merely carrying a fertilized egg. Indeed, the

IA Standards require confirmation of pregnancy to screen in an unborn child abuse case. (SDPFOF ¶ 105.)

The Act protects an unborn child from an expectant mother's abuse of controlled substances. *See* Wis. Stat. § 48.133. The Act necessarily pertains not to women in general—or even women capable of pregnancy in general—but to expectant mothers who habitually lack self-control in the use of alcohol beverages, controlled substances, or controlled substance analogs. *Id.* Only an expectant mother comes within the jurisdiction of the Act. The statutory classification is, thus, not women (as opposed to men), but pregnant women (as opposed to non-pregnant people).

The courts have recognized that, unless a pregnancy-based classification is a pretext for gender discrimination, it is not a gender-based classification for equal protection purposes. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993); *Geduldig v. Aiello*, 417 U.S. 484, 496–97, n.20 (1974); *Jane L. v. Bangerter*, 794 F. Supp. 1528, 1533–34 (D. Utah 1992). Therefore, a pregnancy-based classification is subject to rational basis review, *Geduldig*, 417 U.S. at 496 n.20, which requires a rational relationship between the legislative classification and a legitimate state interest, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). As shown, the State has a legitimate interest in protecting the health of unborn children. *See supra* at 21–29; (Dkt. 167:25–38.) And, the

various provisions challenged in this litigation are rationally related to the achievement of that legitimate legislative goal. Therefore, the Act does not violate the Equal Protection Clause on gender grounds.[3]

Loertscher next argues that the Act violates pregnant women's equal protection rights because it does not provide procedural protections equivalent to those provided persons subject to civil commitment under Wis. Stat. § 51.20. She points to two procedural distinctions only. First, whereas Wis. Stat. § 51.20 provides for the appointment of counsel "*immediately* upon the filing of a petition for commitment," the Act does not guarantee counsel to a pregnant woman until "much later in the process." (Dkt. 177:61–62.) Second, unlike Wis. Stat. § 51.20, the Act does not provide "for the appointment of experts and does not require expert testimony at the fact-finding hearing determining whether a woman should be subject to the Act." (Dkt. 177:63.) Loertscher acknowledges that any differences between Wis. Stat. § 51.20 and the Act are subject to rational basis scrutiny. (Dkt. 177:62.)

There is no significant difference between the Act and Wis. Stat. § 51.20 with respect to the appointment of counsel. Under Wis. Stat. § 51.20, upon

---

[3] This argument is more fully developed in the State Defendants' summary judgment brief. (Dkt. 167:58–66.)

the filing of a commitment petition, "the court shall assure that the subject individual is represented by adversary counsel by referring the individual to the state public defender, who shall appoint counsel for the individual without a determination of indigency." Wis. Stat. § 51.20(3). An expectant mother faced with a custody order has a similar right. "If a [UCHIPS] petition under s. 48.133 is contested, no expectant mother may be placed outside of her home unless . . . [she] is represented by counsel at the fact-finding hearing and subsequent proceedings. If the petition is not contested, the expectant mother may not be placed outside of her home unless . . . [she] is represented by counsel at the hearing at which the placement is made." Wis. Stat. § 48.23(2m)(b). If the "adult expectant mother is unable to afford counsel in full, or . . . so indicates; the court shall refer . . . [her] to the authority[4] for indigency determinations specified under s. 977.07(1)." Wis. Stat. § 48.23(4). Thus, both Wis. Stat. §§ 51.20 and 48.23 provide for counsel before a person may be involuntarily committed for mental health treatment (Wis. Stat. § 51.20), or committed outside of her home for AODA treatment (Wis. Stat. § 48.23).

---

[4] The "authority" is either the county or, under certain circumstances, the state public defender. Wis. Stat. §§ 48.23(4), 977.07(1).

Any distinction between the two statutes survives rational basis review. Loertscher complains that, whereas Wis. Stat. § 51.20 provides for immediate appointment of counsel without a finding of indigency, Wis. Stat. § 48.23 provides for appointment of counsel only much later in the process and then only upon a finding of indigency. (Dkt. 177:62.) A civil commitment implicates the same fundamental liberties at stake in criminal proceedings,[5] but the commitment proceeding moves much more quickly than a criminal prosecution. Accordingly, the Legislature rationally decided that persons subject to Wis. Stat. § 51.20 are entitled to free counsel as soon as a petition is filed without the time-consuming indigency determination. In contrast, an expectant mother is not subject to a custody order under the Act until efforts at voluntary compliance have failed. *See* Wis. Stat. §§ 48.01(1), 48.193, 48.205(1m), 48.347. Like the mental health respondent, she is entitled to a free lawyer at the point at which she is subject to a custody order that would place her outside of her home. *See* Wis. Stat. § 48.23(2m). However, because a custody order under Wis. Stat. ch. 48 will not be imposed with the same speed and urgency that a person might be committed under Wis. Stat. § 51.20, there is no reason to dispense with the indigency determination.

---

[5] *Lessard v. Schmidt*, 349 F. Supp. 1078, 1099 (W.D. Wis. 1972), *vacated and remanded*, 414 U.S. 473 (1974).

With respect to expert witnesses, the two statutes are not comparable. Wisconsin Stat. § 51.20 provides for the involuntary civil commitment of individuals who are "mentally ill . . . , drug dependent or developmentally disabled." Wis. Stat. § 51.20(1)(a)1. If the court finds probable cause to believe that the subject of the commitment proceedings suffers from one of these conditions, it shall appoint two physicians[6] to examine her. Wis. Stat. § 51.20(9)(a)1. The individual may "secure an additional medical or psychological examination and to offer the evaluator's personal testimony as evidence at the [commitment] hearing." Wis. Stat. § 51.20(9)(a)3. Under Wis. Stat. § 51.20, expert testimony is necessary to prove that the person comes within the terms of the statute, i.e., that she is "mentally ill . . . , drug dependent or developmentally disabled." Wis. Stat. § 51.20(1)(a)1. In contrast, jurisdiction under Wis. Stat. § 48.133 is not triggered by mental status or drug dependency. It is triggered by the person's behavior, whether she "habitually lacks self-control in the use of alcohol beverages, controlled substances or controlled substance analogs, exhibited to a severed degree." Wis. Stat. § 48.133. This standard is not equivalent to the Wis. Stat. § 51.20

---

[6] "[I]t shall appoint 2 licensed physicians specializing in psychiatry, or one licensed physician and one licensed psychologist, or 2 licensed physicians one of whom shall have specialized training in psychiatry, if available, or 2 physicians, to personally examine the subject individual." Wis. Stat. § 51.20(9)(a)1.

standard for civil commitment, and therefore does not require comparable expert evidence.[7]

Loertscher's equal protection claims fail.

## IV. The Act does not violate an expectant mother's Fourth Amendment rights.

Loertscher claims that the Act violates a pregnant woman's Fourth Amendment rights by enabling state officials to "obtain a pregnant woman's medical test results without a warrant or her consent," and "take a pregnant woman into custody and hold her against her will." (Dkt. 177:65.) Loertscher has developed an argument on the first of these propositions, but not the second. Accordingly, State Defendants will only respond to her medical records arguments.

Loertscher argues that the Fourth Amendment absolutely prohibits the government from searching her medical records without a warrant or her consent. She also contends that the Act "invades and destroys doctor-patient

---

[7] Wisconsin Stat. ch. 48 allows for an expert assessment of an expectant mother's use of drugs and/or alcohol. "After the filing of a petition and upon a finding by the court that reasonable cause exists to warrant . . . an alcohol and other drug abuse assessment" the court may order an assessment "of an expectant mother whose ability to control her use of alcohol beverages, controlled substances, or controlled substance analogs is at issue before the court." Wis. Stat. § 48.295(1). If the expectant mother objects to the particular expert chosen by the court, "the court shall appoint a different . . . expert." Wis. Stat. § 48.295(3). Wisconsin Stat. § 48.295 differs from Wis. Stat. § 51.20(9) in that the expert assessment is not mandatory. Nevertheless, the IA Standards counsel that the unborn child abuse standard is "generally best determined by medical or AODA professionals." (SDPFOF ¶ 187.)

confidentiality." (Dkt. 177:67.) As part of her Fourth Amendment analysis, she catalogues the uses that a woman's medical records may be put under the Act.

Loertscher argues that the Fourth Amendment absolutely prohibits the government's warrantless nonconsensual access to her medical records, but that is not a correct statement of the law. Loertscher offers no "search" or "seizure" recognized by a court that could be at issue here.[8]

To support her argument, Loertscher relies on *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), and two Seventh Circuit cases.

Her reliance on *Ferguson* is misplaced. *Ferguson* involved a challenge to a public hospital's mandatory testing of pregnant women suspected of drug abuse. The plaintiffs claimed that "warrantless and nonconsensual drug tests conducted for criminal investigatory purposes were unconstitutional searches." *Id.* at 73. They did not claim and the Court did not consider whether the hospital searched or seized the women's medical records in violation of the Fourth Amendment. *Ferguson* is inapposite because it does

---

[8] Apart from the search and seizure framework, the Supreme Court has been, at best, "'very vague' on the possibility of a constitutional right to the privacy of one's medical records." *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631, 648 (7th Cir. 2013). But Loertscher does not make a privacy argument here.

not address the only Fourth Amendment question presented by Loertscher here, the alleged search and seizure of her private medical information.

The other cases Loertscher cites don't help her either. Neither case recognizes a Fourth Amendment interest against the purported search or seizure of a person's medical records. In *Denius v. Dunlap*, employing a constitutional privacy analysis, the court found that the defendant school district had failed to assert *any* interest whatsoever to justify its requirement that the plaintiff employee release his medical records. 209 F.3d 944, 956 (7th Cir. 2000) (citing, *inter alia, Whalen v. Roe*, 429 U.S. 589, 599–90 (1977)). In *Green v. Berge*, the court rejected the argument by four prisoners that the Wisconsin law compelling them to submit a DNA sample to the DNA data bank violated their Fourth Amendment rights; medical records were not at issue. 354 F.3d 675 (7th Cir. 2004).

Loertscher asserts that "the Act invades and destroys doctor-patient confidentiality, a central societal value." (Dkt. 177:67.) The statement has no factual support whatsoever. Furthermore, Loertscher cites no legal authority, and the State Defendants know of none, connecting an alleged interference with the doctor-patient relationship to the Fourth Amendment.

The balance of Loertscher's Fourth Amendment argument catalogues the uses to which a pregnant woman's medical information may be put "if there is an indication she used drugs or alcohol during her

pregnancy." (Dkt. 177:66.) She summarizes various sections of the Act regarding reporting and investigation of suspected unborn child abuse. (Dkt. 177:66–68.) She contends that the statutory "framework violates the Fourth Amendment's guarantees against arbitrary and invasive acts by government officers." (Dkt. 177:68.) She doesn't explain how.

Contrary to Loertscher's characterization, the Act is a carefully structured, detailed statute that allows for partial disclosure of a pregnant woman's private medical information to a limited number of people under narrowly circumscribed conditions. The statute permits disclosure of unborn child abuse reports to specified medical or social service professionals who will provide services to the mother and/or unborn child; certain family members; and courts, law enforcement, and prosecutors in the event of an investigation or prosecution. Wis. Stat. § 48.981(7)(a). These entities must keep the reports they receive confidential and are prohibited from further disclosure. The medical records statute, Wis. Stat. § 146.82(1), provides that medical records are presumptively confidential. Despite that presumption, the statute permits their disclosure "without informed consent," in certain enumerated circumstances, including cases of child (born and unborn) abuse and neglect. Wis. Stat. § 146.82(2)(a), (2)(a)11. This strictly controlled disclosure and use of a pregnant woman's medical information does not support Loertscher's claim of a Fourth Amendment violation.

The Act does not violate the Fourth Amendment rights of pregnant women.

## CONCLUSION

This Court should deny Plaintiff's motion for summary judgment and grant summary judgment in favor of the State Defendants.

Dated this 1st day of December, 2016.

BRAD D. SCHIMEL
Wisconsin Attorney General


/s/ Karla Z. Keckhaver
KARLA Z. KECKHAVER
Assistant Attorney General
State Bar #1028242

JODY J. SCHMELZER
Assistant Attorney General
State Bar #1027796

JENNIFER L. VANDERMEUSE
Assistant Attorney General
State Bar #1070979

Attorneys for Defendants
Brad D. Schimel and Eloise Anderson

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6365 (KZK)
(608) 266-3094 (JJS)
(608) 266-7741 (JLV)
(608) 267-2223 (Fax)
keckhaverkz@doj.state.wi.us
schmelzerjj@doj.state.wi.us
vandermeusejl@doj.state.wi.us