# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

**TAMARA M. LOERTSCHER**,

        Plaintiff,

    v.

**BRAD D. SCHIMEL**, et al.,,

        Defendants.

Case No. 14-cv-870

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO THE STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATUTORY BACKGROUND AND STATEMENT OF FACTS ........................... 2

    I.    THE ANGELA M.W. DECISION, THE LEGISLATURE'S RESPONSE, AND THE GOVERNMENT'S OPPOSITION ...................................... 2

    II.    STATE DEFENDANTS MINIMIZE THE ACT'S IMPACT ON WISCONSIN WOMEN ............................................................... 4

        A.    The Act Prioritizes the Purported Interests of the Fetus Over the Pregnant Woman, But in Doing So Jeopardizes the Health of Both ........ 4

        B.    The Act Encourages Reporting of a Pregnant Woman's Substance Use and Authorizes Various Individuals to Take the Woman Into Custody ............................................................................... 7

    III.    MS. LOERTSCHER'S OWN EXPERIENCE UNDER THE ACT ................... 10

ARGUMENT ...................................................................................................... 12

    I.    THIS COURT MAY PROPERLY ADDRESS MS. LOERTSCHER'S FACIAL CONSTITUTIONAL CHALLENGE ................................. 13

    II.    STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE THE ACT IS VOID FOR VAGUENESS ................. 15

    III.    STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIMS ............................................................................ 19

        A.    State Defendants Misstate the Fundamental Substantive Due Process Rights Threatened by the Act ....................................... 21

        B.    The Act Cannot Survive Strict Scrutiny Review Because It Does Not Serve a Compelling State Interest .................................. 24

            1.    The Act fails to promote fetal health and undermines maternal health ............................................................ 25

            2.    The State's asserted interest cannot apply to significant time periods covered by the Act ............................... 27

            3.    State Defendants have failed to show that their asserted interest is fetal heath, as expressed in the Act itself, is compelling .................................................................. 28

        C.    The Act Cannot Survive Strict Scrutiny Review Because It Is Not Narrowly Tailored ....................................................... 31

    IV.    STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S PROCEDURAL DUE PROCESS CLAIM ............................................................................... 33

    V.    STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S EQUAL PROTECTION CLAIM ................. 36

    VI.    STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON MS. LOERTSCHER'S FOURTH AMENDMENT CLAIM ............................................................................... 39

# TABLE OF CONTENTS
## (continued)

Page

VII.   THE ROOKER-FELDMAN DOCTRINE DOES NOT APPLY
       BECAUSE MS. LOERTSCHER DOES NOT SEEK REVIEW OF A
       STATE COURT JUDGMENT ........................................................... 43

VIII.  STATE DEFENDANTS' LATEST MOOTNESS ARGUMENT
       SHOULD BE DISMISSED BECAUSE THE ALLEGED POLICY
       CHANGES DO NOT MAKE FUTURE CONSTITUTIONAL
       VIOLATIONS IMPOSSIBLE OR EVEN UNLIKELY ................................... 44

CONCLUSION ....................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................12, 13

*Auto. Workers v. Johnson Controls*,
499 U.S. 187 (1991)..........................................................................................25

*Auto. Workers v. Johnson Controls*,
886 F.2d 877 (7th Cir. 1989) (Easterbrook, J., dissenting)....................25

*Ayotte v. Planned Parenthood of Northern New England*,
546 U.S. 320 (2006)..........................................................................................13

*Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*,
715 F.3d 631 (7th Cir. 2013) ...............................................................41, 42, 43

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016)............................................................................15

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..........................................................................................12

*City of Chicago v. Morales*,
527 U.S. 41 (1999)............................................................................................16

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)..........................................................................................37

*Connally v. Gen. Constr. Co.*,
269 U.S. 385 (1926)..........................................................................................17

*Cruzan v. Dir. Mo. Dept. of Health*,
497 U.S. 261 (1990)..........................................................................................22

*Ctr. for Individual Freedom v. Madigan*,
697 F.3d 464 (7th Cir. 2012) .........................................................................15

*Ctrs., Inc. v. Town of Brookfield, Wis.*,
148 F.3d 699 (7th Cir. 1998) .........................................................................44

*Denius v. Dunlap*,
209 F.3d 944 (7th Cir. 2000) ....................................................................39, 40

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012) .....................................................................14

*Eberhardy v. Circuit Court for Wood Cty.*,
307 N.W.2d 881 (Wis. 1981) ......................................................................3

*Entm't Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) ....................................................................33

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005)............................................................................43, 44

*F.C.C. v. Fox Television Stations, Inc.*,
132 S.Ct. 2307 (2012) ...............................................................................16

*Ferguson v. City of Charleston*,
532 U.S. 67 (2001) ...............................................................39, 40, 41, 42

*Foucha v. La.*,
504 U.S. 71 (1992)....................................................................................34

*Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..................................................................................45

*GASH Assocs. v. Rosemont*,
995 F.2d 726 (7th Cir. 1993) ....................................................................44

*Geduldig v. Aiello*,
417 U.S. 484 (1974)............................................................................38, 39

*Gen. Elec. Co. v. Gilbert*,
429 U.S. 125 (1976)..................................................................................39

*Gonzales v. Carhart*,
550 U.S. 124 (2007)..................................................................................28

*Green v. Berge*,
354 F.3d 675 (7th Cir. 2004) ....................................................................40

*Hayden v. Greensburg Cmty. Sch. Corp.*,
743 F.3d 569 (7th Cir. 2014) ....................................................................36

*Janklow v. Planned Parenthood, Sioux Falls Clinic*,
517 U.S. 1174 (1996) (Stevens, J., concurring)........................................14

*Kamilewicz v. Bank of Boston Corp.*,
92 F.3d 506 (7th Cir.1996) .......................................................................44

*Karlin v. Foust*,
188 F.3d 446 (7th Cir. 1999) .........................................................14, 18, 19

*Long v. Shorebank Dev. Corp.*,
  182 F.3d 548 (7th Cir. 1999) ................................................................44

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)................................................................34, 36

*Miss. Univ. for Women v. Hogan*,
  458 U.S. 718 (1982)................................................................38

*Mitchell v. St. Elizabeth Hospital*,
  119 Fed.Appx. 1 (7th Cir. 2004)................................................................43

*Moore v. East Cleveland*,
  431 U.S. 494 (1977)................................................................25

*New York v. United States*,
  505 U.S. 144 (1992)................................................................23

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
  462 U.S. 669 (1983)................................................................39

*Parham v. J.R.*,
  442 U.S. 584 (1979)................................................................22

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*,
  699 F.3d 962 (7th Cir. 2012) ................................................................28

*Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r*,
  No. 116CV00763TWPDML, 2016 WL 3556914 (S.D. Ind. June 30, 2016) ........................13

*Planned Parenthood v. Casey*,
  505 U.S. 833 (1992)................................................................3, 23, 27, 28

*Rebirth Christian Acad. Daycare, Inc. v. Brizzi*,
  96 F. Supp. 3d 835, 847 (S.D. Ind. 2015) ................................................................34

*Record Head Corp. v. Sachen*,
  682 F.2d 672 (7th Cir. 1982) ................................................................16, 18

*Remer v. Burlington Area Sch. Dist.*,
  205 F.3d 990 (7th Cir. 2000) ................................................................43

*Russ v. Watts*,
  414 F.3d 783 (7th Cir. 2005) ................................................................24

*Santosky v. Kramer*,
  455 U.S. 745 (1982)................................................................23

*Shapiro v. Thompson,*
 394 U.S. 618 (1969), *overruled in part on other grounds*, 415 U.S. 651 ...............................36

*Skinner v. Oklahoma,*
 316 U.S. 535 (1942)...............................................................................................................23

*Smith v. Goguen,*
 415 U.S. 566 (1974)...............................................................................................................19

*Stallman v. Youngquist,*
 531 N.E.2d 355, 125 Ill.2d 267 (Ill. 1988) ...........................................................................25

*State ex rel. Angela M.W. v. Kruzicki,*
 561 N.W.2d 729 (Wis. 1997) ..............................................................................................2, 3

*Taylor v. Fed. Nat. Mortg. Ass'n,*
 374 F.3d 529 (7th Cir. 2004) ................................................................................................44

*Tucson Woman's Clinic v. Eden,*
 379 F.3d 531 (9th Cir. 2004) ................................................................................................39

*Union Pac. Ry. Co. v. Botsford,*
 141 U.S. 250 (1891)...............................................................................................................22

*United States v. Carolene Prod. Co.,*
 304 U.S. 144 (1938)...............................................................................................................39

*United States v. Goforth,*
 465 F.3d 730 (6th Cir. 2006) ................................................................................................12

*United States v. Salerno,*
 481 U.S. 739 (1987)...............................................................................................................14

*Warsco v. Preferred Tech. Grp.,*
 258 F.3d 557 (7th Cir. 2001) ................................................................................................12

*Washington State Grange v. Washington State Republican Party,*
 552 U.S. 442 (2008)..........................................................................................................13, 15

*Washington v. Glucksberg,*
 521 U.S. 702 (1997)...............................................................................................................31

*Whalen v. Roe,*
 429 U.S. 589 (1977).....................................................................................................28, 41, 42

*Whole Woman's Health v. Hellerstedt,*
 136 S. Ct. 2292 (2016)........................................................................................................2, 14

**STATUTES**

28 U.S.C. § 1257 ................................................................................................43

Title VII of the Civil Rights Act ......................................................................39

Pregnancy Discrimination Act .........................................................................39

Wis. Stat. § 48.193(3) ........................................................................................8

Wis. Stat. § 48.01(1) .................................................................................. *passim*

Wis. Stat. § 48.01(1)(a) & 48.01(1)(h) ..............................................................5

Wis. Stat. § 48.01(1)(am) ...................................................................................5

Wis. Stat. § 48.01(1)(bm) ...................................................................................5

Wis. Stat. § 48.08(3) .........................................................................................19

Wis. Stat. § 48.19(1)(d)(8) ...............................................................................34

Wis. Stat. §§ 48.23(2m)(b) & (4) ...................................................................8, 9

Wis. Stat. § 48.25(1) .........................................................................................35

Wis. Stat. § 48.30(1) & (2) ...............................................................................35

Wis. Stat. § 48.30(2) ...........................................................................................8

Wis. Stat. § 48.133 .......................................................................................7, 18

Wis. Stat. §§ 48.193(1)(a)-(c) ............................................................................5

Wis. Stat. §§ 48.193(1)(c) & 48.193(1)(d)(2) ..................................................22

Wis. Stat. §§ 48.193(1)(d)(2), 48.207(1m), & 48.347(3) .................................24

Wis. Stat. § 48.193(a)(1-3), (d)(2) ...................................................................23

Wis. Stat. § 48.203(1) .........................................................................................7

Wis. Stat. § 48.203(3) .......................................................................................22

Wis. Stat. § 48.203(6)(c) ..................................................................................22

Wis. Stat. § 48.205(1m) ....................................................................................22

Wis. Stat. § 48.205(1m), (2) ............................................................23

Wis. Stat. §§ 48.205, 48.207, 48.203 ..............................................34

Wis. Stat. § 48.213 ..........................................................................23

Wis. Stat. § 48.213(1)(a) .................................................................22

Wis. Stat. § 48.213(2)(e) ...................................................................8

Wis. Stat. § 48.213(3)(b) ...................................................................5

Wis. Stat. § 48.235(1)(f) .................................................................24

Wis. Stat. §§ 48.235(1)(f) & 48.02(19) .......................................8, 35

Wis. Stat. § 48.235(3)(b)(2) ........................................................24, 35

Wis. Stat. §§ 48.235(4m)(3), (6) .....................................................23

Wis. Stat. § 48.235(4m)(a) ................................................................9

Wis. Stat. § 48.299(4)(b) .................................................................34

Wis. Stat. § 48.305 ..........................................................................35

Wis. Stat. § 48.345 ............................................................................9

Wis. Stat. § 48.347 ............................................................................9

Wis. Stat. §§ 48.347(1), (2), (4) & (5) ...............................................9

Wis. Stat. § 48.347(6) ......................................................................23

Wis. Stat. § 48.415(2)(a) .........................................................5, 9, 23

Wis. Stat. §§ 48.981(3)(c)(1)(a) & (5m) ..........................................10

Wis. Stat. § 48.981(4) ........................................................................7

Wis. Stat. § 48.981(7)(a) .................................................................40

Wis. Stat. § 51.01 *et seq.* ...............................................................36

Wis. Stat. § 118.16 ..........................................................................18

Wis. Stat. § 146.82(2)(a)11 .........................................................40, 43

Wis. Stat. § 146.0255(2) ..............................................................22, 38, 42

Wis. Stat. § 351.02 .................................................................................18

Wis. Stat. § 961.01 *et seq.*......................................................................38

Wisconsin's Mental Health Act ...............................................................37

Wisconsin Uniform Controlled Substances Act .......................................18

**OTHER AUTHORITIES**

*American Heritage Dictionary* (5th ed. 2011)..........................................17

Fed. R. Civ. P. 56....................................................................................12

27 J.L. Med. & Ethics 332, 337 (1999) ...................................................34

# INTRODUCTION

Following her own horrific ordeal, Plaintiff Tamara M Loertscher brought this lawsuit in order to challenge 1997 Wisconsin Act 292 ("the Act"). Under that law, a pregnant woman suspected of "lacking self control" in the use of alcohol or controlled substances may be subjected to confidential juvenile court proceedings that could lead to forced medical treatment, detention, or the loss of parental rights. Solely on the basis of vague and undefined standards, adjudicated in secret, a woman may be subjected to serious, long-lasting consequences for her life, her health, her family, and her employment. Thousands of Wisconsin women have already been subjected to the Act since its passage, though very little is known about most of these cases. Through her facial challenge, Ms. Loertscher seeks to permanently enjoin the statute and end the constitutional wrongs inflicted on untold numbers of women.

In moving for summary judgment, State Defendants present a picture of a helpful, enlightened law focused on treatment rather than punishment. This is a highly misleading and inaccurate image, as demonstrated by Ms. Loertscher's own experiences, the discovery and expert testimony developed in this case, and the text of the statute itself. That text leaves no question that the Act is unconstitutional on its face. The statute is void for vagueness under the Due Process clause because it does not provide constitutionally adequate notice to citizens of what conduct it prohibits, and because it authorizes arbitrary and discriminatory enforcement. The Act also expressly authorizes multiple infringements of fundamental substantive due process rights, including the right to liberty and to be free from bodily restraint, the right to refuse unwanted medical treatment, and the right to decide whether to carry a pregnancy to term. Thus, the Act is subject to strict scrutiny, a standard of constitutional adjudication it cannot survive because it neither serves a compelling state interest nor is narrowly tailored to serve the interests it purports to advance. The Act also violates the Equal Protection Clause by discriminating on the basis of gender and by denying pregnant women the procedural protections afforded others facing involuntary detention through civil commitment, and it violates the Fourth Amendment

because it permits law enforcement officials access to a pregnant woman's private medical records without her permission.

State Defendants move for summary judgment on each of these claims, and they raise other claims as well, including the Rooker-Feldman doctrine, mootness, and the appropriateness of a facial challenge. For the specific reasons set forth below, as well as in Ms. Loertscher's own summary judgment brief, each of the State Defendants' arguments should be rejected. The Act poses a significant threat to the constitutional rights of Wisconsin women who are or who may become pregnant, and the Act should be permanently enjoined.

## STATUTORY BACKGROUND AND STATEMENT OF FACTS

### I. THE ANGELA M.W. DECISION, THE LEGISLATURE'S RESPONSE, AND THE GOVERNMENT'S OPPOSITION

As in response to the Wisconsin Supreme Court's decision in *State ex rel. Angela M.W. v. Kruzicki*, 561 N.W.2d 729 (Wis. 1997), which held that the Wisconsin children's code did not authorize a juvenile court to exercise jurisdiction over an adult pregnant woman pursuant to a proceeding regarding a "Child to be in Need of Protection or Services," also known as a "CHIPS" proceeding. State Br. at 3; *Angela M.W.*, 561 N.W.2d at 740. State Defendants focus on the court's statement that "the legislature is in a better position than the courts to gather, weigh, and reconcile" competing proposals related to this area of law. State Br. at 3; *Angela M.W.*, 561 N.W.2d at 739. According to State Defendants, the Wisconsin Legislature "recognize[d] the gap in the law" and "promptly enacted the Act." State Br. at 3.

In reality, of course, the court was simply expressing the commonplace notion of initial deference to the legislature. Courts always review the actions of legislatures to ensure protection of constitutional rights. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2310 (2016) (explaining that the "Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake"). Indeed, the *Angela M. W.* court explained that policy issues, such as "the detention of a pregnant woman for acts harming her fetus," are "best addressed *initially* by our legislature," *Angela M.W.*, 561 N.W.2d at 740 (emphasis added),

because of the legislature's ability to hold public hearings and consider relevant medical and ethical testimony. *Id.*; *see also id.* (quoting *Eberhardy v. Circuit Court for Wood Cty.*, 307 N.W.2d 881, 895 (Wis. 1981) ("[The legislature] can marshal informed persons to give an in-depth study to the entire problem and can secure the advice of experts ... to explore the ramifications of the adoption of a general public policy...."). As former Justice William Bablitch explained in oral argument:

> These are questions that we're not equipped to deal with as a court. We don't have the AMA or people coming in to testify to us, to explain to us the various medical ramifications. We don't have ethics people coming in and explaining to us the ethical problems of interfering with the patient/physician relationship. We don't have people coming in at a public hearing to explain to us whether or not greater harm can come to a viable fetus for lack of medical care which, some people say, would be the result of what you[, the guardian ad litem,] want. We're not a legislative body.

*Id.* Here, however, the legislature did not heed the court's advice and consider seriously the relevant medical and ethical information bearing on its decision regarding this "sensitive social policy issue." *Id.* Instead, as explained in Plaintiff's affirmative motion for summary judgment, Pltf. Br. at 4-6, the legislature largely ignored the advice of relevant organizations, including the Wisconsin Division of Children and Family Services ("DCFS"), the bureau of the Division of Public Health tasked with handling substance abuse issues, and the City of Milwaukee Health Department, all of which opposed the Act. Pltf. Br. at 4-6 (PFOF 13-15).[1]

In particular, DCFS recognized the critical importance of prenatal care to fetal development and expressed concern that the Act would undermine this important objective by "scaring women away from treatment." Pltf. Br. at 5 (PFOF 20). Further, DCFS and the City of

---

[1] The legislature also ignored the Wisconsin Legislative Council's warnings that the constitutionality of the Act would be "highly doubtful" if extended to all stages of pregnancy. Pltf.Br. at 4 (PFOF 10). The Legislative Council found it "difficult to perceive" how the state's interest in "unborn life" could extend back in the gestational process to the point of conception. Pltf.Br. at 4 (PFOF 11). Ultimately, the Legislative Council concluded that applying the Act as it was written "appears to impose an undue burden on the woman," in contravention of *Planned Parenthood v. Casey*, 505 U.S. 833 (1992). Pltf.Br. at 4 (PFOF 12).

Milwaukee Health Department believed the Act had the potential "to cause mothers to conceal substance use from their health care providers," thus "interfering with voluntary identification and treatment processes." Pltf. Br. at 5 (PFOF 29). And, in addition to other concerns, both organizations opposed the Act because it implemented a criminal justice approach to maternal and child health, a position both organizations believed to be destructive, in light of available drug treatment alternatives that do not threaten pregnant women with incarceration or loss of parental rights. Pltf. Br. at 6 (PFOF 34-35). Overall, in the view of both DCFS and the Health Department, the Act presented a "serious potential" for "negatively affecting the health of mothers and children" in Wisconsin by reducing the length and quality of prenatal care in this state. Pltf. Br. at 6 (PFOF 26-27).

Notwithstanding the Act's serious potential for negatively impacting the health of women and their fetuses, the legislature continued to advance the Act. DCFS had several conversations with legislators in an attempt to dissuade them from moving forward with the Act, but those efforts failed. Pltf. Br. at 6 (PFOF 23-25). Despite DCFS's opposition, the legislature "absolutely insisted there had to be a category of child abuse called unborn child abuse[,] [t]hey would not change that." Pltf. Br. at 6 (PFOF 24). According to DCF, the legislature "want[ed] expectant mothers to receive treatment[,] [a]nd if they didn't do it voluntarily, they wanted it enforced somehow." Pltf. Br. at 6 (PFOF 25).

## II.    STATE DEFENDANTS MINIMIZE THE ACT'S IMPACT ON WISCONSIN WOMEN

### A.    The Act Prioritizes the Purported Interests of the Fetus Over the Pregnant Woman, But in Doing So Jeopardizes the Health of Both

In her affirmative motion for summary judgment, Plaintiff outlined in detail the operation of Act 292. Pltf. Br. at 7-10. In their own summary of the Act, State Defendants assert several

claims in an effort to downplay the Act's impact on Wisconsin women. The State's arguments, however, are not supported by the text of the Act or the facts of Ms. Loertscher's case.

State Defendants first contend that a "primary goal" of the Act is to assist pregnant women "in fulfilling their responsibilities [as parents]" by providing "just and humane program[s] of services." State Br. at 4-5 (quoting Wis. Stat. § 48.01(1)(a) & 48.01(1)(h)). Yet in describing the "goal" of the Act, State Defendants neglect to mention that, under the Act, the woman's interests are always secondary to the State's asserted interest in potential life. Wis. Stat. § 48.01(1) ("In construing this chapter, the best interests of the child or unborn child *shall always be of paramount consideration*.") (emphasis added). Moreover, the Act makes clear that any "treatment" provided to the pregnant woman is not provided out of a concern for the health of the woman, but rather is provided based on a purported interest in the health of the fetus. *See* Wis. State. § 48.01(1)(am) (providing that "in order to ensure that the needs of the unborn child . . . are provided for, the court may determine that it is in the best interests of the unborn child for the expectant mother to be ordered to receive treatment, including inpatient treatment"). In addition, while "voluntary" treatment is "encouraged" under the Act, Wis. Stat. § 48.01(1)(bm), where a woman disagrees that she needs such "voluntary" treatment, a court may nevertheless force her to receive that treatment if it determines "that it is in the best interests of the unborn child," without any reference to a qualified diagnosis or medical standards for treatment. Wis. Stat. § 48.01(1)(am).

State Defendants next claim that "[t]he focus of the Act is treatment, not punishment." State Br. at 5.  But whatever the theoretical role of treatment, the Act undeniably has a strong punitive component—namely, the Act authorizes juvenile courts, law enforcement officers, and even human service intake workers to take pregnant women into custody, Wis. Stat. §§ 48.193(1)(a)-(c); 48.193(1)(d)(2); 48.08(3), empowers juvenile courts to order a pregnant woman into an inpatient facility, Wis. Stat. § 48.213(3)(b); § 48.01(1)(am), and provides for permanent involuntary termination of parental rights based solely on the fact that the mother was previously placed outside her home during her pregnancy, Wis. Stat. § 48.415(2)(a). Every major

professional medical society involved in the care of pregnant women and children opposes punitive approaches to pregnant women who use alcohol or controlled substances. (ECF No. 154 ¶ 23 ("Expert Report of Hendree E. Jones, Ph.D.") ("Jones Report"); ECF No. 160 ¶ 12 ("Expert Report of Aleksandra Zgierska, M.D., Ph.D.") ("Zgierska Report"); *see also* ECF No. 153 ¶¶ 16-17 ("Expert Report of Kathy D. Hartke, M.D.") ("Hartke Report")). Medical societies oppose punitive laws like Act 292 because such approaches deter women from seeking and obtaining prenatal care and drug treatment and discourage communication between doctor and patient, all of which ensure better pregnancy outcomes and promote maternal and fetal health. (PFOF 29-31; ECF No. 154 ¶ 24 ("Jones Report"); ECF No. 160 ¶ 13 ("Zgierska Report"); *see also* ECF No. 153 ¶¶ 17-18 ("Hartke Report"); DCFS & Health Dep't Legislative History Comments). For example, the National Perinatal Association's advises that "fear of prosecution can cause women to abort their pregnancies, push them underground, and discourage them from seeking treatment for their addiction[;] [i]n addition . . . women who worry that their children will be taken away at birth if they admit substance abuse are less likely to seek essential prenatal and medical care." ECF No. 153-7 at 2-3; ECF No. 153 ¶ 34 ("Hartke Report").

State Defendants also assert generally that substance abuse treatment during pregnancy can produce some positive results. State Br. at 5. Even if this general proposition is true in some circumstances, however, it does not mean that the forced treatment authorized by the Act actually produces positive outcomes. The Act encourages medical providers to report a pregnant woman's substance use to child welfare authorities, an act antithetical to the physician/patient relationship that can create significant impediments to the continued treatment of women and thereby imperil both the woman's health and that of her fetus. ECF No. 156 ¶ 32 ("Expert Report of Misha Terplan, M.D., MPH, dated Jan. 28, 2016") ("Terplan Report"); ECF No. 160 ¶ 16 ("Zgierska Report"); ECF NO. 153-4 at 2 (ACOG Committee Opinion)). The Act also authorizes involuntary treatment, another action that jeopardizes the health of the woman and her fetus. ECF No. 156 ¶ 52 ("Terplan Report"); ECF No. 160 ¶ 21 ("Zgierska Report"); ECF No. 155 ¶ 31 ("Rebuttal Report of Stephen Kandall, M.D.") ("Kandall Report")). Further, the Act's punitive

approach stigmatizes substance use disorders, further eroding the foundation for a healthy patient-clinician relationship. ECF No. 160 ¶¶ 33-35 ("Zgierska Report"); ECF No. 156 ¶ 54 ("Terplan Report")). In sum, the Act prioritizes state control over pregnant women in the supposed interests of the fetus and in doing so creates harmful health consequences for both.

### B. The Act Encourages Reporting of a Pregnant Woman's Substance Use and Authorizes Various Individuals to Take the Woman Into Custody

State Defendants stress that the Act "permits, but does not require" individuals to report "suspected unborn child abuse." State Br. at 6. Yet the State's own interpretations of the Act are inconsistent on whether reporting of "unborn child abuse" is mandated. (PFOF 113). Moreover, several individuals involved in Ms. Loertscher's case believed that they *were* mandated reporters under the Act. (PFOF 112; ECF No. 151 at 34: 21-25; 35: 1-2 ("Duellman Dep."); ECF No. 149 17: 8-9, 17-25; 18:1-10 ("Bantz Dep.")). In addition, the Act provides immunity for providers acting as reporters. Wis. Stat. § 48.981(4). Thus, regardless of whether the Act mandates reporting or not, it nevertheless encourages medical providers to report and share private medical information including records.

State Defendants acknowledge that law enforcement personnel or an intake worker may themselves take a pregnant woman into custody if, in their independent judgment, "reasonable grounds" exist to believe that the conditions for jurisdiction under § 48.133 are satisfied. *See* State Br. at 6. State Defendants note that the statute suggests that a person taking the pregnant woman into custody "must make every effort to release her to an adult relative or friend or under her own supervision," State Br. at 6 (citing § 48.203(1)). Of course, the provision only treats release "under her own supervision" as an option "if an adult relative or friend is unavailable" and after "counseling or warning the adult expectant mother" as appropriate. Wis. Stat. § 48.203(1). Moreover, as Ms. Loertscher's case illustrates, this "make every effort" standard vests tremendous discretion in local officials. Taylor County social worker Julie Clarkson informed Ms. Loertscher during their first conversation that if Ms. Loertscher did not agree to voluntarily receive inpatient drug treatment, Taylor County Human Services would likely request

to take Ms. Loertscher into temporary physical custody. (PFOF 121; ECF No. 179-20 at 4). In any event, as State Defendants recognize, if the statutory standard is met, the "intake worker may decide to hold the expectant mother in custody." State Br. at 6-7.

State Defendants further contend that taking a pregnant women into custody is "not an arrest" because she is not held in jail. State Br. at 7 (citing Wis. Stat. § 48.193(3)). But State Defendants acknowledge that a pregnant woman can be held against her will in several places, including a hospital, an inpatient facility, or the home of an adult relative, State Br. at 7, and as Ms. Loertscher's case illustrates, pregnant women can be jailed for contempt under the Act if the woman is found to have violated an order of the children's court, including by refusing to accept mandatory inpatient drug treatment. (PFOF 202); State Br. at 11. State Defendants also note that a pregnant woman held in custody and not released must have a hearing within 48 hours to determine if probable cause exists for her continued detention, State Br. 7, but pregnant women are not entitled to appointment of counsel for this hearing. Wis. Stat. § 48.213(2)(e).

State Defendants also note that within 30 days of the filing of a CHIPS petition under the Act, a court must hold a hearing for a pregnant woman to enter a plea responding to the petition alleging child abuse or neglect regarding her fertilized egg, embryo, or fetus. *See* State Br. at 7. Again, however, the pregnant woman is not entitled to representation by court-appointed counsel at the plea hearing, even if she qualifies for the appointment in connection with a subsequent fact-finding hearing. *See* Wis. Stat. §§ 48.23(2m)(b) & (4). At the plea hearing, the woman must decide how to plead in response to the allegations against her, whether to invoke or waive her right to a jury trial, and whether to request substitution of the judge. Wis. Stat. § 48.30(2). Furthermore, when a court takes jurisdiction over a pregnant woman pursuant to the Act, the court must appoint a guardian ad litem to represent the fetus, who may separately respond to the allegations against the pregnant woman. Wis. Stat. §§ 48.235(1)(f) & 48.02(19); (PFOF 174-75).

In addition, State Defendants observe that the juvenile court must hold a fact-finding hearing to determine if the allegations in the CHIPS petition under the Act have been established by "clear and convincing" evidence. State Br. at 8. If a woman is threatened with placement

outside her home under the Act, then she is entitled to court-appointed counsel *for the first time* in the course of the proceedings against her, provided she meets the statutory criteria for indigency. *See* Wis. Stat. §§ 48.23(2m)(b) &(4). However, if she is threatened with state supervision or involuntary court-ordered counseling or medical treatment, *see* Wis. Stat. §§ 48.347(1), (2), (4) & (5), then she is still not entitled to court-appointed counsel.

Further, State Defendants describe the juvenile court as having "several options" if it finds that the fetus is in need of protection or services. State Br. at 8. In reality, each available "option" allows the juvenile court, over a pregnant woman's objections and without any requirement that it consider scientifically or medically reliable evidence, to order a pregnant woman to undergo counseling, supervision, or a selected form of drug or alcohol treatment— including involuntarily at an inpatient facility—for the duration of the woman's pregnancy. *See* Wis. Stat. § 48.347. State Defendants also contend that a court may not place a pregnant woman outside her home unless "she refuses to participate in AODA services offered to her." State Br. at 8. But as Ms. Loertscher's case illustrates, the Act permits social service workers to limit the "services offered" to out-of-home placement. In particular, TCHSD offered Ms. Loertscher one AODA option: submitting to inpatient treatment at the Fahrman Center. (PFOF 167, 202).

State Defendants also fail to mention several other actions that may be taken against pregnant women under the Act. Under Section 48.347(7), a court is authorized during a woman's pregnancy to order services or treatment for the child when born including removal from the home and substitution of legal custody. *See* Wis. Stat. § 48.345. Moreover, the Act provides for permanent involuntary termination of parental rights based solely on the fact that the mother was previously placed outside her home during her pregnancy. Wis. Stat. § 48.415(2)(a). At any time, a GAL appointed to represent a fertilized egg, embryo, or fetus, may, among other actions, petition for revision or extension of a dispositional order, and may also petition for termination of parental rights of a pregnant woman over her child once born. Wis. Stat. § 48.235(4m)(a).

Finally, State Defendants point to a November 2015 revision to the Child Protective Services Access and Initial Assessment Standards ("IA Standards"), claiming that the newest

version of the IA Standards no longer allow determinations substantiating maltreatment or the identification of a maltreater in the unborn child abuse context. State Defendants' post-litigation amendment to the IA Standards, however, did not alter the language of the Act, which remains in place and continues to authorize maltreatment determinations. *See* Wis. Stat. §§ 48.981(3)(c)(1)(a) & (5m).

## III. MS. LOERTSCHER'S OWN EXPERIENCE UNDER THE ACT

In her affirmative motion for summary judgment, Ms. Loertscher outlined in detail her own experiences under the Act. Pltf. Br. at 11-18. In short, Ms. Loertscher was subjected to state control under the Act, beginning in August 2014 (PFOF 116). Ms. Loertscher voluntarily sought medical assistance from a hospital when she realized she might be pregnant, and in the course that treatment, she confided that she had used controlled substances and a small amount of alcohol prior to learning she was pregnant. (PFOF 65-88, 105, 111). In response, state actors accessed Ms. Loertscher's private medical information without her consent, appointed a guardian ad litem to represent her then 14-week fetus but no one to represent Ms. Loertscher, and initiated proceedings under the Act. (PFOF 112, 114, 123, 132). Ms. Loertscher, who was without counsel, was soon ordered detained, ordered to adhere to unwanted medical treatment, arrested, and ultimately jailed. (PFOF 143, 165-70, 184, 192, 202). She lacked necessary medical and prenatal care while incarcerated, and she was released only after agreeing to a consent decree authorizing continued state control over medical decisions for the duration of her pregnancy, as well as access to confidential medical information. (PFOF 208-15, 222-24). A guardian ad litem was appointed to represent Ms. Loertscher's fetus for the duration of her pregnancy, and Ms. Loertscher was obligated to comply with the terms of the consent decree upon pain of renewed incarceration. (PFOF 223-24). All of the repeated and intrusive drug tests during this period were negative, and she gave birth to a healthy boy. (PFOF 227-28).

State Defendants downplay the impact of the Act on Ms. Loertscher and instead cast blame on Ms. Loertscher herself for the deprivations she experienced. Several of these outrageous assertions warrant a response. First, State Defendants characterize the inpatient

treatment offered to Ms. Loertscher as "voluntary," State Br. at 10, but there was nothing "voluntary" about it. In fact, during the first conversation between TCHSD and Ms. Loertscher at the Mayo Clinic, a county social worker informed Ms. Loertscher that she could either submit to the medical treatment recommended by TCHSD or the County would take Ms. Loertscher into temporary physical custody. (PFOF 121, ECF No. 179-20 at 4).

State Defendants also tout the testimony of Dr. Jennifer Bantz, an OB/GYN at the Mayo Clinic, who recommended by telephone during the August 5, 2014, temporary physical custody hearing that Ms. Loertscher receive inpatient AODA treatment. State Br. at 11.  Dr. Bantz, however, is not an expert on drug use during pregnancy, (PFOF 148), did not know she had been asked to testify at a temporary physical custody hearing, (PFOF 146), and did not know at the time of the hearing that Taylor County was attempting to require Ms. Loertscher to receive involuntary in-patient medical treatment, (PFOF 147). Moreover, Dr. Bantz did not understand that Ms. Loertscher could be placed into treatment involuntarily as a result of the court hearing, (PFOF 161), and she later acknowledged that, at the time of the hearing, she did not think it would be a good idea for Ms. Loertscher to be forced to go to treatment. (PFOF 162).

In addition, State Defendants assert that Ms. Loertscher "left the Mayo Clinic" and "did not report for her AODA assessment at the Fahrman Center." State Br. at 11. In reality, the Mayo Clinic discharged Ms. Loertscher, concluding that she was not a threat to herself or others. (PFOF 171). The Mayo Clinic allowed Ms. Loertscher to leave after making arrangements with her for medical follow up and prescriptions. (PFOF 173). The Mayo Clinic did not believe Ms. Loertscher was required to stay in a secure unit and allowed her to depart the facility. (PFOF 173).

State Defendants claim that Ms. Loertscher "decided to serve" 30 days in jail under the contempt order. State Br. 12. While this position may be consistent with views held by Taylor County and its expert, (PFOF 206), it fails to consider that Ms. Loertscher's only alternative to jail was to submit to forced inpatient drug treatment that she believed was inappropriate for her health care needs. (PFOF 202). While in Taylor County Jail, Ms. Loertscher received no prenatal

care (PFOF 208), was forced to miss two previously scheduled prenatal care appointments (PFOF 211), was subjected to the stress of incarceration, and was placed in solitary confinement. (PFOF 218-19).

Finally, State Defendants acknowledge that TCHSD issued an administrative finding that Ms. Loertscher had committed "child maltreatment," but contend that Ms. Loertscher "suffered no consequences" as result of the maltreatment finding because TCHSD later withdrew the determination. State Br. 13. Even assuming that no outside party received information regarding the maltreatment determination, the mere accusation of such conduct is devastating for the person accused. As TCHSD has recognized, an accusation of child maltreatment is "very serious." ECF No. 161, 53: 6-9.

Ms. Loertscher never received the inpatient treatment that TCHSD demanded. (PFOF 202, 206). Nevertheless, she delivered a healthy baby boy on January 23, 2015. (PFOF 227).

## ARGUMENT

State Defendants are not entitled to summary judgment. Federal Rule of Civil Procedure 56 states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to grant summary judgment, the court must be able to reach the controlling legal issue without having to resolve any "genuine disputes" of "material" fact. Fed. R. Civ. P. 56(a). In determining whether a material factual dispute exists, the court must view the record in the case and the summary judgment submissions in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, the court must draw all reasonable inferences in the nonmovant's favor. *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 568 (7th Cir. 2001) (reversing summary judgment because district court did not give nonmovant benefit of all inferences available from record); *United States v. Goforth*, 465 F.3d 730, 733 (6th Cir. 2006). The moving party bears the ultimate burden of persuading the court that a trial is unnecessary. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330-331 & n.2 (1986) (stating that the movant bears "an ultimate burden of persuasion, which always remains on the

moving party"). Nor does the absence of a dispute of material fact entitle the movant to summary judgment, for the court must also conclude that the movant "must prevail as a matter of law." *Anderson*, 477 U.S. at 250. Here, State Defendants cannot meet their burden nor prevail on the law, and their motion should be denied.

## I.   THIS COURT MAY PROPERLY ADDRESS MS. LOERTSCHER'S FACIAL CONSTITUTIONAL CHALLENGE

State Defendants first argue that this Court must address Ms. Loertscher's as-applied challenge before reaching her facial challenge, but that is not the law. State Defendants rely upon the general principle that a court should not "invalidate more of a law than is necessary," State Br. at 14, as well as the high threshold for facial challenges. Ms. Loertscher does not deny those general principles, but the law challenged here is the epitome of a vague statute, and it burdens fundamental constitutional rights. The high threshold for facial challenges has been met.

None of the cases cited by State Defendants stand for the proposition that an as-applied challenge must be adjudicated first. Rather, the cases simply hold that courts should tread carefully and enjoin an entire statute only when warranted by the statute as a whole—as is the case here. For example, in *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 458 (2008), the Supreme Court reversed the facial invalidation of Washington's newly adopted primary election system, holding that "[o]n its face, [the law] does not impose any severe burden on respondents' associational rights." In *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 331 (2006), the Court remanded for consideration of a more limited injunction of a parental notification statute after the plaintiffs "conceded at oral argument that carefully crafted injunctive relief may resolve this case." Other courts routinely consider facial challenges regardless of whether a plaintiff has also brought an as-applied challenge. *E.g., Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r*, No. 116CV00763TWPDML, 2016 WL 3556914, at *7 n.2 (S.D. Ind. June 30, 2016) (granting

preliminary injunction finding Indiana abortion restriction facially unconstitutional and rejecting Indiana's argument that the law could only be susceptible to an as-applied challenge).

State Defendants' argument would render facial challenges impossible, for nearly every facial challenge also implies an as-applied challenge. If a law is facially unconstitutional, it is generally also unconstitutional as applied to the particular plaintiff. Instead, the question before every court is merely whether a facial challenge is appropriate. As the Supreme Court recently explained, "if the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is proper." *Whole Woman's Health*, 136 S. Ct. at 2307 (internal citations and quotations omitted). In fact, in *Whole Woman's Health*, the petitioners brought only an as-applied challenge to Texas's abortion admitting privileges law, but because the evidence proffered showed that the law was unconstitutional on its face, the court awarded facial relief. *Id.* ("Nothing prevents this Court from awarding facial relief as the appropriate remedy for petitioners' as-applied claims.") Here, Ms. Loertscher has demonstrated that the statute is unconstitutional on its face, and facial relief is appropriate.

State Defendants also rely on *United States v. Salerno*, 481 U.S. 739 (1987), for the proposition that a facial challenge must establish that "no set of circumstances exist under which the Act would be valid." State Br. at 16. In fact, the *Salerno* test does not "accurately characterize the standard for deciding facial challenges" in many cases. *Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (Stevens, J., concurring); *see also Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012) (noting that "the Supreme Court has repeatedly entertained facial challenges without engaging in this hypothetical exercise"). For example, courts may strike down a statute as unconstitutionally vague even if some potential applications may be permissible. *Karlin v. Foust*, 188 F.3d 446, 465, n.7 (7th Cir. 1999). Similarly, when, as here, a facial challenge alleges violation of fundamental constitutional rights, courts generally weigh the nature and extent of the violation and apply the relevant constitutional standards. As the Third Circuit recently advised, "[t]he Court has often considered facial challenges simply by applying the relevant constitutional test to the challenged

statute, without trying to dream up whether or not there exists some hypothetical situation in which application of the statute might be valid." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016).[2]

Finally, State Defendants complain that "Loertscher is focused on the worst case scenario" and that she fails "to address the many procedural safeguards in the Act that avoid that scenario," State Br. at 16. But that "worst case scenario" is highly relevant here: Ms. Loertscher describes this particular "scenario" because those events actually happened to her, and any so-called "procedural safeguards" failed to prevent substantial constitutional violations. Contrary to Defendant's assertions, Ms. Loertscher's facial challenge focuses on the statutory provisions, which are unconstitutionally vague, which permit substantial violations of substantive due process rights without any attempt at narrow tailoring, and which utterly fail standard tests under the Equal Protection Clause and the Fourth Amendment. While Ms. Loertscher's own story is not necessary to prevail on her facial challenge, the facts of her case illustrate that the constitutional violations expressly authorized by the plain terms of the Act are neither hypothetical nor imaginary, but have actually been inflicted on a Wisconsin woman under the terms of the Act. *See Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012) (citing *Wash. State Grange*, 552 U.S. at 450) (cautioning that courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases").[3]

## II. STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE THE ACT IS VOID FOR VAGUENESS

The vague and indefinite nature of critical statutory terms demonstrates most clearly why a facial challenge is appropriate and why the Act should be struck down. The impact of the Act on Wisconsin women flows from its terms, which fail on their face "to provide the kind of notice

---

[2] Ms. Loertscher does not concede there is any constitutional application of the statute, nor is one easy to imagine given its scope and reach, but the inquiry is not necessary given her claims.
[3] Ms. Loertscher's own experience, of course, also provides the basis for her claim for damages against Taylor County.

that will enable ordinary people to understand what conduct it prohibits" and "encourage arbitrary and discriminatory enforcement." *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Furthermore, because the Act threatens the exercise of fundamental constitutional rights, the law demands an even greater level of clarity. *Record Head Corp. v. Sachen*, 682 F.2d 672, 674 (7th Cir. 1982) ("[V]agueness is tested by more exacting standards when constitutionally protected rights are threatened . . . .").

State Defendants treat the void-for-vagueness doctrine as merely "an aspect of procedural due process," State Br. at 50, but courts assess vagueness claims under a different constitutional test. The void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2317 (2012). Courts address these two issues separately from other due process claims. Here, given that the Act is riddled with vague, undefined terms, it is appropriate to consider the statute's vagueness separate and apart from the other due process issues outlined below.

State Defendants first argue that the statute is not void for vagueness because its standards for intervention are "multi-factored" and involve "distinct, interlocking criteria." State Br. at 50. Of course, as State Defendants quickly admit, none of these "multi-factored" and "distinct" criteria are defined in the statute. State Br. at 51. State Defendants therefore fall back on two different dictionaries, where they unsurprisingly locate definitions for the English words used in the statute. *Id*. The problem with the Act, however, is not the total absence of any definition for the words used. If that were the standard, no statute would ever be struck down on vagueness grounds because almost every word in every statute has some dictionary definition associated with it.

Courts, of course, do strike down laws on vagueness grounds despite common definitions. For example, in *Coates v. City of Cincinnati*, the Supreme Court invalidated a Cincinnati ordinance that made it an offense for "three or more persons to assemble . . . on any of

the sidewalks . . . and there conduct themselves in a manner annoying to persons passing by." 402 U.S. 611, 611 (1971). The Court recognized that "annoying" is a widely used and well-understood word. *Id.* at 612 ("'Annoying' is the present participle of the transitive verb 'annoy' which means to trouble, to vex, to impede, to incommode, to provoke, to harass or to irritate."). But the Court nevertheless deemed the statute impermissibly vague because it failed to provide persons of ordinary intelligence with a standard of conduct by which to conform their conduct. *Id.* at 614 ("Conduct that annoys some people does not annoy others . . . . As a result, 'men of common intelligence must necessarily guess at its meaning.'") (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). Here, too, the words in the statute can be interpreted in very different ways by different people, precluding an individual woman from knowing whether she may be subject to its terms and permitting officials the discretion to apply the Act arbitrarily when it suits them.

As set forth in Ms. Loertscher's own motion for summary judgment, Pltf. Br. at 22-28, numerous aspects of the law render it unconstitutionally vague. First, the Act does not provide adequate notice that an individual may be subject to its terms. The Act applies from the instant of fertilization, rendering a woman potentially subject to its enforcement before she knows, or even could know, she is pregnant. Wis. Stat. §§ 48.01(1); 48.02(19). For example, in Ms. Loertscher's case, the proceedings were based on alleged conduct that occurred before she knew she was pregnant. (PFOF 76-84, 91).

Second, the failure to use medically precise terms, and the failure to define the terms used instead, means that women potentially subject to the Act do not know what measure of alcohol or controlled substance use rises to the level described in the Act. State Defendants cite general dictionary definitions for terms such as "habitual," "severe," "substantial risk," and "seriously affected or endangered," but these terms have no medical definition and lack the precise meaning that could guide individual behavior. *See* Pltf. Br. at 23-25. Furthermore, the dictionary definitions cited by State Defendants themselves contain vague terms, and the same dictionary supplies multiple meanings for the same word. *See, e.g.*, *American Heritage Dictionary* (5th ed.

2011) (defining "habit" with reference to a "pattern" of behavior acquired through "frequent" repetition, and also defining the term as an "established disposition of the mind or character" or a "customary manner or practice"). These terms are far too imprecise to provide any guidance to Wisconsin women.

In some cases, these imprecise terms combine with definitions in other parts of the Act to create additional uncertainty. Vague terms such as "habitual" apply to "controlled substances," but the latter term as defined in the Wisconsin Uniform Controlled Substances Act applies to alcoholic beverages and a wide range of prescription drugs including Tylenol with codeine and common prescription medications used to treat anxiety or insomnia, such as alprazolam or zolpidem. *See* Wis. Stat. §§ 48.133; 961.01(4); 961.14(4)(t); 961.18(5)(a); 961.20(2)(a) & 961.20(2)(p). Because the Act appears to cover *all* alcoholic beverages and controlled substances, including those obtained legally, a Wisconsin woman cannot know whether or at what level her use of legal substances could subject her to the Act, particularly as conduct prior to her pregnancy could be used to satisfy the term "habitual." For example, the desk review of the "child maltreatment" determination in Ms. Loertscher's case cited her occasional use of alcohol prior to conception as one of the bases for a finding of "habitual" misuse. (PFOF 234). In other cases, the lack of definitions for key terms creates additional confusion because those same terms are defined differently in different parts of the Wisconsin code. *See, e.g.*, Wis. Stat. § 118.16 (defining "habitual" for truancy); Wis. Stat. § 351.02 (defining "habitual" for traffic offenses). Regardless of whether the words in the statute are defined in the dictionary, they fail to provide sufficient guidance to Wisconsin women.

Aside from the absence of guidance to individuals, the Act unconstitutionally fails to define a clear standard for enforcement, thereby permitting discriminatory and arbitrary actions by officials. *Karlin*, 188 F.3d at 465. When a law evades uniform interpretation, it allows for unconstitutional *ad hoc* enforcement. *Record Head Corp.*, 682 F.2d at 678. The Act fails to define offending conduct and empowers a large group of people with enforcement authority,

giving those people "unfettered freedom to act on nothing but their own preferences and beliefs." *Karlin*, 188 F.3d at 465.

As described in Ms. Loertscher's summary judgment brief, Pltf. Br. at 27, the Act gives anyone who furnishes services to the court the power of a law enforcement officer to take a person suspected of violating the Act into physical custody. Wis. Stat. § 48.08(3). The lack of clear definitions permits these officials to act on their own beliefs about highly charged, politicized issues such as pregnancy, alcohol consumption, and controlled substance use. Thus, the Act may give rise to widely divergent views as to what degree of use is "habitual" or "severe," whether there is any risk to a fertilized egg, embryo, or fetus from that use, and what degree of risk is "substantial," and whether a pregnant woman lacks "self-control." In this case, Ms. Loertscher disclosed to a health care worker that she had consumed a glass of wine before she knew she was pregnant, and her "use of alcohol" was then cited by officials to assert jurisdiction under the Act. (PFOF 111, 140, 234). Taylor County service workers operated with different definitions of "habitually lacks self-control" and "severe degree" even within Ms. Loertscher's own case. (PFOF 47 & 49). The Act is therefore unconstitutionally vague. *See Smith v. Goguen*, 415 U.S. 566, 575 (1974) ("Statutory language of such a standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections. Legislatures may not so abdicate their responsibilities…"). State Defendants' motion for summary judgment with respect to Plaintiff's void for vagueness claim must be denied.

## III. STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIMS

State Defendants argue that the Act does not violate pregnant women's substantive due process rights, State Br. at 17-18, but they misapprehend the fundamental rights at issue in this case. State Defendants assert that "the Act does not implicate any fundamental rights" because "a pregnant woman has no constitutional right to use drugs, drink alcohol, or abuse her unborn child." State Br. at 17. This is a gross mischaracterization of the rights at issue. As explained in detail in Plaintiff's affirmative motion for summary judgment, the Act deprives individuals who

are or may become pregnant of several fundamental substantive due process rights, including the right to physical liberty and privacy, the right to be free from unconsented and inappropriate medical treatment, the right to decide whether to carry a pregnancy to term or have an abortion, and the right to care and control of one's children free from unjust state interference. Pltf. Br. at 29-38.

Balanced against the infringement of these fundamental rights, State Defendants assert an interest in fetal health, reciting at length the serious health effects that may befall a child born after exposure to alcohol, cocaine, and other controlled substances. While these health effects are indeed serious, they cannot serve as a compelling state interest in this case for three reasons. First, State Defendants fail to link the procedures created by the Act to any improvement in fetal health. In fact, the Act not only fails to further this supposed interest in fetal health but actively undermines it by permitting the imposition of unwanted, inappropriate, or counterproductive treatment and punitive measures on pregnant women, potentially damaging the health of those women and their pregnancies. Second, while courts have recognized some state interest in potential life in the specific context of abortion and a compelling state interest in preventing abuse of children once born, courts have never recognized a compelling state interest in the health of an embryo or fetus throughout a pregnancy, as the State Defendants assert here. State Defendants have the burden to show a *compelling* interest, not just any interest, and they cannot do so here, particularly given the impact on the constitutional rights of pregnant women. Third, the level of alcohol use that could trigger any of the harms cited by State Defendants is generally significantly higher than State Defendants imply, and research has in fact found few causal links between the use of controlled substances and the harms described by the Defendants. ECF No. 154 ¶¶ 16-17 ("Jones Report"). The Act, however, may be triggered by *any* suspicion of substance use, and it permits health care workers and other officials to mandate custody or impose other sanctions on women under undefined and medically imprecise standards such as "substantial" or "habitual." State Defendants cannot meet their burden to show a compelling interest.

Finally, State Defendants deny that strict scrutiny is necessary and assert that the Act applies "only in extreme situations," imposing custody on a pregnant woman only "in moderation." State Br. at 38-40. State Defendants also assert that Ms. Loertscher's case was just such an extreme situation because her "drug use was severe" and she refused "a less restrictive assessment and treatment option." State Br. at 38 & 41. The text of the Act and the evidence produced in this case bely these assertions. The Act relies upon a series of vague terms that can be imposed upon women for only limited use of a wide range of substances, including perfectly legal substances. Contrary to State Defendants' assertions, Ms. Loertscher's case demonstrates exactly this danger because she faced involuntary confinement in an in-patient facility and, ultimately, jail time for alleged substance use prior to the time she knew she was pregnant that no one has demonstrated was severe and despite the fact that she expressed a willingness and ability to immediately stop that substance use. The Act is not narrowly tailored to any interest asserted by the State, as evidenced by Ms. Loertscher's experience.

### A. State Defendants Misstate the Fundamental Substantive Due Process Rights Threatened by the Act

State Defendants argue that the only "rights" of a pregnant woman at issue here are the right to "use drugs or alcohol to the detriment of her unborn child" and the right to "avoid child abuse investigations." State Br. at 19-20. Obviously, Ms. Loertscher claims no such rights in this litigation. In fact, Ms. Loertscher volunteered that she would refrain from the use of drugs or alcohol as soon as she discovered she was pregnant. (PFOF 95). Nor does she claim any right with respect to the state's system governing child welfare or child abuse. Instead, she objects that the Act burdens the fundamental rights of Wisconsin women who may become pregnant by subjecting them to the deprivation of their liberty, to unwanted medical treatment, and to interference in personal reproductive and family decisions. These are all well-recognized substantive due process rights.

As described in Ms. Loertscher's opening brief, the Act deprives women who are or may become pregnant of their right to physical liberty, one of the most basic substantive due process

rights. Pltf. Br. at 30-32; *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ( describing the "sacred" and "carefully guarded" right to the "possession and control of [one's] own person, free from all restraint or interference of others"). The Act authorizes detention based only on a "satisfactory" showing that she "habitually" "lacks self-control" "to a severe degree" in the use of drugs or alcohol and permits law enforcement officers to detain a woman based only on a "reasonable belief" that she satisfies these criteria. Wis. Stat. §§ 48.193(1)(c) & 48.193(1)(d)(2). The initial detention may last several days without a hearing, Wis. Stat. § 48.213(1)(a), and subsequent detention or confinement may continue for a substantial period of time without any clear procedure for release. Wis. Stat. § 48.203(6)(c) (stating only that an intake worker "may release" the pregnant woman "as may be appropriate" under enumerated circumstances). Furthermore, this deprivation of liberty actually happened to Ms. Loertscher. (PFOF 166, 202, 222-24).

In addition, the Act violates the rights of pregnant women by forcing them to submit to medical treatment either directly or under threat of losing their physical liberty. Pltf. Br. at 32-34. The right to refuse medical treatment is fundamental and a well-settled "constitutionally protected liberty interest," *Cruzan v. Dir. Mo. Dept. of Health*, 497 U.S. 261, 278 (1990), and both children and adults have "a substantial liberty interest in not being confined unnecessarily for medical treatment." *Parham v. J.R.*, 442 U.S. 584, 600 (1979). The Act, however, permits a detained adult woman to be "delivered" without her consent to a hospital or doctor's office for the purpose of diagnosis or "treatment," Wis. Stat. § 48.203(3), and she may be forced to undergo treatment based on the results of tests ordered by hospital employees, social workers, or intake workers. Wis. Stat. § 146.0255(2) (providing for referral to an agency authorized to pursue child abuse investigations under § 48.981 and forcible medical interventions pursuant to § 48.238). A pregnant woman may be forced into in-patient treatment over her objections, Wis. Stat. §§ 48.205(1m); 48.347(4), (5), (6), and a guardian ad litem may be appointed to represent the fetus that is empowered to challenge a woman's medical decisions. The violation of this right also actually happened to Ms. Loertscher. The GAL appointed to represent Ms.

Loertscher's fetus successfully sought to substitute his decisions concerning Ms. Loertscher's medical treatment for her own, (PFOF 175-76), and the GAL initiated contempt proceedings against Ms. Loertscher over treatment issues, resulting in her incarceration in Taylor County Jail. (Sup. PFOF 174-203). (The GAL expressed no concern or comment about how incarcerating Ms. Loertscher would likely harm her pregnancy.)

The Act also threatens a woman's fundamental liberty interest in caring for and controlling her children. Plaintiff's Br. at 37-38; *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982). For example, if a woman is suspected of meeting certain statutory criteria she risks losing custody of her future child while she is still pregnant. Wis. Stat. §§ 48. 347(7) & 48.345. A woman placed outside her home during her pregnancy risks permanent involuntary termination of her parental rights after her child is born based on the fact of that placement. Wis. Stat. § 48.415(2)(a). The Act also authorizes the GAL appointed for the fetus to petition for termination of a woman's parental rights after birth. *See* Wis. Stat. §§ 48.235(4m)(3), (6).

Finally, the Act violates the fundamental right to make decisions about whether to carry a pregnancy to term or to seek an abortion. Pltf. Br. at 35-37. The right to procreate is fundamental, *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), and the decision whether to become or remain pregnant belongs to the pregnant person. *Casey*, 505 U.S. at 859. The Act burdens this right by forcing a woman subject to its terms to endure potential sanctions in order to carry her pregnancy to term, including the possibility of physical detention, Wis. Stat. § 48.193(a)(1-3), (d)(2); isolation from family, friends, and chosen medical providers, Wis. Stat. § 48.205(1m), (2); § 48.213(3)(a); court proceedings to determine whether she has committed abuse and/or neglect, Wis. Stat. § 48.213; and the imposition of involuntary and potentially ill-advised medical treatments, Wis. Stat. § 48.347(6). In effect, then, the Act may force women into an unconstitutional choice between ending a pregnancy and being deprived of physical freedom and other fundamental liberties. *See New York v. United States*, 505 U.S. 144, 176 (1992) ("A choice between two unconstitutional[] [alternatives] is no choice at all."). Similarly, the Act creates a number of substantial obstacles in the path of a woman subject to the Act who

might wish to seek an abortion. A woman physically detained under the Act may be unable to access abortion care, Wis. Stat. §§ 48.193(1)(d)(2), 48.207(1m), & 48.347(3), and the GAL appointed under the Act to address the supposed best interests of fetuses has the authority to oppose efforts to end a pregnancy. Wis. Stat. § 48.235(1)(f); Wis. Stat. § 48.235(3)(b)(2) (GAL must make "clear and specific recommendations" to the court concerning "best interests of the …unborn child at every stage of the proceeding").

Each of these rights burdened by the Act is a fundamental substantive due process right that triggers strict scrutiny analysis, forcing State Defendants to identify a compelling state interest that is narrowly tailored to achieve that interest. *Russ v. Watts*, 414 F.3d 783, 789 (7th Cir. 2005) (noting that the due process clause "forbids the government to infringe fundamental liberty interests, *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest"). State Defendants even implicitly acknowledge that some of these rights are at stake, arguing that a "parent's interest in familial integrity is limited by the compelling governmental interest in the protection of children" and that "at some point [a pregnant woman's] right to privacy must be measured against that of potential human life." State Br. at 19-20. As described below, State Defendants fail to meet their burden of demonstrating that any of these competing interests justify the profound infringement of a pregnant woman's fundamental rights that is authorized by the Act. The presence of other interests, however, does not alter the fact that fundamental rights are at stake and that the burden therefore falls on State Defendants to justify the law by meeting strict scrutiny standards. Because the Act violates a number of fundamental rights, this court must "examine carefully" whether it actually advances a compelling interest, and if so, whether the law is narrowly tailored.

**B.      The Act Cannot Survive Strict Scrutiny Review Because It Does Not Serve a Compelling State Interest**

Because the Act violates a number of fundamental rights, this court must "examine carefully" whether it actually advances a compelling interest, and if so, whether the law is

narrowly tailored.  *Moore v. East Cleveland*, 431 U.S. 494, 499 (1977).  State Defendants cannot meet their burden of demonstrating a compelling interest that justifies the Act's unconstitutional infringement of women's fundamental rights.

State Defendants argue that the state has a "compelling interest in protecting unborn children from substantial risk of physical injury."  Br. at 20.  State Defendants then describe at length the serious health effects that it claims may result from exposure to prenatal alcohol or controlled substances.  These potential health effects, while undoubtedly serious for the infants suffering from them from whatever cause, cannot serve as a compelling state interest in this case.  Indeed, if such a state interest throughout pregnancy were recognized, there would be virtually no limits on the control the State could have over the lives of pregnant women. *See, e.g.*, *Stallman v. Youngquist*, 531 N.E.2d 355, 125 Ill.2d 267 (Ill. 1988) (refusing to recognize a tort of maternal prenatal negligence noting that "It is, after all, the whole life of the pregnant woman which impacts on the development of the fetus"); *Auto. Workers v. Johnson Controls*, 499 U.S. 187, 205 (1991) (noting that "[e]mployment late in pregnancy often imposes risks on the unborn child"); *see also Auto. Workers v. Johnson Controls*, 886 F.2d 877 (7th Cir. 1989) (Easterbrook, J., dissenting) (noting that an estimated 15 to 20 million jobs entail exposure to chemicals that pose fetal risk).

### 1.    The Act fails to promote fetal health and undermines maternal health

First, and most importantly, State Defendants fail to show how the Act furthers any asserted interest in fetal health.  As detailed in Ms. Loertscher's opening brief, Pltf. Br. at 39-41, the Act not only fails to further this supposed interest in fetal health but actively undermines it by permitting the imposition of inappropriate and unwanted medical treatment on pregnant women and subjecting them to detention and incarceration without any regard for their health.  The control and punishment allowed by the Act contravene the medical and public health consensus regarding appropriate prenatal care. *See* ECF No. 156 ¶¶ 48, 52-53 ("Terplan Report") ("[P]unitive responses are in conflict with the behavioral theory underlying the non-pharmacological treatment for addiction . . . .").  Indeed, DCFS and the City of Milwaukee Health

Department opposed passage of the Act for this very reason. (PFOF 34-35) (expressing concern that "a criminal justice approach to maternal and child health issues is not the first and best alternative" describing that approach as "destructive," and explaining that "[r]eadily available alcohol and drug treatment for expectant mothers would be preferable to threatening mothers with incarceration and loss of parental rights."). DCFS also specifically warned legislators that the Act could "scar[e] women away from treatment," thereby reducing the likelihood of women receiving adequate prenatal care and thus undermining the purported interest the law sought to advance. (PFOF 20).

Even with respect to the issue of alcohol and controlled substance use, depriving a pregnant woman of physical liberty is not just unconstitutionally intrusive, but also a self-defeating means of deterring alcohol and controlled substance use. *See, e.g.*, ECF No. 156 ¶ 48 ("Terplan Report") ("From a public health perspective, such legislation can be considered harmful as ultimately it leads to fewer women receiving beneficial services (both prenatal care and substance use disorder)"). Every major professional medical society involved in the care of pregnant women and children opposes punitive approaches to substance use during pregnancy (PFOF 34-35; ECF No. 154 ¶ 23 ("Jones Report"); ECF No. 160 ¶ 12 ("Zgierska Report"); see also ECF No. 153 ¶¶ 16-17 ("Hartke Report")). Medical societies oppose punitive laws like Act 292 because such approaches interfere with doctor/patient communication and deter women from seeking and obtaining prenatal care and drug treatment, which are the best ways to ensure better pregnancy outcomes and promote maternal and fetal health. (PFOF 29-31, 36; ECF No. 154 ¶ 24 ("Jones Report"); ECF No. 160 ¶ 13 ("Zgierska Report"); see also ECF No. 153 ¶¶ 17-18 ("Hartke Report"); DCFS & Health Dep't Legislative History Comments). The National Perinatal Association's position paper on substance use among pregnant women, for example, specifically advises that "fear of prosecution can cause women to abort their pregnancies, push them underground, and discourage them from seeking treatment for their addiction[;] [i]n addition . . . women who worry that their children will be taken away at birth if they admit

substance abuse are less likely to seek essential prenatal and medical care." PFOF 29-31, 36; ECF No. 153-7 at 2-3; ECF No. 153 ¶ 34 ("Hartke Report")).

The Act also encourages medical providers to report a pregnant woman's substance use to child welfare authorities, an act antithetical to the physician/patient relationship that can create significant impediments to the continued treatment of women and thereby imperil both the woman's health and that of her fetus. ECF No. 156 ¶ 32 ("Terplan Report"); ECF No. 160 ¶ 16 ("Zgierska Report"); ECF NO. 153-4 at 2 (ACOG Committee Opinion)). In addition, the Act authorizes involuntary treatment, another act that jeopardizes the health of the woman and her fetus. (PFOF 25; ECF No. 156 ¶ 52 ("Terplan Report"); ECF No. 160 ¶ 21 ("Zgierska Report"); ECF No. 155 ¶ 31 ("Kandall Report")). Further, the Act's punitive approach propagates the stigmatization surrounding substance use disorders, further eroding the foundation for a healthy patient-clinician relationship. ECF No. 160 ¶¶ 33-35 ("Zgierska Report"); ECF No. 156 ¶ 54 ("Terplan Report")). In sum, the Act prioritizes the supposed interests of the fetus over the pregnant woman but in doing so creates harmful health consequences for both. The Act takes none of this into account. Because State Defendants have failed to show that the Act furthers the very interest identified, their motion for motion for summary judgment must be denied.

> **2.** **The State's asserted interest cannot apply to significant time periods covered by the Act**

The Act burdens the fundamental rights of a woman who may become pregnant from the moment of fertilization (and even earlier, given that her life and health decisions prior to pregnancy may be considered under the Act in determining her "habitual self-control"). Courts have never recognized a state interest in the health of an embryo or fetus outside of the context of abortion, and even then not at the early stages of pregnancy, as sufficient to outweigh the fundamental due process rights of a pregnant woman. Specifically, the Supreme Court has held that, early in a pregnancy, "the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846. By granting state actors dominion over a pregnant woman's

decision concerning abortion "from the moment of fertilization," the Act imposes a "substantial obstacle" on a women's right to elect an abortion, in violation of *Roe* and *Casey*. *See Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 987 (7th Cir. 2012) ("[T]he Court has explained that the constitutional right to obtain an abortion is a right against coercive governmental burdens; the government may not 'prohibit any woman from making the ultimate decision to terminate her pregnancy' before fetal viability or impose an 'undue burden on a woman's ability to make this decision.') (quoting *Casey*, 505 U.S. at 834).

Furthermore, even when states have an interest in potential life later in the pregnancy such that states may outlaw abortion, any such restrictions must remain subordinate to the woman's own right to life and health. *Casey*, 505 U.S. at 870-71. *See also Gonzales v. Carhart*, 550 U.S. 124, 161 (2007) (recognizing that a prohibition on certain abortion procedures would be unconstitutional "if it subjected women to significant health risks"). Here, the Act makes no provision for maternal life or health in the obstacles it places in the path to abortion.

In addition, State Defendants have offered no authority holding that the state's interest in potential life recognized in the abortion context is sufficient to justify the burden placed on pregnant women who are seeking to continue their pregnancies to conform their lives and health to the vague standards required under the Act. The interest asserted by State Defendants cannot justify the Act. *See* State Br. at 21-34.

### 3. State Defendants have failed to show that their asserted interest is fetal heath, as expressed in the Act itself, is compelling

State Defendants devote 11 pages of their brief to describing the purported detrimental effects of high levels of drugs and alcohol on some fetuses, State Br. at 21-31 (though of course many other substances like cigarettes and lead also have detrimental effects). But State Defendants have *not* demonstrated that courts have recognized a general interest in fetal "health" that is "compelling." Nor have they demonstrated that all levels of alcohol or substance use covered by the Act in fact cause harm or even create "substantial" risks to fetuses. The Act does not identify any medically precise threshold but instead makes *any* use potentially sufficient to

trigger proceedings so long as it generates a "reasonable suspicion" of a "habitual lack of self-control" in any one of numerous actors empowered by the Act.

Medical experts designated by Plaintiff and State Defendants agree that the risks of harm from a pregnant woman's consumption of alcohol to a fetus and/or to the child subsequently born,[4] as well as other controlled substances, including marijuana, opioids and methamphetamine, are varied and range from no risk to greater risk.[5] The experts further agree that smoking cigarettes, environmental factors, genetics, poor nutrition, and other conditions experienced by pregnant women contribute to the inability to determine the degree of risk created by any one factor and the cause of any given harm to a fetus and/or child when born.[6]

---

[4] ECF No. 154 ¶¶ 16-17 ("Jones Report"); ECF No. 156 ¶ 40 ("Terplan Report") ("[T]he data is reassuring that normal alcohol consumption early in pregnancy, stopped upon discovery of pregnancy, will have no ill effect on the developing fetus or the child once born."); ECF No. 137 at 64 ("Hartke Dep."); ECF No. 139 at 133: 21-22 ("Kandall Dep.") ("[M]any of the effects are either nonexistent or very subtle or very minor."); ECF No 141 at 132-34 ("Deposition of Mishka Terplan, M.D., MPH") ("Terplan Dep."); ECF No. 143 at 54: 22-25 ("Deposition of Aleksandra Zgierska, M.D. Pd.D." ("Zgierska Dep.") ("It's well known that alcohol harms the fetus . . . but we don't know what specific level for a specific woman would become harmful."); ECF No. 163 at 52, 67, 76-78 ("Wargowski Dep."); ECF No. 165 at 194: 20-25; 195:2 ("Knox Dep.") (agreeing that "a consensus is still lacking about the effects of low levels of [prenatal alcohol exposure]").

[5] ECF No. 139 at 67: 9-11 ("Kandall Dep.") ("[A]s a general statement these are not drugs you want to take when you're pregnant, but that's about as far as I can go."); id. at 82 ("Cocaine-exposed infants show a very wide spectrum of effects, ranging from a lack of obvious symptoms to neurobehavioral dysfunction . . . . "); ECF No. 155 ¶ 18 ("Kandall Report"); ECF No. 139 at 95:14-22 ("Kandall Dep.") (explaining that when the mother is in a supportive program "those fetuses can do beautifully. They grow normally and there's no problem"); ECF No. 156 ¶ 39 ("Terplan Report") ("[T]here is no conclusive science to support a claim that marijuana use is likely to cause substantial or even minor harm to a developing fetus."); ECF No. 154 ¶ 20 ("Jones Report") (cited study "did not find effects on children with less than heavy prenatal methamphetamine exposure"); ECF No. 156 ¶ 37 ("Terplan Decl.") ("These data do not support statements and suggestions in the medical record that any use is harmful;" "[w]hen those who stopped use during the first or second trimester were contrasted with non-users, birth outcomes were similar"); ECF No. 165 at 216-17 ("Knox Dep.") (agreeing that data suggested a benefit to maternal and newborn health if methamphetamine use is stopped); id. at 246-47 (agreeing that studies are not conclusive between marijuana use and "certain developmental outcomes" and that there are "probably" studies that fail to show an association between marijuana use and "certain outcomes").

[6] ECF No. 155 ¶¶ 9, 13-16, 18 ("Kandall Report"); ECF No. 156 ¶ 36 ("Terplan Report") ("[I]t is hard to tease out whether 'small for gestational age' results from methamphetamine alone, methamphetamine with tobacco, or is a result of the tobacco use alone."); ECF No. 139 at 68 ("Kandall Dep.") ("[A] lot of these [harms] are really lifestyle issues . . . . it may be much more the fact that a mother is not eating well, not getting prenatal care, out on the street using drugs rather than the drug itself, which is what underlies this whole discussion of it's so difficult to ascribe an effect to a particular drug."); ECF No 141 at 94-95 ("Terplan Dep."); id. at 163 ("A lot of the cocaine literature is confounded by maternal smoking. And not a lot of the literature is actually adjusted or well[-]adjusted for that confounder."); ECF No. 142 at 45, 47 ("Jones Dep.") (effects of alcohol depend on many factors); id. at 49 (prenatal marijuana exposure "is a risk factor in a myriad of other risk factors"); Id. at 88; ECF No. 163 at 68 ("Wargowski Dep.") (citing poverty, poor nutrition, and genetic backgrounds as among other factors that contribute to fetal

Experts also agree that while there may be correlation between the use of alcohol or other drugs by a pregnant woman and harm to the child when born, correlation is not causation and the science does not support a linear relationship between use and harm.[7] Similarly, scientific studies do not support the claim that any methamphetamine exposure will result in cognitive delay in children after they are born. ECF No. 156 ¶¶ 35 & 37-38 ("Terplan Report"); ECF No. 154 ¶ 20 ("Jones Report").

Further, it is hard to depict as "compelling" a state interest in protecting the health of a fetus when the Act explicitly does *not* apply to other, potentially more harmful substances, such as tobacco. Tobacco use is demonstrably associated with stillbirth, low birth weight, miscarriage, and pre-term delivery. ECF No. 156 ¶ 39 ("Terplan Report"); ECF No. 155 ¶ 13 ("Kandall Report"); ECF No. 165 at 182: 18-25; 183: 2-4 ("Knox Dep."). Compared to marijuana, the risks of harm from cigarettes have been shown to be more significant and are well established. ECF No. 156 ¶ 39 ("Terplan Report").

---

alcohol syndrome); *id.* at 80-82; ECF No. 165 at 207-10, 229-31 ("Knox Dep.") (agreeing that factors other than substance use can cause preterm labor and premature birth); ECF No. 164 at 63 ("Porte Dep.").

[7] ECF No. 154 ¶ 19 ("Jones Report") ("[B]ased on collective literature, no definitive simple linear cause and effect links can be made with regard to prenatal exposure to marijuana and birth outcomes."); ECF No. 139 at 51: 11-13 ("Kandall Dep.") ("It's not a linear relationship. There are too many biological variabilities."); *id.* at 69; ECF No 141 at 138-39 ("Terplan Dep.") ("I think it's important to distinguish between . . . association and causality, and I don't think any of these studies really are positive like causal correlation between methamphetamine and . . . placenta previa, for example.") ECF No. 142 at 46 ("Jones Dep.") ("[W]e can't just say a linear and cause and effect prenatal alcohol always 100 percent certainty equals a bad birth outcome."); *id.* at 87 ("[Y]ou're making a simple linear cause and effect relationship [between use of drugs or alcohol and harm to the fetus] when it's not that simple."); ECF No. 165 at 209-10, 219-21 ("Knox Dep.") (agreeing that studies show that methamphetamine exposure is "associated with" certain delays and deficits and not the "cause" of); *id.* at 236: 19-23 (agreeing that studies on prenatal exposure to marijuana do not show causation of "stunted growth outcomes"); ECF No. 164 at 63: 18-22 ("Porte Dep.") (noting that many factors influence the risk that children will use marijuana as adolescents or young adults but that there is a 'statistical correlation" between use in pregnancy and later use by "their offspring").

In addition, Plaintiff's designated medical experts on substance use during pregnancy agree that there is "ambiguity and confusion" in the studies of fetal deficits associated with substance use among pregnant women, and the State Defendants' experts do not dispute this opinion. ECF No. 139 at 81 ("Kandall Dep."); ECF No. 163 at 77-78 ("Wargowski Dep.") (noting there is no consensus or definition of significant prenatal alcohol use and whether FASD will result).

State Defendants have not met their burden to show that an asserted but constitutionally unrecognized general interest in fetal health is compelling at all stages of pregnancy or for any level of drug or alcohol exposure potentially covered by the Act.

### C. The Act Cannot Survive Strict Scrutiny Review Because It Is Not Narrowly Tailored

The Act cannot withstand strict scrutiny review for the independent reason that it is not narrowly tailored. Because State Defendants mistakenly contend that strict scrutiny does not apply here, State Br. at 33, they do not argue that the Act is narrowly tailored to a compelling government interest. Instead, State Defendants simply claim that the Act strikes the "appropriate balance" between the rights of the pregnant woman and the state asserted interest in "preventing unborn child abuse." State Defendants cannot satisfy the narrowly tailored requirement, and their motion for summary judgment should be denied. As the Supreme Court has explained, the Fourteenth Amendment "forbids the government to infringe ... 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (citation omitted) (emphasis in original).

The Act casts an enormously wide net and fails the constitutional requirement of narrowly tailoring to achieving a compelling interest. By its own terms, the Act potentially subjects *any person* whose body is carrying a fertilized egg and who uses some undefined amount of alcohol or controlled substance to state jurisdiction, including possible custody and involuntary treatment. This means that a woman whose egg was fertilized hours before her detention, and who would test negative on a pregnancy test, would fall within the ambit of the Act. Further, the Act contains no requirement that any treatment ordered has been proven effective nor that it will not increase risks. The Act requires no scientific studies of the impact of the law itself. The Act undermines maternal health and thereby cannot be narrowly tailored.

State Defendants claim that the "reasonable suspicion" standard outlined in the IA Standards for screening decisions is "consistent" with "conventional child abuse investigations."

State Br. at 34. But unlike "conventional" child abuse cases, under the Act, the state seeks to take the pregnant woman into custody, not merely her child. The nature and scope of the constitutional deprivation here is far greater than a "conventional" child abuse case. In addition, the fact that the UCHIPs petition must set forth "[r]eliable and credible information," State Br. at 35, does not demonstrate narrow tailoring because, regardless of the "credib[ilty]" of the information, none of the words that define the threshold for prohibited conduct—"habitual"; lack of "self-control"; "severe degree"; "substantial risk"'; and "seriously affected or endangered"—are defined in the Act. Indeed, the Act's vague language creates the presumption—which has no basis in fact—that any amount of alcohol use and use of any amount of any controlled substance during pregnancy necessarily harms or poses a significant risk of harm to the fetus. The Act thus lacks identifiable enforcement standards or criteria for assessing whether a woman falls within its ambit. The result is that the Act's theoretical reach is virtually boundless. *Any* woman who is merely suspected by anyone empowered to report suspected unborn child abuse to a government official who uses any amount of alcohol or a controlled substance is at risk of losing her most fundamental rights. This is the opposite of narrow tailoring.

State Defendants also claim that protective custody orders are used in "moderation," State Br. at 39, but that argument is not supported by the text of the Act or the facts of Ms. Loertscher's case. While State Defendant tout that "[o]ne of the goals" of the Children's Code is to "preserve the family," State Defendants fail to mention that, under the Act, "the best interests of the . . . unborn child shall always be of paramount consideration." Wis. Stat. § 48.01(1). Further, while State Defendants contend that there are "numerous options" short of a protective custody order available under the Act, State Br. at 39, Ms. Loertscher's case illustrates how quickly government agents can take severe actions under the Act. Specifically, during her first conversation with Ms. Loertscher, TCHSD social worker Julie Clarkson identified inpatient drug treatment as the only appropriate intervention and informed Ms. Loertscher that if she refused,

TCHSD would likely request to take Ms. Loertscher into temporary physical custody. ( PFOF 121).

In sum, the overwhelming consensus among medical experts and social scientists is that punitive laws like the Act are detrimental to fetal health because they discourage women from communicating with medical providers and from seeking prenatal care, and research indicates that risks associated with the use of controlled substances and alcohol during pregnancy are not unique, quantifiable, necessarily substantial, or certain. (PFOF 16; ECF No. 156 ¶ 52 ("Terplan Report"); ECF No. 160 ¶ 21 ("Zgierska Report"); ECF No. 155 ¶ 31 ("Kandall Report")). A statute seeking to address some kind of problem is only "narrowly tailored," for the purposes of strict scrutiny review, "if it targets and eliminates no more than the exact source of the evil it seeks to remedy." *Entm't Software Ass'n v. Blagojevich,* 469 F.3d 641, 646 (7th Cir. 2006). Because the Act does not advance the interests of maternal, fetal, or child health, but in fact penalizes women who seek prenatal care, all in the name of addressing a problem that has been overstated—the harms wrought by drug and alcohol use by pregnant women—the Act is not narrowly tailored to serve any state interest. The Act certainly is not narrowly tailored to serve the legislature's expressed interest in advancing fetal health, as potential incarceration and imposition of unnecessary and inappropriate treatment work directly contrary to that supposed interest. Because State Defendants have not demonstrated that the Act is narrowly tailored, their motion for summary judgment must be denied.

## IV. STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S PROCEDURAL DUE PROCESS CLAIM

State Defendants claim that the procedures provided by the Act are "fundamentally fair" because the interests advanced by Ms. Loertscher "are on equal footing" with the right to familial integrity "at issue in a child abuse case." State Br. at 43. State Defendants fail to appreciate, however, that considerations involved in a "child" protective removal proceeding are manifestly different from those in an "expectant mother" situation, as anything done purportedly *for* an "unborn child" is done *to* the pregnant woman. Because the intrusions of individual privacy and

deprivations of liberty under the Act are manifestly greater than in the typical child welfare context, the Act must also provide greater procedural protections.

The Act violates a pregnant woman's procedural due process rights because it lacks proper procedural safeguards against wrongful deprivations of liberty. U.S. Const. amend. V ("No person shall… be deprived of life, liberty, or property, without due process of law…"). "[G]overnmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause" must provide proper procedural safeguards against erroneous deprivations. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To determine what process is due, courts employ a three-factor balancing test, which requires the court to assess: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Rebirth Christian Acad. Daycare, Inc. v. Brizzi*, 96 F. Supp. 3d 835, 847 (S.D. Ind. 2015) (quoting *Mathews*, 424 U.S. at 335).

Here, in light of the importance of the constitutional rights infringed by the Act—namely, the right to be free from bodily restraint, the right of privacy, the right to control one's own medical treatment, and the right to family sanctity—the procedural protections afforded women subject to its terms are woefully inadequate. The Act permits pretrial custody and detention on the basis of: (1) probable cause rather than "clear and convincing evidence." *See Foucha v. La.*, 504 U.S. 71, 81 (1992); Wis. Stat. §§ 48.205, 48.207, 48.203 (noting that the state may arrest and detain pregnant women upon belief of "probable cause"); (2) non-neutral fact-finders. Wis. Stat. § 48.19(1)(d)(8); (3) hearings in the absence of counsel; (4) personal opinions rather than hard evidence; (5) medical matters unsupported by scientific evidence; *see* Kenneth A. De Ville & Loretta M. Kopelman, "Fetal Protection in Wisconsin's Revised Child Abuse Law: Right Goal, Wrong Remedy," 27 J.L. Med. & Ethics 332, 337 (1999); and (6) court proceedings that do not adhere to the rules of evidence; Wis. Stat. § 48.299(4)(b) ("Neither common law nor statutory rules of evidence are binding").

Moreover, the potential for erroneous deprivations is high because the Act requires a court to appoint a guardian ad litem ("GAL") to represent the interests of the fertilized egg, embryo, or fetus, Wis. Stat. §§ 48.235(1)(f) & 48.02(19), but does not guarantee counsel for the woman until a fact-finding hearing much later in the process. The Act does not require the GAL or any other state actor to act on behalf of or in the interests of the pregnant woman. In fact, the GAL for the fertilized egg, embryo, or fetus may file a petition against the pregnant woman alleging abuse and neglect of the fertilized egg, embryo, or fetus she is carrying. Wis. Stat. § 48.25(1). The GAL may also take legal action against the pregnant woman in order to challenge her medical decisions and force her into treatment. § 48.235(3)(b)(2). The GAL is required by statute to consider *only* the best interests of the fertilized egg, embryo, or fetus. Wis. Stat. §§ 48.01(1) ("[T]he best interests of the… unborn child shall always be of paramount consideration"); § 48.235(3)(a) (GAL shall be an advocate for "best interests of …unborn child for whom the appointment is made"). By the time a pregnant woman is appointed counsel under the Act, if she even qualifies for the appointment, she may have been held in custody and deprived of physical liberty for up to 30 days, *see* Wis. Stat. § 48.305, and will have faced an initial "plea hearing" at which she must make crucial decisions about defending herself, including invoking or waiving her right to a jury trial and entering a plea on her own behalf—all without the benefit of legal representation, *see* Wis. Stat. § 48.30(1) & (2).

Ms. Loertscher's case illustrates the inadequacy of the procedural protections provided under the Act. When Ms. Loertscher appeared by telephone at the Temporary Physical Custody hearing from the hospital, the state-appointed GAL appeared at the hearing on behalf of her fetus only. (PFOF 142). While Ms. Loertscher was without counsel, the GAL appointed to represent her fetus successfully sought to substitute his decisions concerning Ms. Loertscher's medical treatment for her own. (PFOF 196-97). Later, the GAL initiated contempt proceedings against Ms. Loertscher over treatment issues, resulting in her incarceration in Taylor County Jail. (PFOF 174). The GAL appointed to represent her fetus entered a plea on behalf of the fetus admitting all

the allegations against Ms. Loertscher. (PFOF 196). Yet Ms. Loertscher testified in her own defense. (PFOF 198).

The Act thus creates a litany of opportunities for erroneous deprivations of grave personal liberties. *Mathews*, 424 at 332. While no amount of procedure can cure the substantive due process violations inherent in the statute, the absence of adequate procedures separately violates the Due Process Clause. *Id*.[8] In light of the important constitutional rights involved and the legal representation provided to the woman's fetus (but not the woman), State Defendants have failed to show that the procedural protections provided under the Act are constitutionally adequate. State Defendants are not entitled to summary judgment on Plaintiff's procedural due process claim.

## V.    STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S EQUAL PROTECTION CLAIM

As set forth in Ms. Loertscher's own summary judgment brief, the Act violates the Equal Protection Clause in at least three ways. Pltf. Br. at 46-53. First, the Act deprives women in Wisconsin who are or who may become pregnant of their fundamental constitutional rights without any compelling state interest or narrow tailoring of the policy. A state law that infringes on the fundamental rights of a targeted group of individuals without satisfying this strict scrutiny analysis violates the Equal Protection Clause. *Shapiro v. Thompson,* 394 U.S. 618, 638 (1969), *overruled in part on other grounds*, 415 U.S. 651. Second, the Act specifically targets Wisconsin citizens on the basis of gender because women of reproductive age are targeted for specific prohibitions and sanctions, while men of reproductive age are not. Because the Act is not substantially related to an important state interest, it fails the necessary "intermediate" scrutiny test for gender in violation of the Equal Protection clause. *Hayden v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 577 (7th Cir. 2014) ("Gender is a quasi-suspect class that triggers

---

[8] Moreover, Wisconsin's Mental Health Act, Wis. Stat. § 51.01 *et seq*., provides important procedural protections to individuals threatened with civil commitment that are not available to pregnant women similarly threatened with involuntary confinement and medical treatment under the Act, including the right to immediate appointment of counsel without regard to indigency, and the protections afforded by the requirement that qualified state-appointed experts examine the individual and provide reliable scientific testimony at the hearing to determine whether the statutory requirements have been met.

intermediate scrutiny in the equal protection context."). Third, the Act does not afford pregnant women targeted under the Act the same procedural protections guaranteed by Wisconsin's Mental Health Act to individuals facing involuntary civil commitment. This arbitrary denial is not rationally related to any legitimate governmental interest, and thus the Act cannot even withstand rational basis review. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

State Defendants also move for summary judgment on Ms. Loertscher's Equal Protection claim, arguing that she fails to show that the law treats similarly situated persons differently. State Br. at 54-55. State Defendants claim that the law targets only "expectant mothers who habitually lack self-control" in the use of alcohol or drugs and that other groups, such as men or non-pregnant women, are not "similarly situated" because they cannot expose a fetus to drugs or alcohol. State Br. at 56. State Defendants misapprehend the nature of an Equal Protection analysis.

Contrary to State Defendants' assertions, the law does not target only pregnant women who "habitually lack self-control" (whatever that may mean) in the use of alcohol or controlled substances. Instead the Act targets all women who may become pregnant. Women of reproductive age must monitor their use of alcohol and controlled substances (including legal controlled substances) in order to avoid retroactive classification as "habitually lacking in self-control" should they become pregnant or subsequently discover that they are already pregnant. Ms. Loertscher's case illustrates that this risk is real: state actors cited the use of drugs and alcohol before she knew she was pregnant as part of the basis for imposing sanctions on her. (PFOF 234).[9]

Wisconsin men, who lack the capacity to become pregnant, face no similar restriction on their lives and health. Wisconsin law permits alcohol use by adults as well as controlled

---

[9] Defendants argue that "[o]nly individuals with a confirmed pregnancy could be subject to the Act," Br. at 57, and assert that "non-pregnant women are no more subject to the Act than men are." Br. at 60. Because the Act carries severe consequences for past behavior, however, individuals who may become subject to the specific proceedings under the Act in the future for current behavior may be "subject" to the Act for Equal Protection purposes.

substances other than those enumerated in Schedule I. Wis. Stat. § 961.01 *et seq*. Thus, the Act exposes all Wisconsin women capable of becoming pregnant to potential punishment for engaging in legal behavior, while there is no risk of punishment for men wishing to engage in the same behavior. Nor may a man be subject to mandatory testing following his consumption of alcoholic beverages or controlled substances based on the suspicion by a health care worker that he habitually lacks self-control. Wis. Stat. § 146.0255(2).

This difference is the essence of unequal treatment of similarly situated individuals. State Defendants claim that men cannot become pregnant, so they are not similarly situated, but the Act also impacts women that are not currently pregnant. The Act therefore forces non-pregnant men and women of reproductive age to behave differently.

Because the Act treats similarly situated men and women differently, it must be evaluated on the basis of intermediate scrutiny: the state has the burden to show an "exceedingly persuasive justification" for the classification, which may be met only by demonstrating both that the governmental objective is "important" and that that the discriminatory means employed are "substantially related to the achievement of those objectives." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). As demonstrated in Ms. Loertscher's moving brief, the Act does not advance any purported state interest in maternal, fetal, or child health, because threats of arrest, detention, and loss of parental rights are likely to interfere with the ability to approach medical personnel with candor about private matters during pregnancy, or even the ability to seek health care at all. Pltf. Br. at 43-44.

State Defendants argue that "[l]egal classifications based on pregnancy do not constitute gender classifications," citing *Geduldig v. Aiello*, 417 U.S. 484 (1974). The *Geduldig* court held that pregnant women unable to work due to pregnancy were not entitled to affirmative recovery under a state disability insurance scheme, remarking that "lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis." *Id*. at 497. *Geduldig* does not apply here. The "legislation" permitted in *Geduldig* involved affirmative employment-related "disability" funding, while the Act at issue here

involves severe restrictions on liberty imposed as a consequence of having the capacity for pregnancy or becoming pregnant. Statutes that burden fundamental constitutional rights require a higher level of scrutiny than mere economic statutes. *United States v. Carolene Prod. Co.*, 304 U.S. 144, 153 n.4 (1938). Furthermore, shortly after the Supreme Court applied the reasoning in *Geduldig* to a claim against a private employer under Title VII of the Civil Rights Act, *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), Congress expressly overruled *Gilbert* through the Pregnancy Discrimination Act ("PDA"), which provided that discrimination based on pregnancy constituted sex discrimination. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983). Although *Geduldig* concerned the Equal Protection Clause rather than Title VII, the Supreme Court has not revisited the issue, and courts in recent years have suggested that pregnancy-based discrimination, particularly in areas other than disability benefits, raises issues of gender classification. *See, e.g.*, *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 548 (9th Cir. 2004) (recognizing the holding in *Geduldig* that the denial of disability benefits for pregnant persons was not a gender classification but noting that "*imposing* a disability on pregnant women might nevertheless amount to sex discrimination under the equal protection clause").

In any case, the Act challenged here has consequences for women who *may become* pregnant, unlike statutes that solely impact pregnant women such as disability benefit schemes. Heightened scrutiny is appropriate, and the Act fails to meet that standard. At minimum, State Defendants have failed to carry their burden that the standard has been met.

## VI. STATE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON MS. LOERTSCHER'S FOURTH AMENDMENT CLAIM

Ms. Loertscher's opening brief described how the Act violated a pregnant woman's reasonable expectation of privacy and the Fourth Amendment by permitting non-consensual disclosure of medical information to state law enforcement officials. Like all patients, pregnant women enjoy a reasonable expectation of privacy when seeking medical advice and undergoing medical tests at a hospital or the office of a health care provider. *See Ferguson v. City of Charleston,* 532 U.S. 67, 78 (2001); *see also Denius v. Dunlap*, 209 F.3d 944, 956 (7th Cir.

2000) (recognizing a "substantial" privacy right in the confidentiality of medical information). It is reasonable for patients to expect that the results of their medical tests will not be shared with nonmedical personnel without their consent. *Id.* Similarly, when state actors obtain a patient's test results without her consent in order to coerce her into unwanted treatment, those actors invade the patient's privacy, in violation of the Fourth Amendment. *Id.* at 78, 84; *see also Green v. Berge*, 354 F.3d 675 (7th Cir. 2004). A state's interest in the health of fetuses cannot justify a departure from the rule that a nonconsensual search is unconstitutional if not authorized by a valid warrant. *Ferguson*, 532 U.S. at 70.

State Defendants concede that the Act permits disclosure of a pregnant woman's private medical records to law enforcement officials without her consent. State Br. at 70 (noting that the "Wisconsin statutes permit nonconsensual disclosure of a pregnant woman's medical records"). As State Defendants note, "[p]ursuant to statute, reports of unborn child abuse may be disclosed to certain specified recipients," which include "courts, law enforcement, and prosecutors in the event of an investigation or prosecution." State Br. at 68, citing Wis. Stat. § 48.981(7)(a). State Defendants admit that under the statute, "medical records 'shall be released . . . without informed consent'" in certain circumstances, including to "a sheriff or police department, or a district attorney for purposes of investigation of . . . suspected unborn child abuse." State Br. at 68, citing Wis. Stat. § 146.82(2)(a)11. As State Defendants note, the "health care provider may release information by initiating contact with an agency, sheriff or police department, or district attorney without receiving a request for release of the information." *Id.*

State Defendants therefore acknowledge the statutory scheme described in Ms. Loertscher's opening brief: The Act constructs a framework whereby medical providers may disclose a pregnant woman's confidential medical information to law enforcement and other state agencies if there is an indication of substance or alcohol use. Those state agencies may, in turn, use that information to enforce the broader statutory scheme, which may include forced inpatient treatment or detention.

State Defendants primarily defend against Ms. Loertscher's Fourth Amendment claims on two grounds. First, they argue that the statute meets the standards described in *Whalen v. Roe*, 429 U.S. 589 (1977), and *Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 715 F.3d 631 (7th Cir. 2013). Second, State Defendants assert that the nonconsensual disclosure of medical records only occurs "where necessary to protect her unborn child from prenatal drug exposure." State Br. at 70. Neither argument has merit.

First, the statutes at issue in both *Whalen* and *Big Ridge* involved disclosure of medical records to state or federal health officials, not to unrelated law enforcement officials. In *Whalen*, a New York statute required submission of certain patient medical prescription information to health officials, who stored the information in a protected database. 429 U.S. at 593-94. The Court recognized that "disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice" and held that "requiring disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy." *Id*. at 602. Similarly, *Big Ridge* involved an interpretation of a federal regulation that permitted federal Mine Safety and Health Administration (MSHA) officials to review employee medical and personnel records in addition to injury and illness reports in order to verify that the mines had not been under-reporting injuries or illnesses. 715 F.3d at 633-34. The court acknowledged at least a potential Fourth Amendment interest in personal medical records but, quoting *Whalen*, held that, for "records in third-party custody . . . disclosure to representatives of the State having responsibility for the health of the community , does not automatically amount to an impermissible invasion of privacy." *Id*. at 649.

Here, by contrast, the issue is not disclosure to state health officials for the purpose of protecting public health. Rather, the statute permits or requires disclosure to state law enforcement officials for the purposes of potential proceedings against the pregnant woman. The Supreme Court analyzed an analogous program in *Ferguson*, 532 U.S. 67. *Ferguson* struck down a state hospital policy of searching pregnant women for evidence of drug use through drug

tests, and if positive, handing that information over to law enforcement to facilitate their arrest. *Id.* at 70-71. The Court contrasted the program with previous cases involving the unconsented provision of drug test results to state officials, noting that "the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment." *Id.* at 80. The Court rejected the hospital's argument that the ultimate purpose of the program was to protect the health of the mother and child and that the involvement of law enforcement was merely a means to the end of substance abuse treatment. *Id.* at 81-82. The Court acknowledged that "[a]s respondents have repeatedly insisted, their motive was benign rather than punitive," but held that "such a motive . . .cannot justify a departure from Fourth Amendment protections." *Id.* at 85.

Here, too, the Act provides for the unconsented provision of private medical records to state law enforcement officials, not merely health officials, for the purpose of coercing women into what the state views as appropriate treatment programs. Thus the Act resembles the policy in *Ferguson* more than the health-related record disclosure in *Whalen* and *Big Ridge*. Moreover, State Defendants' assertion that the "nonconsensual disclosure of medical records" only occurs "where necessary to protect her unborn child from prenatal drug exposure," State Br. at 70, cannot justify the departure from Fourth Amendment protections. Whatever its ultimate intentions, the Act violates a pregnant woman's Fourth Amendment rights.

Finally, State Defendants argue that Mayo Clinic is a third party, not a state actor, and therefore "information revealed" to Mayo by Ms. Loertscher and later "conveyed" to the government is not protected from disclosure. State Br. at 70-71. This argument fails because the individual at Mayo who obtains medical information for the purpose of disclosure to state officials under the Act does so under color of state law and is thus subject to the Fourth Amendment. The Act allows "[a]ny hospital employee who provides healthcare, social worker or intake worker…[to] refer an infant or an expectant mother of an unborn child…to a physician for testing of the infant's bodily fluids of the infant or expectant mother for controlled substances or controlled substance analogs." Wis. Stat. § 146.0255(2). As State Defendants argue, those

medical records then "shall be released" by those hospital employees to state law enforcement officials in case of "suspected unborn child abuse." State Br. at 68-69 (citing Wis. Stat. § 146.82(2)(a)(11). When a hospital official acts under color of state law to obtain confidential medical information and then turn it over to state officials, Fourth Amendment protections apply. *See Mitchell v. St. Elizabeth Hospital*, 119 Fed.Appx. 1 (7th Cir. 2004) ("A non-governmental defendant will be found to have acted under color of state law where there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself") (internal citations omitted).[10]

## VII. THE *ROOKER-FELDMAN* DOCTRINE DOES NOT APPLY BECAUSE MS. LOERTSCHER DOES NOT SEEK REVIEW OF A STATE COURT JUDGMENT

State Defendants next argue that the Rooker-Feldman doctrine bars Ms. Loertscher's as-applied challenge, but that doctrine has no bearing here. As State Defendants note, the Rooker Feldman doctrine bars lower federal courts from reviewing state court decisions, because only the Supreme Court has jurisdiction to do so. State Br. at 72 (citing *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000)). State Defendants note that several state court proceedings were involved in enforcing the Act against Ms. Loertscher, including a temporary physical custody hearing and a contempt hearing. The Rooker-Feldman doctrine, however, only applies to effective review of state court proceedings themselves, not all claims involving those proceedings in some way. Here, Ms. Loertscher does not seek reversal of the state court decisions, and the doctrine cannot apply.

The Supreme Court has explained that "*Rooker* and *Feldman* exhibit the limited circumstances in which this Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States district court from exercising subject-matter jurisdiction," noting that, in both cases, the plaintiffs had "called upon the District Court to overturn an injurious state-court judgment." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280,

---

[10] Defendants cite *Big Ridge* for the proposition that medical records given to a third party do not trigger the same Fourth Amendment protections when later obtained by the government. Br. at 71. The policy at issue in *Big Ridge*, however, did not involve the third party obtaining the medical records in the first place under color of state law.

291-92 (2005). The Court stressed that federal jurisdiction exists when "a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party." *Id*. at 293 (citing *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)). As the Seventh Circuit has explained, "if the alleged injury is distinct from the state court judgment and not inextricably intertwined with it, the Rooker–Feldman doctrine does not apply." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 555 (7th Cir. 1999). The pivotal inquiry is "whether the federal plaintiff seeks to set aside a state court judgment or whether he is, in fact, presenting an independent claim." *Id*. (quoting *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 510 (7th Cir.1996)). The phrase "inextricably intertwined" may be "somewhat metaphysical," but  the "crucial point is whether the district court is in essence being called upon to review the state-court decision." *Taylor v. Fed. Nat. Mortg. Ass'n*, 374 F.3d 529, 533 (7th Cir. 2004) (internal quotation marks omitted).

Here, Ms. Loertscher does not seek review of any state court decisions. She is not asking for a reversal of a state court finding that she habitually lacked self-control or that she was in contempt of a prior court order, or any other finding. Instead, she seeks redress for the constitutional violations visited upon her under the Act. Those violations, including the deprivation of her liberty, began prior to any of the state court proceedings, continued outside of the hearings, and continued after those hearings had concluded. (PFOF 112, 114-16, 119-121, 183-86, 192-93, 223, 227-28); *see, e.g.*, *Ctrs., Inc. v. Town of Brookfield, Wis.*, 148 F.3d 699, 702 (7th Cir. 1998) (distinguishing injury caused by a state court judgment itself from "a federal claim alleging a prior injury that a state court failed to remedy"). The *Rooker-Feldman* doctrine has no bearing here.

## VIII.   STATE DEFENDANTS' LATEST MOOTNESS ARGUMENT SHOULD BE DISMISSED BECAUSE THE ALLEGED POLICY CHANGES DO NOT MAKE FUTURE CONSTITUTIONAL VIOLATIONS IMPOSSIBLE OR EVEN UNLIKELY

Finally, State Defendants once again argue that Ms. Loertscher's lawsuit has been rendered moot, this time by the withdrawal of the administrative finding of unborn child

maltreatment and an alleged change in policy regarding "initial assessment" standards. State Br. at 75-76. State Defendants previously moved three times for dismissal of the complaint on the basis of mootness, and this Court rejected each challenge. ECF Nos. 41 & 42, 48 & 49, 61, 68 & 69, 118. This Court has specifically rejected the argument that the termination of state proceedings rendered the case moot. ECF. No. 61 at 19. In rejecting the State's third motion for mootness, the court reiterated that "Loertscher's case was capable of repetition yet evading review because other women will continue to be subject to Act 292" and held that the state's "conduct is still capable of repetition yet evading review, the issues in this case are still very much alive." ECF No. 118 at 3-4. The withdrawal of the administrative finding of unborn child maltreatment presents the same issue again and has no bearing on mootness.

Nor does the State's apparent revision of its initial assessment standards change the inquiry. Even if the policies made certain unconstitutional consequences of the Act less likely to occur, something Loertscher does not concede, a state's internal change in policies cannot render a constitutional challenge moot because there is no guarantee the state could not simply change the policy back in the future. The Supreme Court has admonished that "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," for "[i]f it did, the courts would be compelled to leave the defendant ... free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks and punctuation omitted). A case may only be rendered moot if "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," and the party asserting mootness bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Id*. (internal quotation marks and punctuation omitted). State Defendants have not met that burden here. There has been no showing that the voluntary change in standards makes it "absolutely clear" that the standards cannot be changed again in the future, nor have State Defendants shown how the change in standards would prevent recurrence of all of the constitutional issues raised by Ms. Loertscher.

In fact, the change would not necessarily preclude the constitutional injury Ms. Loertscher claims. State Defendants claim that the state's initial assessment standards previously permitted a determination of "substantiated" or "unsubstantiated" for unborn child abuse allegations, while the revised standards simply permit a determination of "Services Needed" or "Services Not Needed." State Br. at 9. There is no guarantee that an administrative determination of "Services Needed" could not prompt many of the same deprivations of liberty under the Act, or indeed, the same types of injury that happened to Ms. Loertscher. For example, if a pregnant woman faces a determination of "Services Needed" but refuses to accede to those "Services" chosen by the state, she may be mandatorily confined in an in-patient center or other facility and jailed if she refuses. The change in nomenclature effected by the State for one part of the procedures under the Act does not render Ms. Loertscher's case moot.

## CONCLUSION

For the reasons above and set forth in Ms. Loertscher's own summary judgment papers, State Defendants' motion for summary judgment should be denied. Ms. Loertscher also respectfully requests that her own motion for summary judgment against the State Defendants be granted.

Dated this 1st day of December, 2016.　　　　　　　Respectfully submitted,

**PERKINS COIE, LLP**

By:　　*/s/ Jeff J. Bowen*
　　　　Jeff J. Bowen
　　　　JBowen@perkinscoie.com
　　　　David J. Harth
　　　　dharth@perkinscoie.com
　　　　Freya K. Bowen
　　　　fbowen@perkinscoie.com
　　　　Joshua L. Kaul
　　　　jkaul@perkinscoie.com
　　　　David R. Pekarek Krohn
　　　　dpekarekkrohn@perkinscoie.com
　　　　Jesse J. Bair
　　　　JBair@perkinscoie.com

1 East Main Street, Suite 201
Madison, WI 53703
Telephone: (608) 663-7460
Facsimile: (608) 663-7499

**NATIONAL ADVOCATES FOR
PREGNANT WOMEN**
Lynn M. Paltrow
lmp@advocatesforpregnantwomen.org
Nancy Rosenbloom
nlr@advocatesforpregnantwomen.org
875 Sixth Avenue, Suite 1807
New York, NY 10001
Telephone: (212) 255-9252
Facsimile: (212) 225-9253

**REPRODUCTIVE JUSTICE CLINIC**
Sarah E. Burns
sarah.burns@nyu.edu
Sarah Samuels Wheeler (*admission pending*)
Alyson Zureick
Washington Square Legal Services, Inc.
NYU School of Law
245 Sullivan Street, 5th Floor
New York, New York 10012
Telephone: (212) 998-6464
Facsimile: (212) 995-4031

*Attorneys for the Plaintiff,
        Tamara Loertscher*