# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

**TAMARA M. LOERTSCHER**,

        Plaintiff,

                                  Case No. 14-cv-870

    v.

**BRAD D. SCHIMEL**, et al.,

        Defendants.

## PLAINTIFF'S BRIEF IN OPPOSITION TO TAYLOR COUNTY'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

    I.     PRE- AND POST-PASSAGE NOTICE OF CONSTITUTIONAL
         DANGER .................................................................................................. 3

    II.    WISCONSIN COUNTIES ARE RESPONSIBLE FOR
         IMPLEMENTATION OF THE ACT ...................................................... 4

    III.   MS. LOERTSCHER'S EXPERIENCE UNDER THE ACT ................. 5

    IV.   OTHER UNBORN CHILD IN NEED OF PROTECTION
         PROCEEDINGS IN TAYLOR COUNTY ........................................... 12

LEGAL STANDARD......................................................................................... 12

ARGUMENT ..................................................................................................... 13

    I.     TAYLOR COUNTY MAY BE HELD LIABLE FOR ITS ACTIONS
         TAKEN AGAINST MS. LOERTSCHER UNDER ACT 292 ............ 13

        A.   Case Law Cited by Taylor County Misrepresents Prior Cases that
            Distinguish Between Compulsory and Discretionary Municipal
            Actions Taken Pursuant to State Laws .................................... 14

        B.   The Relevant Terms of Act 292 are Discretionary, Not
            Compulsory.............................................................................. 16

        C.   The Record Suggests Taylor County Operated Pursuant to a
            Policy, Practice or Custom....................................................... 19

            1.     Taylor County has a policy of exercising its discretion to
                   select extreme measures, such as mandatory inpatient
                   confinement and maltreatment determinations........................... 20

            2.     Evidence of multiple Taylor County employees
                   participating in Ms. Loertscher's case raises an inference
                   that a Taylor County custom, practice or procedure was
                   involved in the violation of Ms. Loertscher's constitutional
                   rights .................................................................................... 22

            3.     Evidence also suggests that Taylor County relied on
                   procedures previously developed for investigation into
                   potential child abuse ............................................................. 24

        D.   In the Alternative, Taylor County Deliberately Refused to Develop
            Reasonable Policies, Training, or Procedural Safeguards,
            Demonstrating Deliberate Indifference to the Constitutional Rights
            of "Expectant Mothers" .......................................................... 24

        E.   The Actions of Taylor County Officials Violated Plaintiff's
            Constitutional Rights ............................................................... 27

        F.   Taylor County is Liable For Violating Ms. Loertscher's Right to
            Refuse Forced Medical Treatment............................................ 28

        G.   Taylor County is Liable for Violating Ms. Loertscher's Right to
            Equal Protection of the Law Under the Fourteenth Amendments........... 29

        H.   The Rooker-Feldman Doctrine Does Not Apply ..................................... 30

**TABLE OF CONTENTS**
**(continued)**

Page

II.    MS. LOERTSCHER'S FACIAL CHALLENGE TO ACT 292 DOES NOT DEFEAT MONELL LIABILITY AS A MATTER OF LAW ................... 31

III.    TAYLOR COUNTY IS NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY ............................................................................. 32

CONCLUSION ..................................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allen v. Wright,*
    468 U.S. 737 (1984)..................................................................32

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...................................................12, 13, 20

*Bethesda Lutheran Homes & Servs., Inc. v. Leean,*
    154 F.3d 716 (7th Cir. 1998) ......................................................16

*Bowden v. Town of Speedway,*
    539 F. Supp. 2d 1092 (S.D. Ind. 2008) ......................................25

*Bunn v. Khoury Enters., Inc.,*
    753 F.3d 676 (7th Cir. 2014) ......................................................13

*Camara v. Mun. Court of San Francisco,*
    387 U.S. 523 (1967)....................................................................29

*Centres, Inc. v. Town of Brookfield, Wis.,*
    148 F.3d 699 (7th Cir. 1998) ......................................................30

*City of Canton v. Harris,*
    489 U.S. 378 (1989)................................................................2, 25

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983)......................................................................32

*Cooper v. Dillon,*
    403 F.3d 1208 (11th Cir. 2005) ..................................................16

*Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230,*
    991 F.2d 1316 (7th Cir. 1993) .........................................25, 26, 27

*Cruzan v. Dir., Missouri Dept. of Health,*
    497 U.S. 261 (1990)....................................................................28

*Frake v. City of Chi.,*
    210 F.3d 779 (7th Cir. 2000) ......................................................26

*Garner v. Memphis Police Dep't,*
    8 F.3d 358 (6th Cir. 1993) ..........................................................16

*Gibbs v. Lomas,*
    755 F.3d 529 (7th Cir. 2014) ......................................................12

# TABLE OF AUTHORITIES

**Page(s)**

*Kamilewicz v. Bank of Boston Corp.*,
    92 F.3d 506 (7th Cir.1996) ...................................................................................30

*Karlin v. Foust*,
    188 F.3d 446 (7th Cir. 1999) ................................................................................31

*Larimer v. Dayton Hudson Corp.*,
    137 F.3d 497 (7th Cir. 1998) ................................................................................13

*Long v. Shorebank Development Corp.*,
    182 F.3d 548 (7th Cir. 1999) ................................................................................30

*Monell v. Dep't of Social Servs.*,
    436 U.S. 658 (1978).......................................................................................... passim

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977).........................................................................................32, 33

*Murray v. City of Chicago*,
    634 F.2d 365 (7th Cir. 1980) ................................................................................27

*N.N. ex rel. S.S. v. Madison Metropolitan School District*,
    670 F. Supp. 2d 927 (W.D. Wis. 2009) ...........................................................14, 31

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986) (plurality opinion) ...............................................................27

*Snyder v. King*,
    745 F.3d 242 (7th Cir. 2014) .....................................................................16, 31, 32

*Sornberger v. City of Knoxville*,
    434 F.3d 1006 (7th Cir. 2006) ..............................................................................25

*State ex rel. Angela M.W. v. Kruzicki*,
    561 N.W.2d 729 (Wis. 1997).................................................................................4

*Stem v. Ahearn*,
    908 F.2d 1 (5th Cir. 1990) ....................................................................................33

*Teesdale v. City of Chicago*,
    690 F.3d 829 (7th Cir. 2012) ................................................................................27

*Thomas v. Cook Cty. Sheriff's Dep't*,
    604 F.3d 293 (7th Cir. 2009) ................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

*Union Pac. Ry. Co. v. Botsford*,
    141 U.S. 250 .................................................................................................27

*Vives v. City of New York*,
    524 F.3d 346 (2d Cir. 2008) ...........................................................................16

*Warsco v. Preferred Tech. Grp.*,
    258 F.3d 557 (7th Cir. 2001) ..........................................................................20

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ...................................................................................28, 29

STATUTES

42 U.S.C. § 1983 .............................................................................................. passim

Wis. Stat. § 48.01(1)(a) ..........................................................................................25

Wis. Stat. § 48.01 *et seq.* .........................................................................................3

Wis. Stat. § 48.02(19) ...............................................................................................3

Wis. Stat. § 48.59(1) .........................................................................................17, 32

Wis. Stat. § 48.067 ..................................................................................................17

Wis. Stat. §§ 48.78(2)(a) and 48.981(7)(a) ...........................................................12

Wis. Stat. § 48.133 ................................................................................................3, 4

Wis Stat. § 48.193 ...................................................................................................17

Wis. Stat. § 48.245(4) ..............................................................................................17

Wis. Stat. § 48.981(c)(1)(a) .....................................................................................17

Wis. Stat. § 51.05 et seq. .........................................................................................26

Wis. Stat. § 59.51(2), and ........................................................................................33

Wis. Stat. § 67.05 .....................................................................................................33

Wis. Stat. § 785.04 ....................................................................................................9

OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ................................................................................................12

Plaintiff Tamara M. Loertscher hereby submits this Memorandum of Law in Opposition to Taylor County's Motion for Summary Judgment. The facts underlying this Opposition are fully set forth in Plaintiff's Proposed Findings of Fact in Support of her Motion for Summary Judgment filed November 10, 2016 ("PFOF"), Plaintiff's Response to Taylor County's Proposed Findings of Fact ("PRTCPFOF"), and Plaintiff's Supplemental Proposed Findings of Fact ("PSPFOF").

## INTRODUCTION

This Court should deny Taylor County's Motion for Summary Judgment because there are material factual disputes regarding the existence of Taylor County's policy, practice, and custom regarding implementation of the Act, and whether it resulted in constitutional injury to Plaintiff Tamara Loertscher.

Ms. Loertscher filed this action against Taylor County to seek redress for violations of her federal constitutional rights by Taylor County personnel under color of state law. The Act subjects Wisconsin women to detention, coerced medical treatment, and involuntary commitment, among other constitutional deprivations, on the basis of vague terms and standards that fail to provide notice to Wisconsin women of what conduct might be sanctionable and that permit arbitrary enforcement by local officials, social workers and other individuals empowered under the Act. As described below, Taylor County officials used that discretion in a concerted effort to impose the harshest, most draconian consequences on Ms. Loertscher, causing her significant injury. Furthermore, the Act burdens fundamental substantive due process rights of Wisconsin women, including the right to freedom of movement and physical liberty, the right to be free from coerced medical treatment, the right to reproductive freedom and to choose to have an abortion, and the right to make intimate decisions about one's family and health. Because the statute neither serves a compelling state interest nor is narrowly tailored to serve any such interest, the Act is unconstitutional on its face. Nonetheless, the manner in which Taylor County officials used their discretion to implement the Act caused additional violations of Ms.

Loertscher's constitutional rights that need not have happened. Under those conditions, county officials may be held liable under 42 U.S.C. § 1983 for those constitutional injuries.

Taylor County claims that its officials acted without any policy, practice, or custom, but the record raises genuine disputes of material fact about this assertion. First, while information about implementation of the Act in other cases has been difficult to come by, given the assertions of confidentially raised by Taylor County in discovery, the only other proceeding Taylor County has described suggests that its officials have a custom and practice of using their discretion to impose more severe sanctions that cause greater constitutional injury. Second, at every stage of Ms. Loertscher's own proceeding, Taylor County officials acted promptly and deliberately, using their discretion to ensure that more severe sanctions were imposed. Third, the relevant county officials met frequently and coordinated their efforts with respect to Ms. Loertscher, suggesting they were acting according to policy. Fourth, evidence suggests that Taylor County continued to act according to the policy, practice and custom it had developed with respect to children, simply applying that same policy to the wholly inappropriate case of a fetus within a pregnant woman.

Alternatively, if Taylor County is correct that it never developed any kind of policy regarding the Act despite ample warning of the obvious constitutional violations visited upon women who are or who may become pregnant, the county demonstrated deliberate indifference to those constitutional violations. Given that the Act forces adult women into secret juvenile court proceedings where they may face involuntary commitment or coerced medical treatment, and where a fetus may be appointed a guardian ad litem, the failure to develop procedures demonstrates deliberate indifference to the constitutional rights of pregnant women. Under controlling case law, that is sufficient to impose liability on Taylor County for those constitutional violations. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 388, 390 (1989). At a minimum, there is sufficient record evidence to create triable issues of fact as to whether Taylor County maintained a policy, practice, or custom of deliberate indifference in its enforcement of the Act that resulted in the violation of Ms. Loertscher's constitutional rights.

Taylor County's other arguments also either fail to demonstrate the absence of a dispute of material fact or cannot be maintained as a matter of law. Thus, the county asserts that its officials did not violate Ms. Loertscher's rights because her confinement in jail and other injuries resulted from her own refusal to cooperate rather than the actions of county officials. In fact, the record contains ample evidence that actions by Taylor County officials resulted in violations of her constitutional rights. Taylor County asserts that the *Rooker-Feldman* doctrine bars Ms. Loertscher from reviewing a state court decision, but she is not seeking review of any court decision; rather, she seeks redress for constitutional violations that commenced before the state court proceedings and continued thereafter. Similarly, despite the county's assertions, Ms. Loertscher's facial challenge does not undermine her claim for municipal liability because the statute is unconstitutionally vague, permitting county officials the discretion to engage in arbitrary constitutional deprivations. Finally, Taylor County is not entitled to Eleventh Amendment immunity in part because its local taxes and local control mean it does not function as an "arm of the state."

Accordingly, this Court should deny Taylor County's Motion for Summary Judgment.

## STATEMENT OF FACTS

## I.    PRE- AND POST-PASSAGE NOTICE OF CONSTITUTIONAL DANGER

Originally passed as 1997 Wisconsin Act 292, and codified at Wis. Stat. § 48.01 *et seq.*, the Act gives juvenile courts exclusive original jurisdiction over fertilized eggs, embryos, and fetuses—from the moment of fertilization—under the State's child abuse and neglect code, whenever "habitual" lack of "self-control" regarding alcohol or substance use is alleged against a pregnant woman. At the same time it extends jurisdiction under the Children's Code over pregnant women. *See* Wis. Stat. § 48.133 (providing for juvenile court jurisdiction over the "adult expectant mother" of an "unborn child"); Wis. Stat. § 48.02(19) ("'Unborn child' means a human being from the time of fertilization to the time of birth.").

As set forth in Ms. Loertscher's own motion for summary judgment against the State Defendants, ECF No. 177, the Act was passed in direct response to the Wisconsin Supreme

Court's decision in *State ex rel. Angela M.W. v. Kruzicki*, 561 N.W.2d 729 (Wis. 1997), which held that the Wisconsin Children's Code did not authorize a juvenile court to exercise jurisdiction over an adult pregnant woman pursuant to a proceeding regarding a "child alleged to be in need of protection or services," also known as a "CHIPS" proceeding. (Plaintiff's Supplemental Proposed Findings of Fact ("PSPFOF") 8). The legislature then passed the Act to authorize jurisdiction that the state supreme court had found unauthorized under existing statutes. (PSPFOF 10). Prior to enactment, the Wisconsin Legislative Council warned the legislature that the constitutionality of the Act would be "highly doubtful" if extended to all stages of pregnancy, and the Act faced opposition from state and local health agencies. (PSPFOF 11, 13-24). Statements from legislators also warned that the Act may be unconstitutional. (PSPFOF 25-28). Nonetheless, the legislature passed the Act, which became effective in June 1998. (PSPFOF 29).

## II. WISCONSIN COUNTIES ARE RESPONSIBLE FOR IMPLEMENTATION OF THE ACT

The Act grants juvenile courts jurisdiction over "an unborn child" and the "adult expectant mother" when that expectant mother:

> habitually lacks self-control in the use of alcohol beverages, controlled substances or controlled substance analogs, exhibited to a severe degree, to the extent that there is a substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered unless the expectant mother receives prompt and adequate treatment for that habitual lack of self-control.

Wis. Stat. § 48.133. (PSPFOF 42). The terms "habitually lacks self-control," "severe degree," "substantial risk," and "seriously affected or endangered" are not defined in the Act or the 1998 legislative brief. (PSPFOF 44, 46, 48). Enforcers of the Act are therefore left to develop their own policies regarding how to interpret and implement these terms. (PSPFOF 45, 57, 59). The Child Protective Services' 2007 Access and Initial Assessment Standards ("CPS Standards"), which are promulgated by DCF, also failed to provide definitions of those terms. (PSPFOF 50-51).

Child welfare and child protective services laws are administered by the counties. (PSPFOF 53). Counties have discretion in the implementation of Act 292 as long as they comport with the requirements of the law. (PSPFOF 54). Day-to-day decisions and actions taken to implement child protective services are the responsibility of county agency staff. (PSPFOF 65). When a case of suspected unborn child abuse is reported, local law enforcement officials or child protection workers must investigate, but all further steps taken against a pregnant woman under the Act are at the discretion of the counties and their agents. (PSPFOF 58).

## III. MS. LOERTSCHER'S EXPERIENCE UNDER THE ACT

In August 2014, Plaintiff Tamara Loertscher was a 29 year-old pregnant resident of Taylor County, Wisconsin. (PSPFOF 72). During her teens, Ms. Loertscher had radiation treatment that left her without a functioning thyroid. (PSPFOF 73). Ms. Loertscher suffers from severe hypothyroidism, and cannot produce thyroid hormones without medication. (PSPFOF 74); ECF No. 156 ¶¶ 23, 26, 28, & 29 (Terplan Report). She understood that hypothyroidism would make it difficult or impossible for her to become pregnant. (PSPFOF 75); ECF No. 156 ¶ 27 (Terplan Report). Hypothyroidism can disrupt ovulation and is associated with irregular menstrual periods, miscarriage, and infertility. (PSPFOF 76); ECF No. 156 ¶¶ 25 & 27 (Terplan Report). Ms. Loertscher also has a history of depression, which is also a symptom of hypothyroidism. (PSPFOF 77-78); ECF No. 156 ¶ 26 (Terplan Report). Without her thyroid medication, Ms. Loertscher experiences severe symptoms of depression and fatigue. (PSPFOF 79); ECF No. 156 ¶ 26 (Terplan Report).

Ms. Loertscher previously worked as a certified nurse's aide but became unemployed in February 2014. (PSPFOF 80-81). When Ms. Loertscher became unemployed, she was no longer able to pay for her thyroid medication, and her attempt to apply for BadgerCare, Wisconsin's version of Medicaid, was unsuccessful due to the long waiting list. (PSPFOF 82-83). Accordingly, she went without any medical treatment for her hypothyroidism beginning in February 2014, and she sank into a deep depression. (PSPFOF 84). During this time period, Ms. Loertscher began to use methamphetamine about two or three times per week to help her get out

of bed in the morning. (PSPFOF 85). Ms. Loertscher had no history of drug dependency or addiction and had rarely consumed alcohol over the previous year. (PSPFOF 86, 90).

In late July 2014, Ms. Loertscher believed she may be pregnant based on home pregnancy test results and went to the Taylor County Human Services Department ("TCHSD") for help. (PSPFOF 91, 94-96). TCHSD personnel advised Ms. Loertscher to present herself to the Eau Claire Mayo Clinic Hospital ("Mayo Clinic") emergency room that day, and she did so. (PSPFOF 98).

At the emergency room, Ms. Loertscher explained to medical personnel that she needed medical and psychiatric care and that she wanted to confirm her pregnancy. (PSPFOF 99). At the request of Mayo Clinic personnel, Ms. Loertscher provided a urine sample that day. (PSPFOF 100). No one at the hospital informed Ms. Loertscher that her urine would be tested for drugs or provided to government agencies, but Mayo Clinic personnel used Ms. Loertscher's urine sample to perform a drug screen. (PSPFOF 101, 104). The results confirmed her pregnancy and also returned an "unconfirmed positive" for methamphetamine, amphetamine, and THC, the active ingredient in marijuana. (PSPFOF 70). A doctor informed Ms. Loertscher that "trace amounts" of methamphetamine and marijuana had been found in her urine; the doctor advised Ms. Loertscher that drug use is bad for a baby and Ms. Loertscher expressed her willingness to stop all drug use. (PSPFOF 105-06). Ms. Loertscher added that she wanted more than anything for her baby to be okay. (PSPFOF 107).

Later that evening, Ms. Loertscher was admitted to the Mayo Clinic Behavioral Health Unit. (PSPFOF 135). A psychiatrist visited her to discuss her thyroid condition and the pregnancy, and she also asked Ms. Loertscher about her past drug use. (PSPFOF 111, 115). Ms. Loertscher candidly explained that she had been self-medicating her depression with occasional marijuana and methamphetamine but had only done this before she knew she might actually be pregnant. (PSPFOF 116-17). Ms. Loertscher also met with an obstetrician, who showed Ms. Loertscher the ultrasound images of her fetus and asked Ms. Loertscher about her alcohol use.

(PSPFOF 121-22). Ms. Loertscher explained that while she was pregnant, but did not know it yet, she drank a small amount of alcohol. (PSPFOF 122).

On August 4, 2014, while Ms. Loertscher was in the hospital, Corinna ("Corey") Everson, a social worker at the Eau Claire Mayo Clinic, contacted TCHSD to report that Ms. Loertscher was a pregnant woman who had tested positive for drug use. (PSPFOF 123). A team of TCHSD employees "screened in" the referral, and that same day, an Alcohol and Other Drug Abuse ("AODA") counselor employed by Taylor County—based solely on the written report—determined that Ms. Loertscher should enter an inpatient treatment facility, to be followed by outpatient services. (PSPFOF 126-28). At the time of this meeting, no one from Taylor County had spoken to any doctors at the Mayo Clinic who had examined Ms. Loertscher. (PSPFOF 129).

Later that same day, Julie Clarkson of TCHSD informed Ms. Loertscher that if she did not agree to voluntarily receive AODA treatment, TCHSD would request to take Ms. Loertscher into temporary physical custody. (PSPFOF 133). Soon after, Taylor County intake worker Kala Thompson completed a "temporary physical custody request" for the juvenile court directed at Tamara Loertscher, stating she was "taken into custody" on August 4 because of "serious risk to unborn child." (PSPFOF 135). Ms. Thompson is not a doctor or psychologist, nor did she consult any medical or scientific studies when making the determination. (PSPFOF 136).

Ms. Loertscher then met with a hospital social worker, who asked questions focused on her past drug use, and Ms. Loertscher began to feel that she was not receiving the care she needed for her health concerns because the hospital staff were focused on her past drug use. (PSPFOF 138-41). She informed hospital staff that she wished to leave, but the nursing manager told her that there was a "hold" on her. (PSPFOF 144-45). Around that time, a Taylor County judicial officer appointed a guardian ad litem (GAL) on behalf of Ms. Loertscher's fetus but no counsel was appointed for Ms. Loertscher. (PSPFOF 146).

On August 5, 2014, a Mayo Clinic social worker led Ms. Loertscher into a conference room and told Ms. Loertscher that there was a judge on the phone. (PSPFOF 147). Ms. Loertscher realized from what she heard over the telephone that some kind of formal proceeding

was taking place, but she had no idea what was actually going on. (PSPFOF 148). The social worker also placed some kind of legal papers on the table in front of Ms. Loertscher, but Ms. Loertscher did not understand what they were. (PSPFOF 150). Ms. Loertscher stated that she did not wish to speak without legal representation, and did not want to take part in any proceeding until she had a lawyer. (PSPFOF 151). She then returned to her hospital room. (PSPFOF 153).

The legal documents placed in front of Ms. Loertscher were a "Temporary Physical Custody Request" and an as-yet-unfiled "Petition for Protection or Care of an Unborn Child" against Ms. Loertscher. (PSPFOF 154). The Temporary Physical Custody Request stated that Ms. Loertscher had been taken into custody at the hospital on the basis of a serious health risk to an unborn child. (PSPFOF 155). After Ms. Loertscher had stated that she would not participate without counsel and returned to her hospital room, the court found that Ms. Loertscher had waived her appearance at the hearing and allowed the hearing to continue in her absence. (PSPFOF 160). The court heard testimony by telephone from Dr. Jennifer Bantz, a Mayo Clinic obstetrician, who testified that her greatest concern for Ms. Loertscher's pregnancy related to her hypothyroidism and her ability to get appropriate prenatal care. (PSPFOF 161, 174-75). Dr. Bantz recommended inpatient drug treatment for Ms. Loertscher at the hearing, but she later acknowledged that at the time of the hearing she did not think it would be a good idea for Ms. Loertscher to be forced into treatment. (PSPFOF 176, 178). At the time of her telephonic testimony, Dr. Bantz did not know the nature of the hearing or the relief being sought. (PSPFOF 177). The juvenile court entered the order of "Temporary Physical Custody" at the close of the hearing (PSPFOF 179).

On August 6, 2014, a Mayo Clinic social worker informed Ms. Loertscher that a judge had ordered her to stay in the hospital, and then to go directly to the Fahrman Center, a residential addiction treatment facility in Eau Claire, Wisconsin. (PSPFOF 185). The next day, Mayo Clinic personnel informed Ms. Loertscher that she would need to submit to a blood test for tuberculosis before she could be admitted to that facility. (PSPFOF 187). Ms. Loertscher informed hospital personnel that she wanted to stay on her thyroid medication, start prenatal

vitamins, choose her own health care providers, and leave the hospital immediately. (PSPFOF 189). Mayo Clinic staff authorized Ms. Loertscher's discharge because her treating doctor determined she had a plan, family support, and posed no danger to herself or others, and she was released from the hospital that day. (PSPFOF 193-94).

On August 11, 2014, the GAL appointed on behalf of Ms. Loertscher's 15-week-old fetus filed a Notice of Motion and Motion for Remedial Contempt against Ms. Loertscher in Taylor County Circuit Court. (PSPFOF 196). The GAL requested that if Ms. Loertscher did not comply with the terms of the Temporary Physical Custody Order she should be subject to remedial sanctions under Wisconsin Statute Section 785.04. (PSPFOF 197). Attached to the Notice was an affidavit from a TCHSD social worker alleging that Ms. Loertscher was in contempt of the juvenile court's August 5, 2014, Temporary Physical Custody Order because she had refused a TB test and otherwise failed to comply with TCHSD directives. (PSPFOF 198). The Notice set a hearing date on the contempt motion of August 25, 2014. (PSPFOF 200). On August 13, 2014, Taylor County Corporation Counsel filed a "Motion to Take Expectant Mother into Immediate Custody" on behalf of TCHSD. (PSPFOF 201). The Motion stated as grounds that Ms. Loertscher had not been in contact with TCHSD and had otherwise failed to comply with the earlier Order for her placement at the Fahrman Center. (PSPFOF 202). The same day, the court granted the TCHSD Motion and entered an Order to Take Expectant Mother into Immediate Custody. (PSPFOF 203). The Order stated that it was "contrary to the unborn child's best interests for the expectant mother to have been released from custody and returned home due to the expectant mother's habitual use of controlled substances and her violation of the TPC [Temporary Physical Custody] Order." (PSPFOF 204).

The afternoon after she received the Notice, a police officer came to Ms. Loertscher's grandparents' house, where she had been staying, multiple times and told Ms. Loertscher's family that he had come to arrest her pending a court date, scheduled for a week later. (PSPFOF 206-07). Ms. Loertscher's grandfather assured the police officer that Ms. Loertscher would

appear at the scheduled hearing. (PSPFOF 208). Ms. Loertscher was horrified and humiliated. (PSPFOF 209).

On August 25, 2014, Ms. Loertscher appeared in Taylor County Circuit Court for the hearing. (PSPFOF 210). Present were the GAL on behalf of Ms. Loertscher's fetus, Corporation Counsel for TCHSD, and two TCHSD social workers. (PSPFOF 211). Ms. Loertscher was not represented by counsel. (PSPFOF 212). The court rescheduled the hearing for September 4, 2014, before a different judge, and on that date Ms. Loertscher again appeared, without counsel, in Taylor County Circuit Court for the hearing on the contempt motion. (PSPFOF 213). At the hearing, the court asked the GAL what his plea was "on behalf of the child," and the GAL admitted all the allegations against Ms. Loertscher on behalf of her fetus. (PSPFOF 215). The court then heard testimony from a TCHSD social worker, who testified that Ms. Loertscher had not complied with the August 5, 2014, Order because she did not take a TB test, did not go to inpatient treatment at the Fahrman Center, and otherwise failed to comply with TCHSD directives. (PSPFOF 216).

Ms. Loertscher had very little understanding of what was happening at the hearing, but tried to answer the claim that she needed drug treatment. (PSPFOF 217). She testified: "I don't feel like I need treatment. Like I feel like I went to the hospital and sought treatment and then they violated my rights and all these people got this information that I feel they shouldn't have gotten. And I feel my whole stay there was made worse[.]" (PSPFOF 218). At the end of the hearing, the court found Ms. Loertscher in contempt and ordered her to either cooperate with TCHSD and go to the Fahrman Center, or to serve 30 days in jail. (PSPFOF 220).

Immediately following the September 4, 2014 hearing, Ms. Loertscher was led to a conference room in the courthouse where she met with TCHSD social workers. (PSPFOF 222). Ms. Loertscher asked them what they wanted from her; one of them responded, "we just want a healthy baby." (PSPFOF 222). Ms. Loertscher said that this is what she wanted, too. (PSPFOF 222). Ms. Loertscher then asked if "this would all go away if I had an abortion?" (PSPFOF 223). She recalls the social workers responding, "Yes, it would." (PSPFOF 223).

On the evening of September 4, 2014, Ms. Loertscher surrendered herself to the Taylor County Jail, (PSPFOF 224), where she was held for a total of 18 days, (see PSPFOF 225). During her stay in jail, Ms. Loertscher received no prenatal care, was forced to miss two previously scheduled prenatal care appointments, and experienced significant delay in receiving her thyroid medication. (PSPFOF 227, 228, 229).

Ms. Loertscher began to experience a lot of pain and cramping while she was in jail, and she was kept in solitary confinement for more than 24 hours after declining to take another pregnancy test. (PSPFOF 230, 231-232). On September 12, 2014, jail personnel told TCHSD social worker Julie Clarkson that in order for Ms. Loertscher to continue receiving pregnancy meals, she should consent to urine analysis. (PSPFOF 235). The jail's attempts to get Ms. Loertscher to take a pregnancy test, Ms. Loertscher's refusals, and Ms. Loertscher's lack of access to prenatal care were discussed at a TCHSD meeting on September 16, 2016. (PSPFOF 237). Ms. Clarkson's notes indicate the agency's "[s]uggestion was for the county nurses to continue . . . to encourage her to take a test." (PSPFOF 237).

While she was in jail, Ms. Loertscher found a list of public defenders in Taylor County. (PFOF 220). She called the telephone number, and a public defender was appointed to represent her in the contempt proceeding. (PSPFOF 238). Upon the advice of her new attorney, she signed a consent decree so that she could be released from jail. (PSPFOF 240). The Consent Decree permitted Ms. Loertscher to go home so long as she agreed to complete an Alcohol and Other Drug Abuse (AODA) Assessment; comply with any recommended treatment resulting from that assessment; submit to drug testing on at least a weekly basis at her own expense; sign any and all releases necessary for transfer of drug test results to TCHSD; and sign any other releases as requested by TCHSD. (PSPFOF 241). The Consent Decree also provided that the GAL would remain appointed for Ms. Loertscher's fetus for the duration of her pregnancy. (PSPFOF 288). Ms. Loertscher agreed to these terms because she wanted to leave jail and was not using drugs or alcohol anyway. (PSPFOF 243). Ms. Loertscher was released from the Taylor County Jail on

September 22, 2014, and she continued to comply with all the terms of the Consent Decree, including numerous drug tests, which all returned negative results. (PSPFOF 244-46).

By notice dated September 29, 2014, Ms. Loertscher was informed that TCHSD issued an administrative determination that she had committed "child maltreatment." (PSPFOF 247). The notice stated that the finding was appealable within 30 days, and Ms. Loertscher appealed it. (PSPFOF 249). By letter dated November 10, 2014, Ms. Loertscher received notice that the TCHSD Agency Director had conducted a "desk review" of her appeal and affirmed the finding that Ms. Loertscher had committed child maltreatment of her fetus. (PSPFOF 253). In June 2015, TCDHS withdrew its "child maltreatment" finding. (PSPFOF 258).

## IV. OTHER UNBORN CHILD IN NEED OF PROTECTION PROCEEDINGS IN TAYLOR COUNTY

Because proceedings under the Act are confidential, little information is publicly available regarding the details of individual cases brought against particular women. (PSPFOF 261). DCF does not have specific details readily available regarding the 3,467 "screened-in" cases involving an unborn child abuse allegation across all Wisconsin counties since 2006. (PSPFOF 262). Taylor County has provided limited information about the one other UCHIP proceeding it claims happened in Taylor County but has objected to additional discovery.[1] (PSPFOF 263).

## LEGAL STANDARD

Summary judgment is inappropriate if there is any "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014). A material fact is one that is

---

[1] On September 19, 2016, Plaintiff served on Defendant Taylor County a request for "[a]ll documents relating to any child protective services referral or report received by Taylor County concerning 'unborn child abuse.'" On October 12, 2016, Defendant Taylor County objected to the request on grounds that it was "seeking documents that are confidential and privileged under state statutes and regulations, including, but not limited to, Wis. Stat. §§ 48.78(2)(a) and 48.981(7)(a). These defendants do not have authority to produce such records." Because of this ongoing discovery dispute, Plaintiff's access to information about other UCHIPS cases handled by Taylor County is significantly restricted.

"identified by the substantive law as affecting the outcome of the suit." *Bunn v. Khoury Enters.,*

*Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson*, 477 U.S. at 248).

In determining whether summary judgment is warranted, all facts are viewed in the light

most favorable to the nonmoving party, and all reasonable inferences are resolved in the

nonmoving party's favor. *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998).

As such, if there is any evidence in the record from which a reasonable inference could be drawn

in favor of the non-movant on a material issue of fact, summary judgment is improper. *Id.*

## ARGUMENT

## I. TAYLOR COUNTY MAY BE HELD LIABLE FOR ITS ACTIONS TAKEN AGAINST MS. LOERTSCHER UNDER ACT 292

Taylor County first argues that Seventh Circuit case law precludes municipal liability

because the Act mandates the actions taken by the county and because Ms. Loertscher has failed

to show that the county acted under a policy, practice or custom. Br. at 11-12. Taylor County

misapprehends the case law cited. That case law leaves room for municipal liability under a

facially unconstitutional statute when local officials have sufficient discretion to cause

constitutional harm through their actions. Here, while the Act imposes some obligations on local

officials, its vague terms and overbroad scope vest tremendous discretion in those officials, and

Taylor County seized upon that discretion to act in violation of Ms. Loertscher's rights. In

addition, the record contains evidence that Taylor County officials were acting under a policy or

practice, generating at a minimum a genuine dispute of material fact over Taylor County's policy,

practice and custom. Alternatively, if Taylor County is right that it never established any

relevant policies or procedures, the record contains evidence that Taylor County officials acted

with deliberate indifference to their constitutional violations, subjecting them to liability on that

basis. In either case, the county's motion for summary judgment should be denied.

**A.    Case Law Cited by Taylor County Misrepresents Prior Cases that Distinguish Between Compulsory and Discretionary Municipal Actions Taken Pursuant to State Laws**

Taylor County first argues that it cannot be held liable because Ms. Loertscher brought a facial challenge to the Act, precluding liability for a municipality charged with implementing that Act.  Taylor County relies heavily on this Court's decision in *N.N. ex rel. S.S. v. Madison Metropolitan School District*, 670 F. Supp. 2d 927 (W.D. Wis. 2009), arguing that, under *Madison Metro*, "if state law or policy compels a municipality to act, the municipality cannot be liable even if it exercised some discretion in enforcing mandatory state directives."  Br. at 16.  Taylor County considerably overstates the holding in that case, which would permit municipal liability in the circumstances here.

*Madison Metro* involved a state statute mandating denial of a student transfer request if it would increase racial imbalance in the school district.  The school district and superintendent generated specific guidelines, which led to the denial of the plaintiff's transfer request and her subsequent lawsuit, alleging race discrimination.  670 F. Supp. 2d at 930-31.  Judge Crabb rejected the plaintiffs' argument that the defendants could have "minimized the constitutional injuries" by selecting a different interpretation.  *Id*. at 939-49.  Critical to her decision, however, was the fact that *any* interpretation would have produced the same level of constitutional violation—an impermissible race-based transfer policy.  Indeed, she expressly contemplated municipal liability where the municipality's exercise of delegated authority exacerbated the harm of an unconstitutional statute.  *Id.* at 940 ("[I]n some circumstances . . . a municipality retains a duty to do no more than is necessary to comply with an unconstitutional state directive. . . If in response to . . . a [state] directive [requiring use of a taser against anyone using disrespectful language during a traffic stop] a municipality adopted a policy that required officers to use the taser no fewer than five times, it would be difficult for the municipality to later deny that its

policy was not the cause of any injuries resulting from shocks two through five."). In other words, even a facially unconstitutional statute can give rise to additional municipal liability when that municipality exercises discretion in a way that changes the constitutional injury.

Here, too, Taylor County was delegated considerably more discretion than the school district in *Madison Metro*, and Taylor County repeatedly used that discretion to pursue more extreme actions, exacerbating the constitutional harm. Taylor County officials insisted that Ms. Loertscher be compelled to enter an inpatient facility, (PSPFOF 126-28), threatened Ms. Loertscher with a temporary physical custody request if she did not accede to the plan, (PSPFOF 133), and proceeded with that custody request despite Ms. Loertscher's objections and expressed willingness to stop all drug and alcohol use, (PSPFOF 153). Taylor County officials supported a request for a contempt finding against Ms. Loertscher, alleging she had failed to comply with Taylor County directives, (PSPFOF 198), and later moved to have her taken into immediate custody. (PSPFOF 201). During this time, Taylor County never presented the option of anything less than inpatient treatment despite Ms. Loertscher's wishes and her willingness to avoid drugs and alcohol. (PSPFOF 131-32, 152-54). Taylor County officials also pursued, produced, and then affirmed a finding of child maltreatment. (PSPFOF 247, 253).

Had Taylor County followed a different discretionary policy, one that did not call for mandatory inpatient treatment over a woman's objections, they still would have been enforcing a facially unconstitutional statute that was impermissibly vague and neither justified by a compelling state interest nor narrowly tailored to that interest. The constitutional injuries inflicted, however, would have been different. The county's exercise of discretion therefore caused some of the constitutional injury, subjecting it to liability under § 1983.

Defendant points to *Snyder v. King*, 745 F.3d 242, 243-44 (7th Cir. 2014), arguing that it precludes liability when a municipality merely chooses from among alternatives offered by state law. Br. at 17. *Snyder*, however, also recognizes that a "municipality engages in policy making when it determines to enforce a state law that authorizes it to perform certain actions but does not mandate that it do so." 754 F.3d at 248 (quoting *Vives v. City of New York*, 524 F.3d 346, 351 (2d Cir. 2008)). In *Snyder*, a municipality removed the plaintiff from the voter rolls on the basis of his misdemeanor conviction when the state statute merely used the word "crime." The court rejected the argument that the municipality had caused the injury through its interpretation of the statute, but it did so on the basis that the statute was not ambiguous and that the municipality in reality had no discretion to interpret the statute anyway. *Id*. at 248-49. If those facts had been different, the outcome would have been as well. *Id*. at 248 ("If each step of Snyder's argument was correct, it would indeed lead to the conclusion he desires.").

Thus, where, as here, a law grants local officials discretion to develop different procedures or to enforce the law in different ways, they may be liable under § 1983, regardless of whether the statute as a whole also suffers from some constitutional infirmity.[2]

## B.    The Relevant Terms of Act 292 are Discretionary, Not Compulsory

Defendant next argues that the Act mandated Taylor County's conduct because the County is given "exceptionally narrow discretion" and has "no discretion as to whether or how it would respond." Br. at 18. This assertion is belied by the language of the Act itself, which

---

[2] Unsurprisingly, other cases relied upon by Taylor County also recognize a distinction between conduct that a municipality is *required* or *compelled* to perform under state law and conduct that is *authorized* but *discretionary*. *See, e.g.*, *Vives v. City of New York*, 524 F.3d 346, 354-56 (2nd Cir. 2008) (recognizing municipal liability as cognizable where municipality can choose not to enforce provisions of a state law or where municipality puts "flesh on the bones" of a statute that causes constitutional harm); *Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005) (recognizing municipal liability for discretionary actions taken pursuant to an unconstitutional state law); *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998) (recognizing liability for actions "devised or adopted by the municipality"); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363-64 (6th Cir. 1993) (holding that municipality can be liable for conduct that it was *authorized* but *not required* to performed by state law).

delegates considerable discretion to counties including Taylor County.  The majority of the Act's terms setting out a County's options with respect to a pregnant woman are discretionary, not compulsory.

The Act designates counties as the primary implementing authorities. Wis. Stat. § 48.59(1) (granting county departments authority and responsibility for providing services and pursuing investigations under the Code, including those involving unborn children and expectant mothers); (PSPFOF 38-42. *Cf.* PSPFOF 32; DPFOF 4). Although, as Taylor County argues, the Act requires child protection workers to investigate reports of suspected unborn child abuse when received, Wis. Stat. § 48.981(c)(1)(a), subsequent actions are largely at the discretion of the County and its agents.  Officials may take the expectant mother into custody, Wis Stat. § 48.193, may offer her particular services, and, if refused, "may request the district attorney to file a CHIPS petition."  Wis. Stat. § 48.245(4).   County officials may determine whether to enter instead into an informal disposition of the case. Wis. Stat. § 48.067.

Communications from the State further demonstrate the considerable discretion delegated to counties in the implementation of the Act. Memoranda from the State Department of Health and Family Services shortly after the passage of Act 292 informed county directors and staff of the need to review the Act to "determine what might be 'constitutionally permissible'" when targeting pregnant women and how to proceed with its execution in light of the need for "clear guidelines and protocol and training for the affected staff" in regard to proceedings that involve holding pregnant women in custody. (PSPFOF 30-34).

Taylor County also argues that the statute and CPS Standards limit the discretion available under the Act while conducting an investigation and thereafter, asserting that there is "simply no discretion in these matters." Br. at 19.  Close examination, however, reveals that

significant discretion remains. For example, in the sections cited by the County the Act states only that the expectant mother "may be held" if certain (vague) criteria are met, § 48.205(1m) and that the intake worker shall determine "whether" the woman shall be held, and if so, "where." § 48.067(3)(4). Similarly, the CPS Standards cited by the County merely state that the county worker determines "whether" the child is in need of protection or services, "whether" there are threats, and the maltreater determination "when applicable." Nothing requires the county to insist a particular type of "service" is appropriate, nor whether to condition freedom on a woman's willingness to accept the form of "service" demanded by the county.

Taylor County claims that its conduct at issue in this case is mandated by the language of the Act and state guidelines, County Br. at 18-22, but that is simply not the case. As the State's 30(b)(6) witnesses have confirmed, counties have discretion in implementing the Act. (PSPFOF 2, 54). While the Act may require counties to investigate allegations of unborn child abuse once a report has been received or a case has been "screened in," County Br. at 18-20, counties retain discretion over important decisions, such as determining what medical treatment, if any, a pregnant woman should receive under the Act. (PSPFOF 273). Notably, the CPS Standards, which Taylor County describes as "a 72-page document that addresses each step of the intake and investigation process in detail," County Br. at 5, does not instruct counties on what type of medical treatment counties should recommend to pregnant women. (PSPFOF 274). Rather, where the statutes and guidelines are not specific, the county has discretion to make the decision. (PSPFOF 275).

Furthermore, as described in Ms. Loertscher's own summary judgment brief, ECF No. 177 at 22-25, many of the criteria in the Act are extremely vague, imprecise, and unscientific, permitting county officials to determine whether they have been met. In Ms. Loertscher's case,

Taylor County used its discretion to determine that she met the criteria, that mandatory inpatient treatment was appropriate, and that custody should be pursued when she objected.

### C.  The Record Suggests Taylor County Operated Pursuant to a Policy, Practice or Custom

In her amended complaint, Ms. Loertscher alleged numerous constitutional deprivations she endured and specifically alleged that those deprivations occurred pursuant to Taylor County policy, practice, or procedure. *See* Am. Compl. ¶¶ 84-87 (alleging that Taylor County violated Ms. Loertscher's constitutional rights "pursuant to an unconstitutional policy, procedure, and practice for implementation of the Act"). The amended complaint also alleged that Taylor County "is responsible for development and implementation of county-level policies, procedures and practices for the local-level administration of the laws of the State as they apply in Taylor County." *Id.* ¶ 91. This Court, in its Opinion and Order denying Taylor County's motion to dismiss Plaintiff's *Monell* claim, recognized that "there is enough flexibility and discretion in the statutory language at issue to conclude, at this point, that Loertscher has alleged that a Taylor County policy of enforcing Act 292 violated her constitutional rights." ECF No. 118 at 18. Now, through discovery, Ms. Loertscher has obtained sufficient evidence to give rise to a genuine dispute of material fact as to whether Taylor County violated Ms. Loertscher's constitutional rights pursuant to a county policy, practice, or procedure. While Ms. Loertscher has not yet located a written county policy giving rise to § 1983 liability, Ms. Loertscher has uncovered evidence raising an inference that Taylor County indeed operates under a practice, policy or custom in implementing its discretion under the Act.

In determining whether a factual dispute requiring trial exists, the court must view the record in the case and the summary judgment submissions in the light most favorable to the nonmovant. Moreover, if the evidence supports inferences, the court must draw all reasonable

inferences in the nonmovant's favor. *Liberty Lobby, Inc.*, 477 U.S. at 255 (1986) ("[E]vidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor"); *see also Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563, 568 (7th Cir. 2001) (summary judgment reversed because district court did not give nonmovant benefit of all inferences available from record). Here, Ms. Loertscher has uncovered evidence supporting the inference that a Taylor County practice or procedure violated her constitutional rights. That inference creates a genuine dispute of material fact precluding Taylor County's motion for summary judgment.

> **1.     Taylor County has a policy of exercising its discretion to select extreme measures, such as mandatory inpatient confinement and maltreatment determinations**

Though State Defendants describe Ms. Loertscher's situation as a "worst-case scenario," State Br. at 16, evidence produced in discovery shows that Taylor County took similarly extreme measures in the only other UCHIPs proceeding they have acknowledged facing. In response to a discovery request from Plaintiff, Taylor County maintained that, prior to Ms. Loertscher's case, Taylor County "ha[d] been involved in one prior proceeding that was initiated pursuant to 1997 Wisconsin Act 292." (PSPFOF 276). As in Ms. Loertscher's case, documents from that proceeding demonstrate that Taylor County also used its discretion under the Act to implement at least two severe actions that were not required by either the Act or state guidelines: (1) inpatient out-of-home placement for the woman; and (2) naming the woman personally as the maltreater of her fetus.

The pattern in Ms. Loertscher's case suggests a coordinated policy of pursuing the harshest treatment available. As described *supra* section III, shortly after receiving the child protective service report concerning Ms. Loertscher, Taylor County determined that Ms. Loertscher should be placed in an inpatient treatment facility. (PSPFOF 128). When Ms. Loertscher declined to submit to involuntary out-of-home placement, Taylor County sought to

take temporary physical custody of Ms. Loertscher. (PSPFOF 133-35). Later, a physician at the Mayo Clinic advised that Ms. Loertscher was not a threat to herself or others and that treatment could be accomplished with either outpatient AODA or inpatient treatment. (PSPFOF 192). Taylor County, however, continued to insist that Ms. Loertscher submit to inpatient treatment. (PSPFOF 277). Taylor County's insistence that Ms. Loertscher receive inpatient treatment was required by neither statute nor state guidelines.

In addition, Taylor County issued an administration determination that Ms. Loertscher had committed "child maltreatment." (PSPFOF 247). Although the CPS Standards required caseworkers to determine whether or not child maltreatment occurred in a given case, the standards did not require that Taylor County identify a specific individual as the maltreater. (PSPFOF 250). Again, though neither statute nor state guidelines required such an action, Taylor County chose the more punitive course of conduct. *See* (PSPFOF 247, 250).

Ms. Loertscher's case is not the only time Taylor County chose to impose severe sanctions under the Act. As discovery has revealed, four years earlier, in 2010, Taylor County also demanded that a pregnant woman receive inpatient treatment. There, after receiving information from a hospital regarding the woman's substance use, Taylor County decided to "take [the woman] into custody and place her in a residential treatment facility until the birth of her child." (PSPFOF 278). Taylor County also requested temporary physical custody of the pregnant woman. (PSPFOF 279). As in Ms. Loertscher's case, the decision to seek inpatient treatment was required by neither statute nor state guidelines.

Further, like in Ms. Loertscher's case, Taylor County chose to name the pregnant woman as the maltreater of her fetus, even though Taylor County had no obligation to do so under the Act or state guidelines. In its letter to the woman, Taylor County stated that "[w]e have concluded that the child was maltreated[;] [w]e have also concluded that you maltreated the child." (PSPFOF 280). Taylor County later moved to dismiss the CHIPs Order on the now-born child, but only after the woman gave the child up for adoption and terminated her parental rights. (PSPFOF 280).

Although this sample size is not large, it shows that each time Taylor County participated in a proceeding under the Act, Taylor County chose a course of conduct on the harsher end of the allowable spectrum. The evidence presented is sufficient to create an inference that Taylor County had a custom or practice of using its discretion to choose the most extreme options available when dealing with women accused of committing unborn child abuse. This inference is sufficient to give rise to a genuine dispute of material fact as to whether Taylor County violated Ms. Loertscher's constitutional rights pursuant to a county policy, practice, or procedure. Taylor County's motion for summary judgment should be denied on this basis.

      **2.**       **Evidence of multiple Taylor County employees participating in Ms. Loertscher's case raises an inference that a Taylor County custom, practice or procedure was involved in the violation of Ms. Loertscher's constitutional rights.**

The inference that Taylor County acted pursuant to policy, practice, or custom is further supported by evidence showing that multiple Taylor County agents took immediate, repeated, and coordinated actions over a significant period of time. Evidence further demonstrates that "teams" of Taylor County employees met on multiple occasions to discuss Ms. Loertscher's case. The constitutional deprivations experienced by Ms. Loertscher were simply not the result of unplanned acts by rogue County employees.

Upon receiving the child protective service report concerning Ms. Loertscher, for example, a "team" of Taylor County agents, including deputy director of TCHSD Liza Daleiden, social worker Julie Clarkson, and intake worker Amanda Dassow, sat down to discuss the report and make the decision whether it should be "screened in." (PSPFOF 126). As deputy director Daleiden explained, there are never stand-alone decisions during child abuse investigations in Taylor County because everything Taylor County does is a team effort. (PSPFOF 282.) Accordingly, in Ms. Loertscher's case, deputy director Daleiden supervised social worker Clarkson's actions during the entire process. (PSPFOF 283).

Following the screen-in decision, another team of Taylor County agents, including deputy director Daleiden, social worker Clarkson, and Mike Sanderson, an AODA counselor employed by Taylor County, determined that Ms. Loertscher should be placed in an inpatient treatment facility, to be followed by outpatient services. (PSPFOF 283). A different Taylor County agent, intake worker Kala Thompson, completed the "temporary physical custody request" directed at Ms. Loertscher. (PSPFOF 135).

Later, after a physician at the Mayo Clinic advised that either inpatient or outpatient treatment could be appropriate for Ms. Loertscher, Taylor County again convened a team meeting to determine how they would respond to that doctor's recommendation. (PSPFOF 284). And, a team of Taylor County agents similarly met following Ms. Loertscher's discharge from Mayo Clinic to determine Taylor County's next steps with respect to Ms. Loertscher's case. ((PSPFOF 285). As Ms. Loertscher's case progressed, social worker Clarkson continued to meet with deputy director Daleiden as well as Taylor County legal counsel when the state guidelines did not document what should be done. (PSPFOF 286). Overall, social worker Clarkson and deputy director Daleiden met numerous times regarding Ms. Loertscher's case. (PSPFOF 287).

Following Ms. Loertscher's release from jail, social worker Clarkson and deputy director Daleiden made a joint decision to issue an administrative determination that Ms. Loertscher had committed child maltreatment. (PSPFOF 288). After Ms. Loertscher appealed that determination, TCHSD Director Amber Fallos conducted a "desk review" and affirmed the finding that Ms. Loertscher had committed child maltreatment. (PSPFOF 289).

The fact that multiple Taylor County agents consistently participated in Ms. Loertscher's case, and met regularly at every stage of her case, raises an inference that they acted in a

coordinated manner pursuant to a policy, practice, or custom. This inference generates a genuine dispute of material fact, and Taylor County's motion for summary judgment should be denied.

### 3. Evidence also suggests that Taylor County relied on procedures previously developed for investigation into potential child abuse

Evidence also suggests that Taylor County continued to act according to the policy, practice and custom it had developed with respect to children, simply applying that same policy to the wholly inappropriate case of a fetus within a pregnant woman. For example, deputy director Liza Daleiden described a CHIPs case as presenting the "same concerns" as a UCHIPs case; namely, "child safety." (PSPFOF 290). Moreover, when Taylor County received the child protective services report concerning Ms. Loertscher, Taylor County listed the reporting Mayo Clinic social worker as a "mandated reporter," even though the CPS Standards provide that mandated reporting rules do not apply in unborn child abuse cases. (PSPFOF 291).Yet this action is consistent with cases involving children because social workers are mandated reporters of child abuse allegations. (PSPFOF 292). This evidence raises at least an inference that Taylor County acted in Ms. Loertscher's case pursuant to the same policy, practice, or custom it developed with respect to children.

### D. In the Alternative, Taylor County Deliberately Refused to Develop Reasonable Policies, Training, or Procedural Safeguards, Demonstrating Deliberate Indifference to the Constitutional Rights of "Expectant Mothers"

Although the record raises numerous inferences of a policy or custom on the part of Taylor County, if they are correct and they refused to develop any policies or procedures to implement the Act, that failure demonstrates indifference to the significant constitutional dangers posed by Act 292. A municipal defendant may be held liable under § 1983 when the execution of its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). Yet the *failure* to enact appropriate policies and procedures may also warrant liability, where the need for those policies and procedures is "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the

[municipality] can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. 378 at 390; *see also Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993) (a policy of inaction may satisfy *Monell* where the municipality has "actual or constructive notice that a particular omission . . . is likely to result in constitutional violations"). When a municipality commits inaction of this sort, it "may fairly be said to represent a policy for which the [municipality] is responsible, and for which [it] may be held liable if it actually causes injury." *City of Canton*, 489 U.S. at 390.

First, Taylor County had notice that the Act was at risk of unconstitutional enforcement because the Act assigned the task of enforcement to municipal officers. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006) (stating that one way to prove "deliberate indifference" is through "failure to provide adequate training in light of foreseeable consequences"); *Bowden v. Town of Speedway*, 539 F. Supp. 2d 1092, 1108 (S.D. Ind. 2008) (quoting *Cornfield*, 991 F.2d at 1327) (denying summary judgment to the defendants on the basis that a jury could find that the municipality had violated § 1983 "with respect to a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face," making the constitutional dangers "eminently foreseeable").

Second, the use of the terms "unborn child" and "expectant mother," and the Act's plain reference to physical detention, sufficed to put Taylor County on notice of constitutional violations. A law focusing on "unborn children," and by extension pregnant women, implicates core constitutional interests that are not implicated in actions pertaining to children. Unlike a child, an "unborn child" is so inextricably linked to another person that the "unborn child" cannot be protected or otherwise regulated without intruding into the body, life, and decisional autonomy of the pregnant woman. Nonetheless, while the Act contemplated that risk of harm to "the unborn child . . . may require the expectant mother to be taken into custody," Act 292 § 13, amending Wis. Stat. § 48.01(1)(a) (emphasis added), Taylor County failed to develop any discrete policies or guidelines to govern action against pregnant women. (PSPFOF 71).

Third, Taylor County was also put on notice of the risk of unconstitutional enforcement because the State notified the county of the unique constitutional issues posed by the Act and provided encouragement to counties to develop needed policies and procedures, such as through the July 23, 1998 memorandum from Linda Hisgen, the Director of the Wisconsin Bureau of Programs and Policies at the State of Wisconsin Department of Health and Family Services. (PSPFOF 35). Similarly, the Act's legislative history put Taylor County on notice, as the legislative record is replete with references to the Act's constitutional dangers, such as the memorandum from Director of Wisconsin Legislative Council David Stute of October 28, 1997. (PSPFOF 12).

In executing Act 292, county actors were "certain to face" situations in which they would subject pregnant women to involuntary confinement and invade their reasonable expectations of privacy. *See Cornfield by Lewis*, 991 F.2d at 1027. Taylor County failed to provide any guidelines or procedural safeguards to constrain their agents in implementing involuntary commitment, despite experience with civil commitment proceedings and forced medical treatment under Wisconsin's State Alcohol, Drug Abuse, Developmental Disabilities and Mental Health Act. Wis. Stat. § 51.05 et seq.

Despite clear notice of the constitutional dangers inherent in Act 292 and obvious signals of needed procedural guidance, Taylor County disregarded its delegated implementation responsibility and failed to adopt reasonable constraints, guidance, training, and procedural safeguards to prevent county agents from violating the constitutional interests of Ms. Loertscher and other pregnant women. With no guidelines or training that would address the constitutional violations inherent in the Act, Taylor County exacerbated Ms. Loertscher's constitutional injury. *See Frake v. City of Chi.*, 210 F.3d 779, 782 (7th Cir. 2000) (noting that a finding of deliberate indifference requires a showing that the municipality was aware of a substantial risk and failed to take appropriate steps to protect the plaintiff) (citation omitted). The Seventh Circuit has consistently held that "in situations that call for procedures, rules, or regulations, the failure to make a policy itself may be actionable." *Cornfield by Lewis*, 991 F.2d 1326; *see also Thomas v.*

*Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) ("[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable."). The absence of a written policy cannot immunize municipalities from liability for the unconstitutional actions by their agents; otherwise a municipality could "bury its head in the sand rather than acknowledge and attempt to remedy unconstitutional conduct by its employees." *Cornfield*, 991 F.2d 1316; *see also Murray v. City of Chicago*, 634 F.2d 365, 366 (7th Cir. 1980) (failure of responsible officials to "establish or execute appropriate procedures for preventing such serious malfunctionings in the administration of justice" implicates dereliction of constitutional duty for which municipality may be liable under § 1983).

By the time Taylor County officials initiated proceedings against Ms. Loertscher in August 2014, sixteen years had elapsed since the Act took effect in 1998. (PSPFOF  29). Taylor County's commitment to unfettered discretion and utter indifference was thus a "deliberately-chosen course of action," *Teesdale v. City of Chicago*, 690 F.3d 829, 836 (7th Cir. 2012) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)).  The unique and heightened constitutional concerns inherent in "unborn child abuse" cases necessitated policies, training, and procedures catered to these concerns. Taylor County turned a blind eye to the constitutional injuries its deliberate indifference inflicted on pregnant women subject to the Act. Accordingly, it can and should be held accountable under *Monell.*

E.    **The Actions of Taylor County Officials Violated Plaintiff's Constitutional Rights**

Taylor County also argues that Ms. Loertscher has not identified the conduct by County officials that violated her rights.  In fact, the specific actions of Taylor County officials, working in tandem, violated several of her fundamental rights.

First, Ms. Loertscher was denied her fundamental constitutional right to physical freedom *See Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (enshrining fundamental right to physical liberty).  Taylor County officials repeatedly insisted that she agree to inpatient confinement over

her strong objections, (PSPFOF 126-28), and they threatened Ms. Loertscher with physical custody if she did not accede, (PSPFOF 133). They later supported a request for a contempt finding against Ms. Loertscher, relying primarily on the allegation that she had failed to comply with Taylor County directives (namely, to submit herself to an inpatient facility), (PSPFOF 198). They later moved to have her taken into immediate custody, (PSPFOF 201), and provided testimony in support. Taylor County never presented Ms. Loertscher with another option apart from inpatient treatment. (PSPFOF 128). County agent Amber Fallos admitted that the threat of imprisonment is a common feature of the County's approach to enforcement. ECF 161 at 22 ("Fallos Dep.") (acknowledging other instances where someone has been jailed for not complying with department recommendations). Taylor County is liable for its violations of Ms. Loertscher's rights to physical freedom and bodily integrity that resulted.

### F. Taylor County is Liable For Violating Ms. Loertscher's Right to Refuse Forced Medical Treatment

Taylor County is also liable for infringing on Ms. Loertscher's constitutional right to medical autonomy and privacy. *See Cruzan v. Dir., Missouri Dept. of Health*, 497 U.S. 261, 278 (1990) (recognizing right to decline medical treatment); *see also Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (same). The County's repeated and sustained use of the Act as a mandate to force Ms. Loertscher to submit to unwanted medical treatment caused her significant injury. Specifically, Ms. Loertscher was threatened with custody if she did not acquiesce to a treatment plan that county actors constructed before having seen or spoken to her. (PSPFOF 101-05, 108). While still seeking treatment in the hospital, she was, in fact, taken into temporary custody by county actors who had not seen or spoken with her. (PSPFOF 118). Ms. Loertscher's fetus was appointed a guardian ad litem, also a complete stranger to Ms. Loertscher, her pregnancy, and her medical needs, whose opinion about her medical decision making could supersede her own, and the county did not intervene or change its insistence on the specific medical plan. (PSPFOF 121, 191) (admitting all allegations against Ms. Loertscher "on behalf of" her fetus). Finally, she

was ordered into inpatient treatment on the equivocal testimony of one physician who was admittedly not an expert on drug use during pregnancy. (PSPFOF 122-62). When she continued to refuse, she was imprisoned for 18 days in Taylor County jail. (PSPFOF 207-08). During that time, she was transferred to a holding cell and she was prohibited from attending her prenatal appointments for refusing to provide a urine sample. (PSFOF 232, 234, 236). Ultimately, Ms. Loertscher's health was endangered throughout her detention in Taylor County jail. *Id.*; (PSPFOF 227). By failing to create mechanisms to provide for appropriate medical care and privacy protections when a pregnant woman is imprisoned under the authority of the Act, Taylor County exacerbated the constitutional violations against Ms. Loertscher.

### G. Taylor County is Liable for Violating Ms. Loertscher's Right to Equal Protection of the Law Under the Fourteenth Amendments

Taylor violated Ms. Loertscher's right to have her "privacy, dignity, and security" protected from arbitrary and unreasonable government invasions. *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528 (1967). Taylor County ignored Ms. Loertscher's right to be free from unwarranted searches and seizures when it (1) failed to appraise Children's Code mandatory child abuse reporters that they had no mandatory obligations for "unborn child abuse" reporting under the Act and ( 2) instead aggressively sought to insert County actors into the protected relationship between Ms. Loertscher and her doctors.

Reporting suspected unborn child abuse is discretionary under the Act. (PSPFOF 125, 126). Corinna Everson, the Eau Claire Mayo Clinic social worker who informed TCHSD that Ms. Loertscher had tested positive for controlled substances, identified herself as a "mandatory reporter." (PSPFOF 98-99).[3] This raises the distinct possibility that, had Taylor County informed its agents that unborn child abuse reporting is not mandatory, Ms. Loertscher may never have been brought to the County's attention in the first place. On the strength of Ms. Everson's report, county agents then further breached Ms. Loertscher's privacy rights by soliciting her medical

---

[3] Jared Duellman, a second social worker who was also involved in Ms. Loertscher's case, was also under the misimpression that the Act mandated reporting of alleged "unborn child abuse." (PSPFOF 123).

records without a warrant or her consent. (PSPFOF 131, 165-70). Taylor County's actions led to the personal details that Ms. Loertscher had forthrightly confided to her doctors to obtain needed medical care being disclosed and used against her.

### H.    The *Rooker-Feldman* Doctrine Does Not Apply

Taylor County also raises the *Rooker-Feldman* doctrine, Br. at 26, but this does not apply to Ms. Loertscher's claim. As Taylor County notes, the Rooker Feldman doctrine bars lower federal courts from reviewing state court decisions, because only the Supreme Court has jurisdiction to do so.  Br. at 26. The Rooker-Feldman doctrine, however, only applies to effective review of state court proceedings themselves, not all claims involving those proceedings in some way.  As the Seventh Circuit has explained, "if the alleged injury is distinct from the state court judgment and not inextricably intertwined with it, the Rooker–Feldman doctrine does not apply." *Long v. Shorebank Development Corp.*, 182 F.3d 548, 555 (7th Cir. 1999).  The pivotal inquiry is "whether the federal plaintiff seeks to set aside a state court judgment or whether he is, in fact, presenting an independent claim." *Id*. (quoting *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 510 (7th Cir.1996)).

Here, Ms. Loertscher does not seek review of any state court decisions.  She is not asking for a reversal of a state court finding that she habitually lacked self-control or that she was in contempt of a prior court order, or any other finding.  Instead, she seeks redress for the constitutional violations visited upon her under the Act. Those violations, including the deprivation of her liberty, began prior to any of the state court proceedings, continued outside of the hearings, and continued after those hearings had concluded. (PFOF 112, 114-16, 119-121, 183-86, 192-93, 223, 227-28); *see, e.g.*, *Centres, Inc. v. Town of Brookfield, Wis.*, 148 F.3d 699, 702 (7th Cir. 1998) (distinguishing injury caused by a state court judgment itself from "a federal claim alleging a prior injury that a state court failed to remedy"). The *Rooker-Feldman* doctrine has no bearing here.

Similarly, Taylor County claims that its personnel had "no choice" but to investigate the report of unborn child abuse and then refer the case to juvenile court, with Ms. Loertscher's own

conduct causing her finding of contempt and ultimate confinement. Br. at 26. This discussion ignores the significant discretion retained by the county to, for example, select the type of "services" imposed on Ms. Loertscher. In this case, Taylor County officials insisted on compulsory inpatient treatment for Ms. Loertscher, which she resisted. Her refusal to permit the County to consign her to an inpatient facility ultimately caused to County to support and to obtain a finding of contempt, which then resulted Ms. Loertscher's jailing.

## II.    MS. LOERTSCHER'S FACIAL CHALLENGE TO ACT 292 DOES NOT DEFEAT *MONELL* LIABILITY AS A MATTER OF LAW

Taylor County alleges that Ms. Loertscher's facial challenge against Act 292 defeats her claim against the County as a matter of law. Br. at 27–28. As described above, *supra* Sec. I.A, facial challenges are compatible with municipal liability in situations like this. First, Ms. Loertscher alleges that the statute is facially invalid as unconstitutionally vague. Pltf. Br. at 22-25. One of the primary constitutional issues with an excessively vague statute is that it leaves enforcement open to excessive discretion by local officials. *Karlin v. Foust*, 188 F.3d 446, 465 (7th Cir. 1999) (noting that a vague statute permits "discriminatory and arbitrary actions by officials" who have "unfettered freedom to act on nothing but their own preferences and beliefs"). The vagueness of the statute leaves Taylor County free to exercise discretion in a way that causes additional constitutional injury. Similarly, the statute is unconstitutional on its face because it is not narrowly tailored to a compelling government interest. Nonetheless, Taylor County retained discretion within that framework to pursue extreme policies that visit additional constitutional injury upon Ms. Loertscher.

Taylor County again relies on *Madison Metro*, but that case is of no avail. The court in *Madison Metro* recognized that an unconstitutional state law does not necessarily immunize a municipality that takes steps in excess of that state law. 670 F. Supp. 2d at 940 (noting that an unconstitutional municipal policy could generate municipal liability if it caused a separate constitutional injury). *See also* Snyder, 745 F.3d at 248 (recognizing the same possibility).

Furthermore in Madison Metro, there was no change in municipal policy that could generate a different constitutional injury than the state statute because small adjustments to the racial quotas behind the transfer policy would still leave the policy racially discriminatory in the same way. *Id*. Here, by contrast, Taylor County has had the discretion implement the policy in multiple ways, even if all of those ways involve a constitutional and they have chosen to do so in a way that adds additional constitutional injury.[4]

## III.    TAYLOR COUNTY IS NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY

Defendant also argues that Taylor County is entitled to Eleventh Amendment Immunity. Br. at 28-30. Eleventh Amendment immunity from suit generally does not extend to counties and other local units of government. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). Protections from suit afforded to the states in federal court have sometimes been extended to specific agencies that are acting as an "arm of the state" in the context of a particular lawsuit, Northern Ins. Co. of New York v. Chatham County, Ga., 547 U.S. 189, 193-194 (2006) but that situation does not apply here.

Taylor County is not an arm of the state for sovereign immunity purposes generally or in "unborn child abuse" proceedings. Taylor Couinty argues that it has a contract with the State for Child Protective Services functions, that it receives some state funding, and that the state has supervisory authority and promulgates CPS standards. None of these minor factors makes Taylor County an "arm of the state" for Eleventh Amendment Purposes. Instead Wisconsin makes counties primarily responsible for implementation of child welfare services. PSPFOF 2. The Act specifically makes counties responsible for screening, investigation, and recordkeeping functions. Wis. Stat. § 48.59(1). Counties have substantial discretion in the implementation of the Act and may take actions beyond the minimum requirements of the Act. PSPFOF 54 & 57.

---

[4] The County also cites *Allen v. Wright*, 468 U.S. 737 (1984), and *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983), for the proposition that the County cannot be liable under § 1983 for its enforcement of a facially valid state law. Br. at 28. Yet *Allen* and *Lyons* both involve standing; neither one addresses the viability of a § 1983 claim in the face of a facially constitutional state law. Here, even if the law were held to be facially valid, Ms. Loertscher's as-applied challenge would remain, which would obviously implicate the actions of Taylor County officials who enforced the Act against Ms. Loertscher.

The Taylor County Human Services Department website states that it is focused on Taylor County individuals and families and that its funding comes from a variety of sources, including federal, state, and county sources. *See* http://www.co.taylor.wi.us/departments/f-m/hs/ (accessed Dec. 1, 2016).

In *Stem v. Ahearn*, 908 F.2d 1 (5th Cir. 1990), cited by Taylor County, the Fifth Circuit held that two Harris County Children's Protective Services workers acting as agents of the Texas Department of Human Services. Br. at 29. The court considered a number of "non-exhaustive" factors, including the view taken by state law, the source of the entity's funding; the degree of local autonomy retained; and whether the entity is concerned primarily with local, as opposed to statewide, problems. 908 F.2d at 4. *Id.* The court had "little difficulty" concluding they were state agents in light of Texas case law, statutory law, and agency funding, among other factors. Id. Here, by contrast Wisconsin law focuses on county responsibility, and counties have substantial discretion in practice. Taylor County also has the authority to levy taxes, Wis. Stat. § 59.51(2), and to issue bonds, Wis. Stat. § 67.05, which have been cited as factors in determining that local entities are not arms of the state Mt. Healthy City School Dist., 429 U.S. at 280 (citing the ability to levy taxes and issue bonds in support of its conclusion that a school board was not an arm of the state).

Taylor County is not an arm of the state, and Eleventh Amendment immunity cannot apply.

## CONCLUSION

The record demonstrates that there remain genuine, material disputes as to Taylor County's policies, practices, and customs in implementing Act 292. Taylor County has not met its burden, and Plaintiff respectfully requests that this Court deny Taylor County's Motion for Summary Judgment.

Dated this 1st day of December, 2016.          Respectfully submitted,

                                               **PERKINS COIE, LLP**

                               By:      /s/ Jeff J. Bowen
                                        Jeff J. Bowen
                                        JBowen@perkinscoie.com
                                        David J. Harth
                                        dharth@perkinscoie.com
                                        Freya K. Bowen
                                        fbowen@perkinscoie.com
                                        Joshua L. Kaul
                                        jkaul@perkinscoie.com
                                        David R. Pekarek Krohn
                                        dpekarekkrohn@perkinscoie.com
                                        Jesse J. Bair
                                        JBair@perkinscoie.com
                                        1 East Main Street, Suite 201
                                        Madison, WI 53703
                                        Telephone: (608) 663-7460
                                        Facsimile: (608) 663-7499

                                        **NATIONAL ADVOCATES FOR
                                        PREGNANT WOMEN**
                                        Lynn M. Paltrow
                                        lmp@advocatesforpregnantwomen.org
                                        Nancy Rosenbloom
                                        nlr@advocatesforpregnantwomen.org
                                        875 Sixth Avenue, Suite 1807
                                        New York, NY 10001
                                        Telephone: (212) 255-9252
                                        Facsimile: (212) 225-9253

                                        **REPRODUCTIVE JUSTICE CLINIC**
                                        Sarah E. Burns
                                        sarah.burns@nyu.edu
                                        Sarah Samuels Wheeler (*admission pending*)
                                        Alyson Zureick
                                        Washington Square Legal Services, Inc.
                                        NYU School of Law
                                        245 Sullivan Street, 5th Floor
                                        New York, New York 10012
                                        Telephone: (212) 998-6464
                                        Facsimile: (212) 995-4031

                                        *Attorneys for the Plaintiff,*
                                            *Tamara Loertscher*