**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

_____

**TAMARA M. LOERTSCHER,**

       **Plaintiff,**

                              **Case No. 14-CV-870**

**v.**

**BRAD SCHIMEL,** *et al.*,

       **Defendants.**

_____

**REPLY BRIEF IN SUPPORT OF TAYLOR COUNTY'S
MOTION FOR SUMMARY JUDGMENT**
_____

Defendant Taylor County, by its attorneys, submits this reply brief in support of its motion for summary judgment.

## INTRODUCTION

The touchstone of a claim under ***Monell v. Dep't. of Social Servs.,*** 436 U.S. 658 (1978), is the existence of a county or municipal policy, custom or practice that is directly responsible for the deprivation of rights protected by the Constitution. ***Id.*** at 690. Conceding in her response that she "has not yet located" such a Taylor County policy (Brief in Opp., p. 19), Ms. Loertscher nevertheless contends her claim for compensatory and punitive damages against the County should continue.

The law is very clear: a County-level policy—not State law—must be "the moving force" behind Ms. Loertscher's constitutional injury. ***Monell v. Dep't of Soc. Servs.***, 436 U.S. 658, 694-95 (1978) (recognizing that § 1983 liability for a municipality arises when an official policy is "the moving force of the constitutional violation"); ***City of Canton v. Harris***, 489 U.s. 378, 380 (1989) (recognizing that a municipality "is not liable under § 1983 unless a municipal 'policy' or 'custom' is the moving force behind the constitutional violation"); ***Gable v. City of Chicago***, 296 F.3d 531, 537 (7th Cir. 2002) (the policy or custom must be the "moving force" behind the constitutional violation); ***Johnson v.***

*Cook County*, 526 Fed. Appx. 692, 695 (7th Cir. 2013) (municipal liability stems from conduct or policy that is the "moving force" behind a constitutional harm).

Unable to identify an actual County policy that meets her needs, plaintiff resorts to inventive legal theories to bootstrap *Monell* liability onto her facial challenge. Her attempt to fabricate a causal County policy is ultimately futile. If County employees had discretion in applying Act 292 it would weigh against Ms. Loertscher's claim that a County policy caused her injury, not favor that claim. Nor does existing U.S. Supreme Court law allow her to infer the existence of a policy, practice or custom from just two Taylor County cases over 19 years in which the County was required to actively enforce Act 292. Similarly, the court may not infer deliberate indifference to training from just two events as a matter of law.

Ms. Loertscher has failed to demonstrate the existence of a dispute of material fact warranting a trial. Having failed to meet her burden, her claim under 42 U.S.C. § 1983 should be dismissed.

## RESPONSE TO PLAINTIFF'S "STATEMENT OF FACTS"

Ms. Loertscher devotes a considerable portion of her response brief to a self-serving narrative that minimizes the significance of her substance abuse and casts Taylor County employees as conspirators intent on imposing "the harshest, most draconian consequences on Ms. Loertscher." (Brief in Opp., p. 3). She fails to cite any evidence suggesting that the Taylor County Department of Human Services staff—all life-long, dedicated, professional social workers—held any personal animus toward her. Likewise, she fails to identify any purpose served or reason why the County would benefit from her misery. The reason Ms. Loertscher cannot cite any such evidence is because the social workers demonstrated no such ill will or intent. They were merely enforcing Act 292 as required by state law.

Ms. Loertscher's narrative is largely irrelevant to this motion. The Court has previously determined that the individual Taylor County employees involved in TL's case are immune from liability, (Order for Dismissal, Dkt. 118, June 6, 2016), and the facts she attempts to spin in her favor

are not material to this motion. The following contentions, however, are substantially misleading and require a response.

###### 1. *That there was no evidence of her drug use warranting screening in her case and performing an Initial Assessment.*

Ms. Loertscher implies that Taylor County commenced this case with little to no evidence that she used drugs during pregnancy or needed treatment for the same. She downplays her drug use by way of a self-serving affidavit memorializing her subjective opinions of her behavior. (Dkt. 19). Ms. Loertscher's personal opinions are only one side of the story and are directly contrary to the medical records and testimony of her board certified, treating gynecologist, Dr. Jennifer Bantz, and her other medical providers. (*See* Dkt. 1-2, p. 11-21). Taylor County, importantly, was required by law to make a screening decision and complete its Initial Assessment based on all information it received, including the medical records. Wis. Stat. § 48.981(3)(c)(1)(a); 48.931(3)(c)(4); (County PFOF ¶ 97).

At the onset, Taylor County was provided a report from Mayo Clinic/Luther Hospital social worker Corey Everson that Ms. Loertscher was "chemically dependent" and admitted to using methamphetamine, marijuana and alcohol during pregnancy. (County PFOF 29). She also confirmed that Ms. Loertscher's "physician is stating that this behavior is putting the fetus in serious danger of harm." (County PFOF 30). Taylor County was ultimately required to make a screening determination within 24 hours based on this information. It did so in compliance with CPS Standards. Wis. Stat. § 48.981(3)(c)(1)(a); (County PFOF 31-36).

After screening in the suspected abuse, Taylor County was then required to gather a laundry list of information in order to determine if Ms. Loertshcer's unborn child was "in need of protection or services" and then make a maltreatment determination. Wis. Stat. § 48.067; 48.931(3)(c)(4). While Loertscher claims these decisions were at the discretion of the county, Wisconsin's Children's code compelled this conduct and also provided an exhaustive list of the types of treatment and locations where Ms. Loertscher could be held if she was found to be in need of medical care. Wis. Stat. §

48.027(1m). Taylor County recommended inpatient treatment—based predominantly on conversations with and the opinions of Dr. Bantz and the medical records. (County PFOF ¶ 115). The ultimate placement decision, though, was left up to a county circuit court commissioner, Gregory Krug, who ordered Ms. Loertscher to be placed at the Fahrman Center after finding probable cause that she was abusing her unborn child. (County PFOF ¶ 65).

Ms. Loertscher also highlights the September 2016 deposition testimony of Dr. Bantz to support her claim that no expert witness supported her drug use or need for treatment. Dr. Bantz's testified at the August 4, 2014 placement hearing as an expert on prenatal care and drug use. (Dkt. 1-2, p. 11-21). At that time, she testified that she was competent to testify and, ultimately, Commissioner Krug found her to be a competent expert and her opinions to be "reliable." (*Id.*).

### 2. *That the county was exclusively behind the order for inpatient treatment.*

Ms. Loertscher also tries to advance the false narrative that Taylor County intake workers were ultimately responsible for the decision, and order, to select inpatient treatment. The undisputed evidence, though, supports that Ms. Loertscher's inpatient treatment was recommended, and supported at the August 5, 2014 placement hearing by testimony from her treating OB/GYN, Dr. Jennifer Bantz. The county relied on Ms. Loertscher's treaters in this regard. Dr. Bantz ultimately recommended inpatient treatment because she was concerned with Ms. Loertscher's support system and she was "certain" that she would not seek outpatient treatment if that was an option. (Dkt. 1-2, p. 18-19). Part of her concern with Ms. Loertscher's support system stemmed from her living conditions, with Dr. Bantz fearing that her boyfriend "was providing her the methamphetamine." (*Id.* at p. 18). This comes on the heals of Ms. Loertscher admitted to Mayo Clinic/Luther Hospital on August 1, 2014, that "her right arm is injured after [she] fought with her boyfriend." (495, 497).

Dr. Bantz' full concern with Ms. Loertscher's likely unwillingness to seek outpatient services is provided in the following exchange:

Q.     And do you believe from what Tamara had told you and reported to you, do you believe that she would avail herself of community services if released?

A.     Could you repeat that?

Q.     Yes.

A.     I'm sorry.

Q.     If she were released, do you believe she would avail herself of community services -- to community services?

A.     That she would get help?

Q.     Yes.

A.     As an outpatient? I'm certain that she might not. I can't speak for her support system, but it sounds poor. I think her decision-making is poor and her insight's poor. So that concerns me. And with that concern, that concerns the outcome of the pregnancy and – and the pregnancy. So that does concern me.

       I think she has good intentions, but that might be all she has, you know. She – she's 29. She's not 17. She's had quite a lot of years to try and get things together, and she – she concerns me. And I did bring up with her, and I didn't dictate as such, but an inpatient therapy, and she seemed to think that that wasn't necessary which I don't agree with that.

Q.     Okay. It is your recommendation, Doctor, that she go to a treatment facility. Is that correct?

A.     Yes.

(Dkt. 1-2, p. 19).

Ms. Loertscher recites her continued objections to inpatient treatment, implying the county workers handling her case should have accepted her word over her medical providers. However, Ms. Loertscher, at the time of her objections to any treatment (not just inpatient), was admitted to a behavior/mental health facility dealing with serious mental health issues. Upon her admission she admitted that she "hears voices in her head at night" (Wiesner Decl., Ex. A Loertscher487); was "hitting her head against a wall and car window" (*Id.* at Loertscher497); suffered from "several suicide attempts" (*Id.* at Loertscher173); and was experiencing "paranoia." (*Id.* at Loertscher356). She was admitted with an ultimate diagnosis of "major depressive disorder, recurrent, severe psychosis, not otherwise specified." (*Id.* at Loertscher374). Her opinions were, quite frankly, tainted by her personal bias, and medical condition.

### 3. That the county is responsible for the conduct of others.

Ms. Loertscher regularly blames the TCDHS intake workers for the conduct of others. This technique is best exemplified by her attempt to blame the entire CPS action on Taylor County's failure to inform Corey Everson that she was not a mandated reporter. The county, indeed, had no control over who reported suspected abuse and it was within Ms. Everson's legal rights to report Ms. Loertscher's conduct. Wis. Stat. § 48.981(2)(d). Regardless of who reported the abuse, the county was required by CPS Standards and Wisconsin law to make a screening decision and perform an Initial Assessment. (Knott Decl., Ex. 184, Ex. B, p. 15).

She also blames the TCDHS intake workers for seeking the Temporary Physical Custody Request. But this decision was made, and the request completed, by Kala Thompson in her role as an on-call, independent contractor for the juvenile court. (County PFOF 40-44). And she tries to cast the county in a negative light by alleging she never received a copy of the TPC Request. But her Mayo Clinic/Luther Hospital records evidence that she received the request forms the morning of the hearing. (Brown Decl., Ex. 19 at Loertscher1204).

Contrary to Ms. Loertscher's allegations, the county workers also had no part in initiating the remedial contempt action—that was a decision made by the guardian *ad litem* of the unborn child, over which the county had no control. (County PFOF 72). She also provides a detailed description of the allegedly poor conditions and less than adequate medical care she received at the county jail, implying that the intake workers were somehow responsible. She, however, has not alleged an Eighth Amendment deliberate indifference claim against her jailers. Ms. Clarkson's social worker notes evidence that the county met with her regularly during her incarceration and encouraged her to attend her prenatal appointments. (Knott Decl., Dkt. 184, Ex. G, p. 180-188).

### 4. That she was deprived of any notice of the CPS action and denied counsel.

Ms. Loertscher also tries to bolster her claim that she was deprived due process rights by exaggerating the facts of her several hearings. She claims that she was never provided an opportunity

to obtain counsel and was completely unaware of the proceedings initiating against her. The transcripts from her August 5 and September 4, 2014 hearings are on file with the Court (Dkt. 1-2, 1-8). Ms. Everson notified Ms. Loertscher of her August 5 hearing and provided a copy of the TPC petition hours before it took place; Loertscher simply refused to be a part of that conversation. ((Brown Decl., Ex. 19 at Loertscher1204). She undoubtedly knew of the hearing and her opportunity to retain an attorney, considering she stated on the record that she had "retained Attorney Rick Cyvekus" and wished for him to be involved. (County's Response to Plf's PFOF, 136). Court Commissioner Krug tried to involve Cyvekus but he did not handle these types of cases, but informed the court that he would get his partner involved and request a rehearing if needed. (*Id.*). Ms. Loertscher then left the hearing and failed to participate. (*Id.* at 137).

During the September 4, 2014, plea hearing, Judge Douglas Fox disclosed to Ms. Loertscher the nature of the proceedings, informed her of her right to counsel and stated he would reschedule the hearing if she wished to retain counsel; she wished to proceed and represent herself. (Dkt. 1-8, p. 3-7). Even after she was incarcerated at the county jail, Taylor County intake worker Julie Clarkson instructed Ms. Loertscher on several occasions to retain an attorney. (*Id.*). Ms. Loertscher finally heeded that advice and retained a public defender who was able to negotiate a consent decree.

### 5. That the county retained discretion in implementing the Act.

Ms. Loertscher ultimately claims that Taylor County was "left to develop their own policies regarding how to interpret and implement" Act 292, but the undisputed testimony supports otherwise. The CPS Standards provide detailed guidelines for intake workers to follow at each stage of their assessment and investigation of unborn child abuse. (Knott Decl., Dkt. 184, Ex. B). The Taylor County intake workers involved in Ms. Loertscher's investigation undisputedly testified that they relied exclusively on the CPS Standards at all times. (County PFOF 99, 114, 115, 127). Ms. Loertscher specifically cites to the deposition testimony of Paula Brown to support her general proposition that

the county "may take actions beyond the minimum requirements of Act 292." (*citing* PSPFOF 57).

Ms. Brown's actually testimony is as follows:

> Q: Okay. We've touched on this before, but what is DCF's understanding of the response-particular responsibilities that counties have for implementation and enforcing Act 292?
>
> [Objections omitted]
>
> A: Okay. ***DCF's understanding is spelled out in the standards starting from the time that the report comes in, what—what is required to be done at access, the screening decision, the services and the assessing that will go on in an initial assessment.***
>
> ***So that's what DCF would expect, is that the things that are outlined in statute and in standards, that's the—the basis, the minimum, the foundation that will be followed.***
>
> Q: Okay. And can counties take actions beyond that minimum that you just described.
>
> [Objection omitted]
>
> A: **Yes, they can—I mean, the law lays out what needs to be done**. But then when you talk about what a family may need, there's really not a limit on that. They'll try to help the family get whatever they need.

(Brown Dep., Dkt. 146, p. 140-141) (emphasis added). At issue in this case is the county's participation in the access stage and Initial Assessment—there is no allegation that it went above these minimum requirements "to try to help [Ms. Loertscher] get whatever [she] needs." In fact, Ms. Loertscher failed to cooperate from the start. (County PFOF 86-87).

Ms. Loertscher lastly provided the unsupported proposed fact that after a county investigates an initial report of suspected abuse "all further steps taken under the Act against a pregnant person are at the discretion of the counties and their agents." (*See* PSPFOF 59). This legal conclusion is not supported in the slightest. In addition to making a screening decision, Wisconsin's Children's Code, specifically Wis. Stat. § 48.931(3)(c)(4) and CPS Standards required Taylor County to perform an Initial Assessment, which provided that its intake workers "shall determine, within 60 days after receipt

of a report . . . whether abuse or neglect has occurred or is likely to occur." (County PFOF 97, 100). Wisconsin statutes and CPS Standards required Taylor County, after performing its Initial Assessment, to make "the maltreatment determination" and determine "whether the child is in need of protection or services."

Additionally, Wis. Stat. § 48.067, which lists the "Powers and duties of intake workers" provides, among other things, that "intake workers shall":

> (3) Determine whether the child or the expectant mother of an unborn child shall be held under s. 48.205;
> . . .
> (8) Make interim recommendations to the court concerning children, and unborn children and their expectant mothers, awaiting final disposition under s 48.355.

The county was ultimately statutorily obligated to perform all conduct with which Ms. Loertscher takes issue.

### 6. *That the county failed to train its employees or was required to implement guidelines in addition to the CPS Standards.*

Ms. Loertscher asserted a brand new claim in her response brief: that the county is "deliberately indifferent" for failing to adopt policies or provide training to prevent her constitutional harm. She implies the county workers received no training or guidance on these matters. This is completely false. The Wisconsin Department of Children and Families (DCF), in connection with its Child Protective Services program (CPS), is responsible for oversight of the Act's enforcement, which is delegated to each Wisconsin county by contract with DCF. (County PFOF 7-10). Wisconsin counties, however, are not given free range to interpret statutory provisions and implement the Act as they see fit. Rather, DCF—as required by Chapter 48—drafted guidelines that counties are required to follow when assessing and investigation reports of child and unborn child abuse (the CPS Standards). Wis. Stat. § 48.981(3)(c)(1)(a). In this case, Taylor County intake workers involved in Ms. Loertscher's case confirmed that they relied exclusively on the CPS Standards and provisions of Chapter 48. If the guidelines were unclear, the state retained exclusive authority to interpret the policies and county

workers were required to follow the state's directive. (County PFOF 17). The intake workers also confirmed they received training on these types of cases. DCF provided the exclusive training in connection with its partnership with the Wisconsin university system to county intake workers concerning handling abuse cases. (County PFOF 12).

### 7. That the county has a "custom" or "practice" of violating pregnant women's rights and failed to produce requested materials in discovery.

The State Defendants produced in discovery a spreadsheet memorializing every report and CPS action initiated against a pregnant woman under the Act. Taylor County, since the Act's enactment, received 11 reports of such abuse but only handled one prior case that was screened in and resulted in a substantiation of abuse. (PSPFOF 262). While Ms. Loertscher contends that the county refused to produce its records, the county produced to all parties its entire case file concerning this single case. (Knott Decl., Dkt. 184, Ex. G p. COUNTY 346-384).

That case arose from a September 2010 report the county received that a 28-week pregnant woman was currently hospitalized for a heroin overdose. (*Id*. at COUNTY 373). The woman's last child was also the subject of a CHIPS action in Marathon County due to a "substantial risk of neglect[]." (*Id*.). The woman admitted to intake workers that she had recently used drugs and medical professionals confirmed that the "drug use may be endangering the health of her unborn child." (*Id*. at COUNTY 373). The women ultimately voluntarily agreed to submit to AODA treatment. (*Id*. at COUNTY 375). Taylor County Judge Ann Knox-Baxter issued an order for the treatment. (*Id*. at COUNTY 360-383). The woman never complained of misconduct on the part of Taylor County. (*Id*.). Julie Clarkson, Liza Daleiden and Amber Fallos did not participate in this case. (*Clarkson Dep., Dkt. 159, p. 22-23; Daleiden Dep., Dkt. 157, p. 82-83; Fallos Dep., Dkt. 161, p. 12*).

## ARGUMENT

The U.S. Supreme Court has held that Congress did not intend in its enactment of 42 U.S.C. § 1983 to make counties or municipalities liable through *respondeat superior* for the acts of employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81, 106 S. Ct. 1292 (1986). Taylor County's liability must therefore be premised on an actual County policy or acts that are "officially sanctioned or ordered" by the County. *Id.* at 480. Ms. Loertscher must demonstrate, specifically, that her deprivation was caused by (1) an official County policy, (2) a widespread County practice or custom, or (3) a decision by an official with final policymaking authority that constitutes an official act of the County. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994). She has simply failed to do so. No such policy exists.

Having conceded in her response brief that she cannot point to an official policy or act of a Taylor County official with policymaking authority, Ms. Loertscher attempts to circumvent this fundamental requirement of her claim. She argues first that *Monell* liability can arise from discretionary decisions of County employees that allegedly enhance her injury. (Brief in Opp., pp. 13-19). Next, she argues that the existence of a "widespread practice" can be inferred from the County's only other instance of enforcement of Act 292. (*Id*. at pp. 19-22). She argues alternatively that the existence of a County policy can be inferred from the participation of multiple County employees on the case (*Id*. at pp. 22-24), or the County's enforcement of state law in other contexts. (*Id*. at p. 24). Finally, Ms. Loertscher argues that the County's reliance on state law and state-level policies evidences deliberate indifference to the need for a County policy. (*Id*. at pp. 24-27).

Ms. Loertscher's arguments, while perhaps creative, are unsupported by existing law. They cannot substitute for the core requirement of a *Monell* claim, *i.e.*, the existence of an unconstitutional County policy or practice that is the "moving force" behind a constitutional harm.

**I.** **THE DISCRETIONARY DECISIONS OF TAYLOR COUNTY EMPLOYEES CANNOT BE THE BASIS FOR *MONELL* LIABILITY.**

Ms. Loertscher's primary complaint has been that Act 292 authorizes government officials "to seize control of pregnant women" for the protection of their unborn children. (Am. Compl., Dkt. 66, ¶ 1, Nov. 6, 2015). She asserts that the law is unconstitutional on its face and in every conceivable application. (*Id.*) Seeking to prevent dismissal of her claim for compensatory damages, however, Ms. Loertscher takes a more nuanced position in her response brief. She asserts that, even though the statute is unconstitutional in every application, Taylor County officials independently caused her constitutional harm. She believes "case law leaves room for municipal liability under a facially unconstitutional statute when local officials have sufficient discretion to cause constitutional harm through their actions." (Brief in Opp., p. 13). Her position, in essence, is that Taylor County caused a constitutional harm on top of a constitutional harm. She suggests by implication that the County's employees were both agents of the State in causing her constitutional harm, but also agents of the County in causing a distinctly different constitutional harm.

**A.** ***Plaintiff has not met her burden of establishing that Taylor County's conduct was "the moving force" behind a distinct constitutional injury.***

Ms. Loertscher's argument, with all due respect, slices the bread too thin. No case authority supports her contention that *Monell* liability may arise from conduct that merely "exacerbates" a pre-existing constitutional injury. (Brief in Opp., p. 15). Plaintiff's legal theory is directly contrary to the heightened causation requirement for *Monell* liability that the courts have established. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 393-94 (1989)(J. O'Connor concurring)(emphasizing that *Monell* liability "entails more than simply showing 'but for' causation" and "[l]esser requirements of fault and causation would 'open municipalities to unprecedented liability…and pose serious federalism concerns.'")(citations omitted); *Bd. of the Cty. Comm'Rs v. Brown*, 520 U.S. 397, 415 (1997)(cautioning courts to apply "rigorous requirements of culpability and causation" because

"Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights."); *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)(noting municipal action must be "direct cause" of constitutional violation); *Thompson v. Connick*, 578 F.3d 293, 300-01 (5th Cir. 2009)(describing "heightened causation" requirement of *Monell*).

The "moving force" analysis is not a simple tort causation concept. Exacerbation of a constitutional harm will not suffice. As Judge Crabb observed, the issue may be framed as "causation", "policy", or "choice", but the ultimate question is whether the municipality is "responsible" for a separate constitutional violation through its own acts. *N.N. v. Madison Metro. Sch. Dist.*, 670 F. Supp.2d 927, 936 (2009). The court determined in *Madison Metro* that the school district's discretion in implementing an unconstitutional policy did not make the district responsible for a distinct constitutional harm. The same applies here. If the constitutional infirmity of Act 292 is its authorization of seizure of pregnant women, then a resulting seizure is not caused by *county* policy; it's the effect of the law. In that circumstance, "the state law is the proximate cause of the plaintiff's injury," not the county's compliance with it. *Snyder v. King*, 745 F.3d 242, 247 (7th Cir. 2014)(*citing Surplus Store and Exchange, Inc. v. City of Delphi*, 928 F.2d 788, 791-92 (7th Cir. 1991) and *Whitesel v. Sengenberger*, 222 F.3d 861, 872 (10th Cir. 2000) (county cannot be liable for "merely implementing" a policy created at the state level)).

Ms. Loertscher cannot argue that Act 292 is unconstitutional on its face and in every application, yet assert also that Taylor County caused an independent constitutional harm by enforcing the law. Her suggestion that the County caused a separate and distinct constitutional harm through discretionary acts is unconvincing and fails the "moving force" and "direct cause" tests.

### B. *Taylor County did not cause constitutional harm through exercise of its discretion.*

Plaintiff's premise that Taylor County caused an independent constitutional harm by its discretionary acts is flawed in several other respects. First, the County was mandated by law to apply Act 292 to Ms. Loertscher's circumstance. It did not have the discretion to ignore a report that Ms. Loertscher was pregnant, had "tested positive for methamphetamines, amphetamines, and THC," and continued to use those drugs during her pregnancy.[1] (County PFOF 27-28). Just as a county social worker cannot ignore reports of a shaken baby or abused toddler, the County could not under Wisconsin law simply ignore the report from Ms. Loertscher's physician that her drug use was "putting the fetus in serious danger of harm." (County PFOF 30).

Ms. Loertscher concedes that Wis. Stat. § 48.981(3)(c)(1)(a) required the County "to determine if the unborn child [was] in need of protection or services." She largely ignores, however, the County's statutory obligation to perform the investigation "in accordance with standards established by the department," *i.e.*, the CPS Standards.[2] The CPS Standards provide precise and exhaustive directions for the County social workers, including a series of mandatory determinations when faced with certain facts. (Knott Decl., Dkt. 184, Ex. B, p. 51). The County was required to determine whether Ms. Loertscher or her unborn child was "in need of protection or services" and, in the absence of her

---

[1] Plaintiff's adamant position that she had stopped using drugs at the time of the report does not raise a question of material fact precluding summary judgment. The fact is not relevant. It is undisputed that the Taylor County Department of Human Services was told those facts by her health care providers. The acquisition of those facts triggered its mandatory investigation whether true or not.

[2] The relevant language of § 48.931(3)(c)(1)(a) provides as follows:

> Within 24 hours after receiving a report under par. (a) of suspected unborn child abuse, the agency, in accordance with that authority, ***shall initiate a diligent investigation to determine if the unborn child is in need of protection or services***. An investigation under this subd. 1.a. ***shall be conducted in accordance with standards established by the department for conducting child abuse and neglect investigations or unborn child abuse investigations***.

(emphasis added).

cooperation, to make a report to juvenile court authorities resulting potentially in her custodial placement. Wis. Stat. § 48.067.

The County was not free to ignore Ms. Loertscher's case as she suggests. Section 48.067 of the Wisconsin Statutes provides that "intake workers *shall*. . .[d]etermine whether the child or expectant mother of an unborn child shall be held under s. 48.205." (emphasis added). While Ms. Loertscher may dispute the conclusions the County staff reached based on her own view of the narrative, she cannot dispute that her case mandated the County's involvement and required that caseworkers assess her need for services, including custodial placement.

### C. *Taylor County is immune from liability for its employees' discretionary decisions.*

Ms. Loertscher argues that Taylor County "used [its] discretion to pursue more extreme actions, exacerbating the constitutional harm." (Brief in Opp., p. 15). She cites specifically the recommendation that she have inpatient rather than outpatient drug treatment. (*Id.*) She complains that "Ms. Loertscher's wishes and her willingness to avoid drugs and alcohol" were ignored. (*Id.*) She later argues that "[t]he pattern in Ms. Loertscher's case suggests a coordinated policy of pursuing the harshest treatment available." (*Id.* at 20). She places blame for her course solely on County social workers.

Ms. Loertscher's contention is factually baseless. Ms. Loertscher offers no motive or incentive for the County to pursue "the harshest treatment available." The County disputes plaintiff's argument that the County selected Ms. Loertscher's custodial placement. By statute, the caseworker was required to advise the juvenile court's intake personnel and law enforcement of the circumstance, but those personnel made the determination on whether a temporary physical custody hold was appropriate. Wis. Stat. § 48.205(1). The disposition of Ms. Loertscher's case thereafter—including custodial placement—was by order of the juvenile court and is absolutely immune from § 1983 liability. Wis. Stat. § 48.069(1)(a)(mandating that county department "shall…supervise and assist…the expectant

mother of an unborn child pursuant to informal disposition, a consent decree or order of the court.”);

***Henry v. Farmer City State Bank***, 808 F.2d 1228, 1239 (7th Cir. 1986)(holding that absolute immunity applies to individuals actions in executing a facially valid court order).

Intent on demonizing the County social workers, Ms. Loertscher accuses them of acting in concert to “impose the harshest, most draconian consequences” on her. (Brief in Opp., p.1). The accusation is baseless and offensive. CPS Standards require that “the CPS caseworker must collaborate with other professionals, as permitted by statute, in the assessment and provision of services to the expectant mother and unborn child.” (Knott Decl., Dkt. 184, Ex. B, p. 52). Taylor County was obligated to collaborate with Ms. Loertscher’s health care providers. Her treating obstetrician, Dr. Jennifer Bantz, testified at the hearing on August 5, 2014, that inpatient treatment was necessary:

> Q. And do you believe from what Tamara had told you and reported to you, do you believe that she would avail herself of community services if released?
>
> …
>
> A. That she would get help?
>
> Q. Yes.
>
> A. As an outpatient?  I’m certain that she might not.  I can’t speak for her support system, but it sounds poor.  I think her decision-making is poor and her insight’s poor.  So that concerns me.  And with that concern, that concerns the outcome of the pregnancy and – and the pregnancy.  So that does concern me.
> I think she has good intentions, but that might be all she has, you know.  She – she’s 29.  She’s not 17.  She’s had quite a lot of years to try and get things together, and she – she concerns me.  And I did bring up with her, and I didn’t dictate as such, but an inpatient therapy, and she seemed to think that that wasn’t necessary which I don’t agree with that.
>
> ***Q. Okay.  It is your recommendation, Doctor, that she go to a treatment facility.  Is that correct?***
>
> ***A. Yes.***

(Dkt. 1-2, p. 19)(emphasis added).

More importantly, Ms. Loertscher’s contention that the caseworkers’ recommendations were “extreme” or “harsh” does not give rise to ***Monell*** liability. Ms. Loertscher’s argument that those

decisions were discretionary undermines her argument that they constitute County *policy*. By definition, a discretionary decision in a particular case cannot be "policy." The treatment and placement recommendations were—by Ms. Loertscher's admission—judgment calls based on the circumstance of her case. While she may dispute the caseworkers' judgment and application of facts (as she sees them) to law, those decisions are not County *policy* and cannot serve as the basis for *Monell* liability. *Monell*, 436 U.S. at 691 (holding "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.")

Plaintiff's position is, in fact, an attempt to hold the County vicariously responsible for the individual discretionary decisions of its employees. Ms. Loertscher disagrees with her physician's testimony suggesting inpatient treatment and the caseworker's judgment in her case; she seeks to have the County held responsible. The argument ignores both the Court's prior decision dismissing Ms. Loertscher's individual capacity claims and the entire purpose of the "official policy" prerequisite to *Monell* liability. As the Court noted in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S. Ct. 1292 (1986), the official policy requirement is intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is "actually responsible."

A county may not be vicariously liable for its employee's acts, in particular their professional judgment calls. To the extent that Ms. Loertscher has argued the County's exercise of discretion "exacerbated" the constitutional injury imposed by Act 292, she has defeated her own claim. The decision by her caseworker that inpatient treatment was appropriate in Ms. Loertscher's case was not a policy determination of Taylor County. Even if the caseworker were mistaken, the Court has previously ruled that she would be entitled to qualified immunity for that determination.

**II.** **PLAINTIFF HAS NOT, AS A MATTER OF LAW, MET HER BURDEN OF DEMONSTRATING THE EXISTENCE OF AN UNCONSTITUTIONAL "CUSTOM" OR "PRACTICE" OF VIOLATING EXPECTANT MOTHER'S RIGHTS.**

This matter has been pending for more than two (2) years. The parties have exchanged more than 20,000 pages of written discovery. Ms. Loertscher admits that she "has not yet located" a written policy on which to base her case (Brief in Opp., p. 19), but contends nevertheless that "the record suggests Taylor County operated pursuant to a policy, practice or custom." (Brief in Opp., p. 20). Her contention that such a policy exists is fantasy. She cannot meet her burden by supposition or unsupported argument. Her case must be dismissed. *See Johnson v. Cambridge Ind.*, 325 F.3d 892, 901 (7th Cir. 2003)(noting summary judgment creates "put up or shut up" moment).

> **A.** ***Plaintiff fails to demonstrate a "widespread practice" as a matter of law.***

Lacking proof of an actual policy, Ms. Loertscher asks the Court to speculate that a "custom" or "widespread practice" of unconstitutional handling of Act 292 cases must exist based on the single other case that has arisen in Taylor County since the law's enactment.[3] (Brief in Opp., pp. 20-22). The handling of a single matter does not permit such an inference. Plaintiff's argument is contrary to clear precedents on the issue.

While theoretically possible that the similar handling of a large number of cases may imply the existence of a custom, the courts are clear that the inference does not arise from the handling of just a few cases. The unconstitutional conduct must occur repeatedly to the point it suggests the government entity has adopted and endorsed the practice. The plaintiff seeking *Monell* liability based on a "widespread practice" must demonstrate the behavior is "permanent and well settled" such that the government entity can be seen to have willfully participated in "a series of bad acts" that resulted in

---

[3] Ms. Loertscher has conceded in her response that the named defendants—now dismissed—were not officials with "final policymaking authority" to act on behalf of the County. No such argument is asserted.

identical constitutional harms. ***Adickes v. S.H. Kress & Co.***, 398 U.S. 144, 167-68 (1970); ***Jackson v. Marion County***, 66 F.3d 151, 152 (7th Cir. 1995).

The Seventh Circuit has determined that the "custom" analysis may ultimately turn on the quantity of prior instances of similar conduct. The court commented recently that "it must be more than one or even three times" to support an inference of a county custom or practice. ***Chatham v. Davis***, 839 F.3d 679, 682 (7th Cir. 2016). The court held previously that a municipality's involvement in ***nine*** prior instances of allegedly unconstitutional conduct does not create a custom or practice under ***Monell***. ***Garrison v. Burke***, 165 F.3d 565, 572 (7th Cir. 1999)(holding that nine incidents of harassment does not imply a custom); *see also* ***Palmer v. Marion County***, 327 F.3d 588, 596 (7th Cir. 2003)(finding that two incidents of unconstitutional conduct in a year was too few to establish widespread practice); ***Gable v. City of Chicago***, 296 F.3d 531, 537-538 (7th Cir. 2002) (holding that three incidents too few to establish widespread custom); ***Cornfield v. Consolidated High Sch. Dist.***, 991 F.2d 1316, 1326 (7th Cir. 1993) (holding that two instances of allegedly unconstitutional conduct by municipal employees did not establish the existence of a municipal custom); ***Harper v. Mega***, 1998 WL 473427 (N.D. Ill. Aug. 7, 1998) (holding that two unrelated incidents do not constitute a widespread practice that is so well settled that it constitutes a custom or usage).

Ms. Loertscher concedes that the "sample size is not large" concerning the County's enforcement of Act 292. (Brief in Opp., p. 21-22). She attempts to argue the single other case in which Taylor County was required to involve a juvenile court demonstrates a "widespread practice." The argument fails as a matter of law.[4] The County's involvement in two unrelated incidents in the almost 20 years since Act 292 has been enacted does not, as a matter of law, create a plausible inference of a widespread practice or actionable municipal policy.

_____

[4] The State Defendants provided an exhaustive list of every Act 292 case initiated in each Wisconsin county, including Taylor County. Taylor County received reports of potential unborn child abuse in 12 such cases, but only two cases, including Ms. Loertscher's, were "screened in" and required County investigation and recommendations for services. (Knott Decl., Ex. 184, Ex. G, p. COUNTY 340-384).

As noted previously, the only other substantiated Taylor County case is actually inapposite. Regardless of the specific circumstance, however, the case did not result in a complaint or grievance by the expectant mother that would put the County on notice of alleged unconstitutional conduct. It cannot serve as the basis for *Monell* liability as a matter of law. *See **Wisconsin Electric Ry. Hist. Soc. v. East Troy***, 657 F. Supp. 1267, 1269-1270 (holding that "proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*").

### B. *The participation of multiple staff members does not imply a custom or policy as a matter of law.*

Ms. Loertscher next argues that a County policy can be inferred because "teams" of County employees' participated in her case. (Brief in Opp., pp. 22-24). It is notable that she cites no authority for her proposition. She has, frankly, lost sight of the concepts underlying *Monell* liability. It is premised on the existence of an unconstitutional policy that has been endorsed by the government entity. The participation of a caseworker and her supervisor in a single case does not suggest the County must have adopted an unconstitutional "playbook" for their work.

It is also notable that Ms. Loertscher cannot identify a County policy suggested by the team approach to social work. The concept of supervision is common in the field. The specific relationship with which Ms. Loertscher takes issue was actually mandated by CPS Standards, which compelled the screening decision and all investigation determinations to be reviewed and approved by a supervisor, here, Liza Daleiden. (Knott Decl., Dkt. 184, Ex. B, p. 22, 41). The CPS Standards state as follows:

**XII.L. Supervisory Approval and Documentation**

All requirements related to a Primary Assessment, Secondary Assessment, or Non-Caregiver Investigation must be approved by the supervisor or her/his designee and documented in the family case record within 60 days from the receipt of the report.

(*Id*. p. 41).

If, as plaintiff suggests, the participation of multiple county employees in a child welfare case evidences an unwritten policy as to how that case will be handled, then each and every such case would support *Monell* liability. The same would pertain to every county service, as consumer-level employees tend to be supervised in their work. The "moving force" element would be meaningless, and every county service would be reviewable in federal courts. The Supreme Court's clear admonition against *respondeat superior* liability would be ignored, exposing government entities to "unprecedented liability" and significant federalism concerns. *See Pembaur,* 475 U.S. at 480. The argument is legally baseless.

> **C.** **The use of procedures developed for investigation of child abuse does not create a County custom or policy as a matter of law.**

In a final attempt to conjure a County policy where none exists, Ms. Loertscher argues that Taylor County "continued to act according to the policy, practice and custom it had developed with respect to children." (Brief in Opp., p. 24). She fails, however, to identify the unconstitutional "policy" or present evidence of how the County handles other types of abuse cases in an unconstitutional manner. (*Id.*, p. 24). Not surprisingly, she cites no authority for the proposition.

Ms. Loertscher references two scant facts to support her theory. First, she highlights a deposition response by Liza Daleiden as evidence of unconstitutional conduct. The statement is taken out of context and does not support the proposition for which it was offered.[5]

---

[5] To clarify, Ms. Daledien's statement was referring to *forms* used in both UCHIPS and CHIPS cases. She did not compare substantive practices or standards for these types of cases. Her testimony, in full, is as follows:

> Q:     Do you have different forms you fill out UCHIPS cases as opposed to CHIPS cases?
>
> A:     Yes.
>
> Q:     Same form?
>
> A:     Yes, we would just indicate it is a UCHIPS, an unborn child.
>
> Q:     Why do you use the same forms?
>
> A:     Because it is the same criteria of whether or not a child is in danger or not. So it is the same concerns, we're looking at child safety.

She also cites a reference to Mayo Clinic social worker Corey Everson as a mandated reporter in support of her argument. These facts are hardly concrete evidence that the County follows some uniform, unidentified policy or custom for all types of abuse cases. More importantly, the argument directly contradicts the undisputed testimony from each social worker who participated in Ms. Loertscher's case that County workers relied on the CPS Standards and provisions of Chapter 48 at all stages of Ms. Loertscher's case, not a County policy or practice. *(County PFOF, Dkt. 181, No. ¶¶ 99, 114, 115, 127).*

### III.    PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIM FAILS AS A MATTER OF LAW.

Having failed to prove the existence of a policy, practice or custom by reference to facts or by operation of law, Ms. Loertscher argues alternatively that an alleged lack of such policies gives rise to a constitutional claim. (Brief in Opp., pp. 24-27). Ms. Loertscher did not plead this claim, however, despite multiple pleadings. A deliberate indifference cause of action under *Monell* is a unique claim subject to federal pleading standards. *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994); *Jackson v. Marion County*, 66 F.3d 151, 153 (7th Cir. 1995); *Mitchell v. City of Chicago*, 1994 WL 649986 at *2. The claim should be dismissed on the basis of the pleading deficiency.

Assuming she is allowed to pursue the claim despite not pleading it, her claim once again fails as a matter of law. Ms. Loertscher fails to acknowledge the U.S. Supreme Court and Seventh Circuit's admonitions that such claims are rarely valid. There are only "limited circumstances" in which a county's failure to act can be deemed "deliberate indifference." *Robles v. Fort Wayne*, 113 F.3d at 736 (*citing* *Bd. of Cnty. Comm'Rs v. Brown*, 520 U.S. 397, 407 (1997); *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989).

---

|  |  |  |
|---|---|---|
| Q: | Is there a requirement that you know of to use the same forms in a UCHIPS case that you use in a CHIPS case? |
| A: | Yes. It's what we are provided to use, we use the same standards. |

(Daleiden Dep., Dkt. 157, p. 22-23).

The Supreme Court stated as much in ***Connick v. Thompson***, 563 U.S. 51, 51 (2011), that such claims should almost always be rejected.

> In ***limited circumstances***, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. ***A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. A policy of inadequate training is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell***. To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact. Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983. (Thomas, J., joined by Roberts, Ch. J., and Scalia, Kennedy, and Alito, JJ.)(emphasis supplied).

Deliberate indifference claims require a widespread practice—"a pattern or a series"—of unconstitutional acts such that the violation is "plainly obvious." It is only when the pattern is so patently obvious that a reasonable policymaker may be deemed indifferent. ***Gable v. City of Chicago***, 296 F.3d 531, 537 (7th Cir. 2002) (*citing **Bd. of Cnty. Comm'rs**, 520 U.S. at 411); **Cornfield v. Consolidated High Sch. Dist. No. 230**, 991 F.2d 1316 (7th Cir. 1993). The cases require specific proof of "a recurring situation that presents an obvious potential for a constitutional violation" and a failure to provide training to remedy the harm. ***Dunn v. City of Elgin, Illinois***, 347 F.3d 641, 646 (7th Cir. 2003).

Once again, Ms. Loertscher has no evidence of a recurring pattern or unconstitutional conduct in Taylor County. She can identify, at most, one other case in which the County was required to involve the juvenile court since the Act's enactment. That single instance cannot as a matter of law give rise to an inference of repeated unconstitutional conduct such that it would be "plainly obvious" to policy makers. In fact, this Court's prior decision suggests that there was no reason for the County to suspect unconstitutional behaviors. The Court observed that "[t]he law in this circuit did not place reasonable county human services employees on notice that enforcing Act 292 in their limited roles was unconstitutional." (Order on Motion to Dismiss, Dkt. 118, p. 22) (emphasis added). "The fact that Act

292 was valid at the time the county defendants enforced it means that they did not have to guess whether it was unconstitutional." (*Id.*). The Court's observations are accurate and demonstrate that the County should not have been on notice of "recurring" unconstitutional acts by its employees.

While the precise analysis may differ, the Court's qualified immunity discussion demonstrates that a deliberate indifference case cannot lie here. Ms. Loertscher is the first expectant mother to challenge the Act's constitutionality, and take issue with the means by which DCF, and Taylor County, enforced its provisions. As the Court noted further, "When a statute has never been challenged, and when 'no reported decision (state or federal) addresses the precise issues[,] it is unlikely that an unconstitutional statute rises to the level of patently or obviously unconstitutional so as to notify officials to abandon enforcement." (*Id.* at 24)(*citing **Doe v. Heck***, 327 F.3d 492, 516 (7th Cir. 2003). It  is for these same reasons that the County cannot be deemed indifferent to its employees' alleged unconstitutional handling of the single other case with which the County was presented.

Ms. Loertscher's liability by omission claims fail for other reasons. She assumes that the County employees had no training. In fact, all counties are required by law to follow the standards established by the State of Wisconsin's Department of Children and Families. Wis. Stat. § 48.981(3)(c)(1)(a); (County PFOF, Dkt. 181, ¶¶ 23, 31). As is the case with every county in Wisconsin, the DCF provides the necessary training for implementation of the Act. (*Id.* at ¶ 12). There is no evidence or argument in this lawsuit that the State's training is inadequate, and there is no basis for a County official to assume the training is so inadequate that it gives rise to indifference.

Again, Ms. Loertscher fails to identify how additional training would have prevented her outcome. She cannot simply rest on her belief that "an injury or accident could have been avoided if a municipal employee had better or more training." ***Canton***, 489 U.S. at 390-91; ***Graham***, 915 F.2d at 1101. The Supreme Court recognized that any § 1983 plaintiff can undoubtedly "point to something the [municipality] 'could have done'" to prevent harm. ***Canton***, 489 U.S. at 392 (*citing **Oklahoma City v. Tuttle***, 471 U.S. at 823). A plaintiff, to meet the strict deliberate indifference standard on a failure

to train claim, must present evidence, including expert testimony, that specialized training in a certain situation would have altered an outcome. ***Cornfield***, 991 F.2d at 1327; ***Fittanto v. Children's Advocacy Ctr.***, 836 F. Supp. 1406, 1418 (N.D. Ill. 1993) (denying plaintiff's deliberate indifference claim for failing to provide more training because plaintiff failed to present evidence, including "expert evidence," supporting the need for additional training for workers handling sexual abuse cases). She must then "still prove that the deficiency in training actually caused" her alleged harm. ***City of Canton v. Harris***, 489 U.S. 378, 390-91 (1989).

Here, Ms. Loertscher has done neither. She failed to present any evidence as to what additional training the County should have provided to its caseworkers, if any, and she has failed to demonstrate that additional training would have prevented her alleged harm. Child protective services is a "specialized field." Explaining its practices, and needed training, undoubtedly requires testimony from a knowledgeable witness. Ms. Loertscher has not identified any witness who supports her liability by omission or failure to train claim. Conversely, Taylor County identified a CPS expert who confirmed that the county's handling of Ms. Loertscher's case was "by the book." (Klyve Report, Dkt. 128, August 19, 2016). Ms. Loertscher's unsupported allegations cannot move forward.

## IV.   PLAINTIFF HAS NOT ALLEGED A CONSTITUTIONAL VIOLATION BY THE COUNTY.

Ms. Loertscher failed to respond to Taylor County's argument that the County employees' specific conduct, as identified in her Amended Complaint, did not rise to the level of unconstitutional behavior. To the extent she responds, Ms. Loertscher identifies only generalized rights[6] that she contends the County violated. She fails, however, to prove that the alleged violations are "affirmatively linked" to a County policy. ***Monell v. Dep't of Soc. Servs.***, 436 U.S. 658, 692 (1978). By discussing only the most general rights in the most general fashion, Ms. Loertscher seeks to evade her obligation

---

[6] Of note, Ms. Loertscher seems to have abandoned her claim that the County violated her rights by receiving or requesting her Mayo Clinic/Luther Hospital medical records. (*See* Plf. Response Brief, Dkt. 200). Taylor County therefore asks the Court to dismiss this aspect of her claim.

of demonstrating a specific County policy that caused her constitutional harm. Even if the County's conduct as alleged by Ms. Loertscher was unlawful, which she fails to support legally, the harm resulted from individual choices and judgments of the individuals rather than County *policy*. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 386 (1989); ***Kujawski v. Board of Comm'rs of Bartholomew County, Ind.***, 183 F.3d 734, 737 (7th Cir. 1999). Ms. Loertscher continues to confuse individual actions, which are immune, with County policy.

### A. Ms. Loertscher's claim that the County imprisoned her is factually erroneous and not reviewable by this Court under the Rooker-Feldman doctrine.

Ms. Loertscher also fails to recognize that her lawsuit is a collateral attack on several facially valid state court judgments and therefore not reviewable in this Court. The constitutional harm she alleges was loss of personal freedom, which was the result of the order of a juvenile court; it was not the order of the Taylor County Department of Human Services. The court commissioner issued an order for her to attend inpatient treatment when discharged from the hospital[7] and a circuit court judge issued a contempt order that led to her incarceration. (County PFOF 65-68, 82). Her claims that the County violated her right to physical freedom or medical autonomy are a request that the Court review and invalidate the juvenile court orders.

This Court lacks the ability to review these decisions pursuant to the ***Rooker-Feldman*** doctrine. ***Exxon Mobil Corp. v. Saudi Indus. Corp.***, 544 U.S. 280, 291-92 (2005) (holding lower federal courts are without jurisdiction to review claims for relief for "an injury cause by [a] state-court judgment); *see also* ***Garry v. Geils***, 92 F.3d 1362 (7th Cir. 1996) (dismissing § 1983 claim that defendant caused property to be condemned because suit was akin to challenging the state court's decision condemning the property). Likewise, Ms. Loertscher's claims that the county workers violated

---

[7] Ms. Loertscher generally claims that the county violated her right to refuse forced medical treatment. The undisputed facts, however, evidence that Ms. Loertscher never presented to the Fahrman Center or participated in the court-ordered inpatient treatment. She only attended outpatient treatment, voluntarily, as part of her consent decree. There was simply no "forced medical treatment" in this case.

her rights by pursuing or participating in contempt proceedings are not actionable as a matter of law. ***Dodson Aviation, Inc. v. Padron***, 2011WL 1097774 (D. Kan. March 22, 2011) (*citing **Shelton v. Wallace***, 1996 WL 428363, *3 (6th Cir. 1996) (holding that "[t]he policy of enforcing state court orders, even if we assume that those orders may from time to time be erroneous, cannot be an unconstitutional policy").

### B. Ms. Loertscher's 14th Amendment claim fails.

Ms. Loertscher alleged a new constitutional injury in her response brief; that the County violated her rights by failing to inform Corey Everson, the Mayo Clinic/Luther Hospital social worker who reported the suspected abuse, that she was not a "mandated reporter" under the law. (Brief in Opp. at p. 29). This claim is meritless and a red herring. Ms. Everson was within the law in reporting Dr. Bantz's concerns.[8] Even if Ms. Everson—a Mayo employee—was mistaken, it is not of constitutional significance or actionable. The County was required by law to investigate the report regardless of its source. (Knott Decl., Dkt. 184, Ex. B, p. 15) ("if suspected unborn child abuse is reported, the agency must document the report, make a screening decision and, if screened in, make a response time decision").

### V. THE COUNTY CANNOT BE LIABLE IF ACT 292 IS FOUND CONSTITUTIONAL.

Taylor County asks the Court to dismiss Ms. Loertscher's § 1983 claim if the State Defendants' motion for summary judgment succeeds and Act 292's constitutionality is vindicated. Ms. Loertscher attempts to rebut the argument, but cites no law. ***Monell*** liability is contingent on a plaintiff proving that the underlying municipal employee's conduct violated her rights. ***Matthews v. City of East St. Louis***, 675 F.3d 703, 709 (7th Cir. 2012) (holding that if there is "no constitutional violation, [there is]

---

[8] Wis. Stat. § 48.981(2)(d) provides that "[a]ny person, including an attorney, who has reason to suspect that an unborn child has been abused or ***who has reason to believe that an unborn child is at substantial risk of abuse may report as provided in sub. (3).***" (emphasis added).

therefore no municipal liability").. There is no question here that the County acted in enforcement of the Act.

The Supreme Court's decision in ***City of Canton v. Harris***, supports Taylor County's position that a facially lawful policy or law defeats ***Monell*** liability, even in the face of an as-applied challenge. 489 U.S. 378, 386-87 (1989). The defendant in ***Canton*** urged the Court to "adopt a rule that a municipality can be found liable under § 1983 only where 'the policy in question [is] itself unconstitutional." *Id*. The Court, realizing it had never resolved this issue, recognized that "[i]t is difficult to see what constitutional guarantees are violated by" a facially constitutional policy and held that "[*n*]*or, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on respondeat superior.*" *Id*.; *see also **Schmelz v. Monroe County**.*, 954 F.2d 1540, 1544 (11th Cir. 1992) (concluding no personal liability for Sheriff who instituted facially constitutional policy).

Here, the County intake worker's undisputedly confirmed that they relied exclusively on the CPS Standards and amended provisions of the Act during Ms. Loertscher's case. If the Act is lawful their conduct is lawful. If they deviated at an individual level and applied the facially valid Act in an unlawful manner they would be liable at an individual, not a county level—but this Court already found them personally immune. ***Canton***, 489 U.S. at 387; *see **McClanahan v. City of Tumwater***, 2012 WL 411383, * 21 (W.D. Wash. Sept. 19, 2012) (holding that a "city cannot be liable for the actions of its employees unless the employees acted pursuant to a 'policy, practice, or custom.' As a matter of law, a 'rogue employee' does not give rise to a ***Monell*** claim").

## VI.    THE COUNTY IS ENTITLED TO ELEVENTH AMENDMENT IMMUNITY.

The State of Wisconsin provides absolute "immunity from liability," both civil and criminal, to "any person or institution participating in good faith" when "conducting an investigation" into unborn child abuse or offering services to an expectant mother. Wis. Stat. § 48.981(4). This immunity statute evidences Wisconsin's goal of protecting county agencies and intake workers who enforce Act

292 and promote the state's overarching policy of protecting unborn children from gestational drug use. This protection is afforded because, under Wisconsin law and CPS Standards, county agencies and their intake workers are treated as state agents when performing their contractual CPS functions on behalf of DCF and CPS, including assessing and investigation unborn child abuse. (*See* Knott Decl., Dkt. 184, Ex. B). This Court must follow Wisconsin law, and take into account the statutory and contractual relationship between DCF and Taylor County, when determining if Taylor County is an arm of the state. ***Mount Healthy City Sch. Bd. of Educ. v. Doyle***, 429 U.S. 274, 280 (1977).

Taylor County presented a plethora of specific facts supporting its and its intake workers' place as state agents when performing its contractual CPS functions. Most notably, DCF and CPS labels the County as a "CPS Agency," directly supervises its conduct, funds its CPS functions, and can defund or discipline it for poor performance or its failure to abide by state standards. (County Brief, Dkt. 182, p. 28-30, Nov. 10, 2016). While Ms. Loertscher opposes this argument by highlighting that the county, generally, has the ability to levy taxes or issue bonds (without evidence that either takes place), the State Defendants position, or lack of one, speaks volumes. The State Defendants filed a statement of no opposition, thereby acquiescing to the County's position that it and its intake workers are state agents when performing CPS functions. (State's No Opposition, Dkt. 190, Dec. 1, 2016).

Ms. Loertscher also claims that, when deciding if a county or municipality is a state agent, "Wisconsin law focuses on county responsibility, and counties have substantial discretion in practice." (sic). (Brief in Opp., p. 33). She, however, fails to cite any supporting authority. (*Id.*). Her only other argument is that the Fifth Circuit Case cited to by Taylor County—in which county CPS workers were found to be agents of the Texas Department of Human Services—was based on the court's finding that "they were state agents in light of Texas case law, statutory law, and agency funding, among other factors." ***Stem v. Ahearn***, 908 F.2d 1 (1990) (Brief in Opp., at p. 33). That is exactly Taylor County's point—Chapter 48, the CPS Standards, and multiple state agencies (DCF and CPS) consider the county to be a CPS agency, and the county is directly supervised and receives funding from the state for its

CPS functions. (*See* County PFOF, Dkt. 181, ¶¶ 7-8, 16-24, Nov. 10, 2016). Ms. Loertscher does not dispute this in her response brief. (Plf. Response Brief, Dkt. 200, p. 32-33).

<u>**CONCLUSION**</u>

For the reasons provided herein and in their initial filings, Defendant Taylor County respectfully requests an Order dismissing all claims against it with prejudice.

Dated this 22nd day of December, 2016.

**LEIB KNOTT GAYNOR LLC**

By: *s/ Douglas S. Knott*
Douglas S. Knott, SBN 1001600
Ryan M. Wiesner, SBN 1090647
Attorneys for Defendant Taylor County
219 N. Milwaukee Street, Suite 710
Milwaukee, WI 53202
Telephone (414) 276-2102
Fax (414) 276-2140
Email   dknott@lkglaw.net
          rwiesner@lkglaw.net