# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

---

**TAMARA M. LOERTSCHER**,

        Plaintiff,

    v.

**BRAD D. SCHIMEL**, *et al.*,

        Defendants.

Case No. 14-cv-870

---

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ................................................................................................................ 1

I.    THE ACT IS VOID FOR VAGUENESS .......................................................... 2

II.   THE ACT VIOLATES THE SUBSTANTIVE DUE PROCESS RIGHTS OF WISCONSIN WOMEN ................................................................................ 4

    A.    The right to freedom from physical restraint ............................................ 5

    B.    The right to freedom from forced treatment .............................................. 9

    C.    The right to continue or terminate a pregnancy ..................................... 11

    D.    The right to one's care and control of her own children .......................... 13

III.  THE STATE'S PURPORTED INTEREST IN FETAL HEALTH DOES NOT JUSTIFY THE ACT'S CONSTITUTIONAL DEPRIVATIONS ............. 14

    A.    State Defendants have not shown a compelling interest in fetal health .................................................................................................. 15

    B.    The Act undermines fetal health by ignoring or undermining maternal health ..................................................................................... 16

IV.  THE ACT IS UNCONSTITUTIONAL UNDER THE EQUAL PROTECTION CLAUSE ............................................................................... 19

V.   THE ACT IS UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT ................................................................................................ 22

CONCLUSION ................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L.A. v. W. Valley City,*
26 F.3d 989 (10th Cir. 1994) ....................................................................22

*Bray v. Alexandria Women's Health Clinic,*
506 U.S. 263 (1993) ...................................................................................21

*Brokaw v. Mercer Cty.,*
235 F.3d 1000 (7th Cir. 2000) ..............................................................14, 16

*Cleveland Bd. of Educ. v. LaFleur,*
414 U.S. 632 (1974) ...................................................................................12

*Coates v. City of Cincinnati,*
402 U.S. 611 (1971) .....................................................................................3

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health,*
497 U.S. 261 (1990) .....................................................................................9

*Daubert v. Merrell Dow Pharm., Inc.,*
43 F.3d 1311 (9th Cir.1995) .......................................................................18

*Denius v. Dunlap,*
209 F.3d 944 (7th Cir. 2000) ......................................................................22

*Doe v. City of Albuquerque,*
667 F.3d 1111 (10th Cir. 2012) ...................................................................1

*E.C. v. Sherman,*
No. 05-0726-CV-C-SOW, 2006 WL 6358376 (W.D. Mo. Aug. 4, 2006) .............5

*FCC v. Fox Television Stations,*
132 S. Ct. 2307 (2012) .................................................................................2

*Ferguson v. City of Charleston,*
532 U.S. 67 (2001) ................................................................................22, 23

*Foucha v. Loiusiana,*
504 U.S. 71 (1992) ................................................................................5, 6, 7

*Geduldig v. Aiello,*
417 U.S. 484 (1974) ...................................................................................21

*In re A.C.,*
573 A.2d 1235 (D.C.1990) ..........................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

*In re Baby Boy Doe,*
632 N.E.2d 326 (Ill. App. Ct. 1994) .......................................................................10

*In re Fetus Brown,*
689 N.E.2d 397 (Ill. App. Ct. 1997) .......................................................................10

*Int'l Union v. Johnson Controls,*
499 U.S. 187 (1991) ...............................................................................................15

*Jane L. v. Bangerter,*
794 F. Supp. 1528 (D. Utah 1992) ..........................................................................21

*Jefferson v. Griffin Spalding Cty. Hosp. Auth.,*
274 S.E.2d 457 (Ga. 1981)......................................................................................10

*Kansas v. Hendricks,*
521 U.S. 346 (1997)...................................................................................................8

*Karlin v. Foust,*
188 F.3d 446 (7th Cir. 1999) .....................................................................................1

*Moore v. East Cleveland,*
431 U.S. 494 (1977)................................................................................................15

*Pemberton v. Tallahassee Mem'l Reg'l Med. Ctr., Inc.,*
66 F. Supp. 2d 1247 (N.D. Fla. 1999)....................................................................10

*Planned Parenthood of SE Pa. v. Casey,*
505 U.S. 833 (1992).........................................................................................11, 16

*Reno v. Flores,*
507 U.S. 292 (1993) (O'Connor, J., concurring) .................................................7, 10

*Tucson Woman's Clinic v. Eden,*
379 F.3d 531 (9th Cir. 2004) ..................................................................................21

*United States v. Salerno,*
481 U.S. 739 (1987)...................................................................................................7

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
455 U.S. 489 (1982)...................................................................................................2

*Washington v. Glucksberg,*
521 U.S. 702 (1997)...............................................................................................9, 10

# TABLE OF AUTHORITIES

**Page(s)**

*Whole Woman's Health v. Hellerstedt*,
136 S. Ct. 2292 (2016)..................................................................................13

*Zablocki v. Redhail*,
434 U.S. 374 (1978)......................................................................................19

*Zinermon v. Burch*,
494 U.S. 113 (1990)........................................................................................7

**STATUTES**

Wis. Stat. § 48.02..........................................................................................10, 11

Wis. Stat. § 48.133....................................................................................6, 10, 13

Wis. Stat. § 48.193.......................................................................................6, 22

Wis. Stat. § 48.205..........................................................................................20

Wis. Stat. § 48.207............................................................................................5

Wis. Stat. § 48.213............................................................................................9

Wis. Stat. § 48.23............................................................................................22

Wis. Stat. § 48.235......................................................................................11, 14

Wis. Stat § 48.347............................................................................................11

Wis. Stat. § 48.415............................................................................................14

Wis. Stat. § 48.981............................................................................................23

Wis. Stat. § 146.82............................................................................................23

Wis. Stat. § 146.0255........................................................................................20

Wis. Stat. § 51.01 *et seq.*..................................................................................19

**INTRODUCTION**

In her summary judgment motion, Ms. Loertscher described her own terrible experiences under 1997 Wisconsin Act 292 ("the Act") and explained how, on its face, the Act may subject an adult woman alleged to have consumed alcohol or drugs during pregnancy to the deprivation of her fundamental rights through confidential juvenile court proceedings. She has shown that the Act is unconstitutional on its face because it contains vague and ill-defined standards that permit arbitrary enforcement by local officials and because the Act deprives Wisconsin women of fundamental rights, including the right to physical liberty and the right to autonomy regarding medical treatment, abortion, and family issues. The Act, which permits involuntary detention and forced medical treatment, violates these rights without any compelling governmental interest or narrow tailoring, and it also violates the Equal Protection Clause and the Fourth Amendment.

State Defendants assert that, regardless of these allegations, Ms. Loertscher's facial challenge fails unless she can "show that the Act cannot be constitutionally applied to anyone." State Opp. at 1. This is not accurate for Ms. Loertscher's challenge, and even if it were, she meets that standard here.[1] State Defendants insist that the Act is not facially invalid because, in some cases, it "simply gives child protection workers the ability to receive reports of unborn child abuse, investigate them, and engage expectant mothers in voluntary services." *Id* at 2. This benign and sanguine description is belied by the record in this case, including Ms. Loertscher's own experiences. More importantly, the nature of Ms. Loertscher's challenge means that the Act *is* being "unconstitutionally applied" to everyone. Even if certain county officials choose to use the Act to offer helpful, voluntary services, they are still acting under unconstitutionally vague provisions that permit *other* county officials to interpret the identical terms very differently. A Wisconsin woman has no way of knowing whether her conduct will trigger the Act's provisions

---

[1] As noted in Ms. Loertscher's opening brief, Pl. Br. at 20, many courts hold that the "no set of circumstances test" for facial challenges does not apply in the context of a challenge involving vagueness or fundamental rights. *See, e.g.*, *Karlin v. Foust*, 188 F.3d 446, 465 n.7 (7th Cir. 1999) (noting that courts may strike down a statute as vague and facially invalid even if that statute is not impermissibly vague in all of its potential applications); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012) (noting that "the Supreme Court has repeatedly entertained facial challenges without engaging in this hypothetical exercise").

or which of those provisions a local government health care worker or social services official may choose to enforce. Similarly, even if some local officials apply the Act in an attempt to help, they are still acting under color of a state law that burdens fundamental rights and violates Equal Protection without a sufficient state interest or adequate limitation on its scope. The Act is therefore facially unconstitutional and should be enjoined.

## I.     THE ACT IS VOID FOR VAGUENESS

Ms. Loertscher's own summary judgment brief showed that the Act is unconstitutionally vague because it fails to provide individuals with sufficient notice of what conduct is prohibited, while simultaneously empowering officials with substantial, unfettered discretion that permits arbitrary enforcement. Pl. Br. at 22-25. State Defendants respond that the Act prescribes civil, not criminal, penalties and that the "Supreme Court is more tolerant" of civil statutes "because the consequences of imprecision are qualitatively less severe." State Opp. at 3 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). But courts also apply vagueness standards to civil statutes and have struck down vague civil laws and regulations on those grounds. *E.g.*, *FCC v. Fox Television Stations*, 132 S. Ct. 2307, 2317 (2012) (striking down FCC policy as vague and noting the due process concerns protected by the vagueness doctrine). Moreover, *Hoffman Estates*, the case cited by State Defendants, emphasizes that "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." 455 U.S. at 499. Here, the statute implicates numerous constitutionally protected rights, including the right to personal liberty, to autonomy regarding medical and familial decisions, and Equal Protection under the law. *See* Pl. Br. at 29-38 (describing rights at stake).[2]

State Defendants next assert that the Act relies on "easily understood non-technical words and phrases." State Opp. at 3-4. As argued in Plaintiff's opposition to State Defendants' own

---

[2] *Hoffman Estates* also notes that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow," while "a scienter requirement may mitigate a law's vagueness." *Id*. at 498-99. Here, the law involves not economic regulations but mandatory confinement, involuntary medical procedures, and the loss of autonomy regarding intimate decisions. Nor does the law include any scienter element, leaving women subject to its consequences regardless of their individual "intent" concerning past or future conduct.

summary judgment motion, however, the fact that terms have dictionary definitions does not defeat a vagueness challenge. Pl. Opp. at 16. The Supreme Court has emphasized that even commonly understand words may be unconstitutionally vague if they fail to provide persons of ordinary intelligence with a standard by which to conform their conduct. *Coates v. City of Cincinnati*, 402 U.S. 611, 613-14 (1971) (striking down an ordinance prohibiting assemblies of three or more persons "in a manner annoying to persons passing by"). The relatively common words in the statute are impermissibly vague precisely because they can be understood and interpreted differently by different authorities, preventing any individual from knowing whether she may be subject to discretionary enforcement of the Act.

State Defendants also note that several of the experts retained in this case were able to produce a definition for many of the words at issue. State Opp. at 4-6. Much like the existence of dictionary definitions, however, the fact that each retained expert can articulate his or her own definition for a particular term does not mean that they are the same, nor that a person of ordinary intelligence can predict how a particular state official will interpret or enforce the term. Indeed, as State Defendants note, Plaintiff's expert Dr. Hartke has testified as an expert witness as to whether an individual patient lacked self-control, while State Defendants' experts testified that they understood what "substantial risk" and "habitually use" meant. State Opp. at 4-5. These experts, however, came to different conclusions as to whether Ms. Loertscher satisfied the criteria in question. *Compare* ECF No. 165 at 187:7-188:8 ("Knox Dep.") (concluding that Ms. Loertscher did exhibit habitual lack of self-control in the use of alcohol or controlled substances), *with* ECF No. 137 at 52:15-53:24 ("Hartke Dep.") (determining that Ms. Loertscher did not habitually lack self-control in the use of controlled substances exhibited to a severe degree). In other words, each individual official may believe fervently in a particular conception of these terms, but an individual citizen is left to guess what that conception is and whether her own conduct falls on the prohibited or permitted side of the line.

Similarly, Taylor County officials responded to deposition questions about the definitions of statutory terms, State Opp. at 6, but the tautologies offered do not provide any meaningful

guidance to Wisconsin women. *E.g.*, SDPFOF ¶¶ 215-16 (Clarkson defining "habitual lack of self-control" as "the person isn't able to control their use of the substance" and Daleiden defining "habitual" as "it happens often, it is habit, it is occurring often"). The Initial Assessment standards cited by State Defendants, even assuming they may be considered as part of the facial challenge, as they were adopted some ten years after the Act, give some indication of the factual information that can be considered but no guidance as to the threshold for different consequences under the Act. State Opp. at 7 (noting that the standards ask caseworkers to gather information regarding behavior that strikes the caseworker as important, as well as the "history of her substance abuse").

State Defendants admit that the Act "is not limited to expectant mothers who are drug-dependent or alcoholic." State Opp. at 7. By conceding that the Act is directed toward "an expectant mother's behavior, not her physical dependency," *id.*, State Defendants effectively concede that an individual official's interpretation of behavior, rather than any medically established concept such as dependency, is controlling. Likewise, State Defendants acknowledge that the Act "applies to all controlled substances, including common prescription medications, and legal substances such as alcohol," and the "standard for applying the Act" to legal substances is the "same as it is for . . . use of illegal drugs." *Id.* (internal quotations omitted). Thus, a statute permitting involuntary detention and forced medical treatment may be applied to consumption of legal prescription drugs and alcohol under the same vague standard of a "habitual lack of self-control to a severe degree," which depends entirely upon the beliefs of the official charged with interpretation. The Act should be struck down as unconstitutionally vague.

## II.     THE ACT VIOLATES THE SUBSTANTIVE DUE PROCESS RIGHTS OF WISCONSIN WOMEN

State Defendants also challenge Ms. Loertscher's substantive due process claims, challenging both the nature of the rights implicated and the application of strict scrutiny to those claims. As Ms. Loertscher has demonstrated in earlier briefing, the restriction on physical liberty, the imposition of involuntary medical treatment, the right to terminate or to continue a

pregnancy, and the right to familial integrity are all implicated by the Act, and strict scrutiny is warranted. Pl. Br. at 29-38.

### A.    The right to freedom from physical restraint

State Defendants first argue that the Act does not provide for incarcerating a pregnant woman because "taking an expectant mother into custody is not an arrest; the expectant mother is not held in jail." State Opp. at 9. However, the Act permits a pregnant woman to be "held in physical custody" in a variety of locations, including a residential inpatient facility, a hospital, and a doctor's office. Wis. Stat. § 48.207(1m).  In each of those situations, the pregnant woman is not permitted to leave state custody because of application of the Act. Courts routinely hold that detention of an individual under color of state law constitutes a deprivation of liberty that warrants constitutional protection. *Foucha v. Loiusiana*, 504 U.S. 71, 80 (1992). Furthermore, confinement by the state in a place other than jail implicates fundamental substantive due process rights. *E.g., E.C. v. Sherman,* No. 05-0726-CV-C-SOW, 2006 WL 6358376, at *3 (W.D. Mo. Aug. 4, 2006) (invalidating a means test for children in state foster care and noting that "the means test triggers strict scrutiny because it infringes on plaintiffs' fundamental right to be free from unnecessarily prolonged government confinement, and the law is not narrowly tailored to a compelling state interest").

State Defendants also note that Ms. Loertscher was "in jail only because she was held in contempt by state court" rather than directly as a result of the Act. State Opp. at 9. But the finding of contempt that led to her incarceration was based on the refusal to acquiesce in her confinement to a mandatory inpatient program that government officials imposed under the Act. (PFOF 116, 121, 165-66, 174-76, 202, 206). That is, she was forced to choose between the deprivation of her liberty in a mandatory inpatient facility with forced treatment and the deprivation of her liberty in jail for contempt of court. (PFOF 116, 121, 165-66, 174-76, 202, 206). Either way, the Act led directly to her confinement, as it could for others who find government-imposed treatment inappropriate or unnecessary. Ms. Loertscher does not challenge the court's civil contempt power in general nor base her substantive due process claim on the

state's general ability to exercise that power. Rather, she asserts that the Act subjects Wisconsin women to deprivation of their liberty and imposes punishment on them if they refuse to cooperate with that loss of liberty.

State Defendants next advance the unremarkable proposition that the state's interest in "community safety" may, "in appropriate circumstances," permit detention of an individual who poses a danger to that community. State Opp. at 9-10. Plaintiff does not dispute this point in general but the Act in no way involves "appropriate circumstances." First, State Defendants have not shown that the governmental interest in "community safety," which permits the detention of "potentially dangerous" resident immigrants and crime suspects in the cases cited by State Defendants, also applies to pregnant women. Second, the Act permits detention of a pregnant woman solely for the theoretical protection of her fertilized egg, embryo or fetus without regard for the woman, and it empowers local law enforcement officials and human services intake workers to detain a woman if they believe "reasonable grounds" exist to believe the Act's standards have been met. Wis. Stat. §§ 48.133, 48.193(1)(d)(2). This broad and unfettered discretion does not ensure that "appropriate circumstances" exist. Third, the Act applies to an individual's use of an undefined level of alcohol or controlled substances, which is a far cry from "potentially dangerous" individuals who pose an immediate threat to the public.

State Defendants assert that, despite the fundamental rights at stake, strict scrutiny is not appropriate because (1) the Supreme Court has not specified the standard of review that applies to civil confinement statutes and (2) the Supreme Court has upheld involuntary commitment statutes "provided the confinement takes place pursuant to proper procedures and evidentiary standards." State Opp. at 10-12. Neither of these points means that strict scrutiny does not apply. As a threshold matter, the Act is not properly described as a civil commitment statute; rather it makes adult women subject to a child protection law. Even viewed through the lens of an involuntary commitment law, however, the analysis fails. State Defendants first argue that *Foucha v. Louisiana*, 504 U.S. 71 (1992), which invalided the continued confinement of insanity detainees, did not expressly state that strict scrutiny applied to laws restricting the right to be free

from bodily restraint. State Opp. at 10. *Foucha*, however, strongly suggested that the Louisiana statute was unconstitutional because it neither furthered a compelling state interest nor was narrowly tailored to that interest—a strict scrutiny analysis. State Defendants point to a single reference to "reasonable relation," State Opp. at 10, which occurred in the discussion of procedural due process, but shortly thereafter the Court stressed that "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" 504 U.S. at 80 (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). The Court also emphasized that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause" and "that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Id*. The Court then contrasted the Louisiana statute with the pretrial detention statute at issue in *United States v. Salerno*, 481 U.S. 739, 749 (1987), in which the "government's interest in preventing crime by arrestees is both legitimate and compelling," and which was "narrowly focused on a particularly acute problem in which the government interests are overwhelming." *Foucha*, 504 U.S. at 81. The Louisiana statute, by contrast, was "not carefully limited" and did not require a showing "by clear and convincing evidence that he is demonstrably dangerous to the community." *Id*. As Justice O'Connor later remarked, citing both *Foucha* and *Salerno*, the "institutionalization of an adult by the government triggers heightened, substantive due process scrutiny. There must be a 'sufficiently compelling' governmental interest to justify such action." *Reno v. Flores*, 507 U.S. 292, 316 (1993) (O'Connor, J., concurring). Here, as in *Foucha*, strict scrutiny applies, and the Act neither serves a "sufficiently compelling interest" nor is "carefully limited" to that interest.

State Defendants next assert that "involuntary commitment statutes" are "subjected only to deferential review," State Opp. at 11, but none of the cases cited by State Defendants mean that strict scrutiny does not apply here. *Jackson v. Indiana* did not discuss the standard of review for the continued detention of an individual found incompetent to stand trial but simply remarked that "[*a]t the least*, due process requires that the nature and duration of commitment bear some

7

reasonable relation to the purpose for which the individual is committed." 406 U.S. 715, 738 (1972) (emphasis added); *see also id.* at 737 (declining to address the "broad questions" of "substantive constitutional limitations" on the power of the states to "commit persons found to be mentally ill"). Likewise, *O'Connor v. Donaldson*, which held that the state could not constitutionally confine a mental hospital patient when the jury had concluded there was no basis for confinement, did not discuss the standard of review and noted that the facts of that case did not present "difficult issues of constitutional law," such as "whether the State may compulsorily confine a non-dangerous, mentally ill individual for the purpose of treatment." 422 U.S. 563, 573 (1975). Nor did *Jones v. U.S.* expressly discuss the standard of review in holding that the state could confine an individual who voluntary sought and obtained a verdict of not guilty by reason of insanity. 463 U.S. 354, 367 (1983). Moreover, all three cases involved individuals previously determined to be mentally ill or incompetent in a full criminal or civil commitment proceeding. Here, by contrast, the Act permits the involuntary commitment to a treatment facility of a pregnant woman based on a vague determination that she "habitually lacks self-control." The need for heightened scrutiny is plain.

Finally, State Defendants rely on *Kansas v. Hendricks*, 521 U.S. 346 (1997), arguing that involuntary commitment statutes may be constitutional "provided the confinement takes place pursuant to proper procedures and evidentiary standards." *Hendricks*, however, involved individuals convicted or charged with a sexually violent offense coupled with a specific finding of future dangerousness and a finding of "mental abnormality" or "personality disorder." *Id*. at 357. No such findings are made under the Act, which relies only on vague terms interpreted by myriad officials without the protections of an earlier criminal or civil trial. State Defendants note that the Act calls for officials to "make every effort to release" a pregnant woman and for treatment decisions to be "appropriate for the expectant mother's needs and provided in the least restrictive environment consistent with those needs." State Opp. at 12-13. These general hortatory provisions provide no actual protection from enforcement of the Act's vague statutory standards, as the facts of Ms. Loertscher's confinement painfully illustrate. Similarly, the

requirement of a finding that a pregnant woman has refused treatment or services, State Opp. at 12, provides no constitutional protection when the "treatment" or "services" refused may themselves be involuntary confinement to an inpatient facility. Wis. Stat. Wis. Stat. § 48.213(3)(b); § 48.01(1)(am); (PFOF 116, 121) (describing Ms. Loertscher's options of either submitting to the inpatient treatment recommended by Taylor County or having the County take Ms. Loertscher into temporary physical custody).

### B.    The right to freedom from forced treatment

As Plaintiff also explained in her opening brief, Pl. Br. at 32-34, the Act infringes the liberty interests of women who are or may become pregnant by forcing them to submit to medical treatment directly or under threat of losing their physical liberty. State Defendants acknowledge a person's right to refuse unwanted medical treatment, but contend that the level of scrutiny applied to laws infringing this right is unclear. State Opp. at 13 (citing *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261 (1990) & *Washington v. Glucksberg*, 521 U.S. 702 (1997)). In *Cruzan*, the Court recognized a competent person's right to refuse lifesaving medical treatment but concluded that that did not necessarily mean that an *incompetent* person should possess the same right, since an incompetent person is unable to make an informed and voluntary choice to exercise that right. 497 U.S. 261, 277-79 (1990). Because the right to refuse medical treatment by an incompetent person must be exercised, if at all, by a surrogate, the Court concluded that Missouri's requirement that an incompetent person's wishes as to the withdrawal of life-sustaining medical treatment be proven by clear and convincing evidence did not violate the incompetent person's substantive due process rights. *Cruzan*, 497 U.S. at 280. Here, of course, the Act applies to competent women, fully capable of making their own health-care decisions, and the Court's approach in *Cruzan* would produce the opposite result. In a situation involving a competent person exercising her right to refuse treatment, the Court would likely apply strict scrutiny to state efforts to override that refusal. *Glucksberg*, 521 U.S. at 720-21 (providing that the Court has "assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment" and explaining that

the Fourteenth Amendment "forbids the government to infringe . . . 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993) (emphasis in original)).[3]

State Defendants also cite two cases where courts determined that a state's interest in protecting a fetus outweighed a pregnant woman's right to refuse medical treatment, State Opp. at 14, but those cases, from Florida and Georgia, concerned situations where the birth of the fetus was imminent and the evidence presented at a last-minute emergency hearing showed that vaginal birth would likely result in the death of the fetus. *See Pemberton v. Tallahassee Mem'l Reg'l Med. Ctr., Inc.*, 66 F. Supp. 2d 1247, 1251-54 (N.D. Fla. 1999); *Jefferson v. Griffin Spalding Cty. Hosp. Auth.*, 274 S.E.2d 457, 458 (Ga. 1981). Neither decision provides any precedent here, and as State Defendants recognize, State Opp. at 14, even in these extreme scenarios, other courts have held to the contrary.[4] Furthermore, unlike the cases cited by State Defendants, the Act at issue here infringes a woman's right to refuse unwanted medical treatment throughout her pregnancy and well before her fetus is viable. *See* Wis. Stat. § 48.133; Wis. Stat. § 48.02(19) ("Unborn child' means a human being from the time of fertilization to the time of birth."); *see also* Pl. Br. at 41-44; Pl. Opp. at 28-33; Amici Br. at 11-15.[5]

---

[3] State Defendants also observe that the Court applied a rational basis test in *Glucksberg*, State Opp. at 14. But the Court applied a rational basis test in *Glucksberg* because it concluded that the "right" at issue in *Glucksberg*—assistance in committing suicide—did not constitute a fundamental liberty interest protected by the Due Process Clause. *Glucksberg*, 521 U.S. at 728. The Court did *not* conclude that the Due Process Clause provides only rational basis protection against laws infringing the right to refuse unwanted medical treatment. *Glucksberg*, 521 U.S. at 720, 728.

[4] *See In re A.C.*, 573 A.2d 1235, 1237 (D.C.1990) (vacating a court-ordered cesarean surgery that was listed as a contributing factor to the mother's death on her death certificate and holding "without a competent refusal from A.C. to go forward with the surgery, and without a finding through substituted judgment that A.C. would not have consented to the surgery, it was error for the trial court to proceed to a balancing analysis, weighing the rights of A.C. against the interests of the state."); *In re Fetus Brown*, 689 N.E.2d 397, 405 (Ill. App. Ct. 1997) (overturning a court-ordered blood transfusion of a pregnant woman and holding that a state may not override a pregnant woman's competent treatment decision, including refusal of recommended invasive medical procedures, to potentially save life of a viable fetus); *In re Baby Boy Doe*, 632 N.E.2d 326 (Ill. App. Ct. 1994) (holding that courts may not balance whatever rights a fetus may have against the rights of a competent woman, whose choice to refuse medical treatment as invasive as a cesarean section must be honored).

[5] State Defendants also argue that because *Pemberton* and *Jefferson* involved surgery, which is "much more invasive than AODA treatment," State Opp. at 14, "the balance surely tips in favor of protecting the unborn child" when

Finally, State Defendants contend that the Act mandates involuntary treatment only as a "last resort." State Opp. at 15. But as Ms. Loertscher's case illustrates, the "last resort" standard vests tremendous discretion in local officials. Taylor County social worker Julie Clarkson informed Ms. Loertscher during their first conversation that if Ms. Loertscher did not agree to voluntarily receive inpatient drug treatment, Taylor County would likely request to take Ms. Loertscher into temporary physical custody. (PFOF 116, 121).[6] Further, while State Defendants acknowledge that a GAL is appointed for the fetus under the Act, they argue that the GAL makes only "recommendations" and that the court makes any eventual "determinations" regarding treatment. State Opp. 15. While that distinction may technically be correct, it does not cure the fact that the Act appoints an attorney to advocate solely on behalf of the purported interests of the fetus, Wis. Stat. § 48.235(1)(f) & 48.02(19), but does not provide counsel for the woman until much later in the process, and then only in limited circumstances. In fact, the Act empowers the GAL to take legal action against the pregnant woman in order to challenge her medical decisions and force her into treatment. Wis. Stat. § 48.235(3)(b)(2) & § 48.235(4m)(8). The mandatory and coercive interventions authorized by the Act violate a woman's constitutional right to decide for herself when and whether to seek medical help during her pregnancy. *See Planned Parenthood of SE Pa. v. Casey*, 505 U.S. 833, 851 (1992).

C.     **The right to continue or terminate a pregnancy.**

The Act also violates the fundamental right to make decisions about whether to carry a pregnancy to term or to seek an abortion. *See* Pl. Br. at 35-37; Pl. Opp. at 23-24. State Defendants argue that the cases cited by Plaintiff are inapposite because the Act does not "force" a pregnant woman to have an abortion. State Opp. at 16. While the Act may not compel a pregnant woman to have an abortion, that is not the relevant constitutional test. *See Casey*, 505 U.S. at 859 (explaining that the decision to carry a pregnancy to term, like the decision to

---

surgery is not involved. *Id*. Plaintiff respectfully submits that forced inpatient treatment for the duration of woman's pregnancy could certainly be experienced as "invasive" by many pregnant women. *See* Wis. Stat § 48.347.
[6] Similarly, although State Defendants claim that drug testing of pregnant women requires informed consent, no one at the Mayo Clinic informed Ms. Loertscher that her urine would be tested for drugs. PFOF 90.

terminate it, deserves protection from "unjustified government interference") (internal citations and quotations omitted). The Act imposes significant government interference on a woman's right to carry a child to term by subjecting her to a range of potential sanctions for choosing to continue her pregnancy. Pl. Br. at 35-36 (listing potential sanctions, including involuntary detention, isolation from friends and family, child abuse proceedings, and involuntary interventions described as treatment).

State Defendants contend that under *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974), the right to bear children without undue government interference is analyzed under a rational basis standard of review, State Opp. at 16, but that is not the correct standard here. First, while the Court in *LaFleur* did determine that the school systems' mandatory leave rules were arbitrary and bore no rational relationship to the state interest in preserving continuity of instruction, 414 U.S. at 643, the Court also concluded that the Fourteenth Amendment required the school board "to employ alternative administrative means, which do not so broadly infringe upon basic constitutional liberty, in support of their legitimate goals," *id.* at 647, which indicates a level of scrutiny greater than rational basis review. In any event, unlike the present case, *LaFleur* involved employment-related obligations under a school systems' maternity leave policy. *Id.* at 638-39. *LaFleur* correctly recognized that a woman has a right to be free from "unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child," *id.* at 640, but the case involved only potential employment-related consequences for impacted women. Even under the lower standard applied in *LaFleur*, however, the court found the intrusion on reproductive decision-making to be unconstitutional. Here, the consequences are much greater because the Act imposes severe restrictions on liberty, including by mandatory detention and forced treatment, and the standard of review must be higher than rational basis review.

In addition, State Defendants downplay the impact of the law on Wisconsin women, contending that the Act mandates "treatment" and "in no way discourages" pregnant women from carrying their pregnancy to term. State Opp. at 17. But the Act undeniably has a strong

punitive component, Pl. Opp. at 5-6, and it defies both common sense and medical research to conclude that the numerous sanctions provided by the Act "in no way discourage[]" pregnant women from carrying their pregnancy to term. ECF No. 153 ¶ 34 ("Hartke Report") (explaining that the National Perinatal Association's position paper on substance use among pregnant women specifically advises that "fear of prosecution can cause women to abort their pregnancies").

State Defendants also contend that the Act does not place a "substantial obstacle" in the path of a woman seeking to obtain an abortion because the Act places no greater restriction on a woman's right to an abortion than on her right to "receive some other medical treatment, such as an appendectomy." State Opp. at 17-18. Yet regardless of whether a law is "designed to strike at the right itself," State Opp. at 18, a state regulation imposes an "undue burden" on a woman's right to decide to have an abortion, and is therefore invalid, if the "*purpose or effect*" of the provision "*is to place a substantial obstacle* in the path of a woman seeking an abortion before the fetus attains viability." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016) (emphasis in original). Here, irrespective of the "purpose" of the Act, as explained in Plaintiff's affirmative brief, Pl. Br. at 36-37, the effect of the Act plainly creates substantial obstacles, including the appointment of a lawyer (in the form of a GAL) to advocate *solely* on behalf of the fetus. The Act therefore violates a woman's right to continue or terminate a pregnancy.

### D. The right to one's care and control of her own children

As explained in Plaintiff's affirmative brief, the Act also threatens a woman's fundamental liberty interest in caring for and controlling her children. Pl. Br. at 37-38. In response, State Defendants assert that the Act contains no provision for termination of parental rights based on an expectant mother's placement outside the home during pregnancy. State Opp. at 19. Yet the Act does expose the pregnant woman to risk of loss of custody of her newborn if the woman is suspected of meeting the criteria of section 48.133. *See* Wis. Stat. §§ 48. 347(7) & 48.345. Then, after birth, a woman whose punishment under the Act results in placement of her newborn outside the home risks permanent involuntary termination of her parental rights once the child has been removed for six months or longer, if the court concludes that the parent has

failed to meet the "conditions" established for the return of the child to the home and concludes there is a substantial likelihood that the parent will not meet those conditions within nine months. Wis. Stat. § 48.415(2)(a). The Act also authorizes the GAL appointed for the fetus to petition for termination of a woman's parental rights after birth. *See* Wis. Stat. §§ 48.235(4m)(3), (6). In fact, one of the few figures that the State tracks annually related to the Act is the number of children placed in out-of-home care after the child's birth as part of the CPS initial assessment of unborn child abuse. (PFOF 60 (citing DCF, Wisconsin Child Abuse and Neglect Annual Reports)). According to DCF, between 2005 and 2014, these placements have occurred in at least 152 instances. *Id.*

State Defendants cite *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1018 (7th Cir. 2000), in support of their argument that strict scrutiny does not apply. Yet *Brokaw* concluded that the right to familial relations *is* a fundamental right entitled to "heightened protection against government interference." *Id.* at 1018. And because that right is fundamental, it can only be limited where the state has a compelling governmental interest, such as "the protection of children." *Id.* at 1019 (internal quotations and citation omitted). Thus, to the extent *Brokaw* discusses "balancing," State Opp. at 20, it does so in the context of balancing the fundamental right to familial integrity against the compelling interest of protecting children. *Id.* Here, however, the State offers only its purported interest in "preventing *unborn* child abuse," State Opp. at 20 (emphasis added), which has never been held to be a compelling government interest. Because the State has not offered a compelling government interest sufficient to justify its infringement on the fundamental right to familial relations, the Act is unconstitutional.[7]

## III. THE STATE'S PURPORTED INTEREST IN FETAL HEALTH DOES NOT JUSTIFY THE ACT'S CONSTITUTIONAL DEPRIVATIONS

Because the Act violates a number of fundamental rights, this court must "examine carefully" whether it actually advances a compelling interest, and if so, whether the law is

---

[7] For the reasons outlined in Plaintiff's opposition brief, Pl. Opp. at 31-33, the justifications offered by State Defendants allegedly supporting the Act's "appropriate balance," are also without merit.

narrowly tailored. *Moore v. East Cleveland*, 431 U.S. 494, 499 (1977). State Defendants cannot meet their burden of demonstrating a compelling interest that justifies the Act's unconstitutional infringement of women's fundamental rights.

### A.    State Defendants have not shown a compelling interest in fetal health

State Defendants claim that the Act furthers a compelling state interest in protecting fetal health and describe certain negative health consequences that it claims could result from an unspecified level of alcohol or controlled substance use. State Opp. at 21-24. But, as Plaintiff has explained in prior briefing, the *risk* of potential health problems cannot serve as a compelling state interest that justifies selectively targeting pregnant women. Pl. Opp. at 25. Indeed, if such a state interest throughout pregnancy were recognized, there would be virtually no limits on the control the State could exercise over the lives of pregnant women. Pl. Opp. at 25; *Int'l Union v. Johnson Controls*, 499 U.S. 187, 205 (1991) (noting that "[e]mployment late in pregnancy often imposes risks on the unborn child"). Furthermore, State Defendants have not presented any authority recognizing a general interest in fetal "health" that is "compelling," nor any authority holding that any purported interest in fetal health can justify the Act's burden on the fundamental rights of Wisconsin women.

Moreover, State Defendants have not demonstrated that *all levels* of alcohol or substance use covered by the Act in fact cause harm or even create "substantial" risks to fetuses. The Act does not identify any medically precise threshold but instead makes *any* use potentially sufficient to trigger proceedings so long as it generates a "reasonable suspicion" of a "habitual lack of self-control" in any one of numerous actors empowered by the Act. State Defendants ignore the Act's potential application to *any* use of controlled substances and instead focus primarily on the purported effects of "abusive and heavy drinking" and "untreated" Neonatal Abstinence Syndrome ("NAS"). State Opp. at 22- 23. Yet even State Defendants acknowledge that low to moderate use of substances—levels of use that fall within the Act's ambit—do not necessarily result in fetal harm. State Opp. at 22 ("Individuals metabolize alcohol differently so the exact amount of alcohol that must be consumed to cause fetal damage is not known."). Even with

respect to alcohol, data from the Lifestyle During Pregnancy Study is reassuring to women who inadvertently expose their fetus to a low to moderate amount of alcohol prior to pregnancy recognition. ECF No. 158 ¶¶ 4-5 (Terplan Rebuttal Rep., May 19, 2016). Expert testimony also shows that NAS is treatable, Amici Br. at 26, and that given existing medical protocols, there is no reason that a medical facility should leave a baby showing signs of NAS untreated. ECF No. 155 ¶ 29 ("Kandall Report"). Further, though State Defendants contend otherwise, State Opp. at 21-22, expert testimony in this case confirms that the risks of harm from a pregnant woman's consumption of alcohol to a fetus and/or to the child subsequently born, as well as other controlled substances, including marijuana, opioids and methamphetamine, are varied and range from no risk to greater risk. *See* Pl. Opp. at 28-30 (citing expert testimony). It is simply not the case that any use of controlled substances leads to fetal harm or even a significant risk of harm.

Finally, State Defendants argue that Wisconsin has a compelling interest in protecting the well-being of a fetus "whether it has reached the stage of viability or not." State Opp. at 24-25. But the only authority cited by State Defendants involves potential abuse of existing children, which has no relevance here. *Id.* at 24 (citing *Brokaw*, 235 F.3d at 1019). Furthermore, although the Act is unconstitutional throughout a woman's pregnancy, the Supreme Court has specifically held that early in a pregnancy, "the State's interests are not strong enough to support a prohibition of abortion or the *imposition of a substantial obstacle* to the woman's effective right to elect the procedure." *Casey*, 505 U.S. at 846 (emphasis added). And, once applied, the Act imposes "substantial obstacles" in the path of women. *See* Pl. Br. at 35-37; Pl. Opp. at 23-24. The Act therefore violates *Casey*.

**B.    The Act undermines fetal health by ignoring or undermining maternal health**

As explained in detail in previous briefing, the Act not only fails to further the State's supposed interest in fetal health but actively undermines it by permitting the imposition of inappropriate and unwanted medical treatment on pregnant women and subjecting them to detention and incarceration without any regard for their health. Pl. Br. at 43-46; Pl. Opp. at 25-

27; 28-33; Amici Br. at 15-18. As amici explained, "empirical research finds that pregnant women who are threatened with criminal sanctions or mandated treatment are likely to be deterred from seeking care that is critical to the health of both the woman and fetus." Amici Br. at 16. Unsurprisingly, every leading medical and public health organization to address this issue has condemned punitive legal interventions as dangerous to both maternal and fetal health. Amici Br. at 16; Pl. Opp. at 26.

State Defendants respond that the Act provides "treatment" rather than "punishment" and that Plaintiff offers "no alternative approach." State Opp. at 25. First, whatever the theoretical role of treatment, the Act undeniably has a strong punitive component. Pl. Opp. at 5-6. Second, the State cites no authority requiring Plaintiff to devise an "alternative approach." But even if it did, several "alternative approaches" are available to the State, including the option of providing *voluntary* prenatal care and substance use treatment to women without the threat of arrest, detention, or loss of parental rights.

State Defendants cite evidence supporting the proposition that treatment for substance use during pregnancy can produce some positive results. State Opp. at 26-27. But Plaintiff does not claim that such treatment is never beneficial for a pregnant woman. Rather, she challenges the Act's punitive approaches, including *involuntary* treatment, as a self-defeating means of deterring alcohol and controlled substance use. *See* Pl. Br. at 43-46; Pl. Opp. at 25-27; 28-33.

State Defendants also cite a compilation of information prepared by the Wisconsin Department of Health Services that it claims shows that coerced drug and alcohol treatment in Wisconsin is effective, State Opp. at 27, yet the data demonstrates no such thing. As the deposition of the State's program evaluator revealed, the report merely represents a compilation of information about adults and juveniles referred to drug or alcohol treatment by the criminal justice system (characterized as involuntary) and otherwise (characterized as voluntary) and whether or not the individuals completed the number of days of treatment recommended or required. (Pl. Resp. to SDPFOF ¶ 186). Effectiveness is not measured in this report except by whether a person attended for the set number of days, *id.*, and there is no analysis or even a

separate category for women coerced or otherwise involved with treatment pursuant to Act 292. *Id*. Even setting aside the many methodological issues with this data, it is hardly surprising that persons who are threatened with incarceration will complete a treatment program more frequently than persons who are not subject to such a threat.[8]

State Defendants also tout the purported benefits of treatment for substance use during pregnancy by describing local practices in Milwaukee County for implementing the Act. State Opp. at 27-28. Notably, however, the Milwaukee County District Attorney's office does not pursue UCHIPs petitions, so the punitive nature of the Act is considerably lessened in Milwaukee County, where women do not fear threats of detention or involuntary out-of-home placement for seeking medical care. ECF No. 174 ¶ 18 (Decl. of Laura Baker) ("Though we could have referred 25 of these cases to the district attorney to file a UCHIPS petition [in the past year], no UCHIPS cases were initiated because the district attorney has chosen not to pursue UCHIPS in the cases that we referred.").

Moreover, State Defendants claim that there have been "many success stories" in Milwaukee County under the Act and cite one example of a woman who received treatment for heroin use and is now doing well. State Opp. at 28-29. But in that example the woman *agreed* to treatment; she was not forced into treatment against her will. *Id.* State Defendants contend that if the Act is struck down, the county would not have had the opportunity to engage that woman and make her aware of available resources, State Opp. at 29, but that of course is incorrect. Even if the Act is no longer in force, counties can still "engage" pregnant women when women voluntarily avail themselves of services offered by county health departments as well as by offering and funding education, outreach, and appropriate voluntary and confidential treatment.

Because the Act does not advance the interests of maternal, fetal, or child health, but in fact penalizes women who seek prenatal care, all in the name of addressing a problem that has

---

[8] Furthermore, nothing in the Quirke report qualifies as science that is admissible as expert opinion. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317-19 (9th Cir.1995) (holding that testimony concerning a drug given to pregnant women that allegedly caused birth defects was not admissible because it lacked a scientific basis).

been overstated—the harms wrought by drug and alcohol use by pregnant women—the Act is not narrowly tailored to serve any state interest. Pl. Opp. at 39-46. This Court should declare the Act unconstitutional and enjoin enforcement of the Act throughout the State of Wisconsin.

## IV. THE ACT IS UNCONSTITUTIONAL UNDER THE EQUAL PROTECTION CLAUSE

As shown in Ms. Loertscher's prior briefing, the Act violates the Equal Protection Clause (1) by depriving women in Wisconsin who may become pregnant of their fundamental constitutional rights without a compelling state interest or narrow tailoring; (2) by targeting women of reproductive age for specific prohibitions and sanctions, but not men of reproductive age; and (3) by denying women threatened with involuntary confinement and medical treatment under the Act the same procedural protections afforded to individuals threatened with civil commitment under Wisconsin's Mental Health Act, Wis. Stat. § 51.01 *et seq.*

State Defendants do not contest that a facial challenge alleging violation of the Equal Protection Clause with respect to a fundamental right triggers strict scrutiny review. *See Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."). Instead, State Defendants argue that the Act does not require strict scrutiny because it does not implicate fundamental rights. State Opp. at 30. As shown above, *supra* Section II, the Act does burden numerous fundamental rights, and strict scrutiny is warranted for the Equal Protection challenge as well as for the substantive due process challenge.

State Defendants respond to Ms. Loertscher's gender-based Equal Protection challenge by denying that the statute affects women who *may* become pregnant and insisting that the Act only targets expectant mothers. State Opp. at 30-31. This response fails to address Ms. Loertscher's argument that the Act imposes burdens on women of reproductive age that it does not impose on men. Pl. Br. at 47-48. State Defendants insist that the Act only applies to women who are actually pregnant because the standards require "confirmation of pregnancy to screen in

an unborn child abuse case" and "there is no test to determine whether a woman is merely carrying a fertilized egg." State Opp. at 30-31. Of course, given that the Act permits a pregnant woman to be held if an intake worker believes there is probable cause that the court has jurisdiction and that the woman meets the other criteria, Wis. Stat. § 48.205(1m), the only way for her to prove that the court lacks jurisdiction is to submit to a pregnancy test. Men of reproductive age are never subject to this potential jurisdiction and thus never have to submit to a medical test in order to prove they fall outside of it.

Moreover, the requirement of a positive pregnancy test does not mean that actions taken prior to that moment fall outside the purview of the Act. Indeed, alcohol and controlled substance use during pregnancy but prior to knowledge of that pregnancy, as well as alcohol and controlled substance use prior to pregnancy, may be used in support of a finding that a pregnant woman "habitually" lacks self-control. The statute permits a pregnant woman to be held based on an intake worker's "beliefs" about her "habitual lack of self-control in the use of alcohol beverages," but the statute does not restrict the "use of alcohol beverages" under consideration to the time of pregnancy. Wis. Stat. § 48.205(1m). Thus, in Ms. Loertscher's case, state actors cited the use of drugs and alcohol before she knew she was pregnant as part of the basis for imposing sanctions on her. (PFOF 234). The only way for a Wisconsin woman of reproductive age to ensure that her perfectly legal alcohol consumption or controlled substance use (including legal prescription medication) cannot be used against her should she later become pregnant is to restrict that legal behavior. The statute imposes no such restriction on men of reproductive age. A man of reproductive age is also free from the threat of mandatory testing following consumption of alcoholic beverages, even if a health worker suspects that he habitually lacks self-control. Wis. Stat. § 146.0255(2). As described in Ms. Loertscher's prior briefing, the differential treatment of similarly situated men and women triggers intermediate scrutiny, and the Act fails that test. Pl. Br. at 43-44; Pl. Opp. at 37-38.

State Defendants also assert that "unless a pregnancy-based classification is a pretext for gender discrimination, it is not a gender-based classification for equal protection purposes." State

Opp. at 31. In fact, as demonstrated in Ms. Loertscher's opening brief, Pl. Br. at 43-44, the Act does not advance any purported state interest in maternal, fetal, or child health, because threats of arrest, detention, and loss of parental rights interfere with the ability to seek candid medical advice and health care in general. Thus, the record could support a finding that the Act is pretextual because it does not advance the interest it purports to advance. Moreover, the cases cited by State Defendants for the application of rational basis review to pregnancy classification do not control here. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993) (considering whether anti-abortion views constituted invidiously discriminatory animus as part of a private conspiracy to violate civil rights); *Geduldig v. Aiello*, 417 U.S. 484 (1974) (considering the economic issue of coverage under a state's disability insurance system); *Jane L. v. Bangerter*, 794 F. Supp. 1528, 1533–34 (D. Utah 1992) (holding that Utah's law prohibiting elective abortions did not violate the state's Equal Protection Clause). State Defendants cite no case applying rational basis review to a statute imposing pregnancy-based discrimination on women that burdens physical liberty, the right to make decisions regarding medical treatment and family issues, or indeed any activity other than the availability of a discretionary economic benefit. *See, e.g.*, *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 548 (9th Cir. 2004) (recognizing that the denial of disability benefits for pregnant women was not gender-based discrimination but noting that "imposing a disability on pregnant women might nevertheless amount to sex discrimination under the equal protection clause"). Thus, even if the Equal Protection class at issue here were limited to pregnant women—which it is not—rational basis review would not be the appropriate standard.

Finally, State Defendants defend the procedural differences between the Act and Wisconsin's civil commitment statute. State Defendants argue that in both cases, counsel may be appointed "before a person may be involuntarily committed for mental health treatment" or "committed outside her home." State Opp. at 33. This, however, obscures the important differences in the timing of the availability of counsel: whereas attorneys are appointed immediately in civil commitment cases, counsel is not appointed under the Act until much later,

after a woman may have been held for some time. *See* Pl. Br. at 51. State Defendants assert that

counsel is available "at the point at which she is subject to a custody order that would place her

outside of her home," but under the Act a woman may be held prior to a custody order or ordered

held within her home. *See, e.g.*, Wis. Stat. §§ 48.193, 48.305, 48.23(2m). Similarly, State

Defendants argue that it is rational to appoint experts earlier in a civil commitment proceeding

because "expert testimony is necessary to prove that the person comes within the terms of the

statute," whereas the Act is triggered by a woman's "behavior," which does not require expert

testimony to establish. State Opp. at 35. This difference, however, only highlights the fact that

potentially severe consequences under the Act are triggered without any of the same medical

standards applicable to Wisconsin's civil commitment law. The Act permits involuntary

commitment of a pregnant woman to an inpatient facility based on non-expert beliefs about

whether her "behavior" falls within a vaguely defined category and without the benefit of

informed expert testimony concerning whether the mandatory "treatment" is appropriate or

harmful. There is no rational basis for this difference.

## V.     THE ACT IS UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT

As Plaintiff has described elsewhere, the Act violates a pregnant woman's reasonable

expectation of privacy and the Fourth Amendment by permitting non-consensual disclosure of

medical information to state law enforcement officials. Pl. Br. at 53-57; Pl. Opp. at 39-43. State

Defendants primarily respond that Plaintiff's reliance on *Ferguson v. City of Charleston,* 532

U.S. 67 (2001) is misplaced, State. Opp. at 37, but that is not so. As the Court in *Ferguson*

explained, pregnant women, like all patients, enjoy a "reasonable expectation" that the results of

medical tests will "not be shared with nonmedical personnel without her consent." *Id.* at 78.

*Ferguson* also reinforced the principle that the Fourth Amendment *does* protect patient medical

records from warrantless searches without probable cause or other justification. *See Ferguson*,

532 U.S. at 78; *see also Denius v. Dunlap*, 209 F.3d 944, 956 (7th Cir. 2000) (recognizing a

"substantial" privacy right in the confidentiality of medical information); *A.L.A. v. W. Valley*

*City*, 26 F.3d 989, 990 (10th Cir. 1994) ("There is no dispute that confidential medical

information is entitled to constitutional privacy protection."). It is reasonable for patients to expect that the results of their medical tests will not be shared with nonmedical personnel without their consent. *Ferguson,* 532 U.S. at 78. When state actors obtain a patient's test results without her consent in order to coerce her into unwanted treatment, those actors invade the patient's privacy, in violation of the Fourth Amendment. *Id*. at 78, 84. A state's interest in the health of fetuses cannot justify a departure from the rule that a nonconsensual search is unconstitutional if not authorized by a valid warrant. *Id.* at 70.

Though State Defendants describe the Act as "carefully structured," State Opp. at 39, they concede that the Act permits disclosure of a pregnant woman's private medical records to law enforcement officials without her consent. State Opp. at 39 (noting that the statute "permits disclosure of unborn child abuse reports to specified medical or social service professionals . . . certain family members[as well as to] courts, law enforcement, and prosecutors in the event of an investigation or prosecution.") (citing Wis. Stat. § 48.981(7)(a)); *id.* (explaining that medical records may be disclosed "without informed consent" in certain circumstances) (citing Wis. Stat. § 146.82(2)(a), 2(a)(11)). State Defendants argue that any disclosure is "strictly controlled," State Opp. at 39, but it is undisputed that the Act constructs a framework whereby medical providers may disclose a pregnant woman's confidential medical information to law enforcement and other state agencies if there is an indication of substance or alcohol use. Those state agencies may, in turn, use that information to enforce the broader statutory scheme, which may include forced inpatient treatment or detention.

As explained in Plaintiff's opposition brief, the Act is analogous to the program in *Ferguson*. Pl. Opp. at 41-42. Like *Ferguson*, the Act provides for the unconsented provision of private medical records to state law enforcement officials, not merely health officials, for the purpose of coercing women into what the state views as appropriate treatment programs. The Act therefore violates a pregnant woman's Fourth Amendment rights. *Ferguson,* 532 U.S. at 85.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion for Summary Judgment.

Dated this 22nd day of December, 2016.

Respectfully submitted,

**PERKINS COIE, LLP**

By:    */s/ Jeff J. Bowen*
Jeff J. Bowen
JBowen@perkinscoie.com
David J. Harth
dharth@perkinscoie.com
Freya K. Bowen
fbowen@perkinscoie.com
Joshua L. Kaul
jkaul@perkinscoie.com
David R. Pekarek Krohn
dpekarekkrohn@perkinscoie.com
Jesse J. Bair
JBair@perkinscoie.com
1 East Main Street, Suite 201
Madison, WI 53703
Telephone: (608) 663-7460
Facsimile: (608) 663-7499

**NATIONAL ADVOCATES FOR PREGNANT WOMEN**
Lynn M. Paltrow
lmp@advocatesforpregnantwomen.org
Nancy Rosenbloom
nlr@advocatesforpregnantwomen.org
875 Sixth Avenue, Suite 1807
New York, NY 10001
Telephone: (212) 255-9252
Facsimile: (212) 225-9253

**REPRODUCTIVE JUSTICE CLINIC**
Sarah E. Burns
sarah.burns@nyu.edu
Sarah Samuels Wheeler (*admission pending*)
sarah.s.wheeler@gmail.com
Alyson Zureick
zureicka@mercury.law.nyu.edu
Washington Square Legal Services, Inc.

NYU School of Law
245 Sullivan Street, 5th Floor
New York, New York 10012
Telephone: (212) 998-6464
Facsimile: (212) 995-4031

*Attorneys for the Plaintiff,*
*Tamara Loertscher*