IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TAMARA M. LOERTSCHER,

              Plaintiff,

v.

ELOISE ANDERSON, BRAD D. SCHIMEL, and
TAYLOR COUNTY,

              Defendants.

OPINION & ORDER

14-cv-870-jdp

---

Under 1997 Wisconsin Act 292, Wisconsin's juvenile courts may treat an unborn child of any gestational age as a child in need of protection or services if the "expectant mother's habitual lack of self-control in the use of alcohol beverages, controlled substances or controlled substance analogs, exhibited to a severe degree, [poses] a substantial risk" of harm to the unborn child. Wis. Stat. § 48.193.

Plaintiff Tamara M. Loertscher filed this case when she was an expectant mother subject to a state-court child in need of protection or services order issued under the authority of Wisconsin's Children's Code, as amended by Act 292. Following a report of unborn child abuse, Loertscher was detained for several days in a hospital, and later incarcerated for contempt of the juvenile court for 18 days, until she signed a consent decree requiring her to submit to drug monitoring and treatment by county authorities. She gave birth in January 2015. Her consent decree has since expired, and all proceedings against her have terminated. But Loertscher persists in her challenge to Act 292, which she contends is unconstitutional both facially and as applied to her.

Loertscher brings this case under 42 U.S.C. § 1983, which authorizes suits in federal court to redress violations of federal constitutional rights by state actors. Loertscher contends

that the Act is void for vagueness and that it violates her substantive due process rights, procedural due process rights, First Amendment rights, Fourth Amendment rights, and right to equal protection. She asks this court to declare Act 292 unconstitutional and to enjoin its enforcement. Loertscher also seeks money damages from Taylor County for its hand in enforcing Act 292 against her.

Now before the court are the parties' motions for summary judgment, which address each of the constitutional issues in the case. But the court will decide only two of these issues, which will dispose of this case.

First, the court concludes that the Act is void for vagueness, and it will grant Loertscher's motion for summary judgment on that basis. At the heart of the Act are two concepts: "habitual lack of self-control" and "substantial risk to the physical health of the unborn child." Both concepts are essential components of the jurisdictional and substantive standards in the Act. But, for reasons explained in this opinion, neither of these concepts is amenable to reasonably precise interpretation. Thus, the Act affords neither fair warning as to the conduct it prohibits nor reasonably precise standards for its enforcement. The court will enjoin enforcement of the Act statewide. Because Loertscher will get the injunctive relief she requests as a result of this ruling, the court need not reach the other difficult constitutional questions raised by the parties' motions. The Act's other potential constitutional problems may be ameliorated if its jurisdictional and substantive standards are drawn with adequate clarity.

Second, the court will grant summary judgment in favor of the County as to Loertscher's claim against it under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). Loertscher has failed to show that the manner in which the Act was enforced

against her can be traced to decisions by the County itself. As a consequence of this decision, Loertscher is not entitled to monetary damages.

## UNDISPUTED FACTS

Except where noted, the following facts are undisputed.

### A. The Act

Under Wisconsin's Children's Code, the Department of Children and Families and county social service departments are responsible for protecting children who are being abused or neglected. If the county social service department deems it necessary, such a child may be the subject of a petition concerning a child in need of protection or services—commonly known as a CHIPS petition—filed with the juvenile court of that county. If the court grants the CHIPS petition, protective services may be ordered for the child. In severe cases, the child may be removed from the parents' home and placed in protective custody.

In 1997, the Wisconsin Supreme Court held that Wisconsin's Children's Code did not authorize a juvenile court to exercise jurisdiction over an adult pregnant woman in connection with a CHIPS proceeding. *See State ex rel. Angela M.W. v. Kruzicki*, 209 Wis. 2d 112, 561 N.W.2d 729 (1997). And so the legislature set out to change that, by passing 1997 Wisconsin Act 292 (the Act).

### 1. Early reactions

Before the legislature passed the Act, the Wisconsin Legislative Council warned the legislature that extending the Act to "all stages of pregnancy" would render its constitutionality "*highly doubtful*." Dkt. 179-2, at 2 (emphasis in original). And the Wisconsin Division of Children and Family Services (now the Department of Children and Families),

the Division of Public Health's substance abuse bureau, and the City of Milwaukee Health Department opposed the Act. Specifically, the DCFS feared that the Act would scare women away from treatment and vital prenatal care, and the City of Milwaukee Health Department opposed the Act in light of "the serious potential [the Act] has for reducing the length and quality of prenatal care in this state, thereby negatively affecting the health of mothers and children." Dkt. 179-3, at 2. Both organizations were concerned that "a criminal justice approach to maternal and child health is not the best alternative, that it is destructive, and that readily available drug and alcohol treatment for expectant mothers would be preferable to threatening mothers with incarceration and loss of paternal rights." Dkt. 218, ¶ 35.

Regardless of the foregoing, the legislature passed the Act, and it went into effect in June 1998.

### 2. The specifics

The Act grants juvenile courts jurisdiction over "an unborn child" and the "expectant mother" when the mother "habitually lacks self-control in the use of alcohol beverages, controlled substances or controlled substance analogs, exhibited to a severe degree, to the extent that there is a substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered unless the expectant mother receives prompt and adequate treatment for that habitual lack of self-control." Wis. Stat. § 48.133. The Act extends various aspects of the Children's Code to unborn children in need of protection or services; the court will highlight a few. The Act allows those who enforce it to take a pregnant woman into custody. § 48.193. The Act allows those who enforce it to hold a pregnant woman in custody if there is "probable cause to believe that the adult expectant mother is within the jurisdiction of the court," and to believe that the woman "is refusing or

has refused to accept any alcohol or other drug abuse services offered to her or is not making or has not made a good faith effort to participate in any alcohol or other drug abuse services offered to her." § 48.205(1m). The court may appoint a guardian ad litem to "advocate for the best interests of" the unborn child and "[m]ake clear and specific recommendations to the court concerning the best interest of the . . . unborn child at every stage of the proceeding." § 48.235(3). The court may order a pregnant woman to submit to inpatient alcohol or drug treatment. § 48.347.

The Child Protective Services Access and Initial Assessment Standards (CPS Standards), drafted by the Department of Children and Families, guide child protective services caseworkers when they screen, investigate, and assess reports of child abuse. The standards provide that an agency that receives a report of unborn child abuse must document the report and make a screening decision—i.e., whether to dismiss the report or pursue it. The screening standard is whether there is reasonable suspicion that the woman is pregnant, that her behavior indicates "a habitual lack of self-control . . . in the use of alcohol, controlled substances or controlled substance analogs to a severe degree," and that the abuse could cause physical harm to the unborn child or a risk of serious harm to the child when born. Dkt. 169-1, at 23.

After a report is screened in, the case is assigned to a county initial assessment worker for investigation and assessment. The individual will gather the following information from the reporter:

> Verification of pregnancy or information to support that the woman or girl is pregnant and, if possible, what month of the pregnancy she is in.
>
> A description of the substances and quantity of substances she is alleged to be using.

A description of the behaviors that lead the reporter to believe that the expectant mother is demonstrating a habitual lack of control or that her substance abuse is exhibited to a severe degree.

The history of her substance abuse, treatment received and previous children who were born with the effects of alcohol or other drugs used during pregnancy.

A description of the prenatal care the expectant mother is receiving, if any, and the name of the doctor and medical clinic where she receives services.

A description of the expectant mother, highlighting individual functioning and her parenting practices, if other children are residing in the household.

*Id.* at 16.

## B. County enforcement of the Act

The CPS program is state supervised and county administered in 71 counties, including Taylor County. The CPS Standards are designed to control county-level decisions as employees navigate unborn CHIPS (UCHIPS) reports from beginning to end. Between 2005 and 2014, 3,326 reports of unborn child abuse were "screened-in" under the Act, and 467 of those reports were substantiated.

## C. Loertscher's experience

In 2014, Loertscher was 29 years old and living in Taylor County, Wisconsin. Loertscher had radiation treatment in her teens that left her without a functioning thyroid: she suffers from hypothyroidism and cannot produce thyroid hormones without medication. When she does not take her thyroid medication, Loertscher experiences severe depression and fatigue. Loertscher believed that her hypothyroidism would make it difficult, if not impossible, for her to get pregnant.

Loertscher was unemployed in February 2014, which left her unable to pay for her thyroid medication. And so she sank into depression. In late February or early March 2014, Loertscher began using methamphetamine two to three times per week to "help her get out of bed in the morning." Dkt. 218, ¶ 74. Loertscher was also using marijuana at that time.

### 1. Loertscher's pregnancy

In early July 2014, Loertscher suspected that she might be pregnant, took a home pregnancy test, and received what appeared to be a positive result. Yet Loertscher continued to use methamphetamine. Loertscher took a second pregnancy test on July 30, received a positive result, and "believed for the first time that she might actually be pregnant." *Id.* ¶ 84. (Defendants dispute that Loertscher did not believe that she was pregnant until then, pointing to Loertscher's admissions to medical staff that she had "cut back" her drug use after taking the first pregnancy test and that she knew that she was taking illicit drugs while pregnant.)

Two days later, Loertscher went to the Taylor County Department of Human Services (TCDHS) to confirm her pregnancy and to receive treatment for her thyroid condition. TCDHS personnel told Loertscher to go to the Eau Claire Mayo Clinic Hospital emergency room, and she did. When she arrived, Loertscher explained that she needed medical and psychiatric care, that she believed that she was pregnant but wanted confirmation, and that she wanted to make sure that her baby was healthy. Loertscher provided a urine sample, and testing revealed a positive pregnancy and "unconfirmed positives" for methamphetamine, amphetamine, and THC (marijuana). The emergency room doctor told Loertscher that drug use is bad for a baby, and Loertscher indicated that she wanted to stop. Loertscher wanted to have a healthy baby and to take care of herself.

That evening, Loertscher was voluntarily admitted to the Mayo Clinic Behavioral Health Unit. The next morning, Mayo Clinic personnel gave Loertscher the thyroid medication she needed. A psychiatrist informed her that her thyroid stimulating hormone levels were very high and that healthy thyroid function was important to ensure a healthy pregnancy. The psychiatrist asked Loertscher about her past drug use, and Loertscher stated that she had been self-medicating with marijuana and, primarily, methamphetamine. Loertscher emphasized that she had been using the drugs before she knew that she was pregnant. (Again, defendants dispute this point, pointing to medical records from that time that indicate that Loertscher knew she was pregnant as she continued to use drugs.)

Later that evening, Loertscher met with Jennifer Bantz, an obstetrician at Mayo. Bantz showed Loertscher ultrasound images of her fetus and told her that the baby looked fine. Bantz asked Loertscher about her alcohol use, and Loertscher explained that she drank a small amount of alcohol during her pregnancy, before she knew she was pregnant.

Loertscher's medical records from that time indicate that she "has polysubstance abuse," that she cut back her methamphetamine use to "perhaps once or two times a week" after "she found out that she was pregnant," and that she suffers from methamphetamine dependence, marijuana dependence, and alcohol abuse. Dkt. 184-7, at 36-37, 39.

## 2. Mayo reports Loertscher to the County

Two days later, on August 4, while Loertscher was still in the hospital, Corinna Everson, a Mayo social worker, contacted the TCDHS to report that Loertscher was three months pregnant, had tested positive for methamphetamine, amphetamine, and THC, had "used alcohol during her pregnancy as well, to the point of blacking out," and had confirmed that she had used drugs while pregnant. Dkt. 169-4, at 6. Everson reported that a Mayo

physician had stated that Loertscher's behavior was putting her fetus in serious danger of harm.

TCDHS employees "screened" the Mayo report that day. An intake worker screened in Loertscher's case and assigned it to TCDHS social worker Julie Clarkson. The intake worker did not contact a physician or review Loertscher's medical records when she decided that the County would investigate and assess the report.

Clarkson began her investigation by contacting Everson to gather more information. Clarkson's notes indicate that Loertscher had been diagnosed with "Major Depressive Disorder with Recurrent psychosis-NOS, meth dependence, marijuana dependence and alcohol abuse," although it is unclear where Clarkson got that information. *Id.* at 12. At 12:30 that afternoon—August 4, 2014—Clarkson, TCDHS Deputy Director Liza Daleiden, and Mike Sanderson (an Alcohol and Other Drug Abuse counselor) decided to recommend that Loertscher be placed in an inpatient treatment facility.

Clarkson continued her investigation to substantiate the alleged abuse. Applicable state guidelines from the Department of Children and Families instruct child protective services caseworkers to gather information regarding (1) "[t]he unborn child's fetal development as reported by a physician"; (2) "[t]he expectant mother's current use of substances and the impact it is having on her, the unborn child and, when applicable, other children in her care"; and (3) "[a]ny substance abuse history and treatment, criminal history, and, when applicable, any history of other children born with the effects of alcohol or other drugs used during pregnancy." Dkt. 179-8, at 5-6. Clarkson requested Loertscher's medical records from Mayo, which stated that she had "polysubstance abuse," that she used methamphetamine daily but decreased her use to "perhaps once or two times a week" after

she "found out that she was pregnant," and that she knew she was pregnant when she continued to use methamphetamine. Dkt. 184-7, at 36-37, 42. (Loertscher disputes this and maintains that she did not know, for sure, that she was pregnant when she was using.)

At 3:20 p.m., Clarkson called Loertscher and informed her of the open investigation. Clarkson told Loertscher that if she did not agree to voluntarily receive AODA treatment, the TCDHS may request to take Loertscher into temporary physical custody. Around 40 minutes later, County personnel had completed a temporary physical custody request.

That same day, Loertscher met with a hospital social worker. After, Loertscher told hospital staff that she did not want to speak with the social worker again, "because the social worker had been judgmental and unhelpful." Dkt. 218, ¶ 128. Loertscher then told staff that she wanted to leave. But a nursing manager told Loertscher that she could not leave because there was a "hold" on her. In the meantime, the County had appointed a guardian ad litem (GAL) to act on behalf of Loertscher's fetus.

### 3. Temporary physical custody hearing

On August 5, 2014, a Mayo social worker led Loertscher to a conference room at the hospital and told Loertscher that there was a judge on the phone for her. In fact, Loertscher was about to participate, by phone, in her temporary physical custody hearing. The State maintains that Everson had told Loertscher about the hearing earlier that morning; Loertscher maintains that she did not understand what was going on. Loertscher stated that she did not wish to speak without legal representation and that she did not want to take part in the proceeding until she had a lawyer. Then Loertscher left the room. The Taylor County court commissioner, TCDHS corporation counsel, the GAL, and other TCDHS personnel were present on the other end of the phone. The court commissioner determined that

Loertscher had waived her appearance and that the hearing would continue in her absence. The court took testimony from Bantz, the Mayo obstetrician, who later testified that she did not fully understand the purpose or implications of the hearing. Dkt. 149 (Bantz Dep. 49:18-23). Bantz testified that Loertscher was approximately 14 weeks pregnant and that she had reported using methamphetamine three times per week during her pregnancy, using marijuana throughout her pregnancy, and using alcohol a few times. Bantz testified about the effects of methamphetamine and marijuana use and alcohol consumption on pregnancy. Bantz disclaimed that she is "not an expert witness in this respect," but went on to testify that THC could "potentially" cause "cognitive deficits" and that methamphetamine tends to lead to newborns that are "smaller at the gestational age" and could cause cognitive problems later in life. Dkt. 1-2, at 17. Bantz stated that she believes "that if [Loertscher] continued with the methamphetamine use that potentially she's putting an increased risk for more complications in that child, potentially cognitive," and that continued use could "directly affect her ability to perhaps make good decisions, such as proper prenatal care and—and adequate care for herself, such as nutrition which would affect the growth of the baby." *Id.* at 18-19. Bantz was also concerned about Loertscher's hypothyroidism. She ultimately recommended inpatient drug treatment for Loertscher. At the close of the hearing, the court entered an order of temporary physical custody against Loertscher: the order required Loertscher to stay at Mayo until she was "cleared," at which time she would transfer to an inpatient drug treatment facility "until the program directors deem it appropriate to release her." Dkt. 1-3, at 4-5.

### 4. Loertscher leaves Mayo

But Loertscher was not resigned to her fate. On August 7, Mayo personnel told Loertscher that she would need to submit to a tuberculosis blood test before the inpatient treatment facility—the Fahrman Center—would admit her. She refused (although she did offer to submit to an alternative tuberculosis test that did not require a blood draw). Loertscher told Mayo personnel that she wanted to stay on her thyroid medication, get a prescription for prenatal vitamins, choose her own healthcare providers, and leave the hospital immediately. Mayo authorized her discharge. Her treating doctor told Clarkson that he did not feel that Loertscher was "an imminent danger to herself or others and that just because she has used in [t]he past does not mean she will again." Dkt. 179-20, at 7.

### 5. Contempt

Several days later, on August 11, 2014, the GAL representing Loertscher's fetus's interests filed a motion for remedial contempt against Loertscher in the Circuit Court for Taylor County, requesting that the court hold Loertscher in contempt pursuant to Wis. Stat. § 785.04 if she did not comply with the terms of the temporary physical custody order (i.e., inpatient drug treatment). Essentially, the GAL argued that Loertscher violated the order when she refused to submit to a tuberculosis test. The court scheduled a hearing on the motion for August 25.

Two days later, the County filed a "motion to take expectant mother into immediate custody." Dkt. 1-5. The court granted the motion the same day, stating that "[i]t is contrary to the unborn child's best interest for her mother to be released from custody and returned home due to the expectant mother's habitual use of controlled substances and her violation of the TPC Order." Dkt. 1-6, at 2. As a result, a police officer came to Loertscher's

grandparents' house, where she was staying, and told her family that he had come to arrest her pending a court date. Loertscher's grandfather assured the police officer that Loertscher would appear for the hearing, and the officer left without arresting her.

True to her word, Loertscher appeared at the August 25 hearing. The GAL, the County's corporation counsel, and two TCDHS social workers also appeared. Loertscher did not have counsel. Loertscher requested a different judge hear the motion, and the hearing was cut short, to be rescheduled for September 4. That evening, another police officer came to Loertscher's grandparents' house and stated that he had a warrant for her arrest. Loertscher's family explained that she was pregnant and stressed and did not need to be in jail, and the officer agreed to leave without arresting her.

On September 4, Loertscher again appeared, without counsel, in the Circuit Court for Taylor County. The GAL entered a plea on behalf of the fetus, admitting all of the allegations against Loertscher in the UCHIPS petition. Clarkson testified that Loertscher had not complied with the temporary physical custody order because she had refused to submit to a tuberculosis test, did not go to the inpatient treatment facility, and did not respond to the County's attempts to contact her. Then Loertscher testified, "I don't feel like I need treatment. Like I feel like I went to the hospital and sought treatment and then they violated my rights and all these people got this information that I feel they shouldn't have gotten. And I feel my whole stay there was made worse." Dkt. 1-8, at 19. At the conclusion of the hearing, the court set the UCHIPS petition for trial and found Loertscher in contempt. The court ordered her to either cooperate with the TCDHS and go to the inpatient treatment facility, or serve 30 days in jail.

### 6. Loertscher goes to jail

That evening, Loertscher declined the court-ordered inpatient drug treatment and surrendered to the Taylor County Jail. She spent 18 days incarcerated there. During that time, she did not receive any prenatal care, because the jail would not provide prenatal care if Loertscher did not submit to a pregnancy test to "confirm" her pregnancy. Loertscher experienced pain and cramping, and she feared that she may have a miscarriage. Loertscher repeatedly asked to see an obstetrician; instead, she saw the jail doctor, who was not an obstetrician. The jail doctor told Loertscher to take a pregnancy test. When she refused, jail personnel put her in solitary confinement.

Eventually Loertscher found a list of Taylor County public defense attorneys and called the number listed. A public defender was appointed to represent Loertscher.

### 7. Loertscher signs a consent decree

Pursuant to her attorney's advice, Loertscher signed a consent decree to purge her contempt and resolve the UCHIPS petition. The consent decree provided that Loertscher would be permitted to go home if she agreed to: (1) undergo an AODA assessment; (2) comply with any recommended treatment resulting from the assessment; (3) submit to drug testing on a weekly basis at her own expense; (4) sign any and all releases necessary to transfer drug test results to the TCDHS; and (5) sign any other releases the TCDHS requested. Dkt. 1-13. At a September 22, 2014 hearing, the court adopted the consent decree and made compliance with its terms sufficient to purge the earlier finding of contempt.

Loertscher complied with the terms of the consent decree. All further drug tests were negative.

### 8. Maltreatment finding

On September 29, the TCDHS informed Loertscher that it had administratively determined that she had committed "child maltreatment." The County eventually withdrew the finding, and the CPS Standards no longer require or allow an administrative maltreatment finding in unborn child abuse cases.

### 9. The baby

In January 2015, Loertscher delivered a healthy baby boy. The consent decree has since expired.

## D. Evidence about alcohol and drug use during pregnancy

The State adduces evidence of alcohol and other substance abuse by pregnant women, both in Wisconsin and nationwide. The court need not repeat each statistic here, but the court will note some highlights. Nationwide, 5.4 percent of pregnant women use illicit drugs during their pregnancies, and 9.4 percent use alcohol. In Wisconsin, approximately 1,600 women tested positive for alcohol, opioid, heroin, or marijuana at the time of delivery in 2014, compared to 600 cases in 2009. Babies born with neonatal abstinence syndrome (NAS)—which occurs when the baby is exposed to drugs in utero—usually stay at the hospital significantly longer than healthy babies, which costs significantly more money. The State has also adduced evidence that pregnant women with alcohol or other substance abuse issues have a hard time stopping use while pregnant. Experts offer opinions that discuss the severity of certain cases of and risks associated with alcohol and other drug exposure in utero, including physical and cognitive deficits and behavioral problems later in life. Some cases result in death. And, as the State sums up, "All together the effects of prenatal alcohol exposure create significant costs to individuals, families, schools, communities, and the

criminal justice system," and "[p]rior research has clearly demonstrated the harmful effects of alcohol and illicit drug use in pregnancy." Dkt. 224, ¶¶ 40, 91.

That said, Loertscher has adduced evidence that the risks of harm to an unborn child or child when born from the pregnant mother's consumption of alcohol or controlled substances varies from no risk to greater risk. The State concedes that "the amount of alcohol that must be consumed to cause fetal damage is not known and must be determined to some extent by individual variability." *Id.* ¶ 45.

Experts from both sides agree that this is an area plagued by at least some degree of medical and scientific uncertainty.

The State has also adduced evidence that drug treatment during pregnancy has improved participation in prenatal care and has reduced fetal complications associated with illicit drug use. Some experts opine that treatment is beneficial for women with substance use disorders, even if that treatment is recommended by child protective services. Others opine that women who use controlled substances while pregnant may not be able or willing to enter treatment on their own. Still other experts opine that substance abuse reporting during pregnancy may dissuade women from seeking prenatal care.

The reality is that both sides have adduced voluminous and, at times, conflicting evidence regarding the specific risks associated with alcohol and other substance abuse while pregnant and the efficacy of state-mandated treatment programs. But one thing remains undisputed: the experts cannot ascertain with any degree of medical certainty the precise levels of alcohol and controlled substance use that trigger a risk of serious danger to the unborn child. There appears to be a consensus that certain high levels of use pose a danger to fetal health; there are disputes about whether certain low levels of consumption pose any risk.

But all agree that medical science can draw no reasonably precise line where consumption levels transition from benign to seriously risky.

### E. Procedural history

Loertscher initiated this case on December 15, 2014. Loertscher's initial complaint asserted only a facial challenge to the Act. After an initial of flurry of requests for emergency injunctive relief, Dkt. 13 and Dkt. 28, the State moved to dismiss Loertscher's claims, contending that: (1) the court must abstain from taking up Loertscher's claims under *Younger v. Harris*, 401 U.S. 37 (1971); (2) Loertscher's claims were moot because the state proceedings against her had terminated; and (3) Loertscher had failed to state a claim upon which relief could be granted. The court denied the motions. Dkt. 61. Loertscher then amended her complaint to add an as-applied challenge and damages claims against Taylor County and three of its employees, Amber Fallos, Liza Daleiden, and Julie Clarkson. Dkt. 66. The State moved to dismiss a third time, citing mootness, and the County defendants moved to dismiss, citing qualified immunity and failure to state a *Monell* claim. Dkt. 68 and Dkt. 83. The court denied the motions to dismiss for the most part, but it dismissed Loertscher's claims against the individual County defendants because they were entitled to qualified immunity. Dkt. 118. And so Loertscher's facial and as-applied challenges to the Act and her *Monell* claim against the County remain.[1]

---

[1] The parties agreed to dismiss Loertscher's claims against Fallos, Daleiden, and Clarkson in their official capacities. Dkt. 145.

ANALYSIS

All parties move for summary judgment. Loertscher moves for summary judgment on her facial challenge; the State moves for summary judgment on Loertscher's facial challenge and her as-applied challenge; and the County moves for summary judgment on Loertscher's *Monell* claim.

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When, as here, the parties have filed cross-motions for summary judgment, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If either party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment against that party is appropriate. *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) (quoting *Tatalovich v. City of Superior*, 904 F.2d 1135, 1139 (7th Cir. 1990)). "As with any summary judgment motion, this [c]ourt reviews these cross-motions 'construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party.'" *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).

Loertscher mounts a number of constitutional attacks against the Act, contending that it violates substantive due process, procedural due process, equal protection, and the Fourth Amendment, and that the Act is void for vagueness.[2] As explained in the introduction, the court will reach two issues: Loertscher's claim that the statute is void for vagueness, and her claim that the County is liable for the violation of her constitutional rights.

## A. Void for vagueness

### 1. The standard

Due process requires that a law clearly define its prohibitions. *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). The required clarity serves two purposes. First, a statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108. Put simply, statutes must provide "fair warning." *Id.* Second, a statute must provide "explicit standards for those who apply them." *Id.* "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108-09. A statute is unconstitutionally vague if it fails to provide either fair notice or standards for fair enforcement. But "the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine— the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).

---

[2] Loertscher includes a First Amendment claim in her amended complaint, but she appears to have abandoned that claim.

Due process does not require mathematical precision; a statute may impose an imprecise yet comprehensible standard. *See Grayned*, 408 U.S. at 110. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Courts tend to be more lenient in evaluating civil statutes, "because the consequences of imprecision are qualitatively less severe." *Id.* at 499. But when a constitutional right is at stake, the court must apply a "more stringent vagueness test." *Karlin*, 188 F.3d at 458.

The State contends that because the Act is a civil statute, the court's vagueness examination should be less exacting. But this is too simplistic a view. Although the Act is nominally a civil statute and does not impose criminal liability, its consequences are nearly equivalent to criminal sanctions: a woman subject to the Act may be involuntarily detained for treatment, as Loertscher's own case shows.

Also contrary to the State's contention, the Act plainly implicates constitutional rights, particularly the right to be free from physical restraint. *See Washington v. Glucksberg*, 521 U.S. 702, 719 (1997); *Foucha v. Louisiana*, 504 U.S. 71, 80, 86 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action," and "[f]reedom from physical restraint [is] a fundamental right."). Restraint under the Act is not criminal incarceration. But "[a] person's core liberty interest is also implicated when she is confined in a prison, a mental hospital, or some other form of custodial institution, even if the conditions of confinement are liberal. This is clear beyond cavil, at least where adults are concerned." *Reno v. Flores*, 507 U.S. 292, 315-16 (1993) (O'Connor, J., concurring).

The Act implicates a second constitutional right: the right to be free from coerced medical treatment. *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (holding that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); *see also Glucksberg*, 521 U.S. at 720 (citing *Cruzan* and stating that "[w]e have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment"). "Because any medical procedure implicates an individual's liberty interests in personal privacy and bodily integrity, the Supreme Court has indicated that there is 'a general liberty interest in refusing medical treatment.'" *United States v. Husband*, 226 F.3d 626, 632 (7th Cir. 2000) (quoting *Cruzan*, 497 U.S. at 278). The Act implicates that liberty interest because its enforcers may seek, and the juvenile court may order, that a pregnant woman submit to involuntary treatment. *See* Wis. Stat. §§ 48.01(am) (a pregnant woman may be "ordered to receive treatment, including inpatient treatment, for [her] habitual lack of self-control"); 48.235(3)(b)2 (a GAL, on behalf of and in the best interests of the unborn child, may "[m]ake clear and specific recommendations to the court concerning the best interest of the . . . unborn child at every stage of the proceeding"); 48.347 (a judge may order a pregnant woman to submit to a "care and treatment plan," which may include "special treatment or care" or "alcohol or drug treatment"). The State concedes that the Act provides for involuntary treatment, even if it is supposed to be a last resort. Dkt. 189, at 17.

Although Loertscher seeks facial relief, "[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975). So the court must consider Loertscher's claim with an eye towards her facts, "for '[a] plaintiff

who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (quoting *Hoffman Estates*, 455 U.S. at 495). This requirement is, in effect, a sort of standing: if a plaintiff clearly falls within the challenged statute, she cannot secure relief by relying on the statute's application to someone else or to purely hypothetical examples. *See Hoffman Estates*, 455 U.S. at 495 n.7.

One last point before turning to the Act itself. The Act cannot survive Loertscher's vagueness challenge simply because some imagined, extreme conduct would unequivocally fall within the Act under any definition of its terms. So it is not quite right to say that an act is void for vagueness only if it is vague in all applications, even though some cases have suggested so. That has been cleared up in *Johnson v. United States*: "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." 135 S. Ct. 2551, 2560-61 (2015). If analysis shows a statute to be vague, it is necessarily vague in all applications, even if one could posit some unproblematic prototypical cases. *Id*. at 2561.

The bottom line is that the Act, though civil, provides remedies more akin to criminal penalties than to economic regulations. And the Act implicates fundamental constitutional rights. Thus, the Act warrants a stringent vagueness analysis that cannot be overcome by positing extreme cases. And, with these principles in mind, we turn to the Act.

## 2. The Act

The Act's critical language appears in the section that articulates the circumstances under which a juvenile court may assert jurisdiction over a pregnant woman and her unborn child[3]:

> The court has exclusive original jurisdiction over an unborn child alleged to be in need of protection or services which can be ordered by the court whose expectant mother habitually lacks self-control in the use of alcohol beverages, controlled substances or controlled substance analogs, exhibited to a severe degree, to the extent that there is a substantial risk that the physical health of the unborn child, and of the child when born, will be seriously affected or endangered unless the expectant mother receives prompt and adequate treatment for that habitual lack of self-control. The court also has exclusive original jurisdiction over the expectant mother of an unborn child described in this section.

Wis. Stat. § 48.133. Elements of the jurisdictional standard also appear throughout the Act as the *substantive* standard that the juvenile court applies when ordering remedies under the Act. *See, e.g.*, §§ 48.08, 48.193(1)(c), 48.193(1)(d)2, 48.205(1m), 48.213, 48.347.

The State's main argument on vagueness is a simple one: the Act is not vague because the words used to establish jurisdiction over a pregnant woman "are all easily understood nontechnical words and phrases." Dkt. 189, at 5-6. And a law is not unconstitutionally vague just because it does not provide statutory definitions; under Wisconsin law, statutory terms get their ordinary meanings. Dkt. 167, at 56 (citing *State v. Ehlenfeldt*, 94 Wis. 2d 347, 288 N.W.2d 786, 790 (1980) (citing Wis. Stat. § 990.01(1))). To make this point, the State cites dictionary definitions of the material terms: habitually, severe, serious, affect, and endanger. *Id.* at 56-57. The State supplements the dictionary definitions with a couple of cases that

---

[3] An "unborn child" is statutorily defined as "a human being from the time of fertilization to the time of birth." Wis. Stat. § 48.02(19).

interpret "lack of self-control" to mean "serious difficulty in controlling [her] behavior," and "substantial risk" to mean a danger that is "[t]rue or real; not imaginary." *Id*. at 57-58.

The State is correct that there is no requirement that a statute set out special definitions for its terms; plain English may work just fine. But using non-technical words does not in itself avoid a vagueness problem. It's probably fair to say that every statute that has been held to be unconstitutionally vague used words that have dictionary definitions. Take the ordinance in *Coates v. City of Cincinnati*, which prohibited people from assembling in groups of three or more and acting "in a manner annoying to persons passing by." 402 U.S. 611, 611 (1971). The Court held that the term "annoying" is so inherently subjective that a prohibition of annoying behavior was unconstitutionally vague. *Id.* at 614. Everybody knows what "annoying" means—and its definition is in the dictionary—but that did not save the ordinance from vagueness.

The fundamental problem with the State's argument is apparent as soon as you look at the definitions it provides. "Habitually" means "done by habit," and habit means a "recurrent, often unconscious, pattern of behavior acquired through frequent repetition." Dkt. 167, at 56. "Affected" means "produce[s] an effect on" or "influence[s] [it] in some way." *Id.* at 57. The State's dictionary-definition approach is a festival of circularity, in which the statutory terms are simply replaced with synonyms that add no real meaning.

A closer review of the jurisdictional standard reveals that the Act suffers from several critical ambiguities. We will start by parsing the Act's jurisdictional standard into its major elements. The standard consists essentially of a two-part test. The expectant mother must:

1.  severely and habitually lack self-control in the use of alcohol, controlled substances, or controlled substance analogs; and the lack of self-control must

2. pose a substantial risk that the physical health of the child will be seriously affected or endangered.

The court will refer to the first prong as the "self-control" prong and to the second prong as the "health" prong.

The first ambiguity is in the self-control prong, arising from terms of degree that are not amenable to reasonably precise definition: severe and habitually. Presumably, these terms are intended to prevent enforcement of the Act against minimal users of alcohol or controlled substances. But where to draw the line? The State contends that its experts and social workers in the field can draw the line. But their answers are just as circular and standardless as the dictionary definitions. Taylor County social worker Clarkson could not offer a general definition of "severe," but methamphetamine was "reportedly very serious and severe," so apparently any use of that drug would be severe. Dkt. 159 (Clarkson Dep. 80:10-16). For Daleiden, "severe" meant use that "could endanger . . . the unborn child." Dkt. 157 (Daleiden Dep. 53:15-19). The State's expert David Wargowski, MD, says that "habitually used alcohol to a severe degree" means that "there was heavy alcohol exposure during the pregnancy." Dkt. 163 (Wargowski Dep. 88:24-89:8). So for him, "severe" means "heavy." None of these explanation attempts give the term "severe" a reasonably precise meaning.

"Habitually" is also a term of degree. Habitually means in some sense "recurrent," so it, too, poses a quantitative question: how often is often enough to be "habitual"? The State's answer, drawn from the deposition testimony of its expert Michael Porte, MD, is that it depends on the drug. Dr. Porte testified that, based on his recall of the literature and "studies," habitual use of marijuana is daily; for meth it would be two or three times per week; for alcohol it would be binge drinking. Dkt. 164 (Porte Dep. 106:10-22). But Dr. Porte acknowledged that his testimony on this subject was outside the scope of his expertise as a

neonatologist. And in any case, the social workers in Loertscher's case did not apply Dr. Porte's definition. For Daleiden, "habitual means that it happens often, it is [a] habit, it is occurring often." Dkt. 157 (Daleiden Dep. 53:9-10). Circular again.

This reveals a fundamental ambiguity in the self-control prong: the concept of "habitual lack of self-control." The Act could have phrased the first prong simply in terms of *use*, prohibiting some quantum of regular or extensive use of alcohol or controlled substances while pregnant. But instead, the standard is directed to the expectant mother's habitual lack of self-control when it comes to use. This introduces the possibility that the Act could be enforced against any drug- or alcohol-dependent woman who was pregnant, because her history of substance abuse could be invoked to demonstrate the requisite lack of self-control, regardless of whether she actually used controlled substances while pregnant. The State disavows this possibility, contending that the Act is directed solely at the behavior of expectant mothers, not at the mother's physical dependency on drugs or alcohol. Dkt. 189, at 9. But then why is the statutory language couched in terms of self-control rather than in terms of habitual use? This point proved critical in Loertscher's case, because she professed no intent to continue her drug and alcohol use once her pregnancy was confirmed. Her purported habitual lack of self-control was based on her history of modest drug and alcohol use, which she self-reported while seeking medical care.

Which raises another question: how would the Act deal with an expectant mother who does not believe that alcohol—or some other drug—is really dangerous to the unborn child, and on the basis of that belief, consciously chooses to drink or use drugs during her pregnancy? There would be no demonstrated lack of self-control in such a case. So under the terms of the Act, a defiant—as opposed to dependent—expectant mother would not be

subject to State control. But Loertscher, despite her good intentions, was somehow suspected of habitually lacking self-control and she was involuntarily detained for the good of her fetus. The point is that the conduct covered by the Act is fundamentally unclear.

The State does not squarely address this issue or really explain what it means to "habitually lack self-control." Instead, the State refers to the deposition testimony of Loertscher's expert, Kathy Hartke, MD. The State contends that Dr. Hartke testified that in two instances she had been able to determine whether an expectant mother "habitually lacks self-control" in the use of controlled substances. *Id.* at 7. But this is not a fair assessment of Dr. Hartke's testimony. Dr. Hartke testified that in two cases she had determined that the expectant mother did *not* habitually lack self-control. She has never determined that an expectant mother *did* habitually lack self-control. Dr. Hartke's previous *negative* conclusions provide no support for the notion that a qualified medical expert would understand and be able to apply the concept "habitual lack of self-control."

The second prong—the health prong—also suffers from ambiguities, beginning with the term "substantial risk." "Risk" is a probabilistic concept: it is itself a matter of degree. When it is modified by "substantial," we end up with a concept that is doubly indeterminate. Based on dictionary definitions, the State suggests that substantial simply means "real" as opposed to imaginary. But the State's expert, Dr. Porte, conceives of "substantial risk" in comparative terms. He contends that a "substantial risk" is a risk "well above that group that does not use these drugs prenatally." Dkt. 164 (Porte Dep. 109:15-17). Dr. Porte's definition includes another undefined term of degree, "well above." But more problematic is the fact that his report discusses the health effects of prenatal drug use, but nowhere does it *quantify*

the risk. Nor does he compare that risk to the baseline risks the children of non-drug users face.[4]

The concept of "substantial risk" here is closely analogous to one of the concepts that the Supreme Court found unconstitutionally vague in the Armed Career Criminal Act's residual clause. *Johnson*, 135 S. Ct. at 2558. The residual clause provided that a predicate offense included not only crimes that involved the use of force, but also any crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Id.* at 2557. One of the reasons the residual clause was unconstitutionally vague was that it "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id*. at 2558. The Act here suffers from the same problem: how much risk constitutes a substantial risk to the health of the child? The State has no meaningful answer, and the Act itself certainly does not provide one.

A more fundamental ambiguity lies at the heart of the health prong, which requires that the mother's lack of self-control pose a substantial risk that the health of the child *will be seriously affected or endangered*. The State offers three experts on the subject: Dr. Wargowski on fetal alcohol syndrome, Dr. Porte on the effects of street drugs on infants, and Barbara Knox, MD, who addresses both. All submit evidence that an expectant mother's use of alcohol and street drugs poses health risks to the unborn child, and they catalog the potential effects of drugs and alcohol, based on their review of the relevant literature and their own treatment of affected infants. Here's what's important to this case: none of the three can say what level of

---

[4] The research itself poses a problem here. The parties' submissions indicate that there is a correlation between drug use and poor fetal health, but that it is difficult to isolate the effect of the drug use, because drug-dependent mothers also tend to be poorer, have worse prenatal care, and less information about pregnancy and fetal health. *See, e.g.*, Dkt. 198, at 39 n.6, 40 n.7 and Dkt. 163 (Kandall Dep. 67:21-69:2).

drug or alcohol consumption poses a *substantial risk* of *serious* damage to the unborn child. Dr. Wargowski says that recent studies suggest that even one episode of binge drinking could adversely affect an unborn child. Dkt. 173-1, ¶ 12. And all agree that more and prolonged exposure is worse, and that no "safe" level of alcohol consumption has been established. Dr. Knox disputes the opinion of Loertscher's expert, Mishka Terplan, MD, that some level of "normal" alcohol consumption early in pregnancy poses a low risk to the unborn child. But the expert evidence here makes one thing abundantly clear: current medical science cannot tell us what level of drug or alcohol use will pose a substantial risk of serious damage to an unborn child.

In light of this uncertainty, many physicians take the cautious route and advise complete sobriety before and during pregnancy. And some women, likely because of serious drug or alcohol dependencies, will abuse substances throughout their pregnancies, exposing their unborn children to substantial risk. But no one can tell where, on the vast spectrum between these two poles, the substantial risk of serious fetal damage begins or ends.

So did the Act provide fair notice to Loertscher? It's worth reiterating that "[t]he due process clause . . . does not demand 'perfect clarity and precise guidance.'" *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). But a statute must provide a reasonably comprehensible standard. Both prongs of the Act's two-part test are fundamentally ambiguous. The concept of "habitual lack of self-control" is, at bottom, an undefined subjective determination. And, although danger to the unborn child is in some sense an objective consideration (though the Act does not make this clear), no one knows at what level drug or alcohol use will pose a risk to the unborn child. An expectant mother who does not maintain complete sobriety simply cannot know

when she would be subject to the Act. There is no way for her to know what type of behavior demonstrates a habitual lack of self-control to a severe degree in the eye of the enforcer, much less whether behavior *prior to pregnancy* may end up being sufficient to trigger the Act's control over her once she conceives.

Loertscher's case leaves the court—and her—to "guess at whether the rule applies to [her] conduct." *Brown v. Bd. of Educ. of Chi.*, 84 F. Supp. 3d 784, 791 (N.D. Ill. 2015) (citing *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991)), *aff'd*, 824 F.3d 713 (7th Cir. 2016). Nothing in the record indicates what behaviors were sufficient to demonstrate a habitual lack of self-control to a severe degree, or why. Loertscher herself expressed a willingness and an ability to stop her drug use for the duration of her pregnancy. And, significantly, it is unclear how her conduct created a "substantial risk" of serious endangerment to her unborn child. There was virtually no concrete evidence to substantiate the purported risk to the child. In fact, two experts disagree about whether Loertscher exhibited a habitual lack of self-control in the use of alcohol or controlled substances. *Compare* Dkt. 165 (Knox Dep. 187:7-188:8) *with* Dkt. 137 (Hartke Dep. 52:15-53:24). A reasonable person could not determine whether the amount of drug use that Loertscher engaged in, combined with her desire to stop in light of her pregnancy, would mean that she had exhibited, to a severe degree, a habitual lack of self-control in the use of alcohol or controlled substances and that she posed a substantial risk of seriously affecting her unborn child.

Does the Act provide meaningful standards for enforcement? Again the answer is "no." As the testimony of the social workers in the case demonstrates, enforcers have no meaningful definition of "habitual lack of self-control." In application, the self-control prong is largely reduced to "any amount of use that would endanger the child." Not only does that

ignore the statutory language, it leads to the fundamental ambiguity in the health prong, which is that no one knows what level of drug or alcohol use poses a risk to the child.

The State contends that the Department of Children and Families has developed a set of standards to guide county workers enforcing the Act: the CPS Standards. Dkt. 189, at 8-9 (citing Dkt. 169-1, at 16). The CPS Standards cover initial assessments for child protective services generally; the discussion of unborn child abuse spans only a couple of pages. The CPS Standards provide a list of six topics about which information should be gathered in cases of alleged unborn child abuse. For example, the case worker should provide:

> A description of the behaviors that lead the reporter to believe that the expectant mother is demonstrating a habitual lack of control or that her substance abuse is exhibited to a severe degree.

Dkt. 169-1, at 16. This is no standard; it simply tells the county worker to collect information on a general topic. Nothing in the CPS Standards clarifies the fundamental ambiguities in the Act.

Because the jurisdictional and substantive standards of the Act are fundamentally indeterminate, those who enforce the Act are free to do so on the basis of "nothing but their own preferences and beliefs." *See Karlin*, 188 F.3d at 465. This unfettered discretion is particularly dangerous here because the Act authorizes such a broad range of initial enforcers—including "[a]ny person authorized to provide . . . intake or dispositional services for the court under s. 48.067 or 48.069." Wis. Stat. § 48.08(3). Erratic enforcement, driven by the stigma attached to drug and alcohol use by expectant mothers, is all but ensured.

The Act did not provide for fair notice or fair enforcement in Loertscher's case. But "[u]nder Wisconsin law, before a court can conclude that a challenged statute is void for vagueness, it must first determine whether the statute can be 'construed so as to avoid

constitutional objections.'" *Karlin*, 188 F.3d at 474 (quoting *State v. Fry*, 131 Wis. 2d 153, 388 N.W.2d 565, 570 (1986)). That is, the court must determine whether the statute is "readily susceptible" to a narrower, constitutional construction. *Id.* (quoting *State v. Thiel*, 183 Wis. 2d 505, 515 N.W.2d 847, 858 (1994)). But the court will not bend over backwards to try to save the Act; "we must apply the Constitution to the law the state enacted and not attribute to the state a law we could have written to avoid the problem." *K-S Pharmacies, Inc. v. Am. Home Prods. Corp.*, 962 F.2d 728, 730 (7th Cir. 1992). This is not a case where "difficulty is found in determining whether certain marginal offenses fall within [a statute's] language." *Johnson*, 135 S. Ct. at 2576 (Alito, J., dissenting) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)). The two-part standard under the Act is fundamentally flawed. The Act is unconstitutionally vague, and the court will grant Loertscher the facial relief she seeks.

## B. Loertscher's *Monell* claim against the County

Loertscher also claims that the County violated her constitutional rights. But the County is liable under 42 U.S.C. § 1983 only if its employees' conduct and the resulting constitutional violation(s) can be traced back to County action. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). And this would require Loertscher to show that the alleged constitutional violation was "caused by: (1) an official policy adopted and promulgated by [the County's] officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). The County contends that Loertscher's rights were not violated pursuant to any County policy, and it moves for summary judgment on that basis.

The County is not liable merely because it enforces or implements state law. *Snyder v. King*, 745 F.3d 242, 247 (7th Cir. 2014) (colleting cases). But "a municipality engages in policy making when it determines to enforce a state law that authorizes it to perform certain actions but does not mandate that it do so." *Id.* (quoting *Vives v. City of New York*, 524 F.3d 346, 351 (2d Cir. 2008)). The question "is whether the municipality enforcing a state law has enough discretion in implementation to make the municipality 'responsible' for any constitutional violation that occurred." *N.N. ex rel. S.S. v. Madison Metro. Sch. Dist.*, 670 F. Supp. 2d 927, 936 (W.D. Wis. 2009).

So even when a state law is in play, as in this case, a plaintiff must identify a *municipal policy, practice, or custom* responsible for the alleged constitutional violation. It all comes back to *Monell*: "[t]he overarching questions in any case involving municipal liability under § 1983 are whether the unconstitutional act 'may fairly be said to represent official policy' of that municipality and whether the policy was the 'moving force' behind the violation." *Snyder*, 745 F.3d at 933 (quoting *Monell*, 436 U.S. at 694). "The plaintiff who wants a judgment against the municipality under that statute must be able to trace the action of the employees who actually injured him to a policy or other action of the municipality itself." *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998). Because Loertscher has not demonstrated that a County policy, practice, or custom came into play during her case, her *Monell* claim fails.

### 1. Official policy

Loertscher concedes that she is unable to identify any written County policy that governed the County's enforcement of the Act against her. But she contends that the record

"suggests" that the County acted against her pursuant to an official policy: a policy of pursuing the most extreme measures available under the Act.

Loertscher has not adduced any evidence of such a policy. She points to a Taylor County UCHIPS case from 2010 in which County employees (1) recommended inpatient treatment for the pregnant woman, and (2) determined that the woman had maltreated her unborn child. But that case and Loertscher's case do not evince an official County policy. Loertscher does little more than speculate that such a policy exists. The fact that County employees made "harsh" decisions (a qualitative call on Loertscher's part) on two separate occasions over the course of nearly 20 years since the Act's enactment hardly means that they made those decisions pursuant to County directive. No reasonable jury could find that County employees acted pursuant to an official County policy based on this evidence.

Loertscher also suggests that the County acted pursuant to official policies that it had developed for CHIPS proceedings. Dkt. 200, at 30. But Loertscher does not explain what these policies required or how they played a role in her case. The argument is underdeveloped and insufficient to raise a genuine dispute of material fact as to the existence of an unwritten County policy.

### 2. Widespread, well-settled practice or custom

Loertscher contends that, even if there is no official policy in place, the County has a practice or custom of "impos[ing] more severe sanctions that cause greater constitutional injury" under the Act. *Id.* at 8. To prevail on this theory, Loertscher must show both that there was a widespread, well-settled practice and that the County was deliberately indifferent to the practice's known or obvious constitutional consequences. "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take

appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303. And, critically, the practice "must be the *moving* force behind the constitutional violation." *Id.* at 306.

Beginning with the first element, the court considers whether Loertscher has identified and adduced evidence of a widespread and well-settled practice or custom. A practice is not a random event, and isolated acts by individual employees are not sufficient to establish a widespread practice. *Id.* at 303-04. A widespread practice is one "which, although unwritten, is so entrenched and well-known as to carry the force of policy." *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014) (quoting *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012)).

Loertscher falls short of demonstrating the existence of a widespread, well-settled County practice. Again, Loertscher points to her own case and the 2010 case, discussed above. But two examples of "severe sanctions" do not a widespread and well-settled practice make. The Seventh Circuit has not adopted "any bright-line rules defining a 'widespread custom or practice.'" *Thomas*, 604 F.3d at 303. But the complained-of conduct must have occurred more than once, if not more than three times. *Id.* ("[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' or even three." (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)). Two examples is simply not enough to show a widespread practice so entrenched and well known that it carries the force of a County policy.

Loertscher contends that the fact that County employees "acted promptly and deliberately" and "met frequently and coordinated their efforts" throughout Loertscher's case suggests the existence of a County practice or custom. Dkt. 200, at 8, 28. But Loertscher does not explain why coordinated "team" decisions show a County practice or custom. It is

just as likely that the County employees met to apply what they thought were *state* standards and policies, such as those suggested in the CPS Standards. On the record submitted at summary judgment, no reasonable jury could find that as of August 2014, there was a widespread and well-settled County practice of "impos[ing] more severe sanctions that cause greater constitutional injury" under the Act.

Even if Loertscher's two examples were sufficient to establish a widespread and well-settled practice, she must also adduce evidence sufficient to allow a reasonable jury to find that the County acted with deliberate indifference to her constitutional rights. In other words, Loertscher would have to show that "a repeated pattern of constitutional violations" made the deficiencies in the system "plainly obvious to the city policymakers." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)). "A plaintiff must show that municipal policymakers made a 'deliberate choice' among various alternatives and that the injury was caused by the policy." *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

Loertscher's weak showing on the existence of any widespread practice makes a showing of deliberate indifference particularly difficult. Loertscher has not adduced any evidence that County officials were aware, or should have been aware, that its employees were making extreme decisions in UCHIPS cases, much less that the decisions were causing constitutional violations. Under the best case scenario for Loertscher, by the time her case came up, there had been *one* constitutional violation caused by County enforcement of the Act. And that is certainly not enough to demonstrate deliberate indifference on the part of the County. *See Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1326

(7th Cir. 1993) ("[A] single isolated incident of wrongdoing by a non-policymaker is generally insufficient to establish municipal acquiescence in unconstitutional conduct."). And Loertscher adduces no evidence that the County was on notice that its 2010 enforcement of the Act was constitutionally suspect.

### 3. Absence of a County policy and insufficient training

Loertscher's last argument is that even if County employees did not act pursuant to a County policy, practice, or custom, the County is still on the hook for its *inaction*. Loertscher contends that the County did not institute any policies or training to guard against constitutional violations attributable to the Act's enforcement, and this inaction demonstrates deliberate indifference to the "significant constitutional dangers" posed by the Act. Dkt. 200, at 30.

Loertscher is correct that "the absence of a written policy does not wholly exempt a municipality from liability." *Cornfield*, 991 F.2d at 1326. But still, Loertscher must come up with evidence that the County was aware of its problem: "an allegation of a pattern or a series of incidents of unconstitutional conduct is required to withstand a motion to dismiss for a failure to make policy." *Id.* Similarly, "[a] municipality will be held liable for the violation of an individual's constitutional rights for failure to train adequately its officers only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact." *Jenkins*, 487 F.3d at 492. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton*, 489 U.S. at 389. It is not enough to show that the violation "could have been avoided if an officer had had better or more training." *Id.* at 391.

Loertscher contends that the problems with the Act were so plainly manifest that even without an established pattern of violations, the constitutional problems were "plainly obvious to the [county] policymakers." *Jenkins*, 487 F.3d at 492 (quoting *City of Canton*, 489 U.S. at 390 n.10). This is because, Loertscher argues, the Act provides for the detention of expectant mothers in a way that plainly implicates fundamental rights. Dkt. 200, at 30-33. The backlash against the Act at the time of its enactment made its potential problems obvious both to lawmakers and to the county officials who were expected to enforce it. Under these circumstances, the County was aware of the constitutional dangers of the Act, and was obligated to devise policies to ensure that its enforcement would be constitutional. The County should have developed "discrete policies or guidelines to govern action against pregnant women." *Id.* at 31.

Loertscher's argument fails for two reasons. First, the County was entitled to rely on the Act's presumption of constitutional validity, particularly because the Act had been on the books and unchallenged for 16 years by the time Loertscher's case came up. Second, the State provided instructions for enforcing the Act in its instructions for CHIPS enforcement, so the need for separate County policies was not apparent. And under the State's enforcement policies, an expectant mother is "screened in" for enforcement under the Act if there is *any* credible evidence to establish habitual lack of self-control or substantial risk to the health of the child. Dkt. 169-1, at 25. Aggressive enforcement is built into the state guidelines. Critically, the County was not required to adopt its own policies to avoid implementing the Act. "[M]unicipalities do not have to choose between following their own interpretation of the Constitution and putting themselves at 'war with state government.'" *Madison Metro.*, 670 F. Supp. 2d at 941 (quoting *Bethesda*, 154 F.3d at 718).

Ultimately, as the court explained in a previous order, "[t]he fact that Act 292 was valid at the time the county defendants enforced it means that they did not have to guess whether it was constitutional." Dkt. 118, at 15. "[N]o case law has placed defendants on notice that Act 292 may be unconstitutional." *Id.* at 16.

### 4. Conclusion

Loertscher is correct that County employees retain at least some discretion as they enforce the Act, and that certain conduct by County employees was *authorized* but not *required* under the Act. But the exercise of discretion by County employees as they enforced the Act against Loertscher does not mean that they made discretionary decisions *pursuant to municipal policy*. "[A] municipality cannot be held liable under § 1983 for efforts to implement a state mandate when the plaintiff cannot point to a separate policy choice made by the municipality." *Madison Metro.*, 670 F. Supp. 2d at 941.

Loertscher's *Monell* claim fails, and the court will grant the County's motion for summary judgment.

ORDER

IT IS ORDERED that:

1. Defendants Brad Schimel and Eloise Anderson's motion for summary judgment, Dkt. 166, is DENIED.

2. Plaintiff Tamara M. Loertscher's motion for summary judgment, Dkt. 176, is GRANTED. The State is enjoined from enforcing 1997 Wisconsin Act 292 statewide.

3. Defendant Taylor County's motion for summary judgment, Dkt. 180, is GRANTED.

4. Defendants Brad Schimel and Eloise Anderson's motion to compel, Dkt. 238, is DENIED as moot.

5. The clerk of court is directed to enter judgment in plaintiff's favor and against defendants Brad Schimel and Eloise Anderson on plaintiff's void for vagueness challenge. The clerk of court is directed to enter judgment in the County's favor on plaintiff's *Monell* claim. All remaining claims are dismissed.

Entered April 28, 2017.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge